UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                           :

UNITED STATES OF AMERICA         :

                            :

           - v. -              :      14 Cr. 68 (KBF)

                            :

ROSS ULBRICHT,              :
  a/k/a "Dread Pirate Roberts,"    :
  a/k/a "DPR,"                :
  a/k/a "Silk Road,"         :

                            :

         Defendant.         :

                            :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS THE INDICTMENT

PREET BHARARA
United States Attorney
Southern District of New York
One St. Andrew's Plaza
New York, New York 10007

SERRIN TURNER
      Assistant United States Attorney
      -Of Counsel-

## **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ...................................................................................... 1

BACKGROUND ........................................................................................................... 2

   A.   The Complaint ................................................................................................. 2

   B.   The Indictment ................................................................................................ 3

   C.   Ulbricht's Motion to Dismiss ......................................................................... 5

LEGAL STANDARD .................................................................................................... 6

ARGUMENT ................................................................................................................ 7

   A.   Count One Sufficiently Alleges a Narcotics Conspiracy ................................... 7

   B.   Count Two Sufficiently Alleges a Continuing Criminal Enterprise ................... 14

       1.   Count Two Sufficiently Alleges that Ulbricht Occupied a Position of Control ....... 15

       2.   Count Two Sufficiently Alleges a Continuing Series of Narcotics Violations ........ 18

   C.   Count Three Sufficiently Alleges a Computer Hacking Conspiracy ................. 22

   D.   Ulbricht's Remaining Challenges to Counts One Through Three Are Meritless ............. 25

       1.   There Is No Basis to Construe the Statutes at Issue Not to Apply to Ulbricht's Conduct ........... 26

       2.   The Statutes at Issue Are Neither Void for Vagueness Nor Overbroad ................. 29

   E.   Count Four Sufficiently Alleges a Money Laundering Conspiracy ................... 33

CONCLUSION ............................................................................................................ 39

# TABLE OF AUTHORITIES

**Cases**

*Apprendi v. New Jersey*, 530 U.S. 466 (2000) ............................................................. 20

*Ascentive, LLC v. Opinion Corp.*, 842 F. Supp. 2d 450 (E.D.N.Y. Dec. 13, 2011) .................... 27

*Callanan v. United States*, 364 U.S. 587 (1961) ........................................................ 26

*Cf. United States v. Gatien*, 18 Fed. App'x 37 (2d Cir. 2001) ........................................ 10

*Clark v. Martinez*, 543 U.S. 371, 381 (2005) ........................................................... 26

*Doe v. Bates*, 05 Civ. 91, 2006 WL 3813758 (E.D. Tex. Dec. 27, 2006) ................................. 29

*Garcia v. United States*, 01 Civ. 6234 (SWK), 2002 WL 562647
   (S.D.N.Y. Apr. 15, 2002) ................................................................. 9, 11, 34

*Murawski v. Pataki*, 514 F. Supp. 2d 577 (S.D.N.Y. 2007) .............................................. 27

*Parker v. Levy*, 417 U.S. 733 (1974) ................................................................... 32

*Richardson v. United States*, 526 U.S. 813 (1999) ..................................................... 19

*SEC v. Shavers*, 13 Civ. 416, 2013 WL 4028182 (E.D. Tex. Aug. 6, 2013) ............................... 36

*Taniguchi v. Kan Pacific Saipan, Ltd.*, 132 S.Ct. 1997 (2012) ........................................ 34

*U.S. v. Chavez*, 549 F.3d 119 (2d Cir. 2008) ........................................................... 8

*United States v. Al Kassar*, 660 F.3d 108 (2d Cir. 2011) .............................................. 38

*United States v. Alfonso*, 143 F.3d 772 (2d Cir. 1998) .............................................. 6, 22

*United States v. All Right, Title and Interest in Real Property and Appurtenances
   Thereto Known as 143-147 East 23rd Street*, 888 F. Supp. 580 (S.D.N.Y. 1995) ................. 10

*United States v. Anderson*, __ F.3d __, 2014 WL 814889 (2d Cir. Mar. 4, 2014) .................... 7, 12

*United States v. Apodaca*, 843 F.2d 421 (10th Cir. 1988) .............................................. 17

*United States v. Arditti*, 955 F.2d 331 (5th Cir. 1992) ............................................ 34, 36

*United States v. Benjamin*, 72 F. Supp. 2d 161 (W.D.N.Y. 1999) ..................................... 13, 21

*United States v. Burgos*, 94 F.3d 849 (4th Cir. 1996) .................................................. 8

*United States v. Chestaro*, 197 F.3d 600 (2d Cir. 1999) ............................................... 32

*United States v. Coffey*, 361 F. Supp. 2d 102 (E.D.N.Y.2005)........................................ 6

*United States v. Cole*, 423 F. App'x 452 (5th Cir. 2011) .............................................. 8

*United States v. Colon*, 884 F.2d 1550 (2d Cir. 1989)................................................. 13

*United States v. Cruz*, 785 F.2d 399 (2d Cir. 1986) ............................................. 16, 17

*United States v. D'Amelio*, 683 F.3d 412 (2d Cir.2012) ............................................... 6

*United States v. Day*, 700 F.3d 713 (4th Cir. 2012).......................................... 35, 37, 38

*United States v. Esdaille*, 769 F.2d 104 (2d Cir. 1985) ............................................. 13

*United States v. Farhane*, 634 F.3d 127 (2d Cir. 2011)............................................... 32

*United States v. Flaharty*, 295 F.3d 182 (2d Cir. 2002) ...................................... 18, 19, 20

*United States v. Franklin*, 09 Cr. 168 (RPP), 2011 WL 1311818 (S.D.N.Y. Apr. 1, 2011)......... 13

*United States v. Garcia–Torres*, 280 F.3d 1  (1st Cir. 2002)......................................... 9

*United States v. Goldberg*, 756 F.2d 949 (2d Cir. 1985) ............................................. 22

*United States v. Gonzalez*, 686 F.3d 122 (2012)................................................... 19, 20

*United States v. Gore*, 154 F.3d 34 (2d Cir. 1998) .................................................. 25

*United States v. Hysohion*, 448 F.2d 343 (2d Cir. 1971) ............................................ 13

*United States v. Jarrett*, 12 Cr. 144, 2013 WL 1117871 (E.D. Tenn. Jan. 18, 2013)................. 22

*United States v. Jenkins*, 419 F.3d 614 (7th Cir. 2005) .............................................. 8

*United States v. Joyner*, 201 F.3d 61 (2d Cir. 2000) ............................................... 17

*United States v. Lane*, 97 Cr. 50 (LEK), 1997 WL 625497 (N.D.N.Y. Sep. 25, 1997) .............. 13

*United States v. Lanier*, 520 U.S. 259 (1997)....................................................... 30

*United States v. Lasky*, 967 F. Supp. 749 (E.D.N.Y. 1997)........................................... 21

*United States v. LaSpina*, 299 F.3d 165 (2d Cir. 2002) .............................................. 7

*United States v. LeBlanc*, 24 F.3d 340 (1st Cir. 1994) ............................................. 34

*United States v. Litchfield,* 986 F.2d  (2d Cir. 1993) ............................................. 26

*United States v. Mannino*, 635 F.2d 110 (2d Cir. 1980)........................................ 16, 17

*United States v. Martines-Chaves*, 131 Fed. App'x 151 (11th Cir. 2005)...................................... 8

*United States v. Mason*, S1 06 Cr. 80 (NRB), 2007 WL 541653 (S.D.N.Y. Feb. 16, 2007)........ 21

*United States v. McCullough*, 457 F.3d 1150 (10th Cir. 2006) .................................................... 11

*United States v. Mullen*, 450 F. Supp. 2d 212 (W.D.N.Y. 2006) ........................................... 19, 20

*United States v. Oakland Cannabis Buyers' Coop.*, 532 U.S. 483 (2001) .................................. 26

*United States v. Orozco-Prada*, 732 F.2d 1076 (2d Cir. 1984) .................................................... 24

*United States v. Pagan*, 721 F.2d 24 (2d Cir.1983) ....................................................................... 6

*United States v. Palomares-Parra*, 116 Fed. App'x 71 (9th Cir. 2004) ...................................... 11

*United States v. Perry*, 643 F.2d 38 (2d Cir. 1981) ..................................................................... 24

*United States v. Pike*, 01 Cr. 129A, 2006 WL 146061 (W.D.N.Y. Jan. 19, 2006)...................... 21

*United States v. Polk*, 715 F.3d 238 (8th Cir. 2013) ....................................................................... 8

*United States v. Ramos*, 314 Fed. App'x 344 (2d Cir. 2008) ....................................................... 11

*United States v. Sabbeth*, 262 F.3d 207 (2d Cir. 2001) .................................................................. 6

*United States v. Santos*, 541 F.3d 63 (2d Cir.2008)........................................................................ 8

*United States v. Sattar*, 395 F. Supp.2d 79 (S.D.N.Y. 2005)........................................................ 28

*United States v. Scarpa*, 913 F.2d 993 (2d Cir. 1990) ................................................................. 16

*United States v. Serrano*, 57 Fed. App'x 12 (2d Cir. 2002) ......................................................... 18

*United States v. Stavroulakis*, 952 F.2d 686 (2d Cir. 1992) .......................................................... 6

*United States v. Stevens*, 04 Cr. 222S, 2006 WL 3827419 (W.D.N.Y. Dec. 27, 2006) .............. 19

*United States v. Stewart*, 590 F.3d 93 (2d Cir. 2009) ................................................................... 28

*United States v. Sturmoski*, 971 F.2d 452 (10th Cir. 1992) ......................................................... 11

*United States v. Tannenbaum*, 934 F.2d 8 (2d Cir. 1991) ...................................................... 29, 30

*United States v. Thomas*, 274 F.3d 655 (2d Cir. 2001)............................................................ 19, 20

*United States v. Tyler*, 758 F.2d 66 (2d Cir. 1985)....................................................................... 13

*United States v. Vargas*, 986 F.2d 35 (2d Cir. 1993)............................................................... 8, 16

*United States v. Walker*, 912 F. Supp. 655 (N.D.N.Y. 1996) ........................................................ 16

*United States v. Walsh*, 194 F.3d 37 (2d Cir. 1999) ....................................................................... 6

*United States v. Wydermyer*, 51 F.3d 319 (2d Cir. 1995) ............................................................ 7

*United States v. Zambrano*, 776 F.2d 1091 (2d Cir. 1985)................................................... 23, 24

*Virginia v. Hicks*, 539 U.S. 113 (2003)....................................................................................... 32

**Statutes**

18 U.S.C. § 1030(b) ................................................................................................................ 2, 30

