```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: JUL 0 9 2014
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------X
                                              :
UNITED STATES OF AMERICA                      :
                                              :
            -v-                               :        14-cr-68 (KBF)
                                              :
ROSS WILLIAM ULBRICHT,                        :        OPINION & ORDER
      a/k/a "Dread Pirate Roberts,"           :
      a/k/a "DPR,"                            :
      a/k/a "Silk Road,"                      :
                                              :
                            Defendant.        :
-------------------------------------------------------------X

KATHERINE B. FORREST, District Judge:

On February 4, 2014, a Grand Jury sitting in the Southern District of New

York returned Indictment 14 Cr. 68, charging Ross Ulbricht ("the defendant" or

"Ulbricht") on four counts for participation in a narcotics trafficking conspiracy

(Count One), a continuing criminal enterprise ("CCE") (Count Two), a computer

hacking conspiracy (Count Three), and a money laundering conspiracy (Count

Four). (Indictment, ECF No. 12.) Pending before the Court is the defendant's

motion to dismiss all counts. (ECF No. 19.) For the reasons set forth below, the

Court DENIES the motion in its entirety.[1]

The Government alleges that Ulbricht engaged in narcotics trafficking,

computer hacking, and money laundering conspiracies by designing, launching, and

administering a website called Silk Road ("Silk Road") as an online marketplace for

illicit goods and services. These allegations raise novel issues as they relate to the

Internet and the defendant's role in the purported conspiracies.

---

[1] This Opinion & Order addresses various issues both as background informing its decision herein
and to preview for the parties a number of issues that are relevant to the trial of this matter.

1

A conspiracy claim is premised on an agreement between two or more people to achieve an unlawful end.  The Government alleges that by designing, launching, and administering Silk Road, Ulbricht conspired with narcotics traffickers and hackers to buy and sell illegal narcotics and malicious computer software and to launder the proceeds using Bitcoin.  There is no allegation that Ulbricht conspired with anyone prior to his launch of Silk Road.  Rather, the allegations revolve around the numerous transactions that occurred on the site following its launch.

The Government alleges that Silk Road was designed to operate like eBay:  a seller would electronically post a good or service for sale; a buyer would electronically purchase the item; the seller would then ship or otherwise provide to the buyer the purchased item; the buyer would provide feedback; and the site operator (i.e., Ulbricht) would receive a portion of the seller's revenue as a commission.  Ulbricht, as the alleged site designer, made the site available only to those using Tor, software and a network that allows for anonymous, untraceable Internet browsing; he allowed payment only via Bitcoin, an anonymous and untraceable form of payment.

Following the launch of Silk Road, the site was available to sellers and buyers for transactions.  Thousands of transactions allegedly occurred over the course of nearly three years – sellers posted goods when available; buyers purchased goods when desired.  As website administrator, Ulbricht may have had some direct contact with some users of the site, and none with most.  This online marketplace thus allowed the alleged designer and operator (Ulbricht) to be

2

anywhere in the world with an Internet connection (he was apprehended in California), the sellers and buyers to be anywhere, the activities to occur independently from one another on different days and at different times, and the transactions to occur anonymously.

A number of legal questions arise from conspiracy claims premised on this framework.  In sum, they address whether the conduct alleged here can serve as the basis of a criminal conspiracy – and, if so, when, how, and with whom.

Question One:  Can there be a legally cognizable "agreement" between Ulbricht and one or more coconspirators to engage in narcotics trafficking, computer hacking, and money laundering by virtue of his and their conduct in relation to Silk Road?  If so, what is the difference between what Ulbricht is alleged to have done and the conduct of designers and administrators of legitimate online marketplaces through which illegal transactions may nevertheless occur?

Question Two:  As a matter of law, who are Ulbricht's alleged coconspirators and potential coconspirators?  That is, whose "minds" can have "met" with Ulbricht's in a conspiratorial agreement?  What sort of conspiratorial structure frames the allegations:  one large, single conspiracy or multiple smaller ones?

Question Three:  As a matter of law, when could any particular agreement have occurred between Ulbricht and his alleged coconspirators?  Need each coconspirator's mind have met simultaneously with Ulbricht's?  With the minds of the other coconspirators?  That is, if Ulbricht launched Silk Road on Day 1, can he be said, as a matter of law, to have entered into an agreement with the user who

joins on Day 300?  Did Ulbricht, simply by designing and launching Silk Road,

make an enduring showing of intent?

Question Four:  As a matter of law, is it legally necessary, or factually

possible, to pinpoint how the agreement between Ulbricht and his coconspirators

was made?  In this regard, does the law recognize a conspiratorial agreement

effected by an end user interacting with computer software, or do two human minds

need to be simultaneously involved at the moment of agreement?

Question Five:  If Ulbricht was merely the facilitator of simple buy-sell

transactions, does the "buyer-seller" rule apply, which in certain circumstances

would preclude a finding of a criminal conspiracy?

*******

The defendant also raises the following additional arguments with respect to

Counts One, Two, and Three:  the rule of lenity, the doctrine of constitutional

avoidance, the void-for-vagueness doctrine, constitutionally defective over-breadth,

and a civil immunity statute for online service providers.  The Court refers to these

collectively as the "Kitchen Sink" arguments.  While this is a case of first

impression as to the charged conduct, the fact that the alleged conduct constitutes

cognizable crimes requires no legal contortion and is not surprising.  These

arguments do not preclude criminal charges.

With regard to Count Two, the defendant alleges that, as a matter of law, his

conduct cannot constitute participation in a CCE (under the so-called "kingpin"

statute).  The defendant argues that the Indictment fails to allege that he had the

requisite managerial authority in the conspiracy and that the Indictment fails to allege a sufficient "continuing series" of predicate violations. The Court disagrees and finds that the allegations in the Indictment are sufficient.

With regard to Count Three, the defendant contends that the allegations in the Indictment are insufficient to support the type of conduct covered by a computer hacking conspiracy. The defendant confuses the requirement for establishing the violation of the underlying offense with the requirements for establishing a conspiracy to commit the underlying offense; he finds ambiguity where there is none. The Government alleges a legally cognizable claim in Count Three.

Finally, with respect to Count Four, the defendant alleges that he cannot have engaged in money laundering because all transactions occurred through the use of Bitcoin and thus there was therefore no legally cognizable "financial transaction." The Court disagrees. Bitcoins carry value – that is their purpose and function – and act as a medium of exchange. Bitcoins may be exchanged for legal tender, be it U.S. dollars, Euros, or some other currency. Accordingly, this argument fails.

I.      THE INDICTMENT

Rule 7(c)(1) of the Federal Rules of Criminal Procedure provides that an indictment "must be a plain, concise, and definite written statement of the essential facts constituting the offense charged." Fed. R. Crim. P. 7(c). It need not contain any other matter not necessary to such statement. Id. ("A count may allege that the

means by which the defendant committed the offense are unknown or that the defendant committed it by one or more specified means.").

An indictment must inform the defendant of the crime with which he has been charged. United States v. Doe, 297 F.3d 76, 87 (2d Cir. 2002). "By informing the defendant of the charges he faces, the indictment protects the defendant from double jeopardy and allows the defendant to prepare his defense." Id.; United States v. Dhinsa, 243 F.3d 635, 667 (2d Cir. 2001). Rule 7(c) is intended to "eliminate prolix indictments," United States v. Carrier, 672 F.2d 300, 303 (2d Cir. 1982), and "secure simplicity in procedure." United States v. Debrow, 346 U.S. 374, 376 (1953). The Second Circuit has "consistently upheld indictments that do little more than track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime." United States v. Walsh, 194 F.3d 37, 44 (2d Cir. 1999) (internal quotation marks and citation omitted); see also United States v. Cohen, 518 F.2d 727, 733 (2d Cir. 1975).

Nevertheless, "[a] criminal defendant is entitled to an indictment that states the essential elements of the charge against him." United States v. Pirro, 212 F.3d 86, 91 (2d Cir. 2000). "[F]or an indictment to fulfill the functions of notifying the defendant of the charges against him and of assuring that he is tried on the matters considered by the grand jury, the indictment must state some fact specific enough to describe a particular criminal act, rather than a type of crime." Id. at 93.

"An indictment must be read to include facts which are necessarily implied by the specific allegations made." United States v. Stavroulakis, 952 F.2d 686, 693

(2d Cir. 1992) (internal quotation marks and citations omitted).  "[C]ommon sense and reason prevail over technicalities."  United States v. Sabbeth, 262 F.3d 207, 218 (2d Cir. 2001) ("[A]n indictment need not be perfect.").  While an indictment must give a defendant "sufficient notice of the core of criminality to be proven against him," United States v. Pagan, 721 F.2d 24, 27 (2d Cir. 1983) (citation omitted), the "'core of criminality' of an offense involves the essence of the crime, in general terms," and not "the particulars of how a defendant effected the crime."  United States v. D'Amelio, 683 F.3d 412, 418 (2d Cir. 2012) (citation omitted).

As with all motions to dismiss an indictment, the Court accepts as true the allegations set forth in the charging instrument for purposes of determining the sufficiency of the charges.  See United States v. Sampson, 371 U.S. 75, 78-79 (1962); United States v. Goldberg, 756 F.2d 949, 950 (2d Cir. 1985).

