F1KGULB1                        Trial

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UNITED STATES OF AMERICA,

 4              v.                         14 Cr. 68 (KBF)

 5   ROSS WILLIAM ULBRICHT,

 6              Defendant.

 7   ------------------------------x

 8                                        New York, N.Y.
                                          January 20, 2015
 9                                        11:00 a.m.

10
     Before:
11
                    HON. KATHERINE B. FORREST,
12
                                          District Judge
13

14                          APPEARANCES

15
     PREET BHARARA,
16        United States Attorney for the
          Southern District of New York
17   BY:  SERRIN A. TURNER
          TIMOTHY HOWARD
18             Assistant United States Attorneys

19   JOSHUA LEWIS DRATEL
     LINDSAY LEWIS
20   JOSHUA HOROWITZ
          Attorneys for Defendant
21
               – also present –
22
     Special Agent Vincent D'Agostino
23   Molly Rosen, Government Paralegal
     Nicholas Evert, Government Paralegal
24   Sharon Kim, Government Intern

25
```

F1KGULB1                         Trial

1             (Case called; in open court; jury not present)

2             MR. DRATEL:  Thank you for your accommodations.

3             THE COURT:  These things happen.  Too bad it happened

4    to late at night for you, but here we are and it's all set at

5    this point.  It actually did have the advantage -- please be

6    seated, all of you -- of giving me some additional time to go

7    through some matters.  I've got one and then possibly a second

8    matter raised by the government in a letter this morning to go

9    over.  The main matter that I wanted to address before we start

10   is the evidentiary issue left over on Thursday, which was the

11   subject of the significant letter submissions that I received

12   on the 19th from both sides.

13            Are there other issues apart from the one raised this

14   morning and the other that was the subject of the significant

15   submissions that you folks want to raise?  I just want to get a

16   sense of how many things we need to address before we begin.

17            MR. TURNER:  There are three others.

18            THE COURT:  Are they short or longer?

19            MR. TURNER:  Two I think are fairly short, two in

20   particular.  One of which we'd like to address at side bar.

21            THE COURT:  Is that the one from your short letter?

22            MR. TURNER:  There's an additional one.

23            THE COURT:  Then is there any that you can otherwise

24   raise and we'll knock those off and get them done?

25            MR. TURNER:  Sure.  One is very short.  We think an

F1KGULB1                          Trial

1    instruction should be given to the jury at some point that any

2    redactions they see in the exhibits should not be taken to mean

3    anything.  They're generally to protect private information

4    that might appear in the documents.

5           THE COURT:  Mr. Dratel, do you have any opposition to

6    an instruction along those lines?

7           MR. DRATEL:  No, just that it's not relevant.  That's

8    why it's redacted.

9           MR. TURNER:  And another issue we wanted to raise is

10   during cross-examination on Thursday, the defense asked Special

11   Agent Der-Yeghiayan about whether there were restrictions about

12   what was sold on the site, that there were no assassinations,

13   there were no credit cards, stolen credit card information.

14   And as your Honor is aware, your Honor ruled originally that

15   the government cannot introduce evidence of uncharged criminal

16   conduct that occurred on the site, and we believe that the

17   defense's question has opened the door to that.  There were

18   guns that were sold on the site.  There was counterfeit

19   apparel.  There was stolen -- there's pirated software, etc.

20          THE COURT:  Let me ask you about that because one of

21   the reasons for the Court's ruling was not only relevancy, but

22   it was also that the basis for getting that information in

23   required, I believe in some instances, getting through the

24   hearsay objection for the photographs of the website which

25   indicated the narcotics, that there's a coconspirator exception

F1KGULB1                          Trial

1    which the Court made rulings on.  But for things like

2    counterfeit Gucci belt, the question is, if you're going to say

3    that counterfeit things were, in fact, sold versus there were

4    advertisements such as X, I think there's a hearsay problem.

5    If you say there were counterfeit things sold, I think we run

6    into this problem.  If you're going to say were you aware that

7    there were advertisements for the following things and leave

8    that open, that's a different alley.

9                MR. TURNER:  There are a couple of points:  First of

10   all, I think the coconspirator exception would apply to the

11   same extent the coconspirator exception doesn't have to apply

12   to a charged conspiracy, it's just any conspiracy.  And we

13   continue to take the position that these statements are not

14   even offered for the truth.  It would be akin to somebody

15   posting pictures of a grocery store with the items on sale and

16   the prices.  These are not statements, but they're evidence

17   that there's something being sold there as reflected in the

18   advertisement.  They're offers.  They're not statements with a

19   truth value.

20               THE COURT:  That's I think the second avenue that I

21   was opening up.  My suggestion is, if you're going to say these

22   are the things that were advertised, you were asked about

23   certain goods and services that were not being advertised, were

24   you aware of other things that were being advertised other than

25   what we talked about?  Yes, such as these types of

1   advertisements.

2             MR. TURNER:  Right.

3             THE COURT:  Are you going to go any further than that?

4             MR. TURNER:  No.  We can stick to advertisements or we

5   can simply strike the testimony that was already admitted and

6   we don't have to get into those other goods, but we do think

7   the defense opened the door to that sort of evidence with that

8   questioning.

9             THE COURT:  Mr. Dratel, do you have a response to

10  that, first, whether or not we eliminate it by just striking

11  the information elicited as to what was not sold, just on the

12  basis with sort of a short statement that you heard testimony

13  about what may not have been sold and the only thing that's

14  really relevant here is information relevant to the charges.

15  That would be one way of handling it, and not getting into the

16  opening of the door for the other pieces.

17            MR. DRATEL:  Right.  I think with respect to opening

18  the door, though, it didn't open the door in the sense that

19  saying what is not permitted on the site, which was accurate,

20  does not open the door to what was permitted on the site.  So

21  in other words, the government -- it's not that the testimony

22  was inaccurate or misleading in anyway because I didn't say

23  that anything that the government wants to put in was not

24  offered on the site, only those specific things that were not

25  allowed on the site.

1          THE COURT:  I do remember the questioning because I

2     actually had the same thought about it falling into the opening

3     of the door for these other pieces.  One of the implications

4     was that really bad things, other kinds of bad things were not

5     offered on the site, for instance, things which, to pick up on

6     a theme I think has been developed, could not harm people; that

7     as we have seen from the signature line of certain chats, the

8     drugs don't jump off the table and harm anyone.  So I think by

9     implication since those documents are in, the question of

10    whether or not guns were being sold, I suppose you could argue

11    that they don't jump off the table and hurt someone either, but

12    it's a little further afield.  It's potentially opened.

13         Why don't you tell me whether or not you'd be willing

14    to strike the line?  I would do it in a way that is very I

15    think very light, which is you may have heard testimony about

16    other goods and services that were or were not sold on the

17    site.  What's relevant to you, ladies and gentlemen, of the

18    jury is the evidence that you have and it's for you to weigh

19    that evidence as to what has been sold on the site.

20         MR. DRATEL:  Can I think about that for a little bit.

21         THE COURT:  Yes.  The other issue, was there something

22    else, Mr. Turner?

23         MR. TURNER:  There's a third issue we'd like to raise

24    at side bar.

25         THE COURT:  Right.  We have two side bar issues.  Then

F1KGULB1                         Trial

1    let me deal with the issue which we have all spent I assume a

2    great deal of time on over the weekend.  And as is the case

3    with rulings like this, I have read the cases which you folks

4    have presented me with, for which I thank you, and also did

5    rather exhaustive research on our own to come up with what is

6    the right way to analyze this evidentiary issue.  And I'm

7    speaking now about the evidentiary issue left over from

8    Thursday afternoon.  I'm going to call it the MK issue for the

9    Mark Karpeles issue, but it also can relate to something more

10   generically described as an alternative perpetrator issue.

11          I have read the letters submitted by the parties.  I

12   have read the cases and I also went back and reviewed the

13   transcript of our prior proceedings.  One thing I would note is

14   that the prior transcript did convince me that there were,

15   having now decided how to analyze this issue properly, there

16   were all kinds of things to which the government probably

17   should have -- undoubtedly should have objected earlier and we

18   would have ripened this issue before it had gotten so far down

19   the road.  Part of the confusion here is trying to

20   differentiate between similar types of questions when certain

21   questions weren't objected to and then others were objected to.

22   But let's put that issue of whether there would be a waiver to

23   the side for a moment and let me tell you how I analytically

24   put this issue together.

25          I want to start from the beginning, which I think is

F1KGULB1                              Trial

important which is asking ourselves as to any evidentiary

ruling what is this case really about.  This case is about

whether this defendant, Mr. Ross Ulbricht, engaged in the

conduct that is charged in the counts in the indictment.  So

then we get to what is relevant evidence?  Relevant evidence is

evidence which is probative of a fact in dispute and whether

the defendant is Dread Pirate Roberts or was Dread Pirate

Roberts at certain points in time but not other points in time

is a fact in dispute.

        Then we ask what's the relevance more granularly of

whether the defendant was Dread Pirate Roberts?  And that is

because at certain points of time, there are certain pieces of

evidence where Dread Pirate Roberts does certain things which

the government has presented.  If Dread Pirate Roberts at that

moment is Mr. Ulbricht, then that leads to one set of possible

inferences; if Dread Pirate Roberts at that point in time is

not Mr. Ulbricht, then it leads to another.

        Now, a question which is, I think, floating around in

here through this is whether or not the fact that there might

be – and certainly the defense is arguing – another Dread

Pirate Roberts, does that exculpate the defendant?  Is it

exculpatory, and that it may or may not.  That will be up to

the jury ultimately to decide.

        First, the jury will decide whether they believe in

the defense theory, which it has a right to pursue as to an

F1KGULB1                          Trial

1    alternative perpetrator, and the alternative perpetrator, the

2    defense alleges, is either "the" Dread Pirate Roberts or became

3    Dread Pirate Roberts and then framed Mr. Ulbricht and turned

4    over his identity to him at some point in time.

5          Now, only if the evidence relating to the Dread Pirate

6    Roberts at a particular point in time where the reasonable

7    inference can be drawn that it was not the defendant could it

8    be exculpatory; in other words, you could have the defendant be

9    Dread Pirate Roberts at one point in time, have somebody else

10   be Dread Pirate Roberts at another point in time and had to go

11   back to the defendant, that's not exculpatory except for the

12   quantum of whatever the proof is in between.

13         For instance, if the quantity of drugs, which could be

14   a very relevant issue, takes hold during the period of time

15   that the defendant was not Dread Pirate Roberts, that's one

16   thing.  Of course, if the defendant is shown to join a

17   conspiracy for narcotics distribution at any point in time, a

18   defendant is liable for all of the acts going backwards.  So as

19   a matter of law, we know this from the *Gonzalez* case, there are

20   oodles of cases from Supreme Court case law that a

21   coconspirator who joins a conspiracy is liable for the acts

22   which occurred prior to that individual joining so long as

23   those acts were reasonably foreseeable to the coconspirator.

24   So whether or not the presence of additional Dread Pirate

25   Roberts helps is a question to be determined first based upon

F1KGULB1                    Trial

1    an analysis as to whether or not there is a second – or even if

2    Mr. Ulbricht is a first – Dread Pirate Roberts.

3          Now, since Mr. Ulbricht, his counsel conceded in the

4    opening that he started Silk Road, the timing is unclear as to

5    when and whether the defendant allegedly left Silk Road and

6    whether or not there's a point in time when he becomes Dread

7    Pirate Roberts before he hands over I think according to the

8    defense theory the website.  And the evidence appears to be

9    from the government that the defendant was found at the time of

10   arrest acting as Dread Pirate Roberts at the time of arrest.

11   Whether that was for that one day or whether it had gone back

12   in time and in fact covered the entire time will be for the

13   jury to determine.  So that's sort of the relevance.

14         Now, the Court looks at relevance broadly as the

15   Second Circuit requires under the rules under 104, but the

16   Court also is mindful of balancing Rule 403, which is whether

17   or not things that require trials within trials end up being

18   unduly confusing, misleading to the jury, and so I have that in

19   mind and I've had that in mind as I have proceeded.

20         The evidence of third-party culpability and

21   alternative perpetrator is admissible if there's sufficient

22   evidence tieing a particular person or even if it's an unknown

23   person to the offense.  That's the *Wade* case, Second Circuit

24   case which you both acknowledged and cited in your papers over

25   the weekend, a 2008 case, but you do need some direct evidence

F1KGULB1                        Trial

1   of connection.  That's the other point that the *Wade* case makes

2   clear, because it's very possible to have suspicion as to more

3   than one person and this apparently happens as you folks know

4   all the time, whereas the investigation eventually focuses

5   primarily on one and one is primarily then tried and the other

6   may never be tried.

7           So the question ultimately boils down to whether this

8   particular defendant did the particular acts which would relate

9   to or amount to Counts One through Seven, not whether somebody

10  else also did those acts at the same time, in effect,

11  duplicating those efforts.

12          So one issue is what does the defendant have that Mark

13  Karpeles is, in fact, DPR if there's something that we're

14  leading up to versus just trying to get that information out of

15  the government's witness; in other words, whether or not there

16  is going to be other evidence offered.  I am mindful of

17  Mr. Dratel's point that the timing of the turning over of the

18  3500 material makes certain aspects of this more difficult for

19  the defendant because they simply haven't had time to develop

20  all that they would have for Mr. Karpeles, but nevertheless,

21  the defense theory has been known since at some point many

22  months ago.  It's been previewed even to the Court.  So the

23  fact of another DPR, whether it be Karpeles or somebody else,

24  is certainly something which I assume the defense has developed

25  to this point and, therefore, there may be lots of things which

1    the defendant, if he has them, would be able to present as

2    direct evidence of that theory.  For instance, now, as we all

3    understand, it's the government's burden to show that the

4    defendant is or is not culpable of the offenses charged.  The

5    question is whether or not the defendant wants to try to rebut

6    some of that evidence in a particular way, but it's the

7    government's burden in the initial instance.

8            So, the question is whether or not the defendant has

9    this, for instance, like chats with a third party showing that

10   he's about to turn over the website, soliciting interest in

11   somebody else wanting to take over the website; in fact

12   conveying the private key, something which indicates that there

13   was a moment when it was copied from another computer to a

14   different computer.  There might be any variety of ways which

15   those of you who are more technically savvy than I am could use

16   to demonstrate that, but it's the direct evidence of another

17   DPR which is competent evidence.

18           Now, we used the term competent evidence on Thursday

19   and competent evidence, just to be clear, it needs to both be

20   relevant as a threshold hold matter, which I've already now

21   described, but it also needs to be admissible evidence under

22   the rules and not subject to an exception under the rules.  So

23   it's direct evidence of somebody taking over the website, it's

24   also circumstantial of someone taking over a website, so

25   circumstantial evidence where various dots can be placed along

F1KGULB1                    Trial

a line and while it's not drawn in between it, a reasonable

juror could draw the inference would be competent

circumstantial evidence.

        It's important, and this is where the difficulty comes

in and it's a difficult issue for trial judges everywhere, to

distinguish between what is speculation and what is

circumstantial.  There's a difference between what is

circumstantial evidence and what is purely conjectural or

purely speculation.  There's a lot written by a lot of courts

on where an inference becomes conjecture or where an inference

is reasonably based on fact.

        The point is that the logical inference must itself be

based on otherwise admissible evidence; otherwise, it does

become conjecture.  So there is lots of case law, which we have

now all had an opportunity to slow down and read, which

indicates that a person's subjective beliefs is simply

speculation.  There are certain instances where subjective

beliefs may be admissible.  Those are not pertinent here.  That

is, for instance, in certain instances not going to an ultimate

conclusion of a case where an expert witness can offer certain

opinions.

        Indeed, lay witnesses can also offer certain opinions,

but they can't usurp the fact-finding role of the jury.  So

let's go back to our umbrella example.  It's certainly okay for

witnesses to discuss on the witness stand -- this is now the

F1KGULB1                      Trial

1    circumstantial evidence example I raised during the early part

2    with the jury -- I saw individuals enter the courtroom with

3    raincoats, I next saw them enter with umbrellas, I saw that

4    there was water dripping off of the umbrellas.  Those are facts

5    which the witness is seeing.  The witness can't say I know it's

6    raining or I believe it's raining because that is ultimately

7    for the lawyers to argue from the various facts which are put

8    in as inferences.

9            So this is where we get to the first part of -- and

10   I'm going to give you folks a list of what's okay and what's

11   not okay, it's not all not okay and it's not all okay -- of

12   Mr. Der-Yeghiayan.  What Mr. Der-Yeghiayan thought and believed

13   it's clear to me, having now reviewed the cases very clearly

14   and analyzed from the beginning what is competent evidence and

15   what is incompetent evidence, that his thoughts and beliefs are

16   irrelevant.

17           I've also gone back through the earlier portion of the

18   transcripts and, in fact, the government stayed away from

19   thoughts and beliefs, but he's been brought into it a lot on

20   cross.  The government did not object to numerous, numerous

21   instances where he was asked about his thoughts and beliefs,

22   and I think this led to the confusion.

23           Let me just give you folks a cite of the *Johnson* case

24   at 529 F.3d 499 at pin cite 501 and also the *Garcia* case, and

25   there are a number of others which stand for this proposition.

F1KGULB1                        Trial

This is an especially important proposition when you're talking
about an investigator or a special agent because the redirect
examination that could lead from this is clearly error and you
can't have one side, one-hand clapping.

          The clear error is the following:  If allowed to say I
believed at one point in time that Mark Karpeles was the DPR,
and what did you base it on?  I based it on the following four
sources of information, the redirect becomes, Did there come a
point in time when you ceased to believe that?  Yes.  And who
did you become a believer in in terms of their guilt?  I
believed it was Ross Ulbricht.  Can you tell me now why?  Yes.
Because of the following 27 pieces of information, which then
become essentially a summary statement that the government
would normally do during its closing arguments.  That kind of
conclusory summarizing testimony as to drawing inferences for
the jury that the jury would be drawing usurps the jury's
fact-finding role and is clearly not relevant.

          What is relevant is direct knowledge and responses to
that direct knowledge.  For instance, before I go into probable
cause, let me say that it's error for the agent to testify
about opinions regarding any person's culpability, particularly
clear with respect to the defendant, but the same principles
apply to third parties.  And that is true under 701 and the
*Garcia* case I mentioned is a Second Circuit 2005 case, the
*Grinage* case, another Second Circuit case; the *Dukagjini* case,

F1KGULB1                      Trial

a Second Circuit case.  We're not the first court to have

confronted this question.  And then also the *Carmichael* case

which is a Second Circuit case from 2005 where the Court then

talks about the difficulties of opening the door in that kind

of case.

          Let's talk about probable cause.  In terms of probable

cause, there have been other instances where individuals have

been asked whether or not there was probable cause in their

view, and that has been precluded across the board on the basis

that it's a legal conclusion; that the concept of probable

cause is a legal concept.  Is there probable cause to believe a

crime has been or is about to be committed?  So it asks for an

answer to that legal conclusion, and so whether it's put into

the form of a statement, "I believe that there's probable

cause" or in terms of a physical manifestation of that, "I

sought a search warrant implicitly because I believed there was

probable cause," that is similarly based upon the legal

conclusion.

          Now, with all of that said, as we all know, there are

a series of cases which are quite clear that the defendant is

entitled to present a defense theory.  There is a defense

theory here that's clear that the defendant is pursuing as to

an alternative perpetrator and he is certainly allowed to

present competent circumstantial and competent direct evidence

supportive of those theories, and I am in no way precluding the

defendant from presenting a witness who may be able to suggest

that he or she knew the real Dread Pirate Roberts and it wasn't

the defendant or whatever various ways this could be shown.

         And there are certain cases that are inapposite to

this case but that are supportive of it, of that principle.

The *Alvarez v. Ercole* case, in that case, there was a report of

another suspect.  The issue there was that the lead for the

other suspect was never pursued.  Here, that's not the issue.

There was an investigation that was doing whatever it was

doing, and it was remanded on the basis of a habeas petition

that they should have allowed it to be inquired into not the

truth of whether that other person was guilty or not, but of

the adequacy of the investigation.

         In the *U.S. v. White* case, which is a 2012 case, in

certain instances, that case indicated that the charging

decisions could be admissible.  There, there were other

occupants of a vehicle who were charged with possessing the

very firearm that then the defendant was charged with

possessing.  It's not apposite.  And then the *Wade* case we

talked about, the *Wade v. Mantello* case is supportive of the

Court's view.  In terms of the *Arbolaez* is a case that we found

which is at 450 F.3d 1283 at 1290, and it's an Eleventh Circuit

case, 2006.  That's another case talking about probable cause

in connection with an investigation being inadmissible hearsay

and the statements only allowed -- if they were allowed in, it

F1KGULB1                          Trial

would be only for the purpose of showing some amount of truth.

          So here are the questions, which, based upon all of
these principles of law, appear to the Court to be clearly off
limits, and then I'm going to give you the ones which I think
are on limits.

          Off limits are things such as the following, these
questions or reasonable derivatives of these questions:  Did
you suspect Mark Karpeles?  The word "suspect" is a conjectural
suspicion.  Now, I will say that was asked in spades with no
objection by the government earlier on.  It was asked two or
three times on Friday, but we'll get to what we do in terms of
the government's application in its letter to strike, which is
somewhat complicated.

          But did you suspect Mark Karpeles?  There should be no
further questioning into that.  Did you believe Mark Karpeles
was DPR?  There should be no further questioning into whether
or not this witness believed -- the dots can be drawn, but the
belief he needs to stay away from.

          Do you suspect Ross Ulbricht?  Do you believe Ross
Ulbricht was DPR?  Similar, the same witness can't do one, he
can't do the other.  Does he suspect that Mark Karpeles
operated Silk Road?  Does he suspect?  Does he suspect Mark
Karpeles did not operate Silk Road?  Both of those are equally
off limits.  Any descriptions of belief that he has are off
limits.  However, what's not off limits are things like:  Did

F1KGULB1                    Trial

you see X?  Did you do Y?  Did you investigate X?  Yes.  No.
Did you see X?  Did you see Y in connection with that work?

        Now, the interview, this is now the Forbes interview
we talked about that on Friday, and that is hearsay, and I
don't think there's much of a debate about the content of it
being hearsay.  Whether or not this particular witness believed
it sounded like the man on the moon, it doesn't matter, or that
he believed it sounded like Karpeles doesn't matter because
that's his subjective belief.

        Now, in terms of the offer, the offer to provide, this
is the Karpeles offer, through his lawyer through another AUSA
etc. to provide law enforcement with information as to who the
real DPR was is also not relevant.  The offer is the fact of
the offer.  That's the only point of that, because we know that
there was no information.  We know that Karpeles did not
provide, based upon the government's proffer, he never provided
that information.  So it's not as if there's some secret name
that comes out.  So the fact of the offer itself is not
relevant to a disputed issue of fact.  It is not a disputed
issue of fact relevant to this defendant's culpability whether
or not an offer was made by somebody else to potentially
divulge information.  And it's really a way of, I believe,
getting out whether or not Karpeles had inside information
about Silk Road.  If he did, he did, but that's a separate
question from whether or not Ross Ulbricht can be tied himself

F1KGULB1                          Trial

1    through competent evidence to Silk Road in the manner the

2    government has been suggesting.

3             In terms of the 807 and whether or not that gets over

4    hearsay, first of all, I find that the fact of an offer upon

5    analysis and taking it apart as to what each segment is for is

6    irrelevant, but is it probative?  Is it more probative than

7    anything else that can be offered?  The answer is no.  It's

8    really inviting the jury to speculate.  And the other issue is

9    that Karpeles was self-interested in making any offer at the

10   time and, therefore, it's unclear whether he actually had any

11   information.  So the fact of the offer is suggestive of a fact

12   of real and potentially inferentially reliable information and

13   Karpeles -- there's no indication that he would have provided

14   that.

15            Now, what would be okay:  Any chats on the website

16   that DPR was handing off the website or that Mr. Ulbricht,

17   during the time that he was in charge of Silk Road by his own

18   admission or by his counsel's assertion, was handing off the

19   website; evidence as to whether or not, for instance, Ross

20   Ulbricht, when he was being viewed by law enforcement and they

21   were tailing him, which this information has some information

22   about, he may have limited information, but whether or not Ross

23   Ulbricht was going to work, for instance.  Was he going to an

24   office, was he doing something else, does he effectively have

25   an alibi defense?  Are there reviews of bank accounts that

F1KGULB1                        Trial

1    reveal information that indicate payroll coming in from a third

2    party?  Is there evidence that another account was receiving

3    Silk Road commissions looking at the account numbers and

4    tracing the numbers through?

5              He can challenge the recollection of the website,

6    challenge the buys, challenge the facts relating to the arrest.

7    He can also seek to introduce evidence that others were tied to

8    the servers; that there were other individuals who were leasing

9    the servers; that Mark Karpeles or somebody else was leasing

10   the servers; that Mark Karpeles did any number of things, X, Y,

11   Z; that Mark Karpeles had a website if he's able to show it

12   through a witness with competent technical evidence that the

13   website had certain aspects of its platform that were

14   replicated in the platform of Silk Road, that would be fair

15   game.  There are other questions which were asked which were

16   fairly asked, which is, was Mark Karpeles running MtGox?

17   That's perfectly appropriate.  Many of the questions that

18   Mr. Dratel asked were absolutely appropriate and are supportive

19   of the defense theory.  The questions that were not appropriate

20   were the ones that strayed into the words "belief" and

21   "conclusion," but where they were simply asking about facts,

22   they are perfectly appropriate.

23              (Continued on next page)

24

25

F1kdulb2

1          THE COURT:  So what we'll have to do -- and that's the

2     Court's ruling on this.  Much of what, as a result, the

3     defendant wanted to go into in terms of exploring the search

4     warrant application is off limits, because the very question

5     that was to be asked, which is what are the four sources of

6     information that you had, X, Y, Z, and then, based on that,

7     what did you do next.  Now having reviewed the cases -- and

8     they seem to be clear in this regard -- so long as he is able

9     to present the witness -- the defendant is able to present

10     direct evidence of his own defense of another perpetrator,

11     getting the speculation of a third party, even the

12     investigator, is an improper way to proceed.

13          So those questions, in that way, are off limits.  But

14     the other questions of direct evidence through this witness,

15     who had a lot to do with the Silk Road website, so if he

16     happened to look at all the chats and looked at all the chats

17     of DPR and/or any account associated with this witness, he can

18     be crossed on whether or not there is clear evidence of a

19     handoff.  And the jury will then be given the opportunity to

20     draw its inference as to whether there was or was not a

21     handoff.  This witness cannot say whether there was or was not

22     a handoff, but he could certainly present evidence in that

23     regard; there is no doubt about that.

24          What we should do, I think, is there are some

25     questions.  I've got a whole bunch of them that are flagged

F1kdulb2

1    here.  I am happy to hand over my copy of the transcript to

2    counsel for everybody to review.  You need to figure out, to

3    the extent anybody wants to go back on certain Q and A's and to

4    the "belief" questions and the "conclusion" questions, which

5    were allowed to go, I don't want to just do a global strike

6    because many of the questions were fine.  So the question is

7    going to be which ones do you want to strike and does the

8    government have a view as to how to do this without creating

9    more problems?

10            So I'm not going to do it when the jury first comes

11   out.  I will take it up at another time.  And I would like it

12   to be very specific and have you folks confer on it.  But when

13   I flagged things, I flagged things which I think are also

14   appropriate.  You will see, based upon what I just said, what

15   will jump out as you as unobjected-to questions that, based

16   upon the Court's review of all the case law, I now believe

17   would have had appropriate objections sustained but they were

18   let go.  So let's take it step-by-step because I don't want to

19   eliminate things which the defendant elicited fairly, and we

20   have to be careful as we proceed now that we do have a live

21   objection.

22            All right.  Mr. Dratel, I know you don't agree with my

23   ruling, but do you understand the parameters that I have set?

24            MR. DRATEL:  I think so.  I have to say, though, that

25   with respect to the offer by the attorney, it is not about --

F1kdulb2

1    it is not about whether he actually had information.  It is the

2    fact that someone who is under investigation is offering to

3    implicate someone else in return for immunity from all charges

4    that the government could bring against them -- money,

5    business, or whatever.  And also, we don't have to prove

6    anything, and all the cases are not about proving --

7              THE COURT:  You don't have to prove anything.  But if

8    you want to rebut something through cross-examination, there

9    are limits.  This is part of what comes up in the 30 cases

10   which you all cited to me and my own research.  You know, of

11   course, there are limits to cross-examination when we start to

12   get too far afield.  Because the next question will be, well,

13   what was the outcome of the interview?  And this is a witness

14   who doesn't have that.

15             MR. DRATEL:  This is his own question --

16             THE COURT:  No.  No.  No.  The government will have to

17   be able to get that.  And it is too far afield.  So you can

18   show that there was another perpetrator.  I am by no means

19   foreclosing your, you know, your attempt to build that defense

20   theory by showing that your client, or whomever had certain

21   user names, whatever the user names are, handed off

22   administrative capabilities to somebody else to take over that

23   role for some period of time.

24             MR. DRATEL:  But that is not the standard in these

25   other cases, and the reversals and Ercole, Alvarez v. Ercole is

F1kdulb2

1    a perfect example and --

2              THE COURT:  Mr. Dratel, I have read those cases, and I

3    believe that they are squarely distinguishable.  I mean the

4    Ercole case, as you know, was a very particular kind of case

5    where not only had somebody else been implicated but somebody

6    else had been essentially shown to be likely to be the guy.

7    And they just didn't -- they had the name.  They had the phone

8    number, or the contact information.  I can't remember how it

9    was.  And then they just failed to follow up.  It is different.

10             MR. DRATEL:  But it's only different as a matter of

11   degree.  If the failure to -- it was the refusal to permit

12   cross-examination as to that issue which was the basis for the

13   reversal.  And it was not -- and it is not a question of I have

14   to have a photograph of DPR and it is not Mr. Ulbricht.  I can

15   establish it by inference.  And just the way the government is

16   establishing its case by inference.

17             THE COURT:  You could certainly establish it by

18   inference, but that is why I want to differentiate between

19   you've got to have some information that Karpeles in fact

20   either had information on DPR or that's reliable, and/or if you

21   are going to build Karpeles up as -- is it your view that

22   Karpeles was not the real DPR, or is it your view that he was

23   the real DPR?

24             MR. DRATEL:  My view is that he could be the real DPR.

25             THE COURT:  Do you have any information, other what

F1kdulb2

you brought out and what is in the 3500 material, that you can

proffer that draws the connection that the Wade case and the

other caress say you have to have before we go off on this

road?

          MR. DRATEL:  I can do cross-examination.  I'm not

required to have a witness who comes up and does that.  We have

other information about the fact that there are multiple --

just so it is clear what our theory is.  Our theory is that

Mr. Ulbricht created the website, got out a couple of month

later, did not come back in at any point until the very end,

was not in at the very end.  He was not in a conspiracy, and he

was not operating the website.  The fact that he had -- what

the evidence shows about what was on his laptop, fine, we will

explain.

          THE COURT:  OK.

          MR. DRATEL:  But --

          THE COURT:  All of that, of course, you are welcome to

explain, and you are certainly welcome to cross-examine this

witness.  I'll tell you.  I feel very comfortable in a

careful -- and with the Ercole case, it is a 2014 case.  It is

an unusual case because it is a reversal of a state court case.

There is a remand on habeas.  I read it a couple of times.  But

I'm comfortable.  I've also read the Kiley v. White case more

than once in the context of this and other cases.  I'm

comfortable with my ruling.

F1kdulb2

1          My question to you right now, so we can get going, is

2     do you understand the parameters of what you can ask?

3          MR. DRATEL:  I think so.  But I just need to complete

4     the record just to preserve it, because with respect to Kyles

5     v. Whitley, the Supreme Court case, Beany, the alleged

6     alternative perpetrator, they didn't have proof.  They did it

7     all through the police investigation.  They didn't have

8     additional witnesses.  They had the police.

9          And this is combined with the police investigation

10    issue.  They are inextricable in many respects, and it is not

11    about -- it is not just about whether it was shoddy but it is

12    about other things that I'll get into on cross with this

13    witness that I don't think are objectionable at all because

14    they go to motivations and other things in terms of the

15    investigation.  So that's all part of the same piece.  And I

16    can build that by inference.  I am permitted to do that by

17    cross and by inference.

18          THE COURT:  You are permitted to do that through

19    competence evidence through cross and through inference.  The

20    question is going to be what is appropriate for this witness to

21    speak to, and it will be things that he perceived with one of

22    his senses, as witnesses do, as opposed to what he may have

23    held as a belief at one point in time.

24          MR. DRATEL:  I understand that part.

25          THE COURT:  I am not going to let them ask did you

F1kdulb2

1    believe Ulbricht did it, tell me.  And then, yes, by the way,

2    tell me the 27 reasons why.  That would be --

3             MR. DRATEL:  That would be his direct.

4             THE COURT:  That would be his redirect.

5             MR. DRATEL:  I am saying that would be his direct.

6             THE COURT:  No.  Well, you are talking about those are

7    inferences versus his conclusions.

8             All right.  So if you have any questions about a

9    particular issue that you want to raise that I am not letting

10   you raise, then present it to me, but otherwise we'll proceed

11   with this.  I'm not right now striking any of the testimony

12   that came in.  Frankly, a huge amount came in on Thursday.  It

13   will be up to really the government's burden to figure out what

14   portions they believe are appropriately struck and then to

15   discuss whether the defense agrees not as to whether or not

16   they agree with the evidentiary ruling but given the Court's

17   parameters, and if the defense does not agree with any of it,

18   then I will just make a ruling.

19            MR. DRATEL:  There is also a waiver aspect of it.

20            THE COURT:  There is a waiver aspect of it.  We

21   haven't talked about that or briefed it.  That is why I don't

22   want to do that right now.  It is complicated because it is

23   interspersed.  There are completely unobjectionable pieces

24   interspersed with objectionable.  You will be able to say

25   Karpeles was out there.  He had the computer expertise.  He

F1kdulb2

1    owns Mt. Gox.  There are going to be certain things that are

2    still going to be, I believe, in the record.  We'll have to

3    take a look at how the Q and A's come out ultimately, but there

4    will be facts.

5           All right.  Let's take up the two sidebar issues.

6           Mr. Turner.

7           MR. TURNER:  Your Honor, I just wanted to make clear.

8           In terms of -- we can look at the transcript and come

9    up with proposed areas to strike.  I just want to be able to do

10   that before redirect, because if certain testimony is not

11   stricken, then we would want to potentially redirect the

12   witness a certain way to cure testimony that did come in.

13          THE COURT:  Can you have some of your colleagues help

14   you with highlighting what you think?

15          MR. TURNER:  Yes, your Honor.

16          THE COURT:  And as little as possible.

17          MR. TURNER:  Yes, your Honor.

18          THE COURT:  I mean, there is one way of doing it which

19   is, ladies and gentlemen, you heard the witness talking about

20   his belief and views and suspicions about an individual.  You

21   should disregard those comments because his beliefs and views

22   and suspicions are not relevant.  It will be for you to decide.

23   You are going to be presented with the evidence here as to this

24   defendant and anything else that's important for you to

25   consider, and you can decide whether or not that is sufficient

F1kdulb2

1      to draw those conclusions yourself.

2                  That would be one way of doing it.  And then we would

3      have to, for purposes of later on, determine if we have

4      questions later for the jury to have read back, whether or not

5      some of those pieces are then excised.

6                  MR. TURNER:  OK.  So we'll take a look -- we'll have

7      somebody on our team take a look at that and see if we can

8      offer specific testimony to excise before redirect.

9                  THE COURT:  All right.  If I understand it, there are

10     two matters at the sidebar?

11                 MR. TURNER:  Yes, your Honor.

12                 (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

F1kdulb2

