F1qgulb1                          Trial

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

            v.                        14 Cr. 68 (KBF)

ROSS WILLIAM ULBRICHT,

                Defendant.

------------------------------x

                                      New York, N.Y.
                                      January 26, 2015
                                      9:27 a.m.


Before:

                HON. KATHERINE B. FORREST,

                                      District Judge


                        APPEARANCES


PREET BHARARA,
     United States Attorney for the
     Southern District of New York
BY:  SERRIN A. TURNER
     TIMOTHY HOWARD
          Assistant United States Attorneys

JOSHUA LEWIS DRATEL
LINDSAY LEWIS
JOSHUA HOROWITZ
     Attorneys for Defendant

          – also present –

Special Agent Vincent D'Agostino
Molly Rosen, Government Paralegal
Nicholas Evert, Government Paralegal

F1qgulb1                     Trial

1                (In open court; jury not present)

2                THE DEPUTY CLERK:  This is the continuation of the

3    matter on trial, the United States of America v. Ross Ulbricht,

4    14 CR 68.

5                Counsel, state your names for the record.

6                MR. TURNER:  Good morning.  Serrin Turner for the

7    government.  With me at counsel table is AUSA Timothy Howard,

8    Special Agent Vincent D'Agostino from the FBI, and Molly Rosen,

9    a paralegal from our office.  Nick Evert will be here shortly.

10               MR. DRATEL:  Joshua Dratel for Ross Ulbricht standing

11   beside me.  Joshua Horowitz is here as well.  Lindsay Lewis is

12   trying to get into the building downstairs.

13               THE COURT:  Mr. Horowitz gets an A because he's always

14   the first one here of anyone.  Thank you.  Good morning,

15   everyone.

16               We have a couple of things to go over.  I want to talk

17   first about the timing for the next few days in light of this

18   significant snowstorm that actually we're in the process of

19   getting right now.  The snow has started outside.  My intention

20   is to adjourn today at noon.  We have got some jurors who come

21   from Rockland County and some who really need to get home

22   because they are necessary for childcare and other things and I

23   don't want them to be stuck here.  It can create some very

24   difficult issues.

25               Then my thought is that we would, in light of

F1qgulb1                    Trial

1    the -- and I have been monitoring the reports and it doesn't

2    seem like this is a fake storm that's going to go away, it

3    seems like it's a real one -- that we'll tell them right now

4    that we will not have trial tomorrow.  I want to hear from you

5    folks if anybody opposes this, and then for Wednesday, I think

6    it depends on whether or not a lot of snow is, in fact, dumped

7    on the area and how quickly people are able to get it cleaned

8    up and what the conditions are where some of the jurors are.

9            I'm going to have Joe communicate with some of the

10   jurors who are in the more far-flung locations on Tuesday to

11   see whether or not they're able to get out, and then he will

12   communicate with them all by text or phone to let them know.

13   They're also going to be instructed for Wednesday to call into

14   the court's auto line, which is if the courthouse is closed,

15   generally there's an auto line that everybody can call and Joe

16   will make sure they have all got that phone number, but if the

17   court's closed, that's it.  It doesn't matter if they can get

18   in.  But if the court is not closed but Manhattan is okay but

19   folks can't get in from Westchester or Rockland, then we're

20   going to have to hold off on Wednesday, as well.  I will

21   nevertheless tell them that Wednesday we will start not at

22   9:30, but at 10:00 for them.  So the best-case scenario would

23   be starting at 10:00, which would mean we would start at 9:30,

24   just to give people a little bit of extra time to get through

25   this.

1     How does that sound to you folks?

2          MR. TURNER:  Sounds perfectly appropriate.

3          MR. DRATEL:  That sounds exactly the same.

4          THE COURT:  So we'll see.  It may mean that we end up

5     with half a day today and then Thursday and nothing in between

6     but we'll play it by ear.  I think we have all lived through

7     some snowstorms now and we have had snowstorms with less snow

8     that have resulted in significant disruption.

9          I wanted to fill you in on Juror No. 4.  I have been

10    in communication with Juror No. 4's employer regarding the

11    requirement of this particular employer to use vacation time

12    after two weeks of trial time.  Now, we don't quite hit two

13    weeks until I think half a day after we adjourn today at noon

14    for her.  We have been trying to get them to accommodate this

15    unusual situation where it's a longer trial than most trials.

16    Jury selection here was quite involved.  I have not heard back

17    whether or not they'll be able to make the accommodation.

18         If they can't, we'll have to discuss what to do next

19    and confer with Juror No. 4 as to how she feels about it.  We

20    do know it was a concern of hers, which is why we have been

21    trying to get an accommodation.

22         Juror No. 10 was the juror who has a potential issue

23    around the 14th of February that she had previewed up at the

24    side bar during voir dire.  That may or may not be a problem.

25    We'll play that out as we go, but those are the two that I'm

F1qgulb1                    Trial

1    aware of.  I just wanted to fill you in and make sure that

2    everybody has the same information about those.

3              Witness lists:  I've gotten this morning a revised

4    witness list from the government.  I take it has been shared

5    with defense.

6              MR. TURNER:  Yes, your Honor.

7              THE COURT:  Tell me what's different.  I can compare

8    the two but why don't you give me a summary.

9              MR. TURNER:  One moment, your Honor.

10             THE COURT:  I see.  You put in dates which will now be

11   different yet again.

12             MR. TURNER:  Right.  Actually it looks like this is

13   slightly outdated.  Gary Alford will be our next witness.  Then

14   Alex Wilson -- I'm sorry -- Alex Miller from Stack Exchange,

15   that will be a brief witness who is just a document custodian.

16             In terms of what else is different, I believe the only

17   other difference is we are no longer planning to call Andrew

18   Michael Jones as a witness.  I'm sorry.  We are planning on

19   calling Vincent D'Agostino, the special agent here, to give

20   brief testimony.  Basically we have shortened it.  Overall, we

21   have shortened it.  The witnesses we cut are shorter, their

22   testimony.

23             THE COURT:  Terrific.  Thank you.

24             Anything further on this?  We'll pick up with

25   Mr. Beeson this morning and hopefully we can get him off the

F1qgulb1                    Trial

1    stand and he can get on a plane before he gets snowed in.

2              MR. TURNER:  Dubious, but there's hope I guess.

3              THE COURT:  You think it's too late for that?

4              MR. TURNER:  Probably.  We would note that we have

5    asked defense counsel witness list and are still waiting for a

6    witness list from the defense.

7              THE COURT:  I had told Mr. Dratel that I would start

8    pressing him on Wednesday, so I'll press you whenever you're

9    ready but no later than Wednesday.  Do you want to preview

10   anything.

11             MR. DRATEL:  We did send the government an expert

12   notice yesterday last night.

13             THE COURT:  All right.

14             MR. DRATEL:  Probably the extra time today, we can put

15   together, probably overnight, for the government so we can get

16   some others.  There may be one daytime decision that -- in the

17   next day or two.

18             THE COURT:  We'll stay tuned for that.  The jury

19   charge:  You folks should have received a copy of the jury

20   charge, which we used yours as a reference and I went through

21   each of the differences between that what we believe the

22   correct statement of the law is and figured out what you had

23   changed from my *Delva* (ph) charge and decided whether we cared.

24             In light of the fact that we'll have tomorrow off, if

25   you folks could get us the Word version with comments, track

F1qgulb1                      Trial

1    changes, by tomorrow late afternoon, 5:00, 6:00, that would be

2    helpful.  That way, we can start in on it Wednesday morning.

3            MR. DRATEL:  What we were thinking of doing would be

4    to communicate between the parties to see if we can narrow the

5    issues that we presented to the Court.

6            THE COURT:  Terrific.

7            MR. DRATEL:  It would give us additional time.

8            THE COURT:  Terrific.  One of those I note, and I may

9    need letters about this, you folks will need to figure out

10   whether or not you'd like to state your position in a letter so

11   that it can be something that we can all focus on.  It has to

12   do with a CCE.  So the continuing series of violations, as you

13   folks know, there's a fair amount of case law on this.  There's

14   the *Richardson* case and a number of other cases, but there

15   seems to be a difference of view, certainly as between you

16   folks.  And it will be for you to let the Court know whether or

17   not you've got support for your respective positions as to,

18   number one, whether or not there has to be a specification of

19   the series of violations in the verdict form, which I think the

20   answer to that question is no; and the extent to which they

21   need to be listed for the jury specifically in the charge or

22   elsewhere, and I think the answer to that is open to debate.

23           In terms of the indictment, I think that it does not

24   need to be listed in the indictment, though there are some

25   courts which suggest that it's useful to do so.

1          But I'd like to get your views on the open issues with

2     respect to the CCE because how that gets dealt with is very

3     important, all right.  Does that make sense?

4          MR. TURNER:  We'll do that.

5          THE COURT:  Terrific.  Thanks.

6          We can fold in the *Alleyne* issue relating to CCE into

7     that process, perhaps.  There may not even be any debate

8     between you folks as to whether or not that needs to occur.

9          I'm on Part 1 for the next two weeks.  Because of the

10    delays in the trial -- we pick Part 1 a year or more in

11    advance.  Originally, we were not scheduled for trial at this

12    time.  That's fine.

13         As you folks know, and the audience may not know, Part

14    1 is like judge-on-call.  It's like being the doctor-on-call.

15    It's 24/7 and it's for a two-week period.  Typically, there's

16    nothing after 7:00 p.m., so it's not really a difficult thing

17    in the middle of the night.

18         It does mean we've got things shifted around so that I

19    can take things before I come out here.  I can take things at

20    the break.  I can take things at lunch hours.  It does mean

21    that there may be something if it was incredibly urgent that

22    couldn't wait for a break or a lunch hour that I have to take.

23    That would be unusual.  It does happen.  As you folks know,

24    you've probably all been people on the side of coming into

25    judges who are in Part 1 needing something urgent.  We'll play

F1qgulb1                    Trial

1    that by ear.  I don't expect any big issues.  I really don't.

2            That's what I have.  What do you have?  Anything?

3            MR. TURNER:  No, your Honor.

4            THE COURT:  Mr. Dratel.

5            MR. DRATEL:  No.

6            THE COURT:  We're waiting on seven.  It is possible

7    that one thing I had considered was whether or not -- it had

8    not started snowing until about an hour ago -- that there may

9    be some people who were sufficiently concerned about the snow

10   that they just are not going to chance it.  We haven't heard

11   from the seven.  Is that right?  Two are on their way.  The

12   ones who are furthest out are actually already here.

13   Hopefully, we'll get the others soon.

14           If there's nothing else, we'll take a break until

15   these folks arrive.  One thing, Mr. Dratel, as long as we have

16   a minute and I don't know, is there another cooperator on this

17   list?

18           MR. TURNER:  Yes, Mr. Duch.

19           MR. DRATEL:  Yes.

20           THE COURT:  If you're going to go into your doing

21   this, the line of cross, which is not atypical, you're doing

22   this to get a break on the penalty, there was an objection

23   during -- I was rereading the transcript -- there was an

24   objection during Bates for life, a lifetime of imprisonment.

25   Don't mention "life."  You can do "substantial."  You can do

F1qgulb1                    Trial

1    "significant."  You can do lots of other words, but lifetime

2    imprisonment, unless you can show that they were going to be

3    getting life -- in other words, mandatory life or something

4    else, the range is not something that you should be going into.

5         As you know, there's lots of cases on this.  It

6    actually treads into the area of jury nullification, so life in

7    the situation of the cooperators is off limits.

8         MR. DRATEL:  I think I'm permitted to go into it.

9         THE COURT:  To life?

10        MR. DRATEL:  I understand the Court's ruling, but I'm

11   making my record.

12        THE COURT:  Why don't you give me a case that says you

13   can go into life imprisonment for a range.  It's not a

14   statutory -- there's no requirement for these folks.  There are

15   so many crimes which carry up to life, and the use of the word

16   life, when somebody reasonably expects that they're going to

17   get far less, conveys to the jury a sense that this particular

18   trial involves something different.  Now, to the extent that

19   that's the message to be conveyed, that's the message that we

20   dealt with during the *in limine* motions.

21        MR. DRATEL:  I'll look at the cases, but in my

22   experience and what I think is appropriate based on the number

23   of factors, one of which is when this guy pled guilty, he was

24   told you can face up to life in prison, I don't know, I don't

25   think it's your Honor, I think it's Judge Griesa is the judge

F1qgulb1                         Trial

1    on that case, but the --

2                THE COURT:  Not Duch, Bates.

3                MR. DRATEL:  So whatever the maximum penalty is,

4    they're told, and whatever he was charged with is a factor in a

5    decision to cooperate.

