UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA                    :

   -v.-                                                    :              S1 14 Cr. 68 (KBF)

ROSS ULBRICHT,                                       :
  a/k/a "Dread Pirate Roberts,"
  a/k/a "DPR,"                                          :
  a/k/a "Silk Road,"

                                     :

                  Defendant.

                                     :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

## GOVERNMENT'S OPPOSITION TO
## DEFENDANT'S POST-TRIAL MOTIONS

PREET BHARARA
United States Attorney
Southern District of New York
Attorney for the United States of America

SERRIN TURNER
TIMOTHY T. HOWARD
      Assistant United States Attorneys
      *Of Counsel*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................... 1

FACTUAL BACKGROUND ....................................................................... 2

    A.   The Indictment ................................................................................ 2

    B.   The Government's Case .................................................................. 3

    C.   Ulbricht's Defense ......................................................................... 7

    D.   The Verdict ..................................................................................... 9

    E.   Sealed Litigation Concerning the Investigation of Carl Force ......... 10

LEGAL STANDARD ................................................................................ 15

ARGUMENT ............................................................................................. 15

POINT I: ULBRICHT'S ARGUMENT THAT THE GOVERNMENT FAILED TO TIMELY DISCLOSE EXCULPATORY MATERIAL IS MERITLESS ................... 15

    A.   There Was No *Brady* Violation Concerning the Karpeles/Athavale Materials ............... 16

        1.   The Materials Are Not Exculpatory ............................................ 16

        2.   The Materials Were Not Suppressed .......................................... 18

        3.   Ulbricht Suffered No Prejudice .................................................. 20

    B.   There Was No *Brady* Violation Concerning the Force Investigation ............... 22

POINT II: THERE IS NO BASIS TO REOPEN ULBRICHT'S SUPPRESSION MOTION ..... 25

POINT III: ULBRICHT'S BELATED "PROFFER" OF EXPERT TESTIMONY IS NOT A GROUND FOR A NEW TRIAL ................................................................ 27

CONCLUSION ........................................................................................... 27

## PRELIMINARY STATEMENT

Defendant Ross Ulbricht was convicted following a three-and-a-half week trial, at which the Government presented one damning piece of evidence after another showing that Ulbricht, at all relevant times, owned and operated the Silk Road website.  The defense never credibly called any of that evidence into question.  The jury's verdict was swift and sure, delivered after only a few hours of deliberation, finding Ulbricht guilty on all counts.  Ulbricht's instant motion provides no reason to disturb that amply supported decision.

The primary contention in Ulbricht's motion – that the Government failed to make timely disclosures of exculpatory material – is baseless.  Specifically, Ulbricht alleges that the Government failed to timely disclose information about certain individuals once considered possible leads on "Dread Pirate Roberts" by an agent who testified at trial.  Those leads never came close to panning out, however, and do not exculpate Ulbricht.  Moreover, information about these individuals was timely disclosed to the defense in the agent's 3500 material.  Ulbricht also alleges that the Government failed to timely disclose information about former Drug Enforcement Special Agent Carl Force, who was recently charged with various corrupt acts in connection with his involvement in an investigation of Silk Road conducted by the U.S. Attorney's Office for the District of Maryland.  However, the corruption inquiry into Force's conduct was disclosed to the Court and the defense months ago, and was properly held not to be exculpatory as to Ulbricht.  Force had no role in the Silk Road investigation conducted by *this* Office – the U.S. Attorney's Office for the Southern District of New York – from which all of the evidence at trial derived.  Moreover, the corruption allegations against Force do no suggest in any way that Ulbricht is somehow innocent.  If anything, they only underscore Ulbricht's guilt, as they indicate that Ulbricht was seeking to pay for inside information concerning law enforcement efforts to investigate him.

Ulbricht's remaining contentions require little discussion.  Ulbricht seeks to "reopen" his motion to suppress evidence from the Silk Road server based on certain statements contained in the Government's 3500 production.  But the statements have nothing to do with how the Silk Road server was located or searched; and, anyway, Ulbricht long ago gave up any right to move to suppress evidence from the Silk Road server by declining to assert that he had any protected privacy interest in it.  Ulbricht's motion also seeks to proffer the testimony of a witness whom he sought to call as an expert at trial.  However, the Court properly precluded the witness from testifying, due to the plainly untimely and inadequate expert notice the defense provided for the witness during trial.  Ulbricht's belated "proffer" does nothing to remedy that failure.

## FACTUAL BACKGROUND

### A.    The Indictment

On August 21, 2014, the Government filed the superseding indictment on which the case went to trial (the "Indictment").  The Indictment alleged that, from in or about January 2011 through in or about October 2013, Ulbricht was the owner and operator of the Silk Road website, known online as "Dread Pirate Roberts," or "DPR" for short.  The Indictment charged Ulbricht in seven counts, including: narcotics trafficking, in violation of Title 21, United States Code, Section 841(a); narcotics trafficking by means of the Internet, in violation of Title 21, United States Code, Section 841(h); conspiring to commit narcotics trafficking, in violation of Title 21, United States Code, Section 846; engaging in a continuing criminal enterprise, in violation of Title 21, United States Code, Section 848; conspiring to commit or aid and abet computer hacking, in violation of Title 18, United States Code, Section 1030; conspiring to traffic in fraudulent identification documents, in violation of Title 18, United States Code, Section 1028; and conspiring to commit money laundering, in violation of Title 18, United States Code, Section 1956.

**B.      The Government's Case**

Trial commenced on January 13, 2015.  The Government's first witness, Special Agent ("SA") Jared Der-Yeghiayan of Homeland Security Investigations ("HSI"), testified about his extensive undercover activity on Silk Road.  That activity included working in an undercover capacity as a member of the Silk Road support staff, known as "cirrus," beginning in July 2013. (Tr. 96:13-97:9).  In that role, SA Der-Yeghiayan frequently communicated with "DPR" through Silk Road's built-in messaging systems, as well as a private "chat" channel that "DPR" used to communicate with his employees in real time.  (Tr. 291:5-292:7).  When Ulbricht was arrested on October 1, 2013, SA Der-Yeghiayan used the "cirrus" account to chat with "DPR" as agents moved in to arrest Ulbricht at a public library in San Francisco, where he was working on his laptop computer.  (Tr. 327:20-334:24).  When the agents made the arrest, they seized the laptop, which SA Der-Yeghiayan was able to view minutes later.  The laptop contained the chat between "cirrus" and "DPR" on the screen, and showed Ulbricht was logged into Silk Road as "DPR." (Tr. 389:5-402:24).  He had been caught red-handed.

