UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------ X

:

UNITED STATES OF AMERICA                                     :

:

:

-v-                                     :                    14-cr-68 (KBF)

:

ROSS WILLIAM ULBRICHT,                                       :          OPINION & ORDER

:

Defendant.                              :

:

------------------------------------------------------------ X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: April 27, 2015

KATHERINE B. FORREST, District Judge:

      Ross Ulbricht ("defendant" or "Ulbricht") was indicted on February 4, 2014.

On August 21, 2014, the Government filed a superseding indictment; Ulbricht was

arraigned on that indictment on September 5, 2014.  The charges against Ulbricht

stemmed from his alleged design, creation, and operation of Silk Road—a sprawling

online marketplace for illegal narcotics, computer hacking materials, and

fraudulent identification documents.  The Government alleged that Ulbricht owned

and operated Silk Road on the dark net under the username "Dread Pirate Roberts"

("DPR") and, as DPR, controlled every aspect of the illegal enterprise until the day

of his arrest.  The Superseding Indictment charged Ulbricht with seven crimes:

narcotics trafficking, narcotics trafficking by means of the Internet, conspiring to

commit narcotics trafficking, engaging in a continuing criminal enterprise,

conspiring to commit or aid and abet computer hacking, conspiring to traffic in

fraudulent identification documents, and conspiring to commit money laundering.

(ECF No. 52.)

Trial was initially scheduled for November 3, 2014, but, on applications from the defense, it was adjourned to November 10, 2014 and then to January 5, 2015. On December 30, 2014, the defense made an additional application for an adjournment—which the Court denied.  This matter proceeded to trial on January 13, 2015.[1]  On February 4, 2015, after just a few hours of deliberation, the jury returned guilty verdicts on all counts.

Now before this Court is Ulbricht's motion for a new trial on all counts.  (ECF No. 222.)  There is no basis in fact or law to grant the motion and it is DENIED.

I.     THE TRIAL[2]

In his opening statement, Ulbricht's counsel conceded that Ulbricht had, in fact, created Silk Road.  Counsel told the jury that the evidence would show that Ulbricht had ceased his involvement with Silk Road "after a few months" but had been lured back—just as law enforcement closed in—to be the fall guy.  In short, he was caught red-handed but was a dupe.  Counsel told the jury that Ulbricht was not the Dread Pirate Roberts.

By the time of trial, defendant had received what evidence the Government possessed; he had copies of the website, the code, the servers, the thumb drives, the photographs, the screen shots, etc.  It was in the face of all this evidence that Ulbricht's counsel presented his opening statement and outlined his defense.  His defense was not that the evidence would fail to show that all manner of illegal drugs

---

[1] The one-week delay in the start of trial was due to a personal matter affecting one of the attorneys for the Government.

[2] The Government has laid out the facts developed during the trial in detail in its submission on this motion.  (ECF No. 230.)  The Court does not repeat all of those facts here and recites only those most pertinent to resolution of the instant motion.

were sold on Silk Road, that Ulbricht was not its creator, that he did not purchase several counterfeit drivers' licenses from the site, that he was not arrested with a laptop which was a standalone, independently sufficient, massive repository of incriminating evidence. His defense was that somehow—in a manner not then explained—Ulbricht had been set up by the real criminal mastermind.

Counsel's opening suggested a developed defense—a defense supported by known evidence. It suggested that there was evidence that Ulbricht—who concededly started Silk Road—at some point ceased his involvement with the enterprise and returned only at the very end. It suggested that there was evidence that the mound of incriminating material on Ulbricht's laptop had been created and placed there by someone else—or by some automated process—in a technologically feasible way.

Counsel pursued this "alternative perpetrator" line of argument during cross-examination of the Government's witnesses—particularly Special Agent ("SA") Der-Yeghiayan, whom counsel questioned extensively regarding two other individuals who were investigated as possible leads on DPR.

There is a necessary disconnect between this defense theory—presented in counsel's opening and cross-examination—of what really happened, and the theory on this motion: that defendant has not had the time or information to develop any defense at all.

The evidence of Ulbricht's guilt was, in all respects, overwhelming. It went unrebutted. This motion for a new trial urges that Ulbricht was prejudiced by that

which he could not know in time, or at all.  But the motion does not address how any additional evidence, investigation, or time would have raised even a remote (let alone reasonable) probability that the outcome of the trial would be any different.

The trial started with the jury hearing that at the time of his arrest, Ulbricht was actively engaged in an online chat with an undercover agent posing as a Silk Road employee.  Ulbricht was at his laptop, typing, and logged in as the Dread Pirate Roberts.  The jury heard and saw evidence connecting the purchase of that laptop to Ulbricht: it was purchased using Bitcoins (converted by Ulbricht into Amazon.com gift cards) and shipped to Ulbricht's home.  (GX 312C, 312.)  A confirmation e-mail was sent to Ulbricht's e-mail account, and Ulbricht duly recorded the purchase in a spreadsheet of Silk Road-related expenses.  (GX 312C, 250.)

