UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X

UNITED STATES OF AMERICA      :        14 Cr. 68 (KBF)

       - against -         :        **DECLARATION OF**
                                        **LINDSAY A. LEWIS, ESQ.**
ROSS ULBRICHT,            :        **IN SUPPORT OF DEFENDANT**
                                          **ROSS ULBRICHT'S PRE-**
                     Defendant.    :        <u>**SENTENCING SUBMISSION**</u>
-------------------------------------------------------X

Lindsay A. Lewis, Esq., pursuant to 28 U.S.C. §1746, hereby affirms under penalty of

perjury:

1.  I am an attorney, and I represent defendant Ross Ulbricht in the above-captioned case.

I make this Declaration in support of Mr. Ulbricht's pre-sentencing evidentiary submission in

relation to the *Fatico* hearing presently scheduled for next Friday, May 22, 2015, at 9 a.m.[1]

**I.**     ***Evidence in Support of Mr. Ulbricht's Position***

2.  Attached as Exhibits to this Declaration, and responsive to the Court's request for

evidence in support of his position, are the following:

          (a)     article written by Hout, M.C.V., & Bingham, T., entitled "'Silk Road,' The

                  Virtual Drug Marketplace: A Single Case Study of User Experiences,"

                  attached as Exhibit 1;

          (b)     article written by Hout, M.C.V., & Bingham, T., entitled "'Surfing the Silk

                  Road:' A Study of Users Experiences," attached as Exhibit 2;

---

[1]  As noted in the accompanying letter from Joshua L. Dratel, Esq., the defense is no
longer requesting an evidentiary hearing but instead will rely on the written submissions
provided herewith.

(c)     article written by Hout, M.C.V., & Bingham, T., entitled "Responsible

        Vendors, Intelligent Consumers: Silk Road, the Online Revolution in Drug

        Trading," attached as Exhibit 3;

(d)     thread in the Silk Road drug safety forum started by Dr. Fernando

        Caudevilla, entitled "Ask a Drug Expert Physician About Drugs &

        Health," attached as Exhibit 4;

(e)     Private Messages from Dr. Caudevilla to Silk Road Users, attached as

        Exhibit 5;

(f)     weekly report from Dr. Caudevilla to DPR documenting topics discussed

        in his thread during the week of September 13, 2013 through September

        19, 2013, attached as Exhibit 6;

(g)     Private Messages Between Dr. X and Dread Pirate Roberts, attached as

        Exhibit 7;

(h)     research report by Dr. Monica J. Barrett, Jason A.Ferris and Adam R.

        Winstock, entitled "Use of Silk Road, the online drug marketplace, in the

        United Kingdom, Australia and the United States," attached as Exhibit 8;

(i)     article written by Meghan Ralston, entitled "The End of the Silk Road:

        Will Shutting Down the 'e-Bay for Drugs' Cause More Harm Than

        Good?" attached as Exhibit 9;

(j)     article written by Meghan Ralston, entitled "Silk Road Was a Better, Safer

        Way to Buy and Sell Drugs." attached as Exhibit 10;

(k)     declaration of Tim Bingham, attached as Exhibit 11;

2

(l)     declaration of Dr. Fernando Caudevilla, attached as Exhibit 12;

(m)     declaration of Dr. Monica J. Barratt, attached as Exhibit 13;

(n)     declaration of Meghan Ralston, attached as Exhibit 14;

(o)     curriculum vitae of Dr. Mark L. Taff, attached as Exhibit 15; and,

(p)     documentary evidence reviewed by Dr. Taff, attached as Exhibit 16.[2]

**II.     *Dr. Mark Taff's Preliminary Assessment of the Alleged Overdose Deaths***

3.   Also responsive to the Court's request for evidence in support of Mr. Ulbricht's position, is the following account of the preliminary impressions and findings of Dr. Mark L.Taff, whom the defense has retained in his capacity as a Board-certified forensic pathologist and consultant, *see* Taff Curriculum Vitae (Exhibit 15), to review and analyze a selection of documentary evidence (*see* Exhibit 16) provided to Mr. Ulbricht by the government (following conclusion of trial) in regard to six alleged overdose deaths it claims were the result of drugs purchased on the Silk Road web site.

