LAW OFFICES OF

## JOSHUA L. DRATEL, P.C.
A PROFESSIONAL CORPORATION

29 BROADWAY
Suite 1412
NEW YORK, NEW YORK 10006
---
TELEPHONE (212) 732-0707
FACSIMILE (212) 571-3792
E-MAIL: JDratel@JoshuaDratel.com

JOSHUA L. DRATEL                                                                                STEVEN WRIGHT
—                                                                                       *Office Manager*
LINDSAY A. LEWIS
WHITNEY G. SCHLIMBACH

May 28, 2015

**BY ECF**

The Honorable Katherine B. Forrest
United States District Judge
Southern District of New York
United States Courthouse
500 Pearl Street
New York, New York 10007

                Re:     *United States v. Ross Ulbricht*,
                            14 Cr. 68 (KBF)

Dear Judge Forrest:

      This letter is submitted on behalf of Ross Ulbricht, defendant in the above-entitled matter, and supplements the previous submissions made on his behalf with respect to sentencing. This letter, in particular, will:

(1)     reply to the government's sentencing letter dated May 22, 2015 (Dkt # 256);

(2)     provide two additional letters on Mr. Ulbricht's behalf (and which were not received until after my May 22, 2015, letter was submitted); and

(3)     the May 26, 2015, report by Board-certified forensic pathologist Mark L. Taff, M.D. (and also Clinical Associate Professor of Pathology at Mount Sinai School of Medicine), which is attached hereto as Exhibit 7,[1] regarding the six deaths the government seeks to attribute to Mr. Ulbricht.

---

[1] The Exhibits attached hereto are numbered sequentially starting with Exhibit 5 in order to avoid confusion with the four Exhibits attached to my May 22, 2015, letter.

| | |
|---|---|
| LAW OFFICES OF<br>**JOSHUA L. DRATEL, P.C.** | Hon. Katherine B. Forrest<br>United States District Judge<br>Southern District of New York<br>May 28, 2015<br>Page 2 of 14 |

**I.**     *The Government's Sentencing Submission*

    **A.**     *The Silk Road's Harm Reduction Measures*

       The government's claim that the Silk Road web site represented an enhanced danger because it "lowered the barriers" for drug purchasing and selling is based not on a canvass of users of the site – as was the case for the researchers who provided Declarations in conjunction with my May 15, 2015, letter – but rather on Michael Duch, a single convicted felon providing cooperation in return for extraordinary leniency,[2] and whose testimony at trial was so riddled with inconsistencies and insupportable claims that he lacks credibility – even if the experience of a single person were somehow a valid substitute for the comprehensive research conducted by the Declarants (Tim Bingham, Meghan Ralston, and Dr. Monica Barratt), and the contact Fernando Caudevilla, M.D., had with many of the site's visitors. *See* May 15, 2015, Letter from Joshua L. Dratel, Esq., to the Court (Dkt #241), at 2-8.

       Also, while the government repeats Mr. Duch's claim that he did not begin selling drugs until he became a vendor on Silk Road, that contention is belied by Mr. Duch's 2008 arrest for possession with intent to distribute a felony-weight quantity of drugs. T. 1596.[3] Also, in 2009-09 (as reflected in his cooperation agreement, *see* T. 1542), Mr. Duch had traded prescription medication for heroin. Mr. Duch also sold drugs on multiple internet sites, including Atlantis and Black Market Reboot. T. 1592.

       In addition, Mr. Duch's claim that he consumed 600-700 bags per week for his own heroin addiction is not corroborated at all. *See* T. 1535-36. Indeed, that astronomical amount more than likely included bags that he sold to others to support his extensive and prohibitively costly habit. In any event, Mr. Duch's claims are without any verification.

       Yet the government urges the Court to rely exclusively on that self-serving,

---

   [2] While Mr. Duch acknowledged selling three times the amount of heroin required for a charge carrying a ten-year mandatory minimum prison term pursuant to 21 U.S.C. §841(b)(1)(A), he was permitted to plead guilty to a charge, under §841(b)(1)(B), that carried only a five-year mandatory minimum. T (Trial Transcript) 1532-34. In addition, the government has not filed against Mr. Duch a prior felony information, which would double any applicable mandatory minimum sentence. *Id*. *See also* T. 1538-39. Mr. Duch's cooperation agreement with the government also insulated him from charges for a host of other criminal activity, including theft, assault (throwing a telephone at his girlfriend), and use and distribution of other drugs. T. 1541-42.

