# EXHIBIT 7

Mark L. Taff, M.D.
Forensic Pathologist
511 Hempstead Avenue
Suite 2
West Hempstead, New York 11552
Telephone: (516) 292-2300

May 26, 2015

Joshua L. Dratel, Esq.
Attorney at Law
29 Broadway, Suite 1412          Re:     U.S. v. Ross Ulbricht
New York, N.Y. 10006                     14 Cr68 (KBF)

Dear Mr. Dratel:

As per your request, I have expeditiously reviewed and analyzed a variety of records
from 6 drug-related deaths from different parts of the world. Mostly incomplete record files
regarding six deceased individuals were reviewed between 5/8-20/15, including: 1) Jordan
███████ (JM); 2) Bryan ███████ (BB); 3) Alejandro ███████████ (ANA); 4) Preston ███████ (PB); 5)
Jacob ███████ (JLG); and 6) Scott ███████ (SW). In addition, I also reviewed Attorney
Lindsay Lewis' declaration in support of defendant Ross Ulbricht's pre-sentencing submission
dated 5/15/15 containing my preliminary assessment of the alleged overdose deaths.

As a Board-certified forensic pathologist with over 30 years of clinical, investigative,
teaching, testimonial and administrative experience, I have conducted hundreds of death
investigations and autopsies, including dozens of drug-related fatalities in urban, suburban and
rural communities.

Medical examiners (coroners' pathologists, forensic pathologists) typically conduct 6-
stage death investigations consisting of: 1) history intake from next-of-kin, police, healthcare
personnel and/or subpoenaed medical, psychological, criminal, education, military, etc. records;
the history phase corresponds with what lawyers refer to as circumstantial-testimonial evidence;
2) scene findings supported by diagrams, sketches, photographs, videos and documentary
evidence; 3) autopsy (external and internal (surgical or invasive) examination of a corpse); the
autopsy is usually performed in a government medical laboratory; 4) lab (toxicology, DNA,
serology, histology, anthropology, dental, ballistics, trace evidence (hairs, fibers, paint chips,
glass, fingernail scrapings, fingerprints, footwear analysis, tool marking analysis); 5)
bureaucratic (creation and preservation of autopsy file with test result reports and medical
examiner notes and communications); and 6) signing of death certificate regarding cause, time
and manner (natural, accident, suicide, homicide, undetermined and/or pending) of a person's
death.

When a medical examiner rules a manner of death to be an accident, the ruling often
results in some civil action. In contrast, if the manner of death is classified as a homicide,
prosecutors usually initiate criminal investigations with the intention of charging a person(s) for
the crime.

Based on my review of the available documentary evidence, each case in U.S. v. Ulbricht lacks information about one or more of the 6-stages of death investigation. The autopsy is the ultimate diagnostic tool for the medical profession. If no autopsy is performed, no information is available to establish the cause, manner and time of death. Partial death investigations and/or partial autopsies yield partial answers which is as bad as no autopsy at all. Without certain pieces of information, it is impossible for medical examiners to render opinions about issues that typically arise during criminal and civil litigation (e.g. cause, manner and time of death, time of onset of injury, pre-existing pathological (medical and/or psychiatric) conditions, interactions of drugs, drug metabolism (absorption, breakdown and elimination of drugs), conscious pain and suffering, life expectancy, quality of medical and surgical care, etc.). In their search for the truth, lawyers frequently ask medical examiners on the witness stand to integrate/correlate circumstantial, testimonial, scene and medical evidence. The request is made difficult when gaps exist in a death investigation. The task is even more complicated when deaths involve individuals with substance abuse and mental disorders. The drug subculture is composed of individuals who chronically seek, purchase and use/mix illicit drugs, prescribed medications and alcohol to satisfy their cravings. Anyone who has studied (interacted, treated) drug addicts know that they are notoriously unreliable historians regarding type, dose (amount), route of administration and time of drug usage. They are also known to frequently lie about how they obtain their drugs and support their habits. Malingering is another personality trait of drug addicts seeking to receive free health care treatment and/or narcotics for short-term gratification of their conditions.

