F5T5ulbS

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  UNITED STATES OF AMERICA,

4            v.                            14 Cr. 68 (KBF)

5  ROSS WILLIAM ULBRICHT,

6            Defendant.

7  ------------------------------x

8                                    New York, N.Y.
                                     May 29, 2015
9                                    1:10 p.m.

10
   Before:
11
                    HON. KATHERINE B. FORREST,
12
                                          District Judge
13

14                        APPEARANCES

15
   PREET BHARARA,
16      United States Attorney for the
        Southern District of New York
17 BY:  SERRIN A. TURNER
        TIMOTHY HOWARD
18          Assistant United States Attorneys

19 JOSHUA DRATEL
   LINDSAY LEWIS
20 WHITNEY SCHLIMBACH
   JOSHUA HOROWITZ
21      Attorneys for Defendant

22 ALSO PRESENT:   VINCENT D'AGOSTINO, Special Agent, FBI
                   GARY ALFORD, Special Agent, IRS
23                 JARED DER-YEGHIAYAN, Homeland Security
   Investgations
24                 Molly Rosen, Government Paralegal
                   Nicholas Evert, Government Paralegal
25

F5T5ulbS

1              (Case called)

2              THE DEPUTY CLERK:  Counsel, please state your names

3     for the record.

4              MR. TURNER:  Good afternoon, your Honor.  Serrin

5     Turner for the government, along with Timothy Howard from the

6     U.S. Attorney's office, Special Agent Gary Alford from the

7     Internal Revenue Service, Special Agent Jared Der-Yeghiayan

8     from Homeland Security Investigations, and paralegals Nicholas

9     Evert and Molly Rosen of our office.  Also, I left out Vincent

10    D'Agostino, Special Agent from the FBI.

11             MR. D'AGOSTINO:  Good afternoon.

12             THE COURT:  Good afternoon to all of you.

13             MR. DRATEL:  Good afternoon, your Honor.  Joshua

14    Dratel with Ross Ulbricht standing beside me; Lindsay Lewis,

15    Whitney Schlimbach, and Joshua Horowitz.

16             THE COURT:  Good afternoon to all of you.

17             We are here today for the sentencing of Mr. Ross

18    Ulbricht who was convicted, after a jury trial, of seven crimes

19    for which he is to be sentenced.  Those crimes are as follows:

20             Count One is the narcotics trafficking count which

21    carries a 10-year mandatory minimum with a statutory maximum of

22    life;

23             Count Two, distribution of narcotics by means of the

24    Internet, which also carries a 10-year statutory minimum and a

25    statutory maximum of life;

F5T5ulbS

1          Count Three, narcotics trafficking conspiracy, which

2   carries a 10-year minimum by statute and a statutory maximum of

3   life;

4          Count Four, continuing criminal enterprise, which

5   requires a 20-year mandatory minimum with a maximum by statute

6   of life;

7          Count Five, which is conspiracy to aid and abet

8   computer hacking which carries a maximum penalty of five years;

9          Count Six, conspiracy to traffic in fraudulent

10  identification documents which carries a statutory maximum of

11  15 years; and

12         Count Seven, which is conspiracy to commit money

13  laundering which carries a statutory maximum of 20 years.

14         I am going to set forth for the record now the

15  materials that I have received in connection with this

16  proceeding and that I am relying upon.  Of course, the trial

17  first and foremost, but also a number of submissions:

18         The defense had made a number of submissions including

19  a submission on May 15, May 22nd, May 27th, three submissions

20  on May 28th, one of which was an additional letter of support,

21  and a submission this morning on May 29th.

22         I want to point out just a few things about those

23  submissions and that is by no means to suggest that I will be

24  covering right here, at this very moment all of the content of

25  those, but just to point out a few things.

F5T5ulbS

1          One of the main points of the May 15th submission

2     relates to an argument that Silk Road was harm-reducing and

3     that this is a factor in favor of mitigation.  And we will

4     discuss this more later in this proceeding.

5          Attached to the declaration of Lindsay Lewis were

6     additional declarations from a number of individuals written

7     for this proceeding:

8          Tim Bingham, who worked in the field of addiction and

9     works now in the field, inter alia, of motivational

10    interviewing;

11         Dr. Fernando Caudevilla from Spain, also known as

12    Dr. X;

13         Dr. Monica J. Barratt, who is a research fellow at

14    Australia's National Drug and Alcohol Research Center which is

15    part of the University of New South Wales in Sydney;

16         Meghan Ralston, a former harm reduction manager for

17    the Drug Policy Alliance and now working as a freelance policy

18    consultant for the Drug Policy Alliance;

19         Also attached was a resume of Dr. Mark Taff.  The

20    Court has received, at this time, a summary of Dr. Taff's

21    conclusions and has now received a formal declaration in that

22    regard later.

23         Also attached were private communications between

24    Dread Pirate Roberts -- Mr. Ulbricht -- and Dr. X, including a

25    notation that Mr. Ulbricht paid Dr. X $500 per week starting at

F5T5ulbS

1    one point in time, for his continued work on the Silk Road

2    forum.

3            There is also the forum thread from Dr. X which is

4    several hundred pages attached as Exhibit 4 to Ms. Lewis'

5    declaration.  I have read each and every one of those posts and

6    in fact the entirety of every piece of paper submitted to me in

7    this proceeding.

8            There are also several articles:

9            Articles by Barratt, Ferris and Winstock regarding

10   Silk Road; an article by Ralston entitled, "End of the Silk

11   Road," Ralston.  Another article, "Silk Road Was Safer Than the

12   Streets."

13           There are also a number of attachments to the May 22nd

14   submission including a letter from Mr. Ulbricht and

15   seven letters from a very broad array, an impressive array of

16   family and friends including his parents, his grandparents,

17   aunts, uncle, cousins, sister, brother, and a large group of

18   friends essentially from every stage of his life like his early

19   childhood, his young schooling, his college years, his grad

20   school years, and his professional life.

21           There were also attached a number of photographs of

22   Mr. Ulbricht with various people from his life, and a letter

23   from an individual who states that Dr. X assisted that

24   individual in kicking his or her drug habit.

25           There was also a submission, a third submission of May

F5T5ulbS

 1    27th, and a fourth submission -- as I said, there were a number

 2    of submissions -- on May 28th, but that's where the Court

 3    received the Dr. Taff report, he is a forensic pathologist who

 4    discusses whether, in his view, it is appropriate to causally

 5    link the overdose deaths which are mentioned in the presentence

 6    investigation report which is known by the acronym PSR to Silk

 7    Road.  Actually, a copy of Dr. Taff's declaration had been

 8    provided as a courtesy to the Court by the defense counsel even

 9    before it was formally submitted the day before at the Court's

10    request, for which I thank them.

11          The government made a number of submissions dated May

12    18, May 26, May 27th, and May 28th.  The government also

13    submitted five victim impact statements.  They submitted those

14    twice so there were two separate submissions but it is the same

15    victim impact statements both times.

16          The Court has also reviewed a number of additional

17    materials specifically in connection with this proceeding after

18    receiving, in particular, the defense materials.  There were a

19    number of articles, as I mentioned, that were attached to those

20    materials, and the Court felt it not only appropriate to read

21    those articles but also appropriate to explore some of the

22    material that was cited in those articles.  So, the Court

23    indicated to counsel that it was doing so, requested the

24    receipt of certain information including certain harder to get

25    articles which were then provided, and the Court has reviewed

F5T5ulbS

1    those.

2         The Court also looked at a few references from those

3    articles into other articles and I am now going to set forth

4    for the record the articles I have read.  It is not

5    particularly typical to go through all of the articles a Court

6    reads in connection with any sentencing proceeding, but because

7    they were submitted as part of the defense submission and

8    relied upon therein, the Court does believe it is appropriate

9    to give a complete indication as to the array of articles that

10   the Court read in connection with this proceeding.  So, they

11   are as follows:

12        Michael Tonry, "The Mostly Unintended Effects of

13   Mandatory Penalties," 2009.

14        The Brennan Center's, "What Caused Crime to Decline?"

15   2015.

16        Cullen, Johnson and Nagin, "Prisons Do Not Reduce

17   Recidivism," 2011.

18        Green & Winik, of Yale, "Using Random Judge

19   Assignments to Estimate the Effects of Incarceration and

20   Probation on Recidivism Among Drug Offenders," 2010.

21        Kleck, Sever, Li and Gertz, "The Missing Link in

22   General Deterrence," 2015.

23        Caulkins, Rydell, Schwabe and Chiesa, "Mandatory

24   Minimum Drug Sentences, Throwing Away the Key or the Taxpayers

25   Money?" Rand, 1997.  I only read chapters 2, 4, 5 and 6 of that

F5T5ulbS

1    book.

2              Martin, "Lost on The Silk Road," 2014.

3              Barratt, Ferris and Winstock, "Use of Silk Road, The

4    Online Drug Market Place in the U.K., Australia and the U.S.,"

5    Addiction, 2013.  Addiction is the name of the

6    publication/periodical.

7              Also, Addiction, "Commentary on Barratt, *et al*," 2014.

8              Ralston, "The End of Silk Road, Will Shutting Down the

9    eBay for Drugs Cause More Harm Than Good?" 2014.

10             Ralston, "Silk Road was Safer Than the Streets for

11   Buyers/Sellers," 2015.

12             Hout and Bingham, "Silk Road:  The Virtual Drug

13   Marketplace," 2013.

14             Hout and Bingham, "Surfing the Silk Road," 2013.

15             Hout and Bingham, "Responsible Vendors, Intelligent

16   Consumers:  Silk Road, the Online Revolution and Drug Trading."

17             Fox-Brewster, "There is No Evidence Dark Websites Like

18   Silk Road Reduce Violence."  2015.

19             Corazza, et al, "Phenomena of New Drugs on the

20   Internet," 2012.

21             Aldridge and Decary-Hetu, Not an eBay for Drugs:  The

22   cryptomarket 'Silk Road' as a Paradigm-Shifting Criminal

23   Innovation.

24             Martin, "Drugs on the Dark Net," 2014, which is

25   different than his other publication.

F5T5ulbS

1              The ACLU's 2013 study of life sentences.

2              The Sentencing Project's 2013 study of life sentences.

3              Johnson and McGuinigall, "Life without Parole," 2008.

4              Appleton and Grover, "Pros and Cons of Life Without

5      Parole," 2007.

6              Mauer, Ryan and Young, "The Meaning of 'Life,'" 2004.

7              In addition, the Court also requested a number of

8      searches be run on the Silk Road website in connection with a

9      number of assertions that were made in some of the submissions

10     and, in particular, as to whether or not drugs were sold mostly

11     for personal use or whether they were sold in wholesale

12     quantities as well as some other facts the Court wanted to

13     explore.  By order of the Court listing those searches,

14     requested those searches be performed, or that a copy of the

15     site be provided to the Court.

16             The government then provided a computer which had the

17     site loaded onto it.  Defense counsel was present when that was

18     provided to the Court.  The Court ran those searches which it

19     had indicated in its order and reviewed those searches in

20     connection with this.

21             Now I want to go into the Fatico issue.

22             There are a number of facts at issue in this

23     proceeding and on April 24th, the defense counsel requested an

24     adjournment of the sentencing that was originally set for May

25     15th because of some information that had been provided.  It

F5T5ulbS

1    wanted an opportunity to develop facts, consult with people,

2    and determine whether or not it wanted to have a Fatico.  It,

3    at that time, indicated that it would likely request such a

4    hearing.  On April 28 the government responded to that letter.

5              The Court then, on April 28th, granted the request

6    for an adjournment and set May 22nd down as a date for a Fatico

7    hearing.  A Fatico hearing is a hearing to determine facts that

8    are necessary for a sentencing if those facts are contested.

9    It doesn't have to be done through a hearing, it can also,

10   under many circumstances, be done on a written record.  But,

11   that's what a Fatico relates to.

12             On May 15th the defendant made its submission, as I

13   have already discussed and recited, which indicated that it was

14   not seeking a Fatico but submitted the extensive additional

15   material which I have mentioned.  In light of those additional

16   factual materials, the Court asked whether the government

17   requested a Fatico.  The Court did that by order dated May

18   18th.

19             The Court also stated that it assumed that the parties

20   understood that even if they waived a Fatico hearing, the Court

21   would make any necessary factual findings based on the evidence

22   in the record.  That statement was contained in the Court's

23   order of May 18th.  By letter dated the same day, May 18, the

24   government agreed that it did not request a Fatico hearing and

25   the Court received no further reference to a Fatico hearing

F5T5ulbS

1   from defense counsel.

2          Now, as I had mentioned, there are a number of

3   actively contested factual issues between the parties.  The

4   defendant has not conceded those facts and, as I have said,

5   there is no necessary reason to have a live evidentiary

6   proceeding where live witnesses testify.  The Court believes it

7   has the necessary factual record before it to make the

8   appropriate factual determinations and will do so at the

9   appropriate time in this proceeding and based upon that

10  evidentiary record.  Any factual determinations would be based

11  on the standards set forth in a vast number of cases in the

12  Second Circuit which indicate that such findings are made at

13  sentencing proceedings or in connection with sentencing

14  proceedings by a preponderance of the evidence.

15         I want to confirm, however, that in light of all of

16  the very recent submissions -- and there are submissions most

17  recently by the defense but also submissions by the government,

18  that no one is seeking a Fatico hearing which would require an

19  adjournment of the sentencing today.

20         Mr. Turner?

21         MR. TURNER:  That's correct, your Honor.

22         THE COURT:  Mr. Dratel?

23         MR. DRATEL:  Yes, your Honor.

24         THE COURT:  Thank you.

25         Now, let me turn to the PSR.

F5T5ulbS

1          The PSR notes an offense level of 43 which is the

2    highest possible offense level but a Criminal History Category

3    of I which is the lowest possible Criminal History Category.

4    The PSR will be made part of the record in this matter and

5    filed under seal, and if an appeal is taken then counsel on any

6    appeal may have access to the PSR without any need for further

7    application to the Court.

8          Mr. Dratel, have you reviewed the PSR with your

9    client?

10          MR. DRATEL:  I have, your Honor.

11          THE COURT:  Are there any additional objections to the

12    PSR apart from those which are contained at pages 75 to 77 of

13    your submission of May 22nd, which we will go over in some

14    detail?

15          MR. DRATEL:  Also, in I think yesterday's submission

16    we had the formal objection to the two points for the credible

17    threats of violence.  I am not articulating it the same way so

18    I want to bring up the formal objection.

19          THE COURT:  The Court had seen such an objection and

20    included it in my notation of objections previously indicated

21    so I think we are all set.

22          Was there anything else?

23          MR. DRATEL:  No, your Honor.

24          THE COURT:  So.  I am going to go through the factual

25    disputes in a moment.  So, before I adopt any factual findings,

F5T5ulbS

1    I am going to go through the factual issues.

2              Now, first before we get there I want to examine the

3    offenses of conviction.  There was some back and forth.  The

4    Court had issued an order indicating that while there are seven

5    counts of conviction there appears to be a legal reason why

6    certain of those counts must be, at the time of sentencing,

7    vacated.

