UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------X

UNITED STATES OF AMERICA,                    :          No. 14 Cr. 68 (LGS)


          - against -                                    :


ROSS WILLIAM ULBRICHT,

                                                         :


          Defendant-Petitioner.                 :

--------------------------------------------------------X

MEMORANDUM OF LAW IN SUPPORT OF MOTION PURSUANT TO
28 U.S.C. § 2255, TO VACATE, SET ASIDE OR CORRECT HIS SENTENCE


                              Paul Grant
                              Law Office of Paul Grant
                              19501 E. Mainstreet, Suite 200
                              Parker, CO 80134
                              Tel.: 303-909-6133
                              Email: paul_pglaw@yahoo.com
                              *Counsel for Mr. Ulbricht*

TABLE OF CONTENTS

Table of Authorities                                                                ii

Introduction                                                                        1

Procedural History                                                                  2

**CLAIMS FOR RELIEF AND FACTUAL BASES FOR RELIEF**                 4

**I.  *Ineffective assistance of trial counsel and denial of Ulbricht's
autonomy right to contest his guilt at trial, resulting
from trial counsel conceding Ulbricht's guilt at trial.***            4

   **ARGUMENT SUPPORTING CLAIM I**                                  9

   **CONCLUSION REGARDING CLAIM I**                                 13

**II.  *Ineffective assistance of trial counsel at trial and on appeal,
where trial counsel failed to protect Ulbricht's right to a public trial,
failed to protect Ulbricht's right to be present and to participate
during all critical stages of trial, failed to protect the presumption of
Ulbricht's innocence, and failed to protect Ulbricht's right to due
process and a fair trial, all resulting from secretive, out-of-court
and off-the-record court proceedings.***                             13

   **ARGUMENT SUPPORTING CLAIM II**                                 23

      **A. Secret Selection of an Anonymous Jury**                  23

      **B.  Secret Evidentiary Discussions**                        31

   **CONCLUSION REGARDING CLAIM II**                                35

**III.  *Ineffective assistance of trial counsel at trial and on appeal,
due to the mishandling of expert witness issues by trial counsel
and errors by the trial court, which resulted in a heavily one-sided
trial where the government was improperly allowed to present
its highly technical case through the expert testimony of lay
witnesses, in violation of the rules of evidence, and where
Ulbricht was improperly denied his right to due process and
to a fair trial and his right to present his defense. The result of
these errors was a fundamentally unfair trial.***                    37

      **A. Improper Use of Lay Witnesses to Provide Expert Testimony**          37

      B. **Erroneous Preclusion of Defense Experts**          45

**ARGUMENT SUPPORTING CLAIM III**          48

      **A. Government Case Built on Expert Testimony from Lay Witnesses**          49

      **B. Erroneous Preclusion of Defense Experts**          52

**CONCLUSION REGARDING CLAIM III**          67

**IV. Denial of the Right to Testify -** *Trial counsel violated Mr. Ulbricht's right to testify by forcing him to sacrifice his right to testify in order to preserve his right to assistance of counsel.  The trial judge further interfered with Ulbricht's right to testify, by telling him he would have to make an application to her to be able to testify, if, after first telling her he was not going to testify, he later changed his mind about whether he wanted to testify.*          67

  **ARGUMENT SUPPORTING CLAIM IV**          70

**CONCLUSION REGARDING CLAIM IV**          73

**V. Ineffective assistance of counsel for failure to raise a challenge to the validity of the laptop search warrant pursuant to** *Franks v. Delaware* **-** *Trial counsel failed to investigate the veracity of the statements provided under oath to obtain a warrant to seize and search Ulbricht's laptop computer, and failed to investigate the pen-trap data provided in discovery by the government, which investigation would have informed him that the government never disclosed the pen-trap data it relied on in the laptop search warrant application, and which investigation would also have shown that the government never provided in discovery any evidence that would have supported several of its claims in the laptop search warrant application, and which would have shown many false statements provided in the search warrant application.  Had trial counsel adequately investigated these issues, he would have discovered a strong basis for challenging the validity of the laptop search warrant, a challenge which likely would have led to an order suppressing evidence obtained from the search of the laptop.  That suppression order would*

*likely have led to a better outcome at trial.*                          73

   **ARGUMENT SUPPORTING CLAIM V**                          85

   **CONCLUSION REGARDING CLAIM V**                          91

**VI.  Ineffective assistance of trial counsel, resulting from trial counsel's failure to adequately advise Ulbricht regarding the risks involved in the choice he faced between pleading guilty and going to trial. Trial counsel failed to advise Ulbricht that his chances of success at trial were minuscule, and on the likelihood that he would be sentenced more harshly if he went to trial and was convicted, than if he pled guilty to the charges in the complaint, or even if he pled guilty to the indictment or to the supeseding indictment.**                          91

   **ARGUMENT SUPPORTING CLAIM VI**                          93

   **CONCLUSION REGARDING CLAIM VI**                          96

**REQUESTS FOR RELIEF REGARDING CLAIMS I - VI**                          96

TABLE OF AUTHORITIES

CASES

*Boyd v. United States*, 116 U. S. 616 (1886)       36

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993)       59

*Diaz v. United States*, 223 U.S. 442 (1912)       30

*Estelle v. Williams*, 425 U.S. 501 (1976)       23, 51

*Estes v. Texas*, 381 U.S. 532 (1965)       25

*Faretta v. California*, 422 U.S. 807 (1975)       *passim*

*Franks v. Delaware*, 438 U.S. 154 (1978)       85

*Gannett Co. v. DePasquale*, 443 U.S. 368 (1979)       *passim*

*Gersten v. Senkowski*, 420 F.3d 588 (2d Cir. 2005)       54

*Guzman v. Scully*, 80 F.3d 772 (2d Cir. 1996)       31

*Illinois v. Allen*, 397 U.S. 337 (1970)       30

*In Re Application of The Herald Co.*, 734 F.2d 93 (2nd Cir. 1984)       27

*In re New York Times Co.*, 828 F. 2d 110, 116 (2d Cir. 1987)       33

*In re Oliver*, 333 U.S. 257 (1948)       25, 28

*In re Winship*, 397 U.S. 358 (1970)       51

*Johnson v. Zerbst*, 304 U.S. 458 (1938)       30

*Kentucky v. Stincer*, 482 U.S. 730       30

*Kumho Tire Co. v. Carmichael*, 119 S.Ct. 1167 (1999)       59

*Kyllo v. United States*, 533 U.S. 27 (2001)       90

*Lafler v. Cooper,* 566 U.S. 156 (2012)       93

iv

*Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110 (2d Cir. 2006)　　33

*Mayo v. Henderson*, 13 F.3d 528, 534 (2d Cir. 1994)　　49

*McCoy v. Louisiana*, 528 U.S. ____ (2018)　　*passim*

*Miranda v. Arizona*, 384 U.S. 436 (1966)　　32

*Missouri v. Frye*, 566 U.S. 134 (2012)　　93

*Montejo v. Louisiana*, 556 U.S. 778 (2009)　　92

*Nebraska Press Ass'n v. Stuart*, 427 U.S. 539 (1976)　　28

*Presley v. Georgia*, 558 U.S. 209 (2010)　　27, 28

*Press-Enterprise Co. v. Superior Court (Press-Enterprise I)*,
464 U.S. 501 (1984)　　*passim*

*Press-Enterprise Co. v. Superior Court of California*, 478 U.S. 1
(1986) (Press-Enterprise II)　　34

*Rock v. Arkansas*, 483 U.S. 44 (1987)　　70

*Rushen v. Spain*, 464 U.S. 114 (1983)　　30

*Strickland v. Washington*, 466 U.S. 668 (1984)　　*passim*

*Sullivan v. Louisiana*, 508 U.S. 275 (1993)　　31

*United States v. Amodeo*, 71 F.3d 1044 (2d. Cir. 1995)　　33

*United States v. Bianco*, 998 F.2d 1112 (2d Cir. 1993)　　85

*United States v. Birkin*, 366 F.3d 95 (2d Cir. 2004)　　49

*United States v. Canaday*, 126 F.3d 352 (2d Cir. 1997)　　30

*United States v. Cojab*, 996 F.2d 1404 (2d. Cir. 1993)　　32, 35

*United States v. Cortina*, 630 F.2d 1207 (7th Cir. 1980)　　86

*United States v. Garcia*, 413 F.3d 201 (2d. Cir. 2005)　　64, 65

v

*United States v. Haynes*, 729 F.3d 178 (2d Cir. 2013)     50, 51, 65

*United States v. Paccione*, 949 F.2d 1183 (2d Cir. 1991)     24

*United States v. Rajaratnam*, 719 F.3d 139 (2d Cir. 2013)     85

*United States v. Teague*, 953 F. 2d 1525 (11th Cir. 1992)     71

*United States v. Thomas*, 757 F.2d 1359 (2nd Cir.1985)     23

*United States v. Ulbricht*, 858 F.3d 71 (2d Cir. 2018)     38

*United States v. Wade*, 388 U.S. 218 (1967)     10

*United States v. Young*, 470 U.S. 1 (1985)     66

*Waller v. Georgia*, 467 U.S. 39 (1984)     27, 31

*Washington v. Texas*, 388 U.S. 14 (1967)     64

*Weaver v. Massachusetts*, 582 U.S. ____ (2017)     *passim*

CONSTITUTIONAL PROVISIONS

Amendment V, United States Constitution     71

Amendment VI, United States Constitution     9, 71

STATUTES

28 U.S.C. § 2255 (f)(1)     1

RULES

Rule 16, Fed.R.Crim.P., Notes of Advisory Committee on Rules -1993
Amendment     59

Rule 16(a)(1)(E)(I), Fed.R.Crim.P.     54

Rule 16(a)(1)(G), Fed.R.Crim.P.     53, 61

Rule 16(b)(1), Fed.R.Crim.P.     55

Rule 16(b)(1)(C), Fed.R.Crim.P.     53, 56, 59

Rule 52(b), Fed.R.Crim.P.                                                         65

Rule 702, Federal Rules of Evidence                                               38, 50

Rule 702, Federal Rules of Evidence, Committee Notes on Rules -
2000 Amendment                                                                    50, 59

Rule 702, Federal Rules of Evidence, Notes of Advisory Committee
on Proposed Rules                                                                 38, 50

Rule 702(a), Federal Rules of Evidence                                            61

Rule 1.2, New York Rules of Professional Conduct                                  12

OTHER AUTHORITIES

Howell, ed., 4 State Trials and Proceedings for High Treason and Other
Crimes and Misdemeanors 1270 (I Charles II 1649) (London:
T.C. Hansord 1816)                                                                34

Johnson's Dictionary of the English Language, V. I (1770)                         10

## INTRODUCTION

Mr. Ulbricht was tried in this court in a 13 day jury trial and on February 4, 2015, his jury brought back guilty verdicts on all charges in the indictment.  Mr. Ulbricht was sentenced on May 28, 2015, to serve two concurrent life sentences, and to serve additional lesser sentences, also to run concurrently to the life sentences.  Mr. Ulbricht's direct appeal was denied on May 31, 2017, and on June 28, 2018, the Supreme Court denied his Petition for Writ of Certiorari. Docket No. 17-950.  Mr. Ulbricht is currently serving his sentence in the United States Penitentiary in Tucson, Arizona.

Mr. Ulbricht's habeas petition is due on or before 1 year from the date on which his judgment of conviction became final, thus, it is due on June 28, 2019.  28 U.S.C. § 2255 (f)(1).

Pursuant to U.S.C. § 2255, Mr. Ulbricht moves to vacate, set aside or correct his sentence, because: his sentence was imposed in violation of the Constitution or laws of the United States; or the court was without jurisdiction to impose such sentence; or the sentence was in excess of the maximum authorized by law; or the sentence is otherwise subject to collateral attack.

After pleading not guilty, Mr. Ulbricht was tried and convicted by his jury in the SDNY, in Case No. 14 cr 68, *United States v. Ross William Ulbricht*.  The jury verdicts of conviction on all counts was returned on February 4, 2015.  Sentence was imposed on May 29, 2015 and Judgment entered on that same date.  Doc.  269.[1]  The judgment recites that Mr. Ulbricht was

---

[1] Mr. Ulbricht will use the term "Doc." to refer to the Docket Numbers in this case, to maintain consistency with the identification of case documents used in the public docket, as shown on PACER.  "Tr." will be used to refer to transcript page numbers from the official case transcript.

1

found guilty on counts 2, 4, 5, 6, and 7; that he was adjudicated guilty of Counts 2, 4, 5, 6, and 7, and that Counts 1 and 3 were vacated by the court.  See Doc. 269.

Mr. Ulbricht was sentenced to life imprisonment on Counts 2 and 4, with those sentences to run concurrently; he was sentenced to 3 years on Counts 5, 6, and 7, to run concurrently.  Doc. 269.

The Second Circuit affirmed Ulbricht's convictions and his sentence on direct appeal. *United States v. Ulbricht*, 858 F.3d 71 (2d Cir. 2017).  The Supreme Court denied review on June 28, 2018.  *Ulbricht v. United States*, Docket No. 17-950.

Mr. Ulbricht was convicted (see Doc. 269) on the following counts:

| | | |
|---|---|---|
| 21 U.S.C. § 841(a)(1) | Aiding and abetting distribution of drugs | |
| | over the internet | Count 2 |
| 21 U.S.C. § 848(a) | Continuing Criminal Enterprise | Count 4 |
| 18 U.S.C. § 1030(a) | Computer Hacking Conspiracy | Count 5 |
| 18 U.S.C. § 1028(f) | Fraud With Identification | |
| | Documents | Count 6 |
| 18 U.S.C. § 1956(h) | Money Laundering Conspiracy | Count 7 |

**Procedural history**

After conviction, Ulbricht appealed his convictions to the Second Circuit Court of Appeals.  In his appeal, Ulbricht raised the following issues:

(1) Trial court abuse of discretion and Ulbricht denied Fifth and Sixth Amendment rights to due process, to present a defense, and a fair trial by (A) precluding the defense from providing evidence of corruption of DEA special agent Carl Mark Force; (B) refusing to order the

government to provide additional discovery regarding corruption; and (C) denying Ulbricht's motion for a new trial based on additional post-trial disclosures regarding corruption of Force and of another law enforcement agent involved in the Silk Road investigation.

(2) The court abused its discretion by curtailing cross-examination and the defense theory of an alternative perpetrator, including"

(A) Curtailing and striking cross-examination of SA Der-Yeghiayan;

(B) Disregarding the untimeliness of government objections;

(C) Precluding the defense from eliciting from SA Der Yeghiayan that Mark Karpeles attempted to obtain his immunity in exchange for providing the identify of Dread Pirate Roberts ("DPR");

(D) limiting cross examination of FBI SA Thomas Kiernan;

(3) The court abused its discretion in precluding the testimony of two defense experts.

(4) The court erred in excluding a statement by an unavailable witness.

(5) The court's evidentiary errors, even if insufficient individually to warrant a new trial, constituted cumulative error.

(6) The court erred in denying Ulbricht's motions to suppress evidence from his laptop and social media accounts because the warrants to search those materials lacked particularity, and erred in denying the motion to suppress obtained via pen register and trap and trace devices because  the orders to used those devices were obtained without a warrant.

(7) The sentence to life imprisonment was procedurally and/or substantively unreasonable.  See Doc. 30, Brief for Defendant-Appellant, Case No. 15-1815, *United States v. Ulbricht*, in the United States Court of Appeals for the Second Circuit.  The panel affirmed

3

Ulbricht's conviction and sentence "in all respects."  *United States v. Ulbricht*, 858 F.3d 71, 82 (2d Cir. 2017).

Mr. Ulbricht's petition for writ of certiorari was denied by the Supreme Court on June 28, 2018.  Docket No. 17-950.  Exhibit A, June 28, 2018 letter from Supreme Court to the Clerk of the Second Circuit, advising that Ulbricht's petition had been denied.

Mr. Ulbricht has not presented a prior motion for relief pursuant to 28 U.S.C. § 2255.

Mr. Ulbricht lists six grounds for relief below.  He could not raise any of these issues at trial or on direct appeal because each of these issues involves failures of trial counsel and trial counsel did not raise his own failures at trial or on appeal.  Ulbricht relied on his counsel at trial and on appeal and he was unaware that his rights were being violated and that his counsel did not have a sound trial strategy.  Ulbricht could not raise any of these issues earlier for the additional reason that each of these issues required further factual development to show many significant facts that are nor visible in the trial or appellate record.  With regard to each of these issues, trial (and appellate) counsel (1) failed to provide reasonably competent assistance of counsel, and/or (2) denied Ulbricht his fundamental rights to determine the objectives of his own defense.

## CLAIMS FOR RELIEF AND FACTUAL BASES FOR RELIEF

**I.  Ineffective assistance of trial counsel and denial of Ulbricht's autonomy right to contest his guilt at trial, resulting from trial counsel conceding Ulbricht's guilt at trial.**

*Trial counsel violated Ulbricht's autonomy right to contest his guilt and his right to be presumed innocent by conceding in his opening statement that Ulbricht created and ran the Silk Road website, and by stipulating to evidence of multiple undercover purchases of illegal narcotics from the Silk Road website, effectively admitting that Ulbricht was guilty of the major*

4

*charged offenses and removing any reason the jury might have had to doubt his guilt.*

(a) Supporting facts -

Prior to trial, defense counsel (henceforth, "trial counsel") Joshua Dratel agreed with Ulbricht to try his case to a jury and defend him against conviction on all charges, by contesting the government's case against him.  Declaration of Ross Ulbricht ("Ulbricht Decl.") ¶¶ 1, 2. Ulbricht never authorized trial counsel to concede his guilt on any of the charges.  Ulbricht Decl. ¶ 2.  Trial counsel assured Ulbricht that he had a viable defense.  Ulbricht Decl. ¶ 3.

Trial counsel conceded in his opening statement that Ulbricht had created and managed the Silk Road website, a Dark Web-located website which the government described as the mechanism for an international conspiracy to distribute illegal items, including large quantities of controlled substances.  Tr. 61-62.

Later on in Ulbricht's trial, trial counsel stipulated to the admissibility of government evidence regarding drugs purchased on the Silk Road website by undercover agents, including the fact that two DEA labs had reliably verified that the substances purchased by the undercover agents from the Silk Road website, were indeed illegal drugs, as advertised on the website.  Tr 181-183 (stipulation re drugs purchased by HSI in Chicago, which were delivered and then tested positive in the DEA Laboratory in Chicago); Exhibit B, GX801 (a chart showing the items purchased from the Silk Road website, the positive lab test results identifying each substance purchased, and Exhibit C, GX801A (the text of the stipulation); Tr. 1389-1390 (stipulation re drugs purchased by DEA in New York, which were delivered and then tested positive in the DEA Northeast Laboratory); Exhibit D, GX802 (chart showing drugs purchased, positive test results, and the identify of each item tested); and Exhibit E, GX802A (the text of the second

stipulation).

Trial counsel, thus, conceded that Ulbricht was the mastermind who created the Silk Road Dark Web website (where illegal drugs were bought and sold in large quantities), and managed the website for a time; stipulated that illegal drugs were purchased from the website by undercover agents, that the drugs purchased were delivered to the undercover agents, and that the substances received were tested by reliable means in government drug labs, and that those substances tested positive for the illegal substances they were advertised to be on the website. Trial counsel's concessions and stipulations effectively admitted guilt of the most serious charges against Ulbricht, namely Counts 2 and 4, which each carried the possibility of sentences to life imprisonment.  Ulbricht was convicted on those counts and sentenced to life imprisonment.

Had Ulbricht decided to plead guilty, he would not have gone to trial.  Had Ulbricht chosen to plead guilty, he would have sought some benefit in return, a benefit in terms of a plea bargain that would have given him a promise, or at least a reasonable chance, of a sentence to less than life imprisonment.  Ulbricht Decl. ¶ 6.  Ulbricht did not go to trial for the purpose of having his lawyer concede his guilt.  Id.