18 U.S.C. § 1956(c)(4)........................................................................................................... 33, 38

18 U.S.C. § 1956(h) ............................................................................................................... 2, 33

21 U.S.C. § 841(a)(1)............................................................................................................. 3, 20

21 U.S.C. § 841(h) ...................................................................................................................... 3

21 U.S.C. § 843(b) ...................................................................................................................... 3

21 U.S.C. § 846 .................................................................................................................... passim

21 U.S.C. § 848 .................................................................................................................... passim

21 U.S.C. § 856 ......................................................................................................................... 11

21 U.S.C. § 881(a)(7)................................................................................................................. 10

47 U.S.C. § 230......................................................................................................... 5, 27, 28, 29

**Other Authorities**

IRS Notice 2014-21, *available at* http://www.irs.gov/pub/irs-drop/n-14-21.pdf ........................ 36

U.S. Department of the Treasury, Financial Crimes Enforcement Network, *Guidance,
      Application of FinCEN's Regulations to Persons Administering, Exchanging, or
      Using Virtual Currencies*, March 18, 2013, *available at*
      http://fincen.gov/statutes_regs/guidance/html/FIN-2013-G001.html..................................... 37

*United States v. Paunescu*, 13 Cr. 41 (RPP), Indictment (S.D.N.Y. filed Jan. 17, 2013) ........... 30

*United States v. Ulbricht*, 13 Cr. 6919 (JPO), Verified Claim and Statement (filed Dec. 12, 2013)
      .......................................................................................................................................... 36

*United States v. Willems*, 11 Cr. 1137, Indictment (C.D. Ca. filed Nov. 29, 2011) ................... 30

## PRELIMINARY STATEMENT

For nearly three years, Ross William Ulbricht ran a vast online black market, known as the Silk Road, through which thousands of vendors sold virtually every illegal drug imaginable, as well as malicious software and other illegal goods, to hundreds of thousands of buyers around the world.  Ulbricht built this illicit network from the ground up.  He oversaw every aspect of its operation.  He was universally regarded as the leader of the enterprise, as reflected by, among other things, the tribute he was paid on every sale.  He did everything in his power to protect the drug dealers and other criminals doing business on Silk Road, and worked tirelessly to prevent law enforcement from finding him and shutting the site down.

Yet, now that he has been apprehended and charged, Ulbricht claims to be, in essence, untouchable. He was merely the "operator of a website," he asserts, and cannot be held responsible for the conduct of its users.  He himself was not directly involved in buying or selling drugs or malicious software, he argues, and therefore he cannot be charged under the narcotics and computer hacking laws.  Further, Ulbricht contends, the money laundering laws have not kept pace with the times and do not cover transactions with Bitcoins, the exclusive form of payment on Silk Road, so he cannot be charged with money laundering either.  He moves to dismiss the Indictment against him in its entirety.

The arm of the law, however, is far longer than Ulbricht imagines it to be.  In particular, Ulbricht misunderstands the law of conspiracy, which extends to anyone who enters into a joint venture with others to commit crime – regardless of whether their role in the crime is large or small, direct or indirect.  The conspiracy laws easily apply to Ulbricht, who played a central, organizing role in running Silk Road and in facilitating the countless illicit sales executed through the site.  And it hardly matters that Ulbricht's conduct took place on the Internet.  The

federal criminal laws are expansive and adaptable, and readily reach his conduct online to the same extent as if it occurred on the street.

In brief, as detailed below, all of Ulbricht's arguments are meritless, and the Indictment is sufficient in every respect.  The motion to dismiss should be denied.

## **BACKGROUND**

**A.    The Complaint**

On September 27, 2013, Ulbricht was charged by complaint (the "Complaint") with one count of conspiring to commit narcotics trafficking in violation of 21 U.S.C. § 846, one count of conspiring to commit computer hacking in violation of 18 U.S.C. § 1030(b), and one count of conspiring to commit money laundering in violation of 18 U.S.C. § 1956(h).

As explained in the Complaint, from January 2011 to September 2013, Ulbricht owned and operated an underground website known as the "Silk Road," a black-market bazaar where illegal drugs and other illegal goods and services were sold, including malicious computer software. The site featured a polished user interface that made buying these illicit items nearly as easy as ordinary online shopping.  At the same time, the site was designed to operate outside the reach of law enforcement, by running on a special part of the Internet known as the "Tor" network, which served to hide the true IP address of the website and its users (and thereby their identities and locations), and by requiring all purchases on the site to be made through a Bitcoin-based payment system, which enabled users to pay for their purchases anonymously.  During its two-and-a-half years in operation, Silk Road was used by several thousand vendors to distribute illegal drugs and other illicit goods and services to well over a hundred thousand users.  Many millions of dollars' worth of Bitcoins flowed through the site as a result, constituting the proceeds from these illegal transactions.

2

As detailed in the Complaint, Ulbricht was the leader and organizer of this vast cybercriminal enterprise. Operating under the online pseudonym "Dread Pirate Roberts" or "DPR," Ulbricht controlled and oversaw all aspects of Silk Road: he maintained the computer code and server infrastructure underlying the site; he decided what illegal goods and services could be bought and sold on the site; he managed a small staff of employees who assisted in the day-to-day operation of the site; and he alone controlled the massive profits generated as commissions from the illicit sales conducted through the site. The Complaint also describes how Ulbricht was willing to use violence to protect his online drug empire, as he commissioned multiple murders for hire in seeking to guard his interests in Silk Road.[1]

**B.      The Indictment**

On February 4, 2014, a four-count indictment was filed against Ulbricht in this district (the "Indictment").

Count One of the Indictment charges Ulbricht with conspiring to violate the federal narcotics laws in violation of 21 U.S.C. § 846.  The conspiracy is alleged to have had three objects: the distribution of controlled substances in violation of 21 U.S.C. § 841(a)(1); the unlawful delivery, distribution, and dispensation of controlled substances by means of the Internet, and the aiding and abetting of such activity, in violation of 21 U.S.C. § 841(h); and the use of a communications facility in committing, causing, and facilitating federal drug felony violations, in violation of 21 U.S.C. § 843(b).  In setting forth the factual background for Count One, the Indictment alleges that Ulbricht "created an underground website known as 'Silk Road,' designed to enable users across the world to buy and sell illegal drugs and other illicit goods and

---

[1] Ulbricht has been separately charged for one of these attempted murders for hire in an indictment issued by the United States Attorney's Office for the District of Maryland.

services anonymously and outside the reach of law enforcement." (Indictment ¶ 1). The Indictment further alleges that Ulbricht "controlled all aspects of Silk Road, with the assistance of various paid employees whom he managed and supervised." (*Id.* ¶ 3).

Count Two, which incorporates the same background allegations made in Count One, charges Ulbricht with engaging in a "continuing criminal enterprise" in violation of 21 U.S.C. § 848, known as the "kingpin" statute. (*Id.* ¶¶ 11-12). Specifically, Count Two alleges that Ulbricht knowingly violated 21 U.S.C. §§ 841, 843, and 846 as part of a continuing series of violations of the Controlled Substances Act, undertaken in concert with at least five other persons as to whom Ulbricht occupied a position of organizer, a supervisory position, or a position of management, and from which violations he obtained substantial income and resources. (*Id.* ¶ 12).

Count Three charges Ulbricht with conspiring to commit computer hacking in violation of 18 U.S.C. § 1030(b). (*Id.* ¶¶ 13-16). The alleged object of the conspiracy was to "intentionally access computers without authorization" in order to obtain information for purposes of commercial advantage or private financial gain, or in furtherance of criminal and tortious acts. (*Id.* ¶ 16). As factual background, Count Three alleges that the Silk Road website "provided a platform for the purchase and sale of malicious software designed for computer hacking, such as password stealers, keyloggers, and remote access tools," and "regularly offered hundreds of listings for such products." (*Id.* ¶ 14).

Finally, Count Four of the Indictment charges Ulbricht with conspiring to commit money laundering in violation of 18 U.S.C. § 1956(h). (*Id.* ¶¶ 17-21). The alleged objects of the conspiracy were to conduct financial transactions involving the proceeds of narcotics trafficking and computer hacking with the intent to promote the carrying on of such activity, and to conduct

such financial transactions knowing that they were designed to conceal the nature, location, source, ownership, and control of the proceeds.  (*Id.* ¶¶ 20-21).  As factual background, Count Four alleges that Ulbricht "designed Silk Road to include a Bitcoin-based payment system that served to facilitate the illegal commerce conducted on the site, including by concealing the identities and locations of the users transmitting and receiving funds through the site."  (*Id.* ¶ 18).

## C.    Ulbricht's Motion to Dismiss

On March 29, 2014, Ulbricht filed the instant motion to dismiss.  As to Count One, the narcotics conspiracy count, Ulbricht argues that the Indictment fails to state an offense because he "is not alleged to be either the seller or purchaser of controlled substances" but rather is alleged only "to have operated a website, Silk Road, that enabled such transactions to occur." (Br. 9).  As to Count Two, the continuing criminal enterprise count, Ulbricht argues that the Indictment fails to allege that Ulbricht "occupied the requisite management authority" required for a continuing criminal enterprise charge, and also that the Indictment "fails to identify the 'continuing series' of predicate violations" involved in the offense with "sufficient specificity." (Br. 13).  As to Count Three, the computer hacking conspiracy count, Ulbricht argues that the Indictment fails to state an offense because it "alleges only that the Silk Road website 'provided a platform for the [exchange] of malicious software'" and "fails to allege facts establishing . . . that Mr. Ulbricht possessed the knowledge and intent to access a protected computer without authorization."  (Br. 21).  Ulbricht also advances a set of arguments addressed collectively to Counts One through Three, arguing that either all three counts should be construed not to apply to his conduct – citing the rule of lenity, doctrine of constitutional avoidance, and a civil immunity statute codified at 47 U.S.C. § 230 – or else the statutes underlying these counts should be held void-for-vagueness or constitutionally overbroad.  (Br. 24-38).  Finally, as to Count Four, the money laundering conspiracy count, Ulbricht argues that the Indictment fails to state an

5

offense because, he contends, Bitcoin transactions do not fall within the category of "financial transactions" covered by the money laundering laws.  (Br. 43-45).

## LEGAL STANDARD

Rule 7(c)(1) requires that an indictment contain a "plain, concise, and definite written statement of the essential facts constituting the offense charged."  Fed. R. Crim. P. 7(c).  "'[A]n indictment is sufficient if it, first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense."' *United States v. Alfonso*, 143 F.3d 772, 776 (2d Cir. 1998) (quoting *Hamling v. United States*, 418 U.S. 87, 117 (1974)).  "An indictment must be read to include facts which are necessarily implied by the specific allegations made."  *United States v. Stavroulakis*, 952 F.2d 686, 693 (2d Cir. 1992).  "[C]ommon sense and reason prevail over technicalities."  *United States v. Sabbeth*, 262 F.3d 207, 218 (2d Cir. 2001).