The Indictment here alleges that Ulbricht designed, created, operated, and owned Silk Road, "the most sophisticated and extensive criminal marketplace on the Internet."  (Ind. ¶¶ 1-3.)  Silk Road operated using Tor, software and a network that enables users to access the Internet anonymously – it keeps users' unique identifying Internet Protocol ("IP") addresses obscured, preventing surveillance or tracking.  All purchases occurred on Silk Road using Bitcoin, an anonymous online currency.

Silk Road allegedly functioned as designed – tens of thousands of buyers and sellers are alleged to have entered into transactions using the site, violating numerous criminal laws.  Over time, thousands of kilograms of heroin and cocaine

were allegedly bought and sold, as if the purchases were occurring on eBay or any other similar website.

Count One charges that, from in or about January 2011 up to and including October 2013, the defendant engaged in a narcotics trafficking conspiracy. To wit, "the defendant . . . designed [Silk Road] to enable users across the world to buy and sell illegal drugs and other illicit goods and services anonymously and outside the reach of law enforcement." (Ind. ¶ 1.) The defendant allegedly "controlled all aspects of Silk Road, with the assistance of various paid employees whom he managed and supervised." (Ind. ¶ 3.) "It was part and object of the conspiracy" that the defendant and others "would and did deliver, distribute, and dispense controlled substances by means of the Internet" and "did aid and abet such activity" in violation of the law. (Ind. ¶ 7.) The controlled substances allegedly included heroin, cocaine, and lysergic acid diethylamide ("LSD"). (Ind. ¶ 9.) The defendant allegedly "reaped commissions worth tens of millions of dollars, generated from the illicit sales conducted through the site." (Ind. ¶ 3.) According to the Indictment, the defendant "pursued violent means, including soliciting the murder-for-hire of several individuals he believed posed a threat to that enterprise." (Ind. ¶ 4.)

Count Two depends on the conduct in Count One. Count Two alleges that Ulbricht's conduct amounted, over time, to his position as a "kingpin" in a continuing criminal enterprise (again, "CCE"). (Ind. ¶ 12.) Ulbricht is alleged to have engaged in a "continuing series of violations" in concert "with at least five other persons with respect to whom Ulbricht occupied a position of organizer, a

supervisory position, and a position of management, and from which . . . Ulbricht obtained substantial income and resources." (Id.)

Count Three charges that Ulbricht also designed Silk Road as "a platform for the purchase and sale of malicious software designed for computer hacking, such as password stealers, keyloggers, and remote access tools." (Ind. ¶ 14.) "While in operation, the Silk Road website regularly offered hundreds of listings for such products." (Id.)  The object of this conspiracy was to "intentionally access computers without authorization, and thereby [to] obtain information from protected computers, for purposes of commercial advantage and financial gain." (Ind. ¶ 16.)

Count Four alleges that Ulbricht "designed Silk Road to include a Bitcoin-based payment system that served to facilitate the illegal commerce conducted on the site, including by concealing the identities and locations of the users transmitting and receiving funds through the site." (Ind. ¶ 18.)  "[K]nowing that the property involved in certain financial transactions represented proceeds of some form of unlawful activity," Ulbricht and others would and did conduct financial transactions with the proceeds of specified unlawful activity, "knowing that the transactions were designed . . . to conceal and disguise the nature, the location, the source, the ownership and the control of the proceeds." (Ind. ¶ 21.)

II.    THE LAW OF CONSPIRACY

A.    Elements of a Conspiracy

"The essence of the crime of conspiracy . . . is the agreement to commit one or more unlawful acts." United States v. Praddy, 725 F.3d 147, 153 (2d Cir. 2013)

(emphasis in original) (citation omitted); see also Ianelli v. United States, 420 U.S.

770, 777 (1975) ("Conspiracy is an inchoate offense, the essence of which is an

agreement to commit an unlawful act."); United States v. Falcone, 311 U.S. 205, 210

(1940); United States v. Beech-Nut Nutrition Corp., 871 F.2d 1181, 1191 (2d Cir.

1989) ("The gist of conspiracy is, of course, agreement."); United States v.

Rosenblatt, 554 F.2d 36, 38 (2d Cir. 1977).  Put differently, a conspiracy is the

"'combination of minds for an unlawful purpose.'"  Smith v. United States, – U.S. – ,

133 S.Ct. 714, 719 (2013) (quoting United States v. Hirsch, 100 U.S. 33, 34 (1879)).[2]

### 1.    Agreement

A meeting of the minds is required in order for there to be an agreement.

Krulewich v. United States, 336 U.S. 440, 447-48 (1949) (Jackson, J. concurring);

Rosenblatt, 554 F.2d at 38.  Two people have to engage in the "act of agreeing" in

order for this requirement to be met.  Rosenblatt, 554 F.2d at 38 (internal quotation

marks and citation omitted).  The conspirators must agree to the object, or unlawful

end, of the conspiracy.  Id.  While the coconspirators need not agree to every detail,

they must agree to the "essential nature" of the plan.  Blumenthal v. United States,

332 U.S. 539, 557 (1947); Praddy, 725 F.3d at 153 (internal quotation marks and

---

[2] There is no overt act requirement to establish a violation of a drug conspiracy prosecuted under 21 U.S.C. § 846.  See United States v. Shabani, 513 U.S. 10, 11 (1994); United States v. Anderson, 747 F.3d 51, 60 n.7 (2d Cir. 2014).  Similarly, a conviction for conspiracy to commit money laundering in violation of 18 U.S.C. § 1956(h) does not require proof of an overt act in furtherance of the conspiracy.  Whitfield v. United States, 543 U.S. 209, 219 (2005).

citations omitted); <u>United States v. Geibel,</u> 369 F.3d 682, 689 (2d Cir. 2004) (internal quotation marks and citations omitted); <u>Rosenblatt,</u> 554 F.2d at 38.[3]

"It is not necessary to prove that the defendant expressly agreed with other conspirators on a course of action; it is enough, rather, to show that the parties had a tacit understanding to carry out the prohibited conduct." <u>Anderson,</u> 747 F.3d at 61 (internal quotation marks, alteration, and citation omitted). However, "a defendant's mere presence at the scene of a crime, his general knowledge of criminal activity, or his simple association with others engaged in a crime are not, in themselves, sufficient to prove the defendant's criminal liability for conspiracy." <u>Id.</u> (citations omitted).

## 2.    Object of the Conspiracy

To be convicted of a conspiracy, a defendant must know what "'kind of criminal conduct was in fact contemplated.'" <u>Rosenblatt,</u> 554 F.2d at 38 (quoting <u>United States v. Gallishaw,</u> 428 F.2d 760, 763 n.1 (2d Cir. 1970)). That is, the defendant has to know what the "object" of the conspiracy he joined was. A "general agreement to engage in unspecified criminal conduct is insufficient to identify the essential nature of the conspiratorial plan." <u>Rosenblatt,</u> 544 F.2d at 39. Indeed, "[t]he government must prove that the defendant agreed to commit a <u>particular offense</u> and not merely a vague agreement to do something wrong." <u>United States v. Salameh,</u> 152 F.3d 88, 151 (2d Cir. 1998) (citation and internal quotation marks omitted) (emphasis in original). That said, "[t]he government need not show that

---

[3] In <u>Rosenblatt,</u> the Second Circuit overturned a conspiracy conviction on the basis that while two individuals agreed to commit offenses against the United States, they did not agree to commit the same offenses and therefore were not conspirators.  554 F.2d at 40.

the defendant knew all of the details of the conspiracy, so long as he knew its general nature and extent." United States v. Huezo, 546 F.3d 174, 180 (2d Cir. 2008) (citation and internal quotation marks omitted).[4]

### 3.    Participation

The crime of conspiracy requires that a defendant both know the object of the crime and that he knowingly and intentionally join the conspiracy. United States v. Torres, 604 F.3d 58, 66 (2d Cir. 2010). The requisite knowledge can be proven through circumstantial evidence. Id.

The quantum of proof necessary at trial to sustain a finding of knowledge varies. "A defendant's knowing and willing participation in a conspiracy may be inferred from, for example, [his] presence at critical stages of the conspiracy that could not be explained by happenstance, . . . a lack of surprise when discussing the conspiracy with others, . . . [or] evidence that the defendant participated in conversations directly related to the substance of the conspiracy; possessed items important to the conspiracy; or received or expected to receive a share of the profits from the conspiracy." United States v. Aleskerova, 300 F.3d 286, 293 (2d Cir. 2002) (citations omitted). Indeed, under the appropriate circumstances, "[a] defendant's participation in a single transaction can suffice to sustain a charge of knowing

---

[4] A defendant may also be found culpable under the conscious avoidance doctrine. Under such circumstances, a crime's "knowledge element is established if the factfinder is persuaded that the defendant consciously avoided learning [a given] fact while aware of a high probability of its existence, unless the factfinder is persuaded that the defendant actually believed the contrary." United States v. Finkelstein, 229 F.3d 90, 95 (2d Cir. 2000). "The rationale for imputing knowledge in such circumstances is that one who deliberately avoided knowing the wrongful nature of his conduct is as culpable as one who knew." Id.

participation in an existing conspiracy." United States v. Zabare, 871 F.2d 282, 287 (2d Cir. 1989); see also United States v. Murray, 618 F.2d 892, 903 (2d Cir. 1980).

    B.    Types of Conspiracies

Conspiracies come in myriad shapes and sizes: from a small conspiracy involving two people to achieve a limited end to a large one involving numerous participants and with an expansive scope. Similarly, a defendant may participate in a single conspiracy or multiple conspiracies. Most questions as to size and number are left to trial. Here, the Court addresses these issues only insofar as they inform whether and how the Government might ultimately prove the conspiracies alleged in the Indictment.