```
 1              (At the sidebar)

 2              THE COURT:  All right.

 3              MR. TURNER:  One is simple.  One is more complicated.

 4    The simple one is if my back is turned --

 5              (In open court)

 6              THE COURT:  You know, I'm sorry, could you -- it is OK

 7    for you folks to talk, but could you talk outside because,

 8    actually, we have a hard time hearing because we whisper up

 9    here, or whisper lower so we can hear what we are saying here.

10              (At the sidebar)

11              MR. TURNER:  So while counsel's back is turned as the

12    case is going forward, I have heard from multiple people on my

13    team now and multiple people in the audience that often during

14    sidebars the defendant is turning, making contact with his

15    family and speaking to his family in a way that multiple people

16    have told me seems geared toward generating sympathy.  So I

17    would ask that any such communications be outside the presence

18    of the jury.

19              THE COURT:  Can you speak to your client?

20              MR. DRATEL:  OK.  I mean, you know, obviously his

21    family is here.  They are used to visiting him on a regular

22    basis and they are not going to be able to visit him during

23    trial because he is here.

24              MS. LEWIS:  Because of his move they are not able to

25    visit him at all right now.  They just got that paperwork.  It
```

F1kdulb2

1    may be weeks before they see him, including his sister who is

2    in from Australia.  This may be his only chance to have contact

3    with her.

4              THE COURT:  OK.  I am not concerned about, so long as

5    there is no inappropriate communication with him, just turning

6    and saying "Hi, mom" at some point when the jury is not in the

7    room, because there are lots of times -- now, for instance --

8    when the jury is not in the room.  But when the jury is in the

9    room, he should just continue looking forward.

10             By the way, we are going to move the -- we did move

11   the monitor.  Terrific.

12             So you will tell him.

13             MR. DRATEL:  I will.

14             (Pages 594 through 614 sealed by order of the Court)

15             (Continued on next page)

16

17

18

19

20

21

22

23

24

25

F1kdulb2

1              (In open court)

2              THE COURT:  We're going to go until 1 o'clock, as

3      opposed to 12:45.  Because of the fact that the jury had to be

4      waiting around, I have had Joe order lunch for the jury to be

5      brought in sort of an attempt to do something for them.  But

6      we'll go right 'til 1 o'clock.  At 1 o'clock I have a

7      sentencing in here.  It is a narcotics case.  And so I will

8      need to have space, probably actually on this side because it

9      will be somebody who has a marshal there.  People are welcome

10     to stay for that but I will need room on the tables.

11             Go ahead and bring in the jury, Joe.  Oh, the witness.

12     Is the witness coming?

13             THE CLERK:  Yes.

14             (Pause)

15             (Continued on next page)

F1kdulb2

| | |
|---|---|
| 1 | THE CLERK:  All rise as the jury enters. |
| 2 | (Jury present) |
| 3 | THE COURT:  All right.  Ladies and gentlemen, let's |
| 4 | all be seated. |
| 5 | And I want to apologize for our late start today.  A |
| 6 | couple of different things result from that.  We do have lunch |
| 7 | coming in for you folks.  We will go to 1 o'clock and then |
| 8 | we'll stop for our lunch break.  I do apologize.  We try not to |
| 9 | have these kinds of things take up your time, and we'll try to |
| 10 | use your time as efficiently as we can.  We wouldn't have had |
| 11 | that delay unless it was necessary, and I do apologize. |
| 12 | I want to remind you, sir, Mr. Der-Yeghiayan, that you |
| 13 | are still under oath. |
| 14 | THE WITNESS:  OK. |
| 15 | JARED DER-YEGHIAYAN, |
| 16 | Resumed, and testified further as follows: |
| 17 | THE COURT:  Mr. Dratel, you may proceed, sir. |
| 18 | MR. DRATEL:  Thank you, your Honor. |
| 19 | THE COURT:  Oh, one thing.  I had a note to myself. |
| 20 | Ladies and gentlemen, from time to time in documents |
| 21 | you see redactions, which are just sort of black marks through |
| 22 | documents.  That is just because certain information is |
| 23 | irrelevant, and so just don't even think about it.  Just sort |
| 24 | of ignore it. |
| 25 | Proceed. |

F1kdulb2

1          MR. DRATEL:  Thank you.

2    CROSS-EXAMINATION (Resumed)

3    BY MR. DRATEL:

4    Q.  Good afternoon, Agent Der-Yeghiayan.

5    A.  Good afternoon.

6    Q.  Have you ever heard of someone with a username "inlightof"?

7    A.  I have.

8    Q.  And have you ever identified that person?

9    A.  No, I did not.

10   Q.  And that was a person you were looking at at some point as

11   DPR, right?

12          MR. TURNER:  Objection.  Form.

13          THE COURT:  Sustained.

14   Q.  And we talked the other day about "peaceloveharmony,"

15   someone with that username, right?

16   A.  Yes.

17   Q.  That was someone who was, as you described it, sitting on

18   DPR's profile for a few hours a couple of days before

19   Mr. Ulbricht was arrested, right?

20   A.  Yes.

21   Q.  And you had asked your law enforcement colleagues whether

22   it was them, and the people on the arrest team, it wasn't any

23   of them, correct?

24   A.  That is the reply I got, yes.

25   Q.  And did you ever learn who peaceloveharmony was?

F1kdulb2                         Der-Yeghiayan - cross

1   A.  Not that I can recall.

2   Q.  Now, was there a user or someone named Mr. Wonderful?

3           MR. TURNER:  Objection.

4   Q.  Do you recall that?

5           MR. TURNER:  Objection.  401.

6           MR. DRATEL:  I didn't hear the objection.

7           MR. TURNER:  401.

8           THE COURT:  Hold on one second.

9           I don't know why it would apply.  I will allow a

10  few -- let me allow a few questions to develop that.

11  BY MR. DRATEL:

12  Q.  Mr. Wonderful was involved with Scout, correct?

13  A.  Yes, he was.

14  Q.  And who was Mr. Wonderful?

15          MR. TURNER:  Objection.  Foundation.

16  Q.  If you know.

17          THE COURT:  If you know.  Just testify if you know.

18          MR. TURNER:  Objection to form.

19          THE COURT:  I will allow it.

20          You made proceed.

21  A.  Mr. Wonderful was operated by another HSI agent.

22  Q.  And was there a question -- was there a discussion between

23  Scout and DPR about Mr. Wonderful?

24          MR. TURNER:  Objection.  Form.

25  Q.  In the forums or in the private messaging system that you

F1kdulb2                          Der-Yeghiayan - cross

1    were able to monitor?

2              THE COURT:  I will allow it.  Overruled.

3    A.  I believe there was.

4              On the forums you are asking?

5    Q.  No.  Between DPR and Scout on the Silk Road system in one

6    form or another.

7    A.  Later on I learned of that there was discussion between

8    them.

9    Q.  And that was one of the reasons for a falling out between

10   DPR and Scout?

11             MR. TURNER:  Objection.  Foundation.

12             THE COURT:  Yes.  So that is sustained.

13   A.  That --

14             THE COURT:  No.  That was sustained.  So he will ask

15   another question.

16             THE WITNESS:  Sorry.

17   BY MR. DRATEL:

18   Q.  But there was talk between Scout and DPR about whether

19   Mr. Wonderful was law enforcement, correct?

20             MR. TURNER:  Objection.  Foundation.

21             THE COURT:  Well, I think that the issue is did you

22   actually review the communications between Scout and

23   Mr. Wonderful?

24             MR. DRATEL:  No, between Scout and DPR, your Honor.

25             THE COURT:  Did you review the communications between

F1kdulb2                          Der-Yeghiayan – cross

1    Scout and DPR?

2             THE WITNESS:  I can't recall if I did.  I know there

3    were some that were shared at a later date, but I don't know if

4    there actually was, if I actually saw the screenshots or this

5    was something that was told to me.

6             THE COURT:  I want you to put aside something that may

7    have been told to you but in terms of what you recall seeing,

8    go ahead, and, Mr. Dratel, you can ask the question in that

9    context.

10   Q.  There was discussion between DPR and Scout as to whether or

11   not Mr. Wonderful was law enforcement, right?

12            MR. TURNER:  The same objection.

13            THE COURT:  Well, if he knows.

14   A.  I don't recall seeing screenshots.  There may have been

15   some that were shared at a later date but I can't recall seeing

16   them.

17   Q.  And do you recall that Mr. Wonderful and whether or not he

18   was law enforcement, or she, was the reason that DPR took over

19   Scout's account for awhile?

20            MR. TURNER:  Objection to form.  Foundation.

21            THE COURT:  Sustained.  You may re-ask it.

22   Q.  Well, DPR took over Scout's account for awhile, correct?

23   A.  Yes.

24   Q.  And wasn't that in order to investigate the Mr. Wonderful

25   situation?

F1kdulb2                        Der-Yeghiayan - cross

1              MR. TURNER:  Objection.  401.

2              THE COURT:  I think the issue is do you have any

3      information regarding why DPR took over that account?

4              THE WITNESS:  That was relayed through a source later

5      on, yes.

6              THE COURT:  Let's put aside what you may have heard

7      from a third, a person, a source.  That's a person?

8              THE WITNESS:  Yes.

9              THE COURT:  OK.  Did you see any information in

10     connection with your review of the screenshots of Silk Road

11     that indicated to you, at least words on a page, as to why

12     DPR --

13             THE WITNESS:  Took over that account?

14             THE COURT:  Took over that account.

15             THE WITNESS:  Not that I could recall.

16             THE COURT:  All right.  You may proceed.

17             MR. DRATEL:  Thank you, your Honor.

18             (Pause)

19             Could you look up Government's Exhibit 126A.

20             It is in evidence.

21     A.  OK.

22     Q.  Take a look at where it says, "Hey, gang," do you see that

23     post?

24     A.  Yes.

25     Q.  This is July 12, 2013, right?

1    A.  Yes.

2    Q.  So you reviewed a lot of communications involving --

3    withdrawn.

4            Here it says "Cirrus," right?

5    A.  Yes.

6    Q.  And Cirrus is the same as Scout, right?

7    A.  The person that originally operated the Scout account

8    created the Cirrus account, correct.

9    Q.  And this is kind of when they created the Cirrus account,

10   right?

11           MR. TURNER:  Objection to form.

12   Q.  It says "post," as far as we know?

13           THE COURT:  I will allow it.

14   A.  This is about the timeframe, yes.

15   Q.  And you reviewed these; this is not when you were operating

16   the account, right?

17   A.  This is not when I was operating the account.

18   Q.  So you reviewed a whole host of Cirrus and, before that,

19   Scout's messages, right?

20   A.  There were other messages that I reviewed that were in the

21   account, yes.

22   Q.  And one of the reasons you did that is because if you are

23   going to be playing that part, you really have to know what's

24   going on, right?

25   A.  That is correct.

F1kdulb2                          Der-Yeghiayan - cross

1   Q.  So let's read it:  "Hey, gang, we have a new moderator

2   going by the name Cirrus.  We used to know him as Scout.

3   Cirrus has always been dedicated to our common goals and the

4   community at large and we've put what happened surrounding

5   Mr. Wonderful behind us so he can come back to the team."

6          Right?

7   A.  Yes.

8   Q.  So reading that, you had to find out what was going on with

9   Mr. Wonderful, right?

10  A.  I was talking to that agent at the time so they had the

11  idea --

12          MR. TURNER:  Objection.  Hearsay.

13          THE COURT:  Don't go into what your conversation was

14  with that agent, but you could talk about what steps you took.

15  Q.  Did you go back and read posts having to do with

16  Mr. Wonderful?

17  A.  I didn't have access to the Scout account to go back to

18  read that.  I only had access to the Cirrus account.

19  Q.  Now, the URL, the onion address for Silk Road, changed in

20  December of 2011, correct?

21  A.  That sounds about right, yes.

22  Q.  And also around that time Silk Road instituted a new

23  bitcoin system, right?

24          MR. TURNER:  Objection.  Foundation.

25          THE COURT:  Hold on for one second.

F1kdulb2                          Der-Yeghiayan – cross

1              MR. TURNER:  804.

2              THE COURT:  Well, if you know.  As to everything, only

3    testify if you know a fact.  Don't speculate or guess.

4              And so the question is do you know whether or not

5    around that time Silk Road instituted a new bitcoin system?

6              THE WITNESS:  I don't recall about a new bitcoin

7    system.

8              (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

F1kgulb3                         Der-Yeghiayan - cross

1    BY MR. DRATEL:

2    Q.  I'll show you what's marked as 3505-3602 and ask you just

3    to review the last paragraph and when you've done that, let me

4    know.

5    A.  Okay.

6    Q.  Does that refresh your recollection that as of December 30,

7    2011, Silk Road instituted a new bitcoin system?

8    A.  I believe what it did is it -- it allowed multiple accounts

9    to deposit bitcoins, so it was something that was different

10   about the bitcoin system, yes.

11   Q.  They instituted a change?

12   A.  As far as I recall, yes.

13   Q.  Now, in June of 2011, the site Silk Road went down for a

14   little bit, right?

15          MR. TURNER:  Objection; time frame, form.

16          THE COURT:  Hold on.

17          June of 2011?

18          MR. DRATEL:  Yes.

19          THE COURT:  All right.  If that's your recollection,

20   you may testify.  Go ahead.

21   A.  I wasn't aware of Silk Road at that time.

22   Q.  That's not my question.  You know that in 2011 the site

23   went down, right?

24          MR. TURNER:  Objection; foundation.

25          THE COURT:  Well, the foundation is only about what

F1kgulb3                        Der-Yeghiayan - cross

1   he -- I don't want you to say anything you don't know.  At any

2   point in time over the course of your investigation, did you

3   learn that in June of 2011 -- did you learn whether or not in

4   June of 2011 a new bitcoin system was implemented?

5              MR. DRATEL:  No.  It's about the site going down now.

6              THE COURT:  Do you know whether or not the site went

7   down in June of 2011, not what you knew in June 2011, but later

8   on did you ever learn that there had been an outage?

9              THE WITNESS:  There were posts that reflect that I

10  believe on the forums, and there's I think articles that said

11  that, yes.

12  Q.  So that in June 5, 2011, the website posted a message

13  saying "Silk Road is currently closed to visitors; this will be

14  reviewed on July first and the site will probably be reopened

15  sorry for the inconvenience."  Right?

16             MR. TURNER:  Objection; foundation.  This document is

17  not in evidence.

18             THE COURT:  I think that he's talked about his

19  recollection.

20             Did you ever determine whether or not the site had in

21  fact gone down?

22             THE WITNESS:  I couldn't confirm it, no.

23             THE COURT:  One way -- did you try one way or the

24  other?

25             THE WITNESS:  There was no way for me to.

1           THE COURT:  It might have gone down, it might not have

2      gone down.  You don't know for sure?

3           THE WITNESS:  I don't know for sure.

4           THE COURT:  You can continue.

5      Q.  But that post was made, right?

6           MR. TURNER:  Objection; hearsay.

7           THE COURT:  I'm going to allow it.

8      A.  The post was made; yes.

9      Q.  And there were posts --

10          THE COURT:  Let me be clear, with that particular

11     objection, that means that the witness is testifying about what

12     he saw or read.  He doesn't know if it's true or not, but he

13     saw a post with those words on it that had that information on

14     it.  Whether it's true or not is another question.

15     Q.  It could have been some other reason why the post was made,

16     right?

17     A.  I'm sorry?

18     Q.  It might not have been a technical problem with the site.

19     It could have been another reason why that post was made,

20     right?

21          MR. TURNER:  Objection; calls for speculation.

22          THE COURT:  Don't speculate.  Sustained.

23     Q.  And the silkroadmarket.org, the page that was available on

24     the ordinary Internet that you testified about, that stopped

25     operating in April of 2012, correct?

F1kgulb3                          Der-Yeghiayan - cross

1    A.   That's correct.

2    Q.   Now, with respect to forum posts, with respect to PGP keys

3    that we were talking about, right, last week, there's no

4    customized version of a PGP key?  Withdrawn.

5            A PGP key is generated by a computer at random, right?

6    A.   It's created when you create a new key; yes, it's created

7    by the computer.

8    Q.   So it doesn't have any specific identifying information

9    about the person who is creating the key, in other words, their

10   initials or anything or numbers or any kind of -- it's not like

11   a password where you would choose to put in the identifying

12   information so that you'd remember it, right?

13   A.   Just on the profile itself can you -- it's customizable to

14   enter in certain information, like a name or an email address.

15   Q.   No, I'm talking about the PGP key.

16   A.   Okay.

17   Q.   The PGP key is not like a password in the sense that you

18   put in identifying information.  It's generated by the

19   computer?

20   A.   You're saying, like, the output?

21   Q.   Yeah, the actual key, the text block?

22   A.   Yeah.  It's random digits and numbers; yes.

23   Q.   And with respect to -- talked about computers and UTC time.

24   In fact, you yourself acknowledged in one of the chats that UTC

25   time -- you assumed that all the computers were on UTC time?

F1kgulb3                    Der-Yeghiayan - cross

1    Essentially the computers ran on UTC time, right?

2              MR. TURNER:  Objection; form, hearsay and relevance.

3              THE COURT:  Hold on one second.  Let me read it.

4              Why don't you restate the question.  I'll allow a form

5    of that question.

6    Q.  You recall a chat with DPR in which you said that

7    essentially all our computers are on UTC time?

8              MR. TURNER:  Objection; form and foundation.

9              THE COURT:  I will allow it.

10             You may answer.

11   A.  I believe there was a chat, yeah, that we were talking

12   about the servers for Silk Road.

13   Q.  I'll show you what's marked as Defendant's F for

14   identification and ask you just to review it.

15   A.  Okay.

16   Q.  Do you recognize it?

17   A.  It's a screen shot that I would have taken of a chat that

18   was on the computer --

19   Q.  Between you and DPR?

20   A.  No, the person that operated before.

21   Q.  And so, I --

22             MR. DRATEL:  I move it in evidence, your Honor.

23             MR. TURNER:  I have several objections, first "the

24   person who operated before" needs to be clarified.  And if it's

25   being offered for truth, then we object on hearsay grounds.

F1kgulb3                          Der-Yeghiayan - cross

1             THE COURT:  Somebody needs to hand me a copy of this

2       document.

3             MR. DRATEL:  I'm sorry.

4             THE COURT:  That's all right.  That's okay.  I didn't

5       know if I needed to look at it.  I have the witness'.  Let me

6       take a quick look.

7             All right.  As of August 2, 2013, were you cirrus?

8             THE WITNESS:  August 2, I was; yes.

9             THE COURT:  All right.  And how about July 23?

10            THE WITNESS:  I was not.

11            THE COURT:  You were not cirrus on July 23rd?

12            THE WITNESS:  No.

13            THE COURT:  All right.  Did you take this screen shot

14      that's been marked as Defense Exhibit F as in frank?

15            THE WITNESS:  Yes, I believe.

16            THE COURT:  And you took it on or about August 2 at

17      the top left?

18            THE WITNESS:  That would be correct; yes.

19            THE COURT:  Was it a true and accurate reflection of

20      what appeared on that page at the time you took it?

21            THE WITNESS:  It is.

22            THE COURT:  All right.  I will allow this in, but the

23      content of the messages themselves are not in for the truth,

24      but you can proceed, Mr. Dratel.

25            MR. DRATEL:  Thank you, your Honor.

1          (Defendant's Exhibit F received in evidence)

2   Q.  See where it says "cirrus."  It says "I always just assume

3   we all live in UTC (or our computers anyway.)"  Right?

4   A.  I do, yes.

5   Q.  And that's because essentially computers can be configured

6   to run on any timezone, right?

7          MR. TURNER:  Objection; foundation.

8          THE COURT:  Sustained.

9   Q.  A computer can be configured so that the timezone on the

10  computer can be anything that the operator inputs, right, the

11  person who is operating the computer?

12  A.  That's correct.

13  Q.  Now, we talked -- you said that you had seen some messages

14  in which the DPR PGP key had not been validated, correct?

15  A.  I believe there were times that he -- other people weren't

16  able to validate a signed message by him, but then that would

17  follow up with him I think reissuing another signature.

18         MR. TURNER:  Objection; hearsay.

19  Q.  You saw this on the site?

20         THE COURT:  The objection is sustained and that answer

21  is struck.

22  Q.  But you saw that on the site?

23         THE COURT:  Why don't you reask the question and then

24  we'll get a clean --

25  Q.  There were some times when the signature was not valid,

F1kgulb3                         Der-Yeghiayan - cross

1    correct?

2              MR. TURNER:  Objection; foundation.

3              THE COURT:  Let's start the question over again and

4    then we'll take it one by one, because if he saw with his own

5    eyes these kinds of things, then he can testify to it.

6              Mr. Dratel, you may proceed.

7              MR. DRATEL:  Thank you, your Honor.

8    Q.  So you saw instances in which the PGP key was not validated

9    from a message from DPR, correct?  You saw that on the forum?

10             MR. TURNER:  Same objection; form and foundation.

11             THE COURT:  First of all, did you ever see -- were any

12   of your messages that you tried to validate not validated?

13             THE WITNESS:  Not that I did; no.

14             THE COURT:  During the course of the time that you

15   were using the Silk Road website, did you become aware of

16   others who at least indicated that they had messages that had

17   not been validated?

18             THE WITNESS:  There were times that there were posts

19   made that the -- that another user might say that they can't

20   validate a signature.

21             THE COURT:  Did you follow up to determine whether or

22   not you could validate that particular message on your own?

23             THE WITNESS:  I did not.

24             THE COURT:  So you don't know whether it's, in fact,

25   the case that they couldn't validate it or if they were just

F1kgulb3                        Der-Yeghiayan - cross

1   saying that?

2              THE WITNESS:  I don't know why it wasn't validating

3   for them at the time.

4              THE COURT:  But you saw it there?  You saw the posts?

5              THE WITNESS:  I did see the posts.

6              THE COURT:  All right.

7   Q.  Government Exhibit 127B, please, if we could focus on the

8   top part.

9              Do you see the part right above 6:12:15 p.m. where it

10  says "encrypted OTR chat initiated."  And then it says "dread@"

11  and there's an onion address, and it says "identity not

12  verified."  Right?

13  A.  I do.

14  Q.  And that essentially comes before every one of these Pidgin

15  chats, right?

16  A.  I believe that, yeah, it was on every time that we

17  initiated a chat.

18  Q.  And you said you used a program called Adium, right?

19  A.  That's correct.

20  Q.  And Adium gives you the ability to authenticate the other

21  side of the chat, correct --

22  A.  I'm not aware --

23  Q.  -- in a way that can verify what's not verified on that?

24  A.  I honestly don't know if it can or cannot.

25  Q.  But you never did that -- you didn't use any kind of

1    verification process in your chats with DPR, correct, like

2    that?

3    A.  No, I did not.

4    Q.  And on your side, you said that there were certain accounts

5    that could have more than even one agent working, right?

6    A.  What type of accounts?

7    Q.  In other words, Silk Road accounts; there are certain Silk

8    Road accounts that were operated by more than one agent?

9    A.  There were ones from time to time, yes, they were operated

10   by multiple agents.

11   Q.  So there's nothing to tell you whether on the other side of

12   that, an unverified chat, whether there's more than one person

13   or who it is on the other side, correct, other than someone

14   coming on as dread, right?

15   A.  There's no way of knowing how many people are operating

16   that, no.

17   Q.  Now, I want to go to Government Exhibit 130, please,

18   Government Exhibit 130, and this is the piece of paper

19   recovered from the trash from Mr. Ulbricht's apartment in San

20   Francisco when you searched it after his arrest, right?

21   A.  Yes, it is.

22   Q.  And it's got notes about ratings, right?

23   A.  That's correct.

24   Q.  Let's go to Government Exhibit 131, please.  So if we go

25   down to the bottom, the bottom of -- I guess also 130A, no.

F1kgulb3                        Der-Yeghiayan - cross

1   I'm sorry.  One second.  If we can enlarge that a little bit.

2           So this a process, going to the first post, and the

3   posts go from bottom to top essentially, not chronologically.

4   The oldest post would be at the bottom and the newest post

5   would be at the top?

6           MR. TURNER:  I don't recognize this exhibit.

7           THE COURT:  What exhibit is this?

8           MR. DRATEL:  131.

9           THE COURT:  GX 131.

10          MR. TURNER:  I see.  Okay.  Third page.

11          THE WITNESS:  Yes, I believe so.

12  Q.  So, the first date that this starts is in August, right,

13  2013?

14  A.  For this --

15  Q.  August 11, 2013?

16  A.  Yes, I believe so.

17  Q.  And it talks about undergoing an overhaul of the ratings

18  system, right?

19  A.  It does.

20  Q.  And this is DPR initiating it, right?

21  A.  It is.

22  Q.  And then there's another post on the 31st of August, right?

23  A.  Correct.

24  Q.  And then there's another post on the 12th of September,

25  right?

F1kgulb3                    Der-Yeghiayan - cross

1    A.  Yes.

2    Q.  And these posts contain detailed discussion mostly from DPR

3    about ideas for the ratings overhaul, right?

4    A.  They do.

5    Q.  So that's been going on as of the date of Mr. Ulbricht's

6    arrest, it's been going on for seven weeks or so, right?

7    A.  Yes.

8    Q.  And these handwritten notes found in the trash are related

9    to a project that DPR has been posting about for two months?

10   A.  It appears so, yes.

11   Q.  And he needed to take notes from this?

12          MR. TURNER:  Objection; calls for speculation,

13   foundation.

14          THE COURT:  Sustained.

15   Q.  Now, an important part of your investigation was trying to

16   find money, right, bitcoin, correct?

17   A.  Yes, it was.

18   Q.  And we went back on Thursday, bitcoin is anonymous but

19   there's a block chain that has every transaction, right?

20   A.  Yes, it does.

21   Q.  And it's public?

22   A.  Yes, it is.

23   Q.  At some point, in October of 2012, Silk Road split some of

24   its accounts up?

25          MR. TURNER:  Objection; form and foundation.

F1kgulb3                          Der-Yeghiayan - cross

1           THE COURT:  Hold on one second.  Sustained.

2           You can come back at it.

3   Q.  Did your investigation establish that Silk Road had split,

4   based on your analysis of the block chain of Silk Road looking

5   for accounts that could be linked to Silk Road, that Silk Road

6   had split a main account into other accounts?

7           MR. TURNER:  Objection; same objection, form.

8           THE COURT:  Sustained.

9   Q.  At some point you identified some of the Silk Road

10  accounts, correct?

11  A.  Yes, there were accounts we believed belonged to Silk Road.

12  Q.  That was in April 2012, right?

13  A.  I believe the date is -- sounds right, yes.

14  Q.  And part of what you're looking for is movement of

15  bitcoins, people cashing out accounts in unusual amounts,

16  correct, in large amounts?

17  A.  We were trying to see if we could trace the funds going in

18  to see if it would hit something that would look like it

19  belongs to the website and we were also trying to trace funds

20  out of the website, too.

21          THE COURT:  Mr. Dratel, when you reach a stopping

22  point, we're at 1:00 now.

23          MR. DRATEL:  Okay.  We can stop now.

24          THE COURT:  I apologize, but we're going to take lunch

25  now.  I know we just started about 40 minutes ago.  We'll come

F1kgulb3                          Der-Yeghiayan – cross

1    back at 2:00.  We're still going to get you out on time today.

2    We're not going to extend the day at all.  You'll get out right

3    as we had previously said, 5:00.

4            I want to remind you not to talk to each other or

5    anybody else about this case.  Thanks very much.  See you after

6    lunch.

7            (Jury excused)

8            (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

F1kgulb3                         Der-Yeghiayan - cross

1                  (In open court; jury not present)

2                  THE COURT:  The witness can be excused for lunch, as

3       well.

4                  (Witness temporarily excused)

5                  THE COURT:  Ladies and gentlemen, be seated for a

6       moment.  I have a matter in this room right now.  I just want

7       to raise one thing.  You folks may want to raise something and

8       let's do it quickly; otherwise, we'll take it up just before

9       two.

10                 What I want to raise is I see the government now is

11      objecting a lot, as is your right to do if you believe the

12      questions are objectionable.  It is a difference from how

13      things were being handled before.

14                 I think you'll do what you need to do, but if there's

15      anything that people believe they can do in terms of the

16      formulation -- now, that you know, Mr. Dratel the government is

17      going to object --

18                 MR. DRATEL:  On every question, yes.

19                 THE COURT:  In terms of form, you can refrain some of

20      the questions and we can avoid some of that.  That was not the

21      way we were proceeding before.  There was a little more leeway

22      given to people to speak in sort of regular formed sentences,

23      but I'm not suggesting the government doesn't have a right to

24      object.  You do.  But we'll just all take into consideration as

25      we figure out how whether it's going to continue to each

F1kgulb3                        Der-Yeghiayan - cross

1    question because it will take longer so you might want to pick

2    a few.

3             MR. DRATEL:  The government is free to do what it

4    wants to do.

5             MR. TURNER:  I don't want to go down the same road we

6    went before.

7             THE COURT:  I understand.  I think that there are

8    objections which are objections that you really need to make,

9    and then there are objections where there certainly may be a

10   legal basis for it, but the better part of valor is to stand

11   down.

12            You'll make your decision and what I mean, Mr. Dratel,

13   in terms of the government being free to do what it wants to do

14   is only insofar as anybody can object when you folks believe

15   that you need to do so to preserve the record, and that's an

16   important thing for you folks to do.  Everybody needs to do it

17   if you believe it's important, but there are lots of objections

18   that are neither here nor there ultimately.  You guys will

19   decide.  The rules are no different from the government than

20   they are for the defense.

21            Let's take our lunch break and we'll come back at

22   2:00.

23            (Luncheon recess)

24            (Continued on next page)

25

F1kgulb3                        Trial

                          AFTERNOON SESSION

                            2:08 p.m.

              (In open court; jury not present)

          THE COURT:  We are still waiting for one juror.

Actually, I have one jury matter and I want to discuss with you

folks how to deal with the struck testimony.

          On the jury matter, there's one juror who has got

apparently issues with her place of employment which will

not -- their HR policy and whether or not we can overcome this

is TBD, we're going to try to overcome this -- indicates that

they can have two weeks paid for jury service and then after

that it has to come out of her vacation.  And that may or may

not present certain issues for this juror.  So we're trying to

determine whether or not her place of employment would see fit

to make an exception in that she's already been impanelled on a

jury, and it's not going to end within the time frame that

she's got.

          If they say no, then we'll have to determine how we

want to approach her about that.  In discussions with counsel,

the Court will discuss that with counsel, how people propose we

should proceed and whether or not, if she is very concerned,

whether or not on that basis we do anything about that,

including replacing her with one of the alternates.  That's to

be determined.  I just wanted to flag for you that that issue

has come up today.

F1kgulb3                        Trial

1        I have received from the government an email that was

2   copied to counsel, all counsel, that has their proposal as to

3   excerpts to be stricken based upon the Court's prior ruling.

4        Mr. Dratel had mentioned before that the Court had not

5   yet entertained arguments as to waiver, and that is correct, or

6   any other arguments other than rearguing the Court's

7   evidentiary ruling.  Also I need to know how soon we're going

8   to have to deal with this when the redirect is likely to begin.

9        Mr. Dratel, let's take the last question first.  How

10  much more on cross do you have of Mr. Der-Yeghiayan?

11        MR. DRATEL:  With the exception of one question that

12  I'll ask the Court, which is whether I'm going to go at all

13  into the second person, I'm not sure whether I'm allowed to go

14  at all into the second alternative suspect, whether that's

15  something --

16        THE COURT:  The main issue that we had dealt with was

17  with the mises.org piece.

18        MR. DRATEL:  Right.

19        THE COURT:  If there are other aspects of it that I'm

20  unaware of, we can take it step by step and see.

21        MR. DRATEL:  So, between an hour, an hour and-a-half I

22  guess.

23        THE COURT:  So probably then, it's likely to be a time

24  for break, but do you want to now preview your waiver argument?

25  I think I understand just with the word "waiver" possibly the

F1kgulb3                    Trial

1       contour of what you're getting at, but I'd like to give you a

2       chance to state it for the record.  We can do it at the break

3       if you'd rather not do it right now.

4               MR. DRATEL:  I can do it at the break in a way

5       that -- the waiver is really three parts:  One is, they didn't

6       object, and you can't put that genie back this the bottle in

7       any respects.  The second is, they're not objectionable in many

8       respects even under the Court's ruling.  And the third would be

9       that, you know, it changes the whole nature of how an

10      examination proceeds and that's one of the reasons why you have

11      to object contemporaneously because then you can't go back and

12      reconstruct it in a manner that then undoes things that you

13      could have changed.

14              So all of that is a factor in the waiver argument and

15      the Court said on Thursday that it was out there already, so,

16      you know, --

17              THE COURT:  The fact that Mark Karpeles exists as a

18      potential individual as to whom there is some evidence that

19      people can draw inferences from, that would not be gone from

20      the case.  Even with the government's suggestions, there is

21      lots of evidence in terms of questions that you asked that was

22      perfectly appropriate in that regard.

23              MR. DRATEL:  Yes.  And I think all appropriate in the

24      context of -- not only in the context of alternative suspect,

25      but also in the context of the conduct of the investigation,

F1kgulb3                        Trial

1    because at the end of the day, we're going to have a comparison

2    with the investigation of Mr. Ulbricht and the conclusions that

3    were drawn and the investigations of at least two other people

4    and the conclusion that were drawn, and at the end of the day,

5    the only thing that's going to be a factor for the government

6    is something that no one can trust.  That's part of the whole

7    defense, and that's part of what these questions are about.

8           And it's perfectly appropriate to ask an agent and a

9    law enforcement officer about the conduct of his investigation

10   and how it proceeded and even --

11          THE COURT:  I don't want to reargue the evidence.

12          MR. DRATEL:  I know, I'm just saying, the notion that

13   now that there's no waiver when these things come in and is

14   just -- I mean, there has to be some notion of waiver in the

15   context of a trial in the sense of what it means to have a

16   contemporaneous objection and what it means not to have a

17   contemporaneous objection.

18          THE COURT:  Mr. Turner.

19          MR. TURNER:  Your Honor, the trial has gone fast.  You

20   wish you had all the law at your fingertips.  I think the Court

21   was inclined to think a lot of the testimony was admissible,

22   which after further review is now clearly inadmissible.

23          It's not too late for the defendant in that we're not

24   past cross.  We're still in the middle of cross.  If the

25   defense has further inquiry that's admissible that's proper

F1kgulb3                        Trial

1     about Mr. Karpeles, the defense can still pursue that, so

2     there's no prejudice to striking the prior testimony.

3            And the problem with leaving it in is there's very

4     clear circuit law that if hearsay like that comes in, the

5     curative admissibility doctrine applies and the government can

6     get equivalent hearsay in on redirect.  So the government

7     certainly would inquire of Special Agent Der-Yeghiayan in the

8     same fashion that the defense inquired on cross about all the

9     reasons that he now believes the defendant is guilty, and that

10    would certainly be appropriate.  And I think that was what your

11    Honor wanted to avoid by striking the testimony that's

12    objectionable that came in on Thursday.

13            THE COURT:  So here is what we're going to do --

14            MR. DRATEL:  Just one other thing.

15            THE COURT:  Yes.

16            MR. DRATEL:  They knew full well what was in the 3500.

17    They cannot -- it cannot be that this was not on the radar for

18    them, then to sit by and let it all come in and then completely

19    eviscerate the defense after the fact is unfair, and that's a

20    waiver.

21            They knew better than anyone what was in the context

22    of my questions and what was in the context of Agent

23    Der-Yeghiayan's answers.

24            THE COURT:  Mr. Turner.

25            MR. TURNER:  I would say never in a million years

F1kgulb3                              Trial

1    would I have imagined that the defense would be trying to

2    allege that Mark Karpeles framed Dread Pirate Roberts.  I don't

3    think that was clear from the opening and that was not apparent

4    to the government until the questioning came in that way.  So

5    the government I don't think was put on notice by the opening

6    alone.

7         THE COURT:  My basis for my ruling is not that the

8    government should not have anticipated; that they may well have

9    anticipated it.  They should have objected, but they didn't.

10   We are now where we are.

11        We have had an objection that we have now talked about

12   extensively, and I will strike the testimony that is indicated

13   in the government's email to the Court, but not right now.  I

14   say that to you folks so that you can plan the remainder of

15   your cross and the government can plan its redirect as

16   appropriate.

17        I do not, however, plan to point the jury to the

18   specific Q and A's that I'm striking, unless you folks make

19   arguments that that's what I should do.

20        My intent, which I intend to do not right now, is to

21   give the jury a general instruction about suspicions and

22   conclusions that the agent reached are struck from the record

23   and then to provide clear indication by line to the court

24   reporter and to everyone here as to what is struck from the

25   record, but I don't think it stands in anyone's interest to

F1kgulb3                    Trial

```
 1   have it be put on to the screen in terms of exactly what's

 2   struck from the record.  That seems to indicate taking away and

 3   giving more weight to it all at the same time.  So I think it

 4   actually has issues where it compounds the problem.

 5           But we can deal with that, the method, at another

 6   time.  And when I say another time, it won't be a long time,

 7   but in terms of being able to understand what to proceed with

 8   right now, people should proceed with that view and to

 9   construct the remainder of your cross.

10           If it goes on longer than you were anticipating,

11   Mr. Dratel, as a result, then I understand.

12           MR. DRATEL:  I don't know that I'm prepared to do it

13   for this reason:  First of all, there are facts here and

14   factual answers and factual questions that the government has

15   included that should not be stricken under any circumstances.

16           THE COURT:  I have reviewed them and I do believe that

17   what they indicated they would strike is consistent with my

18   ruling.  There are pieces that are around it, and I assume

19   you've got the same shaded portions that I have --

20           MR. DRATEL:  Yes.

21           THE COURT:  -- that are not struck and appropriately

22   so, and that would remain in terms of MtGox and Mark Karpeles.