6                THE COURT:  Well, if you have particular facts

7    relating to pressure placed upon a particular cooperator,

8    that's what I want to elicit from you.  If there's a particular

9    reason why for this cooperator it's more relevant than it might

10   otherwise be, but there are a series of cases on naming the

11   penalties and going into things that are more than just the

12   words of substantial, significant, more than a decade, and

13   there are lots of ways of getting at it.

14                But you give me what you would like and if Mr. Duch,

15   if there's something really specific for him, so be it.

16                MR. DRATEL:  Also, I thought it was relevant for

17   Bates, too, but obviously the Court has ruled, in terms of his

18   own --

19                THE COURT:  I didn't sustain the objection.  I let it

20   go because it was already out and I didn't want to pause on it.

21   I thought I would preemptively discuss the issue.

22                Sometimes the government doesn't care about a

23   particular point.  This is my view.

24                Does the government have a position on this?

25                MR. TURNER:  For Bates?

F1qgulb1                    Trial

1           THE COURT:  Not Bates, because Bates is done and

2    locked and loaded.  I'm not going to go back over Bates.

3           MR. TURNER:  For Duch, to be candid, I think we would

4    draw on direct the maximum penalty is he's facing 40 years.

5           THE COURT:  The maximum for him is 40?

6           MR. TURNER:  Yes.

7           THE COURT:  He's looking at a (b)(1)(B)?

8           MR. TURNER:  Yes.

9           MR. DRATEL:  But it's (b)(1)(A) weight.

10          THE COURT:  But if it's (b)(1)(A) weight and he's

11   pled, then under *Alleyne*, he can't get a statutory maximum

12   greater than 40.

13          MR. DRATEL:  I understand that, but when he made the

14   decision to cooperate --

15          THE COURT:  You can always use (b)(1)(A) weight for

16   purposes of the 3553(a) factors also, but he can't raise a

17   statutory max now.

18          MR. DRATEL:  No, I understand that in what he's

19   facing, but what I'm saying is when he was sitting there with

20   his lawyer deciding whether to cooperate, he was aware -- if

21   he's not, he's not, but you know, that he was facing a

22   significantly greater penalty.

23          THE COURT:  You folks will present to me whether or

24   not there are particular facts that were used to pressure that

25   fellow that would be relevant to his bias.  Obviously, bias for

F1qgulb1                          Trial

1     a cooperator is a big point, which the defense can freely

2     explore, but I want to make sure that we're within the limits

3     of the law.

4             I think we're still waiting on folks.  Let's take a

5     break until they all show up.

6             (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

F1QAAULB2                      Beeson - Cross

1           THE COURT:  Let's bring out the jury.

2           (Jury present)

3           THE COURT:  All right.  Ladies and gentlemen, let's

4    all be seated.  Before we get going I want to fill you in on

5    the schedule for the next few days.  Today, because of the

6    snow, we'll be ending at noon and I know that the snow itself

7    isn't supposed to really become particularly bad until three

8    o'clock or so or even later but I am concerned about some of

9    the folks who are in further removed areas being able to be

10   sure they can get home in a safe way.  So he we will end at

11   noon today.  We will not have trial tomorrow.

12          While it's possible the storm will pass us by, I think

13   it's sufficiently looking like it's going to land here that I

14   don't want to have people wondering about what kinds of

15   childcare arrangements and other arrangements they need to

16   make.  So we're going to go ahead and call it a snow day for

17   tomorrow for you folks essentially no matter what happens.

18          For Wednesday my hope is that we'll be able to resume,

19   that tomorrow, late tonight some time the snow will stop or

20   tomorrow early they'll get the roads clear and we'll be able to

21   for Wednesday get people here.  To give you a little bit more

22   time we'll start at ten a.m. on Wednesday.  We'll still only go

23   till five but we'll start at ten a.m. on Wednesday.

24          Now with that said, Joe is going to speak to some of

25   you to get -- he's got all of your contact information.  Make

F1QAAULB2                    Beeson - Cross

1   sure he's got exactly where you are going to be or a cellphone

2   to connect with you folks.  But he's going to connect with some

3   of you who are living outside of the city to see how the

4   conditions are on Wednesday.  Because even though Manhattan's

5   clear and the courthouse is open, that doesn't mean you are

6   going to be able to get in if you are snowed in in Rockland

7   County.  So Joe will be communicating with you folks.  As you

8   know, we can't go forward unless you are all here so we need to

9   assess the conditions where you folks are.

10          If it looks like it's just awful there's an auto line

11  and Joe will give you the phone number for it for the court,

12  the entire building.  And that will tell you if the courthouse

13  is closed.  If the court house is closed there is no way we are

14  going to be having trial.  It's possible that if the courthouse

15  is open that we won't have trial Wednesday if some of you can't

16  get here.

17          So bottom line to summarize, today at noon, then we're

18  going to call off tomorrow, Wednesday at ten a.m. that's what

19  we're hoping.  Thank you.

20          I want to remind you, sir, you are still under oath

21  from Thursday.

22          Mr. Dratel, do you want to continue, sir?

23          MR. DRATEL:  Yes.  Thank you, your Honor.

24  CROSS-EXAMINATION

25

F1QAAULB2                         Beeson – Cross

1    BY MR. DRATEL:

2    Q.  Good morning, Mr. Beeson.

3    A.  Good morning.

4    Q.  I just want to go back to something I showed you last week

5    Thursday and show you a different version.  This will be

6    Defendant's H and ask if you recognize that.

7    A.  I do recognize it as one of the pictures I took.

8    Q.  Of the laptop while you were working with it?

9    A.  Yes, this is a screen shot.

10             MR. DRATEL:  OK.  I move it into evidence, your Honor.

11             MR. TURNER:  I have no objection.

12             THE COURT:  Received; Defendant's Exhibit H.

13             MR. DRATEL:  Thank you.

14             MR. TURNER:  So looking at "H" we can get it

15    published.

16             (Pause)

17    Q.  And looking at "H" you see on the top of that line across

18    and that's a bitcoin client program operating right where it

19    says the Colbert report?

20    A.  Unfortunately, I don't know for sure what it is.  I can see

21    that it says the Colbert report but I don't know what kind of

22    application it is.

23    Q.  But if you look at the metadata that's part of this exhibit

24    now which -- did that enable you to recognize it, by the way?

25    A.  Yes, it did.  Thank you.

1    Q.  So that's the 7:56 p.m. on October 1, 2013?

2    A.  That's what it says, yes.

3    Q.  40 minutes off?

4    A.  40 minutes off.

5    Q.  Which way though?

6    A.  It's slow.  So we'd have to add 40 minutes to this time

7    making it 8:36.

8    Q.  8:36 p.m. San Francisco time?

9    A.  Yes, sir.

10   Q.  And it says 197 -- no, it says 197 megabites uploaded 26.10

11   MB, right?  Do you see on top of the red line?

12   A.  Yes, I do.

13   Q.  Now, you took these photos after you had already imaged the

14   laptop, correct?

15   A.  My recollection is that the laptop was in the process of

16   being imaged.  In other words, I had started the process and

17   was taking these photographs at that time.

18   Q.  Did you testify Friday that you had already made your

19   copies that you took the photos after you had imaged it?

20   A.  I would have to refer to my notes to be sure on the times.

21   A lot of times things are done as I go.  You know, once I start

22   something I can start something else.  So exact times I can't

23   recall.

24            MR. DRATEL:  I just want to publish for a second

25   Defendant's G which is already in evidence.

F1QAAULB2                           Beeson - Cross

1            (Pause)

2    Q.  And there it says "uploaded 8.35 megabites".  Can you see

3    that?

4    A.  It's a little blurry on my screen but it looks like it

5    could be 8.35.

6    Q.  OK.  An on the one that we just saw that you took it's 26.1

7    megabites, right?

8    A.  Yes.

9    Q.  So, are you not familiar with the program that's running on

10   Defendant's H?

11           MR. TURNER:  Objection; asked and answered, beyond the

12   scope and relevance.

13           THE COURT:  Sustained.

14   Q.  And you didn't generate the MD5 hash value for the laptop

15   until October 3 when you started the RAM capture?

16   A.  Correct.

17   Q.  And the RAM capture is essentially the running memory on

18   the laptop?

19   A.  Yes.  RAM is random access memory, that's correct.

20   Q.  Can you just define that for the jury, please?

21   A.  Yeah.  So, random access memory is the memory in your

22   laptop or computer that's used by not hard drive storage.  It

23   is that instantaneous memory that the basic code for the

24   programs get loaded into RAM and then your computer can use it

25   in there.

1    Q.  And that gives you a window -- it gives you a ability to

2    see what processes are running on a computer, right, RAM?

3    A.  Whether it gives you what processes are running --

4    everything get's loaded into RAM.  So all the binary codes, all

5    the codes that the computer needs to run is loaded into RAM.

6    That could be the active process.  That could be the operating

7    system and so forth.

8    Q.  So on October 3 which is two days after you received the

9    laptop you began to do the RAM memory capture?

10   A.  That's correct.  One of my associates and I just to be

11   clear.

12   Q.  And you weren't quite sure how to do that RAM capture,

13   correct?

14   A.  The RAM capture was nontrivial.

15   Q.  Right.  But you weren't quite sure how to do it.  You asked

16   for assistance, in fact?

17   A.  I did.

18   Q.  You asked whether there was a RAM capture tool that you

19   could use for it?

20   A.  That's correct.

21   Q.  And this is a relatively new field in computer forensics,

22   RAM capture?

23   A.  No.  I wouldn't say it's a new field.

24   Q.  Well, one of the things that is part of the RAM capture is

25   encryption keys and passwords and other things that are stored

1    in the memory, right?

2    A.  That's correct.

3         MR. TURNER:  Objection.

4         THE COURT:  Overruled.

5    Q.  And the processes that the computer -- the process of the

6    computer programs that are running on the computer is something

7    else that RAM can tell you, RAM memory capture would be able to

8    reserve for you?

9    A.  That information can be in RAM.

10   Q.  And the active network connections at the time that the

11   capture occurred would be something else?

12   A.  It can be.  It doesn't necessarily mean that it is.

13   Q.  And it could also determine whether there were malware or

14   viruses or other programs running on the system, correct?

15   A.  It could be, yes.

16   Q.  Now, you've used a piece of software called FMEM, F-M-E-M,

17   to try to acquire the RAM memory?

18   A.  That's correct.

19   Q.  And system memory is broken down into registers called

20   ranges; s is that right?

21   A.  That's correct.

22   Q.  And for FMEM you have to specifically point the program at

23   the registers that you want the system that you'd rather that

24   you want to capture, right?

25   A.  That's correct.  The RAM is divided into chunks, into

1  groups, so to speak.  Some are more protected than others.

2  Q.  OK.  And so -- and if you don't direct the capture process

3  at the right registers of RAM they will go to something called

4  uncachable, U-N-C-A-C-H-A-B-L-E?

5  A.  I believe so.

6  Q.  And you weren't sure at the time about this, is that fair

7  to say?

8  A.  Well, this is why I obtained the help from one of my

9  associates.

10 Q.  But in fact, the FMEM capture did not work entirely,

11 correct?

12 A.  Upon capturing what I believe was the third register or

13 third section of the memory FMEM crashed the computer.

14 Q.  And when it crashed the computer you were no longer able to

15 get any of the RAM capture that you had not gotten initially,

16 correct?

17 A.  We were able to continue with the capture after the

18 computer was restarted.

19 Q.  Now, you in doing your RAM capture you consulted the

20 manuals on the computer in an attempt to find out how to

21 proceed, right?

22 A.  I don't recall consulting any manuals on the computer.

23 Q.  Did you keep a running roster of commands that you issued

24 the computer during your work?

25 A.  Yes, we did.

F1QAAULB2                        Beeson - Cross

1    Q.  I am going to show you what's marked Defendant's I for

2    identification -- "K", I am sorry.  Call it Defendant's K for

3    identification.  And ask you to look at page two of this

4    document.  I ask you if that refreshes your recollection that

5    you consulted the manuals on the computer?

6    A.  These are not the manuals for the computer.  These are

7    manuals for the applications MEMDUM and FMEM that may or may

8    not have been on the computer.