Computer Scientist Thomas Kiernan of the Federal Bureau of Investigation ("FBI") next testified for the Government.  Kiernan witnessed the seizure of the laptop at the scene of Ulbricht's arrest and immediately documented the contents found on the screen and in open applications.  (Tr. 836:5-836:14).  Subsequently, Kiernan conducted a full forensic examination of the computer's contents and found a trove of evidence reflecting Ulbricht's creation and operation of Silk Road.  (Tr. 852:2-859:20).  That evidence included, among other things:

- "journal" files in which Ulbricht wrote about how he conceived of Silk Road, launched it, and grew it into a bustling illegal enterprise, (Tr. 877:24-884:15);

- thousands of pages of chat logs, reflecting Ulbricht's communications with co-conspirators who helped him run Silk Road, (Tr. 867:10-876:17);

3

- spreadsheets of Silk Road-related expenses and servers used in the operation of Silk Road, (Tr. 929:18-932:18, 955:21-959:24);

- a "log" file reflecting actions taken by Ulbricht in connection with the day-to-day maintenance of Silk Road, (Tr. 907:14-909:11);

- a to-do list reflecting weekly tasks relating to Silk Road, including, among other things, a list of Silk Road employees and the weekly salaries that Ulbricht paid them, (Tr. 927:15-928:10);

- the "private key" needed to digitally sign messages sent from "DPR" on Silk Road, (Tr. 990:19-991:8); and

- Bitcoin wallets containing over 144,000 Bitcoins, worth approximately $18 million at the time of Ulbricht's arrest, (Tr. 1032:21-1033:5).

The Government's next substantial witness, Richard Bates, was a former friend of Ulbricht's, whom Ulbricht repeatedly asked for programming advice in initially developing the Silk Road website. (Tr. 1103:17-1103:24). Bates testified that, initially, for a number of months, when he would ask Ulbricht what type of site he was working on, Ulbricht would reply only that it was "top secret." (Tr. 1104:8-11). However, after Bates refused to provide further programming help unless Ulbricht disclosed the nature of his project, Ulbricht gave in and confided that he was running an online marketplace for illegal drugs, which he showed to Bates – the Silk Road website. (Tr. 1105:15-1106:2). Bates also testified that, in November 2011, Ulbricht told him that he had "sold" Silk Road to someone else. (Tr. 1138:4-20). But chats with a co-conspirator recovered from Ulbricht's computer made clear that this was a lie Ulbricht had told to Bates and his ex-girlfriend, both of whom he feared knew too much about his involvement in Silk Road. (Tr. 1191:8-10).

Special Agent Gary Alford of the Internal Revenue Service was the next substantial witness to take the stand for the Government. SA Alford explained how he identified Ulbricht as "DPR" based on certain discussion-forum posts on the ordinary Internet, which seemed to be part of an effort to publicize Silk Road when it was initially launched. SA Alford was able to

trace the posts back to an email address controlled by Ulbricht.  (Tr. 1252:23-1267:15).  SA Alford also testified about his subsequent review of the contents of Ulbricht's email and Facebook accounts, obtained pursuant to search warrants.  The account contents included various pieces of information about Ulbricht that matched information "DPR" revealed about himself in the Silk Road-related files recovered from Ulbricht's laptop – thus confirming that Ulbricht and "DPR" were the same person.  For example, in the chat logs recovered from Ulbricht's computer, "DPR" sometimes mentioned his travel plans to co-conspirators, and those same travel plans were reflected in Ulbricht's email and Facebook accounts (*e.g.*, in emails containing airline reservations or postings to his Facebook wall about his trip).  SA Alford found such ties between "DPR's" identity and Ulbricht's real-life identity throughout the time period in which Silk Road operated, confirming that Ulbricht controlled Silk Road continuously.  (Tr. 1267:22-1281:7; 1289:7-1310:1; 1356:19-1385:13).

Following SA Alford, HSI Special Agent Dylan Critten testified for the Government.  SA Critten testified that, in July 2013, U.S. customs authorities intercepted a package coming across the Canadian border that contained nine fake driver's licenses – purporting to be from six different states and three different foreign countries – all with the same individual depicted in the photographs, but in different guises, and paired with different identity information.  (Tr. 1468:2-25).  SA Critten made a controlled delivery of the package to the address where it had been sent, and found Ulbricht there, who matched the photographs on the licenses.  (Tr. 1472:1-24).  After SA Critten assured Ulbricht that he did not plan to arrest him and instead wanted his cooperation in identifying the source of the fake licenses, Ulbricht stated that "hypothetically" anyone could purchase fake identifications or anything else they wanted from a website called "Silk Road." (Tr. 1474:8-1475:14).  (SA Critten was not part of any investigation into Silk Road and had

never heard of the website before.)  Evidence from the Silk Road server introduced through a later witness established that the fake licenses in question had in fact been ordered through Silk Road, and that the user who bought them (*i.e.*, Ulbricht) asked the vendor for his "highest quality IDs," with features sophisticated enough to allow him to "pass airport security" or "get through being pulled over by a cop."  (Tr. 1794:16-1795:2).  Ulbricht thus appeared to be preparing for a life on the run.  Indeed, other evidence showed that he had taken considerable efforts toward obtaining citizenship in a Caribbean island.  (Tr. 405:17-406:3, 1357:24-1358:5, 1361:1-1363:1).

Further evidence tying Ulbricht to Silk Road was presented by Ilhwan Yum, formerly a Special Agent with the Federal Bureau of Investigation.  Using the Blockchain – a public ledger of all transactions on the Bitcoin network – Mr. Yum examined the Bitcoin transfers made into the Bitcoin wallets found on Ulbricht's computer, and checked for any transfers that had come directly from Bitcoin wallets found on the servers used to run the Silk Road website.   Mr. Yum found that nearly 90 percent of all the Bitcoins ever transferred into the wallets on Ulbricht's laptop came *directly* from the wallets found on Silk Road, and that these transfers were made over a period that spanned many months.  (Tr. 1690:22-1699:4).  Thus, the evidence reflected that Ulbricht used his laptop as a "cold storage" location for Silk Road proceeds – *i.e.*, a storage location that was not vulnerable to hacks or crashes that might affect the Silk Road servers.  This evidence was corroborated by the "log" file found on Ulbricht's computer, which contained an entry for April 7, 2013, stating, "moved storage wallet to local machine," and by the metadata associated with the primary wallet file on the laptop, which indicated that the file had been moved to the laptop on the same date, April 7, 2013.  (Tr. 1032:20-1033:11, 1673:8-25, 2155:7-10).