The jury heard that the laptop contained what can only be described as an electronic diary: a detailed description by Ulbricht of how and why he started Silk Road—and the various events that occurred over the years in relation to it—sprinkled with details from Ulbricht's private life.  (GX 240A–240D.)  The laptop also contained thousands of pages of chat logs with Silk Road employees (GX 222–232E), a weekly to-do list for Silk Road (GX 255), copies of the Silk Road website and the Silk Road market database (GX 212, 213), spreadsheets of Silk Road–related expenses and servers (GX 250, 264), a "log" file reflecting actions that Ulbricht took in connection with the day-to-day maintenance of Silk Road (GX 241), the encryption keys used to verify the Dread Pirate Roberts's identity (GX 269, 296),

4

a spreadsheet listing Ulbricht's personal assets in which he valued Silk Road at $104 million (GX 251), and scanned copies of identification documents belonging to Silk Road staff members (GX 216, 256).  There were also Bitcoin wallets on the laptop containing over 144,000 Bitcoins, valued at the time of Ulbricht's arrest at $16-18 million.  (GX 214, Tr. 1032:21-1033:5, 1673:8-1674:6.)  An analysis of those Bitcoins showed that the vast majority of them—nearly 90%—came directly from Bitcoin wallets found on Silk Road servers.  (GX 620B.)

The jury also heard extensive testimony that Silk Road was a website used to buy and sell narcotics and other illicit goods and services.  The jury saw printouts from the website showing advertisements for a variety of such narcotics, and heard testimony from a law enforcement agent who had seized a large volume of narcotics purchased through Silk Road.  The jury heard from a former friend of Ulbricht that Ulbricht had confessed his involvement in Silk Road to him.  The jury saw a variety of Silk Road transactional data demonstrating the sale of computer hacking materials, currency, and a host of fake drivers' licenses, passports, and other identification documents.  The jury heard that a law enforcement agent had intercepted a package containing nine counterfeit drivers' licenses for Ulbricht himself, and that Ulbricht had mentioned Silk Road when confronted with them. The jury saw copies of papers taken from Ulbricht's garbage can shortly after his arrest which had handwritten notes of tasks associated with Silk Road.  The jury also saw documents which demonstrated that the Dread Pirate Roberts attempted

to protect his interests in Silk Road by commissioning the murder of several individuals (though there is no evidence that murders resulted).

By contrast, the jury was not presented with any evidence that the laptop which Ulbricht possessed at the time of his arrest was ever out of his possession since he had purchased it (and it had been delivered to his home address). It was also not presented with any evidence that someone—or some automated process— could, much less did, populate Ulbricht's hard drive with any of the evidence described above, located in different files and in different places on the computer.

## II.   DEFENSE ARGUMENTS

Defendant makes three arguments in support of his motion for a new trial. First, defendant argues that he was deprived of his Fifth Amendment right to due process and his Sixth Amendment rights to a fair trial and effective assistance of counsel. In that regard, defendant argues that the Government's production of 3500 material less than two weeks prior to trial was voluminous and contained exculpatory material that should have been produced sooner. In addition, defendant asserts that he was denied the ability to use, or have discovery into, certain information concerning the corruption investigation into former SA Carl Force and another law enforcement agent (the "Rogue Agents"). Defendant asserts that the recently unsealed criminal complaint against the Rogue Agents—who were involved in an investigation of Silk Road by the U.S. Attorney's Office for the District of Maryland ("USAO-Baltimore")—reveals that Brady material was suppressed in this case. Defendant argues that all of these failures were compounded by the Government's repeated additions and modifications to its

6

exhibit list on the eve of and during trial—which sowed confusion and inhibited effective preparation.

Second, defendant argues that 3500 material revealed that "the government was conducting warrantless TOR network surveillance on a TOR exit node" that his pre-trial suppression motion should be therefore "reopened" and granted. (Memorandum of Law in Support of Defendant Ross Ulbricht's Post-Trial Motions ("Def.'s Br.") at 15, ECF No. 224.)

Third and finally, defendant offers a "proffer" regarding the proposed testimony of Andreas M. Antonopoulos, implicitly suggesting that the Court erred in precluding Mr. Antonopoulos from testifying as an expert witness before receiving a full proffer of his testimony.