4.   Due to necessarily expedited nature of Dr. Taff's review of the materials in light of the May 15, 2015, deadline for the submission of evidence in support of Mr. Ulbricht's position, and his other professional commitments, Dr. Taff has provided preliminary findings that are set forth herein.  His formal report will be produced to the Court and the government before next Friday, May 22, 2015.

---

[2]  The lion's share of these exhibits will be posted to ECF, with the exception of Exhibit 16 (the documentary evidence provided to Dr. Taff as to the various overdose deaths) which, in order to maintain the privacy of the decedents, will only be provided to the Court.  In the public filing, Exhibit 16 will be replaced by a list of the documentary evidence provided to him.   In addition, a disk containing all of the exhibits to this Declaration will be provided to the Court on Monday, May 18, 2015, in lieu of submission of exhibits by e-mail.

5.  Further findings from Dr. Taff are necessary as well because his preliminary report does not include his observations and conclusions regarding the 59-page coroner's report in regard to the death of Alejandro Nunex Avila, received from the government last night at 7:10 p.m. in an e-mail in which Assistant United States Attorney Serrin Turner wrote the government received the report "recently."

A.      *Dr. Taff's Credentials and Publications*

6.  Dr. Taff is currently a Forensic Pathologist Consultant, and previously served as Chief Medical Examiner in Rockland County, New York, from 2008 until 2012.  He provides forensic pathology consultancy services to various private and public entities in and outside of New York state, including District Attorneys' Offices in New York and New Jersey, and Legal Aid and Public Defenders' offices throughout the Northeast.

7.  Dr. Taff obtained his medical degree from the University Bologna School of Medicine in 1978, and completed his residency in Pathology in 1984. He is board certified in Forensic and Anatomic Pathology and has medical licensure in New York, Michigan and New Jersey.  In addition to his consulting work, he has been a Clinical Associate Professor of Pathology at the Mt. Sinai School of Medicine since 1990.  He has also held various teaching and lecturing positions at universities and hospitals in New York and Michigan for more than thirty years.

8.  Throughout his career Dr. Taff has been an active member of numerous medical societies and professional organizations, including the New York Academy of Sciences, the Committee on Public Health of the Medical Society of the County of New York, the American Association of Suicidology, and the American Academy of Forensic Sciences.  He was awarded the AMA Physician's Recognition Award early in his career, and founded the New York Society

of Forensic Sciences at Lehman College in 1985.  He served as Co-Chairman of the National

Association of Medical Examiner's Inspection & Accreditation Committee and as Vice-President

of the Society of Medical Jurisprudence in 1997.

9.  Dr. Taff's work has been published in a broad range of medical journals, publications,

newspapers, symposium papers, and educational materials, and a comprehensive list of his

published and unpublished work is included in his *curriculum vitae*, attached hereto as Exhibit

15.

### B. *Dr. Taff's Preliminary Analysis of the Alleged Overdose Deaths*

10.  According to Dr. Taff, a medical examiner death investigation is a six-stage process

consisting of  (a)  history;  (b)  scene findings;  (c)  autopsy (external and internal/invasive/

surgical exams);  (d)  lab tests (including DNA, toxicology, histology, dental, anthropological, x-

rays, and others);  (e)  bureaucratic processes *(i.e.*, creation and preservation of the autopsy

report, related test results and communications);  and (f)  signing of the death certificate with

opinions regarding the cause, manner and time of death.

11.  The process is conducted in an orderly, sequential manner and all of the steps are

dependent upon one another.  The medical examiner/ forensic pathologist oversees the entire

investigation and is responsible for the integration and interpretation of all the scientific evidence

collected, retained, tested, and analyzed.