   [3] "T." refers to the trial transcript in this case.

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**

Hon. Katherine B. Forrest
United States District Judge
Southern District of New York
May 28, 2015
Page 3 of 14

unsubstantiated anecdotal account and ignore the independent, objective clinical professional research provided by Mr. Bingham, Ms. Ralston, Dr. Barratt, and Dr. Caudevilla. Moreover, as even the government's figures establish, heroin sales did not constitute a significant portion of the sales made by Silk Road vendors. Rather, they comprised 3.5% of all sales on the Silk Road site, and were not in the top 20 drugs for the U.S., the U.K., and/or Australia. *See* Declaration of Dr. Monica Barratt, at ¶ 6 (attached as Exhibit 13 to the May 15, 2015, Declaration of Lindsay A. Lewis, Esq. (Dkt. #242). *See also* Monica Barratt, Jason A. Ferris and Adam R. Winstock, "Use of Silk Road, the online drug marketplace, in the United Kingdom, Australia and the United States," *Addiction* 109, at 774-783 (2013) (attached as Exhibit 8 to the Lewis Dec.). Indeed, Mr. Duch's sales may very well have represented a considerable portion of the total of heroin sales from Silk Road in the U.S.[4]

The government discounts entirely the harm reduction measures instituted on the Silk Road site, but that categorical approach defies the reality of the demand, and consequent supply, of controlled substances (which are detailed in my May 22, 2015, letter, at 52-67). Of course Mr. Ulbricht is being sentenced for his participation in the Silk Road site, but the government's approach would deprive the sentencing of any context with respect to the atmosphere that Silk Road engendered in its totality – perhaps unprecedented, but certainly in more respects than simply internet availability of illicit drugs within the anonymized TOR network. In that context, the harm reduction measures were as much a part of that environment, and highly relevant for sentencing, as the means of buying and selling.[5]

> **B.**   *Attributing to Mr. Ulbricht the Six Deaths Cited By the Government Would Create An Unwarranted Disparity In Contravention of 18 U.S.C. §3553(a)(6)*

As discussed in my May 22, 2015, letter, at 43, 18 U.S.C. §3553(a) directs a sentencing court to "avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." Here, in addition to the lack of sufficient proof linking the six deaths to drugs purchased from vendors on the Silk Road site – the government has not engaged any forensic expert or analysis sufficient under any standard of proof –

---

[4] Mr. Duch's testimony included other prevarications and evasions, including his persistent denial that he made statements (or heard statements made to him) that were reflected in government interview memoranda. *See, e.g.,* T. 1538-39, 1597-98, 1600-01 & 1605-06.

[5] In fact, the chat passages between Dread Pirate Roberts and site administrators quoted by the government (in its letter, at 12-13) demonstrate not an amoral disregard for the consequences, but rather a recognition of the sometimes uncomfortable moral ambiguity, including adverse impact on others, that unavoidably attended the Silk Road site's commitment to an unregulated free market for all forms of commerce and merchandise.

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**

Hon. Katherine B. Forrest
United States District Judge
Southern District of New York
May 28, 2015
Page 4 of 14

enhancing Mr. Ulbricht's sentence because of those deaths would institute an unwarranted disparity.

In that context, the government's argument, in its letter at 9-10, with respect to foreseeability proves too much. If it is axiomatic that facilitating the sale of illegal drugs is inherently dangerous for purchasers, then it applies in *every* drug-trafficking case, particularly in those involving sales by organizations that exist over a period of time.

Yet the government cannot cite a single case in this district, and only one in the Second Circuit, discussed and distinguished below, in which *any* enhancement applied in such a case. Thus, the government would have Mr. Ulbricht serve additional time for a factor that is present in *every* drug-trafficking case of any magnitude or duration, but which is subject to an enhancement within this district only in this case (and in only a minute fraction of cases nationwide, and in very different factual circumstances). That is the essence of an unwarranted disparity.

Also, here the disparity is not merely generalized. This past Tuesday, May 26, 2015, in *United States v. Peter Nash*, 13 Cr. 950 (TPG)*,* the Honorable Thomas P. Griesa sentenced the defendant, Peter Nash, a/k/a Samesamebutdifferent, a forum moderator and one-time administrator on the Silk Road site for nearly a year prior to its closure (during which time the Silk Road site experienced its highest volume of sales), to "time served" – essentially a 14-month sentence. *See* Judgment (Dkt. #36), *United States v. Peter Nash*, 13 Cr. 950 (TPG). *See also* Gov't Nash Sentencing Letter, at 4, 7, 8.