The interpretation of drug levels is difficult because of multiple variables, including: a) use of multiple drugs in varying amounts; b) administration of drug via different or multiple routes (inhalation (snorting, sniffing), ingestion, injection); c) use of drugs at different times; and d) use of drugs by individuals of different ages and body weights with varying levels/degrees of drug tolerance.

The manner of death is ruled "accident" for the majority of drug overdoses investigated by medical examiners. Some accidental drug overdoses turn out to be suicides when medical examiners make the effort to use their subpoena power to obtain decedents' ante-mortem medical and psychiatric records which frequently contain information about prior self-destructive behavior, depression, anxiety, anti-social behavior, unemployment, rehabilitation therapy, criminal activity, incarceration and/or multiple life crises. Each time a drug addict willfully "self-medicates", he/she is engaging in potential self-destructive behavior similar to Russian roulette. Sometimes a drug user wins and lives to enjoy the temporary high. Other times a drug addict loses and dies.

Drug-related homicides are rare. Unless a poisoner confesses to intentionally killing another person with a "hot shot" (acute death by injection or ingestion with a large dose of an illicit drug and/or medication) or the event is witnessed or captured on video, medical examiners rarely classify drug overdoses as homicides. Occasionally, heavy metals or insecticides are administered in low doses over time to cause a slow death by poisoning. Because American lawmakers/policymakers have declared "war on drugs" several times during the past 100 years or so, law enforcement agents (police, prosecutors) have been charged with waging the battles against users and dealers. Medical examiners are licensed physicians who work in government medical laboratories. Although medical examiners are supposed to be independent of law enforcement in many jurisdictions, they frequently collaborate with police and prosecutors during death investigations. Depending on their findings and rulings, medical examiners are

Dratel/Lewis/Ulbricht                                                              Page | 3

frequently adopted as State/People's prosecutorial witnesses at homicide trials. In the majority
of cases, medical examiners use the term to mean the decedent died at the hands of another
individual(s). The cause of death of a person is traced back to another person(s) whose actions
either contributed or caused the death. The majority of traumatic/violent deaths investigated by
medical examiners are caused by physical force/agent such as firearms, cutting instruments,
blunt objects, asphyxia and/or fire/arson. The cause and manner of death are usually clear-cut.
Deaths due to chemical substances are, more often than not, equivocal. Over the years, laws,
circumstances and politics have changed with respect to drug deaths. These changes have created
differences of opinions between medical examiners and lawyers regarding manner of death.
Debates have arisen over the classification of manner of death related to alcohol, tobacco,
pharmaceuticals and, even, food. Traditionally, deaths due to chronic alcoholism and tobacco
use have been classified as natural. Several medical examiners feel that these deaths should be
classified as suicides. Because alcohol and tobacco are, in effect, toxic substances legally sold to
the public, deaths due to these substances, to my knowledge, have never been classified as
homicides. Each fatality must be evaluated on a case by case basis. Although medical
examiners are frequent and important players in the criminal justice system, the final disposition
of each case handled by medical examiners is left to the courts to decide.

Because of the lack of reliable circumstantial, testimonial and scene information
surrounding many drug overdoses, the manner of many drug-related deaths are not clear-cut.
Medical examiners are not mind readers and typically refrain from speculating about the thought
processes of drug users. Many medical examiners have opted to rule the manner of many drug-
related deaths as "undetermined" (possible accident, suicide or homicide) with the understanding
that such a classification might be amended if additional (compelling) information comes forth in
the future.

On 5/13/15, based on governmental documentary evidence provided to me by Ms. Lewis,
I expeditiously submitted an outline of my preliminary impressions about the death
investigations and the cause, manner and time of death of each decedent. The information
contained therein became the basis of Ms. Lewis' declaration in support of defendant Ross
Ulbricht's pre-sentencing submission dated 5/15/15.

Since I first prepared the outline, I have received the partially redacted El Dorado County
Sheriff and Sacramento County Coroner's report and NMS Labs toxicology report regarding the
death of Alejandro ▇▇▇▇▇▇ (ANA). These documents were received on 5/20/15 as part of
new discovery provided by the government. No additional documentary evidence was received
after 5/8/15 concerning the other 5 decedents. Accordingly, my unrevised outline is now being
incorporated into this formal/final report to show that the incomplete records raised several
questions and precluded me from rendering opinions regarding the cause, manner and time of
death as well as, possibly, other forensic medicine issues of interest to the criminal justice
system.