8              On May 27th I issued an order suggesting that Count

9    One is a lesser included offense in Count Two and Count One

10   should therefore be vacated and that Count Three is duplicative

11   of Count Four and should therefore also be vacated.  The

12   government responded by letter indicating that it agreed and

13   would proceed today to move to vacate those counts.  I don't

14   think it needs to do so because I'm going to vacate them *sua*

15   *sponte*.  The defense also agrees that those two counts should

16   be dealt with in that manner; however the defense, in addition,

17   argues that Count Two should be dismissed as it is a lesser

18   included offense in their view of Count Four and as it is also

19   a predicate offense to Count Four.

20             Now, just to be clear, what we are talking about,

21   Count Two is the sale of narcotics by means of the Internet and

22   Count Four is the continuing criminal enterprise.  Count One is

23   just the narcotics sales and Count Three is the conspiracy.

24   So, Count One and Count Three are vacated.  Count Two and Count

25   Four the Court does not find require any further action.

F5T5ulbS

1          The Court's rationale is as follows:

2          The Court  first refers to the Supreme Court's

3    decision in the Rutledge case which is a 1996 case, also the

4    Blockburger decision, Supreme Court, and the Second Circuit's

5    decision in Andino.

6          Count One charges narcotics trafficking.  Count Two

7    charges narcotics trafficking over the Internet.  It is clear

8    Count One is a lesser included offense of Count Two and that's

9    why it is vacated.

10          The Court also finds that Count Three, which is the

11    conspiracy, is a lesser included offense of the continuing

12    criminal enterprise which requires you find all elements of

13    Count Three in order to find Count Four.  That is specifically

14    the situation found in Rutledge.

15          Counts Two and Four, however, are not duplicative.

16    Count Two is a substantive offense.  Congress intended that

17    they be separate offenses and under the Supreme Court's

18    guidance in the Garrett case, 105 S.Ct. 2407, separate

19    punishments may be imposed.  The Court has considered defense

20    counsel's arguments set forth in the May 28th submission but I

21    disagree with defense's points.  There is case law directly on

22    this issue which is contrary to the defense arguments.

23          In Garrett, the Supreme Court considered whether a

24    charged substantive and predicate offense had to be vacated at

25    sentencing in light of a conviction on a CCE as well and the

F5T5ulbS

1    Court held it did not.  It reviewed the statute, the CCE

2    statute, and determined that, "Congress intended the CCE

3    provision to be a separate criminal offense which is punishable

4    in addition to and not as a substitute for the predicate

5    offense.  Insofar as the question is one of legislative intent,

6    the Blockburger presumption must, of course, yield to a plainly

7    expressed contrary view on the part of Congress.  And the Court

8    later held that the CCE offense is indisputably not the same

9    offense as a predicate substantive offense.

10            I would also refer to the Second Circuit's Amen

11    decision, 1987, also holding that double jeopardy does not

12    preclude prosecution nor does it preclude later the subsequent

13    punishment for both counts.

14            Accordingly, the Court vacates only Counts One and

15    Three.

16            The Court also notes that in the event of an appeal

17    and if one of the remaining counts were to be dismissed, there

18    is Second Circuit case law and also there are statements in

19    Rutledge about what happens in just such a circumstance.  One

20    of the vacated counts can be unvacated and can be reinstituted

21    as an offense of conviction, if that were to occur.

22            The vacatur here is due solely to the reasons that I

23    set forth above.

24            Now, these dismissals occur prior to any guidelines

25    calculations and prior to sentencing leaving sentencing only as

F5T5ulbS

to Counts Two, Four, Five, Six and Seven.  So, now I move on to
the guidelines.

I want to go through the correct calculation in some
detail because the PSR has certain corrections which need to be
made and there are certain clarifications which are important
to make.  I used the November 2014 guidelines which are in
effect on the date of sentencing.  Because there are multiple
counts of conviction, the Court has to turn, and it is a rather
complicated procedure to determine how you assess and come up
with the guidelines calculation in such a circumstance, but the
Court turns to Section 3D1.1 for the procedure for determining
offense level on multiple counts.  You look at the counts
first, you determine which ones are grouped together; second,
you determine the offense level applicable to each group under
3D1.3; and then you determine the combined offense level by
taking into account the rules set forth in 3D1.4.

3D1.2 deals with groups of closely related counts.
Subpart B provides that when two or more acts or transactions
are connected by a common criminal objective or constituting
part of scheme or plan, they can be grouped.  And that is
really the most applicable here.

3D1.3(a) also provides that when grouping occurs under
3D1.2(a) through (c), the offense level of the group is the
highest offense level for the counts grouped.  But, if grouping
occurs pursuant to (b), the offense level for the group is the

F5T5ulbS

1    offense level for the aggregated quantity and then the highest

2    offense level is used.  Thus, for (b), it is the aggregate

3    behavior which is the driver of the offense level.

4         In both cases the offense level includes all of the

5    adjustments per application note 1 to 3D1.3.  The Court

6    believes it is proper to refer to 3D1.2(b) for Counts Two and

7    Four because only Two is determined primarily by quantity.

8    But, the Court notes that it is frankly irrelevant, and to the

9    calculation if one were to use one or the other subpart, the

10   CCE count, Count Four, is connected to Count Two by a common

11   criminal scheme or objective, hence the use of subpart (b).

12        Now, probation asserts that because Counts Five and

13   Six represent a separate type of harm they are not included in

14   the first group.  The Court agrees.  Selling narcotics and the

15   harm that comes from that is clearly distinct from the harms

16   relating to computer hacking and the computer hacking

17   conspiracy and a false identification document conspiracy.

18        Here, operating the Silk Road website involved the

19   computer hacking conspiracy and the identification document

20   conspiracy but they are different harms.  So, therefore, Two,

21   Four and Seven are grouped in Group One; Count Five, Group Two;

22   and Count Six, Group Three.

23        Now to the calculation.

24        The money laundering offense in Count One, which under

25   the statute 1956, it requires that the Court look at the

F5T5ulbS

1     underlying narcotics offense to guide the offense level

2     calculations.   The Court looks first to the CCE count which is

3     Count Four and 2D1.5 provides that the offense level is the

4     greater of the offense level from 2D1.1 plus four levels, or

5     38.

6           If we turn to 2D1.1, we calculate the number of kilos

7     of cocaine, the number of kilos of heroin, the number of kilos

8     of meth for a total equivalency for marijuana which is the way

9     the guidelines are written, of 60,720 kilos.   That corresponds

10    with an offense level of 36 under 2D1.1(2).

11          The Court next looks to the specific offense

12    characteristics and this is where we get into some of the

13    contested facts and it is now that I will make and begin to

14    make certain factual findings.

15          The first factual finding relates to the direct abuse

16    of violence.

17          Under 2D1.1(b)(2) there would be a two-level upward

18    offense level adjustment for the directed use of violence.

19    Because it is contested, the Court must make appropriate

20    factual findings if it is to include it.   The standard by which

21    I do that is by a preponderance of the evidence.   Ulbricht's

22    directed violence here is and relates to the murders for hire

23    which he is alleged to have commissioned and paid for.   The

24    Court must determine whether these allegations have been

25    demonstrated by a preponderance of the evidence and I find that

F5T5ulbS

1    there is ample and unambiguous evidence that Ulbricht

2    commissioned five murders as part of his efforts to protect his

3    criminal enterprise and that he paid for these murders.  There

4    is no evidence that he was role-playing.

5            The Court finds that the evidence is clear and

6    unambiguous and it far exceeds the necessary preponderance

7    findings, that Ulbricht believed he was paying for murders of

8    those he wanted eliminated, and that he believed they had in

9    fact been murdered.  He was told his first victim had a wife

10   and several children.  That fact was known to Ulbricht and it

11   is never mentioned by him in connection with his consideration

12   of the murder.  The consequences flowing from the murder of a

13   man with his family is never, so far as the Court can tell from

14   the record, considered.

15           When he commissioned the hit on other of what he

16   thought was one person, Tony76, he learned that Tony76 was

17   apparently someplace -- located someplace with three other

18   individuals.  Ulbricht then agreed and paid for a hit on all

19   four of them.  There is no evidence in the record that he knew

20   them -- these other three folks -- that he ever dealt with

21   these three folks or had any beef with them at all.  He

22   commissioned the hit without regard to who they were, to the

23   fact that they had a right to life.  He never asked if they had

24   families, he never expressed any concern for them at all.

25           The evidence of this murderous intent and the actions

F5T5ulbS

1    specifically taken by Ulbricht to commission the hits is based

2    on trial exhibits including Ulbricht's own journal and his

3    chats with the individuals he hired to oversee the murders and

4    it was not, as I have said, role-playing.

5         He commissioned the hits, there is no discussion of

6    hypotheticals, he paid actual funds.  He paid hundreds of

7    thousands of dollars which were, in fact, paid.  He is told

8    when the murders are completed, he was provided with a photo of

9    the murder scene with random numbers that he had provided to

10   the would-be assassins.  That there had been no confirmation of

11   any of the deaths does not eliminate the fact that he directed

12   violence and directed the use of violence.

13        So, the Court finds by a preponderance of the evidence

14   that the addition of the two-level enhancement is appropriate.

15        The Court turns to the next enhancement which is

16   2D1.1(7).  If the defendant, or a person for whose conduct the

17   defendant is accountable, distributed a controlled substance

18   through mass marketing by means of an interactive computer

19   service one adds two levels.

20        The Court has considered whether in light of the fact

21   that Count Two is a substantive offense using the Internet the

22   addition of this enhancement is in fact appropriate.  It is.

23        Because the offense level is the same for conviction

24   under 841(a) and 841(h), the enhancement here which refers to

25   the use of an interactive computer service is not duplicative

F5T5ulbS

1    and the punishment is not cumulative.

2              In terms of any findings necessary to support the use

3    of the factual predicate for that, the Court finds by a

4    preponderance of the evidence that Silk Road operated, of

5    course using the Internet, and that the drug sales occurred

6    over the Internet on a slick website intended to and in fact

7    marketing drugs to a mass audience.  Therefore, the two-level

8    enhancement is appropriate by a preponderance of the evidence.

9              The next enhancement is 2D1.1(B)(12), which relates to

10   maintaining a premises for the purpose of manufacturing a

11   controlled substance and that would result in a two-level

12   enhancement.

13             The Court finds, by a preponderance of the evidence,

14   that this enhancement is appropriately applied.  The evidence

15   at trial including Mr. Ulbricht's own journal entries indicate

16   that he rented a house to make psychedelic mushrooms, that he

17   in fact made 10 pounds of such psychedelic mushrooms from that

18   house.  The evidence is unambiguous, it is far beyond a

19   preponderance, and that two-level enhancement is appropriate.

20             The next increase is 2D1.1(b)(5).  The offense

21   involved importation of methamphetamine.  The PSR notes this on

22   page 18 but the calculation which is included in the PSR on

23   page 26 does not include that enhancement, though the total

24   aggregate calculation embodies it, it is just a mistake between

25   those two pages.  But, if you try to add up what occurs on page

 1   26 you wouldn't get to 50 unless you go back to page 18.

 2          The evidence at trial was clear and the Court so

 3   finds, by a preponderance of the evidence, that significant

 4   quantities of such narcotics were mailed from abroad to Silk

 5   Road customers within the United States.  That's at the

 6   transcript pages 74 to 96; pages 177 to 183; and GX 804.

 7          Also, there is an adjustment for the role in the

 8   offense -- but actually there is no adjustment for role in the

 9   offense for this particular group because, pursuant to

10   application note 1 of 2D1.5, a Court is not to apply a

11   leadership adjustment when the offense of conviction is a

12   continuing criminal enterprise.  However, because the defendant

13   was convicted under a money laundering statute which is

14   18 U.S.C. 1956, there is an additional two leading to a total

15   aggregate offense level of 50.

16          Group Two is for computer hacking.  The Court looks to

17   guidelines Appendix A to associate the statutory offense with

18   the guidelines provision.  That leads us to 2X1.1.  That

19   provision leads us to the substantive offense which is

20   18 U.S.C. Section 1030(a) which leads us to 2B1.1(a)(2), the

21   base offense level is 6.  There is a leadership role adjustment

22   of four.  That is based upon the Court's finding by a

23   preponderance of the evidence that Mr. Ulbricht was the leader,

24   the creator, the designer, the operator, the ultimate

25   administrator of Silk Road.  While he had help he was certainly

F5T5ulbS

1    the leader of Silk Road and the computer hacking conspiracy

2    related to that activity.  So that enhancement is appropriately

3    applied.

4            The next enhancement for this second group is 2B1.1

5    which is that the offense was committed through mass marketing.

6    That is appropriately applied because the Court finds, by a

7    preponderance of the evidence, that the website was available

8    to all who had the browser and that marketing was intended to

9    reach as many people as it could reach, thousands if not

10   millions.  The offense also utilized a sophisticated means and

11   so there is an appropriate two-level enhancement under

12   2B1.1(e)(10)(C).

13           The Silk Road itself included a number of

14   sophisticated means including the use of Tor which required

15   some amount of sophistication, the bitcoin tumbler of course,

16   the use of stealth listings, all of which support a

17   sophisticated means enhancement.  That leads to a total of 14

18   for that group which is Group Two.

19           Group Three is Count Six only.  The base offense level

20   is 11 pursuant to 2L2.1(a).  There is a specific offense

21   characteristic of involving more than 100 or more documents or

22   passports and the Court finds, by a preponderance of the

23   evidence, that that factual predicate is found.  Certainly

24   there is ample evidence to show that in terms of the sales of

25   such items at trial.  That adds 9 to the 11 which is 20, plus a

F5T5ulbS

leadership adjustment.  The Court has already discussed the

facts supporting a leadership role.  That adds 4 for a total of

24.

Now, how one arrives at what the total offense level

is when you are dealing with these groups relates to looking at

the various aggregate totals and one adds also units.

Group One has one unit, no levels are added to the

offense level because that is essentially the one unit.  No

units are also added to Groups Two, Three because they are nine

or more levels, less serious than Group One.  So, the total

offense level is 50.

Pursuant to Chapter 5, application note 2, in the rare

cases when the total offense level exceeds 43, the offense

level becomes 43 and that is the appropriate offense level

here.

Counsel, are there any other arguments, other than

those which are addressed and set forth in your papers that you

would like to raise at this time or any disagreement you would

like to raise at this time?

MR. TURNER:  No, your Honor.

MR. DRATEL:  No, your Honor.

THE COURT:  Thank you.

The offense level then is 43 and the Criminal History

Category is I.

I am now going to turn to, Mr. Dratel, to your

F5T5ulbS

1    objections to the PSR and go through each of those.

2              There is an objection to paragraph 2, a typo.  That is

3    fine to make a change from "dead" to "dread."