Trial counsel failed to honor his agreement to contest Ulbricht's guilt at trial, breaching his duty of loyalty to Ulbricht and denying Ulbricht his autonomy right to go to trial and test the government's proof against him by relying on the presumption of innocence and challenging the government's evidence as insufficient to prove his guilt beyond a reasonable doubt.

Trial counsel conceded in his Opening Statement that Ulbricht had created and run the Silk Road website - for "a few months."  Tr 61-62.  That concession essentially constituted

Ulbricht's admission of guilt, subject to a little additional corroborating evidence, much of which was stipulated to by trial counsel.  The government obtained from trial counsel what they needed in order to persuade the jury to convict Ulbricht of each of the major charges against him, including:

(A) Count One, Narcotics Trafficking, where all the government was required to prove was (1) that Ulbricht distributed or aided and abetted the distribution of controlled substances, and (2) that he did so knowingly or intentionally.  Doc 177, Jury Instructions, at 34;

(B) Count Two, Distributing or Aiding and Abetting the Distribution of Narcotics by Means of the Internet, where the government had to prove (1) that the defendant aided and abetted others in delivering or distributing a controlled substance, and (2) that the delivery or distribution was accomplished by means of the Internet.  Doc. 177 at 42.

(C) Count 3, Conspiracy to Violate the Narcotics Laws. Doc 177 at 47.  The jury was specifically instructed that the extent of the defendant's participation in the narcotics conspiracy has no bearing on whether or not he is guilty, and that it does not matter whether the defendant's role in the conspiracy may have been more limited or different in nature from the roles of other co-conspirators.  Doc. 177 at 52.  The jury was also instructed that *ceasing to participate in a conspiracy does not establish withdrawal from a conspiracy, and that committing subsequent acts to benefit a conspiracy, after initially attempting to withdraw, defeats any claim that the defendant withdrew from the conspiracy.*  See Id. at 55.

(D) Count 4, Continuing Criminal Enterprise, where the government had to prove that Ulbricht committed a federal narcotic felony as part of a series of such offenses, in cooperation with five or more people whom he organized or managed, and from which he derived substantial

7

profit.  Doc. 177 at 62.

Trial counsel's concession that Ulbricht created and ran the Silk Road, combined with his stipulations (Government Exhibits GX801 and GX801A, GX802 and GX802A, see above) that the government had established that numerous Silk Road vendors sold and delivered controlled substances on many occasions, and the government's undisputed evidence that Dread Pirate Roberts (allegedly one and the same person as Ulbricht) charged a commission on every transaction, proved each of the above four charges.  Trial counsel's concession and his stipulations to the drug evidence defeated any defense that Ulbricht might have had.  Ulbricht's conviction on Counts 2 and 4 led to two concurrent sentences to life imprisonment, which sentences Ulbricht is now serving.

Trial counsel did not raise his own error in conceding guilt, as an issue either at trial or on direct appeal, thus this is Ulbricht's first opportunity to establish the factual basis for this issue and to raise this issue.

After conceding that Ulbricht had created and managed the Silk Road, trial counsel provided no evidence or plausible argument that Ulbricht had withdrawn from the narcotics conspiracy, or that he had never joined the conspiracy.  The government provided evidence in its case-in-chief that the Silk Road website, which was located on the internet and which Ulbricht (through counsel) had admitted creating, was the embodiment of the narcotics conspiracy.  Trial counsel's concession that Ulbricht created and ran the Silk Road, was, effectively, Ulbricht's confession that he had created and managed that conspiracy.

After trial counsel conceded Ulbricht's guilt, there was no defense - no defense of mistaken identity, of withdrawal from the conspiracy, of duress or confusion, of alibi, or even of

8

failure to prove beyond a reasonable doubt the elements of the various offenses.

Trial counsel did not "put the government to its proof" and rely on the presumption of innocence, as he had led Ulbricht to believe that he would.  The Second Circuit observed that trial counsel's "principal defense strategy at trial —[was] more of an effort at mitigation than outright denial of his guilt [or of contesting his guilt] of the conspiracy and other charges in the indictment." *United States v. Ulbricht*, 858 F.3d 71, 89 (2d Cir. 2017).  Trial counsel expressly disavowed a defense of withdrawal from the conspiracy: "Our defense is not withdrawal." Tr. 1567.  "As a threshold matter, the government's proposed instruction regarding withdrawal is inappropriate because Mr. Ulbricht does not intend to interpose the defense of withdrawal." Doc. 168 at 4.  Ulbricht's jury was instructed that "mitigation" (evidence of the defendant's lesser role) is not a defense to a charge of conspiracy.  See Doc. 177 at 54 - 55.

Trial counsel's concession in his Opening Statement of Ulbricht's guilt in creating and managing the Silk Road began a three-week-long process where the trial was used as a drawn-out method of providing the factual basis to support Ulbricht's vicarious - and involuntary - guilty plea. Trial counsel's stipulations to the drug evidence further solidified the government's case.  Ulbricht was left with no defense and with his lawyer having stipulated to the validity of much of the evidence against him.

## ARGUMENT SUPPORTING CLAIM I

The Sixth Amendment guarantees a defendant the assistance of counsel to aid him in his defense.  U.S. Constitution, Amendment VI.

The defendant's right to *assistance of counsel* is based on the idea that the defendant himself is the master of his defense.  *See Faretta v. California*, 422 U.S. 807, 820 (1975);

9

*Gannett Co. v. DePasquale*, 443 U.S. 368, 382 (1979).  Where there is an assistant, there must be a master, and in a trial, the master is the defendant.

A *counsel[lor]*, as understood at the time the Sixth Amendment was adopted, was not a lawyer or an attorney who spoke for the defendant and made his decisions for him, but a legal adviser, "one that gives advice," . . . "one that is consulted in a case of law."  Johnson's Dictionary of the English Language, V. I (1770).  An *attorney*, by contrast, was understood to be a person who "by consent, commandment, or request . . . takes upon him the charge of other men's business, in their absense."  *Id*.  The Framers of the Sixth Amendment deliberately chose language that guaranteed to defendants the right to the *assistance of <u>counsel</u>*, who was an adviser, not the right to an *attorney*, who would make their legal decisions for them.  The Framers understood that crucial difference.  The Sixth Amendment requires that counsel must respect the autonomy rights of the defendant.

The concepts of assistant and master do not allow for counsel to act as master of the defense.  The right to defend is personal to the defendant.  *See McCoy v. Louisiana*, 528 U.S. ____ (2018).  While *counsel* may manage some trial details, fundamental decisions remain for the defendant, including the decisions "whether to plead guilty, waive the right to a jury trial, testify in one's own behalf, and forgo an appeal.  *Id.*  Autonomy to decide the objective of the defense in whether to plead guilty or to contest guilt, is one of those fundamental decisions reserved to the defendant.  *Id*.

When the decision to stand trial has been made, "counsel must hold the prosecution to its heavy burden of proof beyond reasonable doubt."  *United States v. Wade*, 388 U.S. 218, 257 (1967) (White, J., dissenting in part and concurring in part).  Absent a guilty plea, defense

10

counsel must "defend his client whether he is innocent or guilty." *Id.* In other words, counsel must defend against the charges by contesting the defendant's guilt, not just offer "mitigation" evidence and arguments, which was no defense at all.

Trial counsel conceded Ulbricht's guilt despite the fact that "admitting guilt of all charged offenses will achieve nothing.  It is hard to imagine a situation in which a competent attorney might take that approach." *McCoy, supra*, Alito, J., *dissenting*.  Trial counsel's failure to defend Ulbricht by contesting guilt, was not the reasonably competent assistance of counsel which the Sixth Amendment guarantees.

Trial counsel usurped Ulbricht's control over the objective of his defense, which was to rely on the presumption of innocence and put the government to its proof, when counsel conceded Ulbricht's guilt, which is what his Opening Statement and later stipulations to drug evidence accomplished.  Trial counsel conceded Ulbricht's guilt without Ulbricht's understanding or consent because Ulbricht was led to believe that counsel's actions were still consistent with his agreement that he would contest Ulbricht's guilt.

Trial counsel's concession that Ulbricht created and ran the Silk Road, was not based on any reasonable or permissible trial strategy because that concession destroyed the agreed-upon basis for Ulbricht's defense, the objective of which was to rely on the presumption of innocence and put the government to its proof.  That concession was also not based on any sound or reasonable trial strategy, because it amounted to a confession through trial counsel, of that which the government was required to prove.[2]  Trial counsel's defense was not based on putting the

---

[2]  The government certainly treated trial counsel's concession as proof of Ulbricht's guilt when, in Closing Argument, the government attorney reminded the jury that "Mr. Dratel admitted, he had to, admitted that the defendant started Silk Road."  Tr At 2164.

government to its proof, or on contesting Ulbricht's guilt, but on pursuing a strategy of

"mitigation," which amounted to no defense at all.

When trial counsel conceded Ulbricht's guilt, he breached his duty of loyalty to his

client: "The touchstone of the client-lawyer relationship is the lawyer's obligation to assert the

client's position under the rules of the adversary system . . . and to act with loyalty during the

period of the representation."  New York Rules of Professional Conduct, Preamble.  When trial

counsel failed to abide by Ulbricht's decision to contest his guilt at trial, trial counsel breached

his duties to Ulbricht. See Rule 1.2, New York Rules of Professional Conduct ("a lawyer shall

abide by a client's decisions concerning the objectives of representation and, as required by Rule

1.4, shall consult with the client as to the means by which they are to be pursued. A lawyer shall

abide by a client's decision whether to settle a matter.).  Ulbricht chose to contest his guilt and so

instructed trial counsel.  Trial counsel's concession of guilt contradicted Ulbricht's decision and

violated Ulbricht's autonomy right to determine the objectives of his defense.

Those actions of trial counsel do not measure up to the reasonably competent, *reasonably

effective assistance of counsel* that is guaranteed by the Sixth Amendment.  *See Strickland v.

Washington*, 466 U.S. 668, 687 (1984). There are some actions by trial counsel, such as

conceding guilt, which can never be found reasonable: "guilt is almost always the only issue for

the jury [in non-capital cases], and therefore admitting guilt of all charged offenses will achieve

nothing."  *See McCoy, supra*.

When a defendant shows that his autonomy right (including the right to contest guilt and

have his jury trial) was violated by his counsel, he is entitled to a new trial and *he need not show

prejudice* because his claim is not subject to traditional ineffective-assistance-of-counsel

12

analysis.  *See McCoy, supra*.

Violation of his autonomy right to decide whether to contest his guilt at trial ranks as structural error, and is not subject to harmless error review.  *Id.*  This structural error requires reversal without further inquiry because "the right at issue is not designed to protect the defendant against erroneous conviction but instead protects some other interest," such as "the fundamental legal principle that *a defendant must be allowed to make his own choices about the proper way to protect his liberty*." *Id.*, *quoting Weaver v. Massachusetts*, 582 U.S. ____ (2017) (emphasis added).

Trial counsel's fateful decision to concede in his Opening Statement that Ulbricht created and ran the Silk Road, combined with his stipulations to the government's evidence of multiple undercover drug purchases from Silk Road vendors, and his stipulations to evidence of DEA lab verification of the identification of the illegal drugs purchased, breached his agreement (and his duty) that he would defend Ulbricht by relying upon the presumption of innocence and by challenging the sufficiency of the government's evidence to satisfy the burden of proof.  Trial counsel's actions usurped "the defendant's right to make the fundamental choices about his own defense."  *See Weaver, supra.*

### Conclusion Regarding Claim I

A trial in which counsel betrays his client's right to be presumed innocent and in which counsel concedes his client's guilt, is fundamentally unfair.  Trial counsel's actions denied Ulbricht's right to plead guilty and contest his guilt.  Ulbricht must be granted a new trial.

**II.  Ineffective assistance of trial counsel at trial and on appeal, where trial counsel failed to protect Ulbricht's right to a public trial, failed to protect Ulbricht's right to be**

**present and to participate during all critical stages of trial, failed to protect the
presumption of Ulbricht's innocence, and failed to protect Ulbricht's right to due process
and a fair trial, all resulting from secretive, out-of-court and off-the-record court
proceedings.**

Supporting facts -

The trial court conducted secret jury selection proceedings out of court, off the record,
and without the presence and participation of Ulbricht. The trial court or her surrogates, and not
the jury administrator, administered the presentation of a juror questionnaire to a panel of 183
prospective jurors in this case, out-of-court and without making any record of the proceeding.
Declaration of Paul Grant ("Grant Decl.") ¶ 2. Defense counsel was not present for that
proceeding, nor was Ulbricht. Ulbricht Decl. ¶ 2317. The prospective jurors were asked
questions about their backgrounds, possible hardships, possible conflicts and biases they might
have in this case. **Exhibit F**. They were obviously told not to provide their names on the
questionnaires, and also that their questionnaires would be kept confidential and under seal.
Grant Decl. ¶¶ 4, 5; **Exhibit F**. There is no record of whether the jurors were sworn to tell the
truth in their unsigned questionnaires. Grant Decl. ¶ 2. There is no record of what, if any, reason
the prospective jurors were given for the extreme secrecy, and for their anonymity, in these
proceedings. Grant Decl. ¶ 7. There is no record of what questions the prospective jurors may
have asked, nor of what answers or instructions they may have been provided. Id.

The juror questionnaires were provided to trial counsel and counsel for the government
prior to trial. Trial counsel and counsel for the government got together, without the presence of
Ulbricht, and jointly agreed on recommending that 59 prospective jurors be stricken from the

14

jury pool, after which they submitted their joint recommendations to the trial court, in private communications that were never made part of the public or sealed record.  See Doc. 144, Order acknowledging receipt of the jointly agreed-upon list of 59 proposed juror strikes; Ulbricht Decl. ¶ 23.  The trial court accepted the recommendations for striking 59 jurors, and eliminated another 33 prospective jurors *sua sponte*, with no explanation why the court was striking those jurors.  Id.  Thus, 92 out of 183 jurors were struck in secret, out-of-court proceedings from which Ulbricht and the public were excluded.

The juror questionnaires were never made part of the official record in this case.  They are not in the public record or in the sealed records of this case. Grant Decl. ¶ 7.

Given that the prospective jurors did not provide their names on the juror questionnaires, even though the forms called for them to write in their names, it is evident that the trial court decided to tell the jurors not to provide their names on their questionnaires.  That decision is not disclosed in the public record, and was not made known to Ulbricht.  Ulbricht Decl. ¶ 23.  There is also no record as to why the trial court made that decision.

The trial court also decided (as shown by the fact that juror names were not mentioned in court), without any announcement on the record and without providing any explanation for juror anonymity, that there would be no mention in court of the names of the jurors who participated in *voir dire* on the first morning of trial, including no mention of the names of those jurors who were chosen to serve.  Doc. 315, Transcript of Voir Dire, at 2-102.  Jurors were only referred to by their juror numbers.  Id.  At the end of the trial, when giving the jurors their discharge instructions, the trial court advised the jurors who had served, that "You need give no one your name.  You need give no one any information at all."  Tr. 2339.

In response to post-trial requests and inquires from Ulbricht's post-conviction counsel, who was seeking to add various documents and records to the public docket, including the records of the juror questionnaire proceeding, the trial court stated that "the jury in this case was not 'anonymous.'" Doc. 314.

Trial counsel did not object to the secretive, out-of-court jury selection proceedings, nor to the empaneling of an anonymous jury, nor did he ask the trial court to offer a plausible explanation to the jurors for their anonymity, an explanation that should attempt to protect the presumption of Ulbricht's innocence.  In fact, trial counsel went along with and participated in the unusual and secretive jury selection proceedings fashioned by the trial court, despite the fact that Ulbricht and the public were excluded from those proceedings.

Trial counsel, who was also appellate counsel, failed to raise these violations of Ulbricht's rights at trial or on appeal.  This is Ulbricht's first opportunity to develop the factual record necessary for evaluating this claim, and the first opportunity he has had to present this claim.

The trial court apparently had the government provide pre-trial disclosure of their anticipated exhibits and witness list, to the court and to trial counsel, sometime in early December 2014.  See Doc. 96; Doc. 107.  The government exhibits were not added to the public docket (see Exhibit G, a copy of the docket entries), nor included in the sealed records of the court.  See Doc. 328, a list of sealed documents that was eventually provided by the sealed records clerk in response to repeated requests by post-conviction counsel for access to the sealed records.

Trial counsel apparently provided to the trial court (via email) a spreadsheet showing the

16

anticipated objections of Ulbricht to the government-disclosed exhibits. See Doc. 110, a publicly

filed copy of an email from trial counsel to the court that references the defense spreadsheet as

an attachment, but that spreadsheet was not included on the public docket. According to the trial

court, the government then submitted its response to Ulbricht's hearsay objections in an "exhibit

chart *filed with the Court* on December 10, 2014." See Doc. 142 at 37 (Emphasis added). No

such document is shown as filed on the public docket for December 10, 2014 (Exhibit G), nor is

any such *December 10, 2014-filed document* shown on the record of Sealed Filings in this case.

See Document 328. There is no record as to why the defense spreadsheet providing anticipated

objections was filed under seal, or as to why the government's "exhibit chart" was never filed on

either the public docket or in sealed records. Grant Decl. ¶ 18.

　　　The public could not view the government's proposed trial exhibits prior to trial, nor the

defense-anticipated objections to the government exhibits, which were submitted to the court on

a spreadsheet. The public had no way to view the "exhibit chart" "filed with the trial court" by

the government on December 10, 2014. It may be that the exhibit chart that was "filed with the

trial court," was sent via email to the trial court, but never made part of the official court record.

That appears to have occurred more than once during Ulbricht's trial. Decl. Paul Grant ¶ 19.

　　　When the government called its witnesses at trial, and offered its exhibits for admission,

trial counsel would most often voice his objections by referring to the objections he had filed

pre-trial, in the spreadsheet that was filed under seal. The trial court would then rule on the

objections without explanation, or it would reference its own pre-trial ruling discussing the

defense objections. See, for example:

　　　8  MR. SERRIN: The government offers Government

9 Exhibit 100A into evidence.

10 MR. DRATEL: Just note our objection.

11 THE COURT: Government Exhibit 100A is received.

12 (Government's Exhibit 100A received in evidence)

Tr 80

4 MR. SERRIN: The government offers Government

5 Exhibit 100C.

6 MR. DRATEL: The same objection, your Honor.

7 THE COURT: Why don't you establish the time frame.

8 Q. When was the photo taken?

9 A. The photo was taken on December 8, 2011.

10 THE COURT: Government Exhibit 100C is received.

11 (Government's Exhibit 100C received in evidence)

Tr 83

3 Mr. Serrin: Your Honor, the government offers

4 Government Exhibit 104 into evidence.

5 Mr. Dratel: Same objection, your Honor.

. . .

21 The Court: Government Exhibit 104 is received.

Tr 85

3 Mr. Serrin: The government offers Government

4 Exhibit 102D into evidence.

18

1 Mr. Dratel: Previously – can we have a line [continuing]

2 objection, your Honor. If I have something different - -

3 The Court: Yes, yes.  Thank you.

Government Exhibit 102D is admitted.

Tr 89-90

13 MR. TURNER: Your Honor, the government would request

14 that we be able to play the video for the jury.

15 MR. DRATEL: Just our prior objection, your Honor.

16 THE COURT: All right. Government Exhibit 107 is

17 received and you can publish it by playing it.

18 (Government's Exhibit 107 received in evidence)

Tr 101

15 MR. TURNER: Your Honor, we would offer this as a

16 demonstrative just to show how this website works.

17 THE COURT: This is Government Exhibit 106B?

18 MR. TURNER: I believe it is 106A.

19 Q. Is that it?

20 A. A.

21 THE COURT: All right. Mr. Dratel.

22 MR. DRATEL: I'm sorry, we were just -- the same

23 objections, your Honor, that we had before.