The Second Circuit has "repeatedly refused, in the absence of any showing of prejudice, to dismiss charges for lack of specificity."  *United States v. Walsh*, 194 F.3d 37, 45 (2d Cir. 1999).  Indeed, the Second Circuit has "consistently upheld indictments that 'do little more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime.'"  *Id.* at 44 (citing *United States* v. *Tramunti*, 513 F.2d 1087, 1113 (2d Cir. 1975)).  While the indictment must give a defendant "sufficient notice of the 'core of criminality' to be proven against him," *United States v. Pagan*, 721 F.2d 24, 27 (2d Cir. 1983), the "'core of criminality' of an offense involves the essence of a crime, in general terms," and not "the particulars of how a defendant effected the crime." *United States v. D'Amelio*, 683 F.3d 412, 418 (2d Cir. 2012); *see also United States v. Coffey*, 361 F. Supp. 2d 102, 111 (E.D.N.Y. 2005)

("[T]he indictment does not have to specify evidence or details of how the offense was committed.").

Moreover, "[i]t is well settled that in an indictment for conspiring to commit an offense – in which the conspiracy is the gist of the crime – it is not necessary to allege with technical precision all the elements essential to the commission of the offense which is the object of the conspiracy." *United States v. Wydermyer*, 51 F.3d 319, 325 (2d Cir. 1995); *see also United States v. LaSpina*, 299 F.3d 165, 177 (2d Cir. 2002). "The rationale is that the crime of conspiracy is complete whether or not the substantive offense which was its object was committed." *Wydermyer*, 51 F.3d at 325.

## ARGUMENT

### A.     Count One Sufficiently Alleges a Narcotics Conspiracy

Ulbricht challenges Count One, the narcotics conspiracy count, on the ground that he "is not alleged to be either the seller or purchaser of controlled substances (or the possessor at any point during such transactions)," but rather is only "alleged to have operated a website, Silk Road, that enabled such transactions to occur." (Br. 9). Ulbricht's argument is fundamentally misguided. The premise appears to be that selling, buying, or possessing narcotics is an element of the crime charged in Count One. It is not. Count One does not charge Ulbricht with selling, buying, or possessing controlled substances. It charges him with *conspiring with others* to violate certain narcotics laws. And his alleged operation of the Silk Road website provides an ample factual predicate for that charge.

In order to prove a conspiracy, the Government need only establish "that the person charged with conspiracy knew of the existence of the scheme alleged in the indictment and knowingly joined and participated in it." *United States v. Anderson*, __ F.3d __, 2014 WL 814889, at *21 (2d Cir. Mar. 4, 2014). In order to prove participation in the conspiracy in turn,

the Government need only establish that the defendant engaged in "purposeful behavior aimed at furthering the goals of the conspiracy."  *U.S. v. Chavez*, 549 F.3d 119, 125 (2d Cir. 2008) (quoting *United States v. Diaz*, 176 F.3d 52, 97 (2d Cir. 1999) (internal quotation marks omitted)); *see also United States v. Vargas*, 986 F.2d 35, 39 (2d Cir. 1993) (membership in conspiracy requires that defendant "associated himself with the venture in some fashion, participated in it as something that he wished to bring about, or sought by his action to make it succeed") (citation, internal quotation marks, and alterations omitted).

As to a narcotics conspiracy in particular, the law is clear that a defendant need not have personally sold, bought, possessed, or otherwise have come into direct contact with any illegal drugs in order to be a member of the conspiracy.  Indeed, "a variety of conduct, apart from selling [drugs], can constitute participation in a conspiracy sufficient to sustain a conviction." *United States v. Burgos*, 94 F.3d 849, 859 (4th Cir. 1996); *see also United States v. Polk*, 715 F.3d 238, 246 (8th Cir. 2013) (holding that defendant "need not have actually manufactured, harvested, or distributed the [drugs] to be a member of the conspiracy"); *United States v. Cole*, 423 F. App'x 452, 459 (5th Cir. 2011) ("[T]here are many different roles that participants in a drug conspiracy may play, for example: supervisor and manager, distributor, collector, courier, gunman and enforcer . . . ."); *United States v. Santos*, 541 F.3d 63, 72 (2d Cir. 2008) (quoting *United States v. Soto–Beníquez*, 356 F.3d 1, 18 (1st Cir. 2004)) (holding that even the performance of "ancillary functions" can be sufficient to "advance[e] the aim of a narcotics conspiracy"); *United States v. Jenkins*, 419 F.3d 614, 620 (7th Cir. 2005) ("Different people play different roles in a drug conspiracy, be it supplier, lookout, courier, or enforcer."); *United States v. Martines-Chaves*, 131 Fed. App'x 151, 157 (11th Cir. 2005) ("[T]o join a conspiracy to distribute drugs, a defendant need not actually agree to sell the drugs himself."); *United States v.*

*Garcia–Torres*, 280 F.3d 1, 4 (1st Cir. 2002) ("[A] drug conspiracy may involve ancillary functions (*e.g.*, accounting, communications, strong-arm enforcement), and one who joined with drug dealers to perform one of those functions could be deemed a drug conspirator.").

It is therefore unremarkable that the Indictment does not specifically allege that Ulbricht himself sold (or bought or possessed) illegal drugs. That is simply not the charge against him in Count One.  Instead, Count One charges that he conspired with others to distribute drugs, a charge that readily encompasses Ulbricht's operation of the Silk Road website.  In that role, Ulbricht entered into a joint venture with thousands of drug dealers around the world to distribute drugs online.  He supplied dealers with an online sales portal specifically designed to facilitate illegal drug sales and to evade law enforcement; in exchange, they agreed to abide by his rules and allow him to take a commission on every sale.  He thus engaged in "purposeful action" aimed at "furthering the goals" of the conspiracy alleged in Count One – to distribute drugs, to do so via the Internet, and to use a communications facility in furtherance of the activity – which is all the Government need prove as to Count One.

Ulbricht nonetheless contends that he cannot be considered "a co-conspirator in the controlled substances transactions" on Silk Road because he was merely acting as a "digital landlord" for Silk Road vendors; and a landlord, Ulbricht claims, "is *not* a co-conspirator of, and/or liable for, the criminal conduct of his tenants, under § 846 regardless [*sic*] whether the landlord possesses knowledge that the premises are being used for illegal purposes."  (Br. 10).  As an initial matter, Ulbricht was not merely a "digital landlord."  A mere landlord does not recruit drug dealers to sell on his premises, or control the terms on which they conduct business, or take a cut from their sales, or protect their activities from law enforcement.  Nor were the drug dealers on Silk Road mere "tenants," whose criminal conduct Ulbricht unknowingly allowed or

even knowingly tolerated.  They were Ulbricht's partners.  They did business with *his* encouragement and approval, paid a commission to *him* on each sale, and relied on the protection of the anonymous marketplace *he* designed for this specific purpose.  That is the stuff of conspiracy, not a mere landlord-tenant relationship.  *Cf. United States v. Gatien*, 18 Fed. App'x 37, 39-40 (2d Cir. 2001) (upholding drug conspiracy conviction where defendant, a night club owner, knowingly admitted drug dealers into his club, encouraged them to distribute drugs inside in order to draw crowds, and sought to protect the dealers from discovery by the police).

Moreover, even if Ulbricht's role were analogous in certain ways to a "landlord," the notion that landlords are somehow categorically exempted from the narcotics conspiracy laws is simply fanciful.  As long as a landlord agrees with others to violate the narcotics laws, and manifests that agreement by knowingly allowing others to use premises under his control to conduct narcotics trafficking, the landlord is subject to prosecution under 21 U.S.C. § 846 along with every other member of the conspiracy.  Ulbricht fails to cite any law to the contrary.

Ulbricht attempts to rely on 21 U.S.C. § 881(a)(7) for the proposition that the "penalty" for a landlord who makes his property available to drug dealers is "forfeiture of the property, *not* criminal liability."  (Br. 10).  But the provision cited merely provides for forfeiture of any real property used to commit a drug offense.  It does nothing to prevent the Government from prosecuting a landlord of such property where the landlord is a member of a narcotics conspiracy.  The provision provides a tool to supplement, not supplant, criminal prosecution.[2]

---

[2] Ulbricht also cites *United States v. All Right, Title and Interest in Real Property and Appurtenances Thereto Known as 143-147 East 23rd Street*, 888 F. Supp. 580, 583 (S.D.N.Y. 1995) for the proposition that civil forfeiture is "the default cause of action even if a landlord creates conditions on his property that nurture or foster illegal activity."  (Br. 10).  Yet the case cited merely upholds a forfeiture under § 881(a)(7) against a challenge under the Excessive Fines Clause of the Constitution.  The case in no way suggests that forfeiture is the "default" remedy

Ulbricht similarly misplaces reliance on 21 U.S.C. § 856, the so-called "crack house statute."  He argues that § 856 provides the exclusive vehicle for criminally prosecuting landlords who knowingly allow their premises to be used for drug trafficking, and that therefore such conduct cannot also be punished as part of a narcotics conspiracy charged under 21 U.S.C. § 846.  (Br. 11-12)  However, § 856 merely creates a specific criminal offense prohibiting a person from knowingly leasing, renting, using, or maintaining any place for the purpose of manufacturing, distributing, or using controlled substances, or making the premises available to others for such use.  Nothing in the statute suggests that such persons cannot also be prosecuted for other drug offenses if the elements of those offenses are met.  Indeed, it is common for defendants convicted under § 856 also to be convicted under § 846 for conspiring to distribute drugs.[3]  Courts have specifically upheld such overlapping convictions as proper.  *See, e.g.*, *United States v. Sturmoski*, 971 F.2d 452, 461 (10th Cir. 1992) (rejecting argument that convictions under both § 846 and § 856 violated the Due Process Clause, holding that Congress intended to create § 856 as "a distinct offense – with its own, separate punishment").

Accordingly, nothing prevents the Government from using the narcotics conspiracy laws to charge a landlord of drug-related premises.  All that matters, in that context or any other, is

---

against a landlord of drug-related premises.  Indeed, in upholding the forfeiture in the case, the opinion notes that a "colorable criminal case" existed against the landlord claimant.  *Id.* at 585.