"Whether the government has proven the existence of the conspiracy charged in the indictment and each defendant's membership in it, or, instead, has proven several independent conspiracies is a question of fact for a properly instructed jury." United States v. Johansen, 56 F.3d 347, 350 (2d Cir. 1995); see also United States v. Barret, 824 F. Supp. 2d 419, 445 (E.D.N.Y. 2011) (citing cases); United States v. Ohle, 678 F. Supp. 2d 215, 222 (S.D.N.Y. 2010); United States v. Rajaratnam, 736 F. Supp. 2d 683 (S.D.N.Y. 2010) (citing cases). Where an indictment charges a single conspiracy and the evidence later shows multiple conspiracies, the court will only set aside a jury's guilty verdict due to the variance if the defendant can show "substantial prejudice, i.e. that the evidence proving the conspiracies in which the defendant did not participate prejudiced the case against him in the conspiracy in which he was a party." Johansen, 56 F.3d at 351 (emphasis in original).

13

1.    Overview of Single Conspiracies

"[A]cts that could be charged as separate counts of an indictment may instead be charged in a single count if those acts could be characterized as part of a single continuing scheme." United States v. Aracri, 968 F.2d 1512, 1518 (2d Cir. 1992) (internal quotation marks and citations omitted).  In determining whether a single conspiracy involving many people exists, the question is whether there is a "mutual dependence" among the participants. Geibel, 369 F.3d at 692 (citation omitted); United States v. Williams, 205 F.3d 23, 33 (2d Cir. 2000).  The Government must show that each alleged member of the conspiracy agreed to participate "'in what he knew to be a collective venture directed towards a common goal.'" United States v. Eppolito, 543 F.3d 25, 47 (2d Cir. 2008) (quoting United States v. Berger, 224 F.3d 107, 114 (2d Cir. 2000)); see also Geibel, 369 F.3d at 692 (explaining that when two participants do not mutually benefit from the other's participation, a finding of a single conspiracy is less likely).

A "'single conspiracy is not transformed into multiple conspiracies merely by virtue of the fact that it may involve two or more spheres or phases of operation, so long as there is sufficient proof of mutual dependence and assistance.'" Geibel, 369 F.3d at 689 (quoting Berger, 224 F.3d at 114-15).  Neither changing membership nor different time periods of participation by various coconspirators precludes the existence of a single conspiracy, "especially where the activity of a single person was 'central to the involvement of all.'" Eppolito, 543 F.3d at 48 (quoting United States v. Langford, 990 F.2d 65, 70 (2d Cir. 1993) (citations omitted)); United States

14

Jones, 482 F.3d 60, 72 (2d Cir. 2006) ("Changes in membership, differences in time periods, and/or shifting emphases in the location of operations do not necessarily require a finding of more than one conspiracy.").

The Second Circuit has outlined three "hypothetical avenues" for establishing a single conspiracy:

> 1. The scope of the agreement was broad enough to include activities by or for persons other than the small group of core conspirators;
> 2. The coconspirators reasonably foresaw, "as a necessary or natural consequence of the unlawful agreement," the participation of others; or
> 3. "Actual awareness" of the participation of others.

Geibel, 369 F.3d at 690 (citing United States v. McDermott, 245 F.3d 133, 137-38 (2d Cir. 2001); United States v. Carpenter, 791 F.2d 1024, 1036 (2d Cir. 1986)). Alternatively, a jury may find a single conspiracy provided "'(1) that the scope of the criminal enterprise proven fits the pattern of the single conspiracy alleged in the indictment, and (2) that the defendant participated in the alleged enterprise with a consciousness as to its general nature and extent.'" Eppolito, 543 F.3d at 48 (quoting United States v. Rosa, 11 F.3d 315, 340 (2d Cir. 1993) (internal citation omitted)).

2.     Types of Single Conspiracies

Courts often conceptualize single conspiracies using either a "chain" or a "hub-and-spoke" metaphor.  United States v. Borelli, 336 F.2d 376, 383 (2d Cir. 1964).

a) Chain conspiracies

A chain conspiracy refers to a situation in which there are numerous conspiring individuals, each of whom has a role in a "chain" that serves the conspiracy's object. For example, in a narcotics conspiracy, a chain may be comprised of producers, exporters, wholesalers, middlemen, and dealers. The success of each "link" in the chain depends on the success of the others, even though each individual conspirator may play a role that is separated by great distance and time from the other individuals involved. Id.; United States v. Mallah, 503 F.2d 971, 984 (2d Cir. 1974); United States v. Agueci, 310 F.2d 817, 826 (2d Cir. 1962).[5]

For a chain conspiracy to exist, the ultimate purpose of the conspiracy must be to place the "forbidden commodity into the hands of the ultimate purchaser." Agueci, 310 F.2d at 826 (citation omitted). This form of conspiracy "is dictated by a division of labor at the various functional levels." Id. In Agueci, the Second Circuit found that "the mere fact that certain members of the conspiracy deal recurrently with only one or two other conspiracy members does not exclude a finding that they were bound by a single conspiracy." Id. "An individual associating himself with a 'chain' conspiracy knows that it has a 'scope' and that for its success it requires an organization wider than may be disclosed by [one's] personal participation." Id. at 827. That is, to support a chain conspiracy, a participant must know that combined efforts are required. Id.

---

[5] The extreme ends of such a conspiracy – for instance, numerous narcotics dealers who each obtain the narcotics they sell from a single wholesaler or middleman – may have elements of a hub-and-spoke conspiracy. Borelli, 336 F.2d at 383.

b)      Hub-and-spoke conspiracies

In a hub-and-spoke (or "wheel") conspiracy, one person typically acts as a central point while others act as "spokes" by virtue of their agreement with the central actor.  See Kotteakos v. United States, 328 U.S. 750, 754-55 (1946).  Put another way, in a hub-and-spoke conspiracy, "members of a 'core' group deal with a number of contacts who are analogized to the spokes of a wheel and are connected with each other only through the core conspirators." United States v. Manarite, 448 F.2d 583, 589 (2d Cir. 1971).

To prove a single conspiracy in such a situation, the Government must show that there was a "rim" around the spokes, such that the "spokes" became coconspirators with each other.  To do so, the Government must prove that "each defendant . . . participated in the conspiracy with the common goal or purpose of the other defendants." United States v. Taggert, No. 09 Cr. 984 (BSJ), 2010 WL 532530, at *1 (S.D.N.Y. Feb. 11, 2010) (internal quotation marks and citation omitted).

In the absence of such a "rim," the spokes are acting independently with the hub; while there may in fact be multiple separate conspiracies, there cannot be a single conspiracy.  See Zabare, 871 F.2d at 287-88; see also Dickson v. Microsoft Corp., 309 F.3d 193, 203 (4th Cir. 2002) ("A rimless wheel conspiracy is one in which various defendants enter into separate agreements with a common defendant, but where the defendants have no connection with one another, other

than the common defendant's involvement in each transaction." (citing <u>Kotteakos</u>, 328 U.S. at 755)).

C.   The Buyer-Seller Exception

Of course, not all narcotics transactions occur within a conspiracy.  A conspiracy to distribute narcotics does not arise between a buyer and seller simply because they engage in a narcotics transaction.  That is, the mere purchase and sale of drugs does not, without more, amount to a conspiracy to distribute narcotics. <u>See, e.g.</u>, <u>United States v. Parker</u>, 554 F.3d 230, 234 (2d Cir. 2009) (explaining that the buyer-seller rule is a narrow one).  "[I]n the typical buy-sell scenario, which involves a casual sale of small quantities of drugs, there is no evidence that the parties were aware of, or agreed to participate in, a larger conspiracy."  <u>United States v. Hawkins</u>, 547 F.3d 66, 71-72 (2d Cir. 2008) (citations omitted); <u>see also</u> <u>United States v. Mims</u>, 92 F.3d 461, 465 (7th Cir. 1996) (clarifying that "a buyer-seller relationship alone is insufficient prove a conspiracy"); <u>United States v. Medina</u>, 944 F.2d 60, 65 (2d Cir. 1991); <u>United States v. Valencia</u>, 226 F. Supp. 2d 503, 510-11 (S.D.N.Y. 2002) (Chin, J.).  "It is sometimes said that the buyer's agreement to buy from the seller and the seller's agreement to sell to the buyer cannot 'be the conspiracy to distribute, for it has no separate criminal object.'" <u>Parker</u>, 554 F.3d at 235 (quoting <u>United States v. Wexler</u>, 522 F.3d 194, 208 (2d Cir. 2008) (internal alterations omitted)).

When wholesale quantities are involved, however, the participants may be presumed to know that they are involved in a venture, the scope of which is larger

than the particular role of any individual. Murray, 618 F.2d at 902; see also
Valencia, 226 F. Supp. 2d at 510-11.

D.     The Role of Middlemen

In some cases involving narcotics trafficking, defendants are alleged to have
acted as middlemen. Middlemen may be found to have conspired with a buyer, a
seller, or both. United States v. Bey, 725 F.3d 643, 649 (7th Cir. 2013). "Evidence
that the middleman had a clear stake in the seller's sales is typically sufficient to
permit the jury to infer the existence of an agreement with the seller." Id. at 650;
United States v. Colon, 549 F.3d 565, 568-70 (7th Cir. 2008) (citations omitted).
There is no legal doctrine that defines a middleman as having a lesser role than
other conspiracy members. Indeed, there is no legal reason why someone
characterized as a middleman cannot be a powerful, motivating force behind a
conspiracy.