23   I mean, he's not eliminated from the record.  And you'll

24   certainly be able to argue whatever inferences you think you

25   can argue.
```

F1kgulb3                          Trial

1          MR. DRATEL:  But there are other aspects of this that

2     are simply not -- that are factual, such as citizenship, such

3     as the part on page 506 and 507, which is about the conduct of

4     the investigation.  It has nothing to do with --

5          THE COURT:  I believe the government has, consistent

6     with my lengthy ruling this morning, cabined the material

7     appropriately.  So I'll look at each of the individual Q and

8     A's again, but you should proceed right now as if those pieces

9     are going to be struck from the record.

10         MR. DRATEL:  I'm not sure I can proceed on this level

11    because now I have to go back and reconstruct all this material

12    that was unobjected to.  I have to go back and look at parts of

13    the cross that were already finished and done and then

14    reconstruct it.  I can go on with my cross right now, but then

15    I'd like a break until tomorrow.

16         THE COURT:  No.  I'm done with this issue.  If the

17    government had objected timely at the first Q and A, we

18    wouldn't be having this issue right now because it would have

19    been highlighted on the basis of suspicion, conjecture and

20    belief right then as opposed to going on.

21         MR. DRATEL:  And I would have rephrased the question.

22         THE COURT:  I'm saying go back and you can rephrase at

23    the questions right now.

24         MR. DRATEL:  But I need time to look at this.  This is

25    seven or eight different pieces.

F1kgulb3                     Trial

1          THE COURT:  We have been dealing with the possibility

2     that this very information could be struck since Thursday

3     night.

4          MR. DRATEL:  No.  They didn't identify this until 20

5     minutes ago.

6          THE COURT:  No.  It was obvious to me and it should

7     have been obvious to you folks that when we were dealing with

8     an objection about a type of testimony, that one potential

9     result, particularly in light of the government's letter when

10    they made an application to strike, is that certain things

11    would be struck.  The only question was what.

12         And therefore, this should not be a big shock in terms

13    of what's being struck.  I'm not suggesting that you should

14    like it or agree with it, but it's how we're going to proceed.

15         MR. DRATEL:  I want the equivalent so that -- I just

16    want it to be equivalent, that's all, so that they can sit on

17    their hands after providing all the 3500 material knowing

18    exactly where the examination is going, they don't have to do

19    that and now on the fly I have to do this.  I don't think

20    that's equivalent, your Honor.  I'm sorry.

21         THE COURT:  I think we have the way we're going to

22    proceed in mind.

23         Do we have a full jury?

24         THE DEPUTY CLERK:  We do.

25         THE COURT:  Let's bring out the jury.  Let's get

F1kgulb3                         Trial

1   Mr. Der-Yeghiayan back in the courtroom.  Mr. Der-Yeghiayan,

2   can you folks get him.

3               (Continued on next page)

F1kgulb3                        Trial

1              (In open court; jury present)

2              THE COURT:  When you get to your seat, let's all be

3    seated.

4              Mr. Dratel, you may proceed, sir.

5              MR. DRATEL:  Thank you, your Honor.

6    CROSS-EXAMINATION (Continued)

7    BY MR. DRATEL:

8    Q.  Good afternoon, Agent Der-Yeghiayan.

9    A.  Good afternoon.

10   Q.  Going back to Mark Karpeles, he had -- he had an associate

11   named Ashley Barr, correct?

12             MR. TURNER:  Objection; foundation.

13             THE COURT:  If he knows.

14   A.  I believe he had an employee named Ashley Barr.

15   Q.  His right-hand man essentially?

16             MR. TURNER:  The same objection.

17   A.  That is what I believed in 2012, yes.

18             THE COURT:  What I want you to do is try to, if you're

19   going to go into conclusions or beliefs, to stay away from

20   those to the extent that you're conjecturing.

21             If you've learned information during the course of

22   your investigation that is of the type you would rely upon,

23   then you may testify to that.

24             THE WITNESS:  Okay.

25             THE COURT:  So if you know it, you know it; but if you

F1kgulb3                          Der-Yeghiayan - cross

1    don't know it, you're conjecturing.  And let us know that, all

2    right?

3            THE WITNESS:  Okay.

4    Q.  So it's based upon your investigation, correct?

5    A.  Yeah, based upon my investigation, I saw that there was a

6    later on falling out between them, that they weren't as close

7    as I originally thought they were.

8    Q.  But initially, your investigation established that he was a

9    right-hand man to Mr. Karpeles, right?

10           MR. TURNER:  Objection, your Honor.

11           THE COURT:  Sustained.

12   Q.  On the type of information that you would rely on in your

13   investigation, that's the type of information you had

14   establishing that he was Karpeles' right-hand man, correct?

15           MR. TURNER:  Objection; form and foundation.

16           THE COURT:  Sustained.

17           Let me ask it this way:

18           Do you have any independent information that this

19   person, Barr, is a right hand or close associate of

20   Mr. Karpeles?

21           THE WITNESS:  I don't.

22           THE COURT:  All right.  I take it you never spoke to

23   this associate?

24           THE WITNESS:  I never did, no.

25           THE COURT:  All right.  Move on.

F1kgulb3                          Der-Yeghiayan - cross

1    Q.  Mr. Barr worked for Mr. Karpeles, right?

2              MR. TURNER:  Objection; foundation.

3    Q.  Based on your investigation --

4              THE COURT:  Here's what we're not going to do.  What

5    we're not going to do is -- he's not going to speculate.

6              MR. DRATEL:  I'm not asking him to speculate.

7              THE COURT:  If you know, then you may testify.

8    Otherwise, just tell us you don't know.

9    A.  He did work for him.

10   Q.  And during the time period that we're talking about, right,

11   2011, summer of 2012, right?

12   A.  Around the time period, yes.

13   Q.  And Mr. Barr is a Canadian citizen, correct?

14   A.  Yes, he is.

15   Q.  And has a degree in computer science, correct?

16             MR. TURNER:  Objection; foundation.

17             THE COURT:  If he knows he's been -- he seems to have

18   knowledge from some basis.

19   A.  From what I found on the open Internet, yes, he does.

20             MR. TURNER:  Objection; hearsay.

21             THE COURT:  That answer is struck.

22             If you learned something only by virtue of something

23   that's unsubstantiated on the Internet, then we need to know

24   that.  If it's something that you're basing on something that's

25   reliable, then that would be helpful.

F1kgulb3                         Der-Yeghiayan - cross

1            Why don't you build a foundation as to what the source

2       of his knowledge is and then we can proceed.

3       Q.   What's the source of your knowledge about Mr. Barr's

4       education?

5       A.   It came from an Internet page.

6       Q.   Was it his LinkedIn page?

7            MR. TURNER:   Objection; hearsay.

8       A.   I believe it might have been his LinkedIn page.

9            MR. TURNER:   Objection; hearsay.

10           THE COURT:   I'm allowing him to at least figure out

11      whether or not he's got any information.

12           And it says you've got it from a LinkedIn page, right?

13           THE WITNESS:   I believe it might have been.  I don't

14      really recall if there was something that helped me.

15      Q.   You looked at his LinkedIn page, right?

16      A.   I did, yes.

17      Q.   And he was also an expert in Linux, correct?

18           MR. TURNER:   Objection.

19           THE COURT:   Sustained.

20           MR. TURNER:   Hearsay.

21      Q.   Based on your investigation --

22           THE COURT:   No, you can't get in the truth of what his

23      experience is through this witness.  Let's have a side bar and

24      we'll deal with it.

25           I apologize, ladies and gentlemen of the jury.  I

1   really do.  These are complicated issues.  Trials are

2   complicated things.  Each side is doing the right thing by

3   raising these, and I just need to make sure that we proceed

4   carefully, all right, but I do apologize.

5              (Continued on next page)

1              (At the side bar)

2              THE COURT:  I don't want to revisit everything we've

3      been through.  I know that the defense does not agree with my

4      rulings and so I understand that.  What I would like you to do

5      is, you can make a proffer during a break or in a letter as to

6      what you would ask that you understand I'm precluding you from

7      asking so I'll confirm it, so you've got it preserved for

8      appellate purposes.

9              But right now, my ruling is you can't use this witness

10     about what he's read on the open Internet to confirm that

11     certain kinds of expertise were or were not within the -- were

12     not held by Mr. Barr or Mr. Karpeles.

13             This witness is reviewing things on LinkedIn and he

14     can't then say he was an expert in Linux.  He can't.  He can,

15     you know, the most that he can do, and you'd never be able to

16     rely upon it, to state he was an expert --

17             MR. DRATEL:  I'm fine with the notion that everything

18     that's on the Internet is unreliable and that goes for

19     everyone, and that goes for all their evidence, too.  And I'm

20     going to move to strike all of their evidence because it's all

21     Internet.

22             THE COURT:  What you need to do is you need to go

23     back, because there's a difference between something appearing

24     on an Internet where we've gone through each of the evidentiary

25     issues, for instance, a page that says brown heroin and

F1kgulb3                        Der-Yeghiayan - cross

1    something where we're extrapolating from a LinkedIn page which,

2    by the way, has got all kinds of *Vayner* issues, that he is in

3    fact an expert in Linux.  I have no idea who put that there,

4    whether he put that there or somebody else put that there, he

5    being Mr. Barr.

6           MR. DRATEL:  It's not a *Vayner* issue because *Vayner*

7    was about the website itself.  The Russian version of Facebook

8    had not been established.  If it was Facebook, they would have

9    let it in.

10          THE COURT:  I don't know enough about LinkedIn.  I'm

11   not a LinkedIn user myself, so as to the indicia of reliability

12   of who can edit, I don't know whether or not this person is or

13   is not an expert in Linux.  I have no idea.  You can call Barr

14   and find out what his expertise is.  I don't know where this

15   fellow lives.

16          MR. DRATEL:  He's Canadian.  I have no subpoena power

17   over him.

18          THE COURT:  I don't know where he's located.  If he's

19   in New York City, he can be down the street for all I know.

20          MR. DRATEL:  He's in Japan.

21          THE COURT:  My point is, you can't get that kind of

22   thing in.  What other things are we likely to confront so we

23   don't have back and forth that gets heated in front of a jury?

24          MR. DRATEL:  Talking about Karpeles' credentials?

25          THE COURT:  You can get in that there may have been

F1kgulb3                         Der-Yeghiayan – cross

1   information that he saw that indicated certain things, but I

2   will give an instruction that we have no idea that it's true

3   and you can't then --

4           MR. DRATEL:  We don't know what the basis is.

5           THE COURT:  Hold on.  Let me say I want to make sure

6   that you understand what you can't do is get from this witness

7   Karpeles was an expert in X, Y or Z and then cite that in your

8   closing that this fellow was an expert in X, Y or Z.  I have no

9   idea whether this stuff accurate or not on the Internet.

10          MR. DRATEL:  Let's find out from him where he got it

11  from because it may be that he didn't get it from the LinkedIn

12  page.  Maybe he did other research.

13          THE COURT:  If he did, if you can build a foundation,

14  then you can build a foundation.  If he checked in with a

15  university, for instance, and found out from the University of

16  Ottowa that this person had received a degree in computer

17  science, that's a different kettle of fish than looking on the

18  Internet and surmising or a news article.

19          MR. DRATEL:  All right.

20          THE COURT:  Build a foundation.

21          (Continued on next page)

22

23

24

25

F1kgulb3                          Der-Yeghiayan - cross

1                    (In open court; jury present)

2    BY MR. DRATEL:

3    Q.  Now, you did research on certain software platforms,

4    correct?

5    A.  Can you be more specific?

6              MR. TURNER:  Objection; form.

7              THE COURT:  He can answer that question.

8              You may answer.

9    A.  I'm sorry.  Can you --

10   Q.  You did research on certain software platforms, correct?

11   A.  In what context?

12   Q.  Well, MediaWiki, right, M-E-D-I-A-W-I-K-I, correct?

13   A.  I did look into that; yes.

14   Q.  And you found that there were similarities between Silk

15   Road market and a forum associated with Mark Karpeles, correct?

16   A.  It was --

17             MR. TURNER:  Objection; foundation on the research

18   issue.

19             THE COURT:  There is a way of getting at this.

20             Did you look at the MediaWiki software platform?

21             THE WITNESS:  I looked at its website from MediaWiki,

22   yes.

23             THE COURT:  Did you look at the platform it was built

24   on?

25             THE WITNESS:  I didn't really go too deep into the

F1kgulb3                      Der-Yeghiayan – cross

1    software.

2              THE COURT:  Whether you went too deep or at a surface

3    level, did you look at it at all?

4              THE WITNESS:  I had looked at particular websites that

5    were running MediaWiki; yes.

6              THE COURT:  All right.  And did you look at any

7    websites that were run by Mark Karpeles?

8              THE WITNESS:  Yes, I did.

9              THE COURT:  Did the websites that were run by Mark

10   Karpeles utilize any of the same features which you had seen

11   from MediaWiki?

12             THE WITNESS:  I saw the same features.  I believe it

13   was the same as the Silk Road Wiki had the same features as a

14   website that Mark Karpeles was hosting that had MediaWiki, too.

15             THE COURT:  So you perceived, by looking at it,

16   certain features on MediaWiki as you did with the Silk Road?

17             THE WITNESS:  It was the same version number, I

18   believe.

19             THE COURT:  The same version number?

20             THE WITNESS:  Yes.

21             THE COURT:  You may proceed.

22   Q.  That was 1.17, right?

23   A.  I believe that was it; yes.

24   Q.  In fact, it wasn't the latest version at the time?  It was

25   an older version, correct?

F1kgulb3                        Der-Yeghiayan - cross

1              MR. TURNER:  Objection; time frame.

2              THE COURT:  Overruled.

3   Q.  At the time you were looking in 2012, 2013?

4   A.  It was an older version when I did observe it; yes.

5   Q.  Right.  So both the Karpeles site and silkroadmarket.org

6   were operating on the same MediaWiki version that had since

7   been updated, right?

8   A.  That's correct.

9   Q.  And based on your research, that platform is not used by a

10  lot of forum administrators, correct?

11  A.  I did research.  And I think it was something that was just

12  opensource that was used.  I couldn't say exactly how much it

13  was used in other websites, but --

14  Q.  But didn't you say that it was not widely used by forum

15  administrators?

16             MR. TURNER:  Objection; hearsay.

17             THE COURT:  I will allow it.

18             You may answer.

19  A.  It was something that came from my source that told me

20  that.

21  Q.  But you wrote that, did you not?

22             MR. TURNER:  Objection.

23  Q.  Didn't you write that?

24             THE COURT:  Let me ask it this way:

25             Did you look at a number of websites that were using

F1kgulb3                          Der-Yeghiayan - cross

1    the same platform?

2              THE WITNESS:  I didn't -- it was information that was

3    shared to me by my source at the time that instructed me on

4    that.  I wasn't familiar as a web administrator as the source

5    was.

6              THE COURT:  I see, but you did personally look at

7    MediaWiki and look at the Silk Road forum and saw some overlap

8    in the platforms?

9              THE WITNESS:  I saw it was the same version number

10   myself, yes, I did.

11             THE COURT:  The other information you have about the

12   extent to which that same version number was being used by

13   other websites or not, that was something that you personally

14   did not perceive?

15             THE WITNESS:  That I did not perceive, no.

16             THE COURT:  All right, so I think we'll move on.

17             (Continued on next page)

18

19

20

21

22

23

24

25

1              THE COURT:  All right.  So I think that you can go on.

2     BY MR. DRATEL:

3     Q.  Did you swear in an affidavit that "Based on my training

4     and experience, this platform is not widely used by forum

5     administrators?"

6     A.  It was something through the course that I learned --

7     Q.  Did you not swear to that?  That is the question.  Did you

8     not swear under oath in an affidavit that, based on your

9     training and experience, the Wiki 1.17, the MediaWiki 1.17

10    version is not commonly used by forum administrators?

11    A.  That was in my affidavit.  Yes, I swore to that.

12    Q.  Also, you found that the forum, and a company controlled by

13    Mr. Karpeles, also ran something called simple machine -- I'm

14    sorry, the Silk Road forum, and something called -- and Mutum

15    Sigillum, Mr. Karpeles' company, ran something called Simple

16    Machines, right, the software?

17    A.  It was the bitcoin talk forums and the Silk Road forums

18    both ran on Simple Machines forum software.

19    Q.  And that wasn't common either?

20    A.  That was one that I wasn't familiar with, no.

21    Q.  Now, you investigated Mr. Karpeles' background, correct?

22    A.  I did.

23    Q.  And his professional background, right?

24    A.  I did.

25    Q.  And what kind of sources did you use?

F1kdulb4                          Der-Yeghiayan - cross

A.   Things that are open source information that I could --
that I could research as well as any other -- any other sources
I could talk to.

Q.   And can you tell us about the sources that you used with
respect to Mr. Karpeles' expertise in Linux, L-i-n-u-x,
software --

             MR. TURNER:  Objection.

Q.   -- or Linux programs?

             THE COURT:  He can give us the sources that he used.
Let me ask it this way.  In the course of investigating
Mr. Karpeles' background, did you identify information which
referred to any experience he had in different kinds of
programming languages?

             THE WITNESS:  I did observe some of the open source in
LinkedIn pages and such that he did express --

             MR. TURNER:  Objection.

             THE COURT:  All right.  Did you do anything to
yourself verify the truth of whatever was in those LinkedIn
pages?

             THE WITNESS:  No.  I wasn't able to cross-reference
that.

             THE COURT:  All right.  But I take it that you did
identify certain sources which indicated to you at least that
the words on the page seem to suggest that there was Linux
expertise?

F1kdulb4                        Der-Yeghiayan – cross

1              THE WITNESS:  There was.

2              THE COURT:  And you yourself didn't verify whether or

3    not a degree had been obtained from a particular university;

4    you just read them on the page?

5              THE WITNESS:  That is correct.

6              THE COURT:  All right.  Well, then, ladies and

7    gentlemen, the witness is competent to testify about what he

8    saw, that he saw a variety of sources that indicates that there

9    was Linux expertise, but you should understand that he did not

10   verify.  So, therefore, it is not for the truth of that; it is

11   for the fact that he saw that information.  All right?

12   BY MR. DRATEL:

13   Q.  And the same thing with respect to PHP, which is a

14   programming language, correct?

15             MR. TURNER:  I object.

16             THE COURT:  I am going to allow him to proceed in a

17   similar manner that the Court just did to lay a particular

18   foundation, and if he did not verify whether or not the

19   expertise came from a university, we will figure that out, or

20   from another credentialing organization.

21             You may answer.

22             THE WITNESS:  Yes, I did.  It was in the same way that

23   I saw the Linux language there.

24   BY MR. DRATEL:

25   Q.  By the way, Linux is the operational system for Silk Road,

F1kdulb4                        Der-Yeghiayan – cross

1    right, in many ways?

2    A.   I believe that and Ubuntu, which it runs.

3    Q.   And PHP?

4    A.   PHP is a different website programming language.

5    Q.   And the information that you saw also was that Mr. Karpeles

6    had worked professionally in both systems, PHP and Linux,

7    right?

8    A.   Based on the résumé that I saw, yes.

9    Q.   Now, as part of your investigation you looked into IP

10   addresses associated with Mr. Karpeles, correct?

11   A.   That's correct.

12   Q.   And you came up with about five pages worth, lists of IP

13   addresses, right?

14   A.   That is correct.

15   Q.   That's pretty active Internet presence, wouldn't you say?

16   A.   That is a lot of IP addresses, yes.

17   Q.   And you also found out -- and this is directly from hosting

18   companies, right, you found out; so you verified this, these IP

19   addresses, right?

20   A.   Yes.   Through subpoenas, yes.

21   Q.   Yes.   Also you verified, through the subpoenas, that

22   Mr. Karpeles was actively using the support for a software

23   called MYSQL, correct?

24            MR. TURNER:   Objection.

25   Q.   MySQL.

1           MR. TURNER:  Objection.  Form.

2           THE COURT:  I will allow it.

3    A.  I believe he was using MySQL yes.

4    Q.  Do you need to be sure?

5    A.  It's hand in hand with PHP so I'm assuming, yes, he did.

6           THE COURT:  Don't assume.

7    A.  If you have something I could reference, yes, I will

8    certainly look at it.

9    Q.  Sure.

10          (Pause)

11          MR. DRATEL:  3505-3767.

12   Q.  If you just look at that first paragraph (handing).

13   A.  Sure.

14          (Pause)

15          OK.

16   Q.  And so you got confirmation through the subpoenas that he

17   had a port open for M-y-S-Q-L, MySQL?

18   A.  That is correct.

19   Q.  That's also something that is used in Silk Road, right?

20   A.  I believe so, yes.

21   Q.  Silk Road relied on a highly complex system for processing

22   bitcoins, right?

23          MR. TURNER:  Objection.  Foundation.

24   Q.  Based on your investigation?

25          MR. TURNER:  The same objection.

1              THE COURT:  I will allow it.

2              Do you want to rephrase it?

3              MR. DRATEL:  No.  If the Court will allow it.

4              THE COURT:  I will allow it.

5    A.  I'm sorry.  Could you repeat, please.

6    Q.  Sure.  Based on your investigation, Silk Road relied on a

7    highly complex system for processing bitcoins, correct?

8    A.  Yes, it did.

9    Q.  Now, in addition to some of the other subpoenas we've

10   talked about, you also subpoenaed a service in Germany called G

11   small M and small B H -- I'm sorry, BSB Service.  Capital G

12   small M small B capital H, right?  That is the German suffix

13   for corporation, GmbH.

14             But you subpoenaed that with respect to Mr. Karpeles

15   as well, right?

16   A.  I believe it is the 1API, yes.

17   Q.  Now, in all of those returns on the subpoenas that you got

18   from that stuff, the IP addresses, was there anything about

19   Mr. Ulbricht in any of that?

20   A.  There was not.

21   Q.  Now, even after Mr. Ulbricht was arrested, you continued

22   your investigation of Mr. Karpeles, correct?

23   A.  I wanted to see if there was any other ties to him, yes.

24   Q.  And were there any inferences in the notes on

25   Mr. Ulbricht's computer with respect to Mr. Karpeles'

F1kdulb4                          Der-Yeghiayan - cross

1   involvement and associations with Silk Road?

2              MR. TURNER:  Objection.  Form.

3              THE COURT:  Sustained.

4   Q.  Did you review notes from Mr. Ulbricht's computer?

5   A.  I did.

6   Q.  Did you find any inferences of Mr. Karpeles' involvement

7   and association with Silk Road?

8              MR. TURNER:  Objection.  Form.  Foundation.  Hearsay.

9              THE COURT:  Sustained.

10             MR. DRATEL:  Foundation is --

11             THE COURT:  No, you can do it, but you can't ask him

12  were there any differences.  You can show him different things.

13  The jury is the body that will draw inferences.  That's the way

14  it is.

15  BY MR. DRATEL:

16  Q.  Did you find inferences --

17             THE COURT:  I'm not going to allow finding inferences.

18  If you want to ask him about certain facts he saw on the

19  website, you can.

20             MR. DRATEL:  Could we have a sidebar, your Honor?

21             THE COURT:  I am not going to do a sidebar on this

22  one.

23  BY MR. DRATEL:

24  Q.  When you reviewed Mr. Ulbricht's notes, or what were on --

25  withdrawn.

1          You reviewed what was on Mr. Ulbricht's laptop,

2    correct?

3    A.  I did.

4    Q.  And part of that was you were looking for things about

5    Mr. Karpeles, correct?

6    A.  I was looking for any associations with Mr. Karpeles, yes.

7    Q.  Did you find any?

8    A.  There was his name mentioned on some text documents, yes.

9    Q.  Now, the bitcoin forum that we are talking about, shortly

10   after Mr. Ulbricht was arrested there was a report that you

11   received -- and this is not for the truth, this is for the

12   report -- that it had been hacked, correct?

13   A.  I believe so, yes.

14          MR. TURNER:  Objection.  Hearsay.

15          THE COURT:  Well, it is not for the truth.  It is just

16   for the fact that the report indicated that.

17          You don't know whether or not it was in fact hacked,

18   do you?

19          THE WITNESS:  I do not, no.

20          THE COURT:  You can go ahead and continue.

21   BY MR. DRATEL:

22   Q.  And that would eliminate the ability to find information on

23   bitcointalk.org that might have some integrity, right, because

24   that would eliminate that prospect because it would have been

25   hacked, right?

F1kdulb4                          Der-Yeghiayan - cross

1            MR. TURNER:  Objection.  It calls for speculation.

2            THE COURT:  Sustained.

3    Q.  If it had been hacked.

4            THE COURT:  No.  He is not an expert witness to talk

5    about the evidence of hacking.

6    Q.  You never saw Mr. Karpeles' laptop, correct?

7    A.  No, I've never seen his laptop or computers.

8    Q.  Mr. Karpeles also controls a lot of websites, correct?

9    A.  He was a hosting provider, yes.

10   Q.  And part of the your investigation in terms of trying to

11   keep the integrity of your investigation intact, you advised

12   other agents and other agencies not to go on Karpeles' websites

13   because he tracked them, correct?

14           MR. TURNER:  Objection.  Relevance and foundation.

15           THE COURT:  I will allow it.

16           (Pause)

17           There is a form issue with the word "integrity."  Why

18   don't you re-ask the question in a form that I will allow.

19           MR. DRATEL:  We are beyond that.  It is the next

20   question which is about --

21           THE COURT:  No.  The question you had was in part of

22   your investigation --

23           MR. DRATEL:  I'm sorry.

24   Q.  So in part of your investigation, in order to keep it

25   confidential, to keep targets from being advised of the fact

F1kdulb4                        Der-Yeghiayan - cross

1    that they were under investigation, you strongly advised people

2    in the government -- your colleagues, other agencies -- not to

3    go on Karpeles' website because you were afraid that he would

4    be able to see that, had they done so, they would be advised of

5    the investigation, right?

6              MR. TURNER:  Objection.  Relevance and foundation as

7    to the latter part of the question.

8              THE COURT:  I will sustain the objection, but there is

9    a form of it that you can ask but you are adding in a lot of

10   other stuff.

11   Q.  Did you advise your colleagues in HSI around the country,

12   as well as other agencies, not to go to Karpeles' websites and

13   not to visit them?

14   A.  The websites that I listed in my report, I did say do not

15   visit those websites.  I said that, yes.

16   Q.  And the reason was because you wanted to keep the

17   investigation confidential, right?

18   A.  It's what we do in investigations, yes.

19   Q.  You were afraid that if someone went on one of those sites,

20   it might give Karpeles notice that the government was looking

21   at his sites?

22   A.  That is why, yes.

23   Q.  You are also familiar with someone named Anand Athavale.  I

24   don't know if I am pronouncing it correctly, but A-n-a-n-d is

25   the first name, last name A-t-h-a-v-a-l-e.

F1kdulb4                         Der-Yeghiayan - cross

1    A.  I am.

2    Q.  And he is a Canadian?

3    A.  He is a Canadian citizen, yes.

4    Q.  He lives in Vancouver, or lived in Vancouver during 2012

5    and 2013?

6              MR. DRATEL:  Objection.  Foundation.

7              THE COURT:  Why don't you build a foundation for that

8    so we'll see what it is based on.

9    Q.  Did you find out that he lived in Vancouver during that

10   period of time?

11             MR. TURNER:  Objection.  Foundation.

12   Q.  Did you do an investigation to find out that he lived

13   there?

14             MR. TURNER:  Objection.  Foundation.

15             THE COURT:  Did you look to try to find out where this

16   guy was from?

17             THE WITNESS:  I did.

18             THE COURT:  What kinds of information did you look at?

19   Did you look at a passport?

20             THE WITNESS:  I believe it is from travel records.

21             THE COURT:  And travel records from Homeland Security

22   or the Canadian counterpart?

23             THE WITNESS:  It is from Homeland Security.  I am

24   trying to recall.  I'm sorry.

25             THE COURT:  These are records maintained by the

1    customs folks when people would enter or exit the national

2    boundaries?

3                 THE WITNESS:  That is correct.

4                 THE COURT:  And they maintain records as part of that

5    recordkeeping function as to the citizenship reported of the

6    entrant or exiter?

7                 THE WITNESS:  They do.

8                 THE COURT:  All right.  And what did that indicate to

9    you for this individual?

10                THE WITNESS:  He was crossing over around Vancouver.

11   Actually, initially I think it was Toronto and then later on it

12   was north of Vancouver.

13                THE COURT:  Did it give any indication as to his

14   declared citizenship status?

15                THE WITNESS:  We -- throughout the process of the

16   investigation, later on we did confirm through Canadian customs

17   that he was a Canadian citizen, and we did get records from the

18   RCMP.

19                THE COURT:  All right.  Thank you.

20                Mr. Dratel, you may proceed.

21                MR. DRATEL:  Thank you, your Honor.

22   BY MR. DRATEL:

23   Q.  Now, you also did an investigation in terms of his Internet

24   presence, correct?

25   A.  I did.

F1kdulb4                        Der-Yeghiayan - cross

1                  MR. TURNER:  Objection to form.

2                  THE COURT:  I will allow it.  There was an objection.

3      I was letting you go ahead.  I was overruling the objection.

4                  MR. DRATEL:  Thank you, your Honor.

5      Q.  And the list of domain names that he owned was four pages

6      long, right?

7      A.  I believe so, yes.

8      Q.  And the list of his current known IP addresses was a half

9      page, right?

10     A.  From what I got back from the subpoenas, yes.

11     Q.  And he also is someone with computer proficiency based on

12     what you learned in your investigation, correct?

13                 MR. TURNER:  Objection.  Foundation.

14                 THE COURT:  Why don't you approach it the same way as

15     you approached the other one?

16     Q.  What were the sources of your information with respect to

17     Mr. Athavale and who he was and what he -- and, you know, his

18     Internet presence and his Internet -- and his computer

19     proficiency?

20     A.  I believe he had also a LinkedIn page, as well, where he

21     would describe his credentials.

22                 MR. TURNER:  Objection.  Hearsay.

23                 THE COURT:  Sustained.

24                 Let me ask it this way.  Did you look at a LinkedIn

25     page that appeared to be associated with this fellow Athavale?

F1kdulb4                           Der-Yeghiayan - cross

1              THE WITNESS:  I believe so, yes.

2              THE COURT:  Did you investigate whether he himself put

3      the information on the page or whether somebody else put the

4      information on the page?

5              THE WITNESS:  I wasn't able to tell if he put it on

6      himself but I assume so, yes.

7              THE COURT:  But you saw a page that appeared to be

8      associated with this individual, and based on that page you saw

9      information that indicated he had some computer experience?

10             THE WITNESS:  Yes.

11             THE COURT:  And you didn't separately verify that, is

12     that right?

13             THE WITNESS:  No, I did not.

14             THE COURT:  But you saw that there was a LinkedIn page

15     which simply provided information indicating that he had

16     computer experience?

17             THE WITNESS:  Yes.

18             THE COURT:  All right.  So we don't know, ladies and

19     gentlemen, whether it was true or not.  We just know there was

20     a LinkedIn page that was in existence that indicated this

21     individual had some computer experience.  Whether that LinkedIn

22     page was accurate or not or by this individual or somebody else

23     purporting to have that name is unknown.

24             You may proceed, Mr. Dratel.

25             MR. DRATEL:  Thank you, your Honor.

F1kdulb4                         Der-Yeghiayan - cross

1    BY MR. DRATEL:

2    Q.  And this, again, was in the latter part of 2012, correct,

3    like November 2012?

4    A.  Correct.

5    Q.  And, by the way, Vancouver is in the Pacific Time Zone,

6    right?

7    A.  Yes, it is.

8    Q.  And at some point have you reviewed any private messages on

9    the Silk Road service that existed -- on the Silk Road websites

10   or servers or anything on Silk Road, have you reviewed any

11   private messages that had the name Anand Athavale in them?

12             MR. TURNER:  Objection, your Honor.

13             THE COURT:  Give me one more word.

14             MR. TURNER:  403.

15             THE COURT:  I will allow this question.  You may

16   answer.

17   A.  Looking for his name on the servers?

18   Q.  Have you seen any entries in the universe of Silk Road on

19   the servers that has his name?

20   A.  If there is something to help me recollect my memory?

21   Q.  Private messages.  Someone named "deathfromabove"?

22             MR. TURNER:  Objection, your Honor.

23             THE COURT:  Sustained.

24             MR. DRATEL:  He wanted me to help him.

25             THE COURT:  I know.  But you are connecting that, the

F1kdulb4                         Der-Yeghiayan - cross

1   two.  So you can build a foundation for it.

2   BY MR. DRATEL:

3   Q.  I show you what's marked as Defendant's E, for

4   identification.

5          MR. TURNER:  Is this being offered to refresh

6   recollection, your Honor?

7          MR. DRATEL:  Yes.

8          MR. TURNER:  Then I object to foundation.

9          MR. DRATEL:  He asked for me to show him something.

10          THE COURT:  I've got to see what it is first before I

11   figure out if there is a problem.

12          (Pause)

13          All right.  I will allow you to --

14          MR. TURNER:  Your Honor, can we have a sidebar?

15          THE COURT:  No.  I didn't allow one for him.  I will

16   take it step-by-step.

17          So ask your next question, Mr. Dratel.

18          MR. DRATEL:  Thank you, your Honor.

19   Q.  I just ask you to look at that, read it to yourself.

20          THE COURT:  And who put the --

21          MR. DRATEL:  Redactions?

22          THE COURT:  Redactions?

23          MR. DRATEL:  We did, your Honor, for a reason that I

24   can explain later.

25          THE COURT:  All right.

F1kdulb4                        Der-Yeghiayan - cross