9    Q.  Right, but you were looking for them?

10   A.  Yes.

11   Q.  And did you find one for MEMDUM?

12   A.  I don't recall whether one came up or not.

13   Q.  Well, there's no such file for that on a Lenox system, is

14   there?

15   A.  There could be.  Depends on the Lenox system.  Most likely

16   there was not but I don't remember for certain.  Chances are

17   since I then checked for a manual for tool FMEM that there was

18   no tool for MEMDUM on the system.

19   Q.  And so you never got a full RAM memory capture, correct?

20   A.  Can you define a full RAM memory capture, please?

21   Q.  Well, why don't you.

22   A.  Well, the difficulty in RAM capture is that it's live, so

23   it's ever changing and it's ever active.  When we captured what

24   I believed was the third register or third group of memory from

25   the RAM, the system crashed which is not that uncommon in RAM

F1QAAULB2                         Beeson - Cross

1   captures.  And so after we were able to restart we restarted

2   with our own version and move onto the next and we continued to

3   capture the other registers that were still there.

4   Q.  But when you had the capture open before it crashed it has

5   all the operations going, correct?

6   A.  Yes.

7   Q.  And so once it crashes and then you reboot it, you've lost

8   all of that information that's included that went live before

9   it crashed, right?

10  A.  You do not lose all of the information.

11  Q.  But you lose information?

12  A.  Do you lose information.

13  Q.  And you don't know what information you lost?

14  A.  You do not know.

15  Q.  And that information is lost to us forever, essentially?

16  A.  It is.

17          MR. DRATEL:  Nothing further, your Honor.

18          THE COURT:  All right.  Thank you.

19          Mr. Turner, anything further from the government?

20          MR. TURNER:  One moment, your Honor.

21          (Pause)

22          MR. TURNER:  Briefly, your Honor.

23  REDIRECT EXAMINATION

24  BY MR. TURNER:

25  Q.  Agent Beeson, I talked to you about how when you are doing

F1QAAULB2                         Beeson - Redirect

1    a live capture, things are changing.  Could you explain a

2    little bit more what that means if you type something on a

3    keyboard just a single press of a keyboard does that change --

4    A.  Yeah.  So in performing a live capture of basically

5    capturing data from a running computer whether it be from the

6    hard drive or from the RAM, everything that we do is to some

7    degree altering information.  And so our goal is to minimize

8    that alteration to the maximum we can but we do have to use the

9    computer in order to capture this information.

10   Q.  So the sort of alterations you are talking about thought,

11   does that involve --

12   A.  Absolutely, not.  It's very minimal footprint.  We were

13   trying our very best to not alter anything to the extent we

14   can.

15   Q.  You talked about some errors you ran into or crashes.  Any

16   of those prevent you from making a full and complete copy of

17   the Lenox half of the computer that we talked about on direct?

18   A.  No, it isn't.

19   Q.  And those errors, could any of those errors have resulted

20   in the generation of thousands of pages of TOR check logs on

21   the computer that weren't there before?

22   A.  Absolutely, not.

23           MR. TURNER:  No further questions.

24           MR. DRATEL:  Briefly, your Honor.

25           THE COURT:  All right.

F1QAAULB2                         Beeson - Redirect

1    RECROSS EXAMINATION

2    BY MR. DRATEL:

3    Q.  But the RAM capture, we lost the ability to see what the

4    computer was doing at that time, correct, in the full range of

5    it, correct?

6    A.  Yes.

7    Q.  Including connections to the internet, correct, in

8    connection with what was going on with the internet?

9    A.  I supposed.  That's define as anything it's part of the

10   group of things that could be in there.

11   Q.  And the questions of malware and viruses and whatever else

12   might have been on there we'll also never know, right?

13   A.  Potentially.

14             MR. DRATEL:  Nothing further.  Thank you.

15             THE COURT:  All right.  Thank you.

16             MR. TURNER:  Excuse me.  One more question, your

17   Honor.

18             THE COURT:  One.

19   REDIRECT EXAMINATION

20   BY MR. TURNER:

21   Q.  The RAM capture didn't prevent from you seeing what

22   historically had been on the computer from years before?

23   A.  No.

24             MR. DRATEL:  Objection as to form.

25             THE COURT:  Overruled.

F1QAAULB2                        Beeson – Redirect

1   RECROSS EXAMINATION

2   BY MR. DRATEL:

3   Q.  You have no idea when anything was put on that computer,

4   right?

5   A.  I did not conduct the forensic exam on that computer, so.

6            THE COURT:  All right.  Thank you.  You may step down,

7   sir.

8            Would the government like to call its next witness,

9   please.

10            MR. TURNER:  Yes, your Honor.  The government calls

11   Internal Revenue Services Special Agent Gary Alford.

12            THE COURT:  All right.  Mr. Alford to the stand,

13   please.

14    GARY LUIS ALFORD,

15        called as a witness by the Government,

16        having been duly sworn, testified as follows:

17   DIRECT EXAMINATION

18   BY MR. TURNER:

19   Q.  Good morning, Agent Alford.

20   A.  Good morning.

21   Q.  Who do you work for?

22   A.  Internal Revenue Service Criminal Investigation.

23   Q.  And what's your position at Internal Revenue Service

24   Criminal Investigation?

25   A.  I am a special agent.

1   Q.  How long have you been a special agent with the IRS?

2   A.  Approximately, six and a half years.

3   Q.  Where are you currently assigned to work?

4   A.  The New York Organized Crime Drug Enforcement Strike Force.

5   Q.  What's the Strike Force do?

6   A.  It's a task force of state, local and federal agencies and

7   we are charged with investigating, disrupting and dismantling

8   major drug trafficking organizations.

9   Q.  What are yours duties at the strike force?

10  A.  All the law enforcement duties whether it be surveillance,

11  interviews, conducting warrants, arrests.

12  Q.  So did there come a time when you were assigned to an

13  investigation of the Silk Road website?

14  A.  Yes, that was my first assignment.

15  Q.  First assignment at the Strike Force?

16  A.  Yes.

17  Q.  When were you detailed to the Strike Force?

18  A.  At the end of March 2013.

19  Q.  And as part of your investigation into the Silk Road

20  website did you make any efforts to identify the operator of

21  the website?

22  A.  I did.

23  Q.  And did you ever do any searches on the Internet as part of

24  that investigation?

25  A.  I did.

F1QAAULB2                      Alford - Direct

1    Q.   What were you looking for it?

2    A.   I was looking for the first mention of the Silk Road

3    website on the Internet.

4    Q.   And how did you search for the first mention of "Silk Road"

5    on the ordinary Internet?

6    A.   I started using Google searches.

7    Q.   OK.   Did you restrict your search to certain date ranges?

8    A.   Yes.   When you search Google there's a task bar at the top

9    where you can restrict the date or customize the date.   So, I

10   was aware of when the Silk Road allegedly had begun, so I had

11   restricted the date, so I would search before that.

12   Q.   Why were you searching for the first mention of the Silk

13   Road website?

14   A.   Because the Silk Road website was on a hidden part of

15   Internet TOR and TOR hidden services.   So it does no good or

16   let's say a person who is not familiar with it for it just to

17   be there.   You would have to have, someone would have to tell

18   you about it.   So I figured that it would have to be on a

19   regular Internet and someone would have to tell you where to go

20   on the hidden Internet.

21   Q.   OK.   So could you take a look at the binder in front of

22   you, Government Exhibit 301.

23   A.   I see it.

24   Q.   Do you recognize that document?

25   A.   Yes, I do.

1   Q.  What is it?

2   A.  It's a representation of a Google search.

3   Q.  That you did?

4   A.  Yes.

5   Q.  As part of your search for the first mention of the Silk

6   Road website on the ordinary Internet?

7   A.  Yes, a representation of what I did.

8          MR. TURNER:  The government offers Exhibit 301 into

9   evidence.

10          MR. DRATEL:  No objection.

11          THE COURT:  Received.

12          (Government's Exhibit 301 received in evidence)

13          MR. TURNER:  Publish that.

14          (Pause)

15   Q.  OK.  So first of all, what were you searching for in the

16   Google search box?

17   A.  Well, I was searching for -- I know that since it was a

18   Silk Road website you had to have Silk Road.  But that's a

19   pretty generic term that we have a lot of responses.  So I know

20   all the addresses on the TOR hidden services we use a dot on

21   it.  So I would put a term that would be restricted to what

22   would be on the Silk Road website.

23   Q.  Then there's this circle part of the screen.  What does

24   that reflect?

25   A.  That's how you would test the date range of what you are

F1QAAULB2                    Alford - Direct

1    searching.  So you can just put in an end date.  So I'll put in

2    January 31 because all information was that Silk Road had begun

3    in February of 2011.

4    Q.  OK.  So you kept searching back, pushing the date range

5    further and further back?

6    A.  Correct.

7    Q.  And here you were searching for the results before

8    January 31, 2011?

9    A.  Yes, sir.

10   Q.  What did you get?

11   A.  I got back what you see there, a response about a bitcoin

12   talk forum.

13   Q.  So bitcointalk.org, what is a bitcointalk.org?  You visited

14   the site?

15   A.  Yes.

16   Q.  What sort of site is hosted there?

17   A.  It's a discussion forum surrounding bitcoins.

18   Q.  So did you click on this link?

19   A.  Yes, I did.

20   Q.  What did it take you to?

21   A.  It took me to a forum, a discussion thread.

22   Q.  Can you just remind the jury what a discussion thread is?

23   A.  On these forms you -- people would post a topic.  So in

24   this particular one the topic was a heroin store and people

25   would comment and discuss that particular topic.

1  Q.  Could you take a look at what's been marked as Government

2  Exhibit 302 in your binder.

3  A.  Yes.

4  Q.  And do you recognize this document?

5  A.  Yes, I do.

6  Q.  How do you recognize it?

7  A.  It's a screen shot that I took during ny investigation.

8  Q.  What is it a screen shot of?

9  A.  The heroin discussion thread.

10  Q.  When did you take that screen shot?

11  A.  June 3, 2013.

12  Q.  Is that, approximately, when you first visited that thread?

13  A.  Yes.

14          MR. TURNER:  Government offers 302 into evidence.

15          MR. DRATEL:  No objection.

16          THE COURT:  Received.

17          (Government's Exhibit 302 received in evidence)

18          MR. TURNER:  In on the top third of the page.

19  Q.  All right. so this is bitcoin forum and here is the thread;

20  is that right?

21  A.  Yes, sir.

22  Q.  And it's titled "The Heroin Store".  And where do you find

23  a mention of Silk Road in this thread?

24  A.  Further down, approximately --

25          MR. TURNER:  Crop page 6.

1  A.  Yes, page six.

2          MR. TURNER:  All right.  Could you zoom in in this

3  area.

4          (Pause)

5  Q.  So tell us what we're looking at here.

6  A.  It appears that Altoid had made a posting on the bitcoin

7  form on January 29, 2011 and this member "shadow of" is cut off

8  had quoted it.  And it mentions what appears to be a URL for

9  Silk Road.

10          MR. TURNER:  All right.  I think if you scroll down AL

11  little bit more you can see the full name, "Shadow of

12  Harbinger"?

13  A.  Yes, that is the--

14          MR. TURNER:  Can you scroll back up.  All right.  So

15  first all there's in this part of the post right here?  Put the

16  name there.

17          (Pause)

18  Q.  Just to be clear, the person who posted this overall post

19  or the user is what?

20  A.  Shadow Harbinger.

21  Q.  The post includes a post from Altoid?

22  A.  Correct.

23  Q.  And what does that mean, a quote from another user like

24  that?

25  A.  Well, when you first on post on the bitcoin forum another

1    person say if they're responding to something you specifically

2    said they will often quote your statement in their response

3    that people can follow along with the conversation.

4    Q.  So this is a quote from a previous post that appeared on

5    the forum?

6    A.  Yes.

7    Q.  And what was the time of that previous post on the forum?

8    A.  January 29, 2011 at approximately 7:44.

9    Q.  And the user who posted that post was named "Altoid"?

10   A.  Correct.

11   Q.  All right.  And it says:

12        What an awesome thread.  You guys have a ton of great

13   ideas.  Has anyone seen Silk Road yet?  It's kind of like an

14   anonymous Amazon.com.  I don't think they have heroin on there

15   but they are selling other stuff.  They basically use bitcoin

16   and TOR to broker anonymous transactions.  It's at -- and then

17   there's that long onion address.  Those not familiar with TOR

18   can go to SilkRoad420.wordpress.com for instructions on how to

19   access the dot onion site.