The Government's last witness, FBI contractor Brian Shaw, testified about evidence recovered from servers used to operate and back up Silk Road, including private messages sent to and from "DPR."  Those messages included a lengthy exchange in March and April 2013 between "DPR" and a user named "redandwhite," whom "DPR" solicited to murder someone he believed to be a Silk Road drug dealer trying to extort money from him, as well four persons he believed to be the drug dealer's associates.  In the messages, "DPR" agreed to pay "redandwhite" Bitcoins totaling $650,000 for the five murders-for-hire, telling "redandwhite" the Bitcoin addresses to which he would be sending the Bitcoins.  (Tr. 1804:18-1824:5; 1876:14-1905:2). Although "redandwhite" reported back to "DPR" afterwards that he had had the five individuals killed, the murders-for-hire do not appear to have been actually carried out, as the Government stipulated at trial.  (Tr. 1908:14-1909:9).  However, the evidence reflected that "DPR" intended them to be carried out, and that Ulbricht was, again, the person behind the "DPR" username who ordered them.  Blockchain records reflected that the Bitcoin payments for the murders-for-hire were in fact made and came from the Bitcoin wallet recovered from Ulbricht's laptop.  (Tr. 1885:12-1886:4; 1899:14-1900:16).  Moreover, other evidence from Ulbricht's laptop explicitly referred to the murders-for-hire, such as the "log" file, which contained entries corresponding to the messages from the Silk Road servers between "DPR" and "redandwhite," including an April 1, 2013 entry stating: "got word that blackmailer was executed."  (Tr. 1887:7).

## C.    Ulbricht's Defense

In opening, the defense admitted that Ulbricht had "created" Silk Road, but claimed that "after a few months" he "handed it off to others," who later somehow framed him and "left him holding the bag" when he was arrested two-and-a-half years later.  (Tr. 60:21-61:19).  The defense repeatedly pursued this line of argument during cross-examination of the Government's witnesses – particularly SA Der-Yeghiayan, whom the defense questioned extensively

concerning two other individuals he investigated as possible leads on "DPR" – Mark Karpeles and Anand Athavale – before Ulbricht was brought to his attention by SA Alford in September 2013.  (Tr. 490:3-509:20; 527:7-530:13; 651:10-655:4; 659:3-679:3; 793:12-799:9).  SA Der-Yeghiayan's testimony made clear, though, that his investigation of these individuals was preliminary and ultimately did not yield any substantial evidence that either was involved in operating Silk Road.  (Tr. 742:9-755:3; 783:15-791:19).

SA Der-Yeghiayan explained that he investigated Mr. Karpeles after learning that the website "silkroadmarket.org" – which provided information on how to access the real Silk Road on the Tor network – was hosted on a server that was publicly registered to Mr. Karpeles. However, after looking into the matter further, including obtaining a search warrant on an email account used by Mr. Karpeles, SA Der-Yeghiayan learned that Mr. Karpeles hosted a server-hosting company, Kalyhost, which leased servers to other individuals for them to use in operating their own websites.  The server on which "silkroadmarket.org" was hosted was one of the servers leased out by Kalyhost, and evidence recovered from Ulbricht's computer showed that Ulbricht was the customer who leased it (using an alias).  (Tr. 742:9-755:3; 783:15-791:19). Hence, the fact that the "silkroadmarket.org" website resolved to a server registered to Mr. Karpeles turned out to be unremarkable: Mr. Karpeles controlled many servers as part of Kalyhost and was not responsible for what his customers put on them.  (Tr. 753:9-12).  Nor was there any other evidence presented by the defense, at any point during the trial, that Mr. Karpeles controlled the "silkroadmarket.org" website, let alone had any role in running the actual Silk Road marketplace on Tor.

As to Anand Athavale, SA Der-Yeghiayan explained that during his investigation he reviewed a discussion forum on a libertarian website known as "mises.org," which was

referenced in a "reading list" that "DPR" included in his online profile on the Silk Road discussion forums.  SA Der-Yeghiayan noted certain commonalities between the language used by one of the users of the "mises.org" forum – whom he believed to be someone named "Anand Athavale" – and the language used by "DPR" on the Silk Road discussion forums.  (Tr. 793:12-795:16).  Many of the commonalities SA Der-Yeghiayan observed, however, were mundane – *e.g.*, both used the terms "lemme" as opposed to "let me," "labour" as opposed to "labor," and "rout" as opposed to "route."  Other commonalities could be attributed to a common interest in the brand of libertarian economics discussed on the "mises.org" forum – *e.g.*, both used the terms "agorism" and "narco-capitalist" and mentioned certain libertarian authors such as Murray Rothbard and Samuel Konkin.  (Tr. 795:17-799:2).  The defense presented no further "evidence" that Anand Athavale was "DPR" at any point during the trial.

After the Government rested, the defense put on three character witnesses, as well as an investigator who testified briefly in order to authenticate a single document from Ulbricht's laptop.  (Tr. 2001:16-2022:8; 2098:10-2112:2).  The defense also sought, unsuccessfully, to have two witnesses testify as experts, including a purported "Bitcoin expert" named Andreas M. Antonopoulos.  Pursuant to Federal Rule of Procedure 16, the Court precluded either from testifying, given that the defense had failed to disclose the witnesses until very late in the trial and failed to include in its disclosures any substantial information concerning the expert opinions the witnesses planned to offer and the bases therefor.  (Slip op. dated Feb. 1, 2015).

D.      **The Verdict**

After closing arguments, the jury returned with a verdict after three-and-a-half hours of deliberation.  Ulbricht was found guilty on all counts.  (Tr. 2334:22-2338:14).

**E.**     **Sealed Litigation Concerning the Investigation of Carl Force**

On November 21, 2014, the Government filed a letter *ex parte* and under seal informing the Court of an ongoing grand-jury investigation by the U.S. Attorney's Office for the Northern District of California ("USAO-San Francisco").  The target of the investigation was a former Special Agent with the Drug Enforcement Administration named Carl Force, who was one of several agents who had been involved in an investigation of Silk Road conducted by the U.S. Attorney's Office for the District of Maryland ("USAO-Baltimore").  (Gov't Nov. 21, 2014 Ltr. at 1).[1]  As the Government's letter detailed, USAO-San Francisco was investigating Force for, among other things, leaking information about USAO-Baltimore's investigation to Ulbricht in exchange for payment, and otherwise corruptly obtaining proceeds from the Silk Road website and converting them to his personal use.  (*Id.*).  The letter noted that the U.S. Attorney's Office for the Southern District of New York ("USAO-SDNY" or "this Office") was assisting USAO-San Francisco with its investigation into Force.  (*Id.* at 2).

As the letter further explained, Force played no role in the investigation of Silk Road conducted by USAO-SDNY, which proceeded on a separate and independent track from the investigation conducted by USAO-Baltimore; and the Government had no plans to call Force as a witness at trial or rely on any evidence generated through USAO-Baltimore's investigation.