None of these arguments supports granting a new trial.[3]

## III.   LEGAL STANDARDS

### A.   <u>Rule 33</u>

Rule 33 provides that a district court may "vacate any judgment and grant a new trial if the interest of justice so requires."  Fed. R. Crim. P. 33(a).  The ultimate question is whether manifest injustice would result if a court allows a guilty verdict to stand.  <u>United States v. Snype</u>, 441 F.3d 119, 140 (2d Cir. 2001).  Given the deference owed to a jury's verdict, the Second Circuit has instructed that district courts should exercise their Rule 33 authority "sparingly" and only in "the most extraordinary circumstances."  <u>United States v. Ferguson</u>, 246 F.3d 129, 134 (2d

---

[3] The Court notes that Ulbricht's reply papers focus exclusively on the first argument.  It is unclear whether this exclusive focus means that Ulbricht has abandoned his other arguments or whether he is content to let his opening papers address them.

Cir. 2001) (quoting United States v. Sanchez, 969 F.2d 1409, 1414 (2d Cir. 1992))

(internal quotation marks omitted).  Such extraordinary circumstances exist, for

example, when testimony is "patently incredible or defies physical realities."

United States v. Cote, 544 F.3d 88, 101 (2d Cir. 2008) (quoting Sanchez, 969 F.2d at

1414) (internal quotation marks omitted).  A motion for a new trial should not be

granted unless, upon examining the entire case and taking into account all of the

facts and circumstances, the court is left with "a real concern that an innocent

person may have been convicted."  Ferguson, 246 F.3d at 134 (citation and internal

quotation mark omitted).  After a full and thorough review of the evidence, the

Court here is left with no such concern.

    B.    Discovery Obligations in Criminal Cases

    "[I]n all federal criminal cases, it is Rule 16 that principally governs pre-trial

discovery."  United States v. Smith, 985 F. Supp. 2d 506, 521 (S.D.N.Y. 2013)

(citations omitted).  Rule 16(a)(1)(E) provides, in pertinent part, that a defendant is

entitled to obtain from the Government documents and objects that are "within the

government's possession, custody, or control" if they are "material to preparing the

defense" or will be used by the Government in its case-in-chief at trial.  Fed. R.

Crim. P. 16(a)(1)(E).

    Evidence that the Government does not intend to use in its case-in-chief at

trial is material "if it could be used to counter the government's case or to bolster a

defense; information not meeting either of those criteria is not to be deemed

material within the meaning of the Rule."  United States v. Stevens, 985 F.2d 1175,

1180 (2d Cir. 1993).  To warrant a new trial "[t]here must be some indication that

the pretrial disclosure of the disputed evidence would have enabled the defendant significantly to alter the quantum of proof in his favor." Id. (quoting United States v. Maniktala, 934 F.2d 25, 28 (2d Cir. 1991)) (internal quotation marks omitted). Even the withholding of material evidence does not warrant a new trial if the defendant cannot show that it caused him "substantial prejudice." Id. at 1181 (citation omitted). "In assessing that question, the court analyzes the nature of the evidence sought, the extent to which it bore on critical issues in the case, the reason for its nonproduction, and the strength of the government's untainted proof." Id. (citation omitted).

Rule 16(a) was never "intended to provide the defendant with access to the entirety of the government's case against him." United States v. Percevault, 490 F.2d 126, 130 (2d Cir. 1974) (citation omitted). "Discovery of evidence in criminal prosecutions is, inevitably, more restricted than discovery in civil cases." United States v. Tolliver, 569 F.2d 724, 728 (2d Cir. 1978). Rule 16 "does not entitle a criminal defendant to a 'broad and blind fishing expedition among [items] possessed by the Government on the chance that something impeaching might turn up.'" United States v. Larranga Lopez, 05 Cr. 655 (SLT), 2006 WL 1307963, at *7-8 (E.D.N.Y. May 11, 2006) (alteration in original) (citing Jencks v. United States, 353 U.S. 657, 667 (1957)).

C.    3500 Material

The Jencks Act provides that "[a]fter a witness called by the United States has testified on direct examination, the court shall, on motion of the defendant, order the United States to produce any statement . . . of the witness in the

possession of the United States which relates to the subject matter as to which the witness has testified." 18 U.S.C. § 3500(b). The plain meaning of this provision does not require production of 3500 material before trial. In practice, however, courts in this district require the Government to produce 3500 material at least the Friday prior to the commencement of trial and sometimes earlier.

The Jencks Act is intended to provide the defense with prior statements of Government witnesses for purposes of impeachment. United States v. Carneglia, 403 F. App'x 581, 586 (2d Cir. 2010). The Jencks Act is not a general discovery device. See United States v. Exolon-Esk Co., No. 94-CR-17S, 1995 WL 46719, at *2 (W.D.N.Y. Jan. 19, 1995) (citing In re United States, 834 F.2d 283, 286 n.2 (2d Cir. 1987)); see also United States v. Jackson, 345 F.3d 59, 76 (2d Cir. 2003) (The Jencks Act "does not normally mandate disclosure of statements made by a person who does not testify." (citations omitted)). In instances in which the Government has failed to provide 3500 material, a defendant is only entitled to relief if there is a "reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." Carneglia, 403 F. App'x at 586 (quoting United States v. Nicolapolous, 30 F.3d 381, 383-84 (2d Cir. 1994)) (internal quotation marks omitted).