12.  With regard to the six deaths from different parts of the world Dr. Taff was asked to

review and analyze, he concluded that each case – based on the documentary evidence provided

by the government, which we in turn provided to Dr. Taff –  lacks information about one or more

of the six stages of a death investigation.  Therefore, Dr. Taff could provide the defense with only

impressions about the gaps in each case.  He was also consequently precluded from forming

opinions to a reasonable degree of medical certainty as to the cause, manner, and time of death.

Having provided that general overview of the deaths as a whole, Dr. Taff then outlined each

death with respect to the history, scene, autopsy, lab (toxicology results) and death certification

(cause, manner, and time of death).

       1.     ***Jacob Lyon Green***

13.  As per Dr. Taff's assessment, Mr. Green was a 22-year old male based in Adelaide,

Australia, who suffered from a history of mirtazapine treatment for anxiety and depression,

polydrug abuse, and overdoses in 2010 and 2011.  Without access to Mr. Green's medical and

psychiatric records (which were not provided by the government, despite a request for them in

discovery), it remains unknown to Dr. Taff whether Mr. Green was suicidal.

14.  The autopsy performed by Dr. John G____ [3] on February 15, 2015, the day after Mr.

Green was found dead, also revealed old and recent intravenous injection sites in superficial

veins of elbow creases and several portal/abdominal lymph nodes were enlarged, a condition

commonly found amongst intravenous ("I.V.") drug addicts.

15.  Most notably, however, the day before Mr. Green's death he was treated for ringing

ears, difficulty swallowing, nausea and fever after a night of drinking alcohol and taking

amphetamines and heroin.  His white blood cell count was elevated, and he received IV fluids,

anti-heartburn medication, paracetamol for pain relief and as a fever reducer, and ibuprofin for

muscle aches and fever.   Despite having recently completed a course of antibiotics for

---

[3] Dr. Taff used this format in identifying the particular physicians, and this Declaration
conforms with that methodology.

bronchitis, he was discharged from the hospital less than three hours after he was admitted.  Dr. Taff notes that Mr. Green's diagnosis with bronchitis is extremely important with respect to the stated cause of death:  "aspiration pneumonia."

16.   Indeed, according to Dr. Taff, it is unknown whether Dr. John G___, who performed the autopsy, and may or may not be board-certified in forensic pathology, knew that Mr. Green had recently been treated for bronchitis, which could have developed into pneumonia.  It is also unknown whether Dr. G___ had subpoenaed Mr. Green's medical records or reviewed his most recent chest x-rays.  It does not, however, appear that Mr. Green had a chest x-ray before death.

17.   Dr. Taff also identified several other gaps in the death investigation performed by Dr. G___.  The post-mortem drug screen showed low levels of "4 different illicit drugs" (methylamphetamine, heroin, cocaine, and 4-methylmethcathinone) and therapeutic levels of mirtazapine and metoclopramide.  Yet a cause of death due to multiple drug (narcotic, depressants, and stimulants) intoxication complicated by aspiration pneumonia was not entertained.  Dr. Taff considered this to be a very important finding that was completely omitted from the diagnosis.

18.   More importantly even, the manner of death was omitted.  It is unclear whether Mr. Green's death was natural, accident, suicide, undetermined, or homicide.  In this regard, time of death is important because there was not any information regarding when aspiration occurred with respect to a possible drug overdose (by which it would be possible for the synergistic effect of multiple illicit drugs in low doses to work together to kill to Mr. Green).  However, it is common to find some agonal or terminal aspiration in people who are intoxicated at the time of death and miscroscopic exam of the lungs shows "widespread patchy pneumonic consolidation

associated with some vegetable material." Such an extensive tissue reaction suggests pneumonia existed *before* agonal aspiration of food while intoxicated.

19. Dr. Taff further concludes that Mr. Green's death might represent some medical malpractice, *i.e.,* failure to diagnose and treat pneumonia/premature hospital discharge. The chronology of events also indicates that Mr. Green's death occurred within a 27½-hour time frame, during which time Mr. Green "self-medicated," and aggravated his pre-existing pneumonia which caused and/or contributed to his death.