Mr. Nash pleaded guilty to conspiracy to sell drugs in an amount that made him subject to a ten-year mandatory minimum sentence pursuant to 21 U.S.C. §841(b)(1)(A). *See* Government's Sentencing Submission, *United States v. Peter Nash*, 13 Cr. 950 (TPG) (Dkt. # 35) (hereinafter "Gov't Nash Sentencing Letter"), at 4. As a result, Mr. Nash's Sentencing Guidelines Base Offense Level was 36, the same as Mr. Ulbricht's is here. *See id*., at 5. *See also* Mr. Ulbricht's Pre-Sentence Report (hereinafter "PSR"), at ¶ 94. Yet even with multiple downward adjustments for his minor role and his safety valve proffer, Mr. Nash's adjusted Guidelines range was still 121-151 months. *Id*., at 5.

The government did not seek any enhancement for Mr. Nash for the deaths it cites here, even though Mr. Nash, who worked for the Silk Road site from January 2013 through its closure in October 2013, was involved with the site during a period in which five of the six deaths occurred. *See* Gov't Nash Sentencing Letter, at 4 & n.1. In fact, the PSR for Mr. Nash clearly noted the drug-related deaths, as the government, in its submission, remarked that Mr. Nash involved himself with the Silk Road site with full knowledge of its activities and "with predictably harmful (and in some cases deadly) consequences, as the PSR makes clear." *Id*., at

| | |
|---|---|
| LAW OFFICES OF<br>**JOSHUA L. DRATEL, P.C.** | Hon. Katherine B. Forrest<br>United States District Judge<br>Southern District of New York<br>May 28, 2015<br>Page 5 of 14 |

10.

Yet, as noted above, the government did not seek an enhancement of Mr. Nash's sentence on that basis, and clearly, in imposing a "time served" sentence, the Court did not enhance Mr. Nash's sentence on that ground, either. Indeed, the government recommended a below-Guidelines sentence for Mr. Nash. While certain factors, *i.e.*, Mr. Nash's minor role and his safety valve proffer, could justify a disparity in his sentence and that of Mr. Ulbricht, the gulf between time-served and even the 20-year mandatory minimum Mr. Ulbricht faces represents too drastic a disparity, particularly when the government selectively decides against whom to seek enhancements for unintended events, even accidents, that are by the government's rationale attributable to *every* participant in a drug-trafficking conspiracy.[6] Of course, that includes as well Mr. Duch, who sold heroin directly to customers (and against whom it is extremely doubtful the government will seek such an enhancement).

The cases cited by the government only reinforce the conclusion that any enhancement here (pursuant to §3553(a), the Guidelines, or otherwise) would be inappropriate factually and legally, and in contravention of §3553(a)(6). Indeed, none are from this district, or the Eastern District of New York, both of which have an inordinate volume of drug-trafficking cases without a single reported case in which such an enhancement has been applied.

For example, *United States v. Faulkner*, 636 F.3d 1009 (8th Cir. 2011), and *United States v. Westry*, 524 F.3d 1198 (11th Cir. 2008), cases from the 8th and 11th Circuits, respectively, addressed issues of conspiratorial liability for overdose deaths caused by a co-conspirator. Neither opinion discusses the evidence at issue, or whether it, or the causation, was contested by the defendant(s). Rather, the opinions *presume* that the drugs distributed by the charged conspiracies caused the charged overdose deaths. *See, e.g., Faulkner*, 636 F.3d at 1022 (defendant's liability established because *jury* found *beyond a reasonable doubt* that overdose was reasonably foreseeable, although the defendant did not play a "direct role in manufacturing or distributing heroin *that caused* [the victim's] death") (emphasis added); *Westry*, 524 F.3d at 1220 ("[b]ecause [the victim] died from a drug overdose from drugs distributed by a member of the conspiracy . . . , and the goal of the conspiracy was to distribute drugs, [the victim's] death was reasonably foreseeable and within the scope of the conspiracy").