**Jordan** ▇▇▇▇ **(JM):**
- 27-year-old black male (5'10" or 6'7"/260 or 265 lbs)
- Seattle, Washington
- Found dead at home containing drugs and drug paraphernalia on 8/31/13 on or
  around 11:06 p.m.
- File lacks death certificates with dates and times of onset of injuries, death and
  signing of death certificate

- Alleged history of multiple drug-related arrests (1992 - 2001), marijuana, opiate, anti-histamine, alcohol, hydrocodone and anti-pain usage for chronic pain related to a spleen ailment.
- Dr. Timothy W____, Medical Examiner of Kings County, should have subpoenaed JM's past medical/psychiatric records to better understand JM's ante-mortem issues.
- Is Dr. W___, board-certified in forensic pathology?
- Post-mortem drug screen reported alprazolam (anti-anxiety) and diazepam (anti-anxiety).
- Were these drugs found at death scene?
- Autopsy showed presence of acute brain (cerebellar) hemorrhage (bleeding) consistent with a stroke which could be a competent cause of death.
- Stroke omitted from opinion as either cause or contributing factor to death.
- Liver was heavy and enlarged probably due to fatty changes from overeating and alcohol use.
- Microscopic exam of liver shows "hepatocyte necrosis".
- Did JM suffer from drug-induced acute liver failure? Ante-mortem (before death) of codeine, morphine, alprazolam and diazepam were low levels which acted together (synergistically) to impair JM's ability to breathe.
- Tox report issued on 11/4/13.
- Autopsy report issued 11/12/13 - 2 months after autopsy.
- Medical examiner ruled manner of death as "accident".
- Washington State Police Crime Lab labeled death "controlled substance homicide" on either 8/13/13, 9/4/13 or 12/19/13.
- Why didn't medical examiner also use homicide in autopsy report?
- The time of onset of brain bleed cannot be correlated with times(s) of drug usage.
- Drugs probably used prior to brain hemorrhage which was most likely the terminal event.
- JM was an obese black male who may have suffered from (untreated) hypertension, a condition that frequently causes strokes.
- JM's heart was at upper limits of normal weight which is suspicious for chronic high blood pressure.
- Spleen was normal at autopsy.
- Autopsy report correctly attributed death to multiple/combined drug intoxication.
- Heroin/opiate was not singled out as primary cause of death.
- Source of heroin is unknown.
- For reasons unknown, brain hemorrhage was ignored from opinion.

### Bryan ████ (BB):
- 20-year-old white male.
- Boston, Massachusetts.
- Found dead in residence on 10/7/13.
- According to death certificate, cause of death: "acute opiate intoxication" (morphine) due to substance abuse.
- Date and time of injury "unknown".
- Pronounced dead on 10/7/13 at 11:46 a.m.
- Time of death is "unknown".

- Death certificate signed by Dr. Marie _____ on 2/27/14 - 4 months after death.
- Box # 31 on death certificate omits information about performance of autopsy.
- Unknown if Dr. Marie _____ is board-certified in forensic pathology.
- BB file omits autopsy report.
- Toxicology report positive for opiate (morphine) and alcohol.
- Blood-alcohol concentration (BAC) was 0.06% which is equivalent to about 3 12-ounce of beer for average body weight of about 170 lbs.
- BB's body weight is unknown.
- Alcohol and morphine have central nervous system depressant effect.
- Both alcohol and opiate (morphine) should have been mentioned on death certificate.
- Manner of death ruled an "accident".
- Source of heroin unknown.
- Route and time of usage unknown.
- Unknown if other sources of heroin at scene.
- According to Boston Police report, "victim known to Commonweath".
- What does this mean? Does BB have a prior drug-related arrest record?
- Levels of morphine lower in femoral artery blood than pooled/cavity blood.
- Femoral artery blood more accurate.
- Modafinil (anti-sleep stimulant) also found in low level in pooled/cavity blood.