4              In paragraph 10 there is a suggestion about some

5    additional language to be included.  The Court has no problem

6    with that language in paragraph 10.

7              In paragraphs 49, 60(A)(e) there is a request to

8    strike the language regarding the willingness to use violence

9    and for the payment of the $650,000 for the murder for hire and

10   the related language.  That request is denied for the reasons

11   the Court has already discussed.  And, based on the findings

12   that I have made, the statements regarding Mr. Ulbricht's

13   willingness to use violence and the other language that is used

14   here is entirely appropriate.

15             Paragraph 60(B)(1) there is a request to strike a

16   reference to a leadership role in the conspiracy to aid and

17   abet computer hacking and that is denied.  For the reasons set

18   forth above regarding the guidelines findings, the Court finds

19   that the sale of these materials could not have occurred

20   without Mr. Ulbricht.  He was the leader and without the rules

21   that he implemented and oversaw and directed others to oversee

22   on his behalf, this would not have been possible.  So, he was,

23   by all accounts, the leader.

24             Paragraphs 61 to 86 and 87, there is a request to

25   strike the references to the overdose deaths.  That request is

F5T5ulbS

1   also denied.

2          I am now going discuss the factual basis for the

3   inclusion of the overdose deaths in the PSR.

4          The PSR states that the overdose deaths are included

5   as they are related to Silk Road.  The defendant contests that

6   the drugs sold through Silk Road cannot be shown to have caused

7   the deaths of those identified in the PSR as having died

8   following the ingestion of narcotics.  But, this is not the

9   standard of proof that is required for inclusion in the PSR.

10          The defendant is not convicted of killing these

11   people.  Those are not the offenses of conviction.  This is

12   related conduct relevant to his sentencing.  His guidelines are

13   not being enhanced for bodily harm to these individuals or the

14   suffering that they may have endured.  The question as to

15   whether this information is properly included in the PSR is

16   whether the Court finds, by a preponderance of the evidence

17   that the deaths, in some way, related to Silk Road.  And, they

18   do.

19          Indeed, the evidence is really quite clear on this

20   point so the question is not the but-for causation which was

21   addressed in the defense submissions.

22          As a related point, the Court has determined that for

23   the same reason it is appropriate for the decedent's relatives

24   to speak at this proceeding to the extent they so request.  I

25   would note that there is a definition of crime victims that is

F5T5ulbS

1    contained in 18 U.S.C. 3771(b)(2)(D).  However, that definition

2    is not, in and of itself, controlling, as to what the Court can

3    determine is a victim for purposes of a sentencing proceeding.

4    But, I do find, nonetheless, that the decedents here constitute

5    victims under that provision.  A victim is simply person

6    against whom the offense is committed.  It does not mean that

7    the victim, him or herself, could not be participating in some

8    way or manner in the conduct that is ultimately leading to his

9    or her own death.

10        Here the relevant offense committed is the unlawful

11   distribution of drugs and the running of a criminal drug

12   enterprise, *inter alia*, and there is no factual doubt that

13   based on the evidence before the Court, the sale of the drugs

14   through Silk Road caused harm to the decedents.  Whether it was

15   a factor in causing their death, a contributing factor, or

16   somehow related to their deaths in close association is not a

17   decision that we have to make for today's purposes.

18        The Court's determination is supported by the

19   following:

20        The trial record of this matter established beyond

21   doubt that the types of drugs associated with the deaths of

22   each and every one of these individuals were in fact available

23   on Silk Road.  But, in addition to that, there is a direct tie

24   to Silk Road to each of the decedents and to the purchase of

25   the drugs in proximate -- very proximate relation to their

F5T5ulbS

1    death.

2           On May 18, 2015, the government provided the Court

3    with a DVD that contained extensive information associated with

4    the deaths of each of these six individuals.  That DVD is made

5    part of the record in this matter and is filed under seal.  If

6    an appeal is taken, counsel on the appeal may have access to

7    that DVD without further application to the court.

8           On that DVD are materials which specifically link each

9    decedent to the drug purchased by themselves or through another

10   who purchased the drugs from vendors through Silk Road.  The

11   drugs were used by the decedents immediately prior to their

12   deaths.

13          On April 29 and then again on May 26, the Court

14   received five victim impacts statements which contained

15   additional detail the Court does rely upon that for its

16   findings herein.

17          The Court received also the declaration of Dr. Mark

18   Taff dated May 26.  He is a forensic pathologist retained by

19   the defendant.

20          The defendant's basic argument is that it is not

21   appropriate to hold Ulbricht responsible for these deaths and

22   the defendant cites to the Burrage case, the Supreme Court case

23   from 2014.  But the case is entirely inapposite.  In that case

24   the Court was confronted with the question of whether a penalty

25   enhancement may be applied under a statute which was

F5T5ulbS

1   841(b)(1)(C) if a death can't have been shown to have been an

2   independently sufficient cause of death.  Then it may have been

3   insufficient to support a statutory penaltied enhancement.

4   There the drug had to have been the but-for cause of death.

5        The statutory scheme that was at issue was a statutory

6   scheme when "death results," and in that case if such a finding

7   had been made, then Burrage's –- the defendant's –- penalties

8   would have been increased thus the element had to be submitted

9   to the jury.  That wasn't new law, the *Alleyne* case and the

10  *Apprendi* case before that found something that was quite

11  similar.

12       But, here the deaths of the users set forth in the PSR

13  to which the victim impact statements relate are not the basis

14  for any kind of statutory penalty enhancement.  These are not

15  the crimes of conviction, this is related conduct which is

16  entirely appropriate for a sentencing Court to take into

17  consideration in a sentencing proceeding.

18       The government, in its submission of May 26, 2015,

19  lays out the fact which tie each of the decedents to Silk Road

20  and they do that in some detail.  And I will talk about the

21  decedents more in just a moment, but let me comment on

22  Dr. Taff, his examination relates to the manner of death for

23  what he uses, what he refers to as the six-stage death

24  investigation.  He finds in each instance information is

25  missing regarding at least one stage of the six-stage process.

F5T5ulbS

1          He states in some cases no autopsy was performed and

2     there was no cause of death that could be reliably  be

3     determined.

4          He also indicates that without certain pieces of

5     information, it is impossible for a medical examiner to render

6     certain types of opinions and he states that what are deemed

7     overdoses may be death by suicide or other causes.

8          He opines that he is unable to render opinions to a

9     reasonable degree of medical certainty as to the cause, manner

10    and time of death with each of the decedents except for

11    Alejandro.  As to him he agrees that NBOM was one of several

12    drugs which caused his death.  But, Dr. Taff is asking a

13    question which this Court does not need answered.  It is just

14    the wrong question.  The Court is not asking whether the but

15    for cause of death is drugs purchased on Silk Road.  It doesn't

16    have to be but-for.  The Court's question is whether there is a

17    connection between the purchase of drugs on Silk Road and death

18    and whether the drugs were ingested -- those drugs purchased on

19    Silk Road were ingested and whether the ingestion of those

20    drugs may be reasonably associated with those deaths.

21          The Court can make such findings by a preponderance of

22    the evidence and can make reasonable inferences based upon the

23    available circumstantial evidence and I make those reasonable

24    inferences based upon that circumstantial evidence now.  There

25    is strong and even more than sufficient circumstantial evidence

F5T5ulbS

1    to show the connection.  I am only going to go very briefly

2    through a few of these.  I want to just describe the connection

3    so it is clear on the record.

4            Jordan M., who was 27 years old, found dead of an

5    overdose.  There was an express mail package torn open in the

6    room where he was found, there was heroin and needles near him.

7    How is it tied to Silk Road?  His computer had two browser

8    windows open, one displayed Silk Road.  The decedent's private

9    message inbox showed messages with a vendor describing a

10   purchase, the package tracking and receipt.  The package

11   tracking on the Silk Road site corresponded with that on the

12   open window, the second open browser window on the U.S. Postal

13   Service site which corresponded with the number on the express

14   mail envelope found with the decedent at his death.

15           It appeared from a prior message dated August 24th

16   that this individual had ordered Valium and Xanax in the past

17   but he had not previously ordered heroin through Silk Road, and

18   he inquired about ordering it for the first time.

19           The Court finds by a preponderance of the evidence

20   that the death is properly associated with the receipt of

21   heroin from a vendor on Silk Road and purchased through Silk

22   Road.  The Court also finds by a preponderance of the evidence,

23   including the autopsy report and notwithstanding the contrary

24   statement by Dr. Taff, that he died of an overdose.

25           Would this individual have died at that time without

F5T5ulbS

 1   the drugs purchased through Silk Road?  It would be speculation

 2   to even suggest that he could have.  What we know is that he

 3   died in the manner that he did and that his death was connected

 4   to Silk Road.

 5          For Preston B., he was a 16-year-old boy who received

 6   a powerful synthetic drug called NBOM from a friend.  The

 7   friend made a statement in which he told the police, after the

 8   decedent's accident, he purchased it from Silk Road to share

 9   with his friends on prom night and that he had not purchased on

10   Silk Road before, that he had only ever used cannabis before.

11   The decedent is known to have ingested this drug and he had a

12   terrible reaction and jumped from a balcony of a hotel and he

13   subsequently, after being hospitalized, died.

14          The Court finds, by a preponderance of the evidence,

15   that Preston's death is properly associated with Silk Road and

16   that his death was related to a purchase of drugs from Silk

17   Road.  Would he have died on that evening if Silk Road had

18   never existed?  To suggest so is pure speculation.  We know

19   that he died after having ingested drugs available to him

20   through Silk Road.

21          In terms of Bryan B., he was found dead with heroin

22   next to him and a syringe.  Forensic analysis of his computer

23   revealed that he had run searches on his laptop for heroin in

24   Boston suggesting that he did not have a local source.  Other

25   searches indicated that he had found Silk Road, downloaded Tor,

F5T5ulbS

1    and obtained bitcoins.  Silk Road was marked as a favorite

2    website.  A PGP key for encrypting communications was

3    established by him on September 25th, 2013.  That very same day

4    he contacted a vendor and stated, "This will be my first

5    order."  He placed his order for heroin the next day.  He also

6    bought syringes.  The package arrived on October 1st and he was

7    last heard from on October 4th.  The package he received

8    contained enough for 5 to 10 doses.  The heroin and syringe

9    found next to his body closely resembled those that he ordered.

10          The Court finds, by a preponderance of evidence, that

11   Bryan B.'s death is properly associated with Silk Road.  It is

12   reasonable to infer that the heroin he consumed was related to

13   his death and that it is reasonable to assume and to infer from

14   the circumstantial evidence that he received that heroin from a

15   vendor on Silk Road.  Would he have died in the absence of that

16   heroin?  It would be pure speculation to think that.

17          Alejandro N. took NBOM from a friend who told law

18   enforcement that he obtained it from a dealer.  The dealer was

19   then arrested.  The dealer was interviewed.  The dealer stated

20   that he had received the drug from a vendor on Silk Road.  The

21   police were able to confirm that a vendor by the name given to

22   them by the dealer in fact sold NBOM on Silk Road.

23          The Court finds, by a preponderance of the evidence,

24   that Alejandro's death is properly associated with Silk Road.

25   Drugs sold by Silk Road vendors were a contributing factor, at

F5T5ulbS

1   least in his death, and even so agrees Dr. Taff.  Would the

2   dealer have obtained NBOM elsewhere in the absence of getting

3   it from Silk Road?  It would be pure speculation to think so.

4          Jacob L., a 22-year-old from Australia, was found

5   dead.  There were multiple drugs in his system.  He also had

6   pneumonia and the autopsy indicated that he may have been less

7   aware of the severity of his illness due to the presence of

8   drugs in his system.  The Silk Road server revealed that the

9   decedent had an account which had been used to place several

10  dozen orders for heroin, as well as for other drugs found in

11  his system at the time of his death, including meth and crack.

12         The Court finds, by a preponderance of the evidence,

13  that purchases from Silk Road are properly associated with the

14  death of Jacob L.

15         Attached to Exhibit 16 of the Lewis declaration are

16  pages from Jacob's Silk Road account.  There is a list of

17  favorite vendors.  The court performed searches on those

18  vendors and confirms that those Silk Road vendors sold a large

19  array of subject drugs.

20         There are additional objections in the PSR that

21  resolves those objections as to the inclusion of the

22  information relating to the overdose deaths:

23         Paragraph 94 says, discusses a calculation of the base

24  offense level.  We have dealt with that.

25         Paragraph 146 requests a correction that Mr. Ulbricht

F5T5ulbS

 1   has not owned a particular house for several years.  That

 2   correction is appropriate and will be made.

 3            Finally, the defense objects to the inclusion on page

 4   38 of the justification.  The Court does not adopt, at any time

 5   ever, the justification section of the PSR.  The Court only

 6   ever looks to the factual statements so the Court does not

 7   address the justification.  That is from probation itself and

 8   it stands separate and apart.

 9            Do counsel have any other arguments apart from those

10   which were raised in their papers which they would like to

11   raise at this time?

12            MR. TURNER:  No, your Honor.  Thank you.

13            MR. DRATEL:  Just obviously, your Honor, we object to

14   findings that the Court made.

15            THE COURT:  Understood, Mr. Dratel.

16            The Court then does adopt the factual findings set

17   forth in the PSR and the additional factual findings that the

18   Court has made.

19            We have been going for 55 minutes at this point.  We

20   are now at the portion of the proceeding where we are going to

21   hear from the family of two of the victims, I understand; from

22   the government; from Mr. Dratel; and from Mr. Ulbricht if he

23   would like to address the Court.  The question is whether or

24   not we need to take a break right now or whether or not we

25   should just go ahead and continue.  I would note if we take a

F5T5ulbS

1    break, anybody who leaves the room has to come back through the

2    additional security that is outside the courtroom at this time.

3              MR. TURNER:  The government is fine proceeding, your

4    Honor.

5              MR. DRATEL:  We are okay proceeding, your Honor.

6              THE COURT:  All right.  So, those individuals who are

7    in the audience, if somebody happens to need a short break you

8    will have to go out.  You are welcome to go out and come in,

9    you are welcome to go through security but don't hesitate to do

10   so, if you need.

11             So, I understand that we have the parents of two of

12   the victims here in court today, Mr. Turner?

13             MR. TURNER:  That's correct, your Honor.  The father

14   of the individual referred to in the government's submission as

15   Bryan B. and the mother of Preston B.

16             THE COURT:  So, would the father please, of Bryan B.,

17   please approach, sir?

18             RICHARD:  Good afternoon, your Honor.  Can you hear me

19   okay?

20             THE COURT:  I can, sir.  Thank you.

21             RICHARD:  My name is Richard and I am the father of

22   Bryan whose death was referred to in the government's

23   sentencing document.  I greatly appreciate the opportunity that

24   you are giving me to speak on behalf of my son.