24 THE COURT: All right. I will assume it is the same

19

25 as the prior objection.

Tr 108

8 (Witness not present)

9 THE COURT: Ladies and gentlemen, let's all be seated

10 and we'll take up a few matters now.

11 First, and just in terms of the logistics, so I have

12 two exhibit lists, the one that was handed to me this morning,

13 that is I think the updated government exhibit list and then I

14 have the one that has all of the objections on it. To the

15 extent that there are documents that are on the new list that

16 were not on the old list, I don't have any indication as to

17 objection. That was the nature of why I said I assume it is

18 the prior objection for 106B. And so I am assuming that

19 Mr. Dratel has had an opportunity to see the documents that are

20 not on my prior list.

21 MR. TURNER: That is correct, your Honor.

22 THE COURT: All right. So, Mr. Dratel, we'll take it

23 step-by-step, but if they are just going to be the same

24 documents of a type, then your other objections will be, I

25 think, obvious.

Tr 113

1 MR. DRATEL: OK.

2 THE COURT: And my rulings will be similarly, and the

3 basis therefor will similarly be obvious.

4 MR. DRATEL: Right. Some of them we received over the

5 last couple of days so I'm not even sure if they are on the

6 government's list. So sometimes it is hard to -- at least the

7 one that we have, but it is hard to make the comparison the

8 same way that the Court is doing. I am trying to do it in a

9 way that covers that.

10 THE COURT: All right. So we'll just take it

11 step-by-step.

Tr 114

The trial judge repeatedly said the basis of her rulings would be obvious (see above), but her rulings were anything but obvious - to the public, to Ulbricht, or to the jury. Those proceedings appear well-suited for the purpose of hiding the nature of these discussions from everyone but the trial court and the attorneys. See Decl. Ulbricht, ¶ 21. Neither the public at trial, or Mr. Ulbricht, or the jury, could decipher the discussions above, regarding what was being discussed in the context of objections to government-offered exhibits. Decl. Ulbricht ¶ 21. Neither could anyone now reading the trial transcript, unless they could obtain a copy of the sealed objections spreadsheet and the government's unfiled responses, and they would still not have a clear picture.

The trial court did at one point briefly address the subject of objections with the jury and the public, in open court. The trial court basically said - "don't worry, this is not important to

21

you, you don't need to understand this, you can trust me to handle this properly:"

"*You are not to draw any conclusions from the objections made by counsel. It is part of their job. And, similarly, don't draw any conclusions from my rulings other than whether the evidence in question or answer is admissible. The objections relate to legal issues and principles that are within my authority to decide, and making objections to evidence or questions or answers is entirely appropriate regardless of my rulings on any particular objection.*" Tr 134.

In this instance, the fact that the public was present at trial did not mean that the public could actually comprehend the trial proceedings because the discussions between the attorneys and the trial court referenced secret documents and secret discussions. The objections and the rulings on objections presented a largely incomprehensible picture to the jury, to the public, and to Ulbricht, himself.

This pattern of objections and rulings continued throughout the trial, with unnamed and unexplained defense objections to government exhibits, ruled upon by the trial court without comprehensible explanations (even at side bar) - *e.g.*:

(At the side bar) - [thus out of earshot of the jury or the public or the defendant]

THE COURT: For a number of the most recent exhibits, which I was going to take up at the break there actually haven't been objection [*sic*] that had been noted on the pretrial order. So you've been saying objection, same objection, but, for instance, for 116A, for 116B, for 117A and for 117B there hadn't been objections on the pretrial order.

Mr. Dratel: Right.

[This was followed by an extensive discussion -at the side bar - of the admissibility of a particular exhibit]

22

Tr 204 - 206

The public and Mr. Ulbricht and his jury could not have understood during trial what the trial court and the attorneys were talking about in open court in reference to many or most of the objections raised and ruled upon, and the public record is still unintelligible.

Trial counsel failed to object (at trial or on appeal) to these secretive proceedings that effectively precluded the public and Ulbricht from understanding significant portions of the trial proceeding. That failure also contributed to the partial denial of Ulbricht's right to be present and to have a public trial, and to the denial of his right to a fair trial.

### ARGUMENT SUPPORTING CLAIM II

**A. Secret Selection of an Anonymous Jury**

The record shows that the trial court secretly empaneled an anonymous jury, without formal request, without explanation or justification, and without even a public announcement of that decision. Decl. Grant ¶¶ 6, 7. The record also does not show that trial counsel requested, or that the trial court took, any measures to minimize the prejudicial effect that seating an anonymous jury would have on Mr. Ulbricht. Decl. Grant ¶ 7.

"A district court may order the empaneling of an anonymous jury upon (a) concluding that there is strong reason to believe the jury needs protection, and (b) taking reasonable precautions to minimize any prejudicial effects on the defendant and to ensure that his fundamental rights are protected." *United States v. Thomas*, 757 F.2d 1359, 1365 (2nd Cir.1985). "*The impanelling of an anonymous jury . . . and its impact on the presumption of innocence must receive close judicial scrutiny* and be evaluated in the light of reason, principle and common sense." *Id.*, at 1363, *citing Estelle v. Williams*, 425 U.S. 501, 504 (1976) (emphasis added). The

23

trial court made no findings, took no precautions and made no effort to protect Mr. Ulbricht's fundamental rights, including his right to be presumed innocent. The trial court simply decided, in secret, without Mr. Ulbricht's awareness, to empanel an anonymous jury. The trial court never announced that decision and later, after the trial, denied that the jury had been anonymous.

Defense counsel failed to make any effort to protect Ulbricht against the burden that seating an anonymous jury placed on the presumption of innocence.

If an anonymous jury is determined to be required, a defendant's fundamental rights must be protected by "t[aking] care to give the jurors a plausible and non-prejudicial reason for not disclosing their identities. . . " *United States v. Paccione*, 949 F.2d 1183, 1192 (2d Cir. 1991). No reason for anonymity was provided to Mr. Ulbricht's jury during in-court *voir dire*, and there is no record of what the prospective jurors may have been told when the trial court (either directly or through surrogates) administered the juror questionnaire. It is obvious, however, that the trial court, either directly or through surrogates, did instruct the prospective jurors not to write their names on the questionnaires in the space that was provided for their names, thus calling the jurors' attention to the unusual resort to anonymity in Ulbricht's case.[3] There is no record showing what, if any, explanation was offered to the jurors for that peculiar instruction, or showing whether any of the jurors asked why they should not write their names on the forms.

---

[3] Even in the recent trial of "El Chapo," where an anonymous jury was formally empaneled after findings that an anonymous jury was necessary, and where a juror questionnaire was used, and the jurors were told their personal information would be kept secret in order to protect their privacy, those prospective jurors were each required to provide their names and their addresses on the juror questionnaires. **Exhibit 12**, approved Juror Questionnaire. Ulbricht's prospective jurors were told they should not provide their names, and did not, even though the forms were always to be kept confidential and under seal, sending a terrible message that even sealed records were not safe, and they had something to fear.

This must have appeared highly unusual to the jurors, who were also promised - according to the statement on the first page of the questionnaire - that any information they provided on their questionnaires was going to be kept confidential and under seal.  All that apparent need for secrecy and anonymity cast a very dark shadow over Mr. Ulbricht's right to trial by a fair and impartial jury, and eroded the presumption of his innocence.

Mr. Ulbricht's jury was selected largely in secret proceedings, rather than in public proceedings as is favored by the law: "In addition to ensuring that judge and prosecutor carry out their duties responsibly, a public trial encourages witnesses [or jurors] to come forward and discourages perjury." *See In re Oliver*, 333 U.S. 257, 270 (1948).

A public jury selection process, with jurors identified, encourages honest responses, discourages perjury from jurors, and protects the defendant's right to the presumption of innocence:  "The public-trial guarantee embodies a view of human nature, true as a general rule, that judges, lawyers, witnesses, and jurors will perform their respective functions more responsibly in an open court than in secret proceedings." *Estes v. Texas*, 381 U.S. 532, 588 (1965) (Harlan, J., concurring).  The public and Ulbricht were excluded from proceedings in this case where the lawyers and the trial court eliminated 92 out of 183 prospective jurors.  There is no record as to why any of those 92 jurors were eliminated and since the public never had access to the questionnaires, the public can have no confidence that these juror selection processes were conducted in a proper and fair fashion.  Public trials, including public jury selection, are constitutionally guaranteed and they are required because of the Framer's historical distrust for secret trial proceedings.

When the trial court (or the court's surrogate) told prospective jurors not to write their

names on their questionnaires (as is clear from the fact that they left blank the space provided for them to write their names) and told them that anything they wrote on their questionnaires would be kept confidential and under seal, and when in *voir dire* the trial court and the courtroom deputy referred to jurors only by their juror numbers, the court conveyed to the jurors that their anonymity was important and that their identities would be kept secret and, thus, that they could say whatever they wished without ever being held publicly accountable for what they did or did not say. This treatment also sent a message to the jurors that (1) there was something highly unusual about this trial, and (2) that the trial court thought they needed to be protected against Mr. Ulbricht or his supporters.

The trial court stated post-trial that the parties did not object to sealing the juror questionnaires.  Exhibit H, Doc. 314.  This is a peculiar statement for two reasons: first, the questionnaires were not filed as sealed records, they were never made part of the official record, public or sealed, and are, thus, secret to this day; second, Mr. Ulbricht was never asked whether he would object or consent to the sealing of those questionnaires, and he was never made aware that such a sealing would implicate his right to a public trial.  Mr. Ulbricht never waived his right to a public trial; he did not waive his right to be present at all critical stages of his trial proceedings; and he never authorized his lawyer to waive any of his public or fair trial rights. See Decl. Ulbricht, ¶¶ 1-27. Mr. Ulbricht did not waive his rights to object to secret or sealed or out-of-court and unrecorded jury proceedings. *Id*.   Additionally, Mr. Ulbricht never knew that the juror questionnaires were not made part of the trial record.  *Id*.

The trial court's refusal to add the juror questionnaires to the public docket provided no explanation as to why the questionnaires could not be redacted if they contained sensitive

personal information.  Exhibit H, Doc. 314; *See Press-Enterprise Co. v. Superior Court (Press-Enterprise I*), 464 U.S. 501, 505 (1984).  The only personally identifying information on the questionnaires were the handwritten names of 3 jurors out of 183 questionnaires.  Those names could have been redacted. The trial court apparently believed that her decision to maintain the permanent secrecy of those records required no explanation.

When the court decides to seal a record of proceedings in a criminal case, "the judge must articulate on the public or sealed record a sufficiently detailed basis for his serious concern about public dissemination risks . . . and his preference for [sealing] over alternative remedies." *In Re Application of The Herald Co.*, 734 F.2d 93 (2nd Cir. 1984) (dealing with the First Amendment right of access to court proceedings).  Mr. Ulbricht can find no case law which authorized the court to maintain secret files (files not in the sealed or public records) in his criminal case.  The trial court has never offered a justification for not making a record of the juror questionnaire proceedings or for maintaining the secrecy of the *anonymous juror questionnaires*, which have yet to be included in the official record of Mr. Ulbricht's trial, in either public or sealed records.

A criminal defendant's Sixth Amendment right to an open jury selection process is . . . as extensive as the public's right of access under the First Amendment. *Presley v. Georgia*, 558 U.S. 209, 212 (2010). In any case where closed jury selection proceedings are utilized, the court must make findings adequate to support the closure. *Waller v. Georgia*, 467 U.S. 39, 45 (1984).

The juror questionnaire proceedings in this case were not just closed, they were secret at the time they were conducted by the trial court and they are still secret today, since the trial court chose, also for unexplained reasons, not to make a record.

27

Secret jury proceedings, such as those described above "can only breed ignorance and distrust of courts and suspicion concerning the competence and impartiality of judges." *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 587 (1976) (Brennan, J., concurring).  The guarantee that a trial will be conducted in public view, without secret proceedings, is "a safeguard against any attempt to employ our courts as instruments of persecution."  *In re Oliver, supra*, at 268-270.

Conversely, hiding jury proceedings or records of jury proceedings, including juror questionnaires, provides the opportunity to use the courts as instruments of persecution.  Guaranteeing public access to records of judicial proceedings is an effective restraint on abuse of judicial power.  *See Id.*, at 270.

Secret judicial proceedings are a "menace to liberty . . . justice cannot survive behind walls of silence." *Gannett Co. v. DePasquale*, 443 U.S. 368, 412 (1979) (Blackmun, J., concurring in part and dissenting in part).  Jury selection proceedings are presumptively public.  *See Press-Enterprise I* at 505.  That is a right of the public and of the defendant.  *Presley v. Georgia, supra*, 558 U.S. at 212.

 In evaluating a post-conviction claim of ineffective assistance claim based on the partial denial of a public trial during jury selection (a "structural error"), a defendant may establish ineffective assistance of counsel if he can show both deficient performance of trial counsel, and prejudice - or if he can show that the errors led to fundamental unfairness.  *See Weaver v. Massachusetts*, 582 U.S. ___ (2017).  The prejudice showing is required in most, but not all, *Strickland* claims.  *Id* (referring to *Strickland v. Washington*, 466 U.S. 668 (1984)).

There is no record of the trial court's conduct of the juror questionnaire proceeding

because the trial court chose not to make a record. The prospective jurors were called into the courthouse to fill out questionnaires, were informed on the questionnaire which case they were assigned to, and they were asked questions (on the questionnaire) to uncover possible biases, as well as questions exploring for hardship issues.  There is no record of what the prospective jurors were told orally, or of what questions they may have asked, or of what responses they may have received.

Where - as in this case - the prospective jurors may have been sworn to tell the truth,[4] and where they were informed about the nature of the case and the name of the defendant, and where they were told not to write their names on the questionnaires, and where the court inquired about matters related to possible bias, and where the questionnaires were used in out-of-court proceedings, by the court and by counsel for the parties, to eliminate 92 out of 183 prospective jurors - all of which happened during the trial court's administration of the juror questionnaires - these proceedings were clearly part of the *voir dire* process.  Those proceedings appear to have been expressly designed in this case for the purpose of excluding the public and Mr. Ulbricht.

That may well have resulted in less time spent in court on *voir dire*, and the court may have considered that efficient, but that "efficiency" was achieved at the expense of Mr. Ulbricht's right to be present and participate in his own defense and of his right to a public trial. The court's *efficient and secretive* process resulted in the jury being selected and sworn before lunch on the first day of trial, an unusually short time for jury selection in such a high profile,

---

[4]  The prospective jurors were not asked to sign their questionnaires and there is no transcript of the proceeding, so there is no evidence that any of them ever took an oath - even though the questionnaire states on Page 1, "You are sworn to give true and complete answers to all questions in this questionnaire.  See Exhibit F.

lengthy, and complicated case.

The defendant's right to be present in person at all stages of his trial is a fundamental right.  *Rushen v. Spain*, 464 U.S. 114, 117-18 (1983);  *Diaz v. United States*, 223 U.S. 442, 456 (1912).  The defendant's right to be present is "scarcely less important to the accused than the right of trial itself.  *Id.*, at 455.  The right to be present is rooted in the Sixth Amendment Confrontation Clause.  *Illinois v. Allen*, 397 U.S. 337, 338 (1970).  It is also guaranteed by the Fifth Amendment Due Process Clause.  *See Kentucky v. Stincer*, 482 U.S. 730, 745 (1987).  The right to be present at every stage of the trial includes the right to be present for the impaneling of the jury.  *See United States v. Canaday*, 126 F.3d 352, 360 (2d Cir. 1997).  Deprivation of that right rendered Ulbricht's trial fundamentally unfair.

As shown above, Mr. Ulbricht did not waive his right to a fair or public trial or his right to be present at all critical stages of his trial, nor did he authorize trial counsel to waive those rights.

In examining purported waivers of fundamental trial rights, including the right to a public trial, every reasonable presumption should be indulged against finding the waiver of such a right.  *Canaday*, at 359.  Considering the question of waiver, "it has been pointed out that 'courts indulge every reasonable presumption against waiver' of fundamental constitutional rights and that we 'do not presume acquiescence in the loss of fundamental rights.' ... This protecting duty imposes the serious and weighty responsibility upon the trial judge of determining whether there is an intelligent and competent waiver by the accused."  *Johnson v. Zerbst*, 304 U.S. 458, 464-65 (1938).  Defense counsel did not attempt to waive Ulbricht's right to be present, nor did he act to protect it.  He simply ignored the right, at trial and again on direct appeal.

30

The guarantee of a public trial has benefits which cannot be precisely measured, *but a criminal trial cannot reliably function"* if it is not conducted in view of the public. *See Sullivan v. Louisiana,* 508 U.S. 275, 281 (1993).  The defendant cannot be required to show prejudice from denial of a public trial. *Guzman v. Scully*, 80 F.3d 772, 776 (2d Cir. 1996); *Waller v. Georgia*, 467 U.S. 39, 49 (1984) (defendant should not be required to prove specific prejudice in order to obtain relief for violation of his right to a public trial); *but cf. Weaver v. Massachusetts*, 582 U.S. ____ (2016).

### B.    Secretive Evidentiary Discussions

The trial court ordered trial counsel to provide a pre-trial listing of Mr. Ulbricht's anticipated objections to pre-trial disclosed government exhibits. See Doc. 96, 107.  Trial counsel apparently submitted his anticipated objections on a spreadsheet sent to the court by email.  See Exhibit I, Doc. 110, copy of an email sent to the trial court, which references an attached letter to the court and an attached spreadsheet.  This email shows that an Excel spreadsheet was attached to it, but Doc. 110 as filed on the public docket, does not contain the spreadsheet. The email informs the trial court that the letter to the court and the excel spreadsheet "will be filed publicly on ECF," but that was never done. Exhibit I, Doc. 110.

The spreadsheet containing the defense-anticipated objections was, however, filed as a sealed document, and is not available on the public docket. No reason was provided by the trial court for filing that document under seal.  Neither the public or Ulbricht (except as part of trial counsel's stack of papers at trial) ever had access to that document, rendering unintelligible those discussions during trial regarding the admissibility of many government exhibits.

The right to a public trial is guaranteed in the Sixth Amendment, which provides: "In all

criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an

impartial jury...." Amend. VI, U.S. Const.  That provision in the Bill of Rights derives from

English law.  *United States v. Cojab*, 996 F.2d 1404 (2d. Cir. 1993).

      The right to a public trial was described in 1649 as "the first fundamental liberty" of a

free people by John Lilburne, champion of English liberty, in his trial for high treason, where he

demanded his courtroom doors be thrown open to the public.  *Gannett Co. v. DePasquale,* 443

U.S. 368, 394 (fn 20) (1979). This cherished right, Lilburne proclaimed, requires that "all courts

of justice always ought to be free and open for all sorts of peaceable people to see, behold and

hear, and have free access unto; and no man whatsoever ought to be tried in holes or corners, or

in any place, where the gates are shut and barred, and guarded with armed men...."  Reprinted in

IV Cobbett's Complete Collection of State Trials, 1270, 1273 (T.B. Howell ed., 1809) (quoted in

*Cojab, supra*).  "Freeborn John" Lilburne had personal experience with secret court proceedings,

having been tried and convicted in 1637 in a secret trial before the King's ministers in the Court

of Star Chamber, where he was denied counsel, denied the judgment of his peers, and convicted

and punished because he refused to answer questions of the court and incriminate himself.

http://www.british-history.ac.uk/report.aspx?compid=74904&strquery=john lilburne

      That secret trial in 1637 led to the recognition of the common law right of the accused to

a public trial and has also been cited as the foundation for the Fifth Amendment of the United

States Constitution.  *See Miranda v. Arizona*, 384 U.S. 436, 459 (1966).  The trial of Lilburne

also led to the abolition of the secretive Court of Star Chamber.  *Id*.  Many of the demands made

by Lilburne in his trial eventually found their way into the American Bill of Rights, including the

constitutional right of the accused to a public trial.  *Id*.