[3] *See, e.g.*, *United States v. Ramos*, 314 Fed. App'x 344 (2d Cir. 2008) (affirming convictions for conspiring to distribute cocaine base and heroin in violation of § 846 and using drug-related premises to distribute and store cocaine base and heroin in violation of § 856); *Garcia v. United States*, 01 Civ. 6234 (SWK), 2002 WL 562647 (S.D.N.Y. Apr. 15, 2002) (denying *habeas* challenge to conviction for conspiring to distribute drugs in violation of § 846 and for maintaining stash house used to store the drugs in violation of § 856); *see also, e.g.*, *United States v. Palomares-Parra*, 116 Fed. App'x 71, 72 (9th Cir. 2004) (affirming convictions under §§ 841, 846, and 856); *United States v. McCullough*, 457 F.3d 1150, 1162 (10th Cir. 2006) (affirming convictions under § 846 and § 856).

whether the defendant had an agreement with others to violate the drug laws.  And that is what the Indictment alleges.

Contrary to Ulbricht's protestations, the Government's charging theory does not imply that "a whole array of web hosts, internet service providers, and web sites could be liable for the criminal conduct . . . of those who avail themselves of the particular services offered or enabled by those internet entities."  (Br. 12).  The Government's charging theory implies that such providers are subject to criminal prosecution if they intentionally and knowingly agree with others to distribute drugs or otherwise violate the criminal laws, as reflected by purposeful action in furtherance of such agreement.  The fact that "search engines and internet service providers are fully aware that the internet contains illegal web site content," as Ulbricht points out (Br. 12), does not by itself imply conspiratorial liability.  Being generally aware of criminal content on the Internet is a far cry from intentionally and knowingly entering into an agreement with specific online criminals to further their illegal activity.  *Cf. Anderson*, 2014 WL 814889, at *7 ("We have often observed . . . that a defendant's mere presence at the scene of a crime, his general knowledge of criminal activity, or his simple association with others engaged in a crime are not, in themselves, sufficient to prove the defendant's criminal liability for conspiracy.").

Finally, Ulbricht argues that his conduct was analogous to that of a "steerer" in a drug transaction – *i.e.*, one who directs a buyer to a seller – and that "steerers" cannot qualify as members of a narcotics conspiracy.  (Br. 13).  Both premises of this argument are flawed.  First, Ulbricht's role in Silk Road was not analogous to a mere "steerer."  A steerer is typically someone who works at the street level to find individual buyers to bring to a dealer.  Ulbricht's criminal conduct was more expansive than that by many orders of magnitude.  As the owner and operator of Silk Road, he sat at the top of a massive drug distribution network through which

hundreds of kilograms of illegal drugs were sold.  Such a central, continuing role in running a

drug trafficking enterprise bears no resemblance to the limited involvement of a "steerer" in a

drug transaction.  But in any event, even a "steerer" can qualify as part of a drug conspiracy so

long as he knowingly entered into an agreement with the dealers to whom he steered business.[4]

Indeed, the Second Circuit has even rejected minor role adjustments for "steerers" in such cases,

noting the valuable service they can provide to dealers seeking to solicit buyers.  *See United*

*States v. Colon*, 884 F.2d 1550, 1551-52 (2d Cir. 1989) ("'Steerers' play an important role in

street-level drug transactions, directing buyers to sellers in circumstances in which the sellers

attempt to conceal themselves from casual observation.  Without 'steerers,' buyers would either

find it difficult to locate sellers or sellers would have to risk exposure to public view.").

       In short, Ulbricht fails to provide any ground to dismiss Count One.  Because Count One

alleges that Ulbricht agreed with others to violate certain narcotics laws, and puts him on notice

of the conduct at issue, it adequately states a violation of § 846.  *See United States v. Benjamin*,

72 F. Supp. 2d 161, 169 (W.D.N.Y. 1999) ("[A]s an indictment is sufficient if it charges the

---

[4] The cases on which Ulbricht relies in arguing to the contrary – *United States v. Tyler*, 758 F.2d 66 (2d Cir. 1985) and *United States v. Hysohion*, 448 F.2d 343 (2d Cir. 1971) – were isolated cases in which the defendant merely introduced a buyer to a drug dealer without any evidence that he did so as part of an agreement or continuing relationship with the dealer, as required for a conspiracy.  *See Tyler*, 758 F.2d at 68-71; *Hysohion*, 448 F.2d at 347.  Both of these cases have been distinguished on numerous occasions from the more typical "steerer" scenario, in which the defendant steers buyers to a dealer as part of a continuing business arrangement.  *See, e.g.*, *United States v. Esdaille*, 769 F.2d 104, 108-09 (2d Cir. 1985) (upholding conspiracy conviction where evidence indicated that steerer had ongoing relationship with dealer); *United States v. Lane*, 97 Cr. 50 (LEK), 1997 WL 625497 (N.D.N.Y. Sep. 25, 1997) (upholding conspiracy conviction where defendant "did not merely introduce" buyer to seller but instead was "the conduit for the transaction"); *see also United States v. Franklin*, 09 Cr. 168 (RPP), 2011 WL 1311818 (S.D.N.Y. Apr. 1, 2011) ("*Hysohion* and *Tyler* stand for the proposition that the fact that a defendant tells a willing buyer how to make contact with a willing seller does not *necessarily* imply that there was an agreement between that seller and the defendant to engage in illegal activity.") (emphasis in original).

offense using the words of the statute, an indictment under [21 U.S.C. §] 846 need only allege the existence of a narcotics conspiracy, a relevant time frame, and the statute alleged to be violated.") (citations and internal quotation marks omitted).

**B.     Count Two Sufficiently Alleges a Continuing Criminal Enterprise**

Count Two charges Ulbricht with engaging in a "continuing criminal enterprise" in violation of 21 U.S.C. § 848(a).  As defined by the statute, a person engages in a "continuing criminal enterprise" if:

(1)     he violates any provision of [the Controlled Substances Act] the punishment for which is a felony, and

(2)     such violation is a part of a continuing series of violations of [the Controlled Substances Act] –

(A)     which are undertaken by such person in concert with five or more other persons with respect to whom such person occupies a position of organizer, a supervisory position, or any other position of management, and

(B)     from which such person obtains substantial income or resources.

21 U.S.C. § 848(c).  In short, the statute applies to someone who commits a federal narcotics felony as part of a "continuing series" of federal narcotics offenses, undertaken with others whom he organizes, supervises, or manages, and from which he receives substantial profit.

Ulbricht challenges Count Two on two grounds: first, Ulbricht contends that Count Two does not adequately allege that he occupied a position of organizer, manager, or supervisor within the continuing criminal enterprise at issue; and second, he argues that Count Two fails to sufficiently detail the "continuing series" of predicate narcotics felonies involved in the continuing criminal enterprise.  (Br. 13).  Neither challenge has any merit.

14

1.      *Count Two Sufficiently Alleges that Ulbricht Occupied a Position of Control*

Ulbricht first argues that Count Two fails to state a violation of § 848(a) because, he claims, Count Two only alleges that he played "a supervisory role in regard to *administrators* of the Silk Road site (those responsible for keeping the site up and running)."  (Br. 15).  According to Ulbricht, Count Two does not allege that he was the organizer, supervisor, or manager of the "'users' of the Silk Road website who bought and sold 'illegal drugs'" through the site – a supposed shortcoming Ulbricht believes to be fatal, as he claims that these "users" were the "persons engaging in the continuing series of violations giving rise to the criminal enterprise." (Br. 14-15).  This argument rests on both a misunderstanding of the Indictment and a misunderstanding of the law.

The Indictment does not merely charge that Ulbricht occupied a supervisory role with respect to the administrators of the site; it charges that he "owned and operated" Silk Road and "controlled all aspects" of its operation.  (Indictment ¶¶ 2-3).  Such control included organizing and managing the vendors selling drugs on the site.  Ulbricht designed the online structure through which all of the vendors did business; he set the rules the vendors had to follow; he policed vendor accounts for violations of those rules; he controlled the arbitration process to which vendors had to submit in the event of a dispute with a buyer; and he determined the commission that had to be paid every time a vendor consummated a sale.  He was universally regarded on Silk Road as the person in control of the entire operation.  As Ulbricht himself stated in a forum post directed to the site's vendors (who were complaining about a hike in Ulbricht's commission rates): "Whether you like it or not, I am the captain of this ship.  You are here voluntarily and if you don't like the rules of the game, or you don't trust your captain, you can get off the boat."  (Compl. ¶ 26.a).

15

Ulbricht thus easily falls within the positions of control encompassed by Section 848.  As the Second Circuit has made clear, "'[t]he operative concepts used in section 848 – "organize," "supervise," and "manage" – are not technical'" and should be given "'their everyday meanings.'"  *United States v. Scarpa*, 913 F.2d 993, 1007 (2d Cir. 1990) (quoting *United States v. Mannino*, 635 F.2d 110, 117 (2d Cir. 1980)); *see also United States v. Vargas*, 885 F. Supp. 504, 507 (S.D.N.Y. 1995) ("[T]hese elements should properly be given a pragmatic rather than technical meaning in keeping with the objective of preventing lenient treatment of serious crime . . . .").

In particular, for purposes of § 848, "[a] defendant acts as an 'Organizer' when he 'puts together a number of people engaged in separate activities and arranges them in their activities in one essentially orderly operation or enterprise.'"  *United States v. Walker*, 912 F. Supp. 655, 658 (N.D.N.Y. 1996) (quoting *United States v. Patrick*, 965 F.2d 1390, 1397 (6th Cir. 1992)).  And "[a]n individual may be said to be 'managed' by a defendant where it is demonstrated that the 'defendant exerted some type of influence over [an] individual as exemplified by that individual's compliance with the defendant's directions, instructions or terms.'"  *Id.* (quoting *United States v. Possick*, 849 F.2d 332, 336 (8th Cir. 1988) (citations omitted)).  Both of these descriptions readily fit Ulbricht's relation to the drug dealers operating on his site: he arranged and consolidated their activities into a unified, orderly business enterprise; and he set the terms of doing business on the site, with which they had to comply.

Ulbricht is not required to have had direct, personal contact with each of the drug dealers on Silk Road to qualify as an organizer or manager of them.  "The statute does not require personal contact between the leader and each underling."  *United States v. Cruz*, 785 F.2d 399, 407 (2d Cir. 1986).  Further, the dealers do not have to have been salaried employees of Ulbricht,

or otherwise akin to paid workers, in order for him to qualify as their organizer and manager.  All that matters is that they operated under Ulbricht's control.  *See id.* ("We will not read into the statute a distinction between salaried 'employees' . . . and 'independent contractors' or 'franchisees' . . . ."); *see also United States v. Joyner*, 201 F.3d 61, 71 (2d Cir. 2000) (upholding conviction under § 848 where defendant sold to otherwise independent resellers but required them, *inter alia*, to obtain permission from him to discount their prices and to sell in certain locations so he could monitor their activity); *Mannino*, 635 F.2d at 117 (upholding conviction under § 848 of "middleman with a vast network of purchasers and sources of immense supply").