III.    DISCUSSION OF CONSPIRATORIAL AGREEMENT

The Indictment alleges that Ulbricht designed Silk Road specifically to
enable users to anonymously sell and purchase narcotics and malicious software
and to launder the resulting proceeds. On this motion to dismiss, the Court's task
is a narrow one – it is not concerned with whether the Government will have
sufficient evidence to meet its burden of proof as to each element of the charged
conspiracies at trial. Instead, the Court is concerned solely with whether the nature
of the alleged conduct, if proven, legally constitutes the crimes charged, and

whether the defendant has had sufficient notice of the illegality of such conduct.
See D'Amelio, 683 F.3d at 418; Pagan, 721 F.2d at 27.

The defendant argues that Counts One and Three in the Indictment are legally insufficient for failure to allege a cognizable conspiratorial agreement. (Def.'s Reply at 2-3.)  He does not make the same argument with regard to Count Four, but certain aspects of the issue apply to that Count as well.

The Court has set forth five questions that concern the potential existence of a conspiratorial agreement in this case.  Each question is now taken up in turn.

> Question One:  Can there be a legally cognizable "agreement" between Ulbricht and one or more coconspirators to engage in narcotics trafficking, computer hacking, and money laundering by virtue of his and their conduct in relation to Silk Road?  If so, what is the difference between what Ulbricht is alleged to have done and the conduct of designers and administrators of legitimate online marketplaces through which illegal transactions may nevertheless occur?

The "gist" of a conspiracy charge is that the minds of two or more people met – that they agreed in some manner to achieve an unlawful end.  For the reasons explained below, the design and operation of Silk Road can result in a legally cognizable conspiracy.

According to the Indictment, Ulbricht purposefully and intentionally designed, created, and operated Silk Road to facilitate unlawful transactions.  Silk Road was nothing more than code unless and until third parties agreed to use it. When third parties engaged in unlawful narcotics transactions on the site, however, Ulbricht's design and operation gave rise to potential conspiratorial conduct.  The subsequent sale and purchase of unlawful narcotics and software on Silk Road may,

as a matter of law, constitute circumstantial evidence of an agreement to engage in such unlawful conduct. See United States v. Svoboda, 347 F.3d 471, 477 (2d Cir. 2003) ("A conspiracy need not be shown by proof of an explicit agreement but can be established by showing that the parties have a tacit understanding to carry out the prohibited conduct.") (internal quotation marks and citation omitted); United States v. Miranda-Ortiz, 926 F.2d 172, 176 (2d Cir. 1991) ("The defendant's participation in a single transaction can, on an appropriate record, suffice to sustain a charge of knowing participation in an existing conspiracy.") (citations omitted); United States v. Roldan-Zapata, 916 F.2d 795, 803 (2d Cir. 1990) (affirming the conviction of a defendant based on his admitted "involvement in narcotics dealing and [ ] a pattern of trafficking," combined with other circumstantial evidence). Additionally, the Indictment charges that Ulbricht obtained significant monetary benefit in the form of commissions in exchange for the services he provided via Silk Road. He had the capacity to shut down the site at any point; he did not do so. The defendant allegedly used violence in order to protect the site and the proceeds it generated.

Ulbricht argues that his conduct was merely as a facilitator – just like eBay, Amazon, or similar websites.[6] Even were the Court to accept this characterization of the Indictment, there is no legal prohibition against such criminal conspiracy charges provided that the defendant possesses (as the Indictment alleges here) the requisite intent to join with others in unlawful activity.

---

[6] While the defendant refers to Amazon and eBay as similar, there are certain important factual differences between them. For instance, Amazon has warehouses which may fulfill certain orders. Silk Road is not alleged to have ever possessed products for fulfillment.

Moreover, in this case, the charges in the Indictment go further than Ulbricht acknowledges.  The Indictment alleges that Ulbricht engaged in conduct that makes Silk Road different from other websites that provide a platform for individual buyers and sellers to connect and engage in transactions:  Silk Road was specifically and intentionally designed for the purpose of facilitating unlawful transactions. The Indictment does not allege that Ulbricht is criminally liable simply because he is alleged to have launched a website that was – unknown to and unplanned by him – used for illicit transactions.  If that were ultimately the case, he would lack the mens rea for criminal liability.  Rather, Ulbricht is alleged to have knowingly and intentionally constructed and operated an expansive black market for selling and purchasing narcotics and malicious software and for laundering money.  This separates Ulbricht's alleged conduct from the mass of others whose websites may – without their planning or expectation – be used for unlawful purposes.

It is certainly true that the principles set forth in this Opinion would apply to other third parties that engaged in conduct similar to that alleged here; but it is also true that the essential elements for (by way of example) a narcotics conspiracy would be absent if a website operator did not intend to join with another to distribute (for instance) narcotics.  Thus, administrators of an eBay-like site who intend for buyers and sellers to engage in lawful transactions are unlikely to have the necessary intent to be conspirators.

Question Two:  As a matter of law, who are Ulbricht's alleged coconspirators and potential coconspirators?  That is, whose "minds" can have "met" with Ulbricht's in a conspiratorial agreement?  What sort of conspiratorial structure frames the allegations:  one large single conspiracy or multiple small conspiracies?

The Indictment charges a single conspiracy in each of Counts One, Three, and Four.  Ulbricht's alleged coconspirators are "several thousand drug dealers and other unlawful vendors."  (Ind. ¶ 2.)  If these individuals possessed the requisite intent, there is no legal reason they could not be members of the conspiracies charged in the Indictment.

A more complicated question is whether any or all of Ulbricht's coconspirators also conspired with each other, so as to create a potentially vast single conspiracy.  In this regard, the Government may argue that the conspiracy was a "chain" conspiracy or that it was a "hub-and-spoke" conspiracy (in which case it would be necessary for the Government to prove the existence of a "rim").  Each approach has its own complexities regarding the (largely anonymous) inter-conspirator relationships on the Internet.  While this is not an issue the Government need address at this stage, see D'Amelio, 683 F.3d at 418; Pagan, 721 F.2d at 27, it will be relevant as the proof comes in at trial.

Of course, ultimately, the form of the conspiracy is not as important as a determination that at least one other person joined in the alleged conspiratorial agreement with Ulbricht.  With respect to the narcotics conspiracy charge, to prove that the drug types and quantities alleged in the Indictment were the objects of a conspiracy Ulbricht knowingly and intentionally joined, the Government will have

to prove either a single such conspiratorial agreement or an aggregation of

conspiracies.[7]  While, as explained, proof of participants' intent could involve

numerous complexities, these are issues for trial and not for this stage.

> Question Three:  As a matter of law, <u>when</u> could any particular agreement
> have occurred between Ulbricht and his alleged coconspirators?  Need each
> coconspirator's mind have met simultaneously with Ulbricht's?  With the
> minds of other coconspirators?  That is, if Ulbricht launched Silk Road on
> Day 1, can he be said, as a matter of law, to have entered into an agreement
> with the user who joins on Day 300?  Did Ulbricht, simply by designing and
> launching Silk Road, make an enduring showing of intent?

The issue here is one of temporal proximity.  For the sake of illustration,

assume that Ulbricht launched Silk Road on Day 1.  A narcotics trafficker posted

illegal drugs on the site on Day 2 and another posted on Day 300.  Does the Day 2

trafficker enter into a conspiratorial agreement with Ulbricht on Day 2 and the Day

300 trafficker on Day 300?  More importantly, can Ulbricht have agreed to a

conspiracy on Day 1 with an alleged coconspirator who, at that time, had not even

contemplated engaging in an unlawful transaction, and determined to do so only on,

for example, Day 300?[8]

One way of thinking about this issue is to look to the basic contract principles

of offer and acceptance.  On Day 1, according to the Indictment, Ulbricht "offers" to

work with others to traffic illegal narcotics, engage in computer hacking, and

launder money.  He makes this offer by creating and launching a website

specifically designed and intended for such unlawful purposes.  Ulbricht's continued

---

[7] There are additional complexities when other factors such as differences in types of drugs, temporal proximity, and the roles of coconspirators are taken into account.  These too are questions for trial.
[8] As suggested in connection with Question One, another question is whether the Day 2 and the Day 300 trafficker could ever enter into a conspiracy with each other.

operation of the site evinces an enduring intent to be bound with those who "accept" his offer and utilize the site for its intended purpose. It is as though the defendant allegedly posted a sign on a (worldwide) bulletin board that said: "I have created an anonymous, untraceable way to traffic narcotics, unlawfully access computers, and launder money. You can use the platform as much as you would like, provided you pay me a percentage of your profits and adhere to my other terms of service." Each time someone "signs up" and agrees to Ulbricht's standing offer, it is possible that, as a matter of law, he or she may become a coconspirator.

To put this another way, the fact that Ulbricht's active participation may occur at a different point in time from the agreement by his coconspirator(s) does not render the conspiracy charges legally defective. Courts have long recognized that members of a conspiracy may be well removed from one another in time. See, e.g., Borelli, 336 F.3d at 383-84. The law has similarly recognized that coconspirators need not have been present at the outset of a conspiracy in order to be found criminally responsible; they may join at some later point. See, e.g., id.; United States v. Nersesian, 824 F.2d 1294, 1303 (2d Cir. 1987). A lapse in time – in particular in a narcotics chain conspiracy, where a manufacturer creates a substance months prior to a wholesale or retailer selling it, not knowing (and perhaps never knowing) who, precisely, will ultimately distribute it – does not ipso facto render the alleged conspiracy defective as a matter of law. Similarly, the law long ago accepted that coconspirators may not know each other's identity. Blumenthal, 332 U.S. at 557-58. The alleged conduct here is another step along

this established path.  The common law anticipates and accepts application to new

fact patterns.