```
 1   BY MR. DRATEL:
 2   Q.  Have you seen that before?
 3   A.  Not that I recall, no.
 4   Q.  Now, with respect to Mr. Ulbricht, you subpoenaed the
 5   entirety of his Facebook account, correct?
 6            I'm sorry, withdrawn.
 7            The government got a warrant for the entirety of
 8   Mr. Ulbricht's Facebook account, right?
 9   A.  I wasn't included on that, that I recall.
10   Q.  How about Google?  You are aware of it, right?
11   A.  I am aware of Google, yes.
12   Q.  PayPal you are aware of, right?
13   A.  I believe there was multiple subpoenas issued.  A lot of
14   them was done through FBI and not through me.
15   Q.  And you have also reviewed his travel history, right, from
16   the same kind of records that you looked at when you talked
17   about Mr. Athavale, right?
18   A.  I reviewed Mr. Ulbricht's travel records, yes.
19   Q.  And basically one trip per year, right?
20   A.  I believe that is accurate, yes.
21   Q.  One was to Costa Rica, correct?
22   A.  I believe so, yes.
23   Q.  And did you learn during the course of your investigation
24   that his parents have a business in Costa Rica?
25            MR. TURNER:  Objection.  Foundation.
```

1           THE COURT:  Well, I will allow it.

2           I mean, did you ever receive information indicating

3     that one way or the other?

4           THE WITNESS:  I saw open source information off the

5     Internet that would indicate that, yes.

6           THE COURT:  Did you ever confirm it independently of

7     that open source information?

8           THE WITNESS:  No, I did not.

9           THE COURT:  All right.  So you heard or saw

10    information from the Internet which is not separately

11    confirmed?

12          THE WITNESS:  That is correct.

13          THE COURT:  All right.  So, ladies and gentlemen,

14    whether or not the parents have a business in Costa Rica is not

15    yet in the record, but the witness saw information indicating

16    something to that effect but did not confirm it.

17    BY MR. DRATEL:

18    Q.  You got his Mt. Gox account records, right?

19    A.  Yes.  The Mt. Gox records were also I believe through

20    subpoena.

21    Q.  Weren't you given the account number by Karpeles' attorney?

22    A.  I was not --

23          MR. TURNER:  Objection.

24    Q.  The government?

25          THE COURT:  And if you have personal knowledge, then

F1kdulb4                          Der-Yeghiayan - cross

1   testify to it, but don't speculate if you weren't given a

2   number.

3           THE WITNESS:  It was given to the Baltimore office.

4           MR. TURNER:  Objection.  Foundation.

5           THE COURT:  That is struck since it is not your

6   personal knowledge.

7           Did you learn of that through a communication with

8   somebody, through an A.U.S.A. in Baltimore?

9           THE WITNESS:  Through the U.S. attorneys.

10          THE COURT:  The fact of it, that he received that

11  information, is OK, but you can't get the truth of the account

12  number if you are not going to connect the dots.

13          MR. DRATEL:  I would move it under 807.

14  Q.  So you were told that by an assistant United States

15  attorney?

16          MR. TURNER:  Objection.  Hearsay.

17          THE COURT:  Sustained.

18  Q.  And Karpeles was still under investigation at the time,

19  correct?

20          THE COURT:  Can we get the timeframe.

21  Q.  October 12, 2013, eleven days after Mr. Ulbricht's arrest,

22  right?

23  A.  We were still looking at him for money service business

24  service charges, yes.

25  Q.  Now, going back to Mr. Karpeles, you never saw his laptop,

F1kdulb4                          Der-Yeghiayan – cross

1    right?

2    A.  No, I have not.

3    Q.  You never saw his desk-top or any computer belonging to

4    him, correct?

5    A.  I have not.

6    Q.  You never saw his phone, his smart phone or any other

7    phone, right?

8    A.  No, I have not.

9    Q.  You never had access to any of the servers that he

10   maintains overseas, right?

11   A.  I have not.

12   Q.  With respect to Mr. Athavale, the same thing, right?  You

13   never saw his laptop?

14   A.  No, I did not.

15   Q.  His phone?

16   A.  No, I have not.

17   Q.  Any electronic device that he owns?

18   A.  Nothing belonging to him, no.

19   Q.  You have heard of someone named Richard Bates, correct?

20   A.  The name is familiar, yes.

21   Q.  Well, he is someone whose name came up just prior to

22   Mr. Ulbricht's arrest, correct?

23           MR. TURNER:  Objection.  Form.  Foundation.

24   Q.  You learned of his name just prior to Mr. Ulbricht's

25   arrest, correct?

F1kdulb4                          Der-Yeghiayan - cross

1           THE COURT:  I will allow that.

2    A.  I'm sorry.  I am having a hard time refreshing my

3    recollection.  Do you have something that can help me recollect

4    my memory?

5    Q.  Sure.

6           (Pause)

7           MR. TURNER:  Could I see the document?

8           MR. DRATEL:  Sure.

9           (Counsel conferred)

10          THE COURT:  Did I hear you say it was 2935 through 36?

11          MR. DRATEL:  Yes.

12   Q.  Just look at it right here.

13   A.  Sure.

14          (Pause)

15          OK.

16   Q.  So Richard Bates is someone whose name came up in your

17   investigation of Mr. Ulbricht, correct?

18          MR. TURNER:  Objection.  Form.

19          THE COURT:  I will allow it.

20   A.  This was something that was brought to my attention by

21   Special Agent Gary Alford.  It wasn't actually part of my

22   investigation.

23   Q.  It was basically about Bates' profile, right?

24          MR. TURNER:  The same objection.  Hearsay.

25          THE COURT:  I will allow it.

F1kdulb4                        Der-Yeghiayan - cross

1   A.  There was discussions that he had where he brought up a

2   possible lead in connections to Bates.

3   Q.  Right.  He had certain things in common not only with

4   Mr. Ulbricht but also with DPR?

5           MR. TURNER:  Objection.  Again, hearsay.

6           THE COURT:  Sustained.

7   Q.  Some of the things were about his political views, right?

8           MR. TURNER:  Objection.

9           THE COURT:  Sustained.

10          (Pause)

11  Q.  Did you look into Mr. Bates at all?

12  A.  No, I did not.

13  Q.  Now, before lunch we were talking about bitcoins and the

14  accounts that you had identified -- that Homeland Security had

15  identified as being part of Silk Road, do you remember?

16  A.  Yes.

17  Q.  So in August of 2012, you had identified several bitcoin

18  accounts associated with Silk Road that had the equivalent of

19  over -- talking about bitcoins in terms of value at that

20  time -- of over $5 million dollars, U.S. dollars, right?

21  A.  Yes.

22  Q.  And that that had gone up from May of that year, right?  In

23  May -- withdrawn.

24          In May of that year, there was only about $2 million

25  worth of bitcoins in the account, correct?

F1kdulb4                          Der-Yeghiayan – cross

1          MR. TURNER:  Objection.  Lack of foundation.

2          THE COURT:  Just so that I'm clear and so I understand

3     the question, do you mean the number of bitcoins changed or the

4     value of the bitcoins changed, or both?

5          MR. DRATEL:  I am going to get to that, your Honor.

6     Q.  So this is based on your investigation, right, and your

7     monitoring of those wallets, those accounts, correct?

8          MR. TURNER:  Objection.  The foundation, how these

9     wallets are associated with Silk Road.

10         THE COURT:  Well, in connection with your review of

11    the commissions that might be obtained through purchasing them

12    on Silk Road, did you look at any records?

13         THE WITNESS:  It was in connection with our purchases

14    we did and moving money in and out.  These were records or

15    addresses that we identified in the course of the investigation

16    that we suspected were associated to Silk Road.

17         THE COURT:  And did you monitor the account

18    information for those addresses?

19         THE WITNESS:  I did.

20         THE COURT:  All right.  And during what period of time

21    are you talking about, Mr. Dratel?

22         MR. DRATEL:  Well, through the middle part of –– there

23    is a series of dates in 2012.

24         THE COURT:  So did those numbers fluctuate –– in terms

25    of numbers of bitcoins fluctuate throughout 2012?

F1kdulb4                              Der-Yeghiayan - cross

```
 1              THE WITNESS:  It increased steadily in that account up
 2   to a certain period.
 3              THE COURT:  All right.  OK.  Mr. Dratel, why don't you
 4   pick it up from here.
 5              MR. DRATEL:  Thank you, your Honor.
 6   Q.  So in July of 2012, there were about 500,000 bitcoins in an
 7   account, correct?
 8              MR. TURNER:  Objection.  Form.  "An account."
 9              THE COURT:  I will allow it.
10              MR. DRATEL:  I mean, the account we are talking about.
11   If I have to repeat everything in every question, I will.  But
12   thank you, your Honor, for allowing me.
13   Q.  So in that account that you were monitoring, July 10, 2012,
14   the account had 503,825 bitcoins in it, right?
15   A.  That sounds about correct, yes.
16   Q.  And the value of a bitcoin at that time was $7.10, correct?
17   A.  Sounds about accurate, yes.
18   Q.  So that would be about $3-and-a-half million in bitcoins?
19   5 times 7, add the zero --
20   A.  Carry.  Yes.
21   Q.  I mean, you did the math at one point, right?
22   A.  I had a calculator, right, yes.
23   Q.  Now, so there is 500,000 bitcoins in the account, and there
24   were 144,000 bitcoins seized from Mr. Ulbricht's laptop at the
25   time of his arrest, right?
```

F1kdulb4                          Der-Yeghiayan - cross

1    A.  144,000 bitcoins, yes.

2    Q.  So there were 500,000 bitcoins in July of 2012 in that

3    account.

4            Now, that was 16 months before the arrest was made,

5    right, before the site was taken down, correct?

6    A.  That is correct.

7    Q.  So you had the entirety of those 15/16 months of how many

8    bitcoins Silk Road would collect -- withdrawn.

9            Silk Road continued to make sales, collect commissions

10   for those additional 16 months, correct?

11   A.  They did.

12   Q.  And those would be reflected in bitcoins, right?

13   A.  It would.

14   Q.  And also not $7 per bitcoin but by October 1st of 2013,

15   bitcoin was at $100 per bitcoin, right?

16   A.  That is correct.

17   Q.  So that's fourteen times, right, the value?

18   A.  Yes.

19   Q.  So if it was 3.5 million in July of 2012, just those

20   500,000 bitcoins -- not even including the other 16 months --

21   just that amount of bitcoins, it would be worth 70 million,

22   right -- I'm sorry, 50 million?

23   A.  That sounds about right, yes.

24   Q.  14 times three-and-a-half.

25           Now, if someone had cashed out those 500,000 bitcoins

F1kdulb4                         Der-Yeghiayan - cross