20        Let me know what you guys think.

21        And then there's Shadow Harbinger's comments?

22   A.  Yes.

23   Q.  So here we go first bitcoin drug store response.

24        All right.  So in the post Altoid mentions this

25   SilkRoad420.wordpress.com site.  Did that web page still exist

1   by the time you were doing your Google searches in June 2013?

2   A.   No.   It had been taken down.

3   Q.   Were you able to obtain an archived version of the site?

4   A.   Yes.

5   Q.   Where did you get that from?

6   A.   Archive.org.

7   Q.   Could you take a look at what's been marked as 303 in your

8   binder.

9   A.   I have it.

10   Q.   Do you recognize this document?

11   A.   Yes.

12   Q.   How do you recognize it?

13   A.   That's a screen shot of the archive.org capture of the

14   SilkRoad420.wordpress.com site.

15          MR. TURNER:   The government offers 303 into evidence.

16          MR. DRATEL:   No objection.

17          THE COURT:   Received.

18          (Government's Exhibit 303 received in evidence)

19          MR. TURNER:   Can you put it up on the screen.

20          (Pause)

21          MR. TURNER:   Before you read it let me just read in a

22   stipulation, your Honor.

23          It is hereby stipulated and agreed by and between the

24   United States of America by Preet Bharara, United States

25   Attorney for the Southern District of New York, Serrin Turner

F1QAAULB2                        Alford - Direct

1    and Timothy C. Howard, Assistant United States Attorneys, of

2    counsel, and Ross Ulbricht, by and through his counsel Joshua

3    Dratel, Esquire, Government's Exhibit 303 is a screen shot of

4    an archived web page that was once success at

5    http://SilkRoad420.wordpress.com.

6           Government Exhibit 303 fairly and accurately depicts

7    the contents of the http://SilkRoad420.wordpress.com web page

8    as it appeared on February 4, 2011 when the web page was

9    archived on the website http:web?.

10          OK.  So could we zoom into this part of the screen?

11          (Pause)

12   Q.  So what did you find on SilkRoad420.wordpress.com?

13   A.  It was a website that it gave you the instruction of how to

14   access the Silk Road hidden site.

15   Q.  And it says:  This is not the Silk Road but you are close.

16   Silk Road is a TOR hidden service that allows you to buy and

17   sell anonymously online using bitcoins.  To access the Silk

18   Road site you must use a TOR enabled browser.  If you use

19   Firefox you can simply install the TOR button plug-in.

20          And then jumping to the next paragraph, the third

21   paragraph.  It says:

22          At Silk Road every precaution is made to ensure your

23   anonymity and security while connecting to the site from making

24   your transactions to receiving your items, current offerings

25   include marijuana, shrooms and MDMA.  You may also sell items

F1QAAULB2                       Alford - Direct

1    anonymously on Silk Road as an independent seller.  So what are

2    you waiting for.  Install TOR and go to Silk Road now.  Silk

3    Road staff.

4           So after finding this web page did you do any further

5    searches on Google?

6    A.  I did.

7    Q.  What did you search for next?

8    A.  The SilkRoad420workpress.com.

9    Q.  Could you look at Government Exhibit 304.  And do you

10   recognize that exhibit?

11   A.  Yes.

12   Q.  How do you recognize it?

13   A.  It's a representation of the Google search that I

14   performed.

15          MR. TURNER:  Your Honor, the government offers Exhibit

16   304 into evidence.

17          MR. DRATEL:  No objection.

18          THE COURT:  Received.

19          (Government's Exhibit 304 received in evidence)

20   Q.  So when you searched for SilkRoad420wordpress.com what new

21   thing did you find?

22   A.  I found that there was another posting.

23   Q.  And where was this posting that you found?

24   A.  It was at shroomery.org.

25   Q.  What was the date of posting?

F1QAAULB2                          Alford - Direct

1    A.  January 27, 2011.

2    Q.  The one we looked at from Altoid@bitcointalktor when was

3    that?

4    A.  Two days later January 29, 2011.

5    Q.  Could you take a look at Government Exhibit 305.

6    A.  I have it.

7    Q.  Do you recognize this exhibit?

8    A.  Yes.

9    Q.  How do you recognize this?

10   A.  This is a screen shot I took during my investigation of the

11   shroomery.org website.

12          MR. TURNER:  The government offers 305 into evidence.

13          MR. DRATEL:  No objection.

14          THE COURT:  Received.

15          (Government's Exhibit 305 received in evidence)

16          MR. TURNER:  Could you zoom in here.

17          (Pause)

18   Q.  OK.  So what was the shroomery website?

19   A.  It's also a discussion forum for a discussion of illegal

20   mushrooms.

21   Q.  And what did you find?  What post did you find when you

22   clicked on the Google link that you found as a result of your

23   search?

24   A.  I found this posting from Altoid and it also directed the

25   reader to the Word Press site.

1   Q.  All right.  And the user who posted it is reflected to the

2   left?

3   A.  Yes.

4   Q.  And when it says registered 1/27/11 what does that reflect?

5   A.  That reelects when the user registered the account on

6   shroomery.org.

7   Q.  The Altoid user?

8   A.  Yes.

9   Q.  When was this message posted?

10  A.  That same day.

11  Q.  It also directed you to go to SilkRoad420.wordpress.com?

12  A.  Yes, it did.

13  Q.  So after finding these two posts about the Silk Road by the

14  user Altoid what did you do to try to find out who the person

15  was behind the Altoid user name?

16  A.  Well, I wanted to see all the posts that those users made

17  on the relevant discussion forum.

18  Q.  And so what did you do to look into that?

19  A.  Well, the user -- you could click on the user and see posts

20  for that specific user.

21  Q.  Did you do that at shroomery.org?

22  A.  Yes.

23  Q.  Did you find any more posts?

24  A.  No.

25  Q.  What about bitcointalk.org?

F1QAAULB2                          Alford - Direct

1    A.   There were other numerous posts.

2    Q.   Could you take at look at Government Exhibit 306.

3    A.   I have it.

4    Q.   Do you recognize this exhibit?

5    A.   Yes.

6    Q.   And how do you recognize it?

7    A.   It's a screen shot I took during my investigation of the

8    post of Altoid on the bitcoin forum.

9            MR. TURNER:   The government offers 306 into evidence.

10           MR. DRATEL:   No objection.

11           THE COURT:   Received.

12           (Government's Exhibit 306 received in evidence)

13           MR. TURNER:   Top left.

14           (Pause)

15   Q.   OK.   So this page is all the posts of Altoid that you were

16   able to pull up on bitcointalk.org?

17   A.   Yes.

18           MR. TURNER:   Exit out.

19           (Pause)

20   Q.   Did you find the Altoid post on bitcointalk.org that you

21   looked at earlier, the one that is quoted?

22   A.   No, I did not.

23   Q.   Can a bitcointalk user delete a post of theirs if they

24   want, do you know?

25   A.   Yes,they can.

1   Q.  Can the site itself choose to delete a post --

2              MR. DRATEL:  Objection.

3              THE COURT:  Sustained.

4   Q.  Have you visited bitcointalk forum?

5   A.  Yes I have.

6   Q.  Have you seen any rules of the site, any moderator actions

7   on the site?

8   A.  Yes.

9   Q.  And from that review of the site do you know whether

10  moderators on the site can delete content on the site?

11             MR. DRATEL:  Objection.

12             THE COURT:  Rephrase it.

13  Q.  Sure.  From familiarizing yourself with the site, the rules

14  of the site, do you know whether moderators on the forum can

15  delete forum posts if they think inappropriate?

16             MR. DRATEL:  Objection.

17             THE COURT:  I will allow it.  It's not a perfectly

18  formed question but it's fine.  You may answer it.

19  A.  Yes, they can delete and a user can delete.

20  Q.  Do you know if the user post is deleted can any quotes from

21  those users posts still show up in other user messages?

22             MR. DRATEL:  Objection.

23             THE COURT:  Sustained.  You need to build --

24             MR. TURNER:  I was asking if he knows, your Honor.

25  Q.  Have you yourself tested the features of bitcointalk.org

F1QAAULB2                          Alford - Direct

1    forum?

2    A.  I have.

3    Q.  Have you tried -- can you explain from that testing that

4    you've done of the site, do you know that if a user's post is

5    deleted can a quote of that post still show up on the site?

6    A.  Yes, I can.  I went to the site and I tested it.  I went to

7    the site and registered an account and I put a test post up.

8    Subsequent to that post I then quoted that same post so I can

9    see that it quoted my original post.  I then went and deleted

10   the original post and see if the second post remained, which it

11   did.  So I know that if someone can't post on a site someone

12   can delete it.  But if one quotes a post it'll remain on the

13   discussion forum.

14   Q.  What were you able to find in the posts of Altoid that you

15   were able to pull up on the bitcoin.org forum?

16   A.  I found a post and I found the user had left an e-mail

17   address.

18            MR. TURNER:  Can you zoom-in on the full post here.

19            (Pause)

20   Q.  Is this a post you are referring to?

21   A.  Yes, sir.

22   Q.  And what's the date of the post?

23   A.  October 11, 2011.

24   Q.  And it's titled bitcoin project development IT pro needed

25   for venture back bitcoin start-up?

F1QAAULB2                        Alford - Direct

1   A.  Yes.

2   Q.  Hello.  Sorry if there is another thread for this kind of

3   post but I couldn't find one.  I am looking for the best and

4   brightest IT pro in the bitcoin community to be the lead

5   developer in a venture backed bitcoin start-up company.  The

6   ideal candidate would have at least several years of web

7   application development experience having built applications

8   from the ground up.  A solid understanding of OOP and software

9   architecture is a must.  Experience start-up environment is a

10  plus or just being super hardworking, self-motivating and

11  creative.

12          Compensation can be in the form of equity or a salary

13  or somewhere in between.

14          If interested, please, send your answer to the

15  following questions to RossUlbricht@G mail.com.

16          What are your qualifications for this position?

17          What interests you about bitcoin?

18          From there we can talk about things like compensation

19  and references and I can answer your questions as well.  Thanks

20  for in advance to any interested parties.  If anyone knows

21  another good place to recruit, I am all ears.

22          So at some point in the investigation did you obtain a

23  search warrant on the Ross Ulbricht@Gmail.com e-mail account?

24  A.  I did.

25  Q.  And when did you obtain that search warrant?

F1QAAULB2                       Alford - Direct

1  A.  Approximately, October 78, 2013.

2  Q.  So this was after the defendant's arrest in this case?

3  A.  Approximately, a week after.

4  Q.  And how does that work?  When you obtain a search warrant

5  on an e-mail account how do you get records?

6  A.  Well, in this case you get a search warrant to swear out in

7  front of a judge.  Once it's sworn out then Google usually

8  requires --

9          MR. DRATEL:  Objection, your Honor.

10          THE COURT:  I'll allow it.  You may continue.

11  A.  Google allows you to scan it and then send via e-mail a

12  search warrant to them and then they produce the records and

13  they usually produce the records in the form of a thumb drive.

14  Q.  Objection.  So did you get the records from Google?

15  A.  Yes.

16  Q.  When, approximately, did you get the records?

17  A.  I will have to refresh my memory.  It wasn't too long

18  after.

19          MR. TURNER:  I have a stipulation.  Let's now read the

20  stipulation, your Honor, if I may.

21          THE COURT:  All right.  Ladies and gentlemen, you

22  recall from an earlier stipulation, not the one earlier today

23  but last week or perhaps even at the end of the first week,

24  that stipulations are agreements between the parties as to

25  certain facts and you can take those facts as established.

F1QAAULB2                    Alford - Direct

1            You may proceed.

2            MR. TURNER:  It is hereby stipulated and agreed by and

3   between the United States of America, by Preet Bharara, United

4   States Attorney for the Southern District of New York, Serrin

5   Turner and Timothy Howard Assistant United States Attorneys, of

6   counsel, and Ross Ulbricht by and through his counsel, Joshua

7   Dratel, Government Exhibits 307, 308-A, 308-B, 309, 311, 312,

8   312-C, 314, 315-A, 315-B, 316, 317, 320, 321, 322, 324, 325,

9   329, 330, 1000, 1001, 1002, 1003, 1004, 1006, 1007, 1008 are

10  true an accurate copies of e-mails contained in e-mail account

11  RossUlbricht@Gmail.com as of December 3, 2013.

12           All of the e-mail were maintained on computer servers

13  controlled by Google Inc. and were produced to Internal Revenue

14  Service Special Agent Gary Alford pursuant to a court order

15  served on Google on or about October 22, 2013.