---

[1] At the Government's request, its November 21, 2014 letter was unsealed, along with all subsequent sealed filings relating to the Force investigation, on March 30, 2015, after a complaint against Force and a co-defendant, former Secret Service Special Agent Shaun Bridges, was unsealed on the same date, and the USAO-San Francisco investigation was thereby made a matter of public record.  (The sealed filings are attached hereto as Exhibit A.)  Bridges was not discussed in the Government's November 21, 2014 letter or the ensuing litigation in this matter, as he did not become a target of the USAO-San Francisco investigation until later.

(*Id.* at 5-6).[2]  Moreover, the criminal conduct for which Force was being investigated did not

exculpate Ulbricht in any way for his own criminal conduct.  Rather, the investigation of Force

reflected only potential corruption on Force's part, rather than anything suggestive of Ulbricht's

innocence.  (*Id.* at 5).  Accordingly, the Government argued that disclosure of the Force

investigation to the defense was not required under the Federal Rules of Criminal Procedure or

*Brady v. Maryland*, 373 U.S. 83 (1963).  (*Id.*).  Nonetheless, in an abundance of caution, the

Government requested permission to disclose the Force investigation to the defense – which the

Government could not do without judicial authorization, given that it was a pending grand-jury

matter – in order to resolve any potential dispute concerning whether the information was subject

to discovery.  (*Id.* at 6).

The Court granted the Government's request on December 1, 2014, at which point the

Government's November 21, 2014 letter to the Court was disclosed to the defense.  (Order dated

Dec. 1, 2014).  Subsequently, in sealed pretrial motions filed by the defense, the defense sought

to unseal the information contained in the Government's November 21, 2014 letter and sought

extensive discovery into the ongoing Force investigation.  (Def. Mot. in Limine dated Dec. 9,

2014 at 25-30; Def. Ltr. dated Dec. 18, 2014).  In a sealed pretrial conference held on December

15, 2014, the Court indicated that it had received *ex parte* submissions from the defense arguing

that the Force investigation was exculpatory insofar as it raised the possibility that Force had

fabricated evidence against Ulbricht.  (Tr. dated Dec. 15, 2014 at 50:16-51:2).  In a sealed letter

dated December 18, 2014, the Government responded that the Force investigation had not

---

[2] In particular, USAO-Baltimore had no role in identifying Ulbricht as "DPR," which was
accomplished entirely by USAO-SDNY's investigation.  Although USAO-Baltimore charged
Ulbricht with participation in a murder-for-hire scheme on October 1, 2013, it was able to do so
only by virtue of being provided by USAO-SDNY with evidence of the identity between
Ulbricht and "DPR" shortly before Ulbricht's arrest.

uncovered any evidence of such fabrication, and that any argument that such fabrication occurred

was not only completely speculative but contrary to abundant other evidence.  (Gov't Dec. 18,

2014 Ltr. at 4-5).[3]  Moreover, the Government argued that allowing Ulbricht to inject the Force

investigation into the case would turn the trial into a sideshow about Force that would waste

time, confuse and mislead the jury, and unfairly prejudice the Government.  (*Id.* at 5).

On December 22, 2014, the Court issued a sealed opinion denying Ulbricht's request to

unseal information about the Force investigation and denying Ulbricht's application for

discovery.  (Slip op. dated Dec. 22, 2013 at 28).  The Court found that Ulbricht had "not made a

---

[3] Ulbricht's contention that Force could have fabricated evidence appeared to be based on the fact that, in late January 2013, Force temporarily had access to the Silk Road account of a paid Silk Road administrator (*i.e.*, a customer support representative) known as "Flush," who had the ability to reset user passwords.  From this premise, Ulbricht speculated that Force could have used the "Flush" account to reset "*DPR's*" password and thereby take over "*DPR's*" account on Silk Road, in order to fabricate evidence against "DPR." As the Government explained, this scenario was implausible for many reasons, including, among others:

- Logs of chat communications seized from Ulbricht's laptop computer – which occurred over a completely separate communications system from Silk Road – reflect that Ulbricht discussed Silk Road business with his co-conspirators on a daily basis throughout the period that Force had access to the "Flush" account, and long afterwards, without any reference to him losing access to the "DPR" account.
- Those same chats reflect that another Silk Road employee locked down the "Flush" account on January 26, 2013, shortly after coming to believe that "Flush" had stolen Bitcoins from the site – after which the account would have been inaccessible to Force.
- While "Flush" had the capability to reset the passwords of Silk Road users, there is no evidence that he had any ability to reset the password for "DPR's" account, nor is there any reason to believe "DPR" would give any such ability to his employees.
- Even assuming Ulbricht could have been locked out of the "DPR" account, he still would have controlled the server and computer code underlying the website, and could simply have regained control of the account through that root-level access. (By analogy, if a CEO's email account is hacked, that doesn't mean he thereby loses control of his company.  Given that he has ultimate, physical control over the server on which the account is stored, he can take any steps necessary to regain control over the account.)
- "DPR" at times digitally signed or encrypted his communications using what is known as a "private key" – including after January 2013.  In order to send those communications, Force would have had to have that private key; yet it was stored on Ulbricht's computer.  There is no way Force could have obtained it simply by gaining access to "DPR's" account on Silk Road.

showing that either the fact of the Force investigation or the information learned during that investigation is needed to avoid a possible injustice." (*Id.* at 18) "Contrary to the defendant's arguments," the Court stated, "the statements in the [Government's] November 21, 2014 Letter are not exculpatory." (*Id.*) "If anything," the Court found, the Force investigation "is inculpatory" as to Ulbricht, as it indicates that that Ulbricht, as "DPR," paid Force to leak information about USAO-Baltimore's investigation, thus evidencing a criminal state of mind and desire to protect his illegal enterprise. (*Id.* at 18 n.13 (emphasis in original)). As to Ulbricht's allegations that Force could have fabricated evidence against him, the Court credited the Government's representation that USAO-San Francisco had not uncovered any sign of such fabrication and added that, "[t]o the contrary, there is persuasive evidence that no such fabrication occurred." (*Id.* at 19 (citing Gov't Dec. 18, 2014 Ltr. at 4-5)). The Court noted that, if any evidence of such fabrication did come to light, the Government would be obligated to disclose it, but that Ulbricht's speculation that such evidence existed was not an adequate basis to unseal information concerning USAO-San Francisco's ongoing grand-jury investigation or to allow defendant to pursue wide-ranging discovery into it. (*Id.* at 22).