D.   Brady

"There is no general constitutional right to discovery in a criminal case, and Brady did not create one." Weatherford v. Bursey, 429 U.S. 545, 559 (1977); see also Pennsylvania v. Ritchie, 480 U.S. 39, 59 (1987) ("Defense counsel has no constitutional right to conduct his own search of the [Government's] files to argue

relevance." (citation omitted)); United States v. Evanchik, 413 F.2d 950, 953 (2d Cir. 1969) ("Neither [Brady] nor any other case requires the government to afford a criminal defendant a general right of discovery."); United State v. Meregildo, 920 F. Supp. 2d 434, 440 (S.D.N.Y. 2013) ("Brady is not a rule of discovery—it is a remedial rule." (citing United States v. Coppa, 267 F.3d 132, 140 (2d Cir. 2001))).

Rather, Brady established that the Government has a constitutional obligation to disclose favorable and material information to the defendant.  See Brady v. Maryland, 373 U.S. 83, 87 (1963).  "There are three components of a true Brady violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued."  Strickler v. Greene, 527 U.S. 263, 281-82 (1999).  A defendant seeking a new trial on the basis of an alleged Brady violation bears the burden of demonstrating that these elements are met.  United States v. Douglas, 415 F. Supp. 2d 329, 336 (S.D.N.Y. 2006), aff'd, 525 F.3d 225 (2d Cir. 2008).

Prejudice ensues only if the suppressed evidence is material—that is, "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."  Kyles v. Whitley, 514 U.S. 419, 433 (1995) (quoting United States v. Bagley, 473 U.S. 667, 682 (1985)) (internal quotation marks omitted).  "A reasonable probability" means that the likelihood of a different result is sufficiently great to "undermine confidence in the outcome of the trial."  Smith v. Cain, 132 S. Ct. 627, 630 (2012) (quoting Kyles, 514

U.S. at 434) (alteration and internal quotation marks omitted).  Undisclosed information may not be material if the Government's "other evidence is strong enough to sustain confidence in the verdict." Id. (citation omitted).  This standard is not satisfied, however, if the Government "offers a reason that the jury could have disbelieved [the undisclosed evidence], but gives us no confidence that it would have done so." Id. (emphases in original).  Materiality is assessed in light of the trial evidence.  "Where the evidence against the defendant is ample or overwhelming, the withheld Brady material is less likely to be material than if the evidence of guilt is thin." United States v. Gil, 297 F.3d 93, 103 (2d Cir. 2002) (citations omitted).

"Brady material that is not 'disclosed in sufficient time to afford the defense an opportunity for use' may be deemed suppressed within the meaning of the Brady doctrine." United States v. Douglas, 525 F.3d 225, 245 (2d Cir. 2008) (alteration omitted) (quoting Leka v. Portuondo, 257 F.3d 89, 103 (2d Cir. 2001)); see also Coppa, 267 F.3d at 135 ("Brady material must be disclosed in time for its effective use at trial." (citation omitted)).  Brady material buried within "reams" of 3500 material and provided too close to trial to permit effective use may also be deemed suppressed.  See Douglas, 525 F.3d at 245 (citing Gil, 297 F.3d at 103); see also United States v. Rittweger, 524 F.3d 171, 181 n.4 (2d Cir. 2008) ("Complying with the Jencks Act . . . does not shield the government from its independent obligation to timely produce exculpatory material under Brady . . . .").

IV.    DISCUSSION

A.    <u>Fifth and Sixth Amendment Claims</u>

Ulbricht asserts that his Fifth and Sixth Amendment rights were violated as a result of the Government's belated production of 3500 material, failure to timely disclose the details of the investigation of the Rogue Agents, and repeated additions and modifications to trial exhibits.  According to Ulbricht, the Government's gamesmanship in this regard led to inadequate trial preparation, an inability to investigate whether certain evidence might be exculpatory, and, ultimately, an unfair trial.  These arguments are without merit.

1.    <u>3500 Material</u>

Ulbricht argues that he is entitled to a new trial because the Government's 3500 production contained <u>Brady</u> material concerning SA Der-Yeghiayan's investigation of Messrs. Karpeles and Athavale (the "Karpeles/Athavale Materials") which was not disclosed in time for effective use at trial.  This argument fails for three independent reasons.