### 2. *Jordan Mettee*

20. As per Dr. Taff's assessment, Jordan Mettee was a 27-year old black male, weighing 260 to 265 pounds, who was found dead August 31, 2013, at approximately 11:06 p.m., at his home, which contained drugs and drug paraphernalia. The file related to his death lacks certificates with the dates and times of onset of injuries and death, and/or a signed death certificate.

21. Dr. Taff notes that Mr. Mettee had an alleged history of multiple drug-related arrests between 1992 and 2001, as well as marijuana, opiate, anti-histamine, alcohol hydrocodone, and anti-pain usage for chronic pain related to a spleen ailment. Accordingly, Dr. Taff concluded that Dr. Timothy W___, the Medical Examiner of Kings County should have subpoenaed Mr. Mettee's past medical and psychiatric records to better understand Mr. Mettee's ante-mortem issues.

22. Importantly, the autopsy performed on Mr. Mettee showed the presence of acute brain hemorrhage (bleeding) consistent with a stroke, which could have been a competent cause of death. Despite the fact that Mr. Mettee was an obese black male who may have suffered from

untreated hypertension, a condition that frequently causes strokes, for unknown reasons a stroke was omitted as a cause or contributing factor to his death.  According to Dr. Taff, the time of onset of the brain bleed cannot be correlated with times of drug usage.  The drugs were probably used prior to brain hemorrhage, which was most likely the terminal event.

23.  Dr. Taff also notes other unresolved or open issues as to Mr. Mettee's death.  First, while a post-mortem drug screen revealed alpazolam and diazepam (both anti-anxiety drugs) it is not indicated whether these drugs were found at the death scene.  Next, the autopsy revealed that Mr. Mettee's liver was heavy and enlarged, probably due to fatty changes from overeating and alcohol use.  Indeed, a microscopic exam of the liver shows "hepatocyte necrosis," which leaves open the question of whether Mr. Mettee suffered from drug-induced liver failure.

24.  Moreover, the autopsy report was issued November 12, 2013, two months after the autopsy was performed.  The medical examiner ruled the manner of death as an "accident."  The Washington State Police Crime Lab, however, labeled the death a "controlled substance homicide."  Dr. Taff questions why the medical examiner did not also refer to "homicide" in the autopsy report.

25.  Dr Taff's preliminary impressions are that the autopsy report correctly attributed death to multiple/combined drug intoxication.  Heroin/opiate, however, was not singled out primary cause of death, and of course, for reasons unknown, the brain hemorrhage was ignored by the authorities conducting the investigation of Mr. Mettee's death.

### 3.    *Preston Bridge*

26.  As per Dr. Taff's assessment, Preston Bridge was a 16-year old male with a history of being a drug user (alcohol and marijuana).  On Saturday, February 16, 2013, Mr. Bridge fell or

jumped from a balcony at the Sunmoon Resort, in Perth, Australia, after taking a psychedelic drug reportedly purchased or obtained from vendors on the Silk Road web site.  It is assumed that Mr. Bridge sustained multiple blunt force impact bodily injuries associated with bone fractures and internal organ (*i.e.,*  brain) and blood vessel lacerations.

27.    According to Dr. Taff, the autopsy report and death certificate, which contain crucial information, are unavailable for review as they were never provided by the government, and may not exist.  Dr. Taff notes that a post-mortem drug screen was performed by the Perth Coroner.  However, the drug levels therein are useless because they cannot be placed in the context of other (absent) autopsy findings.

28.    Additionally, while testing of chest blood revealed low level of morphine (a narcotic drug) and midazolam (a benzodiazapene sedative) that raises several issues.  For instance, the date of blood collection for drug testing is unknown, and regardless, chest blood is usually contaminated and is not a reliable specimen for testing.  Moreover, while it was indicated that there were low levels of drugs in the blood, the levels may be lower than at the time of Mr. Bridge's fall due to his two-day survival and the continued metabolism and breakdown of the drugs by his body.  The introduction of fluids and blood transfusions to prevent a fall in his blood pressure may also have altered these levels.