---

[6] The government's insinuation, in its letter herein, at 16 (that Mr. Ulbricht "at no time [] has accepted full responsibility for his actions) that Mr. Ulbricht be penalized for exercising his right to trial should be disregarded entirely, especially since the government did not extend to Mr. Ulbricht a plea offer that would have ameliorated any aspect of the Guidelines calculation ultimately adopted by the PSR.

| | |
|---|---|
| LAW OFFICES OF<br>**JOSHUA L. DRATEL, P.C.** | Hon. Katherine B. Forrest<br>United States District Judge<br>Southern District of New York<br>May 28, 2015<br>Page 6 of 14 |

In *United States v. Pacheco*, 489 F.3d 40 (1st Cir. 2007), in contrast with the circumstances here, the government presented medical records which established that the victim, who survived (and is therefore incorrectly described as deceased in the government's submission) was admitted to the hospital with a "provisional[] diagnos[is of] a ketamine overdose" which was confirmed by the victim's later statements to hospital staff regarding his ingestion of heroin and a substantial ketamine dose, as well as "subsequent diagnoses [which] reflected . . . ingestion of both drugs."  *Id*. at 42-43.

In addition to the well documented cause of the victim's injuries, the defendant in *Pacheco* in fact admitted to mailing ketamine to the victim regularly, including a shipment five weeks before the overdose.  *Pacheco*, 489 F.3d at 43.  As the government notes, in its letter herein, at 9, the defendant's argument in *Pacheco* that the five-and-a-half week gap between the last shipment and the overdose raised a "serious question" as to whether he had actually supplied the fatal dose was rejected by the Court, in part because another package of ketamine from the defendant was waiting in the victim's mailbox at the time of his overdose, dispositively undermining the defendant's claim that the last shipment he sent was more than a month before the overdose.  *Pacheco*, 489 F.3d at 45.

Similarly, in *United States v. Nossan*, 647 F.3d 822 (8th Cir. 2011), the government was able to rely on the defendant's own admissions to establish the connection between the drugs and the overdose.  The defendant told police she had mailed a package "containing black tar heroin, a single balloon of cocaine, and syringes" to the victim using the name of one of his former girlfriends as a return address.  *Nossan*, 647 F.3d at 824.  Following the victim's death, established by an autopsy to be the result of heroin toxicity, the police recovered "a small balloon containing . . . black tar heroin" and two padded envelopes, one of which had "a return address of 'Michelle Lamport'," an ex-girlfriend of the victim.  *Id*.

The only case cited by the government on this issue which arises from a court in the Second Circuit is *United States v. Russow*, 2015 WL 1057513, at *1-2 (D. Conn. Mar. 10, 2015), in which the victim's overdose occurred only a few hours after several text messages between the victim and the defendant discussing heroin availability and quality.  The heroin sale was corroborated by surveillance video of the victim arriving and leaving the defendant's home around the same time he sent a text informing someone else that the defendant had "Much Better" brand heroin.  *Russow*, 2015 WL 1057513, at *1-2.  He was found dead about three hours later with two empty bindles labeled "Much Better," and the autopsy report concluded that the cause of death was "acute heroin toxicity."  *Id*.

The government's focus on drug abusers' addictions, and other harms associated with drug abuse, *see* Government's Sentencing Letter, at 9-13, should also not be grounds for enhancing Mr. Ulbricht's sentence.  Those aspects are already factored into the severe

**LAW OFFICES OF**  
**JOSHUA L. DRATEL, P.C.**

Hon. Katherine B. Forrest  
United States District Judge  
Southern District of New York  
May 28, 2015  
Page 7 of 14

punishment matrix and high Guidelines levels for drug offenses in the first place. Singling out Mr. Ulbricht in that regard would not only be, in effect, inappropriate "double-counting," but would also create further unwarranted and unjustified disparity.

### C.  *"General Deterrence" Would Not Constitute An Appropriate Reason to Enhance Mr. Ulbricht's Sentence*

Regarding general deterrence, the government's citation, in its letter, at 14, to *Empress Casino Joliet v. Balmoral Racing Club, Inc.*, 651 F.3d 722, 728 (7th Cir. 2011), that "deterrence is never perfect" is entirely unpersuasive. Not only is that a civil case, but as demonstrated by the research and studies discussed in my May 22, 2015, letter, at 50-64, in the criminal context not only is deterrence "never perfect," it is *illusory*.