**Alejandro▮▮▮▮▮▮▮▮(ANA):**
- 16-year-old Hispanic male.
- Found dead on garage floor of friend's house in Camino, CA on or around 9/10/13.
- ANA had history of wanting to buy marijuana, get high and party.
- File provided is useless for forensic medical evaluation.
- No autopsy, toxicology and death certificate reports provided.
- No medical information available to comment.
- ANA might have used a hallucinogen which triggered aggressive behavior and apparent drug-related seizure.
- Seizures can cause acute respiratory failure and death.

**Preston▮▮▮▮▮(PB):**
- Once again, the autopsy report and death certificate with crucial medical information are unavailable for review.
- PB was a 16-year-old male.
- He has a history of being a drug user (alcohol and marijuana).
- His pre-death health records and prior police arrest records are important in the defense of your client.
- A post-mortem drug screen was performed by the Perth Coroner.
- The drug levels are useless out of context with the other autopsy findings.
- On Saturday, 2/16/13, PB fell or jumped from a balcony at the Sunmoon Resort hotel in Perth, Australia after taking a psychedelic drug reportedly purchased/obtained from Silk Road.
- Other youngsters celebrating their prom night witnessed PB acting bizarrely shortly before they heard him loudly scream "Fuck" during the fall.

- The drop height is unknown.
- It is assumed that PB sustained multiple blunt force impact bodily injuries associated with bone fractures and internal organ (e.g. brain) and blood vessel lacerations.
- He survived in the hospital for 2 days before death reportedly occurred on or about 2/18/13.
- The date of blood collection for drug testing is unknown.
- Specimens received in lab on 2/21/13.
- Only 1 of 2 pages of Chem Centre received for review.
- Chest blood is usually contaminated and not a reliable specimen for testing.
- Chest blood revealed presence of low levels of morphine (narcotic drug) and midazolam (a benzodiazepine sedative).
- Methodology used to test specimens assumed to be immunoassay.
- Levels may be lower than at time of fall due to 2-day survival (and continued metabolism/breakdown) of drugs and introduction of fluids/blood transfusions to prevent fall in blood pressure.
- Femoral blood was negative for alcohol, but low positive for morphine, active component of marijuana (tetra-hydrocannibinal/THC) and benzodiazepines.
- It is unknown if PB received benzodiazepines in hospital.
- It is unknown if marijuana was laced with any hallucinogens.

**Jacob ▮▮▮▮▮▮▮▮▮ (JLG):**
- 22-year-old male (175cm/65kg/143 lbs).
- Incident occurred on or about 2/14/13 (Valentine's Day) in Adelaide, South Australia.
- History of mirtazapine treatment for anxiety and depression, polydrug abuse and overdoses in 2010 and 2011.
- It is unknown if JLG is suicidal.
- Need to see his past medical and psychiatric records.
- Day before death (2/13/13 at 1425 hours/2:25 p.m.), JLG was treated (and discharged!!) for ringing ears, difficulty swallowing, nausea and fever after night of alcohol, amphetamine and heroin.
- Recently completed course of antibiotics for bronchitis (this diagnosis is extremely important with respect to cause of death: "Aspiration Pneumonia").
- His white blood cell count was elevated.
- He received IV fluids and metoclopramide (anti-heartburn medication), paracetamol (pain reliever, fever reducer) and ibuprofen (anti-muscle aches and fever) and discharged at 1700 hours (5 p.m.) - 2 3/4 hours after admission.
- LJG was found by his mother unresponsive at home on 2/14/13.
- EMS found JLG dead with "established rigor mortis (stiffness) and lividity (post-mortem pooling of blood in dependent parts of body").
- Death was pronounced at 8:40 p.m.
- Autopsy performed by Dr. John G_____ on 2/15/13 at 10:50 a.m.
- It is unknown if Dr. John G_____ is board-certified in forensic pathology.
- It is unknown if Dr. John G___ knew that JLG was recently treated for bronchitis (which could have developed into pneumonia).
- It is unknown if Dr. John G_____ subpoenaed JLG's medical records or reviewed his most recent chest x-rays.