25             I have already written a letter to you to describe

F5T5ulbS

1    Bryan and how he died from an overdose of heroin supplied by

2    Ross Ulbricht's Silk Road.  If I may, your Honor, I would like

3    to present you with some pictures of Bryan that I think will

4    help illustrate some of the things I said in my letter to you

5    as well as another important point that I want to make today.

6          May I?

7          THE COURT:  Yes, sir.  Thank you.

8          Do you have an extra copy for counsel, by any chance?

9          RICHARD:  I do.

10          THE COURT:  Thank you.

11          RICHARD:  It has been nearly 20 months since I buried

12   my son.  As I wrote to you in my letter, I could not have been

13   more shocked when I received the phone call on the morning of

14   October the 7th, 2013, to tell me that my son was dead.  As far

15   as I knew and as far as anyone who was close to him knew, Bryan

16   did not do drugs.

17          Bryan and I were very close; we talked, e-mailed or

18   texted nearly every day.  In fact, several days before he died

19   I received an e-mail from Bryan that said, among other things,

20   how much he had grown to dislike marijuana, mainly because of

21   the effect that he saw in a number of his friends he said, and

22   I quote, "The older I get, the more pothead friends I see

23   becoming deadbeats."

24          As I wrote to you, I spent the next several months

25   after Bryan's death trying to understand what happened.

Ultimately, I discovered Bryan had very likely tried heroin during his senior year in college, realized what a mistake he had made and spent parts of the next three years successfully fighting off cravings to do it again.  He hid this from nearly everyone.

My letter described Bryan as a great-looking, athletic and intelligent young man.  He was careful about his health and what he ate.  He often rose at 5 a.m. in the morning to work out in the gym before he went to work.  He shopped for organic food and sometimes asked my wife for healthy recipes that he could cook.  While Bryan was certainly impulsive, he was planning for a long life ahead.  He lectured his friends to make the maximum contribution to their retirement plans, just like he did.

The pictures I have given you illustrate the point I made in my letter:  He was the last person anyone would have imagined to die from a drug overdose.  Two of those photos were taken during the time of my daughter's wedding in early July, a little less than three months before he died; one was from a ski trip in early 2013; and two were from a family bike trip in the summer of 2012.  But I want to draw your attention to one particular picture and that is the one I have indicated with an asterisk.  It is a picture of Bryan with his arms around my wife's niece and her boyfriend.  In particular, I want to point your attention to the marks on Bryan's left forearm.  They're a

1    little hard to see.  There is a series of well-delineated cuts

2    that I didn't notice until he had moved to Boston in late July.

3    Can you see them?

4              THE COURT:  Yes.

5              RICHARD:  He never gave me a good explanation of how

6    those marks got there no matter how many times I asked him.

7    However, after his death, one of his close friends shared with

8    me what he had told her a few months before he died.  He put

9    them there, he said, as a reminder to not do drugs.  We now

10   know that he had this struggle and it breaks all of our hearts

11   to know that he was struggling and he asked no one for help

12   because he wanted no one to know.  He was managing to fight

13   these urges until he discovered Ross Ulbricht's Silk Road.  The

14   lure of Silk Road's convenience, the anonymity, the use of an

15   untraceable payment system, the low risk of detection by law

16   enforcement or parents or family or friends, it all overpowered

17   Bryan.

18             As I indicated in my letter, the forensic analysis of

19   his computers and phone show us exactly what happened.  He

20   discovered Silk Road while doing an Internet search.  He

21   downloaded the Tor browser.  He transferred money from his bank

22   account to a bitcoin account.  He set up several new e-mail

23   accounts, as per Silk Road's instructions.  And then, he

24   ordered heroin.

25             They arrived by the U.S. mail.  He died from an

F5T5ulbS

overdose a few days later.  The U.S. mail packaging from the
Silk Road dealer was a few feet away from his body when he was
found.  The toxicology study discovered only one illegal drug
in his body:  Heroin.

When I spoke to the pathologist she wanted me to know
that Bryan was in exceptional health before he died of an
overdose.

Since Ross Ulbricht's arrest, my family and I have
endured the persistent drumbeat of his supporters who proclaim
Mr. Ulbricht a hero and persistently portray his crimes as
victimless.

To add insult to injury, Mr. Ulbricht's defense now
touts Silk Road's remarkable harm-reduction with the absurd
argument that the website that sold more drugs to more people
than any drug dealer ever before was performing a great service
to society.

Early in the trial the prosecution revealed that Silk
Road generated $200 million in revenue in its existence.  With
drugs like heroin selling for relatively low prices, Bryan's
Silk Road purchase was less than $200.  I found it.  Just
imagine how many individual drug transactions it would have
taken to get to $200 million in sales.  And, keep in mind that
Ross Ulbricht collected a commission on every sale.

Where, exactly, is the harm reduction in that volume
of drug sales?

F5T5ulbS

1          By removing all the hurdles to get dangerous drugs

2     Silk Road expanded the market.  Professionals, like my son,

3     were not going to take the risk of buying drugs from a dealer

4     on the street with all the inherent dangers that came with it.

5     I strongly believe that my son would be here today if Ross

6     Ulbricht had never created Silk Road.

7          But, sadly, when their harm reduction argument wasn't

8     enough, Ross Ulbricht's defense team took things to an even

9     lower level:  They blamed the victims.  I can't speak for the

10    other victims of Silk Road but I can speak for my son and I can

11    point out the statements made by Ross Ulbricht's lawyers about

12    my son's death and the recent court filings that are blatantly

13    false.  They claim that Bryan was 20 years old.  He had turned

14    25 a week before his death.  They claim that the source of the

15    heroin was "unknown" when there was a mountain of evidence to

16    show that it came from Silk Road.  And, worst of all, they

17    quoted a Boston police report saying that, "the victim was

18    known to the Commonwealth," and speculated that Bryan had a

19    prior drug-related arrest.

20         Bryan moved to Boston in late July that year.  He

21    lived there slightly over two months before he died.  The only

22    reason he was, quote unquote, known to the Commonwealth, was

23    because he was found dead in his apartment from an overdose of

24    heroin that was supplied by Ross Ulbricht's Silk Road.  He had

25    never been arrested for anything in his life and I deeply

F5T5ulbS

1  resent the sinister innuendo that he was a chronic drug abuser

2  who had been in trouble with law enforcement before.

3        Your Honor, I know that punishing Ross Ulbricht is not

4  going to bring my son back.  The past 20 months have been more

5  painful to my family and me than anything I can ever describe.

6  I lost my only son.  My daughter lost her only sibling.  We

7  have lost someone who we treasured and deeply loved.  Bryan

8  never saw his 26th birthday.  He never met my daughter's first

9  child.  He won't be there for any more family holidays, ski

10  trips, or bike trips.  We won't be going to Bryan's wedding.

11  We won't be caring for his children.  And, I will never see my

12  son in the role of a father.  We no longer get his funny texts

13  and e-mails and no longer hear his contagious laugh.

14        We know that sending Ross Ulbricht to jail won't fix

15  any of those things but in this country we build prisons for

16  two primary reasons:  To punish those who commit crimes, but

17  also to protect society from dangerous criminals whose behavior

18  is a threat to others.

19        Through Silk Road, Ross Ulbricht had one clear aim:

20  To enrich himself by taking a commission on every drug

21  transaction.  He did not consider the fallout on society from

22  the expansion of the market for dangerous drugs.  He did not

23  consider people like my son who were so vulnerable to Silk

24  Road's deadly combination of convenience and anonymity, and he

25  did not concern himself with the simple fact these drugs are

F5T5ulbS

1    illegal for a reason.  They offer no medicinal value and

2    they're all highly addictive.  Once hooked, the addict loses

3    the ability to choose.  All Russ Ulbricht cared about was his

4    growing pile of bitcoins.

5          This is the behavior of a sociopath and this is

6    exactly the kind of person society needs protection from.  Your

7    Honor, Ross Ulbricht deserves the most severe sentence the law

8    will allow.

9          Thank you for allowing me to speak in your courtroom.

10          THE COURT:  Thank you for speaking, sir.

11          We now have the mother of Preston B.

12          VICKY:  Your Honor, my name is Vicky and I'm here

13    today not only for myself but for my son Preston —— my late son

14    Preston, and family and friends.

15          I have got some photos here that I would like to give

16    to you and I would like to read you my impact statement.

17          THE COURT:  Yes.

18          VICKY:  Your Honor, Friday the 15th of February, 2013,

19    was my son Preston's school ball or what you would call

20    something different.  I assisted him getting ready that day and

21    he looked so handsome.  I enjoyed the company of many parents

22    at the before gathering.  I was about to leave when I asked him

23    for a photo.  Preston said:  Thanks mum for your help.  I love

24    you.  And he placed a kiss on the side of my cheek.  His last

25    words to me and this was the photo of my last kiss from my son.

F5T5ulbS

1          The next day was Saturday the 16th of February, 2013.

2     This would be one of the worst days of my life.

3          I received a phone call around 9:45 p.m. from my

4     ex-husband Rod and daughter Aimee informing me that Preston had

5     been in a bad accident and was being taken to St. Charles

6     Gairdner Hospital.  At the hospital we were ushered into a

7     private room where a doctor and a social worker were there to

8     talk to us about Preston's condition.  They prepared us on the

9     extent of his injuries and what was likely to happen.  Preston

10    had suffered severe head injuries and they would have to

11    operate immediately to reduce the swelling on his brain.  I

12    asked if I could see him before they prepared him for surgery.

13    When I entered the emergency room, I noticed there was a lot of

14    blood coming out from his right ear.  There was staff

15    surrounding Preston with all types of apparatus to keep him

16    breathing while continuing to monitor his observations.

17         Preston laid lifeless on the trolley.  Due to the

18    swelling to the brain they wanted to operate to remove part of

19    his skull.  I returned to the emergency room with my daughter

20    Aimee who said:  Hang in there, Preston.  And I said:  I love

21    you, son.  Hang in there.  Everything will be okay.  They're

22    going to look after you.

23         We went back to the family room and waited.  It seemed

24    like a long time.  During that wait the doctors came in and

25    told us that Preston lost all dilation to his pupils.  They

F5T5ulbS

1    were not going to go ahead with the surgery as it was going to

2    be too dangerous.  They were going to administer a medication

3    instead.

4           Shortly after the Doctor left the social worker came

5    in and she said:  Sorry you've lost Preston.  And we were in

6    shock because we had not been told this by the doctor at that

7    stage.  From the emergency room he was transferred to the

8    intensive care unit.  There were multiple meetings with

9    specialists and organ donation coordinators in the event that

10   Preston was to lose his life.

11          I left the room and collapsed in total shock curling

12   up on a ball on the floor crying in disbelief at what was

13   happening.  The night before was only his school ball.

14          On Saturday night family were coming in and they knew

15   the outcome wasn't going to be good, that Preston may not

16   survive.  On the Saturday afternoon we understood from some of

17   Preston's friends that what had happened to him was somehow

18   connected to drugs.

19          While Preston was at his after-party, a friend handed

20   him a tablet, a synthetic, and was told by his friend who

21   purchased it online from Silk Road that the drug was only to

22   make you stay awake and make you feel happy.

23          I was surprised to learn later that if you bought 10

24   for $20 you could get one free to liven the pot; delivered

25   after three days directly to your door, no proof of age was

F5T5ulbS

1    required and it was delivered by international couriers.  I

2    believe this is something he would not have gone to the streets

3    to find.  He was not a drug addict.  Silk Road made it easily

4    accessible to anyone, children included.

5            From what I am told after taking the drug Preston

6    became extremely aggressive and he was talking in what his best

7    friend explains as another language.  He couldn't understand

8    him.  He became resilient and abusive towards his friend of

9    whom he had known since kindergarten.  His friend could not

10   control him or get him to go down the stairs of the resort

11   where he had been visiting friends.  Preston was afraid of

12   something and kept saying no, no.  He didn't want to go down

13   the stairs.  So, his friend went to get his other mates to help

14   him.  That's when Preston jumped from the second story of the

15   hotel.

16           On the Sunday morning about 200 people came to the

17   hospital.  They were all lined up waiting to see him.  It was

18   quite extraordinary that they allowed all of his friends to

19   visit given that it is an emergency -- 200 people.

20           I took the first group into the ICU unit to say their

21   final good-bye.  We were extremely grateful to all the ICU for

22   allowing this to happen.  When I took them in I said this is

23   what drugs will do to you.  If you take drugs, this is going to

24   happen.  And the nursing staff advised me that I had better

25   tone it down for the next group of people.  That's not what I

felt.  I felt angry that he had taken this synthetic drug.  I
just held on to hope that some miracle may happen and that my
little boy was going to be okay.

        Seeing all of his friends coming in, most of them were
crying.  It was so hard.  Sunday was very busy chauffeuring all
of his friends and family to see Preston.  We realized that day
just how much Preston was loved by many friends.  He was an
extrovert with a genuine heart.  Once he told me, Mum, I don't
know anyone that I don't like and who doesn't like me.  At that
time I took it as him just being a bit of a show off but he was
telling the truth.

        He gave people guidance and wasn't judgmental.
Preston was wise beyond his years which I had relayed to me on
numerous occasions from many of his friends, parents and
friends.

        Monday, the 18th of February, 2013, would be the worst
day of my life.  Preston had an MRI.  Not long after the
doctors came in, they sat down in the interview room and told
us that he had died from a catastrophic brain injury.  There
was no blood flowing through his brain.  I asked, How do we
know when to turn off life support?  What length of time do we
wait because maybe a miracle may happen and he would come
around.  The Doctors showed us an x-ray of a healthy skull and
then the x-ray of Preston's skull.  We could see quite clearly
that there was no blood flow to his brain.  He was pronounced

F5T5ulbS

1    dead.

2              From then we had organ donor coordinators to come in

3    to meet with us.  We all agreed that organ donation would be

4    what Preston would have wanted given his caring nature.  It

5    seemed as if we were making a shopping list of organs to

6    donate.  We were spending as much time as possible with Preston

7    just holding his hand and talking with him.  I even gave him a

8    sponge bath given that soon we would have to be saying our last

9    goodbye.

10             Wednesday was the day that was scheduled for his

11   operation.  The three of us, my ex-husband Rodney, my daughter

12   Aimee and I, walked down to the theater to say goodbye to

13   Preston.  We watched as the theater doors closed and at that

14   moment that was the last time I saw my son.  His organ

15   donations did save many lives.

16             We then made funeral arrangements.  Preston was quite

17   lucky.  He had two memorial services; one was held at his high

18   school, and one for family and friends.

19             Preston was very popular and a well-known young

20   teenager.  We were getting constant phone calls from reporters.

21   He was always involved in many sporting activities, football,

22   and baseball to name a few.  We lived in the same area for many

23   years.  He was house captain many times, perfect, and received

24   citizenship awards.

25             Preston had many friends during his short life.  His

passing has affected a lot of people.  A yearly football match
is played in his honor against two teams which he has played
for, for remembering the outstanding citizen that he was and to
promote the effects of drugs.