Closed and unrecorded jury selection proceedings and the heavy use of sealed and secret records in Ulbricht's trial prevented meaningful public access to the trial proceedings.

"Public monitoring of judicial proceedings is essential to democratic control over courts and deters arbitrary judicial behavior." *United States v. Amodeo*, 71 F.3d 1044, 1048 (2d. Cir. 1995).   Without public access, "the public could have no confidence in the conscientiousness, reasonableness or honesty of judicial proceedings." *Id*.   Public access to judicial documents is essential to public monitoring: The public has a "right of . . . access to judicial documents that are "relevant to the performance of the judicial function and useful in the judicial process." *See Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 120 (2d Cir. 2006).

The trial court offered no reason for sealing the defense spreadsheet (apparently shown on the public docket as a sealed document, Doc. 151) showing Mr. Ulbricht's anticipated objections to pre-trial disclosed government exhibits. Nonetheless, the effect of that sealing was to render unintelligible to the public and to the jury and to Mr. Ulbricht, what the trial court and the attorneys were talking about during trial when objections were made to the admission of many government exhibits.

"Documents may be sealed if specific, on the record findings are made demonstrating that closure is essential to preserve higher values and is narrowly tailored to serve that interest." *In re New York Times Co.*, 828 F. 2d 110, 116 (2d Cir. 1987).   Broad and general findings by the trial court are not sufficient to close access to judicial proceedings or to judicial records.  *See Id.*

Filing the defense objections spreadsheet under seal, for no stated or apparent reason, made important portions of the trial proceedings unintelligible to the public, to Mr. Ulbricht, and to his jury.  Conducting court proceedings in language that is unintelligible to the public or the

accused, is reminiscent of times when the laws of the land were incomprehensible to the accused or the public or the jury because they were "lockt up from common capacities in the Latine or French tongues." Howell, ed., 4 State Trials and Proceedings for High Treason and Other Crimes and Misdemeanors 1270, 1379 (I Charles II 1649) (London: T.C. Hansord 1816). Keeping the government's responses (and the juror questionnaires) secret, not filed anywhere, is even more troubling.

The constitutional right to an open, public trial is one shared by the accused and the public. *Press-Enterprise Co. v. Superior Court of California*, 478 U.S. 1, 7 (1986) (Press-Enterprise II). The presumption of an open proceeding is overcome only where the possible loss of the guarantee of a fair trial is supported by careful and specific findings that (1) closure is necessary to safeguard the defendant's right to a fair trial, and (2) the order for closure is narrowly drawn to serve a specific, identifiable interest. *Press-Enterprise Co. v. Superior Court of California*, 464 U.S. 501, 510 (1984) (Press-Enterprise I).

The trial court made no findings at all with respect to the decision not to file the government's responses to the defense objections, or to the decision not to file the juror questionnaires on either the public docket or in the sealed records of the court. The trial court failed to provide any reason for closing access to the public and the defendant and his counsel, and for not making a record of that portion of the jury *voir dire* which the court or her surrogates administered ("the juror questionnaire proceeding") out of court.

A court's "power to close a courtroom where proceedings are being conducted during the course of a criminal prosecution and/or to seal the records of those proceedings is one to be very seldom exercised, and even then only with the greatest caution, under urgent circumstances, and

34

for very clear and apparent reasons". *United States v. Cojab*, 996 F.2d 1404, 1405 (2d Cir. 1993).

The trial court failed to make any findings to justify closed proceedings and secret records.  Trial counsel did not object to the out-of-court and unrecorded juror questionnaire proceeding, nor to the failure to make the filled-out questionnaires part of the public or sealed trial record, nor to the sealing of the defense spreadsheet showing anticipated objections to government exhibits, nor to the sealing of many other records.  Trial counsel failed to object at trial to secretive proceedings and, as appellate counsel, he also failed to raise these issues on direct appeal.

## CONCLUSION REGARDING CLAIM II

Trial counsel failed to protect Mr. Ulbricht's right to a public trial regarding the out-of-court and unrecorded jury selection proceedings and regarding the incomprehensible in-trial discussions about the admissibility of government exhibits, and regarding the incomprehensible in-trial discussions and rulings concerning objections to witness questions and answers.  Trial counsel actually joined the court in denying Ulbricht's right to a public trial.  Trial counsel should have insisted that his list of anticipated objections to government exhibits, and the government's responses, be made part of the public docket, so that the public could have access to that information and use it to understand what was being discussed during the trial.

There was no justification for the trial judge to conduct in-trial discussions of evidentiary objections by reference to sealed discussions or secret records that only the judge and the attorneys had seen.  Public trials are not conducted for the private benefit of the judge and the attorneys, but for the protection of the defendant's right to a fair trial, for pursuit of the truth, for

demonstrating to the public that trials are being conducted in a fair and forthright manner, and to assure the public of the integrity of the judicial system.

Mr. Ulbricht was denied his right to a fair and public trial, and the right to be present at all critical stages of his trial, without any effort from trial counsel to protect those rights.  Mr. Ulbricht was denied, in this regard, not just the effective assistance of counsel - he was denied any assistance at all, at trial or on direct appeal.

Those who framed our Constitution and the Bill of Rights were aware of subtle encroachments on individual liberty. They knew that "illegitimate and unconstitutional practices get their first footing . . . by silent approaches and slight deviations from legal modes of procedure." *Boyd v. United States*, 116 U. S. 616, 635 (1886).

The trial court's secret jury selection proceedings, frequent and unjustified use of secret and sealed records, and of methods for concealing legal discussions in trial, may all appear to be "slight deviations from legal modes of procedure," but their cumulative effect was to deprive Ulbricht of a public trial, deny him the right to be present at all critical stages of his trial, and burden or compromise the presumption of innocence to which he was entitled.

Mr. Ulbricht cannot show what particular harms he suffered as a result of trial counsel's failure to protect his right to a public trial and his right to be present at all critical stages of his trial, nor should he be required to make such a showing.  Ulbricht was denied the right to be present during critical stages of the jury selection process and during portions of his trial because of secret proceedings, secret and sealed records.  He was denied his right to a public trial because of secretive proceedings, sealed and secret records.  Ulbricht's right to be presumed innocent was compromised by the trial court's empanelling of an anonymous jury.  Ulbricht has shown

that he was denied his fundamental trial rights as a result of trial counsel's failures to render reasonably competent and professional assistance of counsel. Prejudice must be presumed or his trial must be considered to have been fundamentally unfair.

### Conclusion Regarding Claim II

Mr. Ulbricht has shown that his trial was not conducted fully in public view and not fully in his presence and, that *his trial, therefore, could not be considered to have functioned reliably*. It was, therefore, fundamentally unfair. He is entitled to a new trial, one conducted consistent with the fair and public trial rights guaranteed by the Sixth Amendment. *See Weaver v. Massachusetts*, 582 U.S. ___ (2017).

**III.  Ineffective assistance of trial counsel at trial and on appeal, due to the mishandling of expert witness issues by trial counsel and errors by the trial court, which resulted in a heavily one-sided trial where the government was improperly allowed to present its highly technical case through the expert testimony of lay witnesses, in violation of the rules of evidence, and where Ulbricht was improperly denied his right to due process and to a fair trial and his right to present his defense. The result of these errors was a fundamentally unfair trial.**

**Supporting facts -**

**A.  Improper Use of Lay Witnesses to Provide Expert Testimony**

The case against Ulbricht was a technically complicated case. The panel which denied Ulbricht's appeal described the technical nature of the evidence presented against Ulbricht as follows: "'The Silk Road prosecution was uniquely laden with issues related to technology, computer servers, forensics, cyber security, digital currency, and myriad other *issues that are*

indisputably "beyond the ken of the average juror."  *United States v. Ulbricht*, 858 F.3d 71, 117 (2d Cir. 2018) (emphasis added). This is a perfect description of circumstances under which *expert witness testimony* would have been appropriate to assist the triers of fact in understanding the evidence.  *See* Rule 702, Federal Rules of Evidence, Notes of Advisory Committee on Proposed Rules ("Whether the situation is a proper one for the use of expert testimony is to be determined on the basis of assisting the trier of fact").

 The panel also observed that Ulbricht (through his counsel) must surely have known from the outset, that, "in order to mount a meaningful attack on the government's voluminous and technically complex evidence, he would need to call his own expert."  *Id.*  What the panel did not comment on, was the fact that *the prosecution's case was presented entirely through the testimony of lay witnesses.*  None of the government witnesses were identified or qualified as expert witnesses, yet they were allowed to testify (without objection and without judicial screening) extensively about  'technology, computer servers, forensics, cyber security, digital currency, and myriad other issues that are indisputably "beyond the ken of the average juror."' See the trial transcripts, generally.

 Trial counsel failed to object to the government presenting its technical evidence through lay witnesses and failed to rebut that technical evidence through defense expert witnesses. Reasonably competent trial counsel would have objected to the government's presentation of expert testimony through lay witnesses, and would have provided rebuttal expert testimony where needed.  Reasonably competent trial counsel would not have allowed the government to misquote Rule 16 and mislead the trial court into concluding that the defendant had failed to comply with Rule 16 expert witness disclosure requirement.

The government could not have presented an intelligible case and would not have satisfied its burden of proof, had defense counsel timely objected to improper expert testimony from lay witnesses, and had the defense been allowed to present expert rebuttal testimony where needed.  Trial counsel did not object at trial, nor raise his own failures on appeal, nor raise this issue as plain error.

The trial court also recognized that the government's case involved many technical issues and the court assured the jurors they would get all the help they needed to understand the case, in the form of evidence (presumably, from the government).  The trial court's statement bolstered the government's case, impaired the presumption of innocence, and reduced the government's burden of proof when the trial court advised the jury, before any evidence was presented:

"Now, I want to assure you that while the facts in this case involve a website and involve the Internet, you don't have to have any particular expertise to serve as a juror on this case because *all of the evidence that you are going to need to render a verdict will be evidence received into evidence at this trial*." Doc. 315, Tr. Voir Dire at 9. [emphasis added].

The trial court's statement vouched for the strength of the government's evidence before it was even presented, implying that the trial court knew in advance that the government's evidence would be sufficient for the jury to render its verdict, *i.e.*, convict Mr. Ulbricht.

Trial counsel failed to object to this harmful comment from the trial court, at trial or on direct appeal.

Homeland Security Special Agent Jared Der-Yeghiayan was the government's first witness and testified for more than three days, describing the history of the government's

39

investigation of the Silk Road and Ulbricht in great detail.  To make his story understandable to the jury, the government had Der-Yeghiayan explain to the jury (without defense objection or court intervention) all of the technical or legal matters that he mentioned in his testimony.

Homeland Security Special Agent Der-Yeghiayan, assigned to Chicago O'Hare International Airport, testified as a lay witness, without expert disclosures or qualification.  Tr. 72.[5]  Der-Yeghiayan was the government's key witness, tracking the government's investigation from its earliest days when [he testified] HSI began seeing a major increase in the interception of drug shipments at O'Hare International Airport, right through the day of Ulbricht's arrest in a San Francisco public library on October 1, 2013.  Der-Yeghiayan's testimony began on Day 1 of the 13 day trial and was not concluded until Day 5 of the trial.  The government built its case on expert testimony elicited from its lay witnesses, beginning with Der-Yeghiayan.

Among the many technical or legal topics that Der-Yeghiayan discussed and explained, are: an explanation of the meaning of Schedule I and Schedule II controlled substances (Tr 65); identification of items found in mail as ecstasy pills (Tr 67); explanation of field tests for identifying drugs (Tr 68); witness testified he tested substances and identified them as various drugs (Tr 69); witness testifies there were 3600 drug seizures made from October 2011 through April 2013 (Tr 72); the Silk Road website (Tr 74), which the government claimed Ulbricht had created; whether warrants are required to search items crossing the border (objected to, but overruled, Tr 75); what drugs were found in packages in the mailroom (Tr 76); that HSI began

---

[5]  A list of many dozens of examples of expert witness testimony from lay witness Der-Yeghiayan has been compiled in spreadsheet format, and is attached as Exhibit 1 to this Memorandum.  This list identifies many of the various topics on which Der-Yeghiayan was allowed to provide expert testimony, the expertise that would be required to provide such testimony, and some of the objections that trial counsel should have raised against this lay witness offering such expert testimony.  Other government lay witnesses (Kiernan, Beeson, Yum) also provided extensive expert testimony.  See below.

seizing more drugs than just ecstasy, including MDMA, LSD, cocaine, heroin, and other

Schedule I and Schedule II narcotics (Tr 79); an opinion that what investigators found in an

envelope was ecstasy pills (Tr 81); the field testing of suspected drugs, how the test works (Tr

82); the results of testing of various envelopes recovered in the mail, asserting that they

contained ecstasy, LSD, and amphetamines (Tr 83); the history of drug seizures at O'Hare

airport (Tr 86-87); the alleged fact that what was sold on the Silk Road website was mostly

illegal (Tr 88); the connection between drugs seized at O'Hare and items sold on the Silk Road

(Tr 88-89); a comparison between ecstasy pills seized at O'Hare and what was being advertised

on the Silk Road (Tr 89); identification of items shown in an exhibit as three ecstasy pills (Tr

90); identification of a photo exhibit as showing drugs (Tr 92); the witness tested five dots for

drugs, and they tested positive for LSD (Tr 93); identification of details in a photo as showing

amphetamine, ecstasy pills, MDMA, crystal (Tr 94); the fact that certain seized items tested

positive for amphetamine (Tr 95); the fact that the government had seized the same drugs that

were advertised on the Silk Road (Tr 96); how the Silk Road website could be accessed only

through Tor, the onion router browser (Tr 98); what a dot onion web address was (Tr 98); the

Tor network, what that was and that it anonymized traffic, allowing persons to visit websites on

the Tor network without being identifiable (Tr 98); whether the Tor network was illegal (Tr 99);

whether the Silk Road website could be accessed through the "ordinary Internet" (Tr 99); how

using the Tor browser differed from internet browsing with an ordinary browser (Tr 99-100);

how the Tor browser hid a user's IP address, and what an IP address is, how to find an IP

address, what IP addresses are used for (Tr 100); a video demonstration prepared by the witness

showing the difference between IP addresses on the regular internet, and how they can be

physically located, and addresses on the Tor network, and showing how the witness accessed the two different types of websites (Tr 100- 105): what an Internet service provider is (Tr 105); how Tor protects the privacy of internet users and can make criminal investigations more difficult (Tr 106); what a computer server is (Tr 107); how the government finds websites (Tr 108); how the Tor network provides anonymity and what advantages that provides (Tr 135);  how Tor conceals IP addresses (Tr 136); how Tor routes traffic on the internet (Tr 136); a diagram showing how the Tor network is organized and works, and including a discussion of relays and nodes and what information is known at what points on the network (Tr 137-138); an explanation of what type of drug testosterone is (Tr 143).

Der-Yeghiayan offered additional expert testimony, discussing and explaining and offering opinions about: what bitcoin is, a virtual currency (Tr 151); how the use of bitcoin "anonymizes" the user (Tr 151); how the use of bitcoin compares with the use of credit cards (Tr 152); whether the use of bitcoin is illegal (Tr 152); how buying bitcoin compares to exchanging dollars for foreign currencies (Tr 153); how bitcoin exchanges make money (Tr 153); how the value of bitcoin has fluctuated (Tr 153-154); what a bitcoin address is, and how it compares to a bank account number (Tr 158-159); the blockchain public ledger where bitcoin transactions are shown (Tr 159); whether a government or company controls bitcoin (Tr 159); who owns the computers that run the bitcoin network (Tr 159); comparison of the bitcoin world to the "ordinary financial world" (Tr 159); how the blockchain keeps track of bitcoin transactions (Tr 159 - 163); items intercepted contained powder another which tested positive for heroin (Tr 178); another substance tested positive for cocaine (Tr 180); nearly all the substances acquired through undercover purchases tested positive for the drug they were supposed to be (Tr 180);

42

other "illegal goods" were sold on the Silk Road website (Tr 183); the meaning of malware (Tr 187);  bitcoin tumblers and how they work (Tr 214); computer encryption (Tr 219); PGP signing of digital messages (Tr 247); PGP public keys (Tr 247 - 249, 368); computer metadata (Tr 230); computer software applications Pidgin and Adium (Tr 295); PGP private keys (Tr 368); a video demonstration made by the witness to show how PGP public and private keys work (Tr 370 - 384).

The government called FBI Special Agent Thomas Kiernan, a computer scientist, to testify as its second lay witness, again without expert disclosures or qualification as an expert. The government began its examination of Kiernan by asking him to explain what a forensic image is (Tr 845), and proceeded to then begin to lay a foundation as though the government might seek to have Kiernan qualified as an expert so that he could testify as an expert, but did not then ask the court to recognize him as an expert qualified to testify on certain matters. Tr 845-846.  The government then proceeded directly to asking Kiernan questions that required technical expertise or training or experience, including: how to stage Ulbricht's arrest with his laptop on in order to avoid encryption problems with the laptop (Tr 847); how and why the government conducted triage on the laptop after it was taken from Ulbricht (Tr 857); how a laptop can become locked or encrypted (Tr 857; how the government extracted documents from the laptop as part of the triage (Tr 857); what kind of operating system was running on Ulbricht's laptop, and explaining that it was running Ubuntu, and explaining what an operating system is (Tr 857); what other popular operating systems are frequently used (Tr 857); that Kiernan had reviewed hundreds of computers running Ubuntu (Tr 858); the significance and purpose of the home directory and user accounts (Tr 858); the meaning of metadata that comes with camera

43

files (Tr 862); Kiernan's conclusion as to what user account Ulbricht was logged into at the time the computer was seized (Tr 864); a description of files seen on Ulbricht's laptop (Tr 865); what is the Tor browser (Tr 866); and a whole lot more.

Kiernan later testified about his examination of a hard drive sent to him by FBI Special Agent Christopher Beeson, a hard drive that the government had created by attempting to image the hard drive on the laptop. (Tr 872). Kiernan described the hard drive he received from Beeson as a forensic image of the defendant's computer. (Tr 872). Kiernan then proceeded to recount in great detail the steps he took in copying the hard drive copy sent to him by Beeson, and describing what he found on the copy he made of the hard drive he received from Beeson, attributing everything he saw as coming from Ulbricht's laptop. (Tr 872 - 1021). Those descriptions of what he found included reading at great length from digital files he supposedly found in what he copied from what he had been sent by Beeson.

Former FBI Special Agent Ilwhan Yum was called to testify as a lay witness to explain his role in the investigation when he was still with the FBI, and he explained how he went about seizing two computer servers, removing the hard drives, and making forensic copies of the hard drives. (Tr 1639 - 1643). Yum continued his testimony by explaining and discussing the technical issues involved in his recent (post-FBI) professional analysis of what he said that he found on the hard drive, and he described his actions in attempting to use the hard drive to track bitcoin transactions from the Silk Road website to Ulbricht's laptop. Tr 1643 - 1685. Yum testified that he found 2,105,527 unique bitcoin addresses on the server containing a copy of the Silk Road Marketplace and 11,135 bitcoin addresses on Ulbricht's laptop. (Tr 1685). Yum then testified as to how he tracked bitcoin transfers shown on the blockchain from the bitcoin

44

addresses on the Silk Road Marketplace to bitcoin addresses on Ulbricht's laptop, and he

claimed to have tracked 700,254 bitcoin that were transferred to Ulbricht's laptop.  (Tr 1685 -

1699).