But even setting aside Ulbricht's control over the drug dealers on Silk Road, Ulbricht's supervisory authority over his paid employees on Silk Road – the administrators who helped him run the site – provides an independent factual predicate for Count Two.  *See Cruz*, 785 F.2d at 407 ("[T]he statute does not require that the same type of superior-subordinate relationship exist with each of the persons involved."); *see also United States v. Apodaca*, 843 F.2d 421, 426 (10th Cir. 1988) (holding that a defendant acts as a "supervisor" where he "gives orders or directions to another person who carries them out").  Ulbricht's argument that these employees somehow cannot qualify as part of a continuing criminal enterprise, because they themselves did not sell drugs on the site, is baseless.  The statute requires only that the employees undertook a continuing series of federal narcotics offenses in concert with Ulbricht.  Here, the Indictment adequately alleges that they did so, as it alleges that Ulbricht controlled "all aspects of Silk Road" with "the assistance of various paid employees whom he managed and supervised." (Indictment ¶ 3).

"All aspects of Silk Road" include all of the narcotics violations that occurred on the site on a daily basis.  The employees do not have to have been directly involved in those violations as

a seller or buyer to bear criminal responsibility with respect to them.  For example, every instance when a Silk Road administrator facilitated a specific drug sale – *e.g.*, by arbitrating a dispute between the buyer and seller – constituted the aiding and abetting of distribution of controlled substances over the Internet in violation of 21 U.S.C. § 841(h)(1)(B).  Similarly, every communication sent by an administrator through the Silk Road private message system in helping to run the site constituted the use of a communication facility to facilitate a narcotics conspiracy, in violation of 21 U.S.C. § 843(b).[5]  In this way, Ulbricht's employees engaged in a continuing series of drug felony violations, in concert with him and under his supervision, which is all the statute requires.

       2.     *Count Two Sufficiently Alleges a Continuing Series of Narcotics Violations*

Ulbricht next argues that Count Two fails to specify the individual narcotics violations constituting the "continuing series" of violations involved in the continuing criminal enterprise at issue.  Ulbricht contends that the Indictment must detail which of the illegal drug transactions on Silk Road – which he correctly notes number "in the potentially hundreds of thousands" – will be relied upon by the Government "in attempting to prove Count Two" at trial.  (Br. 17-19).

The law is clear, however, that such particularity is not required in an indictment.  Indeed, as Ulbricht acknowledges in his brief (Br. 20), the Second Circuit has already rejected precisely the argument he makes here, in *United States v. Flaharty*, 295 F.3d 182 (2d Cir. 2002).  The continuing criminal enterprise charge in that case simply alleged, similarly to the Indictment here, that the defendants had "committed felony violations of Title 21, United States Code, Sections 841(a)(1) and 846, which violations were part of a continuing series of violations of

---

[5] *See* 21 U.S.C. § 843(b) ("Each separate use of a communication facility shall be a separate offense under this subsection."); *United States v. Serrano*, 57 Fed. App'x 12, 15-16 (2d Cir. 2002) (separate phone calls constitute separate violations of § 843).

18

those statutes." *Id.* at 197.  The defendants challenged this language as insufficient, arguing that it "failed to specify the violations that constituted the 'series.'"  *Id.*  The Second Circuit disagreed, noting that "[a]n indictment need only track the language of the statute," and finding that the indictment at issue did so.  *Id.* at 198 (internal quotation marks and citations omitted); *see also United States v. Stevens*, 04 Cr. 222S, 2006 WL 3827419, at *4 (W.D.N.Y. Dec. 27, 2006) (noting that the argument that a § 848 charge must "identify the predicate narcotics violations that are alleged to make up the 'continuing series of violations'" has been "expressly rejected by the Second Circuit"); *United States v. Mullen*, 450 F. Supp. 2d 212, 215 (W.D.N.Y. 2006) (same).

Ulbricht suggests that *Flaharty* is no longer good law, stating that the case "addressed an indictment returned (and tried) prior to the Supreme Court's decision in *Richardson* [*v. United States*, 526 U.S. 813 (1999)]."  (Br. 20).  In *Richardson*, the Supreme Court held that, to convict a defendant on a continuing criminal enterprise charge, a jury must be unanimous as to which specific violations constitute the "continuing series" supporting the charge.  However, Ulbricht's suggestion that *Flaharty* was abrogated by *Richardson* is puzzling.  *Flaharty* was decided three years after *Richardson*; and *Flaharty* specifically held that *Richardson* does not imply the Government must detail the violations forming the "continuing series" in the indictment itself.  *See Flaharty*, 295 F.3d at 197 ("Although *Richardson* requires that the jury be unanimous on each of the constituent felonies, . . . an indictment that does not identify which of many alleged felonies constituted the series is not thereby defective.").

Ulbricht further contends that *Flaharty* "cannot be reconciled" with the Second Circuit's decisions in *United States v. Thomas*, 274 F.3d 655 (2d Cir. 2001) and *United States v. Gonzalez*, 686 F.3d 122 (2012).  Yet, *Thomas* and *Gonzalez* do not conflict with *Flaharty* – let alone

overrule it.  In *Thomas*, the defendant was convicted of conspiring to import more than 500 grams of cocaine, yet the indictment did not allege the type and quantity of drugs involved in the conspiracy.  Because that was an element of the crime that influenced the applicable statutory maximum, the Second Circuit held, in light of *Apprendi v. New Jersey*, 530 U.S. 466 (2000), that a corresponding allegation was required to be pled in the Indictment.  *Thomas*, 274 F.3d at 660-61.  Similarly, in *Gonzalez*, the indictment charged the defendant with distributing cocaine in violation of 21 U.S.C. § 841(b)(1)(B), but, again, failed to allege the drug quantity involved. The Second Circuit held that a parenthetical citation to § 841(b)(1)(B) (which specifies the quantity of cocaine required for the offense) was not an adequate substitute for such allegation.

Neither *Thomas* nor *Gonzalez* is relevant here.  In both cases, the crime at issue included as an element a certain drug type and amount, specified in the text of the statute itself, which needed to be included in corresponding allegations of the indictment.  Here, by contrast, the element of the crime at issue is simply that a continuing series of violations of the Controlled Substances Act was committed.  No *particular* violations are required by the statute itself.  Thus, the Indictment properly addresses this element by alleging, generally, that Ulbricht was involved in a continuing series of narcotics violations.  It does not omit this allegation, as in *Thomas*; nor does it relegate the allegation to a statutory citation in a parenthetical, as in *Gonzalez*.  Count Two states that Ulbricht "knowingly and intentionally violated Title 21, United States Code, Sections 841, 843, and 846, *which violations were part of a continuing series of violations of the Controlled Substances Act*."  (Indictment ¶ 12).  Hence, the Indictment sufficiently "track[s] the language of the statute," *Flaharty*, 295 F.3d at 198, and adequately states the charge.[6]

---

[6] *See United States v. Mullen*, 450 F. Supp. 2d 212, 216 (W.D.N.Y. 2006) (holding that indictment alleging that defendant "did ... engage in a Continuing Criminal Enterprise in that he

As to Ulbricht's complaint that the Indictment fails to give notice of the specific violations the Government will rely on at trial to prove Count Two, such notice is not required. An indictment need not provide a preview of the Government's evidence; it need only put the defendant on notice of the essential charges against him.  Here, there is no mystery about the nature of the "continuing series" of violations at issue: the series consists of all the illegal drug transactions and other narcotics crimes by the Silk Road vendors and employees whom Ulbricht organized, managed, and supervised.  The Indictment puts Ulbricht on notice of that.  It need not further specify which particular violations will be featured in the Government's proof at trial, any more than it need specify any other aspect of the Government's case.  *See, e.g.*, *United States v. Mason*, S1 06 Cr. 80 (NRB), 2007 WL 541653, at *5 (S.D.N.Y. Feb. 16, 2007) ("An Indictment need not identify all alleged co-conspirators, nor specify the nature, time, and place of every overt act the defendant or others allegedly took in furtherance of a conspiracy, nor set forth all the evidence the Government seeks to introduce."); *United States v. Lasky*, 967 F. Supp. 749, 753 (E.D.N.Y. 1997) (holding that an indictment "need not disclose [the Government's] evidence or its legal theory, and need not describe the precise manner in which the crime . . . is alleged to have been committed") (internal quotation marks and citations omitted).

---

did violate Title 21 ... Section 841(a)(1), 843(b) and 846 which violations were part of a continuing series of violations of said statutes ...." "fairly track[ed] the CCE statute"); *United States v. Pike*, 01 Cr. 129A, 2006 WL 146061, at *2 (W.D.N.Y. Jan. 19, 2006) (finding indictment sufficient where it "closely track[ed] the language of § 848" by charging defendant "with engaging in a series of violations of § 841(a)(1) and § 846"); *United States v. Benjamin*, 72 F. Supp. 2d 161, 170 (W.D.N.Y. 1999) (finding indictment sufficient where it alleged that defendant violated § 841(a)(1) and § 846 in concert with five others "and from which continuing series of violations, the defendant . . . obtained substantial income and resources").

**C.      Count Three Sufficiently Alleges a Computer Hacking Conspiracy**

Ulbricht argues that Count Three, the computer hacking conspiracy count, "fails to allege that [he] had the requisite knowledge or intent to conspire" to commit computer hacking.  (Br. 21).  Specifically, Ulbricht contends that "even the direct provision of software with potentially illegal applications cannot, by itself, demonstrate intent to conspire to use that software to access protected computers without authorization."  (Br. 22).  Notwithstanding that the Indictment charges that Ulbricht provided a platform for selling "malicious software designed for computer hacking," Ulbricht claims that he "would not know" with respect to any such software sold on Silk Road "whether the purchaser or ultimate user was intending to use the software for proprietary research, academic study (by students or professors), security purposes, or merely to satisfy the particular abstract interest of a particular consumer."  (Br. 23).

Ulbricht's argument misses the mark, as it does not go to the sufficiency of the Indictment.  The extent to which Ulbricht knew that the malicious software being sold on Silk Road was intended for illegal use is simply an evidentiary issue for the Government to establish at trial.  *See Alfonso*, 143 F.3d at 776 (holding that "the sufficiency of the evidence is not appropriately addressed on a pretrial motion to dismiss an indictment"); *United States v. Goldberg*, 756 F.2d 949, 950 (2d Cir. 1985) (allegations of the indictment are accepted as true for purposes of a motion to dismiss); *see also United States v. Jarrett*, 12 Cr. 144, 2013 WL 1117871, at * (E.D. Tenn. Jan. 18, 2013) (finding that "the issue of whether the Defendant had the requisite intent" to commit crime alleged in the indictment was a "matter for the trier of fact" and not properly raised on a motion to dismiss).