> Question Four:  As a matter of law, is it legally necessary, or factually
> possible, to pinpoint how the agreement between Ulbricht and his
> coconspirators was made?  In this regard, does the law recognize a
> conspiratorial agreement effected by an end user interacting with computer
> software, or do two human minds need to be simultaneously involved at the
> moment of agreement?

Another issue raised by this case is whether a conspiratorial agreement may

be effected through what are primarily automated, pre-programmed processes.

This is not a situation in which Ulbricht is alleged to have himself approved or had

a hand in each individual transaction that occurred on Silk Road during the nearly

three-year period covered by the Indictment.  Instead, he wrote (or had others

write) certain code that automated the transaction.  Yet, as a legal matter, this

automation does not preclude the formation of a conspiratorial agreement.  Indeed,

whether an agreement occurs electronically or otherwise is of no particular legal

relevance.

It is well-established that the act of agreeing, or having a meeting of the

minds, may be proven through circumstantial evidence.  United States v.

Rodriguez, 394 F.3d 539, 544 (2d Cir. 2004).  There is no requirement that any

words be exchanged at all in this regard, so long as the coconspirators have taken

knowing and intentional actions to work together in some mutually dependent way

to achieve the unlawful object.  See Diaz, 176 F.3d at 97.  In this regard, "how" any

agreement between two coconspirators may be proven at trial depends solely on the

evidence presented.  See Anderson, 747 F.3d at 61.  Though automation may enable

a particular transaction to take place, it is the individuals behind the transaction that take the necessary affirmative steps to utilize that automation. It is quite clear, for example, that if there were an automated telephone line that offered others the opportunity to gather together to engage in narcotics trafficking by pressing "1," this would surely be powerful evidence of the button-pusher's agreement to enter the conspiracy. Automation is effected through a human design; here, Ulbricht is alleged to have been the designer of Silk Road, and as a matter of law, that is sufficient.[9]

> Question Five: If Ulbricht was merely the facilitator of simple buy-sell transactions, does the "buyer-seller" rule apply, which in certain circumstances would preclude a finding of a criminal conspiracy?

Ulbricht is not alleged to have been a buyer or seller of narcotics or malicious software. Following the design and launch of Silk Road, his role is alleged to have been that of an intermediary. While it will be for the Government to prove the defendant's specific role vis-à-vis his alleged coconspirators at trial, one issue that may arise is whether the participation of an intermediary could itself (all other factors remaining the same) eliminate the applicability of the "buyer-seller" rule to a given narcotics transaction involving a small quantities bought and sold on the site. In other words, can mere buyers and sellers of small quantities of narcotics –

---

[9] Acceptance of the terms of service, the payment of commissions, placing Bitcoins in escrow, and other intervening steps involved in the transactions that allegedly occurred on Silk Road could, in this regard, perhaps constitute evidence that Silk Road users entered into an unlawful conspiracy with Ulbricht (and others). It will be for the Government to prove which conduct in fact occurred, and how, at trial. See, e.g., United States v. Lorenzo, 534 F.3d 153, 161 (2d Cir. 2008) (noting that "a defendant's knowing agreement to join a conspiracy must, more often than not, be proven through circumstantial evidence" and there are "cases where the circumstantial evidence considered in the aggregate demonstrates a pattern of behavior from which a rational jury could infer knowing participation") (internal quotation marks and citations omitted).

who might not otherwise legally be coconspirators if the transactions occurred in the brick-and-mortar world – become conspirators due to the interposition of a website or website administrator?  Plainly, the level of involvement in any transaction by the website would be relevant.  And there are certainly instances in which the participation of three participants renders what might otherwise be a simple purchase or sale into a conspiracy.  See, e.g., Medina, 944 F.2d at 65.  There can be no hard and fast rule that answers this question – its ongoing relevance will depend on how the proof comes in at trial.

IV.    OTHER LEGAL ISSUES RAISED WITH REGARD TO COUNT ONE

The defendant argues that while Count One charges him with conspiracy to possess with intent to distribute various controlled substances (i.e., heroin, cocaine, and LSD), Ulbricht is not alleged to have himself been a buyer, seller, or possessor of any of the controlled substances at any point during the conspiracy. (Def.'s Mem. at 9.)[10]  And, by alleging only that he designed, launched, and operated a website, the Government has not described the conduct of a coconspirator in a narcotics conspiracy.  (Id. at 10.)  At most, argues the defendant, the Government has alleged that Ulbricht has acted in a manner akin to that of a landlord, and the law is clear that merely acting as a landlord to drug dealers is itself insufficient to make one a coconspirator in narcotics transactions occurring on the premises.  (Id. at 10-13.)

---

[10] The defendant argues that imposing criminal liability for Ulbricht's alleged conduct would constitute "an unprecedented and extraordinarily expansive theory of vicarious liability." (Def.'s Mem. at 1.)  This is incorrect.  The Government alleges direct – not indirect – participation in the crimes charged.  The law of conspiracy (see supra) has long recognized the many varied roles participants may play.

According to the defendant, the statutory violation that occurs when one "knows" his premises have been or are being used for unlawful activities is either civil forfeiture pursuant to 21 U.S.C. § 881(a)(7) or the "crack house" statute passed by Congress in 1986, 21 U.S.C. § 856. (Id. at 11.) The statute outlaws the knowing operation, management, or leasing of premises where crack cocaine and other illicit drugs are manufactured, distributed, or used. 21 U.S.C. § 856(a). The defendant argues that because Silk Road is, at most, a type of "premise" for the distribution of narcotics, he should have been charged under either §§ 881 or 856, not with a narcotics conspiracy under §§ 841 or 846. (Def.'s Mem. at 12.) Alternatively, the defendant argues that his conduct should be analogized to that of a "steerer" in a drug transaction, not a coconspirator.[11] (Id. at 13.)

The defendant's arguments stem from an incorrect set of assumptions: first, that conduct may constitute only one type of statutory violation or must seek civil forfeiture relief to the exclusion of criminal liability. While the defendant may be chargeable with a violation of the "crack house" statute, he may well be chargeable with other crimes as well. How a defendant is charged is within the discretion of the prosecution. United States v. Batchelder, 442 U.S. 114, 124 (1974); United States v. Stanley, 928 F.2d 575, 580-81 (2d Cir. 1991). Additionally, no legal principle prevents the Government from seeking to impose civil forfeiture along

---

[11] Conduct demonstrating that an individual merely helps a willing buyer find a willing seller, and is therefore acting as a mere "steerer," is, without more, insufficient to establish a conspiratorial agreement. See United States v. Tyler, 758 F.2d 66, 69 (2d Cir. 1985); United States v. Hysohion, 448 F.2d 343, 347 (2d Cir. 1971). However, when a defendant steers buyers to sellers as part of a continuing business arrangement, or is otherwise the "conduit" for the transaction, criminal liability may attach. See, e.g., United States v. Vargas-Nunez, 115 F. App'x 494, 495-96 (2d Cir. 2004) (discussing defendant's purported role as a "steerer" in the sentencing context); United States v. Esadaille, 769 F.2d 104, 108-09 (2d Cir. 1985).

with criminal liability – and it is done all the time. Here, in addition to criminal conspiracy, the Government has separately sought civil forfeiture under 18 U.S.C. § 982(a)(1)(A), see Case No. 13-cv-6919 (JPO), as well as in the Indictment itself. (Ind. ¶¶ 22-24.)

Nor is the Government limited to charging a violation of the "crack house" statute simply because facilities (whether electronic or physical) are alleged to be at issue. It may well be that the Government could have charged such a violation – but that does not mean it is necessarily limited to that. When conduct allows for multiple charges – as is alleged here – a court does not second guess which charge is chosen. See Stanley, 928 F.2d at 581.

In this case, the Government has alleged that more is in play than the conduct which is encompassed by the "crack house" statute, or in the context of a non-conspiratorial "steerer." The Government has alleged that the defendant set up a platform for illicit drug transactions designed with the specific needs of his buyers and sellers in mind. Thus, Ulbricht's alleged conduct is not analogous to an individual who merely steers buyers to sellers; rather, he has provided the marketing mechanism, the procedures for the sale, and facilities for the actual exchange. He is alleged to know that his facilities would be used for illicit purposes and, in fact, that he designed and operated them for that purpose. In this regard, he is alleged to have "intentionally and knowingly" "combine[d], conspire[d], confederate[d], and agree[d]" with others to violate United States criminal law. (Ind. ¶ 5.) Ulbricht's alleged conduct is more akin to a builder who designs a house

complete with secret entrances and exits and specially designed traps to stash drugs and money; this is not an ordinary dwelling, but a drug dealer's "dream house."