```
 1   when bitcoins were at $250 per bitcoin, which occurred in the
 2   spring of 2013, right?
 3             MR. TURNER:  Objection.  Form.  Foundation.
 4             MR. DRATEL:  I haven't finished the question.
 5             THE COURT:  I think it is the hypothetical nature of
 6   it.  Why don't you stick to what happened in this account?
 7             MR. DRATEL:  All right.
 8   Q.  Bitcoin, during the period that we were talking about
 9   before, October 1st, 2013, bitcoin peaked in the spring of
10   2013, correct?
11   A.  Yeah, around April it did.
12   Q.  To 250?
13   A.  Yes.
14   Q.  $250 per bitcoin?
15   A.  $250 a bitcoin.
16   Q.  So that would make that 50 million one-and-a-half times
17   more, right?
18   A.  Yes.
19   Q.  125 million?
20   A.  If it -- yeah, if the volume stayed the same in bitcoins in
21   the accounts, yes.
22   Q.  Now, Silk Road made an estimate of $1.2 billion in sales,
23   right, in the course of its -- from the government's
24   investigation, Silk Road made $1.2 billion in sales, right?
25             MR. TURNER:  Objection.  Foundation.
```

F1kdulb4                           Der-Yeghiayan - cross

1   Q.  It is in the complaint, right?

2               MR. TURNER:  Objection.

3               THE COURT:  Do you know if bitcoin --  strike that.

4               Do you know if Silk Road is alleged to have -- strike

5   that.

6               Do you know the volume of sales Silk Road had during

7   the period of time that spans this investigation?

8               THE WITNESS:  Only what was shared with me by the FBI.

9               THE COURT:  Did you yourself look at any documents

10  relating to the Silk Road website that indicated to you the

11  volume of sales?

12              THE WITNESS:  There wasn't anything directly on the

13  website that would tell you what they -- what the volume was,

14  but there was what came out of the FBI investigation on the

15  server, that they came to that figure for the complaint.

16              THE COURT:  Why don't you try it in a different way?

17              MR. DRATEL:  I also move it under 801 as a -- well,

18  not front of the jury.

19              THE COURT:  We'll pick it up at our break.

20  BY MR. DRATEL:

21  Q.  Anyway, so based on the information that was developed, the

22  FBI concluded that Silk Road had made $1.2 billion in sales

23  over the course of its lifetime, correct?

24              MR. TURNER:  Objection.  Hearsay.

25              THE COURT:  All right.  If he only knows about that

1    from hearing about it from somebody else, then it would be

2    hearsay.

3              Do you have any independent sources of information

4    where you learned the volume of sales, either approximately or

5    concretely, that occurred on Silk Road?

6              THE WITNESS:  Other than what was shared with me from

7    them, no.

8              THE COURT:  All right.  And that's hearsay.  So --

9    BY MR. DRATEL:

10   Q.  Did you ever read the complaint in this case?

11             THE COURT:  That is hearsay, too, so it is not

12   admissible evidence.

13   Q.  Now, in November of 2012, you computed that Silk Road was

14   earning $2 million a month in commissions, right, based on the

15   value of bitcoin and the volume of sales that you were able to

16   monitor during that period, right?

17   A.  Sounds about accurate.

18   Q.  And, again, back in 2012, bitcoin hadn't nearly even

19   approached that $100 per bitcoin, right?

20   A.  No.  It was under $10, I believe.

21   Q.  Right.  So by the April of 2013, that same $2 million in

22   commissions would have been worth a lot more, right?  If it was

23   about $10, it would have been worth ten times as much, $20

24   million a month in commissions with the same volume, right?

25   A.  Well, the commission was based on the sales price, and the

F1kdulb4                          Der-Yeghiayan - cross

1   sales price would have fluctuated when compared to the value of

2   bitcoin.  So, I mean, it would have been relevant to the cost

3   of the bitcoin.

4   Q.  Now, that $144,000 -- I'm sorry, the 144,000 bitcoins that

5   were seized from Mr. Ulbricht's laptop, right?

6   A.  Yes.

7   Q.  They were worth $29 million at the time of seizure, right?

8   A.  Yes.

9   Q.  And by November 18, 2013 -- withdrawn.

10          The price of bitcoins skyrocketed, as we talked about

11  Thursday, right, after the arrest?

12          MR. TURNER:  Objection.  Timeframe.

13  Q.  After October 1st, 2013, by the end of the year, between

14  then and the end of 2013, bitcoin at one point exceeded $1,000

15  per bitcoin, right?

16  A.  It went over a thousand dollars, yes.

17  Q.  And as of November 18, 2013, that $29 million worth of

18  bitcoin would have been worth $96.5 million, right?

19  A.  Yes.

20  Q.  So anybody holding bitcoins during that period of six/seven

21  weeks would have seen a 500 percent return, right?

22  A.  That's accurate, yes.

23  Q.  There was a significant amount of law enforcement activity

24  devoted to investigating Silk Road, right?

25  A.  Yes, there was.

F1kdulb4                         Der-Yeghiayan - cross

1   Q.   Multiple agencies?

2   A.   There were multiple agencies involved, yes.

3   Q.   Multiple United States Attorney's offices?

4   A.   Multiple United States Attorney's offices.

5   Q.   Multiple offices even with within your agency, Chicago,

6   Baltimore, other places, right, New York?

7   A.   That is correct.

8   Q.   And you, as part of your investigation, and others, would

9   try to -- withdrawn.

10          During the course of your investigation, you managed

11  to gain control of a number of user accounts with Silk Road,

12  correct?

13  A.   Yes, I did.

14  Q.   Most of them buyer accounts?

15  A.   I mean, it was split up, buyer/vendor accounts, yes.

16  Q.   So -- and you alone had more than a dozen, maybe even two

17  dozen, that you could sign on to, right?

18  A.   I had not that many, but I probably had like six or so that

19  I created myself on the market, six or so that I created on the

20  forums.

21  Q.   No, not that you created, but also in addition to the ones

22  you created, also the ones that you assumed control over when

23  people either were arrested or voluntarily gave you access to

24  their account, right?

25  A.   That is correct.

F1kdulb4                      Der-Yeghiayan - cross

1   Q.  So that increases that number, doesn't it?

2   A.  It does, yes.

3           THE COURT:  So how many of those, approximately, did

4   you have?  You got the six that you created yourself?

5           THE WITNESS:  Correct.

6           THE COURT:  How many, approximately, did you take over

7   in one form or another during the entire time that you were in

8   the business of taking over accounts?

9           THE WITNESS:  Approximately about a dozen.

10          THE COURT:  All right.  So you touched personally

11  about 18 accounts?

12          THE WITNESS:  That sound about right, yes.

13          THE COURT:  All right.

14  BY MR. DRATEL:

15  Q.  And you also told us, I think Thursday, that some of these

16  accounts other agents had access to as well?

17  A.  Some of them, yes, other agents I gave the username and

18  password to.

19  Q.  So you might be on one day and another agent might be on

20  another day, right?

21  A.  Not if it was being utilized in an undercover capacity.  It

22  would only be one agent utilizing it.

23  Q.  And during this period of time, one of the reasons for

24  taking over these accounts were to make the undercover

25  purchases that you had talked about, right?

F1kdulb4                          Der-Yeghiayan – cross

1    A.  Oh, a few of them were used in that capacity, yes.

2    Q.  So you made about 50 such purchases, right?

3    A.  That was from one account, yes.

4    Q.  And the purpose of those purchases was not to keep the site

5    going, right?

6    A.  No, it wasn't to keep the site going.

7    Q.  But at the same time you are sending money overseas --

8    bitcoins overseas to drug dealers, who were pocketing that

9    money, right?

10   A.  It's going into, yes, their hands.

11   Q.  And you don't really have access to them the way you would

12   if someone who perhaps was in the United States doing the same

13   thing even if you could identify them, right?

14   A.  We have processes through MLAT that could give us

15   reciprocity, especially with a lot of governments that we were

16   dealing with at the time, to get legal action if we needed to.

17   Q.  But at the time you were essentially, as part of the

18   undercover operation, putting money into these drug dealers'

19   pocket, right, without any recourse in the sense that they

20   weren't being arrested, right?

21   A.  We were doing that for the purpose of trying to arrest

22   them.

23   Q.  Right.  But isn't that one of the reasons why the

24   undercover buys stopped?

25   A.  No.  There was money that had to be allocated for those

F1kdulb4                          Der-Yeghiayan - cross

1    purposes, and at the time we just didn't have -- we stopped

2    actually collecting seizures around April 2013, and then we

3    stopped doing buys after that since we weren't collecting the

4    seizures.

5    Q.  And in those purchases that were made through the

6    undercover accounts, you were also paying a commission to Silk

7    Road, right?

8    A.  That was something that was automatically taken out, yes.

9    Q.  And you don't know whether that has ever been recovered,

10   right?

11   A.  I don't know if the exact bitcoins that we put in got

12   recovered or not, no.

13   Q.  Now, the government -- withdrawn.

14        You had administrative privileges in July of 2013 as

15   Cirrus, right?

16   A.  On the forum I did, yes.

17   Q.  And the government, the U.S. government, got access to the

18   Silk Road servers no later than July 23, 2013, right?

19   A.  The FBI did.

20   Q.  And the FBI could have pulled the plug right then because

21   they had the servers, right?

22   A.  I don't know what their capabilities were at the time.

23   Q.  Well, they had the servers, correct?  They physically had

24   possession of the servers, if they wanted, correct?

25        MR. TURNER:  Objection.  Foundation.

F1kdulb4                              Der-Yeghiayan - cross

1           THE COURT:  Why don't you dig in a little more to what

2      the FBI had and what this witness knows.

3      Q.  As of July 2013, the FBI knew the location of Silk Road's

4      servers, right?

5      A.  They had an image that came back as a server.

6      Q.  But they knew the location of where that server existed as

7      a physical thing?

8           MR. TURNER:  I object.  As to this witness'

9      foundation?

10          THE COURT:  Why don't you investigate with this

11     witness what he knows about the location.

12     Q.  You know where the location was, right?

13     A.  They had an up IP address for where they got the image that

14     did come back as being Silk Road's server.

15     Q.  But what I'm saying is you know where the servers were

16     located, right?

17          MR. TURNER:  Objection.  Foundation.

18     Q.  You know that --

19          MR. TURNER:  Objection.

20          THE COURT:  Sustained.

21     Q.  -- from the investigation of the information that has been

22     verified, right?

23          MR. TURNER:  Objection.

24          THE COURT:  Sustained.  You need to ask it

25     differently.

F1kdulb4                          Der-Yeghiayan - cross

1    Q.   During the course of your investigation you learned the

2    physical location, the country, that those servers were located

3    in, right?

4              MR. TURNER:  Again, objection.  Foundation.

5              MR. DRATEL:  I am asking if he learned.

6              THE COURT:  He can answer that yes or no.

7    A.   Only from what I was told where they were at is what I

8    knew.

9              THE COURT:  Did you learn from any other source apart

10   from what you were told?  Did you see any written documentation

11   about that, about the location of the Silk Road servers?

12             THE WITNESS:  I did not.

13             THE COURT:  All right.

14   BY MR. DRATEL:

15   Q.   You were told by law enforcement agents to facilitate your

16   investigation?

17             MR. TURNER:  Objection to the hearsay.

18             THE COURT:  Sustained.

19             MR. DRATEL:  Under Rule 807 again, your Honor.

20             THE COURT:  The objection is sustained.

21   BY MR. DRATEL:

22   Q.   Did you know that the FBI knew where the location -- you

23   knew that they were going to image the servers, correct?

24             MR. TURNER:  Objection.  Again, hearsay.

25             THE COURT:  Well, let me ask you.  Did you yourself

1    ever -- did you have any personal involvement in the imaging of

2    the servers?

3              THE WITNESS:  No, I did not.

4              THE COURT:  Did you receive written documentation that

5    related to the imaging of the servers?

6              THE WITNESS:  No, I did not.

7              THE COURT:  All right.  He is not the right witness

8    for this so we'll do it through somebody else.

9              MR. DRATEL:  Your Honor, I do have another question

10   for him, which is:

11   Q.  Didn't you tell FBI New York when to image the servers

12   because when the traffic would be less, that the admins won't

13   be on the site?

14   A.  Is there a particular date that you are referring to?  Is

15   this later on when I had access to the control?  If you could

16   be more specific?

17             THE COURT:  Did there come a point in time when you

18   communicated with anyone else in law enforcement as to a date

19   when the servers would be imaged, from your perspective?

20             THE WITNESS:  I didn't have any involvement in the

21   initial capture of the Silk Road server.

22             THE COURT:  All right.

23             MR. DRATEL:  I am going to show this for impeachment,

24   your Honor.  I show you 605, 3505-605.

25             THE COURT:  Did you have any involvement in any of

1    these subsequent captures?

2              THE WITNESS:  Subsequent captures I might have, yes.

3              THE COURT:  And the word "capture" there refers to the

4    imaging of a server, is that right?

5              THE WITNESS:  Right, the actual imaging.

6              THE COURT:  All right.

7    BY MR. DRATEL:

8    Q.  So you were informed that the FBI was going to, in your

9    words, take down the servers, right?

10             THE COURT:  Hold on.  The question is -- for

11   impeachment purpose, the question, for which it would be

12   impeaching, is whether or not he told the FBI on a particular

13   date to take down, not whether or not he learned of a takedown.

14   Q.  All right.  So on July 20 -- in July 2013, I think it is

15   the 22nd, yes, 22nd of July 2013, you told the FBI a specific

16   time to take down the servers, right?

17   A.  There would be a time that --

18   Q.  First let's answer that question.

19             Did you tell the FBI a specific time that would be a

20   good time to take down the servers?

21   A.  I did.

22   Q.  And that was because you said there wouldn't be a lot of

23   administrative work on the site and so that -- is that right,

24   there wouldn't be admins?

25   A.  There wouldn't be administrative action on the site, yes.

F1kdulb4                          Der-Yeghiayan - cross

1    Q.  That was because you wanted it to be done in a way that

2    nobody could notice, right, if possible?

3    A.  I would think, yes.

4              THE COURT:  Mr. Dratel, we are going to take a

5    mid-afternoon break.  Is this an OK time for you to stop?

6              MR. DRATEL:  This is fine.

7              THE COURT:  Ladies and gentlemen, let's take our

8    mid-afternoon break.  And I want to remind you not to talk to

9    each other or anybody else about this case.

10             Thank you very much.

11             THE CLERK:  All rise as the jury exits.

12             (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (Jury not present)

2              THE COURT:  You can step down because you are on break

3       as well.

4              (Witness not present)

5              THE COURT:  All right.  Let's all be seated and see

6       what we've got.

7              In terms of the line of questioning relating to

8       expertise, I think I had been clear that what the witness

9       learned about in terms of expertise that was unconfirmed is

10      what he learned unconfirmed.  It won't be usable testimony for

11      the purposes of saying X was a computer expert, but there will

12      be ways of wording it that there was indications attached to

13      his name.  You will have to be very careful how that is used

14      because it is not in for the truth.

15             Is there anything that you folks would like to raise

16      right now?

17             MR. TURNER:  Can I just make a record on that, your

18      Honor?

19             THE COURT:  Yes.

20             MR. TURNER:  Because those statements aren't relevant

21      for anything unless they are being offered for the truth.  And

22      the government objects to what Scott, the agent, read on

23      LinkedIn coming in for the truth.  Anybody can create a

24      LinkedIn page.  Anybody can say anything they want about

25      themselves on a LinkedIn page.  That is why there are rules of

1    hearsay that exist.

2              So the fact that he read it as plaintiff's word, it

3    doesn't gift it any more legitimacy or doesn't make it any more

4    admissible.  And I just am afraid that -- I recognize your

5    Honor wants to give a limiting instruction, but there is really

6    no other relevance for it coming in except for the truth of it.

7    So that is what the government has concerns about.

8              THE COURT:  I understand the government's concern.  My

9    ruling stands.  I think I have given them an instruction each

10   time that this has occurred.  The jury I think seems to nod

11   knowingly.  They understand the difference.

12             And, look, there are ways in which I think the

13   limiting instructions are effective.  You folks will have to be

14   very cognizant of those limiting instructions when you decide

15   how to use the information in your closing.

16             But your objection, Mr. Turner, is noted.  The Court

17   is trying, with many of the now very active evidentiary

18   objections, to draw appropriate lines.  The lines are sometimes

19   lines where the question is not perfect but it is not so

20   imperfect as to create a terrific issue if allowable, and that

21   has been true on the government's direct examination as well.

22   So I'm hopeful that people will after this witness get

23   themselves into a routine where we just let each other do our

24   thing.

25             But we'll take it as it comes.  I mean, the

F1kdulb4                         Der-Yeghiayan - cross

1    objections, generally speaking, they have been appropriate and

2    so they require rulings.

3              (Continued on next page)

1              THE COURT:  Did you have anything to do before we take

2     a break?

3              MR. DRATEL:  Yes.  On the complaint, just one sentence

4     from the complaint about these figures, talking about Silk

5     Road, these figures are equivalent to roughly 1.2 billion in

6     revenue and 79.8 million in commissions at current bitcoin

7     exchange rates.  And this is from the complaint and it's from

8     paragraph -- but it's an admission by a party opponent under

9     801.2(a), (b), (c) or (d).  It fits all of them.  It only has

10    to fit one.

11             THE COURT:  That is an interesting argument because

12    you would never allow a whole variety of statements to be put

13    in from a complaint with any evidentiary basis that were

14    against the defendant.  Typically, statements in complaints

15    have no -- they have zero evidentiary value apart from what

16    comes in by virtue of the trial.  So I hear your point.  I

17    think that if you want to make a point about what kind of

18    business was conducted on Silk Road --

19             MR. DRATEL:  No.  It's the numbers that the government

20    said -- the government is going to take a dramatically

21    different position at this trial.

22             THE COURT:  It doesn't matter.

23             MR. DRATEL:  But it does because it's an admission by

24    them of a certain number and now they're going to do a much

25    lower number; and the only reason they're doing a much lower

1    number is because they want that number to mysteriously all of

2    a sudden match what's in Mr. Ulbricht's computer as opposed to

3    a number four or five times that.

4            THE COURT:  Mr. Turner, why don't you address it?

5            MR. TURNER:  I can address that.  First of all, the

6    complaint explained that the figures given were based on the

7    present value of those bitcoins at the time of the complaint.

8    At the time, we weren't able to convert the bitcoins so that

9    they matched the value of the bitcoins at the time of each sale

10   in question, so the value of bitcoins is fluctuating.  So, you

11   could have had ten bitcoins received by the site in 2012 that

12   were worth a lot less than they would be when they were

13   received for sale in 2013.

14           The complaint which is based on the total number of

15   bitcoins that flowed to the site were converted to the value,

16   the exchange rate of bitcoins at the time that the complaint

17   was sworn because of our limitations that we had.  The reason

18   the figures were changed when we introduced the aggregate sales

19   and aggregate profits from the site later on is because now we

20   have a chance to go through the transaction of data more

21   carefully.

22           Each transaction in the database records the number of

23   bitcoins received and the value of those bitcoins at the time

24   of each sale.  That's what the data reflect.

25           THE COURT:  Why don't you address --

F1kgulb5                          Der-Yeghiayan – cross

1          MR. DRATEL:  That's not a true value.

2          THE COURT:  Hold on.  Why don't you address the

3     evidentiary issue as to whether or not this could be an

4     admission of a party opponent?

5          MR. TURNER:  It's not a statement against itself and

6     it's not a statement of this witness, so all it is is a

7     statement of a particular agent based on what he knew at the

8     time.

9          MR. DRATEL:  That's exactly what the rule requires.

10    It doesn't require being against interest.  The rule requires

11    for (a) the party's own statement in either an individual or

12    representative capacity; or (b) a statement of which the party

13    has manifested an adoption or belief in its truth -- this is

14    sworn under oath September 27, 2013 for the purpose of

15    obtaining an arrest warrant against Mr. Ulbricht; (c) a

16    statement by a person authorized by the party to make a

17    statement concerning the subject; or (d), the statement by the

18    party's agent or servant concerning a matter within the scope

19    of the agency or employment made during the existence of the

20    relationship.  It qualifies under any of those.

21         MR. TURNER:  None of these statements were made by

22    this witness or any agent of this witness or this agent did not

23    swear out the complaint, so it's not an admission by this

24    witness.

25         MR. DRATEL:  And I'm not asking that of this witness.

F1kgulb5                          Der-Yeghiayan - cross

1      I'm moving it independently --

2                  THE COURT:  You can't get it in through this witness

3      every possible statement made by the government as an admission

4      by a party opponent.

5                  MR. DRATEL:  By itself, it's admissible.  In other

6      words, by itself; it doesn't need a witness.

7                  THE COURT:  If it doesn't need a witness and it can be

8      by itself admissible, I need some cases on that or a case or

9      two, because in terms of the way this is -- we don't need it

10     right now, right, because it can come in at any point in time.

11                 MR. DRATEL:  An admission is an admission.

12                 THE COURT:  You're using the complaint in a very

13     unique way in terms of getting in an admission through a

14     complaint.  It's not typical; it's not typically the way

15     complaints are used as you know, even when evidence is coming

16     in contrary.

17                 I will look at it, however.  I have not looked that

18     question before and given that it's not necessary to get it in

19     through this witness, there's no urgency to doing it right now.

20                 MR. DRATEL:  I'll call Judge Maas if I have to,

21     Magistrate Judge Maas.  He signed the complaint.  He read it.

22     They came to him as the United States government.  They're

23     going to resist this, okay.

24                 THE COURT:  You know --

25                 MR. DRATEL:  We'll call the judge.

F1kgulb5                          Der-Yeghiayan - cross

1              THE COURT:  Whether or not any testimony on this would

2      be relevant from a judge or from anyone I think is part of the

3      question that I want to explore.  So I need to investigate

4      whether or not what you're suggesting is an admission, which is

5      a statement in a complaint at the outset of a case when many

6      things changed.  It may be, Mr. Dratel.

7              MR. DRATEL:  It's under oath.

8              THE COURT:  I'm not suggesting it's not under oath.

9      That's the best information at the time.

10             MR. DRATEL:  But --

11             THE COURT:  Hold on.  I'm not suggesting you can't

12     have it.  What I'm suggesting is, if it doesn't have to come in

13     through this witness, I need to look at it because I've never

14     had an attorney try to use a statement from a complaint as

15     evidence in a criminal proceeding because you certainly never

16     want any of the evidence obviously against the defendant to

17     come in.

18             MR. DRATEL:  But that's not the point.

19             THE COURT:  Even if there was evidence from a

20     coconspirator, that there's a coconspirator statement recited

21     in the complaint, you'd never want that in.

22             MR. DRATEL:  That doesn't matter because if I was

23     impeaching with grand jury testimony, I wouldn't put in the

24     whole grand jury.  I'd put in the part that impeaches the guy.

25     That's neither here nor there.  And the fact that --

1            THE COURT:  Look, I need to look at this is what I'm

2     suggesting.

3            MR. DRATEL:  I'm also saying to you, the fact that a

4     party changes its mind during the course of a litigation does

5     not vitiate the fact that at one point it took that position

6     under oath as a fact and that's an admission.

7            THE COURT:  You know, you may be right.  And it may be

8     right in the sense other than for this particular witness or it

9     may be right for another witness.  I need to look at it.

10     That's what I'm suggesting.

11            Is there anything else on this topic?

12            MR. DRATEL:  No, your Honor.

13            THE COURT:  I would take from anybody who would like

14     to put in a letter any cases that they have supporting that

15     position.  Since it doesn't have to come in through this

16     witness, it can come in tomorrow morning.

17            Anything else we need to deal with before we take a

18     break?

19            MR. TURNER:  Not from the government.

20            MR. DRATEL:  No, your Honor.

21            THE COURT:  Thank you.  We'll take a short break and

22     then come on back and stay until.

23            (Recess)

24            (In open court; jury not present)

25            THE COURT:  Let's bring out the jury.

F1kgulb5                         Der-Yeghiayan - cross

```
 1              (Jury present)

 2              Mr. Dratel, you may proceed, sir.

 3              MR. DRATEL:  Thank you.

 4    BY MR. DRATEL:

 5    Q.  Based on your investigation, going back to Mr. Karpeles for

 6    a second, based on your investigation, what you were able to

 7    verify from your subpoenas, that silkroadmarket.org was being

 8    run off a web hosting company owned by Mr. Karpeles?

 9    A.  Yes.

10    Q.  Thank you.  Now, I want to go back to July 22, 2013.  And

11    we talked about FBI access to the servers.  Now, you knew that

12    the imaging of the server, the Silk Road server was going to be

13    done in the country where the servers were located, right?

14              MR. TURNER:  Objection; foundation.

15              THE COURT:  Why don't you establish what kind of

16    knowledge he has about that and then you can take it step by

17    step.

18    Q.  Well, the FBI had the IP address for the Silk Road server,

19    correct?

20              MR. TURNER:  Objection; foundation.

21              THE COURT:  Sustained.

22    Q.  Have you seen documents from the FBI with respect to its

23    knowledge either before --

24              MR. TURNER:  Objection.

25    Q.  -- either before or since with respect to --
```

1            THE COURT:  I'll allow this.

2            MR. TURNER:  Objection; hearsay.

3   A.  I haven't seen documentation of an IP that I was told about

4   it.

5            THE COURT:  You did not see documentation about an IP

6   address?

7            THE WITNESS:  Of?

8            THE COURT:  A server that allegedly had the Silk Road

9   site resident on it?

10           THE WITNESS:  Not that I recall, but I know they had

11  an IP address.

12           THE COURT:  Okay.  All right.

13  Q.  Now, at the time in July of 2013, when you told the FBI a

14  good time to take down the servers, what did you mean by "take

15  down"?

16  A.  I know that they were -- they were going to do an image of

17  it so they would have to take it offline.  I was guessing

18  they'd have to take it offline to image it.

19  Q.  You didn't mean take down as in stop the servers from

20  continuing to be used to sell drugs around the world?

21  A.  No.  I believe they were taking it down to image them to

22  take a capture of it.

23  Q.  But not to stop the site?

24  A.  Not to stop it, no.

25  Q.  In fact the site went on for the rest of July, August and

F1kgulb5                         Der-Yeghiayan – cross

1    September, right?

2    A.  It did.

3    Q.  All the while, the FBI had the image of the servers and the

4    IP address for the servers, right?

5    A.  They did.

6    Q.  So there was a lot of pressure to get to the point to get

7    to the point to take down the site entirely, wasn't there?

8    A.  There was -- there was pressure from our management and

9    from, yeah, from basically our management and from the people

10   that are working with the U.S. Attorney's Office; yes.

11   Q.  And nobody was comfortable with the FBI having all this

12   information and this website selling drugs all over the world

13   continuing to operate, right?

14          MR. TURNER:  Objection; form.

15          THE COURT:  Sustained.

16          You can ask him a little bit differently as opposed to

17   everybody, your comfort level for everybody.

18   Q.  Were you comfortable with having all this information and

19   the site continuing to run unimpeded?

20   A.  It's not a call for me to make.  It's something that it's

21   for the U.S. Attorney's Office to make.

22   Q.  I'm not talking about the call.  I'm talking about your

23   comfort level with continuing to let the site operate.

24          MR. TURNER:  Objection; relevance.

25          THE COURT:  Sustained on those grounds.

F1kgulb5                          Der-Yeghiayan - cross

1   Q.  Wasn't there a discussion among agencies about that, about
2   the need to do something about the site?  You just said
3   management was not comfortable with it.  What was that?  And
4   this is not hearsay this is just for the fact that it was said.
5              MR. TURNER:  Objection.
6              MR. DRATEL:  This is not the investigation.
7              THE COURT:  We have now --
8              MR. TURNER:  Form and relevance.
9              THE COURT:  We're going to change the question.  You
10  have a couple different questions embedded in there because you
11  started off on one tact and then went to a different one.
12  Restate the question.
13             MR. DRATEL:  Okay.
14  Q.  You said before in your answer that management had an
15  issue -- there was pressure from management about letting the
16  site continue to run.  What was that pressure?  How did it
17  manifest itself?
18             MR. TURNER:  Objection; relevance.
19             THE COURT:  I'll allow that.
20  A.  There was obviously a concern it wasn't necessarily a
21  pressure, there was concern over -- there's pressure about
22  wanting to shut down the site and do it properly, I mean, we
23  want to do it and take down the site properly.
24  Q.  What does that mean, "properly"?
25  A.  Well, just by turning off a server doesn't completely shut

F1kgulb5                        Der-Yeghiayan - cross

1   down the site.  If -- especially with like a Tor site, you
2   would have to have ownership of it.  You would have to have a
3   key over it.  If you don't have full control over it, someone
4   can just pop it back up again on another server somewhere else.
5   And if you don't arrest the person that's running it, then --
6   there, too, they can just reopen the site again and you let on
7   your hand, you let on your investigation and you didn't really
8   solve anything then at that point.
9   Q.  In fact, Silk Road 2.0 was up and running by early November
10  of 2013, right?
11  A.  Silk Road -- there was a Silk Road 2.0; yes.
12  Q.  And virtually identical service as Silk Road that was
13  operated on those other servers, right?
14  A.  It was very similar to Silk Road 1, yes.
15  Q.  Now, with respect to closing the site down, there was
16  discussion among law enforcement about doing it as early as
17  May or June, right?
18  A.  If there's a document you're referring to to help me
19  recollect.
20  Q.  Sure.  It's marked as 3505-3004.  I'd ask you to read the
21  highlighted parts.  You can read the rest of it if you want,
22  but let me know when you're finished.
23  A.  Okay.
24  Q.  So, you had been told at one point that the FBI said it
25  would take the site down in May or June of 2013, right?

F1kgulb5                          Der-Yeghiayan - cross

1   A.  That was a rumor that I heard from another HSI office.

2   Q.  And you yourself on the 23rd, the very day that the sites

3   were imaged, you said that they were -- you were getting close

4   to taking the website and all the operators down, right?

5   A.  We were making progress at that point, yes.

6   Q.  Getting close?

7   A.  Getting close.

8   Q.  Now, when Silk Road 2.0 obviously was back up in early

9   November, that was after Mr. Ulbricht's arrest, right?

10  A.  It was.

11  Q.  Now, as we've discussed, this investigation was being

12  pursued by a number of different agencies in a number of

13  different locations in the U.S., right?

14  A.  It was.

15  Q.  And internationally, too, right?

16  A.  Yes.

17  Q.  And is it fair to say that there was some competition among

18  agencies with respect to this investigation?

19          MR. TURNER:  Objection; relevance.

20          THE COURT:  Sustained.

21  Q.  Weren't different agencies -- withdrawn.

22          HSI was pursuing it in Chicago, right?

23  A.  Yes, we were suing Silk Road in Chicago.

24  Q.  And also HSI Baltimore was pursuing it, right?

25  A.  There was also an investigation of Silk Road within HSI

F1kgulb5                         Der-Yeghiayan - cross

1    Baltimore.

2    Q.  And the Secret Service was involved in that, right?

3    A.  There was a task force, yes.

4    Q.  And HSI Baltimore and HSI Chicago didn't always see eye to

5    eye, correct?

6              MR. TURNER:  Same objection.

7              THE COURT:  Overruled.

8    A.  Can -- there was differences, but I mean, it was both going

9    after similar targets at the same time.

10   Q.  Right.  But there were differences in how to do it and

11   differences on who would get credit for it, right?

12   A.  Well, there was differences on the work that we were

13   putting in and how we were going after the targets.  There's a

14   different method for investigating -- they had different

15   methods than what we did.

16   Q.  And Chicago, and you in particular, were concerned that by

17   giving out information to other locations, whether it's HSI or

18   task force or others, would be compromising that information

19   because it might be used in a way that would impair the

20   confidentiality of the investigation?

21   A.  There were concerns over how information would be

22   disseminated if it was disseminated properly or if it or if it

23   would be shared in ways that was outside of our knowledge.

24   Q.  In fact, Chicago and Baltimore even had a meeting to try to

25   resolve differences, correct?

F1kgulb5                          Der-Yeghiayan - cross

```
 1              MR. TURNER:  Objection; relevance.