16           Government Exhibit 1000, 1001, 1002, 1003, 1004, 1006,

17  1007 and 1008 and particular are logs on the record chats

18  conducted through Google Talk, an online chat service operated

19  by Google Inc.  Google also provided the option to conduct

20  chats off the record, OTR, which are not stored at Google Chat

21  Talk either parties communicating through the chat.

22           I'll read the remainder later.

23           OK.  So you didn't receive these records until after

24  the defendant was arrested; is that right?

25  A.   Correct.

F1QAAULB2                    Alford - Direct

1   Q.  First of all, in reviewing the contents of this

2   RossUlbricht@Gmail.com account did you find any evidence that

3   the user of the account was Ross Ulbricht, the defendant in

4   this case?

5   A.  Yes.

6   Q.  And what kind of evidence did you find along those lines?

7   A.  I found communication to and from the defendant.  I found

8   pictures representing the defendant.  I found e-mails regarding

9   financial accounts of the defendant.

10          THE COURT:  Mr. Turner, did you mean to offer the

11  documents that you'd read, the exhibit numbers of.

12          MR. TURNER:  I can just do it now or when I go through

13  them.

14          THE COURT:  All right.  So long as you haven't

15  forgotten if that was your intent.  You can do it whenever.

16          MR. TURNER:  The stipulation is Government Exhibit

17  803.

18  Q.  Take a look at Government Exhibit 307.

19  A.  Got it.

20  Q.  Do you recognize that document?

21  A.  Yes.

22  Q.  This is one of the e-mails you found in the account?

23  A.  It is.

24  Q.  What is it of?

25  A.  It's a e-mail that, from the defendant to an individual

1    named Crystal with an attachment and it states:  I cut hair

2    today.  What do you think?

3              MR. TURNER:  The government offers 307 into evidence.

4              MR. DRATEL:  No objection.

5              THE COURT:  Received.

6              (Government's Exhibit 307 received in evidence)

7              MR. TURNER:  Zoom in quickly.

8    Q.  So the bottom of the message is:  I cut my hair today.

9    What do you think?  Which is an attachment to the e-mail?

10   A.  Yes.

11   Q.  Page two, the attachment?

12   A.  Yes.

13   Q.  You find our other e-mails, photos of the defendant like

14   this in the account?

15   A.  Yes.

16   Q.  So going back to the posts from Altoid.  Did you find any

17   e-mail messages in the defendant's e-mail account that were

18   addressed to Altoid?

19   A.  Yes.

20   Q.  Take a look at Government Exhibit 306-A -- excuse me --

21   308-A.

22              (Pause)

23   A.  I have it.

24   Q.  What is this document?

25   A.  It's an e-mail from shroomery.org website to Altoid with

F1QAAULB2                          Alford - Direct

1    the address RossUlbricht@Gmail.com.

2            MR. TURNER:  Government Exhibit 308-A into evidence.

3            MR. DRATEL:  Previous objection, your Honor.

4            THE COURT:  All right.  Those objections are overruled

5    308 A is received.

6    Q.  So this message is from the shroomery.  Do not reply at

7    shroomery.org?

8    A.  Yes.

9    Q.  To Altoid.  And then the user's e-mail address is indicated

10   as RossUlbricht@Gmail.com?

11   A.  Yes.

12   Q.  Subject is shroomery message board account has been

13   created.  Date is 1/27/2011, 6:22 p.m.  When we look back at

14   shroomery post of Altoid, when did that indicate the account

15   had been registered?

16   A.  January 27, 2011, same date.

17   Q.  It says:  Dear Altoid, you have successfully created an

18   account on the shroomery message board.  Thanks for signing up.

19   Before you can use your account it must be activated.  To

20   complete the process, please, click on the following link or

21   paste it into your browser.

22            Did you find any other e-mails in defendant's e-mail

23   account addressed to Altoid?

24   A.  Yes.

25   Q.  Could you take a look at Government Exhibit 308-B?

F1QAAULB2                    Alford – Direct

1   A.  I have it.

2   Q.  Do you recognize this document?

3   A.  Yes.

4   Q.  What is it?

5   A.  It is answer e-mail I found in the Defendant's G mail

6   account.

7   Q.  And what is it about?

8   A.  It is an e-mail from Drugs Forum to the defendant addressed

9   to Altoid.

10          MR. TURNER:  Government offers 308-B into evidence.

11          MR. DRATEL:  Same.

12          THE COURT:  Those objections are overruled.  308 B is

13   received.

14          (Government's Exhibit 308-B received in evidence)

15   Q.  OK.  This is from February 9, 2011?

16   A.  Correct.

17   Q.  About two weeks later, the e-mail we just looked at?

18   A.  Yes.

19   Q.  It said private message, the Drugs Forum, have you been to

20   Drugs Forum, by the way?

21   A.  I have.

22   Q.  What kind of website is it?

23   A.  Also a discussion forum about illegal substances.

24   Q.  It's from Drugs Forum, date February 9, 2011 to

25   RossUlbricht@Gmail.com.

1       (Pause)

2   Q.  It says do not reply to this e-mail.

3       Dear Altoid, have you received a new private message

4   at Drugs Forum from Fungus Head entitled "you have received an

5   infraction at Drugs Forum".  To read the original version,

6   respond to or delete this message you must log-in here.  This

7   is the message that was sent.

8       Dear Altoid, you've received an infraction at Drugs

9   Forum.  Reason:  Spamming.  This infraction is worth 100 points

10  and may result in restricted access until it expires.

11      Zoom out.

12      (Pause)

13  Q.  Original post.  URL attach user received.  No action

14  required.

15      Has anyone heard of Silk Road?  They claim to be an

16  anonymous market place that uses TOR and bitcoin to broker

17  anonymous transactions.  They seem legit but wanted to see if

18  anyone here has any experience on the site.  The hidden URL

19  is -- and then there's a link -- or you can go through

20  http://SilkRoad420.wordpress.com.  Would be interested to hear

21  any feedback.  All the best, Drugs Forum.

22      So you say you have been to Drugs Forum?

23  A.  Yes.

24  Q.  And you've been to a number of other discussion forums as

25  well as part of your research?

F1QAAULB2                       Alford - Direct

1   A.  Yes.

2   Q.  Based on that experience can you explain what an infraction

3   is on that discussion forum?

4           MR. DRATEL:  Objection.

5           THE COURT:  Why don't you do a little bit more in

6   terms of building a foundation.

7   Q.  Do you know what an infraction is on a discussion forum?

8   A.  Yes.

9   Q.  How do you know?

10  A.  It's usually a violation.

11          MR. DRATEL:  Objection.

12  Q.  How do you know?

13          THE COURT:  I'll allow it.

14  A.  When you go to discussion forum there's a term of service.

15  An infraction is when you violate the terms of service on that

16  discussion forum.

17  Q.  What was the reason according to this e-mail that Altoid

18  was being notified that he gotten an infraction?

19          MR. DRATEL:  Objection.

20          THE COURT:  Overruled.

21  A.  Spamming.

22  Q.  Where is the spam located?

23  A.  In that box where the message was sent.

24          MR. TURNER:  OK.  Could you put up Government Exhibit

25  240-A which has already been admitted into evidence.  This is

1    journal file labeled 2010.  The jury's already heard.  Could

2    you put it in top panel.

3             MR. DRATEL:  I am going to object, your Honor.

4             THE COURT:  Overruled.

5             MR. TURNER:  Could you go to page two.

6             (Pause)

7             MR. TURNER:  Could you pull it up so we can get part

8    of the top panel.

9             (Pause)

10   BY MR. TURNER:

11   Q.  It says:  While all of this was happening I began working

12   on a project that had been in my mind for over a year.  I was

13   calling it Underground brokers but eventually settled on Silk

14   Road.  The idea was to create a website where people could buy

15   anything anonymously with no trail whatsoever that could lead

16   back to them.  I had been studying the technology for a while

17   but needed a business model and strategy.  I finally decided

18   that I would produce mushrooms and I could list them on the

19   site for cheap.  I worked my ass off setting up a lab in a

20   cabin out near Bastrop off the grid.

21            Did you find the e-mail notice Defendant's E mail

22   account about renting a place in Bastrop Texas?

23   A.  Yes, I did.

24            MR. DRATEL:  I am objecting to the reading before with

25   no question.

F1QAAULB2                           Alford - Direct

1         THE COURT:  Overruled.  You may proceed.

2    Q.  I should just make clear, have you reviewed the contents of

3    the defendant's laptop as part of your investigation?

4    A.  Yes.

5    Q.  That evidence was given to you by the FBI?

6    A.  Yes.

7    Q.  All right.  So could I take a look at Government's Exhibit

8    314, please.  Do you recognize this document?

9    A.  Yes.

10   Q.  How do you recognize it?

11   A.  It's an e-mail in the Defendant's G Mail account.

12   Q.  What's it about?

13   A.  It's a e-mail regarding Craig's List about renting a

14   country home in Bastrop.

15        MR. TURNER:  The government offers 314 into evidence.

16        MR. DRATEL:  Previous objection, your Honor.

17        THE COURT:  All right.  Those objections are

18   overruled.

19        GX314 is received.

20        (Government's Exhibit 314 received in evidence)

21        MR. TURNER:  Put that in the bottom panel, please.

22        (Pause)

23   Q.  Subject $825/two bedroom country home (Bastrop) from Ross

24   Ulbricht date July 6, 2010, 6:37 p.m.  Is your house still

25   available, Ross?  And then there's a Craig's List listing.

1           Jump down to page two.

2                (Pause)

3           Yes, it is.  Give me a number to call you back.

4           Reply?

5    A.  Yes.

6    Q.  Did you also review something on the defendant's commuter

7    labeled SR accounting?

8    A.  Yes, I did.

9    Q.  What was the nature of that document?

10   A.  That was a spreadsheet of expenses.

11          MR. TURNER:  Could you publish Government Exhibit 250?

12              (Pause)

13   Q.  The dates of these entries are all from July 2010.  The

14   first one is "start", then it's "lab clothes", "carryover from

15   fall 2009", "petri dishes", "Hepa filter", carryover from fall

16   2009.  Did you find anything in the government's -- excuse

17   me -- in the defendant's e-mail account about any items like

18   this?

19   A.  Yes, I did.

20   Q.  What sort of things did you find?

21   A.  I found e-mails related to the purchase of the Hepa filter.

22   Q.  Can you take a look at Government Exhibit 315-A, please.

23              (Pause)

24   A.  Got it.

25   Q.  And what is this document?

F1QAAULB2                        Alford - Direct

A.   It is an e-mail from Sac sells or Sac distributors to the

defendant regarding the purchase of a pure clean room Hepa

filter.

          MR. TURNER:   The government offers Exhibit 315-A into

evidence.

          MR. DRATEL:   Same objections.

          THE COURT:   Those objections are overruled.

Government Exhibit 315-A is received.

          (Government's Exhibit 315-A received in evidence)

Q.   Subject orders shipped from SAC sales, date October 1, 2009

to RossUlbricht@Gmail.com.   Then it says:   Thank you for your

purchase to SAC sales.   Your order has been shipped.   The

description a precision air pure flow clean room Hepa filter

and the total cost is $88.94.   What was the cost of the expense

reflected in the spreadsheet?

A.   $89.

          MR. TURNER:   Could you put go back to the top panel

and scroll down some.

          THE COURT:   Mr. Turner, we are going to take a short

one break before we end, so you don't have to do it right now

but at some point when you reach a logical breaking point.

          MR. TURNER:   Sure.

Q.   OK.   There's some more entries here.   Now we're in August

of 2010.   We have containers, jars, hose, glue guns, plastic

sheet, one for gas, one for humidifier.   Again, did you find

F1QAAULB2                          Alford - Direct

1    any e-mail receipts in the Defendant's e-mail account

2    reflecting any of these items?

3    A.  Yes, I did.

4    Q.  Take a look at Government Exhibit 315-B.

5    A.  I have it.

6    Q.  What is this document?

7    A.  It's an e-mail from Amazon.com to the defendant regarding a

8    purchase he made.

9            MR. TURNER:  The government afters 315-B into

10   evidence.

11           MR. DRATEL:  Same objection.

12           THE COURT:  All right.  Those objections are

13   overruled.  Government Exhibit 315-B is received.