On December 30, 2014, Ulbricht requested "an adjournment of trial until the government completes its grand jury investigation" of former SA Force, again citing the possibility that the investigation might yield exculpatory evidence. (Def. Dec. 30, 2014 Ltr. at 1). The Court denied the request on December 31, 2014, relying on the same considerations set forth in its December 22, 2014 ruling. (Order dated Dec. 31, 2014; Tr. 118:2-119:10).

During trial, Ulbricht made repeated attempts to introduce evidence implicating the investigation of Force, raising issues that were addressed under seal. (Tr. 594:1-614:4, 1440:2-8, 2084:2-2097:11). In particular, on multiple occasions, Ulbricht sought to introduce private

messages sent to "DPR" by a Silk Road user named "DeathFromAbove," in which

"DeathFromAbove" intimated he knew that "DPR's" true identity was that of "Anand Athavale"

and threatened to leak this name to law enforcement unless "DPR" paid him $250,000.  (Tr.

594:1-614:4, 1440:2-1442:8).  As the Government explained in sealed sessions and a subsequent

sealed submission, those messages fit the pattern of conduct at issue in the corruption

investigation into Force, and USAO-San Francisco confirmed during trial that it had uncovered

evidence that Force in fact controlled the "DeathFromAbove" account.  (Tr. 1440:2-18; Gov't

Feb. 1, 2015 Ltr. at 4-5).  Thus, the "DeathFromAbove" messages evidenced nothing more than

that Force used the moniker in a corrupt attempt to extort money from "DPR."[4]  The messages in

no way evidenced that Anand Athavale was actually "DPR."  To the contrary, there was clear

evidence to the contrary: for example, "DPR" responded to "DeathFromAbove's" messages

simply by telling him to "[s]top messaging me and go find something else to do"; and the "log"

file recovered from Ulbricht's computer notes the messages from "DeathFromAbove" and

comments that they were "bogus."  (Gov't Feb. 1, 2015 Ltr. at 2-4).  The Court ultimately

precluded the messages from being introduced into evidence, finding that the messages were

hearsay that the defense was improperly seeking to introduce for the truth, and that in any event

the messages were more prejudicial than probative since they were not substantial evidence of an

"alternative perpetrator."  (Tr. 1871-73).

---

[4] As the Government explained in its sealed submission, former SA Force had access to law enforcement reports filed by SA Der-Yeghiayan, including reports concerning his suspicions regarding Anand Athavale, which was likely the source of the information leaked by Force through the "DeathFromAbove" account.  (Gov't Feb. 1, 2014 Ltr. at 5 n.4).

## LEGAL STANDARD

Rule 33 provides, in relevant part, that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires."  Fed. R. Crim. P. 33(a).  Given the deference owed to a jury's verdict, however, the Second Circuit has cautioned that district courts should exercise their Rule 33 authority only "'sparingly' and in 'the most extraordinary circumstances.'"  *United States v. Ferguson*, 246 F.3d 129, 134 (2d Cir. 2001) (citations omitted).  Thus, a motion for a new trial should not be granted unless, after evaluating "the entire record of the trial," the trial court is left with a "real concern that an innocent person may have been convicted."  *Id*.  "The ultimate test on a Rule 33 motion is whether letting a guilty verdict stand would be a manifest injustice."  *Id.; accord United States v. Parkes*, 497 F.3d 220, 232 (2d Cir. 2007); *United States v. Canova*, 412 F.3d 331, 349 (2d Cir. 2005).

The denial of a Rule 33 motion is subject to review only for abuse of discretion.  *See United States v. James*, 712 F.3d 79, 107 (2d Cir. 2013).

## ARGUMENT

### POINT I

### ULBRICHT'S ARGUMENT THAT THE GOVERNMENT FAILED TO TIMELY DISCLOSE EXCULPATORY MATERIAL IS MERITLESS

Ulbricht first argues that he is entitled to a new trial on the ground that the Government provided late disclosure of what he characterizes as "*Brady* material."  The purported "*Brady* material" consists of (1) materials in the Government's 3500 production concerning SA Der-Yeghiayan's investigation of Mark Karpeles and Anand Athavale and (2) certain information concerning the corruption investigation into former SA Carl Force.  (Def. Mem. at 10-15; Def. Mar. 6, 2015 Ltr. at 1-2).

The argument is meritless.  In order to show a *Brady* violation a defendant must show three things: (1) the evidence at issue is exculpatory; (2) the evidence was "suppressed" by the Government; and (3) the suppressed evidence was so material that there is a reasonable probability that it would have produced a different verdict and, therefore, its suppression caused prejudice to the defendant.  *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999).  Ulbricht cannot establish even one of these elements.

## A.   There Was No *Brady* Violation Concerning the Karpeles/Athavale Materials

### 1.   The Materials Are Not Exculpatory

Ulbricht's motion attaches a list of 70 documents included within the Government's production of 3500 material prior to trial, virtually all of which concern SA Der-Yeghiayan's investigation of Mr. Karpeles and Mr. Athavale (the "Karpeles/Athavale Materials").[5]  (Dratel Decl. Ex. A).  Ulbricht makes a perfunctory claim in his motion that these materials are exculpatory because they constitute evidence that "another perpetrator" was responsible for operating Silk Road.  (Def. Mem. at 11).  The materials evidence no such thing.

The Karpeles/Athavale Materials instead merely reflect suspicions that SA Der-Yeghiayan pursued during his investigation but that turned out to be misplaced.  As the Court specifically held at trial, SA Der-Yeghiayan's suspicions do not themselves constitute evidence of anything.  (Tr. 586 (precluding the defense from questioning SA Der-Yeghiayan about his suspicions of individuals, and distinguishing cases where law enforcement reports reflected that "somebody else had been essentially shown to be likely to be the guy")).  As the Court noted, it

_____

[5] The attachment also includes a small number of materials included within the Government's 3500 production for SA Alford, which do not relate to Mr. Karpeles or Mr. Athavale.  However, Ulbricht fails to provide the slightest explanation of how these materials are supposedly exculpatory.

is hardly unusual for a criminal investigation to consider a variety of suspects before ultimately closing in on the true perpetrator.  (Tr. 572 ("[I]t's very possible to have suspicion as to more than one person and this apparently happens as you folks know all the time, whereas the investigation eventually focuses primarily on one . . . .")).