First, the Karpeles/Athavale Materials do not constitute <u>Brady</u> material because they are not exculpatory vis-à-vis Ulbricht.  Defendant argues that these materials constitute "other perpetrator" evidence, but they in fact only reflect investigative leads that SA Der-Yeghiayan explored but that ultimately turned out to be misplaced.  <u>See</u> <u>Moore v. Illinois</u>, 408 U.S. 786, 795 (1972) (noting that there is "no constitutional requirement that the prosecution make a complete and detailed accounting to the defense of all police investigatory work on a case," including any "early lead the police abandoned"); <u>United States v. Amiel</u>, 95 F.3d 135, 145 (2d Cir.

13

1996) ("The government has no <u>Brady</u> obligation to 'communicate preliminary,

challenged, or speculative information.'" (quoting <u>United States v. Diaz</u>, 922 F.2d

998, 1006 (2d Cir. 1990)) (internal quotation marks omitted)).

SA Der-Yeghiayan investigated Mr. Karpeles because the website

"silkroadmarket.org"—which provided instructions on how to access Silk Road on

the Tor network—was hosted on a server that was registered to Mr. Karpeles.

However, further inquiry revealed that Mr. Karpeles's connection to the server was

an innocent one: he was simply running a server-hosting company that leased

servers to others, and the server in question was in fact leased to Ulbricht. The

Government's investigation of Mr. Karpeles thus does not exculpate Ulbricht. <u>See</u>

<u>United States v. Sessa</u>, No. 92-CR-351 ARR, 2011 WL 256330, at *24 (E.D.N.Y. Jan.

25, 2011) (police reports concerning other suspects in a murder investigation did not

constitute <u>Brady</u> material where, <u>inter alia</u>, their fingerprints came back negative),

<u>aff'd</u>, 711 F.3d 316 (2d Cir. 2013).

As to Mr. Athavale, SA Der-Yeghiayan's suspicion was based on certain

linguistic similarities between DPR's writing and that of Mr. Athavale. However,

these similarities are not exculpatory vis-à-vis Ulbricht because they were never

corroborated by any substantial evidence.[4]

In any event, the Karpeles/Athavale Materials were not "suppressed" within

the meaning of the <u>Brady</u> doctrine. These materials were included in the 3500

---

[4] Even if the Karpeles/Athavale Materials somehow inculpated Messrs. Karpeles and Athavale, they would not exculpate Ulbricht or undermine the mound of evidence against him. Rather, they would simply suggest that there might have been more than one DPR operating Silk Road in the same time period. Whether there was one or 100 DPRs is irrelevant to the ultimate question of whether the Government met its burden of proof as to the crimes charged vis-à-vis Ulbricht.

material for SA Der-Yeghiayan—which was produced to the defense on December 31, 2014, thirteen days before trial began.  While Ulbricht asserts that the 3500 production for SA Der-Yeghiayan was voluminous (totaling 5,000 pages), he has failed to demonstrate that he had insufficient time to make effective use of any of these materials.  See Douglas, 525 F.3d at 245-46 (disclosure of 290 pages one business day before trial did not constitute suppression).  Indeed, the defense displayed great familiarity with the Karpeles/Athavale Materials and used them repeatedly during cross examination.  See Gardner v. Fisher, 556 F. Supp. 2d 183, 195 (E.D.N.Y. 2008) (finding no Brady violation based on last-minute disclosure of an exculpatory statement "since the defense made effective use of this statement at trial through extensive cross-examinations").  Notably, the defense never requested a continuance based on the late disclosure of 3500/Brady material.  See United States v. Menghi, 641 F.2d 72, 75 (2d Cir. 1981) (finding no Brady violation where, inter alia, defense counsel made no motion for a continuance to allow further investigation).

Finally, the Karpeles/Athavale Materials are not material to Ulbricht's defense.  Ulbricht does not offer any explanation as to why there is any chance that he would not have been convicted had the defense been given more time to review the Karpeles/Athavale Materials.  He does not explain how the defense would have used the additional time, much less give how this effort may have affected the outcome of the trial.  As set forth in Part I above, the Government presented overwhelming evidence of Ulbricht's guilt.  Ulbricht was caught red-handed—logged

in and chatting as DPR on a personal laptop, which Ulbricht unquestionably owned, filled with Silk Road files.  In the face of this mound of evidence, there is no faint possibility, much less "reasonable probability," that the jury would have reached a different verdict had the Government produced the Karpeles/Athavale Materials earlier.  See Gil, 297 F.3d at 103 ("Where the evidence against the defendant is ample or overwhelming, the withheld Brady material is less likely to be material than if the evidence of guilt is thin." (citations omitted)); Jackson, 345 F.3d at 74 (finding a lack of materiality because "[t]he jury's verdict was supported by compelling evidence" and "the undisclosed materials were of limited utility").[5]

## 2.   The Rogue Agents Issue

The vast majority of Ulbricht's reply on this motion concerns the unsealing of the criminal complaint in the Northern District of California against two individuals who held positions with law enforcement and were involved in the USAO-Baltimore investigation of Silk Road: former SAs Carl Force and Shaun Bridges.  Defendant's focus on the complaint against these investigators—and the Northern District of California's investigation of them—is misguided.  The Government's failure to reveal more regarding the investigation of either individual violated neither its discovery nor its Brady obligations.