29.    Femoral blood tested was negative for alcohol, but low for morphine, as well as for an active component of marijuana and benzodiazapines.  It is unknown whether Mr. Bridge received benzodiazapines in the hospital, or whether the marijuana was laced with any hallucinogens.

   4.     *Scott Wilsdon*

30.  As per Dr. Taff's assessment, Scott Wilsdon was a 36-year old male, found dead (and decomposed) May 19, 2013, on the floor next to a computer in his residence in Adelaide, South Australia.  Drug paraphernalia and heroin were found at the scene.  Mr. Wilsdon had a history of deafness with cochlear implants, deep vein thrombosis (blood clots in deep veins of his legs) and heroin abuse.  An autopsy was performed by Dr. Stephen W____ on Mr. Wilsdon four days after his death.  Dr. W____ listed the cause of death as "multiple drug toxicity."

31.  Dr. Taff questioned several aspects of the death investigation.  For instance, he questioned whether Dr. W___ was a board-certified forensic pathologist, and why he had waited four days to conduct the autopsy.  He also questioned the manner of death, which is unknown.  Noting that the toxicology screen performed on Mr. Wilsdon indicated eight different drugs (the morphine level was potentially lethal/toxic;  codeine at "therapeutic concentration;"  and doxylamine, tramadol, 7-aminoclonazepam, alrpazxolam, oxazepam, and warfarin at "non toxic/therapeutic concentration"), Dr. Taff concluded that the manner of death was most likely "accident," but noted that "multiple drugs at low levels might be some covert form of suicide."  However, Dr. Taff also commented that it is bad science to extrapolate from one person to groups of people, and to make generalizations, and that each case must be evaluated on its own merits.

32.  Finally, Dr. Taff noted evidence in Mr. Wilsdon of pre-existing coronary artery disease, a pathological finding, in and of itself, sometimes associated with fatal cardiac arrhythmia (irregular heart beat) and sudden cardiac death.

### 5.    *Bryan Barry*

33.    As per Dr. Taff's assessment, Bryan Barry was a 20-year old white male, found dead October 7, 2013, in his residence in Boston, Massachusetts.  According to the death certificate the cause of death was "acute opiate intoxication" due to substance abuse.

34.    Dr. Taff identified a number of issues with the death investigation conducted in Mr. Barry's case.  First, the date and time of injury, and the time of death, are all unknown.  The death certificate was signed by Dr. Marie ____ four months after Mr. Barry's death, and it omits information about performance of an autopsy;  nor was there an autopsy report provided in Mr. Barry's file.  It is also unknown whether Dr. Marie ____ is a board-certified forensic pathologist.

35.    While a toxicology report was prepared and indicates the presence of morphine and alcohol, as well as a blood alcohol level ("BAC") of .06% – which is the equivalent to three 12-ounce beers for the average person with a body weight of 170 pounds – neither alcohol nor morphine were listed on the death certificate.  Also, with regard to the heroin, the time and route of usage are unknown, as is the source of the heroin itself.  It is also unknown whether there was another source of heroin present at the scene.

36.    Finally, according to the Boston Police report, the "victim [was] known to [the] Commonwealth."  Dr. Taff questioned whether this language indicated, for instance, that Mr. Barry had a prior drug-related arrest record.

### 6.    *Alejandro Nunez Avila*

37.    As per Dr. Taff's assessment, Alejandro Nunez Avila was a 16-year old Hispanic male found dead on the garage floor of his friend's house in Camino, California, on or around September 9, 2013.  Dr. Taff found that Mr. Avila had a history of wanting to buy marijauna, get

high, and party.  Based on the limited information available to Dr. Taff at the time of his assessment (*i.e.,* without the coroner's report provided last night),[4] he found the file useless for forensic medical evaluation.  It did not contain an autopsy report, a toxicology report, or a death certificate.  In fact, there was no medical information whatsoever available to assess cause of death precisely or accurately.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.  28 U.S.C. §1746.  Executed May 15, 2015.

 /S/ Lindsay A. Lewis_____
LINDSAY A. LEWIS

---

[4] Dr. Taff will be provided with the coroner's report for review and inclusion in his formal report.

13