Given the lack of any empirical evidence supporting an enhanced sentence for purposes of achieving general deterrence, the government would have the Court enhance Mr. Ulbricht's sentence on a hope – as yet unproven by any clinical studies – that it could have an impact on a hypothetical person who may, at some point in the future, contemplate a crime. The number of conditional elements in that construction are far too numerous to permit, much less justify, a longer sentence on that ground. That is not criminal justice; rather, it is a lottery in which only Mr. Ulbricht suffers.

Relying on general deterrence to enhance Mr. Ulbricht's sentence would also aggravate the disparity between his sentence and others, both generally and specifically with respect to the Silk Road web site, because any such enhancement is neither quantifiable nor consistent with other "general deterrence" components of sentencing. As a result, it represents a recipe for disparity untethered to any objective standard or ability to measure.

### D.  *Mr. Ulbricht's Lifestyle and the Money Generated By the Silk Road Site*

The government's contention that the Silk Road web site's purpose was, like other drug-selling operations, based on the profit motive is belied by several factors. Mr. Ulbricht neither displayed nor possessed any of the traditional material, ostentatious trappings of drug-trafficking, or of financial success at all. Indeed, with respect to Dread Pirate Roberts (hereinafter "DPR"), certain TOR chat logs provide a window to a very different set of priorities.

For example, in TOR log chat TV32, at 785-90, between DPR and Cimon, DPR suggests using profits from the possible sale of the Silk Road site for "feeding and empowering" Africans

| | |
|---|---|
| LAW OFFICES OF<br>**JOSHUA L. DRATEL, P.C.** | Hon. Katherine B. Forrest<br>United States District Judge<br>Southern District of New York<br>May 28, 2015<br>Page 8 of 14 |

by providing seeds for agricultural and other growth.[7]  Later in that same TOR chat, at 499-501 519-20, 523, 526 & 708, DPR and Cimon discuss channeling Silk Road proceeds to Kiva, a global micro loan charity.  *See* <www.kiva.org>.  Similarly, in TOR chat log GX5O, between DPR and Flush, DPR notes that certain Silk Road funds would be passed on to certain non-profit organizations that DPR supported.

        **E.**    *The Two-Point Enhancement for "Credible Threats of Violence"*
              *Should Be Denied and Deleted from the Pre-Sentence Report*

As the government notes, in its letter at 16 n. 19, the PSR, at ¶ 94 and pursuant to §2D1.1(b)(2) of the Guidelines, assesses a two-point enhancement for "credible threats of violence."  For all the reasons set forth above and in the previous submissions on his behalf, Mr. Ulbricht objects to that enhancement, which should be deleted from the PSR.[8]

**II.**    *Two Additional Letters on Mr. Ulbricht's Behalf*

Attached hereto as Exhibits 5 & 6 are two additional letters on Mr. Ulbricht's behalf. Exhibit 5 is from Michael Van Praagh, an inmate at the Metropolitan Correctional Center (hereinafter "MCC").  As Mr. Van Praagh recounts in his letter, he met Mr. Ulbricht at MCC while Mr. Van Praagh was teaching General Education Diploma (hereinafter "GED") classes for other inmates, recalling that "Mr. Ulbricht approached me after class to inquire how he too, might get involved in teaching classes."  *See* Letter from Michael Van Praagh (attached hereto as Exhibit 5).

Mr. Van Praagh was "moved immediately by [Mr. Ulbricht's] sense of concern for what we were doing in trying to share our gifts and help teach some of the other dedicated inmates who haven't been so fortunate to have had some of the same privileges afforded to Ross and myself."  *Id*.

Even during trial, Mr. Ulbricht remained committed to the other inmates, including Mr. Van Praagh, who writes,

> [a]s difficult of a time as it was [during Mr. Ulbricht's trial], he
> always was available for me and for my students.  Sharing his

---

    [7] The excerpts from these TOR chats will be provided as soon as defense counsel can collect them and prepare them as Exhibits.

    [8] The PSR includes that enhancement within the Base Offense Level computation in ¶ 94 instead of as a separate offense-conduct specific enhancement.

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**

Hon. Katherine B. Forrest
United States District Judge
Southern District of New York
May 28, 2015
Page 9 of 14

> knowledge and his experiences had inspired me to do something
> that I always wanted to do but never managed to accomplish. I
> enrolled in College.

*Id*.