- It does not appear that JLG had a chest x-ray the day before death.
- Autopsy reveals old and recent intravenous injection sites in superficial veins of elbow creases.
- A large amount of partly digested food and fluid were present in stomach contents.
- No pills were found.
- Post-mortem drug screen for low levels of "4 different illicit drugs" (methylamphetamine, heroin, cocaine and 4-methylmethcathinone) and therapeutic levels of mirtazapine and metoclopramide.
- Cause of death due to multiple drug (narcotic, depressants and stimulants) intoxication complicated by aspiration pneumonia was not entertained.
- This is a very important finding that was completely omitted from the diagnosis.
- More importantly, manner of death also omitted.
- Was JLG's death natural, accident, suicide, undetermined or homicide (controlled substance homicide)?
- Time of death important because no one knows when aspiration occurred with respect to drug overdose (synergistic effect of multiple illicit drugs in low doses working together to kill).
- It is common to find some agonal/terminal aspiration in people who are intoxicated at time of death.
- Microscopic exam of lungs shows "widespread patchy pneumonic consolidation associated with some vegetable material".
- Such an extensive tissue reaction suggests pneumonia existed **before** agonal aspiration of food while intoxicated.
- JLG's death might represent some medical malpractice (failure to diagnose and treat pneumonia/premature hospital discharge).
- Chronology of events suggest that overdose and death occurred between 2/13/13 5 p.m. and 2/14/14 before 8:30 p.m. - 27 1/2 hour time frame.
- This means JLG "self-medicated" during this period and aggravated his pre-existing pneumonia which caused/contributed to his death.
- Autopsy also showed mild steatosis (fatty changes), a condition commonly associated with alcohol use/abuse.
- Several portal/abdominal lymph nodes were enlarged, a condition commonly found amongst I.V. drug addicts.

**Scott          (SW):**
- 36-year-old male (1.75 meters/5'9"/100kg - 220 lbs.) found dead (and decomposed) by aunt on floor next to computer of his residence in Adelaide, South Australia on 5/19/2013.
- Drug paraphernalia and heroin found at scene.
- Last seen alive on 5/16/13.
- Time of death "on or about 5/16/13".
- History of deafness with cochlear implants, deep vein thrombosis (? blood clots in deep veins of legs) and heroin abuse (Silk Road customer between Jan-May, 2013).
- Dr. Stephen W____ performed autopsy on 5/23/2013 at 11:50 a.m. - 4 days after discovery of SW's body.
- Why 4 day delay before autopsy?

- Unknown if Dr. Stephen W____ is board-certified in forensic pathology.
- Probable recent injection site found in SW's left elbow crease corresponding to his left shirt sleeve.
- Body and internal organs markedly decomposed/autolyzed; Evidence of pre-existing coronary artery disease (partially occlusive (40-50%) arteriosclerotic narrowing of left anterior descending coronary artery, a pathological finding, in and of itself, sometimes associated with fatal cardiac arrhythmia (irregular heart beat) and sudden cardiac death.
- Cause of death listed as "multiple drug toxicity".
- Toxicology screen reported 8 different drugs.
- Morphine level, in and of itself, was potentially lethal/toxic.
- Codeine was considered a "therapeutic concentration".
- Doxylamine, tramadol, 7-aminoclonazepam, alprazolam, oxazepam and warfarin levels were "non toxic/therapeutic concentration".
- According to Note, above mixture of drugs "can all act as central nervous system depressants whose interaction produces an effect greater than the sum of their individual effects". This description is consistent with "synergism".
- Manner of death is unknown.
- Manner most likely accident.
- However, multiple drugs in low levels might be some covert act of suicide.
- Making generalizations about different drugs and levels in different individuals is junk science.
- It is bad science to extrapolate from one person to groups of people.
- Each case must be evaluated on its own merits.

In reference to Alejandro [redacted] (ANA), he was reportedly a 16-year-old Hispanic male (6'0"/200 lbs. or 5'8" 182 lbs.) who was witnessed to have a seizure and subsequently found unresponsive in cardiac arrest somewhere (? garage floor of a friend's house in Camino, CA) on Sunday, 9/9/2012 on or around 1:48 a.m. He was transferred to Marshall Medical Center (location unknown) where he was subsequently pronounced dead at 3:04 a.m. - about 1 1/4 hours after discovery - despite some resuscitative efforts. The sheriff's investigation revealed that ANA wanted to buy marijuana, get high and party. He "intentionally" ingested an unknown type of drug for a "party". Supplemental Narrative indicated that ANA purchased an illicit drug known as 25I-NDOMe or "trips" from a local drug dealer before overdosing. The apparent drug-related death prompted a criminal investigation which eventually led to the arrest of the dealer who sold the illicit drugs to ANA. The death was referred to Dr. Gregory R____ of the Sacramento County coroner's Office for certification.