I think I was numb for the first 12 months after
Preston's death.  It was the hardest year, 2014.  The numbers
had worn off.  I was crying all the time.  When things got
harder, I truly pushed people away.  These feelings can be
overwhelming, especially on anniversaries.

I am very concerned about my daughter Aimee's well
being and how she spends most of her time in the bedroom.  And
she and Preston had a very good relationship.  She was his
nurturing big sister and Preston was her protector.  They
hardly ever fought.

Often I would look at old messages from Preston on my
phone.  Generally, I tried to keep busy and not overthink about
what happened and life without him.  We keep Preston's ashes at
home.  Sometimes I just hold them and get a blanket, his
blanket, and try to get close to him and other times I get
really mad.  Why did it happen?  Why did Preston do it?  He had
so much to live for.  One stupid synthetic tablet cost him his
life.  I mean, who knows who manufacturers these drugs and
where they are manufactured.  Continually they're tweaking the
ingredients to avoid detection.  I believe if he had never
taken this synthetic drug he would still be with us today.

F5T5ulbS

1          I know that all our children have done stupid things

2     or made bad choices.  I don't deny or condone what Preston did

3     by taking the drug.  Some are lucky, some are not,

4     unfortunately.  Preston's consequences were death and I know

5     now I would wait until the afterlife to see him again.

6          Thank you.

7          THE COURT:  Thank you.

8          The Court will now proceed in the following manner

9     which is I will ask the government to speak first, Mr. Dratel

10    and then Mr. Ulbricht if he would like to address the Court

11    before sentence is imposed.

12         Mr. Turner.

13         MR. TURNER:  At the podium, your Honor?

14         THE COURT:  Yes.  Thank you.

15         MR. TURNER:  So, as your Honor just heard from two

16    victims of the defendant's crime from opposite sides of the

17    world -- one from Boston, Massachusetts and the other from

18    Perth, Australia -- both lost loved ones due to drugs from the

19    same place:  Silk Road.  I think their presence here today

20    underscores the global reach of the defendant's drug

21    trafficking enterprise.  It is no exaggeration to say that what

22    he did allowed anyone anywhere in the world to obtain any drug

23    they wanted as long as they had a computer and shipping

24    address.  The site radically lowered the barriers to selling

25    and buying drugs.  It was designed to do that and it did do

F5T5ulbS

1   that and these are some of the resulting consequences.  This

2   was not a victimless crime.

3          Even the defendant now, in his letter to the Court,

4   acknowledges that Silk Road became, as he puts it, "a

5   convenient way for people to satisfy their drug addictions."

6   But what is disingenuous about that statement, your Honor, is

7   the claim that he also makes in the letter that he never

8   anticipated this happening.  That drugs were safe is naive and

9   impulsive.  He said he started the site for idealistic motives

10  but since learned that "taking immediate actions on one's

11  beliefs without taking the necessary time to really think them

12  through, can have disastrous consequences."  This is another

13  variation of the revisionist history that the defense tried to

14  peddle at trial; that the defendant started Silk Road but he is

15  not responsible for what it grew into.  And that is

16  preposterous.

17         This was not some rash decision by a young kid who

18  didn't know any better.  The defendant was not a kid when he

19  started Silk Road, he was a grown man with plenty of

20  intelligence and education and he knew exactly what he was

21  doing.  He studied the idea of Silk Road for months, planned it

22  for months.  He ran it for nearly three years.  He supervised

23  every aspect of its operation.  He knew it through and through

24  and he understood perfectly well what was sold on it.  He was

25  the one who decided what could be sold.  And as for drugs, his

1      policy was very clear:  Anything goes.

2              He knew that the drugs he was selling included highly

3      hazardous substances, highly addictive substances.  This is not

4      some sudden realization he has had in prison.  There is no

5      mystery here.  We are 50,000 heroin sales on the site, 80,000

6      cocaine sales, 30,000-plus methamphetamine sales.  There is no

7      sudden realization now that he may have been fueling drug

8      addictions.

9              At any point the defendant could have shut this site

10     down.  At any point he could have walked away.  And we heard

11     Richard Bates testify at trial that he in fact tried to get

12     defendant to walk away, tried to find something to do that was

13     legal.  But he never walked away, he was committed to it

14     through and through.  This was a purposeful, deliberate crime

15     with full awareness of what he was doing.  He did not do it

16     simply for idealistic motives.  He did it, in significant part,

17     to make large amounts of money.

18             If you wanted to sell on Silk Road you had to pay him

19     a cut.  That was the rule.  That was a rule that he was quite

20     emphatic about, that he and his support staff constantly

21     labored to enforce.  And the only purpose of that rule was so

22     that he could reap huge profits from his illegal enterprise.

23     Which he did.  He fantasized about often becoming a billionaire

24     all from drug money.  This was not some disinterested

25     do-gooder.

F5T5ulbS

1        Obviously, there are also the murders for hire.  On

2    multiple occasions this defendant tried to have people killed

3    in order to protect his enterprise spending well over half a

4    million dollars on those attempts.

5        So, this is no idealistic naive who doesn't understand

6    the criminality of what he was doing, this is someone who was

7    emulating a traditional drug kingpin because he understood that

8    he was essentially in the same business.

9        Now, in addition to money and power did the defendant

10   have other motivations?  Without doubt.  He was motivated, in

11   part, by a political agenda but that is no excuse for what he

12   did.  If he wanted to pursue a political agenda he could have

13   done so through the political process.  He was not entitled to

14   legislate his own policies on the Internet whether it was drugs

15   or fake I.D.s or computer hacking or guns or child pornography.

16   You don't get to say that I think these things should be sold

17   without restriction and therefore I am going to do it, whatever

18   the law says.  You can't do it on the street, you can't do it

19   in cyberspace.  The Internet is not a license to flaunt the

20   law.

21       Your Honor, in summary, the defendant is guilty of a

22   very serious crime.  He leveraged the Internet to partner with

23   thousands of drug dealers around the world.  He distributed

24   massive quantities of drugs in total.  He amassed millions of

25   dollars in profits.  He lowered the barriers to drug use.  He

F5T5ulbS

1    made it easy for anyone, anywhere, to obtain the drugs they

2    wanted.  Serious harm resulted as illustrated by the deaths

3    highlighted in the PSR.  He knew exactly what he was doing the

4    whole time and for all of these reasons, as we have stated in

5    our letter, we request a lengthy prison sentence substantially

6    above the mandatory minimum.

7         Thank you.

8         THE COURT:  Thank you, Mr. Turner.

9         Mr. Dratel?

10        MR. DRATEL:  Thank you, your Honor.

11             The standard for sentencing -- for a reasonable

12   sentence is sufficient but not greater than necessary to

13   achieve the purposes of sentencing and we have submitted enough

14   paper that I am not going to repeat what is in there but just

15   cover a couple of principles that we talked about in our papers

16   that I think are important and that is the guiding principle,

17   sufficient but not greater than necessary to achieve the

18   purposes of sentencing.

19             In that context you are sentencing a person, a young

20   man who, like all of us, is not as good as his best conduct and

21   is not as bad as his worst conduct.  It is the totality of the

22   person that the Court has to sentence.  And I think to a

23   certain extent the Court, part of the sentencing mandate is

24   about projecting into the future.  The future is what is the

25   defendant going to be like and what is the world going to be

F5T5ulbS

1    like.

2              The situation we have here is a 20-year mandatory

3    minimum sentence so I will start with that in the sense that I

4    think that in 20 years if he is released no one will say that

5    was too short.  But, I think when we start to get beyond that

6    and into the higher reaches that within a short period of time;

7    five, 10 years, because of the defendant, because of the world,

8    because it will be removed from the emotional aspect of today's

9    proceeding, that it will be clear to a majority -- overwhelming

10   majority, it is too long to achieve the purposes of sentencing.

11             What does a longer sentence achieve?  In the context

12   of the purposes of sentencing I suggest it does not achieve

13   anything.  I think that the Court, based on the letters that

14   the Court has received including Mr. Ulbricht's letter, I think

15   that the concept of specific deterrence is really not an issue

16   here when you talked about the length of the sentence even

17   under the mandatory minimum term.

18             I am not even sure the government is making that

19   argument in that regard.

20             I know the Court has already decided on the issue of

21   the consideration of some of these other aspects of the

22   government's presentation but I think it is important that

23   minimizing, not diminishing the nature of the personal

24   tragedies involved, the trauma, the pain.  That is all genuine

25   and legitimate but we have to step back and look at the

F5T5ulbS

1    perspective of what the role is today in sentencing.

2              I think intent and impact are important in the context

3    of what the emotional content has brought to this and not even

4    the government can suggest that this was an intended result,

5    but the impact and intent are no different than every drug case

6    that involves an organized sale of drugs or even the

7    disorganized sale of drugs.

8              You talk about volume.  The government talks about

9    50,000 heroin sales, that's about 73 a day over two years to

10   Silk Road.  A small organization with two corner spots in this

11   city does that in an hour.  Cocaine?  80,000.  They do that,

12   when you break that down, they do that in an hour.

13             These stories are real but they are present in every

14   case.  No one is saying this is a victimless crime.  That is a

15   red herring.  But, I will say it is not in every case, the

16   countervailing factors that we have set forth.  And this is not

17   us, this is not coming from the defense, these are independent,

18   objective professional researchers who studied this site.  They

19   didn't study it for sentencing, they studied it before.  They

20   weren't commissioned by us, they did this on their own as part

21   of their own professional obligation to tell the truth about

22   what is going on with these situations, to be realists.  And

23   this is a difference from the average, ordinary drug operation

24   but the other part is no different yet the government would

25   want the Court to enhance the sentence based on what is present

F5T5ulbS

1    in every case that is not part of the enhancement and that is

2    disparity from every other drug case.

3          Another part of disparity is this concept of the

4    general deterrence, and in addition to the fact that there is

5    no science or math or any other objective measurement that

6    sustains the concept of general deterrence, also as a question

7    of justice is, Is it disparate?  How is it measured?  How is it

8    applied in a courtroom in this court house?

9          On Tuesday, someone who worked for Silk Road for

10   nearly a year, through its most profitable, highest volume

11   period during the period when five of these deaths occurred,

12   the government never sought an enhancement, he walked out of

13   the courtroom, essentially.  He got time-served; 14 months,

14   essentially.

15         So, what is the message there versus the message here?

16   There is no message, it is a sentence of a human being.  It is

17   the same foreseeability for Mr. Nash.  It is the same

18   foreseeability for anybody involved in any drug operation yet

19   it does not result in the kinds of sentences that are

20   contemplated here by the government.

21         In the concept of general deterrence if you are

22   looking at the difference between a 20-year sentence and a

23   greater sentence, I suggest that even reduces it even further.

24   I don't know how you can get further than zero but it reduces

25   it even further because what you are talking about is the

F5T5ulbS

1    margins that someone is going to say, well, I won't do it -- I

2    will do it if it is 20 years in jail but I won't do it if it is

3    25.  That's not generally deterrent.  Even beyond the ordinary

4    scholarship on general deterrence that just even reduces it

5    even further.  That is more disparity.

6         We have talked about the -- we have submitted the

7    figures on sentences in this district -- nationwide, and in

8    this district and that is another disparity to be avoided in

9    this case.  Even people who commit intentional murder have, the

10   average is about 270 months.  That's for intentional murder.

11   You need to keep that in mind when talking about disparity and

12   sentencing the person matching the offender, the circumstances,

13   and the offense.  And I submit there is no justice in saddling

14   Mr. Ulbricht with all of that, with all of the general

15   deterrence, with all of the victim impact that occurs in every

16   case that no one else gets as part of their sentence that he

17   bears the burden of all of that.

18        I think, ultimately, we submitted 100 letters to Court

19   on his behalf.  The number is not important, the quality is.

20   These are letters with detail, with specifics, people who

21   really know this defendant, who know Mr. Ulbricht, have known

22   him for a long time with a lot of different connotations.  And

23   I said it in the papers, that is true.  You can't reconcile

24   some of this.  We acknowledge that.  But that goes towards what

25   the purpose of sentencing is and how to achieve it with a

F5T5ulbS

1     reasonable, rational, appropriate sentence for Mr. Ulbricht.

2           I think those letters and I think all of the

3     information that the Court has including his own letter

4     demonstrate what Mr. Ulbricht is capable of in the future, that

5     the solution for pain is not more pain.  The solution for

6     suffering is not more suffering.  It is what is sufficient but

7     not greater than necessary to achieve the purposes of

8     sentencing.

9           So, I submit that down the road, even at 20 years,

10    that would be sufficient but not greater than necessary.  No

11    one is going to look back and say that is too short.  This is a

12    complex situation with a defendant who has a lot to offer in a

13    positive way, already has in his life to others in many ways,

14    and obviously this case represents a departure from that.  The

15    question is are you going to shut it off completely?  Shut it

16    off for how long?  Or are we going to have an opportunity for

17    positive outcome somewhere down the road for this case because

18    we can't correct the other parts now.  That's beyond our power.

19          Thank you, your Honor.

20          THE COURT:  Thank you, Mr. Dratel.

21          Mr. Ulbricht, would you like to address the Court

22    before sentence is imposed?

23          THE DEFENDANT:  Yes.  Thank you.

24          Before you sentence me, your Honor, I want to tell you

25    about myself from my perspective.  I recognize that it is hard

F5T5ulbS

1    to be objective when looking at one's self, but I do have a

2    unique point of view because only I know my thoughts and my

3    feelings and my motivations.  And one thing I want you to know

4    is that I have changed.  I'm not the man that I was when I

5    created Silk Road.  I'm not the man I was when I was arrested.

6    I'm a little bit wiser and a little bit more mature and much

7    more humble.

8         I have spent 20 months in prison.  For six weeks I was

9    in solitary confinement and, you know, there is very few

10   distractions in prison and I have spent a lot of time just

11   being with myself and grappling with the possibility that I

12   will never be free again and trying to come to grips with just

13   how I wound up in this situation, in this position, asking

14   myself where did I go wrong at various points along the way and

15   what should I have done differently.  I wish I could go back

16   and convince myself to take a different path but I can't do

17   that.  And I can learn from my past.

18        The testimony of these parents was incredibly moving.

19   I never wanted that to happen.  I've essentially ruined my life

20   and broken the hearts of every member of my family and my

21   closest friends.  I would never risk causing that kind of

22   heartache and loss ever again.  If given another chance, I

23   would never break the law again.

24        One of the things I have realized about the law is

25   that the laws of nature are much like the laws of man.  Gravity

F5T5ulbS

doesn't care if you agree with it -- if you jump off a cliff
you are still going to get hurt.  And even though I didn't
agree with the law, I still have been convicted of a crime and
must be punished.  I understand that now and I respect the law
and the authority now.