### B.  Erroneous Preclusion of Defense Experts

Ulbricht's trial counsel sought to present the testimony of two expert witnesses at trial,

Steve Bellovin, and Andreas Antonopoulos, to rebut some of the technical testimony provided by

the government.  The trial court precluded the testimony of both proposed experts in response to

the government's motion to preclude, for numerous reasons, including: (1) Ulbricht's Rule 16

disclosures were late - after the trial commenced, not giving the government time to respond; (2)

failure to provide the content in defense expert disclosures that is required by Rule 16; (3) failure

to set forth the expert opinions and the bases for those opinions as required by Rule 16.  Doc.

No. 173, Order Precluding Defense Experts.

The government's motion to preclude the defense experts misquoted Rule 16,

Fed.R.Crim.P. by omitting key passages, hiding from the trial court that part of the rule that

states that the defendant is only required to provide expert disclosures to the government, if the

defendant has already requested the government's expert disclosures, and if the government has

complied.  See Doc. 165 at 2. The government did not provide any evidence or even assert that

those conditions had been met.

Trial counsel did not draw the trial court's attention to the government's misleading

argument, and the trial court did not notice that the government had failed to show that it was

entitled to request any relief.

What the government did state in its *misquotation from Rule 16*, was that "A defendant

45

must 'give to the government a written summary of any testimony that the defendant intends to use under Rules 702, 703, or 705 of the Federal Rules of Evidence as evidence at trial.'" The government left out the all important "if", and what follows that word.  *See* Doc. 165.

Trial counsel disclosed proposed defense expert Andreas M. Antonopoulos by letter to the government dated 1/26/2015.  See Exhibit A, attached to Doc. 165.  The government responded with a letter motion of 1/29/2015, requesting that the testimony of Mr. Antonpoulos be precluded because the expert disclosure did not provide the opinions to be offered or the bases or reasons for his opinion, thus failed to comply with Rule 16(b)(1)(C).  Doc. 165.  The government also argued that the proposed testimony of Antonopoulos related to areas that did not require specialized knowledge.  Doc. 165.  The government further commented that government witnesses had already explained the concepts relating to Bitcoin transactions, including wallets, accounts, exchanges, and the Blockchain, all of which are "familiar to any layperson who has ever used Bitcoins." Doc. 165 at 5.  The government argued that expert testimony was not required to explain how to track bitcoin transactions on the blockchain.  Doc. 165.  The government proudly proclaimed that its witnesses had already explained all of these issues without being qualified as experts. Doc. 165 at 6.

Trial counsel disclosed proposed defense expert Steven M. Bellovin by letter sent to the government on January 30, 2015, after day 9 of the 13 day trial.  See Doc. 170, Government Letter Motion to Preclude the Testimony of Steven M. Bellovin.  The government complained that this late disclosure failed to comply with the detailed disclosure required by Rule 16(b)(1)(C), in that the disclosure did not provide the opinions to be offered by Mr. Bellovin or the bases or reasons for his opinions.  Doc. 170.  The government also complained that the

46

disclosure was too late in the case to allow the government time to hire its own expert and prepare an effective cross-examination or put on a rebuttal case.  Doc. 170.

Trial counsel's disclosure of Mr. Bellovin's proposed expert testimony provided notice of topics on which he would testify, but did not disclose any opinions or conclusions or the bases or reasons for any of his proposed testimony.  See the unmarked attachment to Doc. 170, which attachment is described as Exhibit A in the government's motion.

Trial counsel responded to the government's letter motions to preclude the defense experts, first with respect to Antonopoulos.  See Doc 171.  Trial counsel did not address the government's argument that the defense disclosure failed to provide the anticipated opinions of Antonopoulos, and failed to provide the bases for his expected opinions.  Trail counsel merely argued that the proposed topics of Antonopoulos' testimony were relevant.  *Id.* at Trial counsel also argued that an expert was required to respond to the expert-like testimony of government witness Ilwhan Yum.  Doc. 171 at 4-5.

Trial counsel addressed the issue of whether Antonopoulos' anticipated testimony was relevant as rebuttal to the government's evidence regarding government analysis of bitcoin transactions which, the government witness testified, could be tracked from the Silk Road to Ulbricht.  Doc. 171 at 3. Trial counsel argued that the failure of a defense attorney to rebut the government's expert testimony, could be a basis for establishing ineffective assistance of counsel. Doc. 171 at 4, *citing Gerston [sp] v. Senkowski*, 299F.Supp.2d 84, 103-105 (EDNY 2004).

On February 1, 2015, trial counsel responded to the letter motion to preclude the expert testimony of Dr. Steven Bellovin.  Doc. 172.  There, trial counsel argued that his prior expert

disclosure re Bellovin did comply with Rule 16(b)(1)(C). Doc. 172 at 1. Additionally, trial counsel provided further disclosures, in an apparent effort to satisfy expert disclosure requirements.

Trial counsel's efforts to improve his disclosures, provided more detail about how Dr. Bellovin's proposed testimony would be responsive to the testimony of government witnesses who had testified about technical matters. See generally, Doc. 172. None of the new detail provided disclosure of anticipated opinions that would be offered by Dr. Bellovin.

The trial court granted the government's motion to preclude both defense expert witnesses. Doc. 173.

Trial counsel did not raise the trial court's errors or his own, at trial or on appeal. This is Ulbricht's first opportunity to present this claim and to establish the factual basis for this claim.

## ARGUMENT SUPPORTING CLAIM III

Ineffective Assistance of Counsel - To succeed on a claim of ineffective assistance of counsel, the petitioner must demonstrate both that: (1) "counsel's performance was deficient" – that is, that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment"; and (2) "the deficient performance prejudiced the defense [in] that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland v. Washington*, 466 U.S. 668, 687 (1984).

When evaluating counsel's performance under the first prong of the *Strickland* test, a reviewing court applies a strong presumption that counsel "rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.*, at 690.

"Judicial scrutiny of counsel's performance must be highly deferential. It is all too

tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id*. at 689 (internal quotation marks and citations omitted).

Under *Strickland*'s second prong, the reviewing court must determine "whether, absent counsel's deficient performance, there is a reasonable probability that the outcome of the proceeding would have been different." *Mayo v. Henderson*, 13 F.3d 528, 534 (2d Cir. 1994). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. It is thus "not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding." *Id.* at 693.

Petitioner bears the burden of establishing both constitutionally deficient performance and prejudice. *United States v. Birkin*, 366 F.3d 95, 100 (2d Cir. 2004).

### A.  Government Case Was Built on Expert Testimony from Lay Witnesses

Expert testimony was crucial in Ulbricht's trial for the government to explain to the lay jurors the largely unknown (to average jurors) world of the Dark Web, TOR (The Onion Router, the browser which enables anonymous online communications and which provides access to the

49

Dark Web), bitcoin, blockchain, encryption technology, forensic imaging, internet terminology, Linux operating systems, PHP code, and a whole lot more.

The government was allowed (without defense objection and without the trial judge performing any 'gatekeeping" role to keep out unreliable expert testimony (see Committee Notes on Rules - 2000 Amendment, Federal Rule of Evidence 702)) to provide expert explanations on all of these matters throughout the trial, without which the jury would have been in the dark on the technical matters presented, and without which the government's case would have been unintelligible to the jury.

Experts do not testify only in the form of opinions, they may also explain scientific or other principles relevant to the case, *to assist the jury in understanding the evidence*.  Notes of Advisory Committee on Proposed Rules, Rule 702, Federal Rules of Evidence.  Rule 702 as amended "does not alter the venerable practice of using expert testimony to educate the factfinder on general principles."  Committee Notes on Rules -2000 Amendment, Rule 702, Federal Rules of Evidence.

Lay witnesses are not allowed to testify as expert witnesses.  *See United States v. Haynes*, 729 F.3d 178, 195 (2d Cir. 2013) (law enforcement officer called as a lay witness should not have been allowed to testify based on his specialized training and experience).

When the Second Circuit panel wrote about the Silk Road prosecution being uniquely laden with issues that are indisputably "beyond the ken of the average juror," that court was signaling its recognition that the government's case was built on evidence that required expert testimony *to assist the jury in understanding the evidence*.  If the opinion of a witness "rests in any way upon scientific, technical, or other specialized knowledge, its admissibility must be

determined by reference to Rule 702, not Rule 701 because " lay opinion must be the product of reasoning processes familiar to the average person in everyday life." *Haynes*, 729 F.3d at 195. The requirements of Rule 701 do not permit a law enforcement agent testifying as a lay witness to testify to an opinion or to offer technical explanations based on specialized training or experience. *See Id.*

The trial court eroded the presumption of innocence and reduced the government's burden of proof by providing the court's assurance to the jurors that they would get all of the evidence they needed to understand the case and to reach their verdicts: "***all of the evidence that you are going to need to render a verdict will be evidence received into evidence at this trial***." Doc. 315, Tr. Voir Dire at 9. [emphasis added].

The presumption of innocence is a basic component of a fair trial under our system of criminal justice. *Estelle v. Williams*, 425 U.S. 501, 503 (1976). "The Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged. *In re Winship*, 397 U.S. 358, 364-65 (1970).

The trial court's statement unmistakably vouched for the strength of the government's case, assuring the jurors that the government would meet its evidentiary burden, before any evidence was even presented, implying that the trial court knew in advance that the government's evidence would be sufficient for the jury to convict Mr. Ulbricht. The trial court's statement could only have been interpreted to refer to the strength of the government's evidence because, in a criminal case, only a guilty verdict requires sufficient evidence to support it.

Trial counsel failed to object to the harmful comments from the trial court, at trial or on

51

direct appeal, failed to object to the extensive expert testimony from the government's lay witnesses, and allowed the government to prove its case with evidence that should never have been presented to the jury.  Trial counsel's failures described above cannot be attributed to sound trial strategy because they were not based on any reasonable strategy and because they resulted in the denial of Ulbricht's right to due process and to a fair trial.

### B.  Erroneous Preclusion of Defense Experts

Defendant Ulbricht's expert witnesses were precluded from testifying because the trial court found, in response to the government's motion to preclude the defense experts, that trial counsel's expert disclosures were too little and too late, and did not comply with Rule 16, Federal Rules of Criminal Procedure.  Doc. 173.

Trial counsel did not respond to the government's motion by pointing out that Rule 16's provisions for mandatory expert disclosures from the defendant, had not been triggered.  Trial counsel argued, instead, that his disclosures were sufficient and that Ulbricht had a right to present expert witness testimony as part of his defense.

Rule 16 of the Federal Rules of Criminal Procedure provides rules concerning requirements for disclosure by the government and by the defendant, including provisions regarding the disclosure of expert witnesses.  The government misquoted Rule 16 to the trial court, leaving out key passages, and the trial court misread the rule, relying on the government's misstatements and omissions.

In the government's *two letter motions* asking that defense experts Antonopoulos and Bellovin be precluded from testifying, the government stated the following: "A defendant must 'give to the government a written summary of any testimony that the defendant intends to use

under Rules 702, 703, or 705 of the Federal Rules of Evidence as evidence at trial.'"  Fed. R.

Crim. P. 16(b)(1)(C).  "This summary must describe the witness's opinions, the bases and

reasons for those opinions, and the witness's qualifications." *Id*.  If a defendant fails to provide

disclosures in accordance with Rule 16(b)(1)(C), the district court may exclude the expert's

testimony at trial.  A court may preclude the testimony as a whole, or any part that it determines

was not properly disclosed to the Government.  (Internal quotations and citations omitted).  See

Doc. 165 at 2-3; Doc. 170 at 3-4.

The government omitted from its partial and misleading quotation from Rule 16, the

following, complete language of the pertinent provisions:

(1) "At the defendant's request, the government must give to the defendant a written

summary of any testimony that the government intends to use under Rules 702, 703, or 705 of

the Federal Rules of Evidence during its case-in-chief at trial." Rule 16(a)(1)(G), Fed.R.Crim.P.

(2) "The defendant must, at the government's request, give to the government a written

summary of any testimony that the defendant intends to use under Rules 702, 703, or 705 of the

Federal Rules of Evidence as evidence at trial, *if—*

*(i) the defendant requests disclosure under subdivision (a)(1)(G) and the government*

*complies*;"    . . . Rule 16(b)(1)(C), Fed.R.Crim.P. (emphasis added).

What the government stated in its *misquotation from Rule 16*, left out the all important

"if", and the important statement of conditions that follows that word.

What the government omitted from its motions asking that defense experts Antonopoulos

and  Bellovin be precluded, is precisely that part of Rule 16 which defeated their motions. The

government did not say and did not otherwise establish, in either motion, that the defendant ever

requested expert disclosures from the government or that the government had provided its expert disclosures after any request.

The government's misleading quotation of Rule 16 served a useful purpose and the two motions were granted, resulting in the preclusion of both defense experts.  Neither trial counsel or the trial court took note of what Rule 16 actually states.

Trial counsel did not argue that the defense expert disclosure was adequate or that the disclosure complied with Rule 16, nor did he argue that the defense was not required to make expert disclosures. Trial counsel should have pointed out to the trial court that Ulbricht was not required to provide expert disclosures, and that the trial court had no reason to screen his disclosures for compliance with Rule 16, since Rule 16's requirements for expert disclosures were not properly before the court.  The failure of trial counsel to protect Ulbricht from having his expert witnesses precluded from testifying, was an objectively unreasonable performance. See *Gersten v. Senkowski*, 420 F.3d 588 (2d Cir. 2005) (regarding the unreasonable failure to investigate possible challenges to physical evidence).

Rule 16 generally, and Rule 16(b)(1) specifically, describe procedures that can lead to creating discovery obligations for either or both parties, but the defendant's obligations can be triggered if and only if the defendant first requests discovery from the government.  See Rule 16, Fed.R.Crim.P.  If the defendant does not take that first step, that is, request the government make expert (or other) disclosures, then the government has no right to demand that the defendant make any expert (or other) disclosures.  Rule 16(b)(1), Fed.R.Crim.P.  If the defendant does request government disclosures, but the government fails to comply with the request, the defendant is not required to make any disclosures, even if the government requests disclosure

54

from the defendant.  *Id*.

The government did not establish in its motions to preclude that the defendant had requested the government's expert disclosures, or that the government had provided expert disclosures in response to a defense request. Under these circumstances, Rule 16 did not require that Ulbricht make any expert disclosures.  The trial court misread and misapplied Rule 16, and erroneously precluded the two defense expert witnesses.  Doc. 173.

Trial counsel never called the trial court's attention to the government's misleading motion or to the actual text of Rule 16.  The result was that Ulbricht was denied the right to present expert witness testimony to rebut the technical testimony elicited from the government's lay witnesses.

The trial court's analysis of the adequacy of trial counsel's expert disclosures, is irrelevant because Ulbricht was not required by Rule 16 to make any disclosures.

The trial court did find relevant Antonopoulos' proposed testimony disagreeing with the government's calculations as to how many bitcoin were or could have been transferred from the Silk Road to Ulbricht's computer, but precluded the testimony because of "defense counsel's deficient Rule 16 disclosures . . . and because the Court cannot properly assess his qualifications."  Doc. 173 at 17.  Regarding proposed expert Bellovin's areas of testimony, the court wrote that "the relevance of the summary descriptions as to the topics of his testimony is not in doubt."  Despite this finding of relevance, Bellovin's testimony was precluded "to prevent the government from being at a plain and unfair disadvantage in countering such testimony."  *Id.* In other words, Bellovin's proposed testimony was clearly important and could not be allowed because trial counsel had not disclosed Bellovin's "methodology."  *See Id.*

55

When a defendant is required to make expert disclosures, Rule 16 requires that the defendant provide "a written summary of any testimony that the defendant intends to use under Rules 702, 703, or 705, of the Federal Rules of Evidence . . . which must describe the witness's opinions, the bases and reasons for those opinions, and the witness's qualifications." Fed.R.Crim.P. 16(b)(1)(C).

The initial disclosure for defense expert Bellovin listed six topics that he would address in his expert testimony.  Doc. 170 at 7.  The topics were described in very general terms, without mention or description of any proposed opinions or conclusions, without reference to government testimony which this witness would rebut, without providing the bases or reasons for any of the opinions or conclusions that would be provided in his proposed expert testimony, and without a written summary of his anticipated expert testimony.  *See Id.*

Trial counsel supplemented its initial disclosure re defense expert Bellovin with a last-minute letter attempting to cure any perceived deficiencies of the original disclosure (filed the same date as the court's order precluding both defense experts).  Doc. 172.   Trial counsel offered detailed discussion about six areas of proposed testimony, explaining the relevance of the proposed expert testimony to trial testimony that had been elicited from government witnesses.  Doc. 172 at 3-4.  The trial court described this supplemental disclosure as containing "additional high-level description of the testimony," and stated that the court "might be able to guess as to various opinions, it contains no real opinions, no bases for opinions, no analysis, no methodology."  Doc. 173 at 1-2.

The trial court described "the lack of timeliness and lack of adequate content of the disclosure [from trial counsel] as tactical, not substantive." Doc. 173 at 12-13.  The trial court

tracked the history of the trial, describing points in the proceeding that should have led trial

counsel to be ready with timely and adequate expert witness disclosures, since the need for

expert witnesses should have been obvious from the beginning.  Doc. 173 at 1-6.  The trial court

concluded that the defense "decision to put in such belated and substantially inadequate notices

of expert witnesses was a tactical choice. . . Providing deficient notices . . . was yet another

tactical choice."  Doc. 173 at 6.

The trial court described the defense failure to comply with the requirements for expert

witness disclosures, as fitting a trial-long pattern of *tactical decisions* from the defense that had

negative consequences for the defendant.  Doc. 173, Order Precluding Defense Experts, at 1.   If

those questionable actions of trial counsel that the court described were the result of tactical (or

strategic) decisions, they certainly did not serve the interests of Ulbricht.

Trial counsel's disclosures did not contain summaries of anticipated testimony, nor

opinions to be offered, nor bases or reasons for their opinion.  These disclosures were inadequate

to meet the requirements of Rule 16, had the defendant been obligated to meet those

requirements, which he was not.  His failure to meet those requirements, however, did directly

contribute to the trial court's decision to exclude important and relevant expert testimony from

two expert witnesses.[6]

---

[6] Trial counsel did attempt to "cure" his inadequate disclosure for expert witness Andreas
Antonopoulos, two months after the trial was concluded.  In his post-trial Memorandum
supporting his Motion for a new trial, trial counsel provided, for the first time, his "proffer" from
Antonopoulos regarding his proposed expert testimony.  Doc. 224 at 17.  Trial counsel explained
that he could not provide this proffered information at the time it was needed during trial,
because, at that time, Antonopoulos was on a plane flying from Germany to the United States.
*Id.*  Trial counsel did not explain why he included this proffer in his Memorandum, nor did he
ask the court to consider it.

Trial counsel's deficient performance extended to his failure to explain to the court that Rule 16 did not require him to make expert witness disclosures, unless certain preconditions were satisfied, and those preconditions (a request from the defense for government expert disclosures, and government compliance with that request, per Rule 16(b)(1), Fed.R.Crim.P.), were not shown to be satisfied.[7]

The trial court wrote that the rules [requiring expert disclosures] "do not apply to one side and not the other." That should have been true, but the court did not apply those rules correctly or even-handedly. In addition to not correctly applying Rule 16 to the question whether Ulbricht's disclosures were required, the court adopted a double standard, allowing the government to present extensive expert witness testimony throughout the trial, from several lay witnesses, without requiring any expert disclosures from the government, and without screening the government's expert testimony. Trial counsel did not point out these errors.

The court also wrote that the defense is not entitled to provide late disclosures, to the disadvantage of the government, "A defense preference for trial by ambush is legally unsupportable." Doc. 173 at 7.