The Indictment itself is sufficient in this regard, as it alleges that Ulbricht "intentionally and knowingly" conspired with others to commit computer hacking by operating a marketplace for malicious software on Silk Road.  (Indictment ¶ 15).  There is no basis to dismiss this charge

based merely on the fact that malicious software is hypothetically capable of being used in a legal manner.  So long as the evidence at trial shows that Ulbricht intended to facilitate computer hacking by agreeing with others to sell such software on Silk Road, he may be validly convicted on Count Three.  The Second Circuit has specifically held that a defendant may be convicted of conspiring to commit a crime where he knowingly agreed with others to supply the material necessary for the crime – even if that material is capable of being put to other, non-criminal uses.

For example, in *United States v. Zambrano*, 776 F.2d 1091 (2d Cir. 1985), the defendants were convicted for, among other things, conspiring to use counterfeit credit cards in violation of 15 U.S.C. § 1644(a).  However, the defendants had merely sold blank, unembossed credit cards that were not counterfeit or otherwise illegal by themselves.  *Id.* at 1092.  Rather, the cards "became illegal counterfeits only after unauthorized names and account numbers were embossed on them" by others – specifically, undercover agents investigating the defendants' activity.  *Id.* at 1092, 1094.  On appeal, one of the defendants argued that because it was "possible . . . for unembossed cards to be used legally" – for example, by "supplying them to a bank" – there was insufficient evidence to convict him on the conspiracy count.  *Id.* at 1096.  The Second Circuit rejected the argument, finding that the "clandestine" means the defendant used to produce and deliver the cards (*e.g.*, midnight meetings in parking lots and coded conversations) provided "ample evidence" that the defendant "knew of the illegal use to which the cards were being put." *Id*.  That was "enough to convict him of conspiracy," the court held, explaining:

> [E]vidence that a defendant simply supplies goods, innocent in themselves, to someone who intended to use them illegally is not enough to support a conviction for conspiracy.  But, if there is something more, some indication that the defendant knew of and intended to further the illegal venture, that he somehow encouraged the illegal use of the goods or had a stake in such use, sufficient evidence has been presented to enable the jury to conclude the defendant had knowledge of and an intent to join the conspiracy.

*Id.* at 1095 (citing *United States v. Orozco-Prada*, 732 F.2d 1076, 1080 (2d Cir. 1984) ("'[T]he knowing supply of a raw material necessary for the commission of a crime by another constitutes aiding and abetting that crime.'") (quoting *United States v. Perry*, 643 F.2d 38, 44 (2d Cir. 1981))).

Similarly, in *United States v. Perry*, *supra*, the defendants were convicted of conspiring to distribute heroin, even though they themselves were involved only in distributing materials used to dilute or "cut" heroin.  643 F.2d at 44.  While these materials were not themselves controlled substances or otherwise illegal, the evidence showed that the defendants had distributed the materials "with the intent that they be used in heroin distribution." *Id.*  The Second Circuit upheld the defendants' narcotics conspiracy conviction, holding that they could be found guilty on the basis of "'conspiring to aid and abet' the distribution of heroin." *Id.* at 45; *see also id.* at 53 (Van Graafeiland, C.J., concurring) ("[O]ne who is charged with conspiracy to commit an unlawful act may be convicted if he conspired to aid and abet the commission of the act.").  Even though the indictment in *Perry* "did not spell out" this conspiracy-to-aid-and-abet theory, but rather charged the defendants simply with conspiring to distribute heroin, the court held that the theory could be "read into" the indictment, just as a defendant may be convicted of a substantive offense on an aiding-and-abetting theory even if the theory is not explicitly alleged in the indictment.  *Id.* at 45.

Like the blank credit cards in *Zambrano* and the diluent materials in *Perry*, malicious software may be theoretically capable of being used for lawful purposes.  But, as *Zambrano* and *Perry* show, that theoretical possibility does not shield Ulbricht from being charged with conspiring to commit computer hacking by agreeing with others to sell such software on Silk Road.  At trial, the Government could show based on a variety of evidence that Ulbricht knew

the malicious software being peddled on Silk Road was intended to be used to commit computer hacking.  For example, the Silk Road vendors who sold such software typically highlighted its malicious uses in their advertisements, in listings such as "Hack ANY Facebook Account," "Email Account Cracker," and "USB Password/File Stealer Pack."  And the buyers purchasing the software did so in a surreptitious fashion, by logging into the Tor network to hide their identities and locations, as was required in order to access Silk Road.   *Cf. Zambrano*, 776 F.2d at 1096.  Regardless of whether the purchasers of the software *actually* used it for computer hacking, as long as the Government could show that Ulbricht intended to aid and abet such use in conspiring with Silk Road vendors to sell the software, the Government would have sufficient evidence to convict.  *See Perry*, 643 F.2d at 45 ("It is unnecessary to show that the conspiracy actually aided any particular sale of heroin since a conspiracy can be found though its object has not been achieved."); *see generally United States v. Gore*, 154 F.3d 34, 40 (2d Cir. 1998) ("The essence of conspiracy is the agreement and not the commission of the substantive offense.") (citation omitted).

In short, Ulbricht simply prejudges the evidence in assuming that the Government will not be able to prove at trial what the Indictment alleges – that he knowingly entered an agreement with others to commit (or, as implicitly alleged, aid and abet) computer hacking. Because at this stage the allegations of the Indictment are assumed to be true, his motion to dismiss Count Three fails.

**D.     Ulbricht's Remaining Challenges to Counts One Through Three Are Meritless**

Beyond challenging Counts One through Three individually, Ulbricht also challenges them on grounds that he asserts are common to all three counts.  Ulbricht frames these challenges under various doctrines – the rule of lenity, the doctrine of constitutional avoidance, a civil immunity statute for online service providers, the void-for-vagueness doctrine, and the

overbreadth doctrine.  But, when reduced to their essence, they all amount to the same argument: that the statutes underlying Counts One through Three do not or cannot apply to someone who "operated a web site through which other persons . . . committed illegal activity."  (Br. 6).  The argument is specious: the statutes are not ambiguous as to whether they apply to Ulbricht's conduct, and the fact that Ulbricht violated the statutes by operating a website does not somehow immunize him from prosecution.

1.      *There Is No Basis to Construe the Statutes at Issue Not to Apply to Ulbricht's Conduct*

Ulbricht cites several purported bases for construing the statutes at issue not to apply to his conduct: the rule of lenity, the doctrine of constitutional avoidance, and a civil immunity statute for online service providers.  None lend any genuine support to his position.

The canons of statutory construction cited by Ulbricht – the rule of lenity and the doctrine of constitutional avoidance – have no application here.  "The rule of lenity serves to aid the court in interpreting a criminal statute only if there is ambiguity." *See United States v. Litchfield,* 986 F.2d 21 (2d Cir. 1993).  It "comes into operation at the end of the process of construing what Congress has expressed, not at the beginning as an overriding consideration of being lenient to wrongdoers." *Callanan v. United States*, 364 U.S. 587, 596 (1961).  Similarly, the doctrine of constitutional avoidance is available only when a court is faced with "competing plausible interpretations of a statutory text," one of which raises serious constitutional doubts and the other does not.  *Clark v. Martinez*, 543 U.S. 371, 381 (2005).  The doctrine thus "has no application in the absence of statutory ambiguity." *United States v. Oakland Cannabis Buyers' Coop.*, 532 U.S. 483, 494 (2001).

Here, Ulbricht fails to point to any supposed ambiguities in the texts of any of the statutes at issue.  He merely sets forth the general legal standards concerning the rule of lenity and

doctrine of constitutional avoidance, without explaining what statutory terms they purportedly require to be construed in his favor.  (Br. 28).  In the absence of any particular task of statutory interpretation, these canons simply have no work to do here.

Even more inapposite is the civil immunity statute cited by Ulbricht, 47 U.S.C. § 230, which immunizes providers of "interactive computer services" against civil liability arising from content created by third parties.  Specifically, the statute provides that "[n]o provider . . . of an interactive computer service" – which includes a website operator[7] – "shall be treated as the publisher or speaker of any information provided by another information content provider" – such as a user who posts content on the website.[8]  47 U.S.C. § 230(c)(1); *see also, e.g., Ascentive, LLC v. Opinion Corp.*, 842 F. Supp. 2d 450, 473 (E.D.N.Y. Dec. 13, 2011) (applying statute to website operator and users).  The statute further provides that "[n]o cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section."  *Id.* § 230(e)(3).  Thus, the statute shields website operators from civil liability arising from defamation and other state-law tort claims premised on posts of, or links to, user-created content.  *See Murawski v. Pataki*, 514 F. Supp. 2d 577, 591 (S.D.N.Y. 2007) (citing *Gucci Am., Inc. v. Hall & Assocs.*, 135 F. Supp. 2d 409, 417 (S.D.N.Y. 2001) (citing legislative history of the CDA)).  Essentially, through the statute, Congress "declined to extend traditional defamation law, as applied to classical information providers such as newspapers, magazines, television, and radio stations to the Internet."  *Ascentive*, 842 F. Supp. 2d at 472.

[7] *See* 47 U.S.C. § 230(f)(2) (defining "interactive computer service" as "any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server, including specifically a service or system that provides access to the Internet and such systems operated or services offered by libraries or educational institutions").

[8] *See* 47 U.S.C. § 230(f)(3) (defining "information content provider" as "any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service").

Section 230 is completely inapplicable here.  As an initial matter, none of the charges at issue treat Ulbricht as the "publisher or speaker" of "content" posted by others on Silk Road. Ulbricht is not being prosecuted because Silk Road users *said* things on the site that were illegal. He is being prosecuted because Silk Road users *did* things on the site that were illegal – namely, selling drugs and malicious software – and because Ulbricht conspired with them in support of their activity.  This is simply not a case about First Amendment activity, notwithstanding Ulbricht's strained efforts to portray it as such.  *See United States v. Sattar*, 395 F. Supp.2d 79, 101 (S.D.N.Y. 2005) *aff'd sub nom. United States v. Stewart*, 590 F.3d 93 (2d Cir. 2009) ("The First Amendment lends no protection to participation in a conspiracy, even if such participation is through speech.").

More fundamentally, § 230 merely provides a form of *civil* immunity.  It has no application whatsoever in the criminal context and explicitly provides that "[n]othing in this section shall be construed to impair the enforcement of . . . any . . . Federal criminal statute."  47 U.S.C. § 230(e)(1).  Ulbricht acknowledges this "caveat," as he puts it, but states that "it is anomalous that the law affords greater protection to civil litigants, with money or property at stake, than to defendants in criminal cases whose liberty is in jeopardy." (Br. 30 n.10).  He argues that, notwithstanding its express inapplicability to criminal law, § 230 should be read to "support a decidedly narrow application of the criminal statutes at issue in this case."  (Br. 32).