The defendant argues that Count One must be dismissed because he is not alleged to have distributed or possessed any controlled substance. No such allegation is required. The law of conspiracy recognizes that members of a conspiracy may serve different roles. See United States v. Santos, 541 F.3d 63, 72 (2d Cir. 2008); United States v. Garcia-Torres, 280 F.3d 1, 4 (1st Cir. 2002) ("[A] drug conspiracy may involve ancillary functions (e.g., accounting, communications, strong-arm enforcement), and one who joined with drug dealers to perform one of those functions could be deemed a drug conspirator."); United States v. Burgos, 94 F.3d 849, 859 (4th Cir. 1996) (explaining that "a variety of conduct, apart from selling narcotics, can constitute participation in a conspiracy sufficient to sustain a conviction"). There are numerous examples of participants in narcotics conspiracies who did not themselves intend physically to possess or distribute narcotics; an individual may have been a middleman, the protective muscle, the lookout, a decoy, a person with information or contacts, etc. – in any event, the individual may nonetheless be found to be part of the conspiratorial enterprise. See, e.g., United States v. Pitre, 960 F.2d 1112, 1121-22 (2d Cir. 1992) (affirming conviction of defendant where evidence revealed that defendant was acting as a lookout and was carrying a beeper to facilitate narcotics transactions); United States v. Barnes, 604 F.2d 121, 161 (2d Cir. 1979) (explaining that defendant's "actions as a 'middleman'

31

in three transactions . . . constituted sufficient evidence of knowledgeable participation in the operations of the conspiracy with an expectation of benefiting from them").

Finally, Ulbricht expresses surprise that the Government states in its opposition brief that by operating Silk Road, Ulbricht "entered into a joint venture with thousands of drug dealers around the world to distribute drugs online." (Gov't Opp'n at 9.) This characterization of the defendant's alleged conduct is substantively no different than the allegation in the Indictment that several thousand drug dealers and hundreds of thousands of buyers used the site. (Ind. ¶ 2.) However, the fact that such an allegation falls within a reasonable reading of the Indictment is a separate question from whether the Government will in fact be able to prove one joint venture or single conspiracy at trial. As noted above, proving that thousands of dealers were in a single joint venture together with each other as well as with Ulbricht presents numerous challenges due to temporal and other considerations.

Count One adequately alleges both the elements of a narcotics conspiracy as well as the conduct alleged underlying the charges; the defendant is sufficiently on notice of the charges against him so as to preclude later issues of double jeopardy.

V.    OTHER LEGAL ISSUES RAISED WITH REGARD TO COUNT TWO

Count Two alleges that the defendant's conduct amounted to participation in a CCE in violation of 21 U.S.C. § 848(a). As an initial matter, a "continuing criminal enterprise" requires a determination that a provision of the Controlled

Substances Act has been violated.  Ulbricht's liability under this provision is

therefore premised on a conviction on Count One, the narcotics conspiracy.  Next,

the trier of fact will need to determine if the violation of the Controlled Substances

Act (that is, the narcotics conspiracy) was one of a series of such violations.  21

U.S.C. § 848(c).  The law has defined "a series" as constituting at least three

violations.  See United States v. Flaharty, 295 F.3d 182, 197 (2d Cir. 2002)

(explaining that the Second Circuit has "interpreted 'a continuing series' to mean at

least three felony drug violations committed over a definite period of time") (citation

omitted).

Finally, Ulbricht must have undertaken this series of violations in concert

with five or more persons with respect to whom he occupied a position of organizer,

supervisor, or manager, and he must have obtained substantial income or resources

from such conduct.  21 U.S.C. § 848(c).

Ulbricht argues (1) that the Indictment fails to allege sufficiently that he

occupied the requisite position vis-à-vis five persons, and that, in this regard, the

Government has failed to allege (and could not allege) that he acted in concert with

the buyers and sellers on the site; and (2) that the Indictment fails to enumerate a

predicate series of violations.  (Def.'s Mem. at 13.)  Ulbricht is correct that Count

Two does not explicitly identify the five individuals whom he is alleged to have

organized, managed, or supervised.  He similarly is correct that the Government

has not specified the dates, times, or transaction details of the "series" of violations.

Nonetheless, the allegations of the Indictment are sufficient.  Paragraphs 11 and 12

recite the necessary statutory language to charge a continuing criminal enterprise; and the allegations set forth in Paragraphs 1 through 4 (which are incorporated by reference into Count Two) set forth necessary factual detail.

The law is clear that the Indictment should be read to incorporate those facts that while not explicitly stated, are implicit in the existing allegations. United States v. Silverman, 430 F.2d 106, 111 (2d Cir. 1970). In terms of the facts alleged, here the Indictment asserts that "several thousand drug dealers" and "well over a hundred thousand buyers worldwide" used the site. (Ind. ¶ 2.) With the "assistance of various paid employees whom he managed and supervised" (Ind. ¶ 3), Ulbricht is alleged to have controlled all aspects of Silk Road.

From these facts, the Government argues that by owning, operating, and controlling all aspects of the operation of the site (Ind. ¶¶ 2-3), Ulbricht occupied the necessary position as organizer, manager, or supervisor of the "vendors selling drugs on the site." (Gov't Opp'n at 15.) Ulbricht is alleged not only to have designed the online structure which enabled and allowed transactions, but, in controlling all aspects of its operations, to have set the rules the vendors and buyers had to follow, policed accounts for rule violations, determined commission rates, and taken commissions on every transaction. In addition, Ulbricht allegedly oversaw the efforts of others who assisted him in the administration and operation of the site. Thus, the Government contends that it has set forth sufficient allegations of Ulbricht's occupying the requisite position as organizer, manager, or supervisor. This Court agrees.

The "continuing criminal enterprise" statute is broadly worded – and broadly intends to encompass those who are leaders of a criminal enterprise which engages in a series of violations of the narcotics laws. See United States v. Scarpa, 913 F.2d 993, 1007 (2d Cir. 1990) (explaining that the operative words in the statute – "organize," "manage," and "supervise" – should be given their ordinary, everyday meanings) (citation omitted).  That is precisely what the Government has alleged here.  The statute does not require that Ulbricht have had a particular form of contact with each of the five or more individuals that he purportedly organized, managed, or supervised.  United States v. Cruz, 785 F.2d 399, 407 (2d Cir. 1986); see also United States v. Joyner, 201 F.3d 61, 71 (2d Cir. 2000) (affirming a conviction where a defendant sold to otherwise independent resellers but required them, inter alia, to obtain permission from him to discount their prices and sell in certain locations so that he could monitor their activity).

Here, Ulbricht also argues that he cannot have had the requisite role with respect to individuals who merely assisted him with administering the site.  (Def.'s Mem. at 15.)  This, however, is a question of fact, not law.  Whether those who assisted Ulbricht had the requisite mental state to be acting "in concert" with him is a factual inquiry.  If those who assisted Ulbricht had the requisite state of mind, there is no legal reason why they could not constitute the necessary group of "five or more."

Ulbricht argues that he cannot separately have had the requisite position vis-à-vis the buyers and sellers, as they are referred to as having "used" the site, and

not, for instance, as employees. (Ind. ¶ 2).[12] In this regard, the defendant argues that, at most, his alleged conduct amounted to his being a conduit or facilitator for those engaging in illegal activity. This is, again, a factual argument cast as a legal one. There is no legal reason why one who designs, launches, and operates a website or any facility for the specific purpose of facilitating narcotics transactions that he knows will occur, and acts as the rule-maker of the site – determining the terms and conditions pursuant to which the sellers are allowed to sell and the buyers are allowed to buy, taking disciplinary actions to protect that enterprise (allegedly including murder-for-hire on more than one occasion) – could not be found to occupy the requisite position. See Cruz, 785 F.2d at 407 (no distinction between salaried employees and independent contractors). In this regard, the allegations amount to Ulbricht acting as a sort of "godfather" – determining the territory, the actions which may be undertaken, and the commissions he will retain; disciplining others to stay in line; and generally casting himself as a leader – and not a service provider. Again, whether the Government can prove the facts alleged is not a question at this stage of the proceedings.

Ulbricht also argues that Count Two fails to allege the specific series of continuing violations. The Indictment does allege thousands of separate transactions. (Ind. ¶ 2.) The type of specificity the defendant urges is not required. Flaharty, 295 F.3d at 197 (granular particularity not required). The Government need not enumerate the specific who, when, or where of the series in the

---

[12] Ulbricht also argues that he cannot have engaged in a CCE merely by aiding and abetting drug dealers. This is not, however, the Government's allegation. The Government contends that Ulbricht was the leader of a vast criminal enterprise.

Indictment; it is enough that it is clear from the face of the Indictment that he is alleged to have engaged in a continuing series of narcotics conspiracies punishable under 21 U.S.C. §§ 841, 843, 846.  (Ind. ¶ 12).  See United States v. Simmons, 923 F.2d 934, 952 (2d Cir. 1991).

## VI.   OTHER LEGAL ISSUES RAISED WITH REGARD TO COUNT THREE

The defendant argues that the allegations in the Indictment are insufficient to support the type of conduct covered by a computer hacking conspiracy in 18 U.S.C. § 1030 (the "Computer Fraud and Abuse Act").  (Def.'s Mem. at 21.) According to the defendant, the allegations are "only that the Silk Road website 'provided a platform for the [exchange] of malicious software.'"  (Id. (quoting a portion of the Indictment at ¶¶ 15-16).)

The Indictment in fact alleges more.  It alleges that "Silk Road . . . provided a platform for the purchase and sale of malicious software designed for computer hacking, such as password stealers, keyloggers, and remote access tools.  While in operation, the Silk Road website regularly offered hundreds of listings for such products."  (Ind. ¶ 14.)  It also alleges that the defendant conspired with others to "intentionally access computers without authorization, and thereby would and did obtain information from protected computers, for commercial advantage and private financial gain."  (Ind. ¶ 16.)

The defendant correctly states that to establish a violation of 18 U.S.C. §1030(a)(2)(C) requires "proof that the defendant intentionally accessed information from a protected computer."  United States v. Willis, 476 F.3d 1121, 1125 (10th Cir.