 2              THE COURT:  Sustained.

 3   Q.  Well, the differences in how to proceed between Chicago and

 4   Baltimore were so dramatic that there had to be a meeting,

 5   right, to try to resolve it?

 6              MR. TURNER:  Objection; relevance.

 7              THE COURT:  Sustained.

 8   Q.  There was a meeting between Chicago and Baltimore about the

 9   direction of the investigation and splitting responsibility

10   responsibilities, right?

11   A.  Can you be more specific on a time frame?

12   Q.  Sure.  February 2012, February 1, 2012?

13   A.  That was -- the initial meeting that we had I believe with

14   or around about the time -- February, you said 2012?

15   Q.  Yes, uh-huh.

16   A.  I believe that might have been a coordination meeting among

17   multiple agencies.

18   Q.  And Baltimore said at that meeting that it was shutting

19   down Silk Road soon, right?

20              MR. TURNER:  Objection; relevance and hearsay.

21              MR. DRATEL:  Goes to the investigation.

22              THE COURT:  Hold on.  Let me think about it.  I'll

23   allow a few more of these.  I think I know where you're going

24   and it's not offered for the truth, so I'll allow it.

25              MR. DRATEL:  Right.
```

1          THE COURT:  You may proceed.

2   Q.  So Baltimore said in February of 2012 that it was going to

3   shut down Silk Road soon?

4   A.  They -- I believe they said something similar, that they

5   believed they could shut it down quickly.

6   Q.  There was concern about Baltimore taking the information

7   that you had gathered in Chicago and then issuing subpoenas for

8   the same targets, right?

9          THE COURT:  Why don't you -- just so we're clear and

10  the record is clear, just ask him about his concerns as opposed

11  to generalized concerns.

12          MR. DRATEL:  Sure.

13  Q.  One of your concerns was that your work product, in

14  essence, that you had input into law enforcement computers was

15  then being taken by other offices and they were issuing

16  subpoenas and potentially compromising the investigation,

17  right?

18  A.  There's a proper procedure on how to disseminate

19  information between law enforcement agencies, and one of the

20  concerns if it isn't done through that proper procedure that it

21  could then lead to duplication of efforts and other agencies

22  pursuing other aspects outside of the investigation.

23  Q.  And that was going on through 2012, correct?

24  A.  There were concerns from time to time about things of that

25  nature, yes.

F1kgulb5                          Der-Yeghiayan - cross

Q.  And another source of difference of opinion was whether or

not Baltimore should meet with Mr. Karpeles' lawyers or meet

with him?

          MR. TURNER:  Objection.

          THE COURT:  Sustained.

Q.  You were frustrated a fair amount of the time by these

problems, right?

          MR. TURNER:  Objection; relevance.

          THE COURT:  Sustained.

Q.  Now, you were also worried that the New York office, the

law enforcement in New York would somehow tip off the

investigation of Silk Road, right?

A.  Is there a particular time frame?

Q.  Yes.  August of 2012?

A.  There was multiple -- a lot of things were going on with

multiple agencies, there was a long period of time, and in

between that at different points in time, different

representatives from multiple agencies would contact me and

contact us in a variety of ways and it wouldn't always come

from just one source within the agency.  It would come from

other people from different locations.

          So there was always concerns based upon what those

particular agencies are doing when they're getting involved how

far along their investigation is in compared to ours.  So there

was time periods along the way that we would have -- we would

F1kgulb5                          Der-Yeghiayan – cross

1    be concerned obviously about where an agency, if they were

2    contacting us, where that would lead.

3    Q.   So to get back to my question, you were concerned about New

4    York in particular, correct?

5              MR. TURNER:  Objection.

6              THE COURT:  What was the objection?

7              MR. TURNER:  Relevance.

8              THE COURT:  I think I know where it's going, so I'll

9    allow a few more of these, but why don't you get to where it's

10   going so I'm not thinking the wrong thing.

11             MR. DRATEL:  I'm trying.

12             THE COURT:  Okay.  Try to pull it in quickly;

13   otherwise, I'll think that I've gotten your direction wrong.

14   A.   Is this the New York OCDETF group you're talking about or

15   just --

16   Q.   Intel reports coming from New York -- intel reports from

17   New York, right?  There were intel reports issued by New York?

18             MR. TURNER:  Objection; form, vagueness.

19             THE COURT:  I'll allow that.

20             You may answer.

21   A.   There was -- that had to do with a particular intel group

22   that was based in the northern part of New York that was -- the

23   seizures that we were taking in in O'Hare, they were trying to

24   do deliveries and trying to do actions on those particular

25   packages that were interfering with our investigation on the

F1kgulb5                         Der-Yeghiayan - cross

1  vendors as we were pursuing the vendors with those seizures.

2  Q.  The problem was that an agent in New York was including

3  your seizures on their intel report, correct?

4  A.  They were including seizures that we were holding already

5  for our investigation in a product that was used to disseminate

6  seizures out to be used by other agencies.

7  Q.  And you thought that putting -- and doing that, you thought

8  could potentially jeopardize over a year's worth of

9  investigation evidence, right?

10  A.  By -- yes, by taking those seizures and put them out there

11  falsely to other agencies to use them in different ways without

12  letting me know about our investigation, yes, they can

13  jeopardize it.

14  Q.  Fast-forwarding to September of 2013, you were also

15  concerned that Chicago HSI, once the focus was on Mr. Ulbricht,

16  Chicago HSI might not get any place at the table with respect

17  to this investigation, right, in terms of credit?

18  A.  If there's a particular email that you can help me

19  recollect my memory.

20  Q.  Sure, 319.  3505-319.

21  A.  Thank you.

22            THE COURT:  So what's the question?

23            MR. DRATEL:  I didn't know if he was finished reading

24  it already.

25  A.  Okay.

F1kgulb5                         Der-Yeghiayan - cross

1    Q.  September 20, 2013, you were concerned that the Southern

2    District of New York would prosecute people allegedly involved

3    in Silk Road without anyone else being involved in the

4    prosecution, right?

5    A.  Well, this was in reference to a meeting between Baltimore

6    and Chicago at the time where it was going to be occurring

7    where -- trying to make -- trying to basically include them in

8    with the arrest with Ulbricht to share the information that we

9    had from the New York case and find ways to bridge differences

10   with your investigation.  So this was something that was being

11   discussed between a manager and I about just some of the

12   different ways that we could approach that and how it could be

13   perceived after the take-down.

14   Q.  Wasn't one of your concerns --

15               THE COURT:  Mr. Dratel, are you close to the line of

16   questioning or should I get a proffer on relevance, because I

17   don't think I was correct.

18               MR. DRATEL:  I'm close to the end.  That's fine.

19               THE COURT:  A question or two?

20               MR. DRATEL:  Why don't you come over to the side bar

21   and let me know the relevance and see if I'm on the same page.

22               (Continued on next page)

23

24

25

F1kgulb5                          Der-Yeghiayan - cross

1              (At the side bar)

2              THE COURT:  I just wanted to get a sense of the

3     relevance.  I have in my mind where I think you could be going,

4     but I also think I may be wrong.  Otherwise, I don't see how

5     it's relevant.

6              MR. DRATEL:  It's about the progress of the

7     investigation and the fact that at a certain critical point,

8     once Mr. Ulbricht was on the radar of the Southern District of

9     New York, that everyone else had to fall in line or else they

10    would not be permitted to participate, and that ultimately --

11    and this is all in the 3500 -- he says to his supervisor or his

12    whoever he is talking to, he says and these -- he's talking

13    about Baltimore -- he said basically unless people do it the

14    way the Southern District wants, that they can whine all they

15    want, but it won't stop SDNY from prosecuting all of them

16    without any of us.

17             THE COURT:  My ruling is that's irrelevant.  I had a

18    different version.   That's not where I thought you were going.

19             MR. DRATEL:  It is relevant.

20             THE COURT:  It's not relevant.  It's not relevant.

21             MR. DRATEL:  Once Mr. Ulbricht came on the radar,

22    everything else was shunt to the side because the Southern

23    District was going to get its way and these people had to --

24             THE COURT:  My ruling is that's not relevant.  I had a

25    different version or view.

F1kgulb5                          Der-Yeghiayan - cross

1              MR. DRATEL:  Which is?

2              THE COURT:  I'm not going to give you your

3    relevance --

4              MR. DRATEL:  Conspiracy theories?

5              THE COURT:  It was about ten questions ago, I thought

6    you were going someplace else, so I allowed this but that's not

7    relevant.

8              MR. TURNER:  There's also a reference to Mark Karpeles

9    to the document shown to him and I'm worried about defense

10   counsel asking questions about how Mark Karpeles was stalling

11   the investigation, how they were going to Mark Karpeles again.

12             THE COURT:  We're going to leave this line of

13   questioning.  Thank you.

14             MR. DRATEL:  You said "this line of questioning."  I

15   also was going to ask him because subsequently to all of this

16   at the end of the September, he is invited by the Southern

17   District to participate in the arrest of Mr. Ulbricht, it's

18   basically like a largess by the Southern District and he

19   recognizes that a hundred percent.

20             THE COURT:  Also irrelevant.

21             MR. DRATEL:  I think it is.

22             (Continued on next page)

23

24

25

F1kgulb5                    Der-Yeghiayan - cross

1                     (In open court; jury present)

2      BY MR. DRATEL:

3      Q.  Now, with regard to competition -- withdrawn.

4                With regard to agencies and the arrest of

5      Mr. Ulbricht, afterwards wasn't HSI Chicago concerned about

6      having the HSI banner be on the seizure at some point?

7                MR. TURNER:  Objection; form and relevance.

8                THE COURT:  Sustained.

9      Q.  Now, you spent thousands of hours on Silk Road you said,

10     right?

11     A.  I did.

12     Q.  As a supposed buyer, right:  In other words, utilizing

13     buyer accounts, utilizing seller accounts?

14     A.  I did.

15     Q.  As an administrator?

16     A.  I did.

17     Q.  And the first time you heard Ross Ulbricht's name was

18     either September 10 or September 11 of 2013, right?

19     A.  Around that time frame.

20     Q.  You had been investigating the site for two years, right?

21     A.  Yes.

22     Q.  And many of these accounts that you took over were from

23     back of 2012, right, or the ones that you even started, many of

24     them go back to 2012, right?

25     A.  Some of them do, but I mean, if there were accounts taken

F1kgulb5                          Der-Yeghiayan - cross

1    over regularly, even in 2013.

2    Q.  Now, there were other federal agencies investigating as we

3    talked about, right?

4    A.  There were other agencies investigating; yes.

5    Q.  And in the manner we discussed, they shared their work

6    product with you, right?

7    A.  A lot of them did; yes.

8    Q.  And do you know about state and local enforcement?  Do you

9    know how many accounts they had running on Silk Road?

10   A.  I have no way of knowing.

11   Q.  Do you know how many other federal agencies, how many

12   accounts they were running on Silk Road?

13   A.  We had a method to try and deconflict that through a

14   headquarters component.

15   Q.  What was the total amount of accounts that the federal law

16   enforcement community was running on Silk Road, U.S. federal?

17   A.  I don't know the total number, but we could submit a name

18   and just see if it -- if anyone else was either looking at it

19   or was aware of.

20   Q.  So you don't know how many?

21   A.  I don't know how many; no.

22   Q.  And how about by foreign law enforcement, other countries

23   that could have been looking into Silk Road?  Do you know how

24   many accounts they were running?

25   A.  I do not know.

F1kgulb5                           Der-Yeghiayan – cross

1    Q.  You used other facets of your investigation, too, right,

2    right?

3              MR. TURNER:  Objection; form.

4    Q.  In pursuit of your investigation you used a lot of

5    materials, right, a lot of methods, right?

6              THE COURT:  Why don't you restate that.  You have

7    methods, materials, facets.

8    Q.  You had a lot of methods in your investigation, right?

9    A.  Used as many investigative methods as possible.

10   Q.  And as many sources as possible, right?

11   A.  As many sources as we could; yes.

12   Q.  So that's subpoenas and search warrants, right?

13   A.  We used subpoenas and search warrants, yes.

14   Q.  Confidential informants?

15   A.  And confidential informants.

16   Q.  What's a Tecs, T-E-C-S?  What's a TECS?

17   A.  It's the name of the program, not the program, the system

18   that Customs and Immigration uses for their databases.

19   Q.  Did you use that as well?

20   A.  Yes, I did.

21   Q.  And you also had help from people who had expertise in

22   computers and bitcoins and Tor help you as well, right?

23   A.  We had confidential informants and other people that we

24   would talk to from time to time.

25   Q.  And when you gained access to these accounts, one of the

F1kgulb5                          Der-Yeghiayan - cross

1   purposes was to try to find the identity of DPR, right?

2   A.   If possible, yeah; that was one of the main priorities.

3   Q.   And you had substantial contact with DPR, right?

4   A.   After acquiring the cirrus account, yes.

5   Q.   But you also had a chance to look at all of his forum posts

6   and everything else that was available on the site, right?

7            MR. TURNER:   Objection to form; "everything else

8   available on the site."

9            THE COURT:   Hold on.

10           You can restate.

11  Q.   Forum posts, you had access to that, correct?

12  A.   To the ones that were available to my account, yes.

13  Q.   And also once you got on the site in 2012, you had access

14  to the forums, right?

15  A.   Yes, but there was a limited access depending upon your

16  user role as to how much you could see under that user role.

17  Q.   Okay.  And then did you increase that user role over time?

18  A.   I did.

19  Q.   And finally you were administrator, right?

20  A.   That's correct.

21  Q.   During all of that time until September 10, Mr. Ulbricht

22  never appeared on your radar?

23  A.   He did not.

24  Q.   Until a digital trail presented him to you on a silver

25  platter, right?

F1kgulb5                         Der-Yeghiayan – cross

1   A.   Until Special Agent Gary Alford brought it to my attention,

2   Mr. Ulbricht was not part of my investigation.

3   Q.   And this is late September 2013, right, after –– five

4   months after Mark Karpeles is put on notice of a federal

5   investigation based on a seizure of his accounts at Dwolla,

6   right?

7             MR. TURNER:  Objection to the "late September."  It

8   misstates prior testimony.

9             THE COURT:  It has a couple of objections.

10            Why don't you restate.  Let's not put argument in

11   there.

12   Q.   Mr. Karpeles was on notice of a federal investigation as a

13   result of the May 2013 seizure of his accounts as we discussed

14   on Thursday, right?

15   A.   Yes, for the money seizure, yes.

16   Q.   And Ross Ulbricht comes on your radar three and-a-half

17   months later, right, maybe four months?

18   A.   In September of 2013.

19   Q.   May, June, July, August.

20            Nothing further.  Thank you?

21            THE COURT:  All right.  Thank you.

22            Mr. Turner.

23            MR. TURNER:  Thank you, your Honor.

24   REDIRECT EXAMINATION

25   BY MR. TURNER:

F1kgulb5                    Der-Yeghiayan - redirect

1    Q.  Good afternoon, Special Agent Der-Yeghiayan.

2    A.  Good afternoon.

3    Q.  Good to talk to you again.  On cross, you were asked about

4    the difficulty of figuring out who was on the other side of the

5    screen when you were talking to DPR, Dread Pirate Roberts?

6    A.  Yes, I was.

7    Q.  And am I right that every conversation you had with him was

8    on Tor?

9    A.  Every conversation I had with him was on Tor, yes.

10   Q.  And he was security conscious, right?

11   A.  He was security conscious, yes.

12   Q.  Did he reveal many personal details about himself in the

13   conversations he had with you?

14   A.  No.  Nothing personal.

15   Q.  So it was hard for you to figure out who DPR was just from

16   your own line of communications with him, is that right?

17   A.  It was difficult to try to identify who the real person

18   was, yes.

19   Q.  So what was the whole purpose of arranging the arrest the

20   way that you did it?

21           MR. DRATEL:  Objection.

22           THE COURT:  Sustained.

23   Q.  You testified on direct that you would be -- the plan for

24   the arrest was what?

25   A.  The plan for the arrest was to try to get Mr. Ulbricht in a

F1kgulb5                          Der-Yeghiayan - redirect

1   public setting and then to initiate a chat with Dread Pirate

2   Roberts for the purposes of seeing if --

3              MR. DRATEL:  Objection.

4              THE COURT:  I will allow it.

5              You may continue.

6              THE WITNESS:  For the purposes of seeing if the chat

7   would match between the person we were arresting and Dread

8   Pirate Roberts.

9   Q.  To see who was on the other side of the screen that day?

10             MR. DRATEL:  Objection.

11             THE COURT:  I'll allow it.

12             You may answer.

13  A.  Yes.

14  Q.  And when you saw the defendant go into the library that

15  day, you were monitoring DPR online, right?

16  A.  Yes, I was.

17  Q.  And when he walked in was DPR online or offline?

18  A.  When he walked in, he was offline.

19  Q.  And after he went in, what happened to DPR's online status?

20  A.  He went online.

21             MR. DRATEL:  Objection as to form.

22             THE COURT:  Overruled.

23  Q.  Did you start chatting with DPR after he went online?

24             MR. DRATEL:  Objection to form.

25             THE COURT:  I'll allow it.

F1kgulb5                          Der-Yeghiayan - redirect

1    A.  Yes, I did.

2    Q.  And what happened to the chat once the defendant was

3    arrested?

4            MR. DRATEL:  I'm going to object based on the chat

5    because it's unclear what kind of chat.  This whole thing about

6    online is a specific medium that they were communicating

7    through, not anything precise.

8            THE COURT:  Ladies and gentlemen, the chat that's been

9    referred to so far has not been oral communications, it's been

10   the written chat.

11           MR. DRATEL:  That's not what I mean.

12           THE COURT:  I'm going to -- why don't you, Mr. Turner,

13   why don't you back up and talk about the type of chat and I

14   will allow it.

15           MR. TURNER:  Sure.  The jury heard about this chat

16   before.

17           Can we put up Government Exhibit 129C back on the

18   screen.  Zoom in on the text please up at the top.  Could you

19   zoom in on the text, Mr. Evert.  There you go.

20   Q.  Now do you know what chat I'm talking about?

21           MR. DRATEL:  That's not the issue.  The issue is the

22   medium.

23           THE COURT:  I will allow it.

24           MR. DRATEL:  It's not --

25           THE COURT:  I'll allow it.  We've been through this on

1    direct.  It's more of the same.

2              You may proceed, Mr. Turner.

3              MR. TURNER:  Mr. Evert, can you please zoom in to the

4    right side of the screen.  Zoom in fully.  Perfect.  Thanks.

5    Q.  Okay.  So do you remember this chat, Agent Der-Yeghiayan?

6              THE COURT:  This is GX 129C?

7              MR. TURNER:  Yes.

8    A.  Yes, I do.

9    Q.  What happened in the chat after the defendant was arrested?

10   A.  There was no response from dread.

11   Q.  And when you went up to the library to look at the

12   defendant's computer, what did you see on the screen?

13   A.  I saw an identical chat that I just had with Dread Pirate

14   Roberts.

15   Q.  Who was on the other side of the screen that day?

16   A.  Ross Ulbricht.

17   Q.  Now, let's take a look at this chat -- by the time you had

18   this chat, you had been working for DPR for how long?

19   A.  Since late July 2013.

20   Q.  Over two months, right?

21   A.  Yes.

22   Q.  You had had numerous chats with him up to this point

23   before, right?

24   A.  I had.

25   Q.  Could just anybody strike up a chat with DPR on this

F1kgulb5                          Der-Yeghiayan - redirect

1   system?

2   A.   No, they could not.

3   Q.   What did you have to have?

4   A.   You had to have log-in credentials that are provided by

5   Dread Pirate Roberts.

6   Q.   And how did he provide those to you?

7   A.   It was provided to the original operator through a private

8   message.

9   Q.   And it was a private message on the Silk Road forum, right?

10  A.   Yes, it was.

11  Q.   And would DPR ever contact you on the Silk Road forum?

12  A.   He would send private messages to me, yes.

13  Q.   Would he sometimes tell you to get on chat?

14  A.   Yes, he would.

15  Q.   And then after he told you that on the Silk Road forum,

16  what would happen on the chat window?

17  A.   Then he would initiate a chat with me on the staff chat.

18              (Continued on next page)

19

20

21

22

23

24

25

F1kdulb6                          Der-Yeghiayan - redirect

1    Q.  So the connection between the DPR on the Silk Road and the

2    DPR on the chat was seamless, is that right?

3              MR. DRATEL:  Objection.

4              THE COURT:  Sustained.

5              Why don't you rephrase that.

6              MR. TURNER:  Sure.

7    Q.  What credentials did you have to have to log into your chat

8    account in the staff chat system?

9    A.  I had to have a unique username, which wasn't really a

10   username.  It was a string of characters and numbers, and a

11   password.  Again, that was provided to me.

12   Q.  So what did DPR have to have in order to log into his side

13   of the chat?

14             MR. DRATEL:  Objection.

15   Q.  What did any user of this sort of system have to have in

16   order to log into the chat?

17   A.  They had to have a username and a password, I'm assuming.