14           (Government's Exhibit 315-B received in evidence)

15   Q.  Header information, subject, your order with Amazon.com.

16   The date 8/16-201, Ross Ulbricht.  Thank you for your order,

17   Ross Ulbricht.

18           Scroll down, please.

19           (Pause)

20   Q.  OK.  So the delivery estimate is given for a cool mist

21   humidifier, $33.42?

22   A.  Yes.

23   Q.  How does that compare to the spreadsheet entry that you

24   saw?

25   A.  It's within 42 cents of the 33 dollar entry.

F1QAAULB2                        Alford - Direct

1   Q.  So were these the only items you found like this that

2   matched -- excuse me.  Were these the only e-mails you found on

3   the defendant's e-mail account that matched items on the

4   spreadsheet or were there others?

5   A.  There were numerous others.

6           MR. TURNER:  Government Exhibit -- actually I'll stop

7   there, your Honor.

8           THE COURT:  All right.  So ladies and gentlemen, let

9   just take a short break and then we'll come back and we'll sit

10  until noon.  I want to remind you not to talk to each other or

11  anybody else about this case.  Thanks.

12          (Jury not present)

13          THE COURT:  All right.

14          (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

1       (In open court; jury not present)

2       (Witness temporarily excused)

3           THE COURT:  All right.  Let's all be seated.  It's

4   just going to be a short break.  I just wanted to make sure

5   that the jury had some break this morning.

6           I think in terms of the objections, the documentary

7   objections are in the nature of *Vayner* and hearsay.  And the

8   *Vayner* objections we have gone over before for this particular

9   witness, the documents that he is getting in to, which there's

10  been an objection on *Vayner* grounds, have been appropriately

11  authenticated.  In terms of hearsay, they are not for the

12  truth.

13          But I do want, Mr. Dratel, to give you an opportunity

14  to make the objection relating to the reading of the document

15  because that's one that we haven't yet encountered.

16          MR. DRATEL:  Right.

17          THE COURT:  You and I are familiar with another trial

18  with a similar objection, but I wanted you to make your record

19  and have the government respond.

20          MR. DRATEL:  Thank you, your Honor.  First on the

21  issue of initial exhibits, I didn't object because they were

22  authenticated.  He was just saying what he did on the Internet,

23  but they shouldn't come in for the truth either because it's

24  really just about his process, so therefore they were -- in

25  other words, he said I took the screenshot, so it was the

F1qgulb3                    Trial

1    screenshot, but, in fact, it shouldn't come in for the truth

2    either.

3              But with respect to the reading, the government

4    shouldn't get a chance to sum up periodically throughout the

5    case.  There wasn't a question or an answer.  I understand the

6    linkage between one exhibit and another exhibit if a question

7    is posed to the witness to do it, but not with the wholesale

8    reading of a post that has already been read in at the time

9    that it was put in evidence.  I think through Mr. Kiernan, that

10   Mr. Howard read the same part.  So, in that context, it's got

11   to be narrow in the sense of not exploiting the fact that it's

12   in evidence for the government to just simply reiterate its

13   evidence and get a midterm summation.

14             THE COURT:  Mr. Howard.

15             MR. TURNER:  This is evidence already admitted into

16   evidence.  This is evidence that this agent reviewed and it's

17   important to give context -- it is part of the question.  The

18   question is you reviewed this, did you find any evidence that

19   links to it in some way in the defendant's email account.

20   Without that context, the question doesn't make much sense and

21   there's no reason why the jury needs to be confused as to the

22   relevance of the questioning going on.

23             THE COURT:  I allowed the question.  And so long as

24   it's tied in a manner that you've suggested or otherwise not

25   cumulative, in other words, the government is not just slapping

F1qgulb3                    Trial

1       up a document time after time without needing it for purposes

2       of context, I will continue to allow it but will be mindful of

3       if there's a point when it becomes cumulative.

4                   MR. TURNER:  I note a couple of things.  First of all,

5       most of the exhibits that we're going to be fronting in this

6       manner the jury has either not seen before or have not seen the

7       portions from which I'll be reading.

8                   But can I make a record on the hearsay point?

9                   THE COURT:  Yes.

10                  MR. TURNER:  These statements are not human statements

11      and the law is very clear under the federal rules that the

12      hearsay rules only apply to human statements.  We have some

13      automatically-generated statement by Amazon or by a forum, a

14      discussion forum software, those are machine statements.  I can

15      give your Honor law from several circuits.

16                  THE COURT:  How are you going to get in that it was

17      done by a machine as opposed to a human being sitting there

18      cutting and pasting his rules and slapping it onto an

19      infraction?

20                  MR. TURNER:  That's a different matter.  I'm talking

21      about, for example, just the fact of the post, I think the fact

22      that the Altoid post shows up there and we can have the agent

23      testify that he tested out the discussion forum software, and

24      the post automatically flashes up on the screen, you don't need

25      a human being to type it up there.

F1qgulb3                    Trial

1        THE COURT:  I thought you were referring to the

2   infraction language from drug forum.

3        MR. TURNER:  No.  I'm just speaking generally when we

4   are talking about these computer-generated the statements.

5        THE COURT:  Let me be clear:  Your point is that the

6   word Altoid as a username when it is appearing on a forum post

7   is, according to the testimony, automatically generated?

8        MR. TURNER:  Right.

9        THE COURT:  Therefore, because it's automatically

10  generated, it's not a, quote, statement or a declarative

11  statement for hearsay purposes and, therefore, the hearsay

12  rules don't apply?

13       MR. TURNER:  Right.  The hearsay rules exist to

14  protect against problems of witness credibility, witness

15  memory, out-of-court declarant's memory, perception.  Those

16  sort of issues, those sort of concerns do not apply to

17  statements automatically generated by computer.  All I'm saying

18  is I'm not focusing on one exhibit we talked about in

19  particular, but when we're looking at these emails things like

20  Amazon receipts, etc., those are documents that are

21  automatically generated by computer.

22       THE COURT:  How do we know that?

23       MR. TURNER:  We can have the agent testify that he

24  shopped at Amazon before and it automatically pops up.  We can

25  have a custodian from Amazon actually testify to that, but I

F1qgulb3                    Trial

1    think it's common knowledge.

2           THE COURT:  We'll see whether it's contested, but I

3    just want to note that if you're going to assert that something

4    falls within an exception or there's not even the need to go to

5    that exception, that it falls outside of a rule, while I might

6    intuitively think it or somebody else might intuitively think

7    it, I want to make sure that we either have a legal or

8    evidentiary basis.

9           If it's been established in prior cases that such

10   kinds of messages are automatically generated, then so be it.

11   It would strike me as the kind of thing where potentially it

12   could become a question of fact.  So I just want to make sure

13   that you understand that I hear your legal proposition; whether

14   you've got a sufficient factual basis for that proposition I

15   think is a second question.

16          MR. TURNER:  Okay.  Just to be clear, we do fully

17   agree with your Honor that these things are not coming in for

18   the truth in any event, but we just wanted to note that even if

19   it were, these are not human statements.  And if we need to

20   make more of a record on that, we can.  But these are the sorts

21   of things that are generated when you do things on the computer

22   automatically by the system of the company you're using.

23          THE COURT:  Mr. Dratel, first, and then I'll let you

24   say whatever you would like, but I want to make sure that I

25   understand your position on whether there's a factual dispute

F1qgulb3                    Trial

1    as to whether certain of the Amazon messages, for instance, are

2    made by a machine or made by a human, similarly with respect to

3    Altoid.

4              MR. DRATEL:  Right.  There's no evidence that they're

5    computer-generated.  I don't even know what that means in this

6    context; that unless we are in a world of artificial

7    intelligence that I don't believe we have reached yet, there

8    are no spontaneous computer-generated pieces of information.

9    They're all programmed by human beings.  If I cut and paste

10   something and then hit a keystroke, is that automated?

11             THE COURT:  I think that's a legal question.

12             MR. DRATEL:  Yes, but even as a factual question, it's

13   not in evidence, so it's not established, so I'm not conceding

14   anything on that point.

15             THE COURT:  Here's what I think the government should

16   do for this point just so we're clear -- there's plenty of time

17   for the government to do if it chooses to, it's up to you

18   folks -- one, I'd like to see some of the cases.  I don't doubt

19   that if you say they exist, there are cases.  I don't know

20   whether there are cases on both sides.  I have not investigated

21   this issue, so I would appreciate whatever cases there are,

22   that you folks would like to make me aware of on either side of

23   this issue to understand the legal landscape; but, secondly, as

24   a factual matter, I think that even if the legal landscape says

25   automatic population of text on a page is not a declarative

F1qgulb3                    Trial

1    statement for hearsay purposes, I think it must be, not having

2    read these cases, that the analytical background to that is

3    there's a certain amount of reliability in the coding of the

4    statement into the program, and so that, therefore, you get the

5    reliability of the declarative statement through the computer

6    program.  If that's the case, then you need to demonstrate

7    factually that, in fact, you can rely upon that analytical

8    framework.  That's my guess.  You guys will look at the cases

9    and decide whether or not you're within striking distance of

10   the parameters, but I would think that would be close to the

11   analytical foundation.

12          Let's take a short break.

13          Mr. Dratel, was there anything else you wanted to say?

14   We were only dealing with that one issue.

15          MR. DRATEL:  I think that's it.

16          THE COURT:  Thank you.  Let's take a short break and

17   come right back out.

18          (Recess)

19          (Continued on next page)

20

21

22

23

24

25

F1qgulb3                         Trial

1

2                      (In open court; jury present)

3                 THE COURT:  Will you all be seated, please.

4                 Mr. Turner, you may proceed.

5                 MR. TURNER:  Thank you, your Honor.

6    BY MR. TURNER:

7    Q.  Agent Alford, you testified that you reviewed the contents

8    of the defendant's computer as part of your investigation?

9    A.  Yes, I did.

10   Q.  And you reviewed the contents of the defendant's email

11   account?

12   A.  Yes, I did.

13   Q.  And did you do any comparison between the two?

14   A.  Yes, I did.

15   Q.  And what were you looking for?

16   A.  I was looking for things that matched information on the

17   defendant's computer versus information in the Google account

18   or Facebook account.

19   Q.  Okay.  We'll get to Facebook in a minute.

20          Let's go to Government Exhibit 240B.  This has already

21   been admitted into evidence.  This is another journal entry on

22   the defendant's computer.  This one is dated 2011.  Can you

23   zoom in on the first eight lines or so.

24          It says "Still working on good wagon books and Silk

25   Road at the same time. Programming now.  Patchwork php mysql.

f1qgulb3                    Alford - direct

```
 1   Don't know how to host my own site.  Didn't know how to run
 2   bitcoind.  Got the basics of my site written.  Launched it on
 3   freedomhosting."
 4            Do you know what freedom-hosting is?
 5   A.  Yes.
 6   Q.  What is it?
 7   A.  It was a site where you can host websites.
 8   Q.  Websites where?
 9   A.  Usually on the dark web.
10            MR. DRATEL:  Objection.
11   Q.  You mean Tor?
12   A.  Tor.
13            THE COURT:  Sustained, but you can repeat that last Q
14   and A so it's clear.
15            MR. TURNER:  Sure.
16   Q.  Just to be clear, where were websites on freedomhosting,
17   where did they exist?  On Tor or the ordinary Internet?
18   A.  Tor.
19   Q.  So can you see any reference in the defendant's email
20   address, in the defendant's email account about freedomhosting?
21   A.  Yes, I did.
22   Q.  Can you take a look at Government Exhibit 309.  Do you
23   recognize this document?
24   A.  Yes.
25   Q.  What is it?  What is it from?
```

f1qgulb3                          Alford - direct

1    A.  It's an email from miller@roothosts to the defendant

2    regarding freedomhosting.

3              MR. TURNER:  Government offers Exhibit 309 into

4    evidence, your Honor.

5              MR. DRATEL:  Hearsay and *Vayner*, your Honor.

6              THE COURT:  Those objections are overruled and

7    Government Exhibit 309 is received.

8              (Government's Exhibit 309 received in evidence)

9              MR. TURNER:  Can you zoom in at the top third there,

10   please.  That's good.

11   Q.  So this is an email, the subject is "Re:  Tor hidden

12   service."  And I think the chain actually starts down at the

13   bottom, so if you can go down there.

14             On September 24, 2010 at 12:36 a.m. Ross Ulbricht

15   wrote "Hi, is it possible to set up a tor hidden service on

16   your servers?"