As for any factual information in the Karpeles/Athavale Materials, the information was of a preliminary nature and turned out to be insignificant in light of subsequent investigative developments.  As explained above, SA Der-Yeghiayan started looking at Mr. Karpeles because the server used to host the "silkroadmarket.org" website was registered to him.  But after SA Der-Yeghiayan followed up on that information, he found that Mr. Karpeles was simply running a server-hosting company that leased servers to others, and that the server in question was ultimately controlled by Ulbricht, who leased the server from the company, using an alias.  Thus Mr. Karpeles' association with the server turned out to be an innocent one.  *See United States v. Sessa*, 92 Cr. 351 (ARR), 2011 WL 256330, at *24 (E.D.N.Y. Jan. 25, 2011) (reports concerning other suspects in murder investigation did not constitute *Brady* material where their fingerprints came back negative); *United States v. Indelicato*, 85 Cr. 139 (RO), 1992 WL 188361, at *2 (S.D.N.Y. Jul. 29, 1992) (report of confidential-source information that was contrary to prosecution theory did not constitute *Brady* material, given that source's information was "preliminary or speculative" and report was "simply part of [the Government's] investigatory work"); cf. *United States v. Amiel*, 95 F.3d 135, 145 (2d Cir. 1996) (finding no *Brady* violation where the defendant's allegation about a witness's criminal activity was supported only by a discredited source and the government's follow-up yielded no proof of the alleged criminal activity).

Similarly, SA Der-Yeghiayan's suspicion of Mr. Athavale was piqued by what he perceived to be linguistic similarities between "DPR" and Anand Athavale.  But the similarities were superficial and never corroborated by any substantial evidence.  *See Cabrera v. Artus*, 06 Civ. 2853 (NGG), 2008 WL 4146362, at *2 (E.D.N.Y. Sep. 8, 2008) (finding no *Brady* violation where evidence of supposed "alternative perpetrator" was "far too tenuous to lead to even a weak inference that the crime Petitioner was accused of committing was actually committed by the [alternative] perpetrator").

The law is well settled that "[t]he government has no *Brady* obligation to 'communicate preliminary, challenged, or speculative information'" to a defendant.  *Amiel*, 95 F.3d at 145 (quoting *United States v. Diaz*, 922 F.2d 998, 1006 (2d Cir. 1990)).  The prosecution is not required under *Brady* to disclose every lead, theory, suspicion, or hunch entertained by law enforcement agents during their investigation.  *See Moore v. Illinois*, 408 U.S. 786, 795 (1972) (noting that there is "no constitutional requirement that the prosecution make a complete and detailed accounting to the defense of all police investigatory work on a case," including any "early lead the police abandoned" in light of clear contrary evidence).  SA Der-Yeghiayan's investigations of Mr. Karpeles and Mr. Athavale did not yield fruit and were rendered inconsequential in light of the mountain of evidence eventually recovered against Ulbricht.  The reports and other documents he prepared concerning those subjects are not "exculpatory" and do not constitute *Brady* material.

### 2.    The Materials Were Not Suppressed

Ulbricht further has no basis to claim that any of the Karpeles/Athavale Materials were "suppressed" by the Government.  Contrary to Ulbricht's claim that he did not receive the materials "in time for the defense's effective use [of them] at trial," (Def. Mem. 7), all of the materials were included in the 3500 material for SA Der-Yeghiayan, which was produced to the

defense on December 31, 2014 – nearly two weeks before trial began.  Ulbricht fails to explain how the defense lacked the ability to incorporate these materials into its trial strategy within that time frame.  *See United States v. Douglas*, 525 F.3d 225, 245-46 (2d Cir. 2008) (disclosure of 290 pages one business day before trial did not constitute "suppression"); *see generally United States v. Coppa*, 267 F.3d 132, 144 (2d Cir. 2001) (reiterating "the longstanding constitutional principle that as long as a defendant possesses *Brady* evidence in time for its effective use, the government has not deprived the defendant of due process of law simply because it did not produce it sooner").

What makes Ulbricht's claim particularly perplexing is that the defense clearly *did* have time to utilize the Karpeles/Athavale Materials, because the defense made extensive use of them at trial during cross-examination of SA Der-Yeghiayan.  Indeed, the defense displayed an intimate familiarity with the details of these documents in questioning SA Der-Yeghiayan about them.  (Tr. 490:3-509:20; 527:7-530:13; 651:10-655:4; 659:3-679:3; 793:12-799:9).  The defense's actual use of the documents at trial thus negates any claim that they were not timely produced.  *See Gardner v. Fisher*, 556 F. Supp. 2d 183, 195 (E.D.N.Y. 2008) (finding no *Brady* violation based on last-minute disclosure of exculpatory statement "since the defense made effective use of this statement at trial through extensive cross-examinations").

Moreover, if the defense at any time believed that it did not have sufficient time to review the Karpeles/Athavale Materials or needed more time to conduct an investigation based upon them, it could have asked for a continuance for that purpose.  Having failed to do so, the defense is in no position now to demand a new trial on such grounds. *See United States v. Menghi*, 641 F.2d 72, 75 (2d Cir. 1981) (no *Brady* violation where DEA file was disclosed after relevant

witness had testified but before close of Government's case, given that "defense counsel made no motion for a continuance when the memorandum in the DEA file was disclosed").

### 3. Ulbricht Suffered No Prejudice

Finally, with respect to the third element of a *Brady* violation, Ulbricht fails to show that any of the materials he claims to have been "suppressed" were material to his defense. *See Kyles v. Whitley*, 514 U.S. 419, 437 (1995). Evidence is "material" only if "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Payne*, 63 F.3d 1200, 1209 (2d Cir. 1995).

Ulbricht fails to give any explanation, let alone a convincing one, as to why he likely would not have been convicted if only the defense had been given more time to review the Karpeles/Athavale Materials. He does not point to one single thing the defense would have done differently with that additional time – much less any reason to believe that, whatever it might be, it would have made any difference to the outcome of the case. Instead, he simply complains about the size of the Government's 3500 production and the number of changes made to the Government's exhibit list (which, again, apparently were not significant enough to cause the defense to seek an adjournment of trial[6]) – without any attempt to show that he was wrongly convicted as a result. *See Brown v. Greiner*, 02 Cir. 2043 (JBW), 2003 WL 22964395, at *9 (E.D.N.Y. Oct. 2, 2003) (noting that "[c]onclusory assertions of undefined prejudice are insufficient" to establish a *Brady* violation).

---

[6] Many of the additions to the Government's exhibits about which Ulbricht complains were minor and non-substantive – such as breaking up pages of documents into separate exhibits or adding metadata. Other additions were made in direct response to defense theories that were not aired until the defense's opening or its cross-examination of witnesses.