---

[5] In passing, defendant challenges two other aspects of the Government's 3500 production.  First, defendant asserts that "[o]ther exculpatory material was included within the 3500 material for Internal Revenue Special Agent Gary Alford (which was produced January 6, 2015)."  (Def.'s Br. at 10.)  Second, defendant suggests that the Government may have redacted exculpatory information from its 3500 production.  (Id. at 10-11.)  However, there is no indication that either of these assertions is true, and defendant's unsupported conjecture in that regard is insufficient to establish a Brady violation.  See United States v. Numisgroup Int'l Corp., 128 F. Supp. 2d 136, 150 (E.D.N.Y. 2000) ("In the absence of a particularized showing by the defense that certain materials covered by Brady are being withheld, the Court accepts the Government's good faith assertion [that it has complied with its Brady obligations] as sufficient." (citations omitted)).

Despite the attention given to the Rogue Agents issue in defendant's brief, this Court remains unclear (as it always was) as to how any information relating to that investigation is material or exculpatory vis-à-vis Ulbricht.  Either the defense assumes the answer is so obvious that it need not explain, or its omission is purposeful.  For purposes of the instant motion, this Court assumes that defendant believes he was deprived of information which would have revealed that (1) the Rogue Agents' conduct may have tainted any evidence relating to the website (since they assumed identities on the site), (2) the Rogue Agents may provide a link to someone (including themselves) who may have taken over the DPR account and framed Ulbricht, and/or (3) the Rogue Agents may know the identity of the real DPR.  There is no basis in the record—including in any of what defendant has cited regarding the Rogue Agents—which supports any one of these theories.  These theories are based on no more than speculation and premised on erroneous assumptions as to the scope of discovery obligations and the meaning of exculpatory evidence.

To start, there is no basis for this Court to believe that any undisclosed materials relating to the Rogue Agents would have been remotely useful, let alone exculpatory, vis-à-vis Ulbricht.  The Rogue Agents did not participate in the USAO-SDNY's investigation of Silk Road that resulted in defendant's arrest and indictment, and none of the evidence at defendant's trial came from the USAO-Baltimore investigation in which the Rogue Agents participated.[6]  That the Rogue

---

[6] Defendant argues that the USAO-SDNY and USAO-Baltimore investigations were coordinated, and "[t]o the extent there is any question with respect to that conclusion," the Court should hold an

Agents may have exceeded the scope of their authority in the USAO-Baltimore investigation does not, in any way, suggest that Ulbricht was not the Dread Pirate Roberts.  As this Court explained in an earlier (sealed) ruling on this topic, the investigation of SA Force is, if anything, <u>in</u>culpatory as it suggests that Ulbricht, as DPR, was seeking to pay law enforcement for inside information to protect his illegal enterprise.

Moreover, even if defendant could point to a favorable piece of evidence from the investigation of the Rogue Agents, defendant has not constructed any argument that had he had earlier disclosure, the result of the trial may have been different. There is no reasonable probability of a different outcome here: the circumstances of defendant's arrest, and the evidence found in his own possession at the time of the arrest, are in and of themselves overwhelming evidence of his guilt.

One of defendant's key arguments is that suppression of the Rogue Agents material prevented him from exploring potentially exculpatory avenues—that, in effect, we cannot know whether the result of the trial would have been different since we do not know what it missing.  (<u>See, e.g.</u>, Def.'s Reply at 3-4 ("[T]he complete scope of what SA's Force and Bridges were able to accomplish with the illicit access they gained to the Silk Road web site, and its impact on this case, has yet to be determined."); <u>id.</u> at 37 ("Absent the opportunity to inspect items relevant to the investigation of former SA's Force and Bridges, the full extent of potentially

---

evidentiary hearing on the issue.  (Reply Memorandum of Law in Support of Defendant Ross Ulbricht's Post-Trial Motions ("Def.'s Reply") at 38, ECF No. 232.)  There is no need for any evidentiary hearing: whether the investigations proceeded separately or intersected has no bearing on whether any undisclosed materials relating to the Rogue Agents are exculpatory as to Ulbricht.

exculpatory material cannot be determined.").)  This argument misconstrues Brady—and attempts to turn Brady into a discovery device or to expand the requirements of Rule 16.  The Government had an obligation to turn over favorable material evidence to prevent injustice; it had no obligation to keep Ulbricht continually apprised of developments in a separate investigation.  On the record before the Court, the Government complied with its obligation: as explained above, none of the Rogue Agents evidence is exculpatory—let alone sufficiently exculpatory to give rise to a reasonable probability of a different outcome.