      Thus, even during a period of extraordinary stress and concentration on a matter of utmost importance to him, Mr. Ulbricht nevertheless found the time and energy to devote to others. Yet Mr. Ulbricht's positive influence on Mr. Van Praagh did not stop there. As Mr. Van Praagh relates,

> [a]s a first generation college student, the whole ordeal of choosing
> a school, enrolling, picking a major, and registering for classes was
> completely foreign to me and frankly intimidating. I am forever
> grateful that Mr. Ulbricht patiently walked me through the entire
> process. He has provided me the advice and confidence necessary
> to take those vital first steps.

*Id*.

      In addition, Mr. Van Praagh reports, "[t]here are three other students in my class that are grateful to Mr. Ulbricht, for he convinced them too that as proud as they should be to have made such valuable strides and receive their GED's, that it is only the first step to ensuring a successful life that is free of recidivism." *Id*.

      As a result, Mr. Van Praagh and the three other imates "are degree seeking students, enrolled at Adams State University." *Id*. Yet Mr. Ulbricht did not stop even there. The correspondence courses provide materials and a note of encouragement, but little else in the form of guidance. As Mr. Van Praagh admits, "[t]hat is pretty scary. I know that it is nothing that has not been done before, but with no personal instruction, it's a daunting task."

      Mr. Ulbricht fills that void. According to Mr. Van Praagh, "Mr. Ulbricht sits with the four of us every single day and we've made such great progress that I fear what it will be like when we are no longer able to take advantage of his wealth of knowledge [and] the unparalleled generosity with which he shares it." *Id*.

      In addition, Mr. Van Praagh recognizes that "Mr. Ulbricht does all this without any expectation of something in return. It's [] solely to help others and I have found that to be of the most endearing and noble qualities I have found in anyone I have met throughout this entire unfortunate experience." *Id*. As a result, even in an environment as desolate and despairing as

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**

Hon. Katherine B. Forrest
United States District Judge
Southern District of New York
May 28, 2015
Page 10 of 14

the MCC is in many respects, Mr. Ulbricht's "kindness and devotion to excellence has truly inspired us all." *Id*.

Exhibit 6 is a letter from Joseph Ernst, the son of Thomas J. Ernst, "[a] Georgetown Law Graduate, Air Force intelligence officer and tireless philanthropist," and also a convicted felon currently serving a 48-month sentence at FCI Fort Dix. Joseph Ernst contacted defense counsel yesterday because he wanted to write a letter to the Court on Mr. Ulbricht's behalf after identifying certain similarities between Mr. Ulbricht and his father, who "like Ross, . . . spent a life in service to others, only to make a mistake" which led to his conviction and incarceration. *See* Letter of Joseph Ernst, attached hereto as Exhibit 6.

Mr. Ernst's chief concern is that Mr. Ulbricht, if imprisoned at a higher security level facility for a long period of time, will suffer the same fate as his father who even "incarcerated for what seemed like a short period of time" has experienced irreparable damage to his ability to be a high-functioning and productive member of society. *Id*. As Mr. Ernst explains in his letter, his father

> [a]s a man with considerable education, has been unable to find programs to better himself or prepare himself for life outside beyond basic correspondence courses. . . . As a convicted felon, his job prospects are non-existent. . . . In sum, he is a man that while educated at the highest levels, now finds himself unemployable at even the most entry level jobs. He has no place to live once released, nor means of subsistence and finds himself in an endless cycle of indignity, spiraling ever downward.

*Id*.

Accordingly, "[h]aving seen the affects that even a short period of incarceration can have, it is [his] fervent hope that Ross is not subject to an unduly long period away from his family and friends" given that "[a] man like Ross Ulbricht, with an impressive education, demonstrated ability to favorably impact people around him and prior experience in business with community service components, could add something so positive to [the national] fabric" and "is not someone who has placed himself beyond the edge of society." *Id*.

### III.   *Dr. Taff's Report*

Attached as Exhibit 7 hereto is Dr. Taff's report regarding the six deaths the government seeks to attribute to drugs purchased from vendors on the Silk Road site. As Dr. Taff notes, he possesses "over 30 years of clinical, investigative, teaching, testimonial, and administrative

<table>
<tr><td>LAW OFFICES OF<br>**JOSHUA L. DRATEL, P.C.**</td><td>Hon. Katherine B. Forrest<br>United States District Judge<br>Southern District of New York<br>May 28, 2015<br>Page 11 of 14</td></tr>
</table>

experience," and has "conducted hundreds of death investigations and autopsies, including dozens of drug-related fatalities in urban, suburban and rural communities." *Id*., at 1.