An autopsy was performed on Monday, 9/10/2012. Because Dr. R___ was unable to determine a preliminary cause of death, the cause of death was listed as "pending". Other significant conditions were described as "none". On 9/10/2012, a Case Advisory form indicated the "Homicide/Rule-Out" case was pending toxicology. "Designer drug screening-specific type pending investigative information" and a "BA & Comprehensive toxicology screen" were requested.

A NMS Toxicology Report issued on 10/16/2012 indicated that femoral (thigh) blood was positive for caffeine (coffee), active components of marijuana (Delta-9 THC/tetrahydrocannibinol - a central nervous system depressant) and therapeutic levels of fluoxetine and norfluoxetine (Prozac - an anti-depressant drug). Page 2 of 5 of another NMS Lab report issued on 10/16/2012 indicated the femoral blood was "positive for 25I-NBOMe; the presence of this compound was confirmed through LC/TOF-MS analysis". A quantifiable level of 25I-NBOMe was not reported.

On 1/29/2013 (about 3 1/2 months after the drug results were issued), Dr. Gregory R____ attributed the cause of ANA's death to "cardiorespiratory arrest following major seizure due to acute 25I-NBOMe toxicity". In Dr. R____'s opinion, he claimed that the toxicology screening was "positive" for the designer drug 25I-NBOMe, a synthetic psychedelic drug. However, the precise dose used in the death of ANA was unknown. His report also mentioned that "seizures and death have been rarely reported with high doses (700-1,500 micrograms or more)". Dr. R____ did not include the name of the authoritative treatise/reference describing the above symptoms and levels in his final report. It must be noted that Dr. R____ excluded the presence of marijuana and Prozac as well as pre-existing heart disease (mild left ventricular cardiac hypertrophy) (thickening) (heart weight 440 grams) as conditions contributing to death. A microscopic exam of tissues was not performed. It is unknown if ANA suffered from any significant pre-existing pathological conditions at the microscopic level which might have caused or contributed to his death.

Although ANA's final/amended death certificate was not included in his file, a Supplemental Narrative 03 dated 2/20/13 indicated that the case status was "closed - accident". In addition, a Coroner's Case Property Disposition dated 4/24/2013 described the case type as "accidental". These two documents indicate that the El Dorodo County Sheriff's Office and Sacramento County Coroner's Office joint death investigation concluded that the manner of ANA's death was an accident. Apparently, homicide had been ruled out.

Based on my review of ANA's records, it is my opinion to a reasonable degree of forensic medical certainty that ANA's cause of death was due to multiple drug (25I-NBOMe, marijuana and Prozac) intoxication. Cardiomegaly (enlarged heart) of undetermined origin was a significant associated condition contributing to ANA's death.

After a 7-month long investigation, Californian officials concluded that the manner of ANA's death should be classified as an accident. I found nothing in the records to suggest otherwise. Therefore, it is my opinion to a reasonable degree of forensic medical certainty that ANA's manner of death was appropriately ruled an accident.

## SUMMARY:

I am unable to render opinions to a reasonable degree of forensic medical certainty in 5 of 6 cases regarding cause, manner and time of death as well as several other forensic issues typically addressed by medical examiners investigating drug-related deaths because of the following reasons: a) paucity of information; b) confusing interpretations, selective/partial/incomplete diagnoses; c) omissions; and d) inability to inspect original death investigation and autopsy reports and primary autopsy evidence. I have only opined on the death of ANA and, in that case, I disagreed with the official version of his cause of death. In my opinion, the Californian forensic team failed to factor in the presence of other drugs and a pre-

existing heart condition into ANA's cause of death. It must be emphasized that ANA's death was initially pended to rule out a homicide. After 7-months, ANA's manner of death was classified as an accident. This ruling indicates that local authorities had insufficient evidence to criminally charge another person for contributing to or directly causing ANA's death.