         I also want to talk to you a little bit about my
character and my motivations.  Since coming into the public eye
a lot of people have tried to characterize me and guess at what
my motivations were for creating Silk Road.  As Mr. Turner
said, he believes it was for greed and vanity.  I want you to
know that that is not true.  I am just not a very greedy or
vain person by nature.  I wasn't raised that way.  I was taught
to share my blessings, to live, like, a humble, modest
lifestyle.  I am not into status symbols or luxury, but more
than that, I remember clearly why I created the Silk Road.  I
had a desire to -- I wanted to empower people to be able to
make choices in their lives for themselves and to have privacy
and anonymity.  I am not saying that because I want to justify
anything that has happened because it doesn't.  I just want to
try to set the record straight because from my point of view I
am not a self-centered sociopathic person that was trying to
express some, like, inner badness.  I just made some very
serious mistakes.

         Lastly, I would like to share with you what a second
chance would mean for me personally.  I do love freedom.  It's

 1   been devastating to lose it.  If I had one more chance before I

 2   pass on there are just little things, little joys that -- like

 3   throwing a Frisbee to a dog in a park, you know?  Or

 4   Thanksgiving dinner with my family.  That would mean a lot to

 5   me.  More than that, just being in the lives of my family

 6   members and friends again.  Decades from now many of them will

 7   still be alive and if I take care of myself and stay strong and

 8   sharp, if I do get out eventually I could possibly be a benefit

 9   to their lives and not a burden on them.  If there are any

10   children in my family at that time, nieces, nephews, what have

11   you, I could try to share the wisdom that I have gained with

12   them and try to help them out and not make the same mistakes

13   that I have.  And, I also want you to know that it is just in

14   me to want to have a positive impact on our broader community

15   and my attempt at that with Silk Road ended in ruin, but if I

16   ever get the chance again I will be incredibly cautious and I

17   will make sure that anything I do, large or small, will only

18   have positive effects on those around me and will absolutely be

19   within the confines of the law.

20           I am so sorry to the families of the deceased.

21           Your Honor, I don't envy your position, it can't be

22   easy, but I want you to know that I am here and paying

23   attention and I am ready for whatever sentence you think is

24   wise.

25           THE COURT:  Thank you, Mr. Ulbricht.

F5T5ulbS

1          What I would like to do is to take a break and to come

2     back in 10 to 15 minutes.  I say that because while I don't

3     think I will need a break for 10 to 15 minutes, anybody who

4     leaves is going to have to come back in through security.  So,

5     just be aware that you will have to go through again.  So, I

6     want to give people time to get back in and get seated again.

7          I do think it is appropriate at this point to take a

8     break, so let's take a break for those few minutes.

9          Thank you.

10          (Recess)

11          THE COURT:  In our system of law one Judge is tasked

12     with the very difficult and very serious responsibility of

13     passing judgment on another human being and it is a task which,

14     in my life, there is no more serious task.  It is one I have

15     taken very, very seriously.  I have spent well over 100 hours

16     on this sentence contemplating it, walking and being silent and

17     thinking about it, and running over and over and over it in my

18     mind from every angle I could think of.

19          I have tried very hard to come up with what is a just

20     sentence and in doing that I have tried to come up with what

21     does that even mean.  And I have thought a lot about that.

22     What is justice?  What is justice here?  What does it mean

23     here?  What does it mean here for you, Mr. Ulbricht, for this

24     defendant here now in our society at this time in this context

25     in which we find ourselves.

F5T5ulbS

1          I want to tell you how I arrive at my sentencing

2     decision but that will sound like some of the procedures, but I

3     want you to know the biggest part of the sentencing is just

4     thinking about each and every fact and consideration and

5     provision of law that I am required to look at again and again

6     and again from every possible angle.

7          Now, you have heard us talk about the guidelines.  We

8     have to talk about the guidelines.  We are required to come up

9     with what the appropriate offense level calculation is.  We are

10    told that it is the first thing that we have to do and we have

11    to consider them.  We have to consult them and I have done so.

12    But the guidelines, as your lawyer has said, which here are

13    life for you, the guidelines are not presumed reasonable.  The

14    Court has to step back from what is otherwise a book of numbers

15    and look at the facts and the circumstances that are before it,

16    the human side of what is going on before the Court at that

17    time.  The Court does that guided by the factors under the

18    statute, the federal statute that we call 3553(a) which is

19    where you find it in a book back when people actually looked in

20    a book, otherwise you enter it as a search time term and find

21    it online.  3553(a) requires that the Court look at certain

22    things.  It requires that the Court look at the nature and

23    circumstances of the offense.  I have to.  It requires that I

24    look at the history and characteristics of the defendant; the

25    good and the bad, and to look hard and to make judgments that I

F5T5ulbS

1   can't possibly know if they're entirely right.  They're my best

2   judgment with everything that I have applied to it.  I can't

3   know you like you know you.  I can't know you like your parents

4   know you.  I can't know you like the people who gave birth to

5   you know you.  But I have to try very hard to make a judgment

6   and I have to look at what I know about what you did that was

7   bad.  And I have to, in all of this, ask for myself what is a

8   sentence that reflects the seriousness of the offense.

9           Now, the seriousness of the offense occurs in the

10   context of our society.  It is not a seriousness of an offense

11   devoid of social context, it is what did you do here in our

12   community and I have to ask what is just punishment, as I said,

13   for that offense.  What kind of punishment provides -- and I

14   have to look at it, the statute requires me to look at the

15   question of personal deterrence, general deterrence.  These are

16   not things I can ignore.  I have to ask whether there is any

17   educational, medical, vocational or correctional treatment that

18   suggests a particular sentence.

19           So, I have analyzed each and every one of these

20   factors here and I have analyzed them from every angle I can

21   possibly think of for you and it has been very, very difficult.

22           What sentence serves the ends of justice?  I start

23   with the nature and circumstances of the crime and we have

24   talked about some of it already.  The nature and circumstances

25   of the crime can be summed up as a planned, comprehensive, and

F5T5ulbS

deliberate scheme to do that which was unlawful and something
which posed serious danger to public health and to our
communities.

I, and you all know, that Silk Road was a worldwide
criminal drug enterprise with a massive geographic scope.  And,
Mr. Ulbricht, you don't fit the typical criminal profile.  And,
you know, it is not television or the movies here, right?
Where criminals look a little shady, their eyes are a little
shifty, they wear outfits that make them look like, you know,
criminals.  You are educated.  You have got two degrees; you
have a physics degree, you have a masters degree in applied
materials.  You have an in tact family.  You have 98 people
plus yourself who are willing to write letters on your behalf,
maybe a hundred when the other ones had come in.

So, you are a complicated person and you are not the
typical criminal profile but this is real life and life is a
lot more collected than what we see in the movies or the kind
of people we might imagine as the typical criminals.  We have
you and you're a criminal.  And that word I know probably even
today may sound harsh to you but you stand convicted of seven
counts, we have now dismissed a couple of them, and you are now
to be sentenced on the rest.

Criminals are real life people.  You are a real life
person.  They're born to parents who love them, one hopes, if
they're lucky enough, as you were.  And they're people who have

F5T5ulbS

relationships with other people in their lives who do not want

them to be incarcerated for any period let alone a very, very

long period.  Those relationships are true, those are not fake.

You are not a criminal and then nobody loves you.  That's not

the way the world works.  Okay?  So, not all criminals are bad

people in every way.  People are much more complicated, they

are a fabric of different characteristics.  But, how do I think

about you?

          I think about the fact that you knew you were running

a criminal enterprise.  And in the trial exhibit that is

Government Exhibit 229D you stated at one point in a

communication, *Gosh* -- and I will quote it in a moment later --

*When my friends ask me why don't you do this?  Why don't you do*

*that?  I don't have enough time.  I'm running a multi-million*

*dollar criminal enterprise.*  It wasn't game and you knew that.

It was an enterprise the stated purpose of which -- the stated

purpose of which -- was to flout the law, to be outside of the

law, to be beyond the law.

          In the world that you created over time, democracy

that we had set up with our founding fathers that provide for

the passage of laws and the enforcement of those laws through

our democratic process did not exist.  It wasn't about

democracy.

          You were captain of the ship, as the Dread Pirate

Roberts, and you made your own laws and you enforced those laws

F5T5ulbS

in the manner that you saw fit.  So, it wasn't a world without

restriction.  It wasn't a world of ultimate freedom.  It was a

world of laws that you created, they were your laws.  It is

fictional to think of Silk Road as some place of freedom.  It

was a place with a lot of rules and if you didn't comply with

the rules you would be bumped out of Silk Road, you would have

various kinds of things done to you that are all set forth in

the seller's guide, and here and there, and ultimately there

were, of course, some commissioned murders for hire when people

were making threats against the enterprise.

So, I don't find supportable the argument that the

website was started by an impulsive or naive young man.  I give

you a lot more credit than that.  I don't think you did

something thoughtless, I think you did something very, very

thoughtful with which I disagree entirely.  I disagree with the

choice that you made but I don't think it was a choice that you

made without giving it deep thought.

I don't find supportable the argument that Silk Road

was an economic experiment.  It was, in fact, a carefully

planned life's work.  It was your opus.  It may have been based

on some theory or some philosophy that you held, but it was no

experiment of philosophy and provides no excuse.  You wanted it

to be your legacy -- you said that in some of the

communications introduced at trial -- and it is.  It was a

project that you had an idea for, you carefully nurtured it,

F5T5ulbS

you took deliberate acts to set it up over years to put your

plan into motion and to perfect it and to continue to perfect

it and to improve it.  That was not anything impulsive.  That

is not the definition of impulsive.  There was no experimental

quality to it, it was slick, it was professional, it was built

to last.  And, but for the very hard and creative work of law

enforcement, it would still be going right now.

You spent several years very carefully planning the

site and designing carefully considered methods of avoiding

legal detection both for yourself, for your vendors, and for

your customers, and you sought in all of these ways to put

yourself above the law.  There are so many documents which

demonstrate that that were introduced at trial.

You wrote the code and worked with others to perfect

it and others helped you with code and wrote some code for you.

You designed the terms of service, the seller's guide at

Government Exhibit 120, which advised the Silk Road clients on

anonymity, on how to sell things in stealth mode, how to use

stealth listing; that when vendors sell drugs they should do so

through the U.S. Postal Service which needs a warrant to open

packages, that to avoid detection in terms of smell how to do

that or who to talk to about it and how to "creatively disguise

the packages."

All the evidence shows that you viewed Silk Road both

as above the law and the laws didn't apply, and in this context

F5T5ulbS

1    the fact that the laws are what distinguished us from what is

2    uncivilized that they are the embodiment -- laws are the

3    embodiment -- and they are the manifestation of our democratic

4    process.  When that gets lost, it becomes meaningless.

5         Silk Road's birth and its presence asserted that its

6    creator -- you -- and its operator -- were better than the laws

7    of this country and there are posts which discuss the laws as

8    the oppressor and that each transaction is a victory over the

9    oppressor.  This is deeply troubling and terribly misguided and

10   also very dangerous.

11        Your own words I have looked at very carefully and I

12   have reread certainly more than once in this whole process.

13   They reveal a kind of an arrogance and they display an intent

14   that is very important to the Court's determination, and the

15   Court will go through some of the chronology of putting some of

16   your words into chronological order here now and I will give

17   you the Government's Exhibits but they're exhibits that were

18   all introduced at trial and which were all very, very familiar.

19        In GX 240A you wrote in 2010 that you began -- or

20   about 2010 that you began working on a project that had been in

21   your mind for over a year indicating, of course, the lack of a

22   last minute lightbulb going off, this was a well-planned

23   project, and you say:  "The idea was to create a website where

24   people could buy and sell anything anonymously with no trail

25   whatsoever that could lead back to them."  And that is not so

F5T5ulbS

1     much about the economics of it, of an economic experiment, that

2     is about a method of law evasion.

3             Then you state that, "I finally decided I would

4     produce mushrooms so that I could list them on the site for

5     cheap to get people interested."  Then you describe the process

6     of making several kilos of mushrooms and selling them.

7             Then in 2011 you wrote:  "I am creating a year of

8     prosperity and power beyond what I have ever experienced

9     before.  Silk Road is going to become a phenomenon at least one

10    person will tell me about it, unknowing that I was its

11    creator."

12            Government Exhibit 240B; in 2011 you described the

13    technical build of the site and said that, "before long,

14    traffic started to build."

15            Also in 2011, you wrote proudly that Silk Road was

16    getting its first press from Gawker but you also wrote that two

17    senators came out against the site.  And then you said:  "I was

18    mentally taxed and now I felt extremely vulnerable and scared.

19    The U.S. government, my main enemy, was aware of me and some of

20    its members were calling for my destruction."  And then you

21    changed your name to Dread Pirate Roberts; you devised a cover

22    story.

23            You say in Government Exhibit 240C in December of

24    2011, "Everybody knows too much.  Dammit."

25            Government Exhibit 240D, January 1, 2012 you write,

F5T5ulbS

1   "Well, I am choosing to write a journal for 2012."  And

2   footnote, it is still unclear to me why you ever wrote a

3   journal.  But putting that aside, "I imagine that some day I

4   may have a story written about my life.  It would be good to

5   have a detailed account of it."

6           In Government Exhibit 226A in March of 2012 you and

7   some employees run a promotional campaign with a prize for a

8   participant.  In messages introduced at trial you point out to

9   your colleagues that it is a worthwhile thing to do and state:

10   "We will be doing a mil in sales" -- which I read as a million

11   but it says -- "a mil in sales every week at full commission

12   before long.  I think it's leading by example for the vendors.

13   They will be more generous if we are.  And we are selling drugs

14   here.  First one's free, little Johnny.  Damn, that sounds

15   awful."  Followed by your colleagues saying, "Ha."  And then

16   you say:  "Sponge Bob canoe and life-size my little pony with

17   every hash purchase of 50 bitcoins or more."

18           And in Government Exhibit 226E in March of 2012, so we

19   are in the same time frame, you were discussing with an

20   individual called VJ -- Valerie Jones -- Variety Jones --

21   getting alternative citizenship because you were planning your

22   exit, and you stated that you already had your banking plan

23   worked out and your living plan worked out.

24           You also wrote additional messages in May of 2012 that

25   reveal that the winner of the Silk Road promotional contest had

F5T5ulbS

1    actually been trying to, unfortunately, dry out from heroin.

2    And you were told that the influx of cash as a result of that

3    promotional My Little Pony campaign didn't help and it is clear

4    that he has relapsed and that Silk Road had made it too

5    difficult.  And you stated, "shoulda thought more carefully

6    about dropping 4K on an addict so maybe our next prize will be

7    three months in rehab."

8              And then, Government Exhibit 226E in May 2012, this

9    fellow VJ advises you to carefully create and nurture a public

10   persona and you respond "I'm not complaining about any of this,

11   great fucking problem to have."

12             Then, in 229C, still in May 2012, you were informed

13   that a vendor is selling cyanide.  You were told, "it's only

14   the most well known assassination suicide poison out there."

15   And you consider whether to allow it to be sold because you are

16   the decision maker.  In prior statements you had said that

17   things would not be sold that would harm another but within six

18   minutes from the start of this chain of this communication you

19   had made the decision that it is okay to sell cyanide.