With regard to expert witness disclosures, the court was clearly wrong on this point. Rule 16 does expressly provide the defendant with the option of not providing expert disclosures before trial. The defendant may, indeed, choose not to provide any notice at all regarding expected testimony from his expert witnesses. See Rule 16(b)(1)(C), Fed.R.Crim.P. The

---

[7] Habeas counsel has examined the client file materials provided to him by trial counsel, and the publicly available trial records, and has found no indication that trial counsel ever requested expert disclosures from the government. Decl. Grant ¶ 20. Habeas counsel has also not located any government disclosure that they intended to introduce expert testimony. Id. ¶ 21.

provisions of Rule 16(b)(1)(C) for "reciprocal discovery" of information regarding expert witnesses have been in effect since 1993, so that could not have come as a surprise to either the government, trial counsel, or the trial court.  See Notes of Advisory Committee on Rules -1993 Amendment, Rule 16, Federal Rules of Criminal Procedure.

Since Ulbricht was not shown to have requested expert disclosures from the government, and since the government did not provide expert disclosures (despite the fact that the government presented substantial expert testimony from its witnesses at trial), Ulbricht should have been allowed to call his expert witnesses to testify.  At that point, the court could have required a hearing (out of the presence of the jury) to determine the admissibility of the defense's proposed expert testimony.  Trial courts have a duty to determine the reliability and admissibility of proposed expert testimony.  *See Daubert v. Merrell Dow Pharmaceuticals, Inc*., 509 U.S. 579 (1993) and *Kumho Tire Co. v. Carmichael*, 119 S.Ct. 1167 (1999).  The court might have considered that in-trial procedure "inefficient," but it would have been consistent with Rule 16 and with the court's obligations under *Daubert and Kumho Tire*.  The trial court is not required, however, to conduct "reliability proceedings in ordinary cases where the reliability . . . is properly taken for granted."  Committee Notes on Rules-2000 Amendment to Federal Rule of Evidence 702.

The government provided misleading argument to the trial court, by leaving out of its motions to exclude the defense experts, any mention of the preconditions in Rule 16 that must be satisfied before the defendant can be required to provide expert disclosures.  The trial court overlooked the reciprocal discovery provisions of Rule 16, and the fact that the government did not establish that it had the right to require defense expert disclosures, and the court then

59

erroneously excluded the defense experts.

Trial counsel's failure to inform the court of the controlling law must be attributed to neglect, not to strategic choice or trial tactics, unless one wants to suppose that trial counsel wanted the defense experts excluded. Trial counsel's failure to provide adequate disclosures, is similarly not attributable to strategic choice or tactics. That, too, can be attributed to neglect, as shown by the fact that trial counsel did eventually provide a more complete disclosure for proposed expert Andreas Antonopoulos - two months after trial. See Footnote 6. Trial counsel's failures do not demonstrate reasonable professional judgment.

### Prejudice Resulting From Defense Expert Witness Preclusion

Based on the disclosures provided by trial counsel, inadequate as they may have been, it is apparent that trial counsel intended to have the defense experts testify about the following:

(1) rebuttal to the testimony of Ilwhan Yum regarding his supposed tracking of bitcoin transfers from the Silk Road server to Ulbricht's laptop (Antonopoulos). Doc. 173 at 7.

(2) Yum's calculation of bitcoin transferred to Ulbricht's laptop was implausible (Antonopoulos). Doc. 173 at 7.

(3) Bellovin would have explained why BitTorrent running on the laptop at the time of the arrest, could have provided the opportunity for "incriminating evidence" finding its way onto Ulbricht's laptop, or which would call into question the source of the information found on the laptop. Doc. 173 at 7. Doc. 172 at 2.

(4) Bellovin would have explained the role of timestamps on UNIX-based operating systems, and he would explain the significance of PHP code. Id; Doc. 172 at 3. Bellovin would discuss various issues which would challenge the results of Special Agent Kiernan's test

regarding the torchat program.  Doc. 172 at 4.

(5) Bellovin would have explained general principles of public key cryptography.  *Id.*

(6) Bellovin would have explained that without a full RAM capture (relating to government testimony about the government's unsuccessful effort to copy the system memory on Ulbricht's laptop before the laptop crashed), it was impossible to determine whether the laptop was compromised.  *Id.*

Many of these areas of proposed defense expert testimony, were found by the trial court to be relevant areas of inquiry.  Doc. 173 at 17.

Trial counsel described his purposes in calling the proposed defense experts as providing rebuttal evidence, including evidence to "challenge the Government's assertion" that over 700,000 bitcoin had been transferred to Ulbricht's laptop, Doc. 171 at 2-4; to rebut testimony from FBI Special Agent Kiernan about timestamps which record file creation time, and explain that timestamps cannot be relied upon because they can be edited; Doc. 172 at 2 - 3; and to rebut other testimony from Kiernan.  *Id.*

**Government misuse of lay witness testimony**

The trial court allowed government lay witnesses to testify at great length explaining technical matters the jurors needed to understand in order to understand the evidence.  These matters were beyond the knowledge and understanding of the average juror, so that would have been a proper area for expert testimony, but not for lay testimony.  See Rule 702(a), Federal Rules of Evidence.

The government was not required to make expert disclosures because the defense did not request them.  See Rule 16(a)(1)(G), Fed.R.Crim.P.  Trial counsel and the trial court both

ignored the fact that government lay witnesses testified as expert witnesses.

Contrast that treatment with the fact that defendant Ulbricht was faulted by the trial court for late and inadequate disclosures, when, in truth, Rule 16 did not require his expert disclosures.

The government provided expert testimony as they chose, whenever they chose, explaining any technical or legal matters they thought needed explaining through their lay witnesses, without prior disclosures and without prior court screening of their expert testimony. The government's case was built on a foundation of expert testimony from lay witnesses.

Homeland Security Special Agent Der-Yeghiayan was the government's first witness and testified for more than three days, describing the history of the government's investigation of the Silk Road and Ulbricht in great technical detail. To make his story understandable, the government had Der-Yeghiayan explain to the jury (without defense objection or court intervention) all of the technical or legal matters that he mentioned in his testimony.

Without his improper expert testimony, his discussion of the investigation would have been unintelligible to the jury. Among the technical matters that would have been unexplained are: Tor (The Onion Router) browser, which anonymizes a user's web browsing (Tr. 135); bitcoin, the digital currency, what it is, how you buy it, bitcoin addresses, the blockchain, how you can track bitcoin transactions on the blockchain, who "runs" the bitcoin network, and how that network compares to the traditional banking system (Tr. 136, 151, 159, 170); malware (Tr. 187); bitcoin tumblers (Tr. 214); encryption (Tr. 219); metadata (Tr. 230-231); PGP signatures and procedures (Tr. 247-249); computer "servers", including what they are and where they are located (Tr. 252-254); "Pidgin" (a chat program) (Tr. 294); Internet chat (Tr. 294); Adium (Tr. 295); an unencrypted computer (Tr. 315); triggers that can cause a computer to lock up (Tr. 315);

private keys and public keys and PGP signing, including a video demonstration (Tr. 368-370);
how a person can have and use multiple PGP keys (Tr. 371); and a lot more.

In addition to the expert testimony from Der-Yeghiayan, the government also elicited
extensive expert testimony (without objection from trial counsel or screening by the trial judge)
from FBI Special Agent Thomas Kiernan, former FBI Special Agent Ilwhan Yum, FBI
Computer Forensics Examiner Christopher Beeson, and IRS Special Agent Gary Alford.

Ulbricht was prevented from providing any rebuttal to the government's expert testimony
when his experts were excluded.  That unbalanced treatment was fundamentally unfair to
Ulbricht, depriving him of his right to present his defense, and unfairly giving the government an
advantage that the law does not allow.

The Sixth Amendment guarantees to Defendants the right to meet the case of the
prosecution. *See Strickland* at 685.  The errors of trial counsel, combined with the misleading
argument of the government and the trial court's errors, deprived Ulbricht of his right to present
his defense in response to the government's case:

"The right to offer the testimony of witnesses . . . is in plain terms the right to
present a defense, the right to present the defendant's version of the facts as well as the
prosecution's to the jury so it may decide where the truth lies. Just as an accused has the
right to confront the prosecution's witnesses for the purpose of challenging their
testimony, he has the right to present his own witnesses to establish a defense. This right
is a fundamental element of due process of law."  *Washington v. Texas*, 388 U.S. 14, 19
(1967).

Due to the neglect of trial counsel, Rule 16 was misread, misquoted, and misapplied,

Ulbricht's experts were precluded from testifying, and Ulbricht was prevented from responding to the government's case.

The trial court did not exercise its gatekeeping function to screen out unreliable expert testimony from government witnesses, but the trial court did screen out proposed expert testimony from Ulbricht's proposed expert witnesses, based on its views of the disclosures from trial counsel that Ulbricht was not even required to make.  That unequal treatment gave the government a huge and unfair advantage over the defendant.

HSI Special Agent Der-Yeghiayan was a lay witness who should not have been allowed to offer expert testimony.  Without his testimony, the government would not have been able to explain its very technical case to the jury.  The government would not have been able to elicit his legal opinions, his explanations about Tor and the Dark Web, his explanations about bitcoin and blockchain, his opinions as to what controlled substances had been found in mail packages, and his unreliable and mistaken technical explanations that went far beyond his experience and training.

Lay testimony is restricted by the Rules of Evidence to matters that are the product of perception and of "reasoning processes familiar to the average person in everyday life." *United States v. Garcia*, 413 F.3d 201, 215 (2d. Cir. 2005). Rule 701 "prevents a party from conflating expert and lay opinion testimony thereby conferring an aura of expertise on a witness without satisfying the reliability standard for expert testimony set forth in Rule 702." *Id.*

A law enforcement officer testifying as a lay witness is not permitted to testify to an opinion [or otherwise] "if his reasoning process depended, in whole or in part, on the agent's specialized training and experience."  *Id.*, at 216, quoted in *U.S. v. Haynes*, 729 F.3d 178, 195

(2d Cir. 2013).

The trial court ignored its obligations under Rules 701 and 702, to screen out expert testimony from government lay witnesses Der-Yeghiayan, Kiernan, Beeson, Alford, and Yum, because those witnesses were not determined to be offering reliable expert testimony, and because they did, in fact, improperly provide expert testimony.  The trial court then compounded that error by precluding the defense experts based on a misreading and misapplication of Rule 16.

Reasonably competent trial counsel would have objected to expert testimony from the government's lay witnesses at trial, preserving error for appeal (and then rasing that issue on appeal) if the trial court had overruled the objections. Reasonably competent trial counsel would have drawn the trial court's attention to the pertinent provisions of Rule 16 and to the facts known and not known by the court (the government did not establish that Ulbricht requested expert disclosures from the government nor was the government shown to have provided expert disclosures).  The court would then have realized that Ulbricht was not required to provide expert disclosures.

Appellate counsel (who was also trial counsel) should have raised these arguments on appeal.  "[I]n exceptional circumstances, especially in criminal cases, appellate courts, in the public interest, may, of their own motion, notice errors to which no exception has been taken, if the errors are plain errors.  Rule 52(b) also allows "plain errors" to be raised by counsel for the first time on appeal, if the error affected substantial rights.  Rule 52(b), Fed.R.Crim.P.  A plain error raised for the first time on appeal should be corrected if it "seriously affects the fairness, integrity, or public reputation of judicial proceedings." *United States v. Young*, 470 U.S.1, 15

(1985), (*quoting United States v. Atkinson*, 297 U.S. 157, 160 (1936).

Appellate counsel's performance did not meet the standards of reasonable professional judgment and Ulbricht was denied a fair trial. "A fair trial is one in which evidence subject to adversarial testing is presented to an impartial tribunal for resolution of issues defined in advance of the proceeding." *Strickland*, 466 U.S. at 685. The right to effective assistance of counsel "plays a crucial role in this system, since access to counsel's skill and knowledge is necessary to accord defendants the ample opportunity to meet the case of the prosecution to which they are entitled." *Id.* (internal quotations omitted). Trial counsel failed to provide reasonably competent adversarial testing of the government's case.

Where, as in this case, the defendant's Sixth Amendment-guaranteed right to contest the government's case was denied due to government actions, errors by the trial court, and ineffective assistance of trial and appellate counsel, and where these errors pervaded the whole trial and the appeal, the errors led to fundamental unfairness, and require a new trial. *See Weaver v. Massachusetts*, 528 U.S. ____ (2017).

The government flouted the limitations on lay and expert testimony provided in Federal Rules of Evidence 701 and 702 and took advantage of trial counsel's failure to object and the trial court's failure to intervene, by eliciting extensive and improper expert testimony from lay witnesses. The government's case was built on a foundation of expert testimony from lay witnesses. The government misrepresented the provisions of Rule 16, Fed.R.Crim.P., in its successful effort to persuade the trial court to preclude testimony from the proposed defense experts. The trial court ignored its gatekeeping function under Rule 702, and overlooked the provisions of Rule 16 which determine when a defendant is required to make expert disclosures.

Trial counsel failed to object to improper expert testimony from lay witnesses, and failed to point out the provisions of Rule 16 which showed that Ulbricht was not required to provide expert disclosures. Appellate counsel failed to raise these errors as plain errors on appeal.

### CONCLUSION REGARDING CLAIM III

The net result of all of these actions and inactions, is that Ulbricht was denied what the Sixth Amendment guarantees - effective assistance of counsel and fundamental fairness, including his right to respond to the government's case.

As the Second Circuit panel recognized, this was a case built on technical evidence that was beyond the ken of the average juror. The government's case would have failed without the "voluminous and technically complex evidence" (expert testimony) provided by its lay witnesses. Without that improper testimony, the government's technically complex case would have been incomprehensible to Ulbricht's jury. A more favorable outcome would likely have resulted.

The accumulation of errors described above seriously affected the fairness, integrity, and the public reputation of Ulbricht's trial and appellate proceedings," and should be corrected. Ulbricht's convictions should be vacated and a new trial should be ordered.

**IV. Denial of the Right to Testify -** *Trial counsel violated Mr. Ulbricht's right to testify by forcing him to sacrifice his right to testify in order to preserve his right to assistance of counsel. The trial judge further interfered with Ulbricht's right to testify, by telling him he would have to make an application to her to be able to testify, if, after first telling her he was not going to testify, he later changed his mind about whether he wanted to testify.*

These errors constitute violation of the defendant's autonomy right to testify and they are

the result of trial and appellate counsel's failure to provide the reasonably professional - and loyal - assistance of counsel which the Sixth Amendment guarantees.  Appellate counsel, who was also trial counsel, failed to notice or object to the trial court's error at trial and failed to raise that issue on appeal as plain error, constituting ineffective assistance of trial and appellate counsel. Trial counsel could not have been expected to raise his own violation of Ulbricht's right to testify or to raise his own ineffectiveness on direct appeal, and he neglected to raise the trial court's error.  This is Ulbricht's first opportunity to establish the facts that support this claim and to raise this issue.

(a) Supporting facts -

Late in the trial proceedings, Ulbricht decided that since things were not going well, and since the government had painted a false picture of him, he would testify.  Decl. Ulbricht  ¶ 30. In a meeting with trial counsel in a holding cell just outside the trial courtroom, Ulbricht informed trial counsel that he wanted to testify.  Decl. Ulbricht  ¶ 31.  Trial counsel told Ulbricht that was a bad idea and if he insisted on testifying, trial counsel would have to withdraw as counsel and Ulbricht would then be on his own, and that Ulbricht would have to testify in narrative form.  Id. Trial counsel also informed Ulbricht that if he chose to proceed that way, it would make Ulbricht look bad to the judge, the jury, and the public.  Id.

Shortly after this discussion with trial counsel, Ulbricht was asked by the trial court whether he would testify.  He told the court that he had decided not to testify.  Decl. Ulbricht  ¶ 33.  Faced with a terrible choice, Ulbricht abandoned his right to testify because he could not imagine completing the trial without the assistance of his lawyer.  Decl. Ulbricht ¶¶ 32, 34.

When Ulbricht told the trial court that he had decided not to testify, the trial court then

informed him that if he changed his mind and decided he did want to testify, after seeing what his other witnesses accomplished, that he would have to "make an application to be able to testify," and that the judge was unlikely to preclude him.  Tr. 2040.  The trial court also said: "if you end up with a burning desire to testify or just any desire to testify, you will be allowed to do so."  Id.

Ulbricht did not know what an application for permission to testify was, and no one explained that to him.  He thought that an application would require him to provide a satisfactory explanation as to why he had changed his mind, and a possible review by the court of what he planned to say.  Decl. Ulbricht ¶ 35.  Ulbricht had witnessed trial counsel being asked to disclose what some defense witnesses would testify about, before they were allowed to testify, and he had observed the trial judge preclude both of the proposed defense expert witnesses, based on her finding problems with their proposed testimony and the inadequacy of disclosures regarding their proposed testimony.  Decl. Ulbricht ¶ 36.  Ulbricht had no idea what he would have to say to persuade the trial court to let him testify, if he did change his mind, nor what limits she would place on his testimony.  Id.

Ulbricht wanted to testify in order to provide the jury with a more honest picture of who he was.  Ulbricht Decl. ¶¶ 30, 32, 37, 38.  Ulbricht allowed the threat from trial counsel to withdraw, and the instruction that he would have to make an application to the court to be able to testify if he changed his mind, to finalize his decision not to testify.  Ulbricht Decl. ¶ 37.

Trial counsel did not object to the trial court's statement that Ulbricht would have to make an application to the court to be allowed to testify, nor did he raise that issue on appeal.  Reasonably competent counsel would not have threatened to withdraw when Ulbricht announced

69

his decision to testify.  Counsel loyal to Ulbricht would have protected his right to testify.

## ARGUMENT SUPPORTING CLAIM IV

To succeed on a claim of ineffective assistance of counsel, the petitioner [typically] must demonstrate both that: (1) "counsel's performance was deficient" – that is, that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment"; and (2) "the deficient performance prejudiced the defense [in] that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland v. Washington*, 466 U.S. 668, 687 (1984).

The Supreme Court has long recognized that a defendant has a fundamental right to testify in a criminal trial: "It is now accepted . . . that an accused has a right ... to testify on his own behalf." *Faretta v. California*, 422 U.S. 806, 819 (1975).  It is one of the rights that "are essential to due process of law in a fair adversary process." *Id*.

"[T]he right to be heard, which is so essential to due process in an adversary system of adjudication, [can] be vindicated only by affording a defendant an opportunity to testify before the factfinder." *Rock v. Arkansas,* 483 U.S. 44, 51 (1987).  "[L]ogically included in the accused's [Sixth Amendment] right to call witnesses whose testimony is material and favorable to his defense, is a right to testify himself, should he decide it is in his favor to do so." *Id.*, at 52 (internal quotations omitted).

In *Rock*, the Supreme Court emphasized that the right to testify is "even more fundamental to a personal defense than the right of self-representation. *Id*.  The right to testify is a necessary corollary to the Fifth Amendment right against compelled testimony. *Id*.  The *Rock* Court recalled the case of *Jones v. Barnes*, 463 U.S. 745, 751 (1983), where the Court had stated

that "the accused has the ultimate authority to make certain fundamental decisions regarding the case, as to whether to plead guilty, waive a jury, testify in his or her own behalf, or take an appeal." *Id.* Trial counsel's actions denied Ulbricht's right to make the fundamental decision whether to testify in his own behalf.

Recently, in *McCoy v. Louisiana*, the Supreme Court again observed that some decisions are reserved to the defendant, including "whether to plead guilty, waive the right to a jury trial, testify in one's own behalf, and forgo an appeal." *McCoy v. Louisiana*, 584 U.S. ____ (2018). These decisions *are not strategic decisions* to be made by counsel, *but fundamental decisions* made by the defendant as to "choices about what the client's objectives in fact are." *Id.* There is no language in either the Fifth or Sixth Amendment, that suggests that a defendant's exercise of his right to testify in his own behalf, is dependent on court permission. See Amendment V, Amendment VI, United States Constitution.