This argument is, of course, wrong.  It is not at all anomalous that § 230 draws a sharp distinction between civil and criminal liability.  That distinction reflects a conclusion by Congress that, if online services were subject to lawsuits based on content posted by their users, they could be flooded with crippling litigation.  Congress had no such concern with criminal

prosecution and wished to avoid restricting law enforcement's ability to prosecute providers of online services engaged in criminal activity.  As one court has explained:

> Congress decided not to allow private litigants to bring civil claims based on their own beliefs that a service provider's actions violated the criminal laws. . . .  [T]he reason is evident.  If civil liability were possible, the incentive to bring a civil claim for the settlement value could be immense, even if a plaintiff's claim was without merit. Even if it ultimately prevailed, the service provider would face intense public scrutiny and substantial expense.  Given the millions of communications that a service provider . . . enables, the service provider could find itself a defendant in numerous such cases.  Congress determined that it wanted to eliminate the resulting disincentives to the development of vibrant and diverse services involving third-party communication, while maintaining the ability of criminal prosecutions by the government for violations of federal criminal law.  In sum, Congress did intend to treat civil and criminal claims differently and carefully crafted Section 230(e)(1) to achieve exactly that result.

*Doe v. Bates*, 05 Civ. 91, 2006 WL 3813758, at *22 (E.D. Tex. Dec. 27, 2006).

In short, in enacting § 230, Congress unsurprisingly did not intend to create a safe harbor for operators of criminal websites.  Accordingly, Ulbricht's reliance on § 230 in arguing for the dismissal of Counts One through Three is utterly misplaced.

       2.     *The Statutes at Issue Are Neither Void for Vagueness Nor Overbroad*

Ulbricht next argues that, if the statutes underlying Counts One through Three are construed to apply to his conduct, they should be deemed unconstitutional – either as void-for-vagueness as applied to him, or as overbroad on their face.  Neither constitutional concern applies here.

The void-for-vagueness doctrine simply requires, as a matter of due process, that a criminal statute define an offense with sufficient specificity to provide "a person of ordinary intelligence . . . fair notice that his contemplated conduct is forbidden."  *United States v. Tannenbaum*, 934 F.2d 8, 11 (2d Cir. 1991).  Again, Ulbricht fails to point to any terms in the statute that lack such specificity and fail to provide such notice.  Instead, Ulbricht simply claims that the statutes have never been applied to "the alleged operator of a web site."  (Br. 38).

29

That premise, as an initial matter, is not true.  In fact, both the narcotics conspiracy statute and continuing criminal enterprise statute have specifically been applied in a previous prosecution of defendants involved in operating online marketplaces for illegal drugs.  *See United States v. Willems*, 11 Cr. 1137, Indictment (C.D. Ca. filed Nov. 29, 2011) (attached as Ex. A) (bringing charges under 21 U.S.C. §§ 846 and 848 against "members of a conspiracy to distribute a variety of controlled substances world-wide through the use of on-line marketplaces that allowed independent sources of supply to anonymously advertise illegal drugs for sale to the public").  Similarly, the computer hacking statute has previously been applied to persons involved in providing online services used by others to distribute malicious software.  *See United States v. Paunescu*, 13 Cr. 41 (RPP), Indictment (S.D.N.Y. filed Jan. 17, 2013) (attached as Ex. B) (bringing charges under 18 U.S.C. § 1030(b) against operator of "bulletproof hosting service," who, "in exchange for fees, . . . provided cyber criminals with Internet Protocol . . . addresses and servers in a manner designed to enable them to preserve their anonymity and evade detection by law enforcement").

In any event, regardless of any novel aspect of this prosecution, a statute is not rendered unconstitutionally vague simply by virtue of being applied in a novel context.  No statute can ever specify all the various factual scenarios in which it may be violated.  *See United States v. Lanier*, 520 U.S. 259, 271 (1997) ("[D]ue process requirements are not designed to convert into a constitutional dilemma the practical difficulties in drawing criminal statutes both general enough to take into account a variety of human conduct and sufficiently specific to provide fair warning that certain kinds of conduct are prohibited.") (citation and internal quotation marks omitted).  Thus, "it is immaterial" whether, when Ulbricht violated the statutes at issue, "'there [was] no litigated fact pattern precisely in point.'"  *Tannenbaum*, 934 F.2d at 12 (quoting *United*

30

*States v. Ingredient Technology Corp.*, 698 F.2d 88, 96 (2d Cir. 1983) (quoting *United States v. Brown*, 555 F.2d 336, 339-40 (2d Cir. 1977))).

Again, the only question in a void-for-vagueness challenge is whether a "person of ordinary intelligence" would have understood that his contemplated conduct was illegal. And here, anyone with an ounce of common sense in Ulbricht's position would have known that what he was doing – running an enormous black market for illegal drugs, malicious software, and other illicit goods and services – was against the law.[9] Indeed, the allegations of the Indictment and Complaint make clear that Ulbricht himself was acutely aware of the illegality of his conduct. Throughout the operation of Silk Road, he used sophisticated technological methods to conceal any connection between the website and his true identity. He used multiple aliases and fake identities, both online and in real life, to hide from law enforcement. He was willing to resort to violent means in order to protect his enterprise, including soliciting the murder-for-hire of several individuals. Ulbricht is thus hardly in a position to claim ignorance of any wrongdoing. *See Ingredient Technology Corp.*, 698 F.2d at 96 (rejecting void-for-vagueness challenge where defendants' clandestine conduct evidenced that "surely the defendants knew they were committing a wrongful act").[10]

---

[9] As to Count One in particular, Ulbricht is hard pressed to explain how the law failed to provide notice that his conduct was illegal, given that 21 U.S.C. § 841(h) – which is one of the statutes he is alleged to have conspired to violate – specifically makes it a crime to distribute controlled substances over the Internet or to aid and abet such distribution. 21 U.S.C. § 841(h)(1). The statute even provides the following example of the activity it covers: "serving as an agent, intermediary, or other entity that causes the Internet to be used to bring together a buyer and seller to engage in the dispensing of a controlled substance." *Id*. § 841(h)(2)(C).

[10] In addition to attacking the statutes underlying Counts One through Three as void for vagueness on the above grounds, Ulbricht launches a separate attack specifically on Count Three, arguing that the computer hacking statute is unconstitutionally vague by virtue of failing to adequately define what it means to "access" a computer "without authorization." (Br. 39-43). As support, Ulbricht cites the fact that there are "divergent opinions" among the courts as to how

Ulbricht fares no better in attempting to rely on the overbreadth doctrine. The overbreadth doctrine is rooted in the First Amendment, and applies only where a law "punishes a substantial amount of protected free speech, judged in relation to [its] plainly legitimate sweep." *Virginia v. Hicks*, 539 U.S. 113, 118–19 (2003) (internal quotation marks omitted). A finding of overbreadth invalidates a challenged law in its entirety, unless it can be saved by a limiting construction. *Id.* at 119. "Mindful that such relief is 'strong medicine,' the law rigorously enforces the burden on the challenging party to demonstrate 'substantial' infringement of speech." *Id.*

Here, Ulbricht fails to explain what "protected free speech" the statutes underlying Counts One through Three illegitimately sweep within their scope. He merely claims in a conclusory fashion that "application of those statutes herein would render them overbroad, as they would undoubtedly chill First Amendment activity on the internet." (Br. 38). Yet the only activity these statutes threaten to "chill" on the Internet is drug dealing and computer hacking. The mere fact that violations of these statutes may occur on the Internet does not somehow grant them First Amendment protection and does not render the statutes overbroad. Ulbricht simply offers no basis to conclude that the statutes at issue impinge on First Amendment interests at all, let alone in any substantial, illegitimate manner. *See United States v. Farhane*, 634 F.3d 127, 137 (2d Cir. 2011) ("[The defendant's] recitation of the applicable legal standards and his conclusory declaration that [the statute] is overbroad do not come close to carrying [his] burden.").

---

to interpret this language. (Br. 42). Such divergence, however, hardly amounts to a constitutional infirmity. "[S]ome ambiguity in a statute's meaning is constitutionally tolerable," *United States v. Chestaro*, 197 F.3d 600, 605 (2d Cir. 1999), and statutes "are not automatically invalidated as vague simply because difficulty is found in determining whether certain marginal offenses fall within their language." *Parker v. Levy*, 417 U.S. 733, 757 (1974).

**E.     Count Four Sufficiently Alleges a Money Laundering Conspiracy**

Lastly, Ulbricht challenges Count Four, which charges him with conspiring to commit money laundering in violation of 18 U.S.C. § 1956(h).  Specifically, Count Four alleges that Ulbricht designed Silk Road's Bitcoin-based payment system to facilitate the illegal commerce conducted on the site, by enabling money to be moved through the site anonymously. (Indictment ¶ 18).  Ulbricht seeks to dismiss Count Four based on the argument that Bitcoin transactions fall outside § 1956's scope.  The argument is meritless.

Count Four specifically charges Ulbricht with conspiring to commit promotion money laundering and concealment money laundering in violation of 18 U.S.C. § 1956(a)(1)(A) and § 1956(a)(1)(B), respectively.  Section 1956(a)(1)(A) makes it a crime to conduct a "financial transaction" involving the proceeds of specified unlawful activity, with the intent of promoting such unlawful activity.  Section 1956(a)(1)(B) makes it a crime to conduct a "financial transaction" involving the proceeds of specified unlawful activity, knowing that the purpose of the transaction is to conceal the nature, location, source, ownership, or control of the proceeds of the activity.

The term "financial transaction," which is the touchstone of both violations, is defined in 18 U.S.C. § 1956(c)(4) as follows:

> (A)     a transaction which in any way or degree affects interstate or foreign commerce
>
>> (i)      involving the movement of funds by wire or other means, or
>>
>> (ii)     involving one or more monetary instruments, or
>>
>> (iii)    involving the transfer of title to any real property, vehicle, vessel, or aircraft, or
>
> (B)     a transaction involving the use of a financial institution which is engaged in, or the activities of which affect, interstate or foreign commerce in any way or degree.

As is clear from the above, "[t]he statute defines 'financial transaction' very broadly." *United States v. Blackman*, 904 F.2d 1250, 1257 (8th Cir. 1990) (citation omitted).  The various prongs of the definition "indicate that Congress intended to criminalize a broad array of transactions designed to facilitate numerous federal crimes."  *United States v. Garcia*, 533 Fed. App'x 967, 978 (11th Cir. 2013) (internal quotation marks and citation omitted); *accord United States v. LeBlanc*, 24 F.3d 340, 346 (1st Cir. 1994); *United States v. Arditti*, 955 F.2d 331, 338 (5th Cir. 1992).