2007).  However, the defendant incorrectly extends this to the requirements for sufficiently alleging a computer hacking conspiracy.  At this stage, such a claim requires not proof – as the defendant argues (see Def.'s Mem. at 22) – but rather, only allegations that the defendant agreed with another to "(1) intentionally access[] a computer, (2) without authorization . . . (3) and thereby obtain[] information." Willis, 476 F.3d at 1125.  As with any conspiracy, the actual success or failure of the venture is irrelevant.  See United States v. Perry, 643 F.2d 38, 46 (2d Cir. 1981) ("It is unnecessary to show that the conspiracy actually aided any particular sale of heroin since a conspiracy can be found though its object has not been achieved.").

It is, of course, axiomatic – as set forth at length above – that to charge a conspiracy the Government must allege that two or more people agreed to achieve an unlawful end.  See Stavroulakis, 952 F.2d at 690.  Each conspirator must knowingly and intentionally enter the conspiracy, Torres, 604 F.3d at 66, though it is common for coconspirators to have different roles.  See, e.g., United States v. Sanchez, 925 F. Supp. 1004, 1013 (S.D.N.Y. 1996) ("There are many roles in a conspiracy.").

The defendant argues that the Government's charge must fail as it relies upon a concept of "transferred intent" – that is, that Ulbricht himself is not alleged to have had the intent to obtain unauthorized access, but only to have conspired with another who did.  (Def.'s Reply at 13.)  According to Ulbricht, he could not know the buyer's intent.  (Id.)

As an initial matter, the law of conspiracy does not require that <u>both</u> participants intend to access a computer – but they must both intend that one of them will.  Questions as to how the Government will prove its case as to the buyer's intent are reserved for trial.[13]

Ulbricht also argues that the statutory term "access without authorization" is undefined.  (Def.'s Mem. at 39-41 (discussing § 1030(a)(2)(C).)  Describing the 1996 amendments to the statute and the addition of the term "any" to unauthorized access of computers over the Internet, the defendant argues that the "ubiquitous use of computers, smartphones, tablets, or any other Internet-enabled device in today's world" places special emphasis on the meaning of the word "authorization" and may criminalize a broad amount of routine Internet activity.  (<u>Id.</u> at 41.)  The Government counters this argument only in a footnote.  (Gov't Opp'n at 31 n.10.)

The defendant's argument is misplaced, or at least premature.  The term "authorization" has a plain and ordinary meaning and requires no special construction.  That the statute may implicate a broad swath of conduct is an issue for Congress.  Whether this issue has any special significance can only be determined at trial.  That is, whether Ulbricht's and his coconspirators' alleged conduct falls into the suggested grey area must await the Government's proof.

---

[13] The defendant's arguments that potentially lawful uses of malicious software also fail.  There are numerous examples of lawful products put to unlawful use, resulting in criminal liability.  <u>See, e.g.</u>, <u>United States v. Zambrano</u>, 776 F.2d 1091, 1092, 1096 (2d Cir. 1985); <u>United States v. Orozco-Prada</u>, 732 F.2d 1076, 1080 (2d Cir. 1984); <u>Perry</u>, 643 F.2d at 44.

VII.   THE "KITCHEN SINK" ARGUMENTS

Ulbricht also alleges that since his alleged conduct in Counts One, Two, and

Three has never before been found to constitute the crimes charged, a variety of

legal principles preclude criminal liability. Those principles include the rule of

lenity, the doctrine of constitutional avoidance, void-for-vagueness, and

overbreadth. In addition, the defendant argues that the presence of a civil

immunity statute for online providers indicates congressional "support for a free-

wheeling [I]nternet, including one in which providers or users of interactive

computer services can operate without fear of civil liability for the content posted by

others." (Def.'s Mem. at 28.) These arguments do not preclude the criminal charges

here.

As an initial matter, as set forth above, the conduct charged fits within

existing law. It is certainly true that case law to date has not been applied to the

type of conduct that forms the basis for the Government's charges[14] – but that is not

fatal. Throughout the history of the common law system there have been times

when laws are applied to new scenarios. At each new stage there were undoubtedly

those who questioned the flexibility of the law. But when the principles underlying

a law are consistent and clear, they may accommodate new fact patterns. See

Williams v. Taylor, 529 U.S. 362, 384-85 (2000) (Opinion of Stevens, J.) ("[R]ules of

law often develop incrementally as earlier decisions are applied to new factual

situations."); see also, e.g., ABC, Inc. v. Aereo, Inc., – U.S. – , 2014 WL 2864485, at

---

[14] The Government argues that a conspiracy and CCE have previously been charged in the context of online marketplaces. (Gov't Mem. at 30.) Those cases have entirely different facts from those alleged here.

*10 (2014) (applying copyright laws customarily imposed upon cable companies to a new type of distributor). The fact that a particular defendant is the first to be prosecuted for novel conduct under a pre-existing statutory scheme does not <u>ipso facto</u> mean that the statute is ambiguous or vague or that he has been deprived of constitutionally appropriate notice.

The defendant's Kitchen Sink arguments are also premised on a view of his alleged conduct as being sufficiently common – <u>i.e.</u>, that he is doing nothing more than that done by other designers and operators of online marketplaces – that he could not have known or been on notice of its illegality.

The Court disagrees. Again, on a motion to dismiss an indictment, the Court accepts as true the Government's allegations; whether and how those allegations can be proven is not a question for this stage in the proceedings.

A.      The Rule of Lenity and the Doctrine of Constitutional Avoidance

The defendant's arguments with respect to the rule of lenity and the doctrine of constitutional avoidance are based on the incorrect premise that the statutes under which he has been charged in Counts One, Two, and Three are ambiguous when applied to his alleged conduct.

The rule of lenity provides that when a criminal statute is susceptible to two different interpretations – one more and one less favorable to the defendant – "leniency" requires that the court read it in the manner more favorable. <u>See</u> <u>Rewis v. United States</u>, 401 U.S. 808, 812 (1971); <u>United States v. Ford</u>, 435 F.3d 204, 211 (2d Cir. 2006) (explaining that "restraint must be exercised in determining the

41

breadth of conduct prohibited by a federal criminal statute out of concerns regarding both the prerogatives of Congress and the need to give fair warning to those whose conduct is affected").

The rule of lenity is a principle of statutory construction: it comes into play only if and when there is ambiguity. United States v. Litchfield, 986 F.2d 21, 22 (2d Cir. 1993). It should not be viewed as a general principle requiring that clear statutes be applied in a lenient manner. Callanan v. United States, 364 U.S. 587, 596 (1961) (explaining that the rule of lenity, "as is true of any guide to statutory construction, only serves as an aid for resolving an ambiguity; it is not to be used to beget one").

In Skilling v. United States, 561 U.S. 358 (2010), the Court addressed the type of conduct encompassed by the ambiguous term "honest services." The Court reiterated the principle that "ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity," and refused to agree with the Government's broad interpretation of the statute. Id. at 410. Instead, the Court limited its coverage to bribery and kickback schemes. Id. at 412. The Court noted that if "Congress desires to go further . . . it must speak more clearly than it has." Id. at 411.

Here, with regard to Counts One and Two, the defendant does not allege that a word or phrase in a statute requires construction or is susceptible to more than

one interpretation.[15]  Instead, he argues that even if the elements of, for instance, a narcotics conspiracy are well known, his particular conduct in designing and operating the website does not clearly fall within what the statute is intended to cover.  The Court disagrees.

Sections 841 and 846 are intended to cover conduct in which two or more people conspire to distribute or possess with the intent to distribute narcotics.  If the Government can prove at trial that Ulbricht has the requisite intent, then these statutory provisions clearly prohibit his conduct.  These statutory provisions do not, for instance, require that only one type of communication method be used between coconspirators (for instance, cellular telephone versus the Internet); they do not prescribe what the various roles of coconspirators must be or are limited to; and they have been applied in the past to individuals alleged to be middlemen in drug transactions.  See generally Pitre, 960 F.2d at 1121-23.  Here, there is no statutory ambiguity and thus no basis for application of the rule of lenity.

The doctrine of constitutional avoidance provides that when a "statute is susceptible of two constructions, by one of which grave and doubtful constitutional questions arise and by the other of which such questions are avoided, [a court's] duty is to accept the latter."  United States ex rel. Attorney General v. Del. & Hudson Co., 213 U.S. 366, 408 (1909); see also Jones v. United States, 526 U.S. 227, 239-40 (1999); Triestman v. United States, 124 F.3d 361, 377 (2d Cir. 1997).

---

[15] As discussed supra, the defendant does argue ambiguity with regard to aspects of § 1030; as the Court has stated, whether that alleged ambiguity (or really, breadth) plays any role here is a question for trial.

This doctrine is inapplicable for the same reason as the rule of lenity: there is no ambiguity; the Court is not struggling with dueling interpretations as to whether the alleged conduct, if proven, would be covered. Thus, there are no grave constitutional issues on either side of this question.

B.    Void-for-Vagueness and Constitutional Overbreadth

The defendant also argues that the statutes, as applied to his conduct in particular, are void on the basis that they are either unconstitutionally vague or overbroad. (Def.'s Mem. at 32-38.) The Court disagrees.

The void-for-vagueness doctrine is inapplicable. It addresses concerns regarding (1) fair notice and (2) arbitrary and discriminatory prosecutions. Skilling, 561 U.S. at 412 (citation omitted). To avoid a vagueness challenge, a statute must define a criminal offense in a manner that ordinary people must understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement. Id. at 402-03. The question, in short, is whether an ordinary person would know that engaging in the challenged conduct could give rise to the type of criminal liability charged.