18   Q.  Was there ever a time when you were chatting with DPR where

19   someone seemed to take over your account and start sending

20   messages to DPR that you had no control over?

21   A.  Can you repeat that.

22   Q.  Was there ever a time when you were chatting with DPR and

23   someone seemed to take over your account and send messages to

24   DPR that you had no control over?

25   A.  No.

1    Q.  It never happened.

2            So on the date of the defendant's arrest, when you

3    started up this chat with DPR -- if you go back to the chat,

4    please.  You can leave it up on the screen.  Could you actually

5    back out a little bit more.  Right here.

6            You start off the chat, you said, "Hi."  And DPR said

7    back, "Hey."  Right?

8            MR. DRATEL:  Objection.

9    Q.  Is that how the chat went?

10   A.  Yes.

11   Q.  He didn't ask why are you appearing on my screen?

12           MR. DRATEL:  Objection.

13           THE COURT:  Sustained.

14   Q.  He didn't say who are you?

15           MR. DRATEL:  Objection.

16           THE COURT:  Sustained.

17           Why don't you just ask him what the communication

18   consisted of.

19   Q.  When you say "check out," "can you check out one of the

20   flagged messages for me," you were referring back to a prior

21   conversation you had had with him earlier, is that right?

22   A.  Yes, I was.

23   Q.  What conversation was that?

24   A.  There was multiple chats that I had with him ever since he

25   provided me access to that administrator page and to the

F1kdulb6                          Der-Yeghiayan - redirect

1    flagged message section of the marketplace.

2    Q.  When did he first show you the flagged messages page?

3    A.  I would have to go back on the exhibit.

4    Q.  Was it days before or weeks before or even longer before?

5    A.  It was weeks before.

6    Q.  So weeks before you had this chat he had shown you the

7    flagged messages screen?

8    A.  Yes.

9    Q.  And when you brought it up here, he didn't say what flagged

10   messages screen are you talking about?

11                 MR. DRATEL:  Objection.

12                 THE COURT:  Sustained.

13   Q.  He said, "Sure, let me login."

14                 What did he have to log into in order to get to the

15   flagged messages screen?

16   A.  In order to access that page, you would have to have

17   administrator rights.  So you would have to have an account

18   that would have access to that support page.

19   Q.  Then later he asked you, unprompted, "You did bitcoin

20   exchange before you started working for me, right?"

21                 Now, the person you took over the Scout account from,

22   the Cirrus account from, what kind of business was she involved

23   in?

24                 MR. DRATEL:  Objection.  Foundation.

25   Q.  If you know?

F1kdulb6                          Der-Yeghiayan - redirect

1              MR. DRATEL:  Foundation.

2              THE COURT:  Why don't you try to build up a foundation

3     for it, first.

4     Q.  Do you know what sort of business the person who took over

5     the Scout account or --

6              MR. DRATEL:  Objection.  Foundation.

7              THE COURT:  No.  Let me just hear the question first

8     and then I will decide if I will let him answer.

9     Q.  Do you know what sort of business the person who was

10    engaged -- excuse me.

11             Do you know what sort of business the person who you

12    took over this Cirrus account was engaged in?

13             MR. DRATEL:  Objection.  Foundation.

14             THE COURT:  Can you answer that "yes" or "no"?

15             THE WITNESS:  Yes, I do.

16             THE COURT:  All right.  How did you obtain that

17    information?

18             THE WITNESS:  There was --

19             THE COURT:  Just tell me generally the source of

20    information that you used.

21             THE WITNESS:  Clear.  It is a choice point.  So it is

22    a government operated account that we have that gives business

23    data based upon like Social Security number, things of that

24    linked to a person, so it will tell if they have a business

25    registered to him.

1          THE COURT:  All right.  I will allow the question.

2          MR. DRATEL:  I am still going to object on foundation.

3          THE COURT:  I hear you.

4    BY MR. TURNER:

5    Q.  What sort of business was that person involved in?

6    A.  They had a bitcoin business.

7    Q.  Had you ever mentioned to DPR on your Cirrus account that

8    you were involved in a bitcoin exchange business?

9    A.  Not that I recall.

10   Q.  You never represented that in your undercover capacity?

11   A.  No, I did not.

12   Q.  So if DPR knew this from Cirrus, he would have heard it

13   before you took over the account --

14         MR. DRATEL:  Objection.

15   Q.  -- is that right?

16         THE COURT:  Sustained.

17   Q.  When did you take over the Cirrus account?

18   A.  Late July of 2013.

19   Q.  So that would have been information conveyed to DPR more

20   than two months before this conversation, is that right?

21         MR. DRATEL:  Objection.

22         THE COURT:  You can ask it differently but he can't

23   answer that question.  Sustained.

24   BY MR. TURNER:

25   Q.  After you saw the chat on the defendant's computer, you

F1kdulb6                          Der-Yeghiayan - redirect

1   eventually took part in the search of the defendant's

2   residence, is that right?

3   A.  I did.

4   Q.  And you testified about the handwritten notes you recovered

5   from Mr. Ulbricht's bedroom, is that right?

6   A.  Yes, I did.

7   Q.  And during cross-examination, the defense asked you

8   something like would someone running Silk Road be so careless

9   to leave notes like that in the trash; do you remember that?

10  A.  I do recall that, yes.

11          MR. TURNER:  Can you put the notes back up, by the

12  way, Government Exhibit 130.

13  Q.  Do these notes say Silk Road on them anywhere?

14  A.  No, they do not.

15  Q.  Do they say illegal drugs on them anywhere?

16  A.  No, they do not.

17  Q.  How were you able to recognize what these notes were about?

18  A.  From my account that I was operating on Silk Road and being

19  active in the Silk Road forums, it was something that stood out

20  to me.

21  Q.  If a random person picks these notes --

22          MR. DRATEL:  Objection.

23  Q.  -- out of a trash bin, would they have any idea that they

24  concerned Silk Road?

25          MR. DRATEL:  Objection.

1           THE COURT:  Sustained.

2  Q.  By the way, you said earlier that you identified Ross

3  Ulbricht's bedroom in the residence by the personal effects

4  that were inside the bedroom, right?

5  A.  I did.

6  Q.  Passport, credit cards, that sort of thing?

7  A.  Yes.

8  Q.  Did you recover the personal effects of anyone else in that

9  bedroom?

10  A.  There was another alias, I believe, on one of the

11  documents.

12  Q.  Beside "alias" documents, did there appeared to be anyone

13  else who lived in that bedroom with him?

14           MR. DRATEL:  Objection.

15           THE COURT:  I will allow it.

16  A.  No.

17  Q.  By the way, you were asked on cross about travel records

18  that you reviewed for Mr. Ulbricht?

19  A.  Yes, I was.

20  Q.  And I think you testified you saw maybe one trip or two

21  trips a year, something like that?

22  A.  I believe that was what I recall, yes.

23  Q.  The travel records you have access to from HSI, do you have

24  access to records for trips anywhere around the world that

25  Mr. Ulbricht took?

F1kdulb6                              Der-Yeghiayan - redirect

1    A.  Only trips that have an international nexus, so a

2    connection.  So it has to be somewhere outside the country or

3    coming from outside into the country.

4    Q.  To or from the United States, right?

5    A.  Yes.

6    Q.  If he flies from one foreign country to the other, you

7    don't see that in your records?

8    A.  I do not see that, no.

9    Q.  You were asked on cross about someone named Mark Karpeles

10   repeatedly, right?

11   A.  I was.

12   Q.  And one of the questions you were asked concerned software

13   called MediaWiki, do you remember that?

14   A.  I do.

15   Q.  You testified that there was a website you thought was

16   associated with Mark Karpeles --

17              MR. DRATEL:  Objection.

18   Q.  -- that used MediaWiki software?

19              THE COURT:  Hold on.  Let me just read this.  Hold on.

20              (Pause)

21              THE COURT:  I will allow it.

22   Q.  Right?

23   A.  Yes.

24   Q.  And what is MediaWiki software?

25   A.  It's an open source.  It is a free program that you could

F1kdulb6                         Der-Yeghiayan - redirect

1   download from the Internet.

2   Q.  What is it used for?

3   A.  It's used to create Wiki pages.

4   Q.  FAQ pages, right?

5           MR. DRATEL:  Objection to leading.

6           THE COURT:  Sustained.

7           Why don't you ask it differently.

8   Q.  What do you mean, Wiki pages?

9   A.  So information pages, so it could be used to provide

10  information.

11  Q.  It is a tool for building pages --

12          MR. DRATEL:  Objection.  Leading.

13  Q.  -- on websites?

14          THE COURT:  I will allow it, just to sort of cut

15  through this.

16  A.  Yes, it is.

17  Q.  Go ahead.

18  A.  Yes.

19  Q.  And when you say "freely available," what do you mean?

20  A.  That means that anyone on the Internet can download it.

21  Q.  Anyone on the Internet can download it for free, right?

22  A.  Yes, without paying for it.

23  Q.  Just like are there browser software programs that you can

24  download from the Internet for free?

25  A.  Yes, there are.

F1kdulb6                    Der-Yeghiayan - redirect

1    Q.  And sometimes those programs change from time to time,

2    right?

3    A.  Yes.  There is different versions, updated versions.

4    Q.  So some people can download one version and then it can

5    change and some people can download the next version?

6              MR. DRATEL:  Objection.

7              THE COURT:  I will allow it.

8    A.  Yes.

9    Q.  So you noticed that the same MediaWiki software was running

10   on -- was used to create Silk Road's FAQ page, is that right?

11   A.  Yes.  The same version of MediaWiki was used on the Silk

12   Road --

13   Q.  Do you have any idea how many thousands or tens of

14   thousands websites --

15             MR. DRATEL:  Objection.

16   Q.  -- had FAQ pages still using the same --

17             MR. DRATEL:  Objection to the form.

18             THE COURT:  I will allow it.

19   A.  I do not know.

20   Q.  I think you testified about Simple Machines software?

21   A.  I did.

22   Q.  And what is that software used for?

23   A.  It is to create online forums.

24   Q.  Like a discussion forum, right?

25   A.  Yes.

F1kdulb6                      Der-Yeghiayan - redirect

1   Q.  Is that freely available software?

2   A.  Yes, it is.

3   Q.  Can anybody download it?

4   A.  Anyone can download it for free.

5   Q.  And use it to create a forum on whatever website they want?

6   A.  Yes.

7   Q.  You testified about PHP and MySQL, is that right?

8   A.  Yes.

9   Q.  What are those programs used for?

10  A.  It's just a free program that you could download that is a

11  language that helps you build and create websites.

12  Q.  Do you have any idea how many thousands or millions of

13  websites use PHP or MySQL?

14          MR. DRATEL:  Objection to form.

15          THE COURT:  Why don't you ask a different --

16  Q.  Do you have any idea how many websites in the world use PHP

17  or MySQL?

18  A.  I don't but I know it is popular.

19  Q.  You testified on cross that there was a time when you were

20  looking at whether Mark Karpeles might be involved in operating

21  Silk Road, correct?

22  A.  Yes.

23  Q.  And in terms of what initially led you to look at Mark

24  Karpeles, you testified it was something about the

25  silkroadmarket.org website, is that right?

F1kdulb6                          Der-Yeghiayan - redirect

1   A.  Yes.

2   Q.  Remind the jury, what is the silkroadmarket.org website?

3   A.  It was a website that was on the regular Internet that if

4   you were to search Silk Road on a regular Internet browser, you

5   would potentially find this website first, since it wasn't on

6   Tor, and it would redirect you, give you directions

7   step-by-step on how to access the Silk Road marketplace on Tor.

8              MR. TURNER:  Your Honor, may I approach?

9              THE COURT:  You may.

10  Q.  I'm showing you what's been marked as Government Exhibit

11  149.

12  A.  OK.

13  Q.  Do you recognize this exhibit?

14  A.  I do.

15  Q.  What is it?

16  A.  It's a screenshot from archive.org of a Silk Road market

17  page.

18  Q.  Silkroadmarket.org?

19  A.  Silkroadmarket.org page --

20             MR. TURNER:  The government offers Exhibit 149 into

21  evidence.

22             MR. DRATEL:  Objection.  Vayner.

23             THE COURT:  You need to lay a foundation for this

24  witness for this document.

25             MR. TURNER:  Your Honor, we have -- if I can, I will

F1kdulb6                          Der-Yeghiayan - redirect

1    authenticate it under 902 with a declaration from archive.org,

2    and we won't have to have a sidebar.  We have already discussed

3    archive.org, and it came through the cross as a tool that can

4    archive reliably websites over time.

5              THE COURT:  I need to take a look at that testimony to

6    remind myself of that.  I am going to allow the document for

7    the moment, subject to connection.

8              MR. TURNER:  Thank you.

9              THE COURT:  And then, ladies and gentlemen, I will let

10   you know if there is a issue and we need to strike it.

11             But you can proceed.

12             (Government's Exhibit 149 received in evidence)

13             MR. TURNER:  So could we publish Government Exhibit

14   149?

15             THE COURT:  You may.

16             MR. TURNER:  Thank you.

17             Can you zoom in?

18   Q.  All right.  So was this all there was to the website?

19   A.  This was all there was.

20   Q.  And it just told you how to get to the actual Silk Road

21   website on Tor, right?

22   A.  Yes.

23   Q.  It wasn't the actual Silk Road website at all?

24   A.  No, it was not.

25   Q.  It wasn't on Tor?

1   A.  It was not on Tor.

2   Q.  It was just on the ordinary Internet?

3   A.  It was a regular website, yes.

4   Q.  And because it was on the ordinary Internet, you were able

5   to look up its true IP address on who.is like you told us about

6   before, right?

7   A.  Yes.

8           MR. TURNER:  May I approach again, your Honor?

9           THE COURT:  You may.

10  Q.  I show you what's been marked as Government Exhibit 150.

11  A.  OK.

12  Q.  Do you recognize this Web page?

13  A.  Yes, I do.

14  Q.  Where is it from?

15  A.  It's who.is -- a screenshot of who.is searching

16  silkroadmarket.org.

17          MR. TURNER:  The government offers Government Exhibit

18  150 into evidence under 803(17).

19          MR. DRATEL:  Objection, your Honor, Vayner.

20          THE COURT:  All right.  I need to take a look at it.

21          (Pause)

22          I will allow it.  Government Exhibit 150 is received.

23          (Government's Exhibit 150 received in evidence)

24          MR. TURNER:  Can you publish Government Exhibit 150,

25  Mr. Evert?  Could you zoom in here.  Zoom in just on that half,

F1kdulb6                          Der-Yeghiayan - redirect

1    please.

2    Q.  OK.  So you looked up silkroadmarket.org on who.is, right?

3    A.  Yes.

4    Q.  And you found it was controlled -- it was on a server that

5    was going to --

6                MR. DRATEL:  Objection.

7                MR. TURNER:  Your Honor, I'm trying to get done before

8    5.

9                THE COURT:  Even though you are trying to get done, we

10   may have to have him back anyway, so take your time.

11               MR. TURNER:  OK.

12   Q.  So where did you find the IP address resolve back to?

13   A.  It came back to a server that was under XTA, an XTA server.

14   Q.  You testified on cross that you found that xta.net was

15   registered to Mark Karpeles, right?

16   A.  Yes.

17   Q.  You found that based on publicly available information?

18   A.  Yes.

19   Q.  So you decided to look for Mark Karpeles, is that right?

20               MR. DRATEL:  Objection.

21               MR. TURNER:  Your Honor, this has already come in

22   through cross.

23               MR. DRATEL:  I know, but the leading parts --

24               THE COURT:  Try not to lead.  I will allow it.  Try

25   not to lead.  Take your time.

F1kdulb6                         Der-Yeghiayan - redirect

1   BY MR. TURNER:

2   Q.  So you decided to look for Mark Karpeles, is that correct?

3   A.  Yes, I did.

4   Q.  You wanted to see if there was anything further --

5           MR. DRATEL:  Objection.

6   Q.  -- in this connection?

7           MR. DRATEL:  Objection.

8           THE COURT:  Sustained.

9           MR. DRATEL:  Objection as to the --

10          THE COURT:  I'm sustaining it.

11          MR. DRATEL:  OK.

12  BY MR. TURNER:

13  Q.  You testified on cross you got a search warrant on

14  Mr. Karpeles' email, is that right?

15  A.  Yes, I did.

16  Q.  And you searched through all those emails?

17  A.  Yes, I did.

18  Q.  When did you finish looking into those emails, by the way?

19  A.  It took me awhile, a few weeks, a month maybe.

20  Q.  What time of year?  When did you --

21  A.  It's hard to say.

22  Q.  Was it in 2014?

23  A.  Because I think by the time we got it later on, it probably

24  ended early 2014.

25  Q.  OK.  So this was after Mr. Ulbricht's arrest you finished

F1kdulb6                          Der-Yeghiayan - redirect

1   looking up through all those emails, is that correct?

2   A.  Yes.

3   Q.  And when you looked through all those emails, what kind of

4   company did you learn that Mr. Karpeles ran?

5            MR. DRATEL:  Objection.  Foundation.

6            THE COURT:  Well --

7            MR. DRATEL:  Hearsay.

8            THE COURT:  Hold on.  I get the drift.

9            Sustained.  We are going to have to come at it a

10  different way, based on what we did earlier.  Gander/goose.

11  What's good for the goose is good for the gander.

12  Q.  What sort of email did you see?  What were the emails

13  about?

14            MR. DRATEL:  Objection.

15            THE COURT:  I will allow there to be a topical

16  description, but it is not for the truth.  It's just for the

17  topics.

18            You may proceed.

19  A.  Generally, I mean, it was about his hosting services that

20  he had, so the majority of the emails that were coming through

21  revolved around that as well as his bitcoin business.

22            MR. DRATEL:  Objection.

23            MR. TURNER:  Your Honor, this all came in during

24  cross.

25  Q.  You testified on cross he hosted websites, is that right?

F1kdulb6                      Der-Yeghiayan - redirect

1    A.  Yes, he did.

2    Q.  OK.  So what was his Web hosting company called, by the

3    way?

4    A.  KalyHost.

5              MR. DRATEL:  Objection.  Foundation.

6              THE COURT:  I will allow it.

7    Q.  K-a-l-y-h-o-s-t?

8    A.  H-o-s-t.

9    Q.  Did it go by any other names that you saw in emails?

10             MR. DRATEL:  Objection.

11             THE COURT:  Ladies and gentlemen, if he did and didn't

12   confirm it, then it wouldn't be in for the truth, it is just

13   for what he saw in the email, and the email may have had

14   certain words, and I will allow is for that purpose.

15   A.  AutoVPS I believe was the name of the other company.

16   Q.  Remind the jury what a Web hosting company does.

17   A.  Web hosting is a company that you could go to to host

18   websites.

19   Q.  Right.

20   A.  So you could buy services from them.

21   Q.  And does that involve renting server space from the

22   companies?

23   A.  That does include that.

24   Q.  So if you -- you said earlier that you looked up

25   Mr. Karpeles and there were many, many servers registered to

1    him, many IP addresses registered to him, right?

2    A.  That's correct.

3    Q.  If you own a car rental company, do you own a lot of cars?

4    A.  You own a lot of cars, yes.

5    Q.  What do you do with those cars?  You rent them out to?

6    A.  Other people.

7    Q.  Right.  Do you control where those other people drive with

8    the cars?

9              MR. DRATEL:  Objection.

10             THE COURT:  Sustained.

11   Q.  With a Web hosting company, when the Web hosting company

12   rents out its servers to other people, does the Web hosting

13   company control what the customers put on their websites?

14   A.  No, they do not.

15             THE COURT:  We are going to end in just about two

16   minutes on the dot.

17             MR. TURNER:  I think I can almost get through, your

18   Honor.  I think I can get through.

19             THE COURT:  But don't rush it in terms of I'm not sure

20   that this witness -- I don't know whether this witness will be

21   on or off the stand, so I just want to make sure that you don't

22   proceed on that assumption.

23             Go ahead.

24   BY MR. TURNER:

25   Q.  All right.  Now, when a customer of a Web hosting company

F1kdulb6                          Der-Yeghiayan - redirect

1    sets up a website, is there any type of information the

2    customer has to provide in order to register the website?

3              MR. DRATEL:  Objection.

4              THE COURT:  Sustained unless you can build a

5    foundation for that.

6    Q.  Do you know?

7    A.  Just what I have observed through looking through Mark

8    Karpeles' emails.

9              MR. DRATEL:  Objection, your Honor.

10   Q.  Let's back out of this area of the document here, please,

11   Mr. Evert.

12             You testified before that you are familiar with the

13   who.is database, right?

14   A.  I am.

15   Q.  Is this database relied on regularly by people to figure

16   out who websites are registered to?

17             MR. DRATEL:  Objection.

18             MR. TURNER:  I am building a foundation, your Honor.

19             THE COURT:  I know but not to "everybody."  You can

20   ask him if he relies upon it.

21             MR. TURNER:  Sure.

22   Q.  If a person -- well, excuse me.

23             Do you rely upon who.is in order to determine who a

24   website is registered to?

25   A.  There is information you could use off of that, yes.

F1kdulb6                          Der-Yeghiayan - redirect

1   Q.  It is a publicly available database that is available for

2   that purpose?

3   A.  Yes, it is.

4           THE COURT:  All right.  We are going to end here,

5   Mr. Turner.

6           MR. TURNER:  OK.

7           THE COURT:  I know that you have made a valiant effort

8   to get through it.  But you are going to have to come back

9   another day.

10          All right.  Ladies and gentlemen, I want to thank you

11  for your patience with us today.  And I want to remind you not

12  to talk to each other or anybody else about this case, and to

13  avoid any mentions of this case that you may see in any news

14  reports or media reports of any kind.  And we'll see you

15  tomorrow morning.

16          We'll start at 9:30, I hope, right on time.  Thank you

17  very much.  Good night.

18          THE CLERK:  All rise as the jury leaves.

19          (Continued on next page)

20

21

22

23

24

25

F1kdulb6