17             Go up.  This person is writing back from someone at

18   roothosts.com?

19   A.  Yes.

20   Q.  And the reply is "Hello Ross.  No, sorry. I suggest you

21   look at Freedom Hosting or KOGEOX," and several dot-onion

22   addresses are provided below that.

23             As part of your review of the defendant's computer,

24   did you also look at some of the Tor chat logs on the

25   defendant's computer?

f1qgulb3                    Alford - direct

1    A.  I did.

2    Q.  Did those include Tor chats with the username h7?

3    A.  Yes.

4            MR. TURNER:  Could you please publish GX 224, which

5    has already been admitted into evidence.

6            Okay.  And could you go to the bottom of page two,

7    please, and zoom in on that.  This is page 17 of an 88-page

8    chat log.  The date is October 30, 2011.

9            H7 says "How was your week?

10           Myself:  Not bad.  I will be traveling soon, so I have

11   much to do before I go and I didn't get as much done as I

12   wanted, but this week I will focus on getting out of town.

13           H7:  Okay."

14           Go down to the next page.

15           "h7:  Is it just you over there?

16           Myself:  I have people to take care of, but I'll be

17   traveling alone.  Is that what you mean?

18           H7:  No, when you leave town will anyone be looking

19   after the servers?

20           Myself:  Oh, yes indeed.

21           H7:  Because I see "The Silk Road Staff" written in

22   messages but I don't know if it's just you or not.

23           Myself:  It's basically just me, but more and more I

24   am trying to spread the responsibility around.  You are a big

25   part of that."

f1qgulb3                          Alford – direct

1              Can you go back to page two again, please, the bottom.

2              MR. DRATEL:  Objection, your Honor.

3              THE COURT:  Overruled.

4    BY MR. TURNER:

5    Q.  It says "myself:  I will be traveling soon."  And the date

6    of that is October 30th, 2011.

7    A.  Yes.

8    Q.  In the defendant's email account, did you see any evidence

9    of travel plans around this time?

10   A.  Yes, I did.

11   Q.  Can you take a look at Government Exhibit 329, please.  Do

12   you recognize this document when you get to it.

13   A.  Yes.

14   Q.  What is it?

15   A.  It's an email from CheapAir to rossulbricht@gmail.com

16   regarding airline tickets.

17             MR. TURNER:  The government offers Government

18   Exhibit 329 into evidence.

19             MR. DRATEL:  Hearsay and *Vayner*, your Honor.

20             THE COURT:  Those objections are overruled.  GX 329 is

21   received.

22             (Government's Exhibit 329 received in evidence)

23             MR. TURNER:  Could you scroll down.  Let's see.  Let's

24   do the header information first, please.

25   Q.  This is dated October 18, 2011; is that right?

f1qgulb3                    Alford - direct

1    A.  Yes.

2    Q.  It says "Confirmation for Ross Ulbricht."

3            Could you scroll down, please.  Can you zoom in on the

4    flights.  It's hard to read here but can you describe what

5    flights were shown?

6    A.  There's an itinerary.  One leg is dated Tuesday

7    November 15, '11, for Austin, Texas to Denver, Colorado; then

8    there's a second leg from Denver, Colorado to Los Angeles,

9    California; then there's a third leg from Los Angeles,

10   California to Sidney, Australia.

11   Q.  Does the itinerary include a return trip on the second

12   page?

13   A.  Yes, it does.

14   Q.  And what is that return trip?

15   A.  The first leg is Tuesday, April 3rd, 2012.

16   Q.  About six months later?

17   A.  Yes, sir.  And it's departing from Sidney, Australia to San

18   Francisco, California; and then the final leg is April 3rd,

19   2012, from San Francisco, California to Austin, Texas.

20   Q.  Could we take a look -- could we go back to Government

21   Exhibit 224, please, up at the top.

22           MR. DRATEL:  Objection.  This is the fourth time it's

23   going to be read.

24           THE COURT:  Overruled.  Overruled.

25           MR. TURNER:  It wasn't read before.

f1qgulb3                        Alford - direct

1          THE COURT:  You can proceed.

2          MR. TURNER:  Could you go to page four, please and

3     zoom in to the conversation at the bottom.  Can you actually

4     bring it into the center panel.  Pages 52 through 53 of the

5     88-page chat log.  December 15, 2011 is the date of the chat

6     starts.

7          "myself: By the way, I'm going to be unavailable from

8     about 4 am UTC Friday to about the same time on Sunday, so I'll

9     send you your pay tomorrow.

10         h7: k, you forgot me last week

11         h7: and can u send 100USD to Silk Road HR for this

12    weeks bounties?

13         myself: you are right, so sorry about that. sending

14    $3k now for last week and this week."

15    Q.  So, did you find any emails in the defendant's Gmail

16    account about any travel plans the weekend of December 15,

17    2011?

18    A.  Yes, I did.

19    Q.  And what did you find?  Take a look at Government

20    Exhibit 330.

21    A.  I found an email from Cally Ulbricht to the defendant

22    regarding a houseboating trip.

23    Q.  Is that a Government Exhibit 330?

24    A.  Yes, it is.

25         MR. TURNER:  Government offers 330 into evidence, your

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

f1qgulb3                         Alford - direct

1    Honor.

2             MR. DRATEL:  Objection, your Honor; hearsay and

3    *Vayner*.

4             THE COURT:  Overruled.  Government Exhibit 330 is

5    received.

6             (Government's Exhibit 330 received in evidence)

7             MR. TURNER:  Could you zoom in on the message headers?

8    That's good.

9             Subject:  Houseboating final checklist from Cally

10   Ulbricht date December 15, 2011 to Ross Ulbricht.  "Seafarers,

11   if you remember nothing else for our trip tonight remember

12   these important points:  We'll be setting off at 7:00 p.m." and

13   it goes on to offer various instructions.

14            And actually, if you could go down, Mr. Evert, to page

15   three.  Listing for Boat 2 and person number ten is listed as

16   Ross Ulbricht for both days?

17   A.  That's correct.

18   Q.  Take a look at Government Exhibit 226I, please.  Zoom in.

19   So who is this chat with?

20   A.  VJ.

21   Q.  And what's the date of the chat?

22   A.  January 26, 2012.

23   Q.  So this is page 383 to 384 of a 1,096-page chat log and it

24   says:

25            "myself: also, there is no sr user called smedley, I

f1qgulb3                      Alford - direct

1   guess he hasn't make him yet

2        myself: pretty great. speaking of spliffs, they are

3   abundant here, so I may just have to partake."  Emoticon.

4        "vj: Ah, I'll send him a note about that — when he

5   said he was on at both sites, I guess he meant the private

6   forums and the SRForums

7        vj: Yeah, had zero sleep last night due to leg/muscle

8   cramps, and there was in the mail today a 1oz. time of

9   Tangerine pheno AOrange from ~s, that's taken about a month to

10  wend it's way to me. Kismet, I say.

11       vj: 1oz. tin., oops.

12       vj: Are you managing to relax?

13       myself: yea, for sure. friendly folks everywhere. very

14  relaxing environment.

15       vj: Sounds very Thai

16       myself: haha, I didn't expect you to start guessing

17       vj: Heh — was a comment, not a guess. I love thailand

18  for the weather, the people, and the weed ain't bad either."

19       Can you pull back up.  Can you go down to the bottom

20  of this chat.  This is from a few days later, February 1, 2012,

21  is that right?

22  A.  Yes.

23  Q.  It starts out:

24       "myself: ok, yea I keep all of my income/expenses from

25  the site on a spreadsheet

f1qgulb3                        Alford - direct

1          vj: how many concurrent users does the site have?

2          myself: I'm actually not sure

3          myself: I think I have 24 hrs, lemme see

4          vj: k

5          vj: <-- making a coffee, back in 3

6          myself: unique users logged in:

7                 Day: 6073

8                 Week: 17589

9                 Month: 38021

10                Quarter: 72830

11         vj: interesting numbers - the big question is how many

12    concurrent."

13         You can skip down to the next page, Mr. Evert.  The

14    chat ends -- I'll start here:

15         "vj: So yeah, that's my things for today then. Don't

16    need coin from you for a while, and we'll let utah/smed

17    interact a bit more before we make any decisions there.

18    Anything on your mind today?

19         myself: took the day off. ran around beaches and

20    jungles with some girls, very little on my mind."  Emoticon.

21         "vj: girls and jungles, life dont' get any better for

22    o'l Dread Pirate Roberts, eh.

23         vj: But we'll hear no more of your fancy agorist

24    beaches and babes talk!"

25         Now, you mentioned earlier that you also looked at

f1qgulb3                          Alford – direct

1    Facebook records?

2    A.  Yes, I did.

3    Q.  Whose Facebook account did you review?

4    A.  The defendant's.

5         MR. TURNER:  Just a moment, your Honor.  I'd like to

6    read in another stipulation.  This is stipulation 810.  It's

7    Government Exhibit 810.

8         It is hereby stipulated and agreed by and between the

9    United States of America by Preet Bharara, United States

10   Attorney for the Southern District of New York, Serrin Turner

11   and Timothy Howard, Assistant United States Attorneys, Counsel,

12   and Ross Ulbricht, by and through his counsel Joshua Dratel,

13   Esquire, as follows:

14        One, Government Exhibits 318, 319 and 331 are true and

15   accurate copies of records obtained in the Facebook account

16   Ross Ulbricht registered to the name Ross Ulbricht and to the

17   email accounts rossulbricht@gmail.com and rwu103ftsu.com.  All

18   of the records were maintained on computer servers controlled

19   by Facebook, Inc. and they were produced through the Internal

20   Revenue Service Special Agent Gary Alford pursuant to Court

21   order served on the days of on or about October 22, 2013.

22        Government Exhibit 318 in particular is a status

23   update that was posted by the user to the Facebook account to

24   the user's Facebook wall.  The Facebook user's wall is a space

25   on the user's Facebook profile where the user can post

f1qgulb3                    Alford - direct

1    messages, attachments and links that are visible to anyone who

2    can view the user's profile.

3            Government Exhibit 319 in particular is a photograph

4    stored in the Facebook account and user-created album entitled

5    "Thailand, February 2012" and uploaded by the user to the

6    account on or about March 29, 2012.

7    Q.  So, can you take a look at Government Exhibit 319, please,

8    actually, 318.

9    A.  I have it.

10   Q.  And what is this that you're looking at?

11   A.  It's a Facebook post.

12   Q.  Is this from the Facebook records you received for the

13   defendant's Facebook account?

14   A.  It is.

15           MR. TURNER:  The government offers Exhibit 318 into

16   evidence, your Honor.

17           MR. DRATEL:  The same objection.

18           THE COURT:  The objection is overruled.  GX 318 is

19   received.

20           (Government's Exhibit 318 received in evidence)

21   Q.  So we saw the January 26 chat earlier.  This is dated what?

22   A.  January 27, 2012.

23   Q.  It says "Surprise, I'm in Thailand now.  Hanoi was way too

24   cold and allure of a warm beach was too much."

25           Can you take a look at Government Exhibit 319.

f1qgulb3                         Alford - direct

1    A.  I have it.

2            MR. TURNER:  Mr. Evert, can you put the last page of

3    the chat back up on the top panel.

4    Q.  So we saw the reference before to beaches and jungles.

5    What does Exhibit 319 reflect?

6    A.  It's a picture of the defendant in front of what appears to

7    be jungles and beaches.

8    Q.  And is this from the Facebook account again?

9    A.  Yes.

10           MR. TURNER:  The government offers Exhibit 319 into

11   evidence.

12           MR. DRATEL:  Same objection.

13           THE COURT:  The objection is overruled.  GX 319 is

14   received.

15           (Government's Exhibit 319 received in evidence)

16           MR. TURNER:  There's the picture and down below, could

17   you zoom in, Mr. Evert, here.

18   Q.  What was the name of the album that was found in?

19   A.  "Thailand, February 2012."

20   Q.  Look at 226H.  These have already been admitted into

21   evidence.

22           MR. TURNER:  Can you pull it up, Mr. Evert.

23   Q.  This is another chat with VJ that you reviewed?

24   A.  Yes.

25   Q.  And the date of the chat is what?

f1qgulb3                          Alford - direct

1   A.  February 7, 2012.

2   Q.  It starts out "vj: tumbling is the key, and we need to set

3   up a frickin' HUGE series of small servers running transactions

4   all over the fucking place to the point that regression

5   analysis is impossilbe because the error level progresively

6   compounds until it could branch anywhere, and everywhere, at

7   once. Think millions of transactions per portion of coin rec'd.