It is clear that earlier disclosure of the Karpeles/Athavale Materials would *not* have made any difference to the outcome of the case, because the evidence at trial was absolutely, positively overwhelming.  The evidence established, among other things, that: at the time of his arrest, Ulbricht was logged into Silk Road as "DPR" and chatting with SA Der-Yeghiayan, who was posing as a Silk Road employee; Ulbricht's laptop was filled with files reflecting his creation and operation of the website; Ulbricht confessed his creation and operation of the website to a friend, who provided powerful and credible testimony at trial; there was a continuing correspondence over time between the contents of Ulbricht's email and Facebook accounts and the communications of "DPR" found on Ulbricht's laptop; the massive amount of Bitcoins on Ulbricht's laptop traced back to the Silk Road servers; and the laptop further contained evidence of the "redandwhite" murders-for-hire that corresponded to messages about them found on the Silk Road servers.

It is little wonder that the jury took a mere three-and-a-half hours to convict Ulbricht in light of this comprehensive corpus of evidence.  By contrast, the preliminary information that initially led SA Der-Yeghiayan to investigate individuals other than the defendant – which the defense *was* in any event able to use at trial – paled in comparison.  There is no remote possibility – let alone "reasonable probability" – that the jury would have reached any different verdict had that same information been produced to the defense any earlier before trial than it was already.  *See United States v. Bagley*, 473 U.S. 667, 682 (1985) ("Where the evidence against the defendant is ample or overwhelming, the withheld *Brady* material is less likely to be material than if the evidence of guilt is thin."); *United States v. Jackson*, 345 F.3d 59, 74 (2d Cir. 2003) (concluding that the jury's verdict was supported by compelling evidence and undisclosed

materials were of limited utility, such that there was no reasonable probability that there would

have been a different result had the materials been disclosed prior to trial).[7]

## B. There Was No *Brady* Violation Concerning the Force Investigation

Ulbricht's allegation that the Government violated *Brady* by withholding information

about the Force investigation is likewise meritless.

As the Court already ruled prior to trial, "[c]ontrary to defendant's arguments," the

allegations of misconduct by former SA Force "are not exculpatory." (Slip op. dated Dec. 22,

2014 at 18). Force played no role in the investigation of Silk Road conducted by this Office; he

was never contemplated as a witness at trial; and none of the trial evidence otherwise came from

the USAO-Baltimore investigation in which he was involved. *See id.* at 7.[8] But more

---

[7] In addition to faulting the Government for not producing the Karpeles/Athavale Materials
earlier, Ulbricht also speculates that there was other supposedly exculpatory material that the
Government did not produce at all. In particular, Ulbricht suggests that the Government redacted
exculpatory information from its 3500 production. (Def. Mem. at 10-11). However, he points
merely to one instance of information concerning Mr. Athavale that was redacted in one place in
the Government's (voluminous) 3500 production but not elsewhere in the production. Aside
from conclusory assertions, Ulbricht fails to explain how this information is exculpatory in the
first place; and in any event it *was* included in the Government's production. Thus, Ulbricht has
failed to show that exculpatory information was redacted from the Government's 3500
production – let alone any information likely to have led to a different outcome at trial. *See
United States v. Muyet*, 95 Cr. 941 (PKL), 1998 WL 92434, at *1 (S.D.N.Y. Mar. 4, 1998)
(rejecting challenge to redactions where defendant did "not specify what redactions he
questions" and made "no showing that the Government failed to disclose any exculpatory
material"); *see also United States v. Numisgroup Intern. Corp.*, 128 F. Supp. 2d 136, 150
(E.D.N.Y. 2001) ("In the absence of a particularized showing by the defense that certain
materials covered by *Brady* are being withheld, the Court accepts the Government's good faith
assertion as sufficient."). Similarly, Ulbricht claims, "[u]pon information and belief," that the
Government is in possession of law enforcement interviews conducted after his arrest that
"generated exculpatory material and information." (Def. Mem. at 11). Again, Ulbricht's mere
conjecture along these lines is not sufficient to support a claimed *Brady* violation.

[8] Indeed, even though the Government had independent proof from Ulbricht's laptop of
Ulbricht's involvement in the murder-for-hire scheme charged by USAO-Baltimore, (Gov't
Mem. in Opp. to Def.'s Mot. in Limine dated Dec. 12, 2014, at 16 n.2 &18 n.3), and even though
(cont'd…)

importantly, the Force investigation concerns only corruption on the part of Force.  It does not somehow exculpate Ulbricht.  Indeed, as the Court found, if anything the investigation inculpates Ulbricht further, as it shows that Ulbricht was seeking to pay law enforcement for inside information in order to protect his illegal enterprise.  Accordingly, the Court was absolutely correct to preclude the defense from injecting the Force investigation into the trial, as it had no legitimate relevance to the defense case and would only have served to distract attention away from the issue of Ulbricht's guilt or innocence.  *See United States v. Milan-Colon*, 836 F. Supp. 1007, 1012-14 (S.D.N.Y. 1993) (precluding evidence of a corruption investigation into officers suspected of stealing money from defendant's car at the time of his arrest, since the Government did not plan to introduce evidence seized by the officers or call them as witnesses, and nothing about the corruption investigation indicated that evidence was fabricated against the defendants).

Given the Court's pre-trial ruling on the matter, the arguments Ulbricht makes in his instant motion concerning the Force investigation are barred by law of the case and can be quickly dispatched.  First, Ulbricht argues that the Government somehow violated *Brady* by virtue of the fact that Force *himself* never disclosed to the defense any misconduct he committed, contending that Force's knowledge of his own misconduct "is imputed to the prosecution as a whole."  (Def. Mar. 6, 2015 Ltr. at 1).  This argument is as lacking in legal support as it is in common sense.  Force, again, was not part of the investigation conducted by this Office.  And even as to the separate USAO-Baltimore investigation in which he did participate, Force's allegedly corrupt conduct was plainly unauthorized.  To the extent Force engaged in the corrupt conduct alleged, he did not do so under the control or direction of *any* prosecuting office, let

the Court specifically held that this evidence was relevant and admissible, (Slip op. dated Jan. 7, 2015, at 27-33), the Government declined to use the evidence at trial.

alone this Office, and his knowledge of his own misconduct thus cannot be imputed to the prosecution team.[9]  But more importantly, Ulbricht fails to explain how Force's misconduct exculpates him in the first place, or how Force's failure to disclose that misconduct prejudiced him.  The Court's prior ruling precludes either contention.

Second, Ulbricht faults the Government for not providing continuing disclosures about USAO-San Francisco's investigation into Force.  In particular, Ulbricht faults the Government for not disclosing until trial that USAO-San Francisco had uncovered evidence that Force controlled the username "DeathFromAbove."  However, the Government did not learn that USAO-San Francisco had uncovered such evidence until during trial, and thus cannot be faulted for failing to disclose that fact sooner.[10]  In any event, the Court already found the "DeathFromAbove" evidence to be inadmissible hearsay and irrelevant to the defense.  Thus, it is not *Brady* material, notwithstanding Ulbricht's breezy characterizations otherwise.