      3.    <u>Trial Exhibit Disclosures</u>

Defendant argues that the Government's failure to timely disclose Brady material was "compounded" by its late and continued production of a significant number of exhibits throughout the trial.  (Def.'s Br. at 12.)  To start, and as explained above, there were no Brady violations to compound.  In any event, the Government's disclosure of exhibits was neither unusual nor unreasonable.

Prior to trial, the Court established a procedure for the Government's disclosure of its trial exhibits.  That procedure was designed to allow the parties to assess potential objections, discuss them, and preview evidentiary issues with the Court.  That process occurred as ordered, but, as is frequently the case, there were exhibits added and subtracted as trial approached and then commenced.  The Court did not preclude these modifications—though it expected counsel to work together in good faith in that regard.  Defense counsel remarked on this during the trial, but specifically stated that he was not "complaining" and that "[i]t [was] not something that's out of the realm of a trial."  (See 1/28/15 Tr. 1553:13-24, ECF No. 214; 1/29/15

Tr. 1837:2-6, ECF No. 212.)  While counsel did raise an issue with regard to one

particular document—an analysis of Bitcoins found on defendant's laptop (1/28/15

Tr. 1546:2-20)—this document was added to the Government's exhibit list during

the trial to address an argument defense counsel raised in his opening.

B.    Suppression Motion

Next, defendant argues that 3500 material produced by the Government just

prior to trial warrants reopening and granting his pre-trial motion to suppress

evidence obtained as a result of the search and seizure of a server located in

Iceland.  (ECF No. 46.)  In particular, defendant points to text messages between

SA Der-Yeghiayan and a confidential informant (the "CI") from August 2012 in

which SA Der-Yeghiayan asks, "Are we up on the exit node yet?"  The CI confirms

that they are and states, "100 percent running, logging and recording . . . with

verification."  (Def.'s Br. at 16 (quoting 3505-4059–3505-4060).)  Defendant also

references texts in which SA Der-Yeghiayan and the CI discuss the prospect of the

Government performing a distributed denial of service ("DDOS") attack with the

purpose of "listening" to the Silk Road servers.  (Id. (quoting 3505-4066).)

Defendant asserts that these communications provide "further evidence that the

government discovered the Internet Protocol . . . address for the Iceland server

ending in '.49' through warrantless TOR network surveillance" and that it may have

authorized or conducted DDOS attacks.  (Id.)  This argument is without merit.

Defendant's pre-trial suppression motion was denied principally on the basis

that he had failed to establish a personal privacy interest in any Silk Road servers

or the items thereon.  (ECF No. 89.)  That has not changed: defendant still has not

provided an affidavit attesting to his personal privacy interest in the affected servers at the relevant time.  His arguments in support of a new trial are premised on a defense that he was set up—that someone else was DPR.  Thus, despite admitting that he started Silk Road (and was logged in as DPR on the day of its demise), he nevertheless has not attested to a personal privacy interest.

In addition, none of the communications between SA Der-Yeghiayan and the CI goes to the core issue on the suppression motion, namely <u>how</u> the Icelandic server was located.  At trial, SA Der-Yeghiayan testified that he had no involvement in that aspect of the investigation.  (1/20/15 Tr. 695-98, ECF No. 202.)[7]

C.   The "Proffer" of Expert Testimony

Finally, Ulbricht's motion includes what is captioned as a "proffer from Andreas M. Antonopoulos regarding his proposed expert testimony."[8]  (Def.'s Br. at 17.)  Curiously, this proffer—which describes what Mr. Antonopoulos "would have testified" about had he been permitted to appear as an expert at trial—is unaccompanied by any request for relief.  The Court construes this portion of Ulbricht's motion as an argument that the Court erred in precluding Mr. Antonopoulos's testimony—particularly after receiving Ms. Lewis's January 31, 2015 letter indicating that Mr. Antonopoulos was traveling and thus was

---

[7] Ulbricht also assets that, "[i]n reopening Mr. Ulbricht's suppression motion, the government should be required to produce any and all pen registers not previously provided to defense counsel, such as any for Mr. Ulbricht's email accounts."  (Def.'s Br. at 17.)  The Court need not address this discovery demand given that there is no basis to reopen the suppression motion.

[8] This proffer was outlined orally for the first time on February 2, 2015, the day that the Government rested.

unavailable to make a full proffer.  This argument ignores the history that
underlies the Court's decision to preclude Mr. Antonopoulos's testimony.

Long before trial began, the Government disclosed to the defense the
evidence underlying its case-in-chief.  With respect to Bitcoins, the defense knew at
the outset that Silk Road transactions occurred in Bitcoins, that the Silk Road
servers contained Bitcoin wallets, that Ulbricht's laptop contained its own Bitcoin
wallets, and that inside Ulbricht's wallets were over 144,000 Bitcoins, valued at the
time of his arrest at approximately $18 million.  At that point, the defense had at its
disposal all the information necessary to make a decision as to whether to call an
expert on Bitcoins at trial.