As Dr. Taff's report states, based on his "review of the available documentary evidence," *id*., at 2, each of the six deaths "lacks information about or more the 6-stages of death investigation." *Id*. *See also id*., at 1 (listing the six stages of a death investigation); Lewis Dec., dated May 15, 2015, at ¶ 10-12 .[9]

Elaborating, Dr. Taff's report cautions that

> [p]artial death investigations and/or partial autopsies yield partial answers which is as bad as no autopsy at all. Without certain pieces of information, it is impossible for medical examiners to render opinions about issues that typically arise during criminal and civil litigation (*e.g*., cause, manner and time of death, time of onset of injury, pre-existing pathological (medical and/or psychiatric) conditions, interactions of drugs, drug metabolism (absorption, breakdown and elimination of drugs), conscious pain and suffering, life expectancy, quality of medical and surgical care, etc.).

*Id*., at 2.

Also, Dr. Taff's report points out that

> [t]he interpretation of drug levels is difficult because of multiple variables, including:  a)  use of multiple drugs in varying amounts;  b)  administration of drug[s] via different or multiple routes (inhalation (snorting, sniffing), ingestion, injection);  c)  use of drugs at different times;  and d) use of drugs by individuals of different ages and body weights with varying levels/degrees of drug tolerance.

---

[9]  Mr. Ulbricht submitted to the government a number of discovery requests regarding the six deaths.  However, the government failed to provide any additional information or materials with the exception of a coroner's and toxicology report with respect to one death, a toxicology report with respect to another death, and scant information as to what the government described as Silk Road drug user profiles.

<table>
<tr><td>LAW OFFICES OF<br>**JOSHUA L. DRATEL, P.C.**</td><td>Hon. Katherine B. Forrest<br>United States District Judge<br>Southern District of New York<br>May 28, 2015<br>Page 12 of 14</td></tr>
</table>

*Id.*

      In addition, Dr. Taff's report notes that "[d]rug-related homicides are rare[,]" and "medical examiners rarely classify drug overdoses as homicides." *Id.* As Dr. Taff's report explains, "[b]ecause of the lack of reliable circumstantial, testimonial and scene information surrounding many drug overdoses, the manner of many drug-related deaths are not clear-cut." *Id.*, at 3. As a result, "[m]any medical examiners have opted to rule the manner of many drug-related deaths as 'undetermined' (possible accident, suicide or homicide) with the understanding that such a classification might be amended if additional (compelling) information comes forth in the future. *Id.*

      Dr. Taff's report proceeds with the evaluation of the six deaths, which findings are summarized in the May 15, 2015, Declaration of Lindsay A. Lewis, Esq. (which is attached as Exhibit 1 to my May 15, 2015, letter). Dr. Taff's report also discusses the coroner's and toxicology report for Alejandro A. (which was provided to the defense May 14, 2015, after Dr. Taff had provided his preliminary findings to defense counsel).

      In addition to analyzing the documents provided, including the exclusion of certain factors – such as the presence of two other drugs, marijuana and Prozac, as well as a pre-existing heart disease – from the cause of death, *id.*, at 9, Dr. Taff , based on his review of Mr. A.'s records, offered an opinion to a reasonable degree of forensic medical certainty that Mr. A.'s cause of death was "due to multiple drug (25I-NBOMe, marijuana and Prozac) intoxication." Dr. Taff's report adds that "[c]ardiomegaly (enlarged heart) of undetermined origin was a significant associated condition contributing to [Mr. A.'s] death. *Id.*[10]

      Ultimately, Dr. Taff concludes that "the incomplete records raised several questions and precluded [Dr. Taff] from rendering opinions regarding the cause, manner and time death as well as, possibly, other forensic medicine issues of interest to the criminal justice system." *Id.*, at 3. Thus, he was "unable to render opinions to reasonable degree of medical forensic certainty in 5 of 6 cases regarding cause, manner and time of death as well as several other forensic issues typically addressed by medical examiners investigating drug-related deaths . . ." *Id.*, at 9.