For reasons previously discussed above, I am not surprised at the results of the ANA death investigation. During my career, law enforcement has conducted dozens of in-depth investigations with the intention of making drug dealers legally/criminally responsible for the deaths of individuals to whom they sold drugs. To the best of my recollection, no one was ever charged with murder. Several factors, singly or in combination, play into a prosecutor's decision not to bring charges against drug distributors, including: a) unreliable witnesses; b) reluctant witnesses; c) discarded physical evidence (e.g. flushing bags of drugs down the toilet; concealment of drug paraphernalia); d) complicated causes of death; e) non-homicidal manners of death; f) politics (justifying the spending of taxpayer money on drug addicts and dealers); g) multiple drugs acting synergistically (together); and h) victim's background (criminal record, history of substance abuse and mental disorder, lifestyle, poor state of health).

It is my understanding that Ross W. Ulbricht was recently convicted of being the founder of the website Silk Road, a black market for the sale of heroin, cocaine, LSD and other drugs. It is also my understanding that, on Friday, 5/29/15, federal prosecutors intend to present "evidence" to Hon. Katherine B. Forrest, the sentencing judge, that the six drug deaths were linked to drugs bought from vendors on Silk Road.

In addition to paucity of post-mortem medical-scientific evidence and the decedents' ante-mortem histories of medical and mental health and substance abuse problems, the physical/geographical distance between Mr. Ulbricht/Silk Road and the six decedents has basically eliminated any chance of applying Locard's Theory of Exchange/Transfer/Linkage to scientifically connecting the death scenes and decedents to Mr. Ulbricht through trace (e.g. fingerprints, fibers, footwear impressions, etc.) and/or biological (e.g. DNA, blood, saliva, semen, hair, etc.) evidence. At this time, I have not seen any evidence that scientifically links Mr. Ulbricht to the six decedents and the death scenes.

Although all the decedents had drugs in their systems at the time of death, toxicology labs cannot match illicit drugs present in a person's body fluids and tissues to an exogenous (outside) source of drugs. Heroin, cocaine and marijuana are heroin, cocaine and marijuana on a post-mortem drug screen. However, if a person's fingerprints, blood and/or DNA are found on the outside of a glassine bag containing drugs, the physical identity of a drug user/dealer can be scientifically established. Based on the available information, I cannot correlate the time of purchase/acquisition from an alleged Silk Road vendor, time of usage of the alleged Silk Road purchase, time of usage of other illicit drugs and prescribed medications, the amount (dose) of drugs used, time of mixing/cocktailing of alleged Silk Road purchase with other drugs, pre-existing pathological health conditions and cause, manner and time of death. It is unknown when each decedent, with other drugs in his system, took alleged Silk Road drugs.

The mixing of drugs in low levels can cause more powerful and potentially fatal effects than each drug used individually (so-called synergism). Medical examiners must look at all of the results in a post-mortem drug screen. It is bad science to be selective or hierarchal about drugs (e.g. heroin is more dangerous than cocaine which is more dangerous than alcohol, and, thus, if not for heroin, the person would still be alive) when rendering opinions about the cause

of drug-related fatalities.  Post-mortem drug results must be viewed in context with the findings
from other phases of a death investigation.  Different people react differently to different drugs in
different doses at different times.  Each drug-related death is unique and must be evaluated on a
case by case basis.  Medical examiners should refrain from extrapolating the findings of one
death to those of groups of people.

I reserve the right to amend the above opinions in the event additional information comes
forth during future legal proceedings.

I declare, under the penalty of perjury, that the above opinions are true and accurate to the
best of my professional ability.  The above opinions are based on over 30 years of clinical
experience as a practicing Board-certified forensic pathologist who has investigated dozens of
drug-related fatalities.

Sincerely,

*Mark L. Taff, m.d.*

_____

Mark L. Taff, M.D.
Forensic Pathologist

Clinical Associate Professor of Pathology
Mount Sinai School of Medicine
New York, New York

New York State Medical License # 148497-1