20             In Government Exhibit 229D, that fall in October of

21   2012, you tell VJ that you have a little alibi for friends and

22   family and that "I'm clever so I can BS when I need to."  And

23   that, "friends will tell me shit like, why don't you do this or

24   that, like I have all this free time.  I just want to scream at

25   them 'because I'm running a goddammed multi-million dollar

F5T5ulbS

1    criminal enterprise.'"

2          Then, in January 2013, you discuss with an employee

3    the risks of working for Silk Road.  And when you are

4    discussing getting caught which the individual is concerned

5    about you state, "put yourself in the shoes a prosecutor trying

6    to build a guess case against you.  What evidence could they

7    pin on you?"

8          Then, in Government Exhibit 241, March 2014, you wrote

9    a journal of short snippets of your day and you write -- and

10   each of these snippets is going to be one after another,

11   they're just tiny snippets with a period in between:

12         March 28:  "Being blackmailed with user info.  Talking

13   with large distributor, (hell's angels)."

14         Then, March 29th:  "Commissioned hit on blackmailer

15   with angels."

16         April 1:  "Got word that blackmailer was executed.

17   Created file upload script."  So, you went back to the

18   technical work right after getting word that the blackmailer

19   had been executed.  "Started to fix problem with bond refunds."

20         Government Exhibit 936 details communications relating

21   to that hit further.  Apparently you were sent a photo of the

22   hit.  The photo was no longer in existence, you acknowledge

23   receiving the photo and deleting it.

24         A short time later you wrote, on April 6:  "Make sure

25   backup crons are working.  Gave angels go ahead to find

F5T5ulbS

1    tony76."  Who was the subject of the next hit.  "Cleaned up

2    unused libraries on server."

3         Two days later on April 8 you write:  "Sent payments

4    to angel for hit on Tony76 and his three associates.  Began

5    setting up hecho as standby" -- I have no idea what that is --

6    "refactored main and category pages to be more efficient."

7         These are the words of a man who knows precisely what

8    he is doing and they're the words of a man who is callous as to

9    the consequences or the harm and suffering that it may cause

10   others.

11        You joke about an addict unable to contain his

12   addiction because of Silk Road and you seek to kill people that

13   you don't even know -- these are the words of a criminal and

14   that is truth.

15        The crimes as to which you stand convicted,

16   Mr. Ulbricht, are crimes which are intentional, they occurred

17   over a lengthy period of time, you knew exactly what you were

18   doing.  This was not some sort of experiment, it wasn't some

19   sort of game.  This is the general nature of Silk Road.

20        We have talked a lot about the drugs.  There were a

21   vast array of narcotics.  Silk Road is about fulfilling demand

22   and creating demands.  It was market-expanding.  It was market

23   fulfilling and market expanding and there are numerous facts in

24   the record that support this.

25        The facts brought out in connection with the victims'

F5T5ulbS

death provide evidence of first-time and expanded usage.

Mr. Duch, at trial, talked about becoming a new drug dealer for

the very first time.  There are numerous messages with Dr. X in

which people discuss using a drug for the very first time.

There is no reason to believe and certainly we cannot

know whether, in the absence of the ease of use of privacy and

the other features of Silk Road, that these first-time users or

those trying different drugs for the first time would have done

so in the absence of Silk Road.  It is just wishful thinking to

believe that Silk Road was a zero sum game.

Silk Road also distributed drugs anywhere that the delivery

service would take it worldwide -- DHL, Fed Ex, USPS --

bringing drugs to communities that previously may have had no

access to such drugs or in such quantities.  That was an

assault on the public health of our communities.

In short, there is supportive evidence from which

reasonable inferences may be drawn that Silk Road grew the

market for certain drugs and certain suppliers, no doubt

leaving a trial of drug users and drug dealers in its wake.

You could by heroin, crack, cocaine, meth, MDMA, steroids,

prescription pills.  If it wasn't available that wasn't because

it was excluded from the site.  You could have it shipped

anywhere.  A vendor could have shipped it anywhere.

The quantities are staggering, we talked about those,

and there are materials by the defense that suggest that the

F5T5ulbS

1    drug laws -- and these are particularly why the articles are

2    misguided in many respects and also the harm-reduction

3    arguments are implicitly based upon much of that, and it is

4    rare in a sentencing to have the restrictions on drug

5    distribution to safeguard public health as something that we

6    need to argue about.  And, in fact, we don't need to argue

7    about it but I think it is worth addressing given the attention

8    that it has gotten here.

9            There appears to be, in some of these articles that

10   were presented to the Court, some view that there is a moral

11   ambiguity about some of the drug distribution.  There is no

12   moral ambiguity about it.  It was just wrong.  And that is what

13   our democratic process had said and there is a way to change

14   the law but it is not by doing what occurred.

15           No drug dealer from the Bronx selling meth or heroin

16   or crack has ever made these kinds of arguments to the Court.

17   It is a privileged argument, it is an argument from one of

18   privilege.

19           Let me start with the basic proposition:  The impact

20   of heroin, crack, and meth sold in the Bronx, the impact of

21   those drugs sold in the Bronx are no better for our society

22   than those drugs that were sold through Silk Road.  When those

23   drugs arrive it is the same drugs.  You are no better a person

24   than any other drug dealer and your education does not give you

25   a special place of privilege in our criminal justice system.

F5T5ulbS

1   It makes it less explicable why you did what you did.

2          The social costs of drugs are manifest.  The user is

3   only one part of the equation, that is where much of this harm

4   reduction argument comes from and it is focused on the user.

5   The user is one part of a massive, massive worldwide scheme of

6   drug trafficking and if you sat where I sat you would see that

7   the user is not -- it is not -- it is the tail waging the dog,

8   it is the end.  So, harm reduction focused on the user is

9   missing the point.

10          It is a fantasy, it is magical thinking to believe

11   that drug use can occur widely only in private places in some

12   sort of cocoon involving no one other than the user and never

13   involving what is surely predictable collateral damage, so

14   let's just talk about what some of the well known social costs

15   are that are necessary to talk about because of the articles

16   that were submitted.

17          Some drug users may lead functional lives day to day

18   or they may not.  But, you don't know.  Or, they may for a time

19   and they may not be able to sustain it.

20          Many drugs on Silk Road were highly addictive.  Many

21   have harmful side effects.  Many people have unpredictable

22   reaction.  Repeated use of highly addictive drugs leads to a

23   host of clear social costs, costs that we all pay:  People lose

24   the ability to function, they lose their jobs, they lose their

25   income, they lose their ability to have meaningful

F5T5ulbS

relationships and sustain those relationships.  They lose their

ability to care for children and then those children get

neglected and then those children grow up and those children

grow up with models of parents who have been drug users and

addicts and may have had to engage in crime to sustain their

habits.

       Another cost of addiction is an out-of-control life

and a life that is out of control can lead to assaults on loved

ones, to assaults on random strangers, to assaults on one's

self.

       You can lose your home and then society picks up the

cost of the homeless families, the homeless kids, of the

parents who were drug addicts.  There may be a social cost to

food stamps or welfare when people can't afford their food and

their kids can't afford the food because they can't have jobs

anymore because their drug addiction has driven them to such a

state.

       The social costs associated with arrests for crime

committed to support the habit.  Not the hand-to-hand drug deal

but when those people are addicted and when those people are

desperate, they're often stealing.  They're stealing to support

the habit.  That's robbery, it is burglary, or it is worse and

that violence was not taken into account in the articles that I

read.  And, there is the cost of lawyers for the indigent

defendants who are then arrested for these crimes and then who

F5T5ulbS

1    are brought in to court not for drug crimes but for the violent

2    crimes that are the collateral effect of some of those drugs.

3         There are certainly costs in terms of medical expenses

4    that we, as a society, have to pay for the medical care

5    resulting from worsened use of drugs, from the individuals who

6    have medical conditions worsened by drugs.

7         The social impact of violence.  Let there be no

8    mistake, there is no way in the world that Silk Road could

9    actually reasonably be expected to reduce violence.  I have

10   reviewed each and every one of the articles that were submitted

11   and those articles have a very narrow focus and they fail to

12   deal with many of the very obvious facts.

13        Major violence on the streets during the hand-to-hand

14   transaction.  That's been the focus of so much so-called harm

15   reduction argument.  It is really, I think, quite misguided.

16        The facts are clear and there are just cases

17   everywhere about the way the drug world works, that drugs are

18   made available, first of all on the website itself, it shows

19   drugs made available in wholesale quantities; kilos of this,

20   kilos of that.  So, it is not just hand-to-hand.  All right?

21   So, those drug dealers, when they go out, where is the

22   hand-to-hand harm reduction for them?  And drug dealers are

23   targets of violence.  So, when they get their express mail

24   package in the mail and it is sitting in their apartment, are

25   they not the targets of somebody coming in?  Does the mailman

F5T5ulbS

1    not show that he is delivering a package to John Doe?

2           But, there are also other places where the violence

3    comes in and so the violence isn't going to go away with one

4    Silk Road or with a thousand Silk Roads.  Drug usage creates

5    demand.  Silk Road, in part, based on the evidence we have

6    already seen, created people who hadn't tried drugs before that

7    was increasing the demand for certain drugs and Silk Road

8    wasn't making the drugs so the drugs are going to be made

9    elsewhere.

10          Let's take Afghanistan or Mexico as the place for

11   poppies for heroin.  As we know, there is all kinds of violence

12   in terms of the production of drugs and Silk Road can't reduce

13   that violence because it is not involved in that part of the

14   chain.  But, when it expands the market it is expanding the

15   demand on that part of the chain and it is a step in the chain.

16   So then, what happens next?  Then there is a valuable cargo.

17          That valuable cargo comes from place A to place B.

18   The valuable cargo comes into this country or goes into

19   Colombia or somewhere else and there is violence down there.

20   When you have a demand-expanding operation such as Silk Road

21   there is more demand for cargo and there is going to be

22   whatever violence that results.  So, Silk Road is not involved

23   in these initial stages.

24          The drugs arrive here, they arrive in large

25   quantities.  So, maybe the next step is further distribution.

F5T5ulbS

Maybe there is going to be some ease of distribution at that

time and Silk Road can claim credit for that or not, but the

idea that it is harm-reducing is so very narrow and it is

talking about such a privileged group able to sit in the

privacy of their own home with their high-speed Internet

connection.

So, this is our real world.  Our real world, if we

make it easy and possible to buy and use drugs, are we helping

society?  Or are we hurting society?  And these are the

questions I have to ask.  These are the values of our country.

Our country has made determinations through our democratic

process.  So, I don't want to defend the drug laws.  I don't

think it is necessary to.  But, the facts that I have described

are clear every day in the newspapers.  So, there is broad and

unrelenting violence known and easily observed from the facts

before the Court.

So, let's talk about your own violence.

So, we also have your own violence and there is no

doubt -- really none -- that you wanted to and paid for the

murders of five people to protect your drug enterprise.  That

is not the conduct of conviction but it is relevant conduct, so

how is that consistent with harm reduction?

The submissions by the defense experts that you folks

put in say that we should ignore that because it wasn't

charged.  But, that doesn't mean it didn't happen.  How do you

F5T5ulbS

1    ignore that?  I just really don't understand that argument at

2    all.  It happened, it is there in black and white.  Now, did

3    the murders happen?  Well, they can't find any bodies.

4                Did you commission a murder?  Five?  Yes.

5                Did you pay for it?  Yes.

6                Did you get photographs relating to what you thought

7    was the result of that murder?  Yes.

8                So, I have read many articles about the harm reduction

9    and it is just fantasy.

10                What Silk Road really was was a social market expander

11    of a socially harmful drug that we have deemed in our

12    democratic process to be unacceptable and it was an enabler of

13    those trying so very hard to get away from it.

14                The Court notes that there is the presence of Dr. X

15    who deserves special mention in his particularly despicable --

16    that he has been pointed to as a big part of the harm

17    reduction.  I have read each and every post of Dr. X and I was

18    blown away and infuriated by it.  A doctor who wants to sell

19    Fentanyl patches?  Expired Fentanyl patches?

20                So, it is absolutely clear that Dr. X is part of the

21    problem, he is not part of the solution and, again, it is

22    magical thinking to think so.  So, let's talk about Dr. X

23    because he is an absolute enabler.  He is a positive marketing

24    event to get people to use drugs.  Does that mean that he never

25    ever helped people discuss how to titrate down on certain

F5T5ulbS

drugs?  No.  I'm not suggesting he didn't do that.  I'm

suggesting that having somebody there who can also say, *Hey,*

*yeah, ecstasy is not a bad thing, here is how you do it.*

*That's fine*.  That's enabling.

          The first post of Dr. X on Exhibit 4 in Ms. Lewis'

affidavit is an example of the problem.  He is told that an

individual has never done MDMA -- ecstasy -- but is interested

in exploring it. -- market expanding --  The individual

discloses that he has Type 1 Diabetes.  Dr. X states that MDMA

would be okay nonetheless, that "dramatic changes in glucose

are not expected."  He states that a danger is that MDMA could

make the user forgetful, that he might forget to test his

sugar, so he recommends the individual set an alarm clock.  He

states:  "I think with that, it should be enough."

          This doctor has got a guy with Type 1 Diabetes, knows

nothing else about him, about to try MDMA.  This is

breathtakingly irresponsible.  It does not take a physician to

see this as plain common sense.

          So, he was here and elsewhere encouraging

experimentation in very dangerous circumstances to another who

has disclosed using Lexapro, an anti-depressant, who wants to

use MDMA.  Dr. X encourages him that he will not feel the full

extent of the effects of ecstasy until he has "abandoned"

Lexapro.

          The irresponsibility of this statement given that this

F5T5ulbS

 1    is a person who may have depression already -- he doesn't know

 2    if Lexapro is prescribed for depression or something else --

 3    and given the possible known effects of MDMA which include

 4    further depression possibly afterwards, is breathtaking.

 5            In another post he glibly advises that "all drugs are

 6    absolutely harmless.  They won't, in his words, assault you or

 7    rape you.

 8            To an 18-year-old who states he is concerned that he

 9    has a developing brain Dr. X advises:  "but given how you're on

10    Silk Road and your mannerism of speaking, be careful, and I

11    feel you'll be fine.  Stick to psychedelics."

12            Another asked about combining MDMA with an SSRI and

13    Dr. X advises that there is a theoretical risk but, in his

14    opinion, it is overestimated.

15            And in a private message between Dr. X and an

16    individual he states to the individual he will sell him 75

17    milligrams of Fentanyl patches.  He shipped them from Spain.

18            So, he puts in a declaration in this matter and says

19    he is unaware of a single overdose associated with Silk Road.

20    I asked the question about the woman curled up in the fetal

21    position he had been told about and then he then did respond.

22    But, what he is doing is enabling and what he is doing is

23    breathtakingly irresponsible.