Trial counsel may have thought that preventing Ulbricht from testifying was sound strategy, but that was not a strategic decision for him to make. When the defendant decides what his objectives are, his lawyer [and the trial court] must abide by that decision. *McCoy,* (*citing* to U.S. Constitutional Amendment 6; and referring to ABA Model Rule of Professional Conduct 1.2(a) (2016)). The Sixth Amendment recognizes that the accused has the right to present his own defense and that counsel cannot override that right because counsel is merely his assistant. *See Faretta v. California*, 422 U.S. at 819.

The accused, not her lawyer, is the master of her own defense. *McCoy*, 584 U.S. at ___. (Internal quotations and citations omitted). Counsel provides assistance, but does not decide the fundamental objectives of the defendant. *Id.*

71

The right to testify is personal to the defendant and cannot be waived by the actions of defense counsel.  *United States v. Teague*, 953 F. 2d 1525, 1532 (11th Cir. 1992).  Trial counsel's threat to withdraw interfered with Ulbricht's decision and forced Ulbricht to give up his right to testify.  The trial court's statements to Ulbricht further interfered with his autonomy right to testify.

Where the defendant's autonomy, and not counsel's competence, is in issue, the Supreme Court does not rely on [traditional] ineffective assistance of counsel jurisprudence.  *McCoy*, 584 U.S. at ____.  Thus, no showing of prejudice is required where the defendant has shown that his protected autonomy right was violated.  *Id*.  Likewise, no showing is required that trial counsel's actions were inept or not reasonably competent.  Violation of the Sixth Amendment-protected right to testify "ranks as error of the kind . . . called "structural."  *See Id*.  When present, such errors are not subject to harmless error review.  *Id*.  Denial of a fundamental right, such as the right to self representation - or the right to testify - cannot be harmless.  *See Id*.  Such an error is structural error, not "simply a flaw in the trial process itself."  *See Id.*

Structural error involves violation of a right which "is not designed to protect the defendant from erroneous conviction but instead protects some other interest," such as "the fundamental legal principle that a defendant must be allowed to make his own choices about the proper way to protect his own liberty."  *Id.*, *citing Weaver v. Massachusetts*, 582 U.S. ____ (2017).  Ulbricht was denied those fundamental rights, both when trial counsel conceded his guilt (see **Claim I**, above), and when trial counsel denied his right to testify.

"No matter what counsel [or the trial judge] thinks best, <u>a defendant has the right to insist on a jury trial and to take the stand and testify in his own defense</u>.  *McCoy, supra,*

*(Alito, J. dissenting on other grounds), citing  Harris* v. *New York*, 401 U. S. 222, 225

(1971).  The trial judge had no authority to require any application from Ulbricht or to decide

whether he would be allowed to testify.

**Conclusion Regarding Claim IV (and also applying to Claim I)**

This proceeding represents Ulbricht's first opportunity to raise the issue that he was

denied his right to testify.  Ulbricht has now established the facts that show that he was

denied his right to testify (and his right to contest his guilt) by the actions of trial counsel

and, regarding Claim IV, by the actions of the trial court and, he is, therefore, entitled to a

new trial.  That is all that he is required to show. *See McCoy, supra.*

V.  **Ineffective assistance of counsel for failure to raise a challenge to the validity of the laptop search warrant pursuant to *Franks v. Delaware.*[8]**

*Trial counsel failed to investigate the veracity of the statements provided under*

*oath to obtain a warrant to seize and search Ulbricht's laptop computer, and failed to*

*investigate the pen-trap data provided in discovery by the government, which investigation*

*would have informed him that the government never disclosed the pen-trap data it relied*

*on in the laptop search warrant application, and which investigation would also have*

*shown that the government never provided in discovery any evidence that would have*

---

[8]  Mr. Ulbricht is currently pursuing discovery of the actual methods used by the FBI to electronically surveil his internet activity and track his location and movements in his residence, in a Motion for Discovery filed on June 12, 2019.  Doc. 343, 344, 345, and 346.  Ulbricht has reason to believe that the evidence he seeks to discover will reveal that the FBI's monitoring and surveillance of his internet activity, without a warrant and while he was in his residence, violated his Fourth Amendment rights, providing additional grounds for challenging the issuance of the laptop search warrant.  Ulbricht intends to pursue that additional factual basis for challenging the laptop search warrant, and for this claim of ineffective assistance of counsel, should the data and reports now hidden in three sealed magistrate's files, support that claim.

*supported several of its claims in the laptop search warrant application, and which would*
*have shown many false statements provided in the search warrant application.  Had trial*
*counsel adequately investigated these issues, he would have discovered a strong basis for*
*challenging the validity of the laptop search warrant, a challenge which likely would have*
*led to an order suppressing evidence obtained from the search of the laptop.  That*
*suppression order would likely have led to a better outcome at trial.*

(a) Supporting facts -

During its investigation into the Silk Road, the government obtained a search warrant
authorizing the seizure and search of Ulbricht's laptop computer.  See Doc. 47, Dratel Decl.
¶ 3(k).  The government also obtained several pen-trap orders, authorizing the installation of
several trap and trace and pen register devices to collect various types of data (henceforth
"PRTT data") from Ulbricht's home WiFi network.  Doc. 47, Dratel Decl. ¶¶ 3(c), 3(d), 3(e),
3(g), and 3(h).

The affidavit submitted in support of the laptop search warrant, relied upon evidence
allegedly collected pursuant to the pen-trap orders.  No such PRTT data (as claimed in the
laptop search warrant applications) has ever been produced in discovery, despite defense
requests - both before trial and post-conviction.

Results from only one pen-trap data collection effort were provided to the defense
prior to trial, despite the fact that the government apparently conducted pen-trap data
collection pursuant to five separate pen-trap orders.  Grant Decl. ¶ 8.  Post-conviction
counsel has requested from the USAO the data collected pursuant to four other pen-trap
orders, the orders identified by magistrate case numbers as 13 MAG 2228, a Sealed Order for

the Secret Service directed to Comcast, 13 MAG 2258 (the 9.19.13 wireless router pen for FBI), 13 MAG 2274 ((9.20.13.Router Pen for FBI), and 13 MAG 2275 (9.20.13.MAC Address Pen for FBI).  Grant Decl. ¶ 3.

Defendant Ulbricht did make a written discovery request to the government before trial for *any and all data obtained from pen registers judicially authorized in this case*. Doc (Docket #) 70-3, Par. 13, p. 3, 9/17/2014 letter from Joshua Dratel to AUSAs Serrin Turner and Timothy T. Howard. As stated above, the government only provided PRTT data from one data collection effort.

Defense counsel at trial ("trial counsel") may not have realized that he never received the PRTT data ("pen register data") that the search warrant applications referenced, and he may never have realized what PRTT data he had received, and what data he had not received. Grant Decl. ¶ 10.  It does not appear that trial counsel ever examined any PRTT data.  Id.

Post-conviction counsel has had an expert examine the PRTT data produced in discovery prior to trial, and that expert, Andrew Sayler, has determined that the  data produced appears to have been collected by internet service provider Comcast, and not by the FBI.  See generally, the attached Declaration of Andrew Sayler ("Sayler Decl.").  The government only produced to the defense the data collected pursuant to one pen-trap order, data in a file that the government called Ulbricht Home Comcast 67.169.90.28.  Grant Decl. ¶ 8.  The pen-trap order that led to that data collection appears to have been an order directing Comcast cooperation and authorized by the magistrate on September 17, 2013. Doc. 47, Dratel Decl. ¶ 3(d). That order authorized the use of pen register devices for the identification of source and destination IP addresses communicating with the Comcast

account, and did not authorize the collection of MAC addresses (used to identify devices on the local network) and did not authorize collection of routing data involving any data transmitted from or to any device identified by a MAC address, and that order did not seek data collection to monitor internet activity from Mr. Ulbricht's computer. *Id.*

Four other pen-trap orders were obtained in September 2013 for data collection regarding network activity at Ulbricht's residence, but no data was ever produced in discovery for any of those other four orders, yet the laptop search warrant cites the results from two of those orders, orders which did authorize the collection of MAC addresses, and which did authorize collection of data transmitted to or from devices associated with certain MAC addresses. Doc. 57, Tarbell Decl. ¶ 19. No PRTT data resulting from either of those two pen-trap orders was ever produced in discovery, despite the fact Tarbell stated in his declaration that the pen registers were used to collect the MAC addresses of the devices connecting to the router in Ulbricht's residence. Id.

Tarbell also offered his explanation, under oath, that "A media access control address, or "MAC address," is a unique identifier embedded in the hardware of devices with a network interface, which can be used to identify the device on any network the device connects to." Doc. 57, Tarbell Decl. fn 11. Mr. Sayler disagrees with Tarbell's statement that a MAC address is unique, and he disagrees with the value of a MAC address for identifying a device on a network. Sayler Decl. 15. Sayler stated that he knows from his own study and work that changing a MAC address is a trivial operation on most systems. He states that he published an article on that subject in 2011. Id.

Mr. Sayler also said he understood that when Ulbricht's laptop was seized, it was

running Ubuntu Linux, and that "on Ubuntu Linux it would have been a trivial step to change the MAC address of the laptop. Ulbricht could have collected other MAC addresses on any network he used, and then substituted other MAC addresses for his own. Similarly, other users on networks used by Ulbricht could have collected the MAC address from Ulbricht's computer, and used his MAC address as their own. . . The fact that MAC addresses can be easily changed is widely known."  Sayler Decl. ¶ 16.

The government stated that the pen registers were used to establish when Ulbricht logged onto and off of the internet, in support of their argument that the search warrant applications to search for information to allow comparison with online activity were reasonable requests seeking relevant and permissible information, not tracking information, referencing Doc. 57, Tarbell Decl. ¶ 21.  See Doc. 56, Memorandum of Law in Opposition to Defendant's Motion to Suppress, at p. 29 of 58.

Mr. Sayler stated that he has not seen any data that would allow the FBI to claim that it had collected data that showed any device communicated to or from Ulbricht's computer. Sayler Decl. ¶ 22.

There is new information which has become available since Ulbricht's trial that indicates that the government used electronic surveillance as part of its pen register data collection, to track and determine Ulbricht's precise location in his residence, and to determine when he "logged in" and out on his laptop, while Ulbricht was in his residence. This information is provided in the pages of the book titled "American Kingpin," a book published in May 2017, more than two years after the trial was concluded.

According to the author, Nick Bilton, his accounts are based, in part, on more than

250 hours spent with federal agents involved in the investigation,[9] including FBI special

agents he identifies [Christopher Tarbell and Thomas Kiernan], and including Homeland

Security Investigations special agent Jared Der-Yeghiayan. Bilton's account of FBI

surveillance correctly places Tarbell, Der-Yeghiayan, and Kiernan on site outside Ulbricht's

residence, a short time before Ulbricht's arrest.  He describes the actions and observations of

these agents.  His account is credible.  Grant Decl. ¶ 11.  Bilton describes the FBI

surveillance of Ulbricht in his residence:

"Jared [Der-Yeghiayan], Thom [Thomas Kiernan], and Brophy stood in front

of the café near Ross' house, listening to Tarbell . . . They knew that Ross was at

home because the FBI had an undercover SUV circling his block and monitoring the

Wi-Fi traffic (this is pen register and trap and trace activity).  The system they were

using (which should be described in the magistrates' files) would check the signal

strength of the Wi-Fi on his computer and then, by triangulating that data from three

different points they had captured as they drove around the block, they were able to

figure out Ross's exact location, which at this very moment was his bedroom, on the

third floor of his Monterey Boulevard apartment."

"American Kingpin" (hardcover edition) at 283.

Mr. Ulbricht has obtained expert assistance to examine the one set of PRTT data (in

pcap format) produced by the government pre-trial, and to examine the additional PRTT data

provided to post-conviction counsel by the government in February 2017, data that was

provided in csv format.  Grant Decl. ¶ 9.  That expert has also commented on various

---

[9]  "American Kingpin" at 324 .

statements made by Christopher Tarbell in his Declaration (Doc. 57) *and in the search warrant application*, and he has examined the search warrant materials the government used to obtain a search warrant authorizing the government to seize and search Mr. Ulbricht's laptop computer.  *Id.*

Mr. Ulbricht's expert, Andrew Sayler, is an expert in the field of computer and information security and computer systems, and holds a PhD and MS in Computer Science. Sayler Decl. ¶ 1.  Mr. Sayler examined the PRTT data (in the form of pcap files) that was provided to him by undersigned counsel, the same PRTT data that was provided to Ulbricht in discovery.  Sayler Decl. ¶ 3.

Mr. Sayler determined that the pcap files appeared to contain wide area network (WAN) traffic involving communications between a cable modem and other servers on the internet.  Sayler Decl. ¶ 4.  All of the files he examined showed bidirectional traffic, always involving a Comcast IP Address as one end of each exchange.  Id.  This type of traffic could be collected by Comcast outside of the home where the router was located, without needing to break any WiFi encryption or otherwise monitor the local-area network (LAN) in the home.  Id.

None of the pcap files examined appeared to contain any local-area network (LAN) or WiFi traffic internal to the house where the modem was located.  Sayler Decl.  ¶ 5.  None of the pcap files appeared to identify any of the MAC addresses internal to the home network or WiFi.  Id. at ¶ 6.  Those files showed only the external MAC address of the modem itself, plus MAC addresses of other Internet systems, most likely routers on the Comcast network. Id.  All of the internal MAC addresses (for devices using the home network) would have

been stripped by the home's router from the network traffic examined, before the traffic entered Comcast's network, where it appears that the data was collected.  Id.

According to Mr. Sayler, there is no way to determine from the network traffic (PRTT data) provided in discovery, who within the house originated that network traffic, and there is no way to determine whether that traffic involved a single individual or multiple individuals, absent additional information.  Sayler Decl.  ¶ 7.

Mr. Sayler examined two court orders authorizing PRTT data collection by Comcast, and states that the pcap files he was provided and examined, appear to correspond with what was authorized for collection in the court order *at 13 MAG 2236, an order dated 9/17/13, an order which references the IP Address 67.169.90.28; that was the IP address seen in the pcap files he examined.*  Sayler Decl. ¶ 8.

Mr. Sayler also examined additional PRTT data provided to him by post-conviction counsel, data in a csv (comma-separated value) format.  Sayler Decl. at ¶ 9.  That data and the data provided to him as pcap files, appears to have been all of the PRTT data that was ever provided to Mr. Ulbricht by the government.  Grant Decl. ¶ 12.  Mr. Sayler stated that the csv files appear to contain a processed version of the same pcap data he previously examined.  Sayler Decl. ¶ 9.

Mr. Sayler was provided with search warrant materials relating to the laptop search warrant obtained by the government.  Sayler Decl. at ¶ 10.  He reviewed those materials, including the affidavit provided *by Christopher W. Tarbell (the "affiant")* in support of the search warrant application.  Id.  *That affidavit described a "Subject Computer" as belonging to Mr. Ulbricht, and described that computer as containing a network adapter assigned a*

*certain MAC address, the address of 88-53-2E-9C-81-96. Id.*  Mr. Sayler was tasked with examining the affiant's sworn statements, to identify possible examples of inaccuracy or factual incorrectness, where possible.

Mr. Sayler describes the affiant as having stated that *the FBI used PRTT data collected from the LAN-side of the home's wireless router, to identify the MAC address associated with Ulbricht's laptop.  Sayler Decl. at ¶ 11.*

Mr. Sayler reviewed two pen register applications requested on 9/20/2013, where orders was obtained and identified as *13 MAG 2274 and 13 MAC 2275.*  Id., at ¶ 12.  The first pen-trap order authorized the collection of MAC addresses associated with communications sent to or from the home router, and the second order authorized the government to capture communications involving any computer associated with any of several different MAC addresses. Sayler Decl. ¶ 12; Doc. 47 ¶¶ 3(g), 3(h).

None of the data examined by Mr. Sayler showed any of the *(affidavit) described LAN-side data collection*, nor did it show the identification of any MAC address of any devices on the LAN network.  Sayler Decl. at ¶ 13.  Mr. Sayler saw no data which showed that any MAC addresses were collected by the government, *let alone the MAC address which the affiant claimed was associated with the Subject Computer.*  Id.  Mr. Sayler stated that the data he was provided does not show how the FBI obtained the MAC address of Mr. Ulbricht's computer.  Id.  FBI special agent Christopher Tarbell did state, under oath, that the FBI collected MAC addresses of the devices using the router at Ulbricht's residence.  Doc. 57, Tarbell Decl. ¶ 19.

*Mr. Sayler states that the affiant stated in his affidavit that a "MAC address" was a*

*unique identifier, allowing for identification of a device on a network.  Sayler Decl. at ¶ 14.*
Mr. Sayler disagreed with *that statement and* the statement in Tarbell's Decl. (Doc. 57,
Tarbell Decl. fn 11) regarding the uniqueness of a MAC address, and, therefore, disputed the
value of a MAC address for the purpose of identifying a device on a network.  Sayler Decl. at
¶ 15.  Mr. Sayler knows from his own study*,* and has published an article explaining that
changing a MAC address is a trivial operation on most systems. Id.  Mr. Sayler's article
appears in an article titled Network Anonymity Through "MAC Swapping". (An article
appearing in 2600: The Hacker Quarterly, Volume 28, Issue 3, Autumn 2011. Middle Island,
NY.)  Id.

Mr. Sayler observed in the trial transcript, that Mr. Ulbricht's laptop was running
Ubuntu Linux when the laptop was seized.  Sayler Decl., ¶ 16.  Knowing that, it would have
been a trivial step to change the MAC address of the laptop.  Id.  Ulbricht could have
substituted other MAC addresses for his own.  Id.  The MAC address associated with the
network adapter on Ulbricht's computer could also have been collected from his computer,
and used by other users on networks used by Ulbricht.  Id.

These facts - that a MAC address is not a unique identifier and can be easily changed
- are widely known.  Id.

Mr. Sayler also commented on *the affiant's statement that every computer device on*
*the Internet has an Internet protocol or 'IP' address assigned to it, and which can be sued to*
*determine the computer's physical location and, thereby, the location of its user.  Sayler*
*Decl. at ¶ 17.*  Mr. Sayler disagrees with that statement, explaining that *most devices connect*
*to the Internet via a router or gateway that performs network address translation, a process*

*that allow multiple devices to share a single public IP address.* Id., at ¶ 18.  Furthermore,

Mr. Sayler explains, *public IP addresses are not permanent, and are frequently changed by*

*an ISP provider such as Comcast.* Id.  These facts are also widely known and not new, and

contradict *what Tarbell stated in his affidavit.* Id.  According to Sayler, there are numerous

ways to change *a device's public IP address, such as an anonymity network like TOR, or a*

*virtual-private network (VPN).* Id.  Sayler observed that *the affiant, himself, in his affidavit,*

*described how the Tor network conceals true IP address of computer accessing Tor services,*

*and the affiant acknowledged that VPNs can be used to assign temporary and easily changed*

*IP addresses to devices.* Id.  Thus, observed Sayler, *the affiant contradicted his own*

*statement that an IP address was a reliable identifier of a user or his location.*  Id.

     Mr. Sayler also indicates his disagreement with *the affiant's statement that the first*

*six characters in a MAC address indicate that the Subject Computer is a Windows-based*

*computer.*  Sayler Decl. at ¶ 19.  Mr. Sayler - who is a computer security expert, with a PhD

in Computer Science - said that he has seen no data that would support that conclusion.  Id.

Mr. Sayler also disagrees that *the MAC address of a device reliably indicates what operating*

*system is running on a device.* Id.  Mr. Sayler observed that the MAC address provided in

the affidavit, corresponds to an Intel device, and he states that Intel devices routinely run

Windows, Linux, or other operating systems, and that this, too, is common knowledge in the

computer industry.  Id.

     Mr. Sayler takes exception to *the affiant's statement that he concluded that DPR was*

*using a Windows machine, from the fact that DPR had provided instructions to SR*

*administrators how to install Pidgin from an ".exe" file, a file common to Windows*

*machines.*  Sayler Decl. at ¶ 20.  Mr. Sayler states that the mere fact that DPR explained how to install a program on Windows, was no support for the affiant's conclusion that DPR was using Windows.  Mr. Sayler comments that he, himself, often provides directions to other how to install programs on Windows, despite the fact that he typically uses Linux**.**  Id.