Bitcoin transactions comfortably fit within the broad language of the definition, as Bitcoins are "funds," and Bitcoin transactions, which are conducted via the Internet, therefore involve "the movement of funds by wire or other means."  18 U.S.C. § 1956(c)(4)(A)(i).[11] Section 1956 does not specifically define the term "funds," so the term is given its ordinary meaning in applying the statute.  *See Taniguchi v. Kan Pacific Saipan, Ltd.*, 132 S.Ct. 1997, 2002 (2012) ("When a term goes undefined in a statute, we give the term its ordinary meaning.").  As defined in the dictionary, "funds" is a flexible term encompassing virtually any liquid form of value.  Black's Law Dictionary, for example, defines "fund" as "a sum of money or other liquid assets established for a specific purpose."  *Black's Law Dictionary* 743 (9th ed. 2009).  A "liquid asset" is defined by cross-reference to "current asset," *id.* at 1014, which means "[a]n asset that is readily convertible into cash," *id.* at 134.  Other, non-legal dictionaries define the term "funds" in a similarly open-ended fashion.  The Oxford English Dictionary, for

---

[11] As explained in more detail in the Complaint, Bitcoins are a form of virtual currency that operates on a peer-to-peer network over the Internet.  Bitcoins may be acquired through an "exchanger" – typically a company that, in return for a commission, accepts payments of real currency in exchange for a corresponding number of Bitcoins, based on a fluctuating exchange rate.  Exchangers also can accept payments of Bitcoin and exchange them back for real currency. Once a user acquires Bitcoins, he can conduct transactions with anyone else on the Bitcoin network, by transferring the Bitcoins to those other users through the Internet.  (Compl. ¶ 21).

example, defines "funds" as "money at a person's disposal; pecuniary resources." *Oxford English Dictionary* (2d ed. 1989). The term "pecuniary" is defined in turn as "of or relating to money; monetary; financial." *Id.*; *see also Random House Dictionary* (4th ed. 2001) (defining "funds" as "money immediately available; pecuniary resources").

In *United States v. Day*, 700 F.3d 713 (4th Cir. 2012), the Fourth Circuit had occasion to interpret the term "funds" in the context of § 1956. The defendant in the case had conspired with another to convert his criminal proceeds to gold and covertly transport the gold to Mexico. *Id.* at 717-18. He was convicted, among other things, of money laundering conspiracy. *Id.* at 718. On appeal, he challenged his conviction, arguing, similarly to Ulbricht, that gold does not qualify as either "funds" or "monetary instruments" within the meaning of § 1956. *Id.* at 723. The Fourth Circuit disagreed. Upon reviewing dictionary definitions of "funds," the court construed the term to refer to any "assets of monetary value that are susceptible to ready financial use." *Id.* at 725. Thus, it concluded that "gold can constitute 'funds' . . . where it is moved as a liquid, monetary asset." *Id.* at 726. The court noted that any other reading would lead to anomalous results at odds with the "purpose and structure of the money laundering statute," explaining:

> At its core, Day's argument is that a defendant can violate the transportation money laundering provision if he moves cash or some other ordinary financial instrument with a design to conceal its source, ownership, or other listed attribute, but not if he takes the further deceitful step of first converting the cash into the more difficult-to-trace financial asset of gold. To accept Day's argument would turn the transportation money laundering statute on its head, creating an odd safe harbor for criminals to transport and conceal their criminal proceeds where they engage in more deceit and concealment, not less. We do not think Congress could have intended such a result . . . .

*Id.*

The Fourth Circuit's holding in *Day* readily extends to Bitcoins. As with gold, Bitcoins are "assets of monetary value that are susceptible to ready financial use." *Day*, 700 F.2d at 726. They can easily be purchased in exchange for ordinary currency and then used to conduct

financial transactions.  *See SEC v. Shavers*, 13 Civ. 416, 2013 WL 4028182, at *2 (E.D. Tex.

Aug. 6, 2013) ("It is clear that Bitcoin can be used as money. It can be used to purchase goods or

services, and . . . used to pay for individual living expenses. . . . [I]t can also be exchanged for

conventional currencies.")  The fact that the Silk Road website processed well over a million

sales transactions, all paid for with Bitcoins, attests to their ability to be used as "a substitute for

cash."  *Day*, 700 F.2d at 726.  Indeed, the monetary value of Bitcoins is not lost on Ulbricht, who

has sought to oppose the forfeiture of the tens of millions of dollars' worth of Bitcoins recovered

from the laptop seized from him upon his arrest.  *See United States v. Ulbricht*, 13 Cr. 6919

(JPO), Verified Claim and Statement (filed Dec. 12, 2013) (attached as Ex. C).[12]

    Ulbricht fails to point to any case law or any text or legislative history of § 1956 in

support of his assertion that Bitcoins do not qualify as "funds" within the meaning of the statute.

Instead, he relies solely on guidance documents issued by the Internal Revenue Service ("IRS")

and the Financial Crimes Enforcement Network ("FinCEN").  (Br. 47-49 (citing IRS Notice

2014-21, *available at* http://www.irs.gov/pub/irs-drop/n-14-21.pdf ("IRS Guidance") and U.S.

---

[12] In addition to constituting "funds," Bitcoins may, at least in some circumstances, also qualify
as "monetary instruments" for purposes of § 1956(c)(4)(A)(ii), insofar as they may be considered
"investment securities." *See* 18 U.S.C. § 1956(c)(5) (defining "money instruments" to include
"investment securities").  Indeed, Ulbricht acknowledges a district court case in which Bitcoins
were deemed to be securities for purposes of an enforcement action brought by the Securities and
Exchange Commission.  (Br. 49 (citing *SEC v. Shavers*, *supra*)).  However, given that Bitcoins
clearly fall within the "funds" prong of § 1956(c)(4)(A), there is no need to reach this issue here.
*See Arditti*, 955 F.2d at 338 (finding it unnecessary to decide whether cashier's checks qualify as
"monetary instruments" under § 1956 given that they were "unquestionably" "funds [moved] by
wire or other means"). It should also be noted that Bitcoin transactions separately qualify as
"financial transactions" under § 1956(c)(4)(B) where they involve Bitcoin exchangers, because
such transactions involve the "use of a financial institution" – a term that includes virtual
currency exchangers.  *See* 18 U.S.C. § 1956(c)(6) (defining "financial institution by cross-
reference to 31 U.S.C. § 5312(a)(2)); 31 U.S.C. § 5312(a)(2) (defining "financial institution" to
include money transmitting businesses); FinCEN Guidance*, supra*, at 1 (explaining that virtual
currency exchangers are money transmitters).

Department of the Treasury, Financial Crimes Enforcement Network, Guidance FIN-2013-G001, *Application of FinCEN's Regulations to Persons Administering, Exchanging, or Using Virtual Currencies*, March 18, 2013, *available at* http://fincen.gov/statutes_regs/guidance/html/FIN-2013-G001.html ("FinCEN Guidance"))).

These guidance documents have nothing to do with the meaning of "funds" as used in § 1956. The IRS Guidance addresses "only the U.S. federal tax consequences" of virtual currency transactions. In that regard, it advises that virtual currencies such as Bitcoins are "not treated as currency that could generate foreign currency gain or loss for U.S. federal tax purposes," and that they are instead governed by the "[g]eneral tax principles applicable to property transactions." IRS Guidance at 2. The FinCEN Guidance clarifies the applicability of Bank Secrecy Act regulations to virtual currency administrators and exchangers, advising that such entities are considered money services businesses under FinCEN regulations and are subject to anti-money laundering laws. As background, the FinCEN Guidance notes that virtual currency "operates like a currency in some environments, but does not have all the attributes of real currency," and in particular "does not have legal tender status in any jurisdiction," FinCEN Guidance at 1 – which is the part of the document that Ulbricht cites in his brief. (Br. 46).

Notwithstanding the narrow focus and careful language of these guidance documents, Ulbricht boldly asserts in his brief that "[b]oth IRS and FinCEN have categorically declared that Bitcoins are not 'funds.'" (Br. 49). IRS and FinCEN have made no such declaration whatsoever. The inference that Ulbricht appears to be making is that because Bitcoins are not regarded by the IRS or FinCEN as *real* currency, Bitcoins cannot qualify as "funds" within the meaning of § 1956. The inference is based, however, on an erroneous assumption that the term "funds" as used in § 1956 refers only to real currency. As explained in *Day*, there is no reason to construe the term so narrowly; the term's ordinary meaning instead encompasses any liquid, pecuniary asset.

37

Indeed, construing the term "funds" as coterminous with real currency would contravene the structure of the definition of "financial transaction" in § 1956.  In addition to defining "financial transaction" in § 1956(c)(4)(A)(i) to include any transaction "involving the movement of funds," the definition contains a separate prong that explicitly addresses real currency: specifically, § 1956(c)(4)(A)(ii) covers any transaction involving any "monetary instruments," which is defined in turn to include, *inter alia*, "coin or currency of the United States or of any other country."  18 U.S.C. § 1956(c)(5).  Thus, construing "funds" to mean the same thing as "currency" would render the "funds" prong of the "financial transaction" superfluous, since currency is separately and specifically addressed in the "monetary instrument" prong.  Only if the "funds" prong is construed more broadly – as a catchall provision covering, again, *any* liquid, pecuniary asset – do the various prongs of the "financial transaction" transaction form a harmonious whole.  *See United States v. Al Kassar*, 660 F.3d 108, 124–25 (2d Cir. 2011) ("[W]e interpret statutes to give effect, if possible, to every clause and word and to avoid statutory interpretations that render provisions superfluous.").

In short, Bitcoins are not exempt from the money laundering laws.  They fall well within the broad sweep of § 1956's "financial transaction" definition, as they constitute one of many potential types of "funds."  As explained in *Day*, any contrary holding would cut a gaping hole in § 1956 and create an obvious incentive for criminals to use Bitcoins to launder the proceeds of their illegal activity.  Accordingly, Ulbricht's motion to dismiss Count Four should be rejected.

## **CONCLUSION**

For the foregoing reasons, Ulbricht's motion to dismiss the indictment should be denied in its entirety.

Dated:  April 28, 2014                                    Respectfully submitted,
       New York, New York

                                              PREET BHARARA
                                              United States Attorney for the
                                              Southern District of New York

                               By:  /s/ Serrin Turner          
                                            SERRIN TURNER
                                            Assistant United States Attorney
                                            (212) 637-1946