The Government argues that this prosecution is not particularly novel. "[B]oth the narcotics conspiracy statute and continuing criminal enterprise statute have specifically been applied in a previous prosecution of defendants involved in operating online marketplaces for illegal drugs." (Gov't Opp'n at 30.) "[T]he computer hacking statute has previously been applied to persons involved in providing online services used by others to distribute malicious software." (Id.) The

citations by the Government in support of these assertions are, however, merely to indictments. (Id.) And neither case has yet resulted in a published decision which could reasonably have provided notice to the defendant, or which demonstrates an ineffectual legal challenge.

As the Supreme Court has recognized, however, "due process requirements are not designed to convert into a constitutional dilemma the practical difficulties in drawing criminal statutes both general enough to take into account a variety of human conduct and sufficiently specific to provide fair warning that certain kinds of conduct are prohibited." United States v. Lanier, 520 U.S. 259, 271 (1997) (internal quotation marks and citations omitted). Here, the charged conduct is not merely designing some benign marketplace for bath towels. The conduct is alleged to be specific and intentional conduct to join with narcotics traffickers or computer hackers to help them sell illegal drugs or hack into computers, and to be involved in enforcing rules (including using murder-for-hire) regarding such sales and taking commissions. No person of ordinary intelligence could believe that such conduct is somehow legal. Indeed, no reasonable person could assume that such conduct is in any way equivalent to designing and running eBay, for example. There is nothing vague about the application of the statute to the conduct charged.

Ulbricht also argues that his alleged conduct also constitutes protected free speech and that the imposition of criminal liability would be overbroad as applied. (Def.'s Mem. at 35-38.) This argument stems from an incorrect premise as to the nature of the criminal charges here.

The defendant does not explain how such conduct could amount to protected speech; even if this Court were to agree that such conduct has a speech element, the law is clear that speech which is part of a crime is not somehow immunized. See United States v. Rahman, 189 F.3d 88, 116-17 (2d Cir. 1999). For instance, no one would doubt that a bank robber's statement to a teller – "This is a stick up" – is not protected speech.

The thrust of the defendant's overbreadth argument appears to be similar to his vagueness, constitutional avoidance, and rule of lenity claims. All are premised in part on the incorrect view that the challenged conduct occurs on a regular basis by many people, that therefore enforcing these criminal statutes as to Ulbricht amounts to arbitrary enforcement and that the umbrella or tent of the statutes would be stretched beyond reason in order to encompass the alleged conduct.

For all of the reasons set forth above, this is incorrect.

C.    Civil Immunity for Online Service Providers

The defendant argues that the existence of a civil statute for certain types of immunity for online service providers expresses a congressional intent to immunize conduct akin to that in which Ulbricht is alleged to have engaged. This Court disagrees. Even a quick reading of the statute makes it clear that it is not intended to apply to the type of intentional and criminal acts alleged to have occurred here. See 47 U.S.C. § 230. It is inapplicable.

## VIII. COUNT FOUR

Count Four charges the defendant with participation in a money laundering conspiracy in violation of 18 U.S.C. § 1956(h).  (Ind. ¶¶ 17-21.)  The Government has alleged the requisite statutory elements.  (See Ind. ¶ 19.)  First, the Government has alleged that a conspiracy existed between the defendant and one or more others, the object of which was to engage in money laundering.  In paragraph 20, the Indictment recites the specific elements required for money laundering:

> It was a part and an object of the conspiracy that . . . the defendant, and others known and unknown, . . . knowing that the property involved in certain financial transactions represented proceeds of some form of unlawful activity, would and did conduct and attempt to conduct such financial transactions, which in fact involved the proceeds of specified unlawful activity, to wit, narcotics trafficking and computer hacking . . . with the intent to promote the carrying on of such unspecified unlawful activity . . . .

(Ind. ¶ 20.)  The defendant argues that the factual allegation that Bitcoins constituted the exclusive "payment system that served to facilitate [] illegal commerce" on Silk Road cannot constitute the requisite "financial transaction." (Def.'s Mem. at 3, 45.)  The Court disagrees.

As an initial matter, an allegation that Bitcoins are used as a payment system is insufficient in and of itself to state a claim for money laundering.  The fact that Bitcoins allow for anonymous transactions does not ipso facto mean that those transactions relate to unlawful activities.  The anonymity by itself is not a crime.  Rather, Bitcoins are alleged here to be the medium of exchange – just as dollars or Euros could be – in financial transactions relating to the unlawful activities of

47

narcotics trafficking and computer hacking.  It is the system of payment designed specifically to shield the proceeds from third party discovery of their unlawful origin that forms the unlawful basis of the money laundering charge.

The money laundering statute defines a "financial transaction" as involving, inter alia, "the movement of funds by wire or other means, or [ ] involving one or more monetary instruments, [ ] or involving the transfer of title to any real property, vehicle, vessel, or aircraft."  18 U.S.C. § 1956(c)(4).  The term "monetary instrument" is defined as the coin or currency of a country, personal checks, bank checks, and money orders, or investment securities or negotiable instruments.  18 U.S.C. § 1956(c)(5).

The defendant argues that because Bitcoins are not monetary instruments, transactions involving Bitcoins cannot form the basis for a money laundering conspiracy.  He notes that the IRS has announced that it treats virtual currency as property and not as currency.  (Def.'s Mem. at 46-47 (citing I.R.S. Notice 2014-21, http://www.irs.gov/pub/irs-drop/n-14-21.pdf, and U.S. Dep't of Treasury, Fin. Crimes Enforcement Network ("FinCEN"), "Guidance, Application of FinCEN's Regulations to Persons Administering, Exchanging, or Using Virtual Currencies," March 18, 2013, http://www.fincen.gov/statutes_regs/ guidance/html/FIN-2013-G001.html).)  The defendant argues that virtual currencies have some but not all of the attributes of currencies of national governments and that virtual currencies do not have legal tender status.  (See id. at 45-46.)  In fact, neither the IRS nor FinCEN purport to amend the money laundering statute (nor could they).  In any event, neither the

IRS nor FinCEN has addressed the question of whether a "financial transaction" can occur with Bitcoins. This Court refers back to the money laundering statute itself and case law interpreting the statute.

It is clear from a plain reading of the statute that "financial transaction" is broadly defined. See United States v. Blackman, 904 F.2d 1250, 1257 (8th Cir. 1950) (citation omitted). It captures all movements of "funds" by any means, or monetary instruments. "Funds" is not defined in the statute and is therefore given its ordinary meaning. See Taniguchi v. Kan Pacific Saipan, Ltd., – U.S. – , 132 S.Ct. 1997, 2002 (2012) (citation omitted). "Funds" are defined as "money, often money for a specific purpose." See Cambridge Dictionaries Online, http://dictionary.cambridge.org/us/dictionary/american-english/funds?q=funds (last visited July 3, 2014). "Money" is an object used to buy things.

Put simply, "funds" can be used to pay for things in the colloquial sense. Bitcoins can be either used directly to pay for certain things or can act as a medium of exchange and be converted into a currency which can pay for things. See Bitcoin, https://bitcoin.org/en (last visited July 3, 2014); 8 Things You Can Buy With Bitcoins Right Now, CNN Money, http://money.cnn.com/gallery/technology/2013/11/25/buy-with-bitcoin/ (last visited July 3, 2014). Indeed, the only value for Bitcoin lies in its ability to pay for things – it is digital and has no earthly form; it cannot be put on a shelf and looked at or collected in a nice display case. Its form is digital – bits and bytes that together constitute something of value. And they may be bought and sold using legal tender. See How to Use Bitcoin, https://bitcoin.org/en/getting-

started (last visited July 3, 2014).  Sellers using Silk Road are not alleged to have given their narcotics and malicious software away for free – they are alleged to have sold them.[16]

The money laundering statute is broad enough to encompass use of Bitcoins in financial transactions.  Any other reading would – in light of Bitcoins' sole raison d'etre – be nonsensical.  Congress intended to prevent criminals from finding ways to wash the proceeds of criminal activity by transferring proceeds to other similar or different items that store significant value.  With respect to this case, the Government has alleged that Bitcoins have a value which may be expressed in dollars.  (Ind. ¶ 3 (alleging that Ulbricht "reaped commissions worth tens of millions of dollars, generated from the illicit sales conducted through the site").)

There is no doubt that if a narcotics transaction was paid for in cash, which was later exchanged for gold, and then converted back to cash, that would constitute a money laundering transaction.  See, e.g., United States v. Day, 700 F.3d 713, 718 (4th Cir. 2012).

One can money launder using Bitcoin.  The defendant's motion as to Count Four is therefore denied.

---

[16] Recently, the U.S. Government auctioned off nearly 30,000 Bitcoins as part of a civil forfeiture proceeding related to Silk Road. See Sydney Ember, After Bitcoin Auction, Winning Bidders Remain Elusive, N.Y. Times Dealbook (June 30, 2014 6:59 P.M.), http://dealbook.nytimes.com/2014/06/30/after-bitcoin-auction-winning-bidders-remain-elusive/?_php=true&_type=blogs&_r=0.

IX.   CONCLUSION

For the reasons set forth above, the defendant's motion to dismiss is DENIED in its entirety.  The clerk of the Court is directed to terminate the motion at ECF No. 19.


SO ORDERED.

Dated:      New York, New York
            July 9, 2014

_____
KATHERINE B. FORREST
United States District Judge