```
 1              (Jury not present)

 2              THE COURT:  Why don't you go ahead and step down, sir.

 3         Let's all be seated here.

 4              (Witness not present)

 5              THE COURT:  Not knowing what there will be on these

 6    topics for any recross, which I am considering in light of all

 7    the back and forth we have, we have had a lot of evidentiary

 8    objections -- for instance, if there were recross, I would not

 9    necessarily cut it off.  I didn't want to have you end with

10    this witness and then have pressure whether or not to bring him

11    back.  I wanted to for this particular witness, given the

12    difficulty we have had with everything today, to proceed and

13    let it unfold as it needs to unfold.

14              Mr. Dratel, Mr. Turner had suggested earlier that he

15    is about to end with this witness.  I have one, two, three,

16    four, five, six topics I think he has covered.  That doesn't

17    mean that you have to cover all of them, but at this point are

18    you thinking of any recross?

19              MR. DRATEL:  Yes, your Honor.

20              THE COURT:  Approximately how long do you think you

21    will take on one or more of those topics?

22              MR. DRATEL:  Your Honor, let me just look through my

23    notes.

24              THE COURT:  Yes.

25              (Pause)
```

F1kdulb6

1        MR. DRATEL:  I would think right now we're about 15

2    minutes.

3        THE COURT:  All right.  Terrific.  So we ought to then

4    plan on, if all goes well in the morning we'll be moving on to

5    our next witness, which will, I'm sure, some relief to us all.

6        In terms of tomorrow's examination, is there anything

7    that people expect to come up that we ought to be thinking

8    about right now versus having to deal with it tomorrow?  We now

9    know the nature of, generally speaking, where folks are getting

10   exorcised and not.

11       MR. TURNER:  With respect to this witness or the next,

12   your Honor?

13       THE COURT:  No.  Right now I am just dealing with this

14   witness.  I just want to see whether there is something that we

15   know of that is going to come up, for instance, that's going to

16   be getting into areas that we'll need to address.  Because, if

17   so, I want to have a chance to think about them and you folks

18   as well.

19       MR. TURNER:  To the extent the defense wants to

20   revisit the issues that we went over today in terms of getting

21   back to the agent's beliefs about --

22       THE COURT:  I will let him preview that.

23       MR. TURNER:  -- on redirect --

24       THE COURT:  There is nothing else that you are going

25   to be doing on your redirect that you expect will raise

F1kdulb6

1    particular issues?

2                  MR. TURNER:  Not that I can think of right now.

3                  THE COURT:  All right.  Mr. Dratel, are there things

4    which you expect will raise particular issues?

5                  MR. DRATEL:  On this witness?

6                  THE COURT:  On this witness right now for tomorrow

7    morning.

8                  MR. DRATEL:  Not directly related to the redirect.

9                  THE COURT:  All right.  OK.  If anybody has any cases

10   on the statement relating to the complaint, I'm not finding

11   anything that's jumping out at me, but I don't have time to

12   look at it closely right now.  Give it to me the first thing in

13   the morning and I'll read it.

14               I also have gotten and you folks could presumably get

15   a copy of the sealed portion of the transcript.  If you want to

16   get a copy of it and look at it and tell me whether there is

17   anything that comes out of it that you think we need to talk

18   about tomorrow morning, we will do that at 9 as well.

19               Is there anything else, folks?  No?

20                  MR. TURNER:  Nothing here.

21                  MR. DRATEL:  No, your Honor.

22                  THE COURT:  All right.  I will see you folks tomorrow

23   morning.  We are adjourned.

24                  THE CLERK:  All rise.

25                  (Adjourned to 9 a.m., Wednesday, January 21, 2015)

```
 1                     INDEX OF EXAMINATION

 2   Examination of:                          Page

 3   JARED DER-YEGHIAYAN

 4   Cross By Mr. Dratel . . . . . . . . . . . 617

 5   Redirect By Mr. Turner . . . . . . . . . . 729

 6                    GOVERNMENT EXHIBITS

 7   Exhibit No.                          Received

 8    149  . . . . . . . . . . . . . . . . . 747

 9    150  . . . . . . . . . . . . . . . . . 748

10                    DEFENDANT EXHIBITS

11   Exhibit No.                          Received

12    F  . . . . . . . . . . . . . . . . . . 631

13

14

15

16

17

18

19

20

21

22

23

24

25
```