8   We need a statistician, as I've said before, keep on the

9   lookout for one.

10          myself: I know a good statistician

11          vj: World class?

12          vj: know - or know of?

13          myself: I'll check up on her latest publications

14          myself: I know her and her husband well

15          vj: dude, no

16          vj: but you can ask her who are the top 5 folks in the

17  world in her field

18          myself: ok."

19  Q.  Go to the next part of the chart.  This is February 13.

20  A.  Yes.

21  Q.  It starts off:  "myself: here is my convo with my stats

22  friend:

23          Myself: who are the top 5 statisticians in the world?

24          Myself: Wow, good question.

25          In terms of lifetime achievement or current "hotness"?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

f1qgulb3                         Alford - direct

1          myself: Someone you could take a life or death stats

2     problem to and be confident in their answer.

3          myself: So this is a request for consultation, not an

4     evaluation of the field?

5          For business I take it," and it continues on.

6     Q.  Did you find anything in the Defendant's Gmail account

7     about statisticians like this?

8     A.  Yes, I did.

9     Q.  Would you take a look at 322, please.  What did you find?

10    A.  I found an email from Ross Ulbricht; and in the email, the

11    same language that is in the Tor chat is contained within the

12    email.

13         MR. TURNER:  The government offers Exhibit 322 into

14    evidence.

15    Q.  That's what you were looking at when you just described

16    that email --

17    A.  Yes, sir.

18    Q.  -- just for the record?

19         MR. DRATEL:  Objection; hearsay and *Vayner*.

20         THE COURT:  All right.  Those objections are

21    overruled.  GX 322 is received.

22         (Government's Exhibit 322 received in evidence)

23         MR. TURNER:  So can you zoom into the header

24    information, please.  That's fine.  You can start at the

25    bottom.  From Ross Ulbricht to someone named Joseph:  "Subject,

f1qgulb3                        Alford - direct

1    statistician:  Who are the top five statisticians in the world

2    besides Heather?"

3              Can you scroll up.

4              Next chain, "Wow, good question.  In terms of lifetime

5    achievement or current "hotness"?"

6              Reply:  "Someone you could take a life or death stats

7    problem to and be confident in their answer."

8              Can we take a look at Government Exhibit 232C.  It's

9    another Tor chat.

10   A.  Yes.

11   Q.  And who are the -- who is the other person on the Tor chat

12   this time?

13   A.  DA.

14   Q.  Could you zoom into the top half.  The date of this chat is

15   what?

16   A.  March 3, 2012.

17   Q.  It starts out "da: Hey I'm curious about something

18             myself: what's up man

19             da: When you first started SR it must have been hard

20   to get the words aorund, it being a .onion

21             There was a mod KindBud who was part of GreenCo, who

22   was here from week one. Which means they most liekly heard it

23   form the place you first advertised. But then they dissapeared,

24   and ever since I have wondered what happened (we were in the

25   middle of a conversation and had been doing allot of

f1qgulb3                        Alford - direct

1    buissness).

2            myself: Ya know I almost forgot about KindBud and

3    GreenCo. I honestly don't know what happened to them.

4            da: How did you get the word out there? It would

5    almost seem you owuld have had to all ready know email vendors,

6    etc. Or else you advertised at other forums, which means I

7    might be able to find them else where.

8            myself: It's gotten back to me on more than one

9    occasion that a vendor has been busted, but whenever I ask

10   further, it's always from deals irl gone bad

11           da: (If you can;t tell that's cool)

12           myself: you know what I did

13           myself: I made one thread on the forums at

14   bitcointalk.org

15           myself: and made a blog at wordpress.com with

16   instructions

17           myself: both go taken down pretty quickly

18           myself: the rest was word of mouth

19           myself: and pr"

20           So, where did we see the first quote we looked at from

21   Altoid?

22   A.  It was from the bitcointalk forum.

23   Q.  Let's go back to the SR account and spreadsheet please,

24   Government Exhibit 250, page five.  And zoom in a few lines

25   down here.  Scroll up, please.  That's fine.  Okay.

f1qgulb3                          Alford - direct

1   Q.  So, we're looking at late April 2012 in the spreadsheet and

2   there's an entry here for a laptop.

3   A.  Yes.

4   Q.  And what was the purchase price indicated on the

5   spreadsheet for it?

6   A.  $1,150.

7   Q.  And did you see in the defendant's email account any record

8   of a laptop purchased around this time?

9   A.  Yes, I did.

10  Q.  Can you take a look at Government Exhibit 312, please.

11  A.  I have it.

12  Q.  And what are you looking at?

13  A.  I'm look at an email from Amazon.com to the defendant's

14  Gmail account regarding a purchase of a Samsung series laptop.

15         MR. TURNER:  The government offers Exhibit 312 into

16  evidence.

17         MR. DRATEL:  Same objection, your Honor, hearsay and

18  Vayner.

19         THE COURT:  The objections are overruled.  Government

20  Exhibit 312 is received.

21         (Government's Exhibit 312 received in evidence)

22         MR. TURNER:  Can you scroll in ton header information

23  and zoom in on the header information first.

24  Q.  The date of this email is April 26, 2012?

25  A.  Yes, it is.

f1qgulb3                    Alford - direct

1    Q.  From Amazon.com to rossulbricht@gmail.com?

2    A.  Yes, it is.

3    Q.  And the subject is "Your order with Amazon.com"?

4    A.  Correct.

5            MR. TURNER:  And zoom out, and could you zoom into

6    this area.

7    Q.  The item at the bottom is Samsung series 7NP700Z5A, silver

8    15.6-inch laptop, and what's the price indicated for the item?

9    A.  $1,153.98.

10   Q.  How does that compare to the spreadsheet?

11   A.  It's only within $4 of the amount listed on the

12   spreadsheet.

13   Q.  Could you tell from the defendant's email address how this

14   laptop purchase was paid for?

15   A.  Yes.

16   Q.  How could you tell?

17   A.  I saw purchases of Amazon gift cards through the use of

18   bitcoins.

19   Q.  Would you take a look at Government Exhibit 312C, please.

20   A.  I have it.

21   Q.  Are these the emails you were just referring to?

22   A.  Yes, it is.

23           MR. TURNER:  The government offers 312C into evidence.

24           MR. DRATEL:  Same objection.

25           THE COURT:  GX 312C is received.  The objection is

f1qgulb3                    Alford - direct

1    overruled.

2              (Government's Exhibit 312C received in evidence)

3    Q.  What do these documents reflect?

4    A.  It reflects that they received payment of a certain amount

5    of bitcoins for a $500 Amazon gift card.

6    Q.  When you say "they," who are you referring to?

7    A.  BTC Buy.

8    Q.  You've been to that website?

9    A.  That specific website?  No, I have not.

10   Q.  Have you been to other websites that offer gift cards for

11   bitcoins?

12   A.  Me personally?  No, I have not.

13   Q.  Withdrawn.

14              How many emails like this did you see in the account

15   here?

16   A.  From BTC Buy?

17   Q.  Yes.

18   A.  Approximately four.

19   Q.  How many are reflected in 312C?

20   A.  Three.

21   Q.  How much are they each for?

22   A.  They are for each $500.

23   Q.  And what are the dates of those purchases?

24   A.  They are all April 25, 2012.

25   Q.  And how does that compare to the purchase of the laptop?

f1qgulb3                           Alford - direct

1    A.  It's approximately for the same amount as the purchase

2    price of the laptop.

3    Q.  And the date?  How does the date of those gift card

4    purchases compare to the purchase of the laptop?

5    A.  I believe it's the day before.

6    Q.  Did you find any emails in the defendant's email account

7    referencing the name Frosty?

8    A.  Yes, I did.

9    Q.  Would you take a look at Government Exhibit 311.

10   A.  I have it.

11   Q.  And what does it reflect?

12   A.  It's an email from Peter to Ross Ulbricht where he

13   addresses the defendant as Rossty Frosty.

14          MR. TURNER:  If government offers Exhibit 311 into

15   evidence.

16          MR. DRATEL:  Same objections, hearsay and *Vayner*.

17          THE COURT:  GX 311 is received.  The objections are

18   overruled.

19          (Government's Exhibit 311 received in evidence)

20   Q.  This is from someone named Peter to Ross Ulbricht who

21   referred to him as Rossty Frosty?

22   A.  Yes.

23   Q.  Is that the only email you found like that in the

24   defendant's email account or were there others?

25   A.  There were others.

f1qgulb3                         Alford - direct

1             MR. TURNER:  I'm at a natural stopping point.

2             THE COURT:  Thank you.

3             Ladies and gentlemen, we're now going to break until

4    what I hope is Wednesday morning at 10:00.  Make sure that you

5    follow Joe's instructions in terms of getting the court auto

6    line to call into to see whether the court is open, and then

7    Joe will otherwise communicate with you.  And I'm hoping that

8    we all plan on being here ready to go Wednesday at 10:00.

9             I want to remind you not to talk to each other or

10   anybody else about this case and, again, to stay away from any

11   media reports about the case.  And if you run across any

12   articles of any kind, whether on the Internet or in hard copy

13   or on the television, do make sure that you turn away from them

14   and that you do not read them or listen to them at all, all

15   right?

16            Thanks very much.  Get home safe.

17            Mr. Alford, you may step down, as well.  We'll resume

18   Wednesday at 10 a.m. we hope.

19            (Jury excused)

20            (Witness temporarily excused)

21            (Continued on next page)

22

23

24

25

f1qgulb3                      Alford - direct

1              (In open court; jury not present)

2              THE COURT:  Ladies and gentlemen, let's be seated and

3      see if there is anything that we need to go over.

4              One thing that I wanted to note is that we had had a

5      discussion about whether or not the hard drive had been

6      properly authenticated in advance of Mr. Beeson's testimony and

7      the Court's ruling at that time, and I made myself a note to

8      this effect, was that it was received subject to further -- any

9      further authentication.  And the Court believes that there is

10     now fully a sufficient foundation for the receipt of the hard

11     drive, so that connection has been made.

12             Are there things which you folks would like to raise

13     in advance of our break until Wednesday morning?

14             MR. TURNER:  No, your Honor.  Thank you.

15             MR. DRATEL:  Nothing, your Honor.  Thank you.

16             THE COURT:  I look forward to receiving the jury

17     instruction materials from you folks with track changes in Word

18     tomorrow, late afternoon, if you can you can email it to my

19     chambers email box.  Thank you.

20             (Adjourned to January 28, 2015 at 10:00 a.m.)

21

22

23

24

25

1                          INDEX OF EXAMINATION

2     Examination of:                              Page

3     Cross By Mr. Dratel  . . . . . . . . . . . .1242

4     Redirect By Mr. Turner . . . . . . . . . . .1250

5     Recross By Mr. Dratel  . . . . . . . . . . .1252

6     Redirect By Mr. Turner . . . . . . . . . . .1252

7     Recross By Mr. Dratel  . . . . . . . . . . .1253

8     GARY LUIS ALFORD

9     Direct By Mr. Turner . . . . . . . . . . . .1253

10                         GOVERNMENT EXHIBITS

11    Exhibit No.                               Received

12     301   . . . . . . . . . . . . . . . . . . .1256

13     302   . . . . . . . . . . . . . . . . . . .1258

14     303   . . . . . . . . . . . . . . . . . . .1261

15     304   . . . . . . . . . . . . . . . . . . .1263

16     305   . . . . . . . . . . . . . . . . . . .1264

17     306   . . . . . . . . . . . . . . . . . . .1266

18     307   . . . . . . . . . . . . . . . . . . .1273

19     308-B   . . . . . . . . . . . . . . . . . .1275

20     314   . . . . . . . . . . . . . . . . . . .1279

21     315-A   . . . . . . . . . . . . . . . . . .1281

22     315-B   . . . . . . . . . . . . . . . . . .1282

23     309   . . . . . . . . . . . . . . . . . . .1293

24     329   . . . . . . . . . . . . . . . . . . .1295

25     330   . . . . . . . . . . . . . . . . . . .1298

1    318    . . . . . . . . . . . . . . . . . .1302

2    319    . . . . . . . . . . . . . . . . . .1303

3    322    . . . . . . . . . . . . . . . . . .1305

4    312    . . . . . . . . . . . . . . . . . .1308

5    312C    . . . . . . . . . . . . . . . . .1310

6    311    . . . . . . . . . . . . . . . . . .1311

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25