More generally, the Government had no obligation to keep Ulbricht continually apprised of developments in USAO-San Francisco's corruption investigation.[11]  As the Court's December

---

[9] *See United States v. Diaz*, 176 F.3d 52, 106-07 (2d Cir. 1999) (whether person is part of the prosecution team depends on whether he acts under the direction of the prosecutor or plays a continuing, substantial role in the investigation leading to the defendant's prosecution).

[10] As the Government explained in its sealed letter of February 1, 2015, after the defense first sought to introduce messages from "DeathFromAbove" during cross-examination of SA Der-Yeghiayan, the Government consulted with USAO-San Francisco about the username, which subsequently reported that it had found evidence that the username was controlled by Force. (Gov't Feb. 1, 2015 Ltr. at 4-5).

[11] In particular, the Government was not obligated to inform the defense when Shaun Bridges eventually became a target of the corruption investigation.  The Government noted the possibility that the USAO-San Francisco investigation could expand to encompass other subjects, co-conspirators, or aiders and abettors, (Gov't Dec. 19, 2014 Ltr. at 2), so it should not come as a surprise to the defense that another agent besides Force was ultimately charged.  But regardless, the defense was not entitled to be notified when Bridges came under investigation, because the conduct he was being investigated for was not exculpatory as to Ulbricht.  Bridges' alleged (cont'd…)

22, 2014 ruling made clear, "*Brady* . . . imposes an obligation on the Government to apprise defendant of any exculpatory information obtained via the Force Investigation, but it does not entitle defendant to obtain access to materials from that grand jury investigation."  (Slip op. at 27.)  The Court credited the Government's representations that it knew of no exculpatory information from the Force investigation and that it would disclose any exculpatory information from the investigation if any came to light in the future.  (Slip op. at 22).  Hence, the Government had no *Brady* obligation to disclose any further information from the Force investigation, unless and until the investigation yielded information *exculpatory* as to Ulbricht. That never happened – not before trial, not during trial, and not since.  Nor is there any reason to expect that it ever will, given that the proof of Ulbricht's guilt is multifarious and overwhelming.

In short, Ulbricht has not come close to establishing any *Brady* violation with respect to any information from the Force investigation.  In an abundance of caution, the Government disclosed the Force investigation to the defense well in advance of trial, and it was properly found not to be exculpatory by the Court.  Ulbricht's motion provides no reason for the Court to revisit that holding.

## POINT II

### THERE IS NO BASIS TO REOPEN ULBRICHT'S SUPPRESSION MOTION

Ulbricht next argues that his suppression motion should be reopened based on certain statements found in SA Der-Yeghiayan's 3500 material, which Ulbricht claims to raise new questions about how the server hosting the Silk Road website was located.  The argument is meritless.

---

conduct is of the same nature as Force's alleged conduct: it reflects only corruption on the part of a law enforcement agent, not innocence on Ulbricht's part.

First, the statements at issue have nothing to do with how the Silk Road server was located.  Ulbricht cites two exchanges of text messages between SA Der-Yeghiayan and a confidential informant that were included in the Government's 3500 production.  The first, in or about August 2012, concerns the testing of a Tor "exit node," while the second, from in or about October 2012, concerns the feasibility of conducting a "DDOS" attack on the servers operating Silk Road.  These discussions, however, had nothing to do with the manner in which the Silk Road server was located, which was accomplished by the FBI in July 2013.  SA Der-Yeghiayan, who is from Homeland Security Investigations, had no involvement in that aspect of the investigation – as he specifically testified at trial.[12]

Second, and more fundamentally, as the defense is well aware, Ulbricht's suppression motion with respect to the Silk Road server was denied on standing grounds, given that he failed to submit any sworn affidavit asserting a protected privacy interest in the server.  He failed to submit such an affidavit despite being given a "final opportunity" to do so during the litigation of his motion.  Ulbricht thus gave up any right to seek suppression of the Silk Road server evidence many months ago.  Nothing in SA Der-Yeghiayan's 3500 material changes that.[13]

---

[12] *See* Tr. 695-698 ("Q. And the government, the U.S. government, got access to the Silk Road servers no later than July 23, 2013, right?  A. The FBI did.  Q. And the FBI could have pulled the plug right then because they had the servers, right?  A. I don't know what their capabilities were at the time. . . . Q: During the course of your investigation you learned the physical location, the country, that those servers were located in, right?  A: Only from what I was told where they were at is what I knew.  THE COURT: Did you learn from any other source apart from what you were told? . . . A: I did not. . . . THE COURT: Well, let me ask you.  Did you yourself ever – did you have any personal involvement in the imaging of the servers?  A: No, I did not.").

[13] Ulbricht also contends that, "[i]n reopening Mr. Ulbricht's suppression motion, the government should be required to produce any and all pen registers not previously provided to defense counsel, such as any for Mr. Ulbricht's email accounts."  Given that there is no basis to reopen the suppression motion, there is no reason to address this discovery demand.  However, the Government notes that the pen register obtained on Ulbricht's email account was included in discovery produced to the defense in September 2013.

## POINT III

## ULBRICHT'S BELATED "PROFFER" OF EXPERT TESTIMONY
## IS NOT A GROUND FOR A NEW TRIAL

Finally, Ulbricht's motion includes what is captioned as a "proffer from Andreas M. Antonopoulos regarding his proposed expert testimony."  (Def. Mem. 17).  Strangely, the proffer is not accompanied by any request for relief.  The proffer simply describes what Mr. Antonopoulos "would have testified" about had he been permitted to appear as an expert at trial.

Needless to say, this "proffer" comes far too late.  The Federal Rules of Criminal Procedure require timely disclosure of expert witnesses, their qualifications, their opinions, and the bases and reasons therefor.  Fed. R. Crim. P. 16(b)(1)(C).  Hence, the time for the defense to give notice of Mr. Antonopoulos's anticipated testimony was before trial – or *at least* far enough in advance of the defense case to avoid unfair surprise and to allow evaluation of the relevance and reliability of the testimony anticipated.  Because the defense failed to provide such notice in the time or manner required, the Court properly precluded Mr. Antonopoulos from testifying.  Ulbricht is not entitled to a "do over" on the issue by making more fulsome disclosures now, when he has already been convicted.

## CONCLUSION

For the reasons set forth above, the defendant's motion for a new trial should be denied.

Dated:  New York, New York
         April 3, 2015

                              Respectfully submitted,

                              PREET BHARARA
                              United States Attorney
                              Southern District of New York

By:                           _____
                              SERRIN TURNER
                              TIMOTHY T. HOWARD
                              Assistant United States Attorneys

27