In his opening statement, defense counsel referred to Bitcoins and the
"Bitcoin market," and suggested to the jury that the $18 million in Bitcoins found
on Ulbricht's laptop had nothing to do with Silk Road—that Ulbricht had earned
this money through Bitcoin trading.  (1/13/15 Tr. 67:13-20, ECF No. 196.)  This
statement logically leads to the following: (1) defendant had some evidence to
support this theory already—in the form of an expert who analyzed the various
Bitcoin wallets, as a leading possibility, and (2) after defendant affirmatively
opened the door, it was reasonable to expect that the Government would respond to
this theory in its case-in-chief (indeed, not to do so would have been irresponsible).

On January 14, 2015, the second day of trial, the Court inquired as to defense
counsel's intention to call expert witnesses.  Counsel indicated that it was too early
to tell, and the Government previewed that it would move to preclude any experts

unless it received the requisite notice.  Defense counsel responded that it would provide such notice "at the earliest possible rather than at the latest."  (1/14/15 Tr. 125:14-15, ECF No. 198.)

No such notice was provided for the next twelve days.  As the trial unfolded, it became increasingly clear that counsel did not want to show the defense's hand, and that his strategy was to use the Government's witnesses as his own—often through cross-examinations that went beyond the scope of the direct.

On January 26, 2015—well into the trial—the defense disclosed to the Government its intention to call Mr. Antonopoulos as an expert witness on Bitcoins. The defense's disclosure letter recited Rule 16, listed eight general subjects as to which Mr. Antonopoulos would testify, and attached Mr. Antonopoulos's curriculum vitae.  (ECF No. 165-1.)  Lacking were any expected opinions or the bases therefor, any description of analysis or methodology, and any indication that Mr. Antonopoulos has the requisite expertise.  On January 29, 2015, the Government indicated on the record that it would move to preclude Mr. Antonopoulos's testimony.  At that time, the Court requested that defense counsel provide notice to the Court immediately upon receiving the Government's motion to preclude as to when he would respond to that motion.  January 29, 2015 was a Thursday; the Government indicated that it would rest on Monday, the next trial day.

The Government promptly filed its motion to preclude after the day's proceedings on January 29, 2015, yet the Court did not hear from defense counsel that evening or the following day.  On January 31, 2015—after the Court issued an

order requiring the defense to respond by 2:00 p.m. that day—Ms. Lewis indicated

that Mr. Antonopoulos was traveling and that religious observance prevented Mr.

Dratel from complying with the court's order.  The Court then set 8:00 p.m. as the

deadline to file any opposition to the Government's motion to preclude.  Shortly

after that deadline, the defense filed an opposition which further set forth Mr.

Antonopoulos's testimony without in fact disclosing any analysis or methodology

underlying that testimony.  On February 1, 2015, the Court issued an Opinion &

Order precluding Mr. Antonopoulos's testimony on the basis of the defense's plainly

untimely and inadequate Rule 16 notice and the Court's inability—based on the

deficient disclosures before it—to assess Mr. Antonopoulos's qualifications and the

relevance and reliability of his testimony.[9]  (ECF No. 173.)

The Court's decision was amply supported.  Defense counsel had failed to

timely comply with the appropriate disclosure requirements, and that failure was a

tactical choice—not an oversight.  The potential utility of a defense expert on

Bitcoins—particularly one who would testify as to the Bitcoins found on Ulbricht's

laptop—was known very early in the case.  Defense counsel understood at the

outset—upon receiving the discovery in this case—that Bitcoins were an important

aspect of Silk Road, and that the origin of the Bitcoins on Ulbricht's laptop was an

important issue in this case.  Indeed, defense counsel opened on a theory that

Ulbricht had earned the Bitcoins through Bitcoin trading.  Nonetheless, counsel

chose not to disclose his intention to call an expert witness on Bitcoins until two

---

[9] For similar reasons, the Court also precluded the testimony of another proposed defense expert, Steven Bellovin.  Defense counsel has not argued that the Court erred in precluding Mr. Bellovin's testimony.

weeks into the trial, and even then utterly failed to comply with the requirements of Rule 16 as to the content of the disclosure.  Counsel cannot undo this tactical choice now by offering a belated "proffer" of Mr. Antonopoulos's testimony.

V.      CONCLUSION

For the reasons set forth above, Ulbricht's motion for a new trial is DENIED. The Clerk of Court is directed to terminate the motion at ECF No. 222.

SO ORDERED.

Dated:      New York, New York
            April 27, 2015

_____
KATHERINE B. FORREST
United States District Judge