      Dr. Taff's report cites as reasons the following:

---

    [10] Dr. Taff's report notes that "[a]fter a 7-month long investigation, California[] officials concluded that the manner of [Mr. A.'s] death should be classified as an accident." *Id.*, at 9. Finding "nothing the records to suggest otherwise," Dr. Taff rendered an opinion to a reasonable degree of medical forensic certainty that Mr. A.'s "manner of death was appropriately ruled an accident." *Id.*

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**

Hon. Katherine B. Forrest
United States District Judge
Southern District of New York
May 28, 2015
Page 13 of 14

    a)    paucity of information;
    b)    confusing interpretations, selective/partial/incomplete diagnoses;
    c)    omissions;  and
    d)    inability to inspect original death investigation and autopsy reports and primary autopsy evidence.

*Id*.

Regarding the sixth case, that of Mr. A., in which Dr. Taff does posit a cause of death, Dr. Taff, as noted **ante**, "disagreed with the official cause of death[]" because "the California[] forensic team failed to factor in the presence of other drugs and a pre-existing heart condition into [Mr. A.'s] cause of death." *Id*., at 9-10.[11]

Regarding the other five deaths, Dr. Taff's report cites, *inter alia*, the "paucity of post-mortem medical-scientific evidence and the decedents' ante-mortem histories of medical and mental health and substance abuse problems . . ." among the reasons for his inability to render an opinion. Also, he explains that "[a]lthough all the decedents had drugs in their systems at the time of death, toxicology labs cannot match illicit drugs present in a person's body fluid and tissues to an exogenous (outside) source of drugs." *Id*., at 10.

Also, "[b]ased on the available information," Dr. Taff was unable to

> correlate the time of purchase/acquisition from an alleged Silk Road vendor, time of usage of the alleged Silk Road purchase, time of usage of other illicit drugs and prescribed medications, the amount/dose of drugs used, time of mixing/cocktailing of alleged Silk Road purchase with other drugs, pre-existing pathological health conditions and cause, manner and time of death.

*Id*.

Indeed, Dr. Taff's report points out that "[i]t is unknown when each decedent, with other

---

[11] In noting that Mr. A.'s death was ultimately declared an accident, Dr. Taff notes that "[t]his ruling indicates that local authorities had insufficient evidence to criminally charge another person for contributing to or directly causing [Mr. A.'s] death." *Id*., at 10. Dr. Taff was "not surprised" at that conclusion, although he points out that during his career, "law enforcement has conducted dozens of in-depth investigations with the intention of making drug dealers legally/criminally responsible for the deaths of individuals to whom they sold drugs." *Id*.

| | |
|---|---|
| LAW OFFICES OF<br>**JOSHUA L. DRATEL, P.C.** | Hon. Katherine B. Forrest<br>United States District Judge<br>Southern District of New York<br>May 28, 2015<br>Page 14 of 14 |

drugs in his system, took alleged Silk Road drugs." *Id*. In that context, as Dr. Taff's report states, "[t]he mixing of drugs in low levels can cause more powerful and potentially fatal effects than each drug used individually (so-called synergism)." *Id*. Consequently, "[m]edical examiners must look at all of the results in a post-mortem drug screen[,]" *id*., and "[i]t is bad science to be selective or hierarchical about drugs (*e.g.*, heroin in more dangerous than cocaine which is more dangerous than alcohol, and, thus, if not for heroin, the person would still be alive) when rendering opinions about the cause of drug-related fatalities." *Id*., at 10-11. As a result, "[p]ost-mortem drug results must be viewed in context with the findings from other phases of a death investigation." *Id*., at 11.

Accordingly, the information provided by the government fails to establish a sufficient factual, medical forensic basis for attributing the deaths either to drugs purchased from vendors on the Silk Road site, or to Mr. Ulbricht. That would be not only "bad science," but, in the context of the Due Proces requirements for considering information at sentencing, legally unsustainable. While, as the letters from the decedents' family members make clear, unquestionably the six deaths represent personal and family tragedies and trauma, there is simply not an adequate basis to attribute them to Mr. Ulbricht.

## Conclusion

Accordingly, for all the reasons set forth above, as well as in Mr. Ulbricht's prior submissions, it is respectfully submitted that he should be sentenced to a term of imprisonment substantially below the advisory Guidelines range.

Respectfully submitted,

Joshua L. Dratel

JLD/

cc:  Serrin Turner
     Timothy T. Howard
     Assistant United States Attorneys