24            The other declarants also described why Silk Road is

25    harm reducing and none consider the upstream or the collateral

F5T5ulbS

1   violence and the social costs that I have described.  There has

2   been much focus on the drug trafficking but there, of course,

3   that is only one aspect of the site.  There is also a wide

4   array of computer hacking tools available and fake

5   identification documents.  What kind of harm reduction can be

6   found there?  What kind of harm reduction can be found in the

7   sale of computer hacking tools?  What kind of harm reduction

8   can be found in fake identification documents?  Did anybody

9   expect them to be posted on the wall and just looked at?  No.

10  The expectation, the reasonable expectation would be use.  So,

11  that's fraud.  How is that harm reduction in our society?  Is

12  it harm reduction to the fraudster user?  Maybe.  Is it harm

13  reduction to the recipient?  Oh, most certainly not.

14          So, general deterrence.

15          So, defense counsel has argued that general

16  deterrence, through sentencing, is illusory.  And I have

17  listened very closely.  I have read very, very closely the

18  articles and interestingly, in a study cited by defense

19  counsel -- which is Kleck as the lead author -- the author

20  acknowledges, right towards the back of the article, "It is

21  also possible that unusually highly publicized punishment

22  events may generate deterrent effects that the routine, largely

23  unpublicized punitive activities of the criminal justice system

24  ordinarily do not."

25          This is a case in which general deterrence plays a

F5T5ulbS

particularly important role.  This is one of those cases.  It is a case without serious precedent.  What you did was unprecedented and in breaking that ground as the first person you sit here as the defendant now today having to pay the consequences for that.

There is significant public interest in this case in terms of the social utility analysis or any kind of risk reward analysis.  For those considering stepping into your shoes, carrying some flag, some misguided flag, or doing something similar, they need to understand very clearly and without equivocation that if you break the law this way there will be very, very severe consequences.

You don't bear only the general deterrence you also bear the responsibility for the other factors as well.  That is just one element in the analysis.

For personal deterrence it is also an issue here.  It is clear you did lead a double life.  Frankly, I can't make a judgment about which of you to know, which of you to rely on, and which of you to believe.  You were able to create an identity for friends and family that was entirely different from that which was separate from the sweeping criminal enterprise that you ran.  In the quotes that I have already read you stated you changed your name, developed an alibi, you were able to BS when necessary.  And I take you at your word in that, that you were able to do all of those things.

1          It is notable that you were prepared to flee; that

2     having acquired new identification because you acquired your

3     own array of fake identification -- nine of them -- that you

4     were in the process of obtaining alternative citizenship.  You

5     had flown down to Dominica, had an interview and filled out the

6     form and were doing that.  You just didn't pull the trigger

7     fast enough.

8          It is also notable that the reasons that you started

9     Silk Road were philosophical and I don't know that it is a

10    philosophy left behind.  And except for your family and friends

11    and the statement you made today, I don't know that you feel a

12    lot of remorse for the people who were hurt.  I don't know that

13    you believe you hurt a lot of people.  I don't think you know

14    that you hurt many.

15         Let me comment now on the many letters of support you

16    received discussing your character.  I read each and every one

17    of them with care.  I have read them more than once.  They are

18    beautiful letters.  These are letters written by a vast, broad

19    array of people which are a statement that is extraordinary for

20    you because they are, as I said earlier, from every phase of

21    your life and they tell different stories and they tell

22    different anecdotes about you.  They reveal a man who was

23    loved, who has built enduring and significant relationships

24    over a lifetime and maintained them.  The letters reveal you as

25    intelligent, that you displayed great kindness to many people,

F5T5ulbS

1    that people believed in you when you were younger and believe

2    in you still.  The letters that your supporters wrote express

3    experiencing great pain at your incarceration and concern for

4    your future.  Most letters ask this Court to impose the lowest

5    possible sentence and those that do not, they don't see it one

6    way or another.  Nobody is asking for anything else.  The

7    letters are profoundly moving.

8        I have thought about them and read them over and tried

9    to reconcile them with the facts I know about this case.  There

10   is no reason to make a choice between these two people that I

11   see that are on display -- the Ulbricht who is the leader of

12   the criminal enterprise and the Ulbricht who is known and

13   loved.  What is clear is that people are very, very complex and

14   you are one of them.  They are made up of many different

15   qualities and many characteristics with no one quality defining

16   them.  And there is good in Mr. Ulbricht, I have no doubt, but

17   there is also bad, and what you did in connection with Silk

18   Road was terribly destructive to our social fabric.

19       Now, there have been the issues of sentencing

20   disparities raised.  Defense counsel raised that in his letter

21   of May 28th and also today with respect to Mr. Nash.  Mr. Nash,

22   who was sentenced before Judge Griesa to time-served, that was

23   17 months.  That individual was a moderator for a period of

24   time on Silk Road.  He was a very, very different person than

25   you.  It's a person way up on top of the hierarchy and a person

F5T5ulbS

way down in the hierarchy.  In any event, he was given a

downward role adjustment for having a non-leadership role, a

minor role.  He was also safety-valve eligible and he made

proffers to the government.  Also, his sentencing transcript

was 8 pages long.  It must have lasted -- I don't know -- 10

minutes?  And, there is no rationale.  So, you are not

similarly situated but nor can anybody draw any kind of

comparison based upon any rationale that was put forward.

Now I want to talk about forfeiture because I am going

to go into the imposition of sentence but I am going to do

forfeiture first.

The government seeks forfeiture here in the amount of

$183,961,921.  The superseding indictment contains a forfeiture

allegation as to all seven counts but of course we have

dismissed certain counts.

The Court finds that $183,961,921 is subject to

forfeiture pursuant to the applicable statutes and that is

21 U.S.C., Section 853(a)(1) as to Counts Two and Four, and

14 U.S.C. 982(a)(2)(B) as to Counts Five and Six, and 18 U.S.C.

982(a)(1) as to Count Seven.

Rule 32.2(b)(1) of the Federal Rules of Criminal

Procedure outlines the procedures for criminal forfeiture.

After a guilty verdict is returned on a count with respect to

which the government has sought criminal forfeiture, the Court

must determine what property is subject to forfeiture under the

F5T5ulbS

1    applicable statute.  If the government seeks that personal

2    money judgment, the Court must determine the amount of money

3    that the defendant will be ordered to pay.  The government must

4    establish the nexus between the offense and the forfeiture

5    requests by a preponderance of the evidence.  *Capoccia*, (2d

6    Cir. 2007).

7           Under 21 U.S.C. 853(a)(1) and 982(a)(2)(B), the

8    government is entitled to forfeiture of proceeds obtained

9    directly or indirectly as a result of the offenses in Counts

10   Two, Four, Five and Six.

11          Under the Second Circuit's decision in *Contorinis* (2d

12   Cir. 2012), the Court may order the defendant to forfeit

13   proceeds received not by him but "by others who participated

14   jointly in the crime, provided the actions generating those

15   proceeds were reasonably foreseeable to the defendant."  I

16   find, by a preponderance of the evidence, that they were.

17          Here, the government has established by a

18   preponderance of the evidence that the sales of Silk Road of

19   illegal drugs total at least $182,962,583 and that the sales of

20   false identification documents totaled at least $1,001,636.

21   And that is Government Exhibit 940A and Government Exhibit

22   940B.

23          At trial, Brian Shaw testified that these figures

24   reflects Silk Road sales specifically categorized in

25   transactional records (Transcript 1929:1 through 1934:13) and

F5T5ulbS

1    that these sales were foreseeable to the defendant in his role

2    as the Dread Pirate Roberts.

3          In addition, under 982(a)(1) the government is

4    entitled to forfeiture of property, real or personal, involved

5    in the money laundering offense in Count Seven.

6          The Circuit has held even where a defendant does not

7    retain money laundered property he will be subject to

8    substitution of assets, i.e., a money judgment, so long as he

9    conducted at least three separate transactions in any 12-month

10   period involving at least a total of $100,000 or more.  I

11   should mention that money laundering allowed people on the

12   website to exchange money that, circumstantially the inference

13   is clear, was obtained for one purpose to exchange it into

14   currency and cash out and launder that money.

15         So, in this case, all funds passing through Silk

16   Road's Bitcoin-based payment system were involved in the money

17   laundering offense in Count Seven.  The Bitcoin-based system

18   promoted and facilitated illegal transactions on Silk Road and

19   concealed the proceeds of those transactions.  It also

20   concealed the identities of and locations of users.  Government

21   Exhibit 119; it is Mr. Der-Yeghiayan's testimony.

22         The defendant was involved in laundering well beyond

23   $100,000 through many more than three transactions over a

24   12-month period.  That evidence is clear and I find it by far

25   more than a preponderance of the evidence.  He is liable for

F5T5ulbS

 1    all the funds that passed through Silk Road regardless of

 2    whether he personally retained them.

 3          I also note that the forfeiture amount is not an

 4    "excessive fine" under the Eighth Amendment but I say it *sua*

 5    *sponte* given that is over $180 million.  While the amount is

 6    significant, it is no more significant than the revenue that

 7    was generated through the sales of illegal drugs and fraudulent

 8    identification documents on Silk Road and money laundering, a

 9    criminal enterprise which the defendant designed and operated.

10          Accordingly, the Court does find that $183,961,921 is

11    subject to forfeiture and hereby enters an order of forfeiture

12    pursuant to 32.2(b)(2) and I will sign the order following this

13    proceeding.

14          The Court is not going to impose restitution.  While

15    there are victims that are harmed, it is not quantifiable in

16    terms of money damage.

17          Let me go back now to the other aspects of sentencing.

18          The guidelines here as we know are life, but the Court

19    has made an independent inquiry under 3553(a) and my sentence

20    is not a Sentencing Guideline sentence.  I have given the

21    sentence a great deal of thought, as I have said, and I have

22    considered each potential increment of time and I have

23    considered that in terms of what it means to you, what it means

24    to other people in your family, and also what it means to

25    others in our society who are appropriately considered under

F5T5ulbS

1    3553(a) and to the extent that they are.

2         I have examined each potential year of incarceration

3    carefully and I am humbled by this responsibility that requires

4    one person to judge another and that one judge can sit in our

5    society and determine what society deems an appropriate and

6    just sentence.  But, I was appointed to do this task and I sit

7    here as a representative of our society and I sit here with a

8    flag of the United States of America representing our

9    democratic process and it is to me to mete out a just sentence

10   and preserve the safety of our community so I take this very

11   seriously.  I must impose a just sentence taking into account

12   all applicable factors.

13        It is with all of that in mind that I now pronounce

14   the remainder of the sentence.  So, Mr. Ulbricht, would you

15   please stand, sir?

16        Mr. Ulbricht, it is my judgment delivered here, now,

17   on behalf of our country, that on Counts Two and Four you are

18   sentenced to a period of life imprisonment to run concurrently;

19   on Count Five you are sentenced to five years' imprisonment to

20   run concurrently; on Count Six, you are sentenced to 15 years'

21   imprisonment also concurrent; and for money laundering in Count

22   Seven, you are sentenced to 20 years, also concurrent.

23        In the federal system there is no parole and you shall

24   serve your life in prison.

25        I make this judgment mindful of the tremendous pain

F5T5ulbS

that I am causing you and all of those who you love.  I make
this judgment mindful of the crimes that you have committed and
the needs for the severest possible penalty to be imposed.

There must be no doubt that lawlessness will not be
tolerated.  There must be no doubt that no one is above the
law, no matter the education or the privileges.  All stand
equal before the law.  There must be no doubt that you cannot
run a massive criminal enterprise and, because it occurred over
the Internet, minimize the crime committed on that basis.

After deep contemplation and much searching, I believe
that this sentence and no other is sufficient but not greater
than necessary to meet the factors under 3553(a).

In the unlikely event that you are ever released, I
also impose a period of lifetime supervised release on Counts
Two and Four to run concurrently; three years on Counts Five,
Six and Seven to run concurrently; and the usual conditions
shall be imposed.  There will be a special condition that you
will have to submit your person, computer, and place of
residence to reasonable searches by the probation office.

There is a required special assessment of $100 for
each count on which you are sentenced which is $500 because
there are only five remaining counts.

I do not impose a fine because the Court has imposed a
very large forfeiture order.

Counsel, is there any legal or other reason why

F5T5ulbS

1    sentence cannot be imposed, as stated?

2              MR. TURNER:  No, your Honor.

3              MR. DRATEL:  No, your Honor; other than what we have

4    already stated on the record.

5              THE COURT:  The Court does impose the sentence, as

6    stated.

7              Mr. Ulbricht, you have a right to appeal.  Any notice

8    of appeal must be filed within 14 days of the filing of the

9    judgment of conviction in this matter.  If you cannot afford

10   the costs of appeal, those costs shall be waived and you can

11   apply to proceed in forma pauperis to have those costs waived.

12             Now, the defendant made an application to the Court to

13   recommend that he be housed in a facility that may be at a

14   lower security level than he would otherwise score.  I decline

15   to do so.  The BOP is best positioned to determine where the

16   defendant is housed.  I will, however, make a recommendation he

17   be housed in New York, Arizona, or Florida, if possible.

18             There is also a Rule 38 application that the Court

19   recommend that he not be designated to another facility pending

20   appeal in order to assist with that appeal.  I do grant that

21   motion and the Court will make that recommendation.  So,

22   Mr. Ulbricht, to the extent that the Court's recommendation is

23   followed, you would be housed in the New York area until your

24   appeal has been completed or whatever appropriate time is

25   determined by the BOP.

F5T5ulbS

1          Anything further?

2          MS. LEWIS:  Yes, your Honor.  We would like to ask for

3     specific language regarding the designation request after

4     further consultation with the family.

5          First, while we understand that you don't -- we will

6     be asking for the waiver of the public safety factor in light

7     of the fact that the BOP still has the authority to do so.  If

8     they determine so, we would ask if they do waive that, that he

9     be designated to FCI Petersburg 1 which is a medium, and that

10    you would recommend that they do so in light of the fact that

11    Mr. Ulbricht's family is in the Richmond area.  And, in the

12    alternative, if they don't waive the public safety factor,

13    designation USP Tucson or as a second choice USP Coleman 2 on

14    the basis that both of those facilities have special needs

15    yards which are more appropriate.

16          (Defendant and counsel conferring)

17          THE DEFENDANT:  Second choice Allenwood.

18          MS. LEWIS:  Second choice Allenwood, then.

19          That's all, your Honor.

20          THE COURT:  So, the Court will make a recommendation

21    that while the BOP should determine the appropriate security

22    level, if its determination is such that designation at one of

23    those facilities is possible, that the Court recommends that

24    the housing occur in that facility in that order.  All right.

25          Anything further?

F5T5ulbS

1          MR. TURNER:  The original indictment should be

2     dismissed, your Honor.

3          THE COURT:  Thank you.  The original indictment is

4     dismissed.

5          Anything further?

6          MR. TURNER:  No, thank you.

7          MR. DRATEL:  No.

8          THE COURT:  Thank you.  We are adjourned.

9                              o0o

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25