Mr. Sayler commented on the affiant's statement that the Subject Computer was the only Windows-based computer detected from the Wireless Routing Pen.  Sayler Decl. at ¶ 21.  Mr. Sayler restates that he has seen no basis for the affiant to claim that he knew the Subject Computer was a Windows-based computer, that the affiant's reasoning was flawed and inaccurate.  Id.  Mr. Sayler also states that it was not surprising that Ulbricht's laptop was actually found to be running Ubuntu, and not Windows, given all of the flaws in the affidavit.  Id.

Mr. Sayler noted that the affiant said that the FBI collected data on 9/20/2013 that showed the Subject Computer connecting to the wireless router at the subject residence. Sayler Decl. at ¶ 22.  Mr. Sayler states that he has not seen any such data nor has he seen any basis for the FBI to claim that it had collected data that showed anything communicated to or from Ulbricht's computer.  Id.

Mr. Sayler completed his analysis by stating that he had many disagreements with the affiant's statements about supposed facts established in the search warrant affidavit, and that he has seen no data resulting from PRTT data collection that supports the affiant's claim to have uniquely identified Ulbricht's computer or any other computer present on the home's network**.**  Sayler Decl. at ¶ 23.

Mr. Sayler stated in his Declaration that he saw no PRTT data that would have

allowed the government to identify Ulbricht's computer or any other computer on the home network at the residence where Ulbricht was staying.  Id.

Trial counsel does not appear to have examined the PRTT data that was provided to the defense in discovery.  It also does not appear that he discovered the numerous false statements in the laptop search warrant application.  Nor does it appear that he was aware that the government had violated its discovery obligations because it never produced in discovery the PRTT data that it relied on in the laptop search warrant application.

Had trial counsel investigated these matters and presented a motion to suppress based on the false statements in the search warrant application, the outcome at trial would likely have been much more favorable for Ulbricht.

## ARGUMENT SUPPORTING CLAIM V

Mr. Ulbricht has now shown that numerous false and inaccurate statements were provided in the search warrant affidavits regarding the pen-trap data collection efforts, and he has shown that the government has never produced any data to support many of its factual assertions provided - under oath - in the search warrant affidavits.

"Under *Franks v. Delaware*, 438 U.S. 154 (1978), if a search warrant contains a false statement or omission, and the defendant makes a substantial preliminary showing (1) that the false statement or omission was knowingly and intentionally, or with reckless disregard for the truth, included by the government in a search warrant affidavit, (2) that the information was material, and (3) that with the affidavit's false or omitted material aside, the affidavit's remaining content is insufficient to establish probable cause, then the fruits of the search must be suppressed." *United States v. Bianco* , 998 F.2d 1112, 1125 (2d Cir. 1993)

(*citing Franks v. Delaware*, 438 U.S. at 155-56, 98 S.Ct. 2674 ) (emphasis added).

"[T]o suppress evidence obtained pursuant to an affidavit containing erroneous information, the defendant must show that: (1) the claimed inaccuracies or omissions are the result of the affiant's deliberate falsehood or reckless disregard for the truth; and (2) *the alleged falsehoods or omissions were necessary to the [issuing] judge's probable cause finding.*" *United States v. Rajaratnam*, 719 F.3d 139, 146 (2d Cir. 2013). (internal quotation marks omitted) (emphasis added).

The standards set out in *Franks* that will justify exclusion of evidence as a remedy for false statements made to get a warrant do not describe the exclusive remedy for law enforcement actions designed to deceive a court: a "court has 'inherent authority to regulate the administration of criminal justice among the parties before the bar' through its general suppression powers." *United States v. Cortina*, 630 F.2d 1207, 1214 (7th Cir. 1980) *(citing McNabb v. United States*, 318 U.S. 332 (1943)).

Ulbricht has pointed out numerous false statements that were made in the laptop search warrant application. Mr. Sayler has made clear that many of the false statements that he described are widely known to be false, and that other of the false statements are even contradicted by the government's own affiant, in other parts of his affidavit. The knowingly or recklessly false statements from the affiant that have been exposed in Mr. Sayler's declaration involve key factual statements that were obviously made for the purpose of persuading the magistrate that the government had identified Ulbricht as DPR through its PRTT data collection, and that the government had also used that data collection to uniquely identify Ulbricht's computer. A search warrant application based on false statements made

86

under oath, will not and did not establish probable cause.

Those false factual statements and fallacious reasoning provided in the search warrant application were used to justify conclusions which Mr. Sayler says are unreasonable and unsupported. Those false statements were key in convincing the magistrate that the government had established probable cause to justify issuance of the laptop [and residence] search warrants. Those numerous false statements identified by Mr. Sayler cast into doubt the truthfulness of all other factual statements provided by the affiant. If an affiant is willing to make numerous demonstrably false statements in order to obtain a search warrant, it is reasonable to assume that there may well be other, undiscovered false statements in his affidavit.

The affiant who intentionally, or knowingly and recklessly, provides numerous false statements to a magistrate under oath, has destroyed his own credibility with regard to any of his statements made under oath. Had the magistrate who issued the laptop and residence search warrants been made aware of, or otherwise had become aware of, the numerous false statements from the affiant that were provided in the affidavit, he would not likely have found anything the affiant said to be credible and, as a result, would not have found that probable cause was established to justify issuance of the laptop (or the residence) search warrant(s).

To succeed on a claim of ineffective assistance of counsel, the petitioner must demonstrate both that: (1) "counsel's performance was deficient" – that is, that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment"; and (2) "the deficient performance prejudiced the

defense [in] that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland v. Washington*, 466 U.S. 668, 687 (1984).

"Strategic choices made after less than complete investigation are reasonable . . . to the extent that reasonable professional judgments support the limitations on investigation." *Id.*, at 690-691.  Counsel has a duty to make reasonable investigations.  *Id*.  Complete neglect of the duty to investigate, as occurred here, is not the exercise of reasonable professional judgment.

Trial counsel failed to investigate and discover the false statements in the laptop search warrant application, and he failed to investigate and discover that the government never produced in discovery the pen register and trap and trace data that it claimed to have collected, data collection that it relied on in obtaining the laptop search warrant. Had trial counsel discovered these matters, and presented a challenge to the issuance of the laptop search warrant based on these discoveries in the form of a motion to suppress, the trial court would likely have found the laptop search warrant to be invalid.  That would have required suppression of all evidence found on the laptop.

Trial counsel neglected to investigate the pen register and trap and trace ("PRTT") data provided by the government, thus failed to realize that the government never produced in discovery (despite a defense request for all of the pen-trap data) the data that it had relied on, in part, to get the laptop search warrant.  Trial counsel failed to call the trial court's attention to the government's discovery violation and failed to request access to the sealed magistrates' files which should contain the data that was withheld from discovery.  Had trial counsel sought and obtained that data, trial counsel would have discovered whether the

88

government's methods for collecting the PRTT data, violated Ulbricht's Fourth Amendment rights.

Trial counsel's complete failure to investigate the veracity of the sworn statements in the laptop search warrant application, was a result of neglect, not of reasonable professional judgment. Trial counsel's failure to examine the PRTT data he had been provided, and his failure to notice that the PRTT data he was provided did not include the PRTT data that the FBI claimed it had collected, was also a result of neglect, not of sound judgment. The FBI told the magistrate from whom they sought the laptop search warrant, that they had confirmed that Ulbricht was DPR, through PRTT data they had collected and used to monitor Ulbricht's internet activity. Trial counsel should have pursued the government's failure to provide that data as a discovery violation, and requested that the government be ordered to produce the data. If the government could not or would not produce that data, that should be regarded as additional evidence that the laptop search warrant was obtained through false and misleading statements. If the data collected by the FBI is contained in the sealed magistrate's files, and if those files show the laptop search warrant contains false statements about what data was collected, or that those files show the FBI's data collection invaded the privacy of Ulbricht's residence, thus violated Ulbricht's Fourth Amendment rights, that will strengthen Ulbricht's argument that the search warrant was obtained using false statements or in reliance on illegally obtained evidence. *See Kyllo v. United States*, 533 U.S. 27, 40 (2001) ("Where . . . the government uses a device to explore details of the home that would previously have been unknowable without physical intrusion, the surveillance is a "search" and is presumptively unreasonable without a warrant"). If the sealed files show a Fourth

Amendment violation, then facts concerning trial counsel's failure to investigate and discover that Fourth Amendment violation, a violation which should have led to suppression of the evidence obtained from the seizure and search of Ulbricht's laptop computer, will be added to this claim.

To justify a finding of ineffective assistance of counsel, the defendant must show that there is *a reasonable probability* that counsel's deficient performance prejudiced the defense, *i.e.*, led to a less favorable outcome.  *See Strickland*, 466 U.S. at 694.

Had the government been unable to use at trial the evidence that it claimed to have found on the laptop, the government would have been deprived of important evidence such as: evidence of bitcoin addresses on the laptop; evidence of 144,000 bitcoin stored on the laptop; evidence of Ulbricht's journal, in which he supposedly kept track of the history of his creation of the Silk Road; evidence of many of DPR's chats and chat logs found on the laptop See the extensive testimony of FBI Special Agent Thomas Kiernan regarding what he claimed to have found on the laptop, Tr. 891-1021.  Had the government been unable to use evidence found on the laptop, the government would have been hard-pressed to prove that Ulbricht was DPR.  Had the government been unable to use evidence found on the laptop, neither FBI SA Kiernan or FBI SA Beeson would have had any relevant testimony.

Had the government been unable to use at trial the evidence it found on the laptop, the government would not have been able to have FBI Special Agent Ilwhan Yum testify about how he tracked bitcoin from the Silk Road server to Ulbricht's laptop.  Tr. 1679-1699; 1723-1746.

90

**Conclusion Regarding Claim V**

Trial counsel's failure to notice and investigate the discovery violations and the false statements in the laptop search warrant application, and his failure to present a motion to suppress based on these issues, were based on neglect and were not the reasonably competent assistance of counsel guaranteed by the Sixth Amendment. Had he presented such a motion, the evidence supposedly obtained from the laptop would likely have been suppressed and the government's case would have been dramatically weaker. There is a reasonable probability that the outcome of the trial would have been more favorable to Ulbricht. Ulbricht is entitled to a new trial.

**VI. Ineffective assistance of trial counsel, resulting from trial counsel's failure to adequately advise Ulbricht regarding the risks involved in the choice he faced between pleading guilty and going to trial. Trial counsel failed to advise Ulbricht that his chances of success at trial were minuscule, and on the likelihood that he would be sentenced more harshly if he went to trial and was convicted, than if he pled guilty to the charges in the complaint, or even if he pled guilty to the indictment or to the supeseding indictment.**

Supporting facts -

When the criminal complaint was filed in this case, Ulbricht stood accused of three very serious federal offenses, (Doc. 1), for which the evidence against Ulbricht was strong. Ulbricht was arrested with his laptop computer in hand and he saw that his computer was seized and searched. See Tr. 850 - 860. The laptop contained Ulbricht's journal, chat records, and other incriminating evidence. Tr. 910 - 950, etc. Prior to filing an indictment in

91

this case, the government presented Ulbricht with an opportunity to make an open plea and avoid additional charges. Ulbricht Decl. ¶ 7.  Trial counsel advised Ulbricht to reject the plea offer. Id.  He told Ulbricht that losing at trial would produce the same sentence exposure under the sentencing guidelines as accepting responsibility and pleading guilty prior to trial, and that Ulbricht should take his chances at trial rather than accepting the government's plea offer. *Id.*

Counsel failed to explain that pleading guilty before trial typically leads to a better chance at a downward variance from the sentencing guidelines-recommended sentence, whereas, proceeding to trial was likely to result in a harsher sentence, should he be convicted.  See Ulbricht Decl. ¶ 11.

Believing that he had nothing to lose and possibly something to gain by putting the government to the test of meeting its burden of proof at trial, Ulbricht accepted the advice of trial counsel and rejected the government's offer. *Id.* at ¶ 10.  Subsequent to Ulbricht's rejection of that offer, the government obtained an indictment against Ulbricht that added a count of engaging in a continuing criminal enterprise. Doc. 12. That count increased the mandatory minimum sentence that Ulbricht faced, from 10 years to 20 years.  Three additional counts were added later in a superseding indictment. Doc. 52. The jury found Ulbricht guilty on *all seven* counts of the superseding indictment. Doc. 183.

Trial counsel failed to adequately explain to Ulbricht how sentencing works in a federal case, and failed to explain that the district court has significant discretion in determining an appropriate sentence, and that he was much more likely to receive some leniency if he pled guilty, than if he chose to go to trial and was convicted at trial.  Trial

counsel, when advising Ulbricht to reject the government's initial offer, failed to explain to Ulbricht the likely result of a "trial penalty," a harsher penalty if he went to trial and was convicted.  Ulbricht Decl. ¶¶ 11-12.  Trial counsel also failed to advise Ulbricht on his very slim chances of winning at trial.  Ulbricht Decl. ¶ 12.

Had Ulbricht been advised that he stood almost no chance of winning at trial, but that he stood a good chance of avoiding a life sentence if he pled guilty and provided mitigating evidence to support a lesser sentence, he would have plead guilty. Ulbricht Decl. ¶¶ 11, 12. Ulbricht would have pled guilty, had he been advised that in more than 97% of federal criminal cases, attorneys and their clients choose to plead guilty because they know they are likely to lose at trial, and because they know that their sentence will be worse if they are convicted at trial. Id.  Had Ulbricht been advised that his chances of being acquitted at trial were less than 1%, or just that his chances of winning were terrible, Ulbricht would have pled guilty.  See Ulbricht Decl. ¶ 12.

Ulbricht rejected the initial plea offer because trial counsel advised him that he risked nothing by proceeding to trial, and that he stood a chance of acquittal on some of the charges. See Ulbricht Decl. ¶ 7.  Ulbricht rejected that offer and soon faced additional and more serious charges in the first indictment.  See Doc. 12.  He was convicted on all charges and received the harshest sentence the law allowed - two concurrent life sentences.  See Doc. 169 (the Judgment).

## ARGUMENT SUPPORTING CLAIM VI

The Sixth Amendment guarantees effective assistance at all critical stages of a criminal trial proceeding. *Montejo v. Louisiana,* 556 U.S. 778, 786 (2009). This right to

effective assistance necessarily extends to the plea-bargaining process. *Missouri v. Frye,* 566 U.S. 134, 141 (2012). "If a plea bargain has been offered, a defendant has the right to effective assistance of counsel in considering whether to accept it." *Lafler v. Cooper,* 566 U.S. 156, 168 (2012). "If that right is denied, prejudice can be shown if the loss of the plea opportunity led to a trial resulting in a conviction on more serious charges or the imposition of a more severe sentence." *Id.*

In order to prove ineffective assistance of counsel at the plea stage, a petitioner must show that: (1) but for the ineffective advice of counsel there is *a reasonable probability* that the plea offer would have been accepted by the defendant and presented to the court, (2) that the court would have accepted its terms, and (3) the conviction or sentence, or both, under the offer's terms would have been less severe than under the judgment and sentence that in fact were imposed." *Id.* at 164 (emphasis added). Had Ulbricht accepted the original offer, he would have plead to fewer charges and the likelihood is that he would have received a lesser sentence.  Mr. Ulbricht has made clear that if he had been advised of the odds against winning acquittal, and of the fact that 97% of defendants choose to plead rather than go to trial, and of the likelihood of being penalized if he went to trial and was convicted, he would have chosen to plead guilty.  The court would have likely accepted his plea since there was no reason not to.  The record reveals that Ulbricht can satisfy *Lafler*'s requirements on each point.

It has for many years been the opinion of many in the criminal justice system that defendants who go to trial and put the government to its proof, but are convicted, are likely to be sentenced more harshly than defendants who plead guilty before trial. *See* Andrew

94

Chongseh Kim, *Underestimating the Trial Penalty: An Empirical Analysis of the Federal Trial Penalty and Critique of the Abrams Study*, 84 Miss. L. J. 1195 (2015) (author claims that the average federal defendant who goes to trial receives a sentence 64% longer than if he had instead plead guilty); *see also* National Association of Criminal Defense Lawyers, The Trial Penalty: The Sixth Amendment Right to Trial on the Verge of Extinction and How to Save It (2018) (The trial penalty is now so severe and pervasive that it has virtually eliminated the constitutional right to a trial).

Trial counsel failed to explain to Ulbricht the reality he faced: "the trial penalty has made the government the most powerful player in the criminal justice system.  Although the defendant is cloaked in the presumption of innocence and the prosecutor theoretically has the burden of proof . . .  the mere decision to charge triggers a domino effect making a guilty plea the only rational choice in most cases." *Id.*  A recent NACDL study shows that defendants convicted of drug trafficking charges at trial, are likely to receive a sentence nearly triple the average sentence received by those who plead guilty.  *See Id.*

It was reckless of trial counsel to recommend to Ulbricht that he reject the government's plea offer before he assessed Ulbricht's chances of winning at trial, and without advising Ulbricht of his chances of winning at trial.  Trial counsel failed to advise Ulbricht that 97% of all federal criminal defendants plead guilty because they consider a plea to be a better option than going to trial.  Ulbricht Decl. ¶ 12.  Trial counsel failed to advise Ulbricht that fewer than 1% of those charged with federal felonies, are acquitted at trial.  Id. Trial counsel's recklessness in failing to assess and advise Ulbricht of the strength of the government's case, coupled with trial counsel's failure to explain the trial penalty to Ulbricht

and its likely effect on him if he rejected the plea offer, constitute a failure to provide the reasonably effective assistance of counsel guaranteed by the Sixth Amendment.

Ulbricht relied on trial counsel's recommendation that he reject the government's offer and go to trial, and he paid the maximum possible penalty: he was convicted at trial and sentenced to two concurrent life sentences. Had trial counsel explained to Ulbricht - at any time prior to trial - the likely application of a trial penalty should he go to trial and lose, and had trial counsel assessed the strength of the government's case and advised Ulbricht on the weakness of his defense and the overwhelming likelihood of his conviction at trial, Ulbricht would have accepted the plea offer and he would likely have received a less severe sentence.

### Conclusion Regarding Claim VI

Trial counsel's ineffective assistance resulted in Ulbricht rejecting any plea and likely resulted in Ulbricht being sentenced more harshly after being convicted at trial than he would have been had he pled guilty to the complaint or to the indictment or to the superseding indictment. The court should place the parties back in the position before Ulbricht declined to plead guilty, i.e., (1) order the government to reoffer to Ulbricht the plea offer where he would be allowed to plead guilty to the charges in the complaint, or (2) allow Ulbricht to consider whether he will plead guilty to the indictment or to the superseding indictment. If Ulbricht accepts the government offer or otherwise chooses to plead guilty, the district court can then exercise its discretion in fashioning an appropriate remedy. *See Lafler* at 174.

### RELIEF REQUESTED ON CLAIMS I - VI

For all the reasons provided above, on Claims I - V, above, Mr. Ulbricht requests that his convictions and sentence be vacated and a new trial ordered. On Claim VI, Mr. Ulbricht

requests that his convictions and sentence be vacated, and that the government be ordered to re-offer the plea deal that Ulbricht was offered but rejected, and that Ulbricht also be allowed to consider whether he will plead guilty to the indictment or to the superseding indictment, and that the Court grant such other relief as is deemed just and equitable.

I, Paul Grant, am authorized to sign this motion on behalf of Petitioner and I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Signed on:  June 28, 2019

/s/ Paul Grant
Paul Grant, Counsel for Petitioner Ross
Ulbricht, who is incarcerated and
unavailable